# No. 16-2119(L)

## 16-2134(con), 16-2098(con)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

—————————————

LINDE,

*Plaintiff-Appellee*,

v.

ARAB BANK, PLC,

*Defendant-Appellant.*

—————————————

On Appeal from the United States District Court for the
Eastern District of New York, Nos. 04-cv-2799, 04-cv-5449, 04-cv-5564

—————————————

**SPECIAL APPENDIX
VOLUME I OF I: SPA1-SPA241**

—————————————

JONATHAN D. SIEGFRIED
KEVIN WALSH
DOUGLAS W. MATEYASCHUK
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500

PAUL D. CLEMENT
 *Counsel of Record*
MICHAEL H. MCGINLEY
NICHOLAS T. MATICH
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellant Arab Bank, PLC*

October 21, 2016

**Special Appendix**
**Table of Contents**

District Court's Opinion & Order, Denying in Part, and Granting in Part, Defendant's Motion to Dismiss the *Linde*, *Litle* and *Coulter* Complaints, dated Sept. 2, 2005 .......................................................SPA1-21

District Court's Order, Denying Defendant's Motion for Certification of the September 2, 2005 Opinion & Order Denying in Part, and Granting in Part, Defendant's Motion to Dismiss the *Linde*, *Litle* and *Coulter* Complaints, dated July 21, 2006 ....................................................SPA22-23

District Court's Opinion & Order, Denying in Part, and Granting in Part, Defendant's Motion to Dismiss the *Almog* and *Afriat-Kurtzer* Complaints, dated Jan. 29, 2007.....................................................SPA24-62

Magistrate's Report & Recommendation, Recommending Sanctions Against Defendant for Non-Production of Documents and Information Subject to Privacy Laws of Other Countries, dated June 1, 2009 ...............SPA63-74

Magistrate's Order, Modifying Report & Recommendation, Recommending Sanctions Against Defendant for Non-Production of Documents and Information Subject to Privacy Laws of Other Countries, dated June 18, 2009 ........................................................................................SPA75-77

District Court's Opinion & Order, Imposing Sanctions Against Defendant for Non-Production of Documents and Information Subject to Privacy Laws of Other Countries ("Sanctions Order"), dated July 12, 2010.........................................................................SPA78-97

District Court's Order, Denying Defendant's Motion for Reconsideration of the Sanctions Order, dated Oct. 5, 2010.......................................SPA97-101

District Court's Order, Denying Defendant's Motion for Certification of the Sanctions Order, dated Oct. 5, 2010...................................................SPA102

District Court's Bench Ruling, Denying in Part, and Granting in Part,
    Defendant's Motion for Summary Judgment, dated
    Apr. 24, 2013 ................................................................................SPA103-12

District Court's Opinion & Order, Denying Defendant's Motion to Submit
    Evidence of Foreign Law, dated May 14, 2013 ..........................SPA113-16

District Court's Opinion & Order, Imposing $1,332,268.50 Discovery
    Sanction Against Defendant for Non-Production of Documents and
    Information Subject to Privacy Laws of Other Countries, dated June
    17, 2013 .........................................................................................SPA117-22

District Court's Opinion & Order, Denying Defendant's Motion for Partial
    Reconsideration of the Summary Judgment Ruling, or, in the
    Alternative, for Certification of that Ruling,
    dated June 18, 2013 ......................................................................SPA123-24

District Court's Bench Ruling, Denying Defendant's Motion for
    Reconsideration of Sanctions Order in Light of the Views
    Expressed by the United States, dated July 14, 2014 ...................SPA125-27

District Court's Charge to the Jury, dated Sept. 18, 2014 .......................SPA128-60

Jury Verdict, dated Sept. 22, 2014 ...........................................................SPA161-64

Jury Verdict, dated Sept. 22, 2014 ...........................................................SPA161-64

District Court's Opinion & Order, Granting in Part, and Denying in Part,
    Defendant's Post-Trial Motions for Judgment as a Matter of Law, a
    New Trial, or, in the Alternative, Certification for Interlocutory
    Appeal, dated Apr. 8, 2015 ..........................................................SPA165-228

Stipulation to Enter Final Judgment Pursuant to Rule 54(b) for Sixteen of the
    Seventeen Plaintiffs in the Bellwether Trial,
    dated May 24, 2106 ......................................................................SPA229-33

Final Judgment Pursuant to Fed. R. Civ. P. 54(b),
    dated May 24, 2016 ......................................................................SPA234-37

Notice of Appeal of Defendant Arab Bank PLC, dated
June 22, 2016 .................................................................................SPA238-41

and to consider the "reality" of the relationship. While the Court agrees that it is essential to perform a critical analysis of the relationship between the private party and the government, the Court cannot disregard the evidence or make assumptions about the "reality" of the relationship that are not supported by the evidence. In *Knoll,* there was testimony that the government agent encouraged the private party after learning of the surreptitious search by making statements such as "get me more information," "you've got to turn more over," and "[i]f there's stuff out there, you've got to turn it over." *Knoll,* 16 F.3d at 1320. The Second Circuit reasoned that these statements, made prior to the carrying out the private search, may have tacitly approved such conduct.

In this case there was absolutely no evidence that the government directed, encouraged, or tacitly approved of Zambaras' actions. Both Zambaras and Special Agent Peiscop–Grau testified that she told Zambaras that he was not a government agent and was not authorized to take documents from PLS. After their first meeting, Special Agent Peiscop–Grau did not encourage Zambaras to obtain additional documents. Rather, she repeatedly admonished Zambaras for taking the materials. Also, instead of asking Zambaras to seize additional evidence, Special Agent Peiscop–Grau immediately sought advice from an Assistant United States Attorney and a search warrant from the court. In sum, there is absolutely no evidence in the record that the government directed or tacitly approved the search and seizure executed by Zambaras. Therefore, the Court finds that Judge Orenstein correctly determined that Zambaras was not acting as a government agent in any way.

After carefully reviewing Judge Orenstein's well-reasoned and thorough Report, the Court concludes that his Report is certainly not clearly erroneous. Judge Orenstein applied the proper standard and reasonably applied the facts obtained from all the testimony given at the suppression hearing to the law. Accordingly, the Court adopts Judge Orenstein's Report and denies the motion to suppress the evidence.

## III.   CONCLUSION

For all the foregoing reasons, it is hereby

**ORDERED**, that the Court adopts Judge Orenstein's Report in its entirety; and it is further

**ORDERED**, that the defendants motion to suppress the evidence obtained by Zambaras is denied.

**SO ORDERED.**



**Courtney LINDE, et al., Plaintiffs,**

v.

**ARAB BANK, PLC, Defendant.**

**Philip Litle, et al., Plaintiffs,**

v.

**Arab Bank, PLC, Defendant.**

**Robert L. Coulter, Sr., et al., Plaintiffs,**

v.

**Arab Bank, PLC, Defendant.**

**Nos. 04 CV 2799(NG)(VVP), 04 CV 5449(NG)(VVP), 05 CV 365(NG)(VVP).**

United States District Court, E.D. New York.

Sept. 2, 2005.

**Background:**  United States citizens, and estates, survivors, and heirs of United

States citizens, who had been victims of terrorist attacks in Israel, brought actions against Jordanian bank, alleging that bank had provided financial services and supports to agents of terrorist organization, and asserting claims under Anti-Terrorism Act (ATA) and for intentional infliction of emotional distress. Following denial of preliminary injunction, 353 F.Supp.2d 327, bank moved to dismiss.

**Holdings:** The District Court, Gershon, J., held that:

(1) victims adequately alleged that they were injured "by reason of" acts of international terrorism, as required to state cause of action under ATA;

(2) aiding and abetting liability is available under ATA;

(3) civil conspiracy liability is available under ATA;

(4) complaint sufficiently alleged secondary liability under "common plan" theory;

(5) complaint sufficiently alleged secondary liability under theory that bank knew that another's conduct constituted breach of duty and gave substantial assistance or encouragement to the other;

(6) victims sufficiently alleged secondary liability under theory that bank gave substantial assistance to another in accomplishing tortious result and that bank's own conduct, separately considered, constituted breach of duty to the third person;

(7) bank was not required to have specific intent to commit specific acts of terrorism in order to be liable under ATA's material support and financing provisions;

(8) complaint sufficiently alleged that bank knew that funds in question were to be used for conducting acts of international terrorism;

(9) ATA provision setting forth cause of action for any United States national injured by reason of act of international terrorism is not limited to physical injuries; and

(10) bank's alleged acts, if proven, did not constitute intentional infliction of emotional distress.

Motions granted in part and denied in part.

## 1. War and National Emergency ⬅50

Liberal pleading standard of rule requiring only "short and plain statement of the claim showing that the pleader is entitled to relief" would be applied to Anti-Terrorism Act (ATA) action for damages brought against Jordanian bank by victims of terrorist acts, and, thus, victims were not required to plead specific facts from which its knowledge of alleged wrongful acts could be inferred. 18 U.S.C.A. § 2333; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

## 2. War and National Emergency ⬅50

To state a claim under the Anti-Terrorism Act (ATA) section providing for an action for civil damages by a United States national injured by reason of an act of international terrorism, plaintiffs must allege that they were injured "by reason of" a crime that constitutes an act of international terrorism, as defined by the ATA. 18 U.S.C.A. §§ 2331(1), 2333(a).

## 3. War and National Emergency ⬅50

Complaint against Jordanian bank by victims of terrorist attacks in Israel, alleging that bank provided financial services and assistance to terrorists, and that violent acts of murder, attempt or conspiracy to commit murder, and physical violence resulting in serious bodily injury gave rise to their injuries, adequately alleged that they were injured "by reason of" acts of

international terrorism, as required to state cause of action under Anti-Terrorism Act (ATA), notwithstanding lack of allegations that victims were injured by reason of bank's conduct. 18 U.S.C.A. §§ 2331(1)(A-C), 2333(a); Fed.Rules Civ. Proc.Rule 12(b)(6), 28 U.S.C.A.

### 4. War and National Emergency ⊂⊃50

Violations of Anti-Terrorism Act (ATA) provisions that make it a crime to provide material support to terrorists and to designated foreign terrorist organizations are included in the ATA's broad definition of "international terrorism," as are violations of the provision that prohibits the financing of terrorism, and, thus, violations of these provisions can serve as predicate crimes giving rise to civil liability under the ATA. 18 U.S.C.A. §§ 2331(1), 2339A, 2339B.

    See publication Words and Phrases for other judicial constructions and definitions.

### 5. War and National Emergency ⊂⊃50

Aiding and abetting liability is available under the Anti-Terrorism Act (ATA). 18 U.S.C.A. § 2333.

### 6. Conspiracy ⊂⊃1.1

Civil conspiracy liability is available under the Anti-Terrorism Act (ATA). 18 U.S.C.A. § 2333.

### 7. War and National Emergency ⊂⊃50

Complaint by victims of terrorist acts in Israel, alleging that Jordanian bank knowingly and intentionally agreed to provide services to organizations it knew to be terrorist, and that victims were injured by overt act done in furtherance of the common scheme, sufficiently alleged secondary liability under "common plan" theory, for purposes of determining whether victims stated cause of action for conspiracy under Anti-Terrorism Act (ATA), notwithstanding their failure to allege that bank planned, intended, or knew about the particular act that injured a plaintiff. 18

U.S.C.A. § 2332(b); Fed.Rules Civ.Proc. Rule 12(b)(6), 28 U.S.C.A.; Restatement (Second) of Torts § 876(a).

### 8. War and National Emergency ⊂⊃50

Complaint by victims of terrorist acts in Israel, alleging that financial services provided to terrorist organizations by Jordanian bank, and administration of death and dismemberment benefit plan for families of martyrs, provided substantial assistance to international terrorism, sufficiently alleged secondary liability, for purposes of determining whether victims stated aiding and abetting cause of action under Anti-Terrorism Act (ATA), under theory that bank knew that another's conduct constituted breach of duty and gave substantial assistance or encouragement to the other. 18 U.S.C.A. § 2333; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.; Restatement (Second) of Torts § 876(b).

### 9. War and National Emergency ⊂⊃50

Complaint by victims of terrorist acts in Israel, alleging that Jordanian bank breached independent duties and committed criminal acts in violation of material support and financing provisions of Anti-Terrorism Act (ATA), sufficiently alleged secondary liability, for purposes of determining whether victims stated cause of action under those provisions, pursuant to theory that bank gave substantial assistance to another in accomplishing tortious result and that bank's own conduct, separately considered, constituted breach of duty to the third person. 18 U.S.C.A. §§ 2339A, 2339B, 2339C; Fed.Rules Civ. Proc.Rule 12(b)(6), 28 U.S.C.A.; Restatement (Second) of Torts § 876(c).

### 10. War and National Emergency ⊂⊃50

Victims of terrorist attacks in Israel were not required to allege sufficient facts to establish evidentiary basis for their allegations of knowledge and intent in order to state cause of action in complaint against

Jordanian bank under Anti-Terrorism Act (ATA), inasmuch as they were not required to plead more than requisite knowledge and intent. 18 U.S.C.A. § 2333; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**11. War and National Emergency ⬅50**

Jordanian bank, which allegedly provided financial services to terrorist organizations, was not required to have specific intent to commit specific acts of terrorism in order to be liable to victims of terrorist attacks in Israel under material support and financing provisions of Anti-Terrorism Act (ATA). 18 U.S.C.A. §§ 2339A, 2339B, 2339C; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**12. War and National Emergency ⬅50**

Victims of terrorist attacks in Israel were not required to allege involvement of upper level management employees in misconduct alleged in order to state cause of action in complaint against Jordanian bank under Anti-Terrorism Act (ATA), based on bank's alleged provision of financial services to terrorist organizations. 18 U.S.C.A. § 2333; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**13. War and National Emergency ⬅50**

Complaint, stating that Jordanian bank provided and collected funds "with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians," sufficiently alleged that bank knew that funds it received as deposits and transmitted to various organizations were to be used for conducting acts of international terrorism, as required to state cause of action under Anti-Terrorism Act (ATA) provision prohibiting financing of terrorism. 18 U.S.C.A. § 2339C; Fed. Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**14. War and National Emergency ⬅50**

The scope of the Anti-Terrorism Act (ATA) provision setting forth a cause of action for any United States national injured by reason of an act of international terrorism is not limited to physical injuries, and it extends to United States nationals suing for such things as emotional distress and loss of consortium in connection with acts perpetrated against their family members who were not United States nationals. 18 U.S.C.A. § 2333(a).

**15. War and National Emergency ⬅50**

Violations of the Anti-Terrorism Act (ATA) provision requiring a financial institution to retain and report any funds under its control in which it knows a foreign terrorist organization has an interest do not, in and of themselves, constitute material support for foreign terrorist organizations in violation of the ATA. 18 U.S.C.A. § 2339B(a)(1, 2).

**16. Damages ⬅57.21**

Under New York law, the tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.

**17. Damages ⬅57.22**

Violent terrorist attacks qualify as the type of conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community, and such attacks thus come within the ambit of the tort of intentional infliction of emotional distress under New York law. Restatement (Second) of Torts, § 46 comment.

**18. Damages ⬅57.29**

Jordanian bank's alleged acts of providing financial services to international terrorists, resulting in deaths of plaintiffs' family members in Israel, if proven, was

too far removed from terrorists' suicide attacks to constitute intentional infliction of emotional distress under New York law. Restatement (Second) of Torts, § 46 comment.

————

Mark S. Werbner, Sayles Werbner, Dallas, TX, Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY, Gary M. Osen, Osen & Associates, LLC, Oradell, NJ, Joshua D. Glatter, Wechsler Harwood LLP, New York, NY, Robert A. Swift, Steven M. Steingard, Kohn, Swift & Graf, PC, Philadelphia, PA, for Plaintiffs.

Kevin Walsh, Leboeuf Lamb Greene & Macrae LLP, New York, NY, for Defendant.

### OPINION & ORDER

GERSHON, District Judge.

Plaintiffs in the above captioned suits are United States citizens, or their estates, survivors, and heirs, who have been victims of terrorist attacks in Israel since September 2000. The sole defendant in all three cases, and in four additional suits filed by separate groups of plaintiffs,[1] is a financial institution headquartered in Jordan with a federally licensed and regulated branch office in New York. Plaintiffs bring several claims under the civil remedy provision of the Anti–Terrorism Act ("ATA"), 18 U.S.C. § 2333, and bring common law

claims for intentional infliction of emotional distress. The Linde plaintiffs' motion for a preliminary injunction, which was premised on the fifth claim for relief in the Linde First Amended Complaint, was denied on November 29, 2004. *See Linde v. Arab Bank, PLC*, 353 F.Supp.2d 327 (E.D.N.Y.2004). Defendant now brings motions to dismiss the complaints in these three suits under Rule 12(b)(6) of the Federal Rules of Civil Procedure and on *forum non conveniens* grounds. (The Linde plaintiffs and the Litle plaintiffs have each filed a First Amended Complaint, while the Coulter plaintiffs have filed only a complaint. For purposes of this opinion, all three documents will be referred to simply as "complaints.")

### FACTUAL ALLEGATIONS AND CLAIMS

All three complaints contain nearly identical allegations regarding Arab Bank's conduct and each posit the same theories of culpability. The factual allegations concerning each plaintiff's injuries are, of course, unique to each plaintiff. To the extent these factual differences impact the legal analysis, they will be explained separately below. The following is a summary of the allegations common to all three complaints. The alleged facts are assumed to be true for the purposes of defendant's motions to dismiss.[2]

Plaintiffs allege that, on September 29, 2000, following the collapse of peace nego-

---

**1.** Additional motions to dismiss, which were filed on July 22, 2005, are now pending in two of these cases, *Almog v. Arab Bank*, 04–CV–5564, and *Afriat–Kurtzer v. Arab Bank*, 05–CV388. In addition to bringing claims under the Anti–Terrorism Act, which are similar to the allegations in the *Linde*, *Litle*, and *Coulter* suits, plaintiffs in these two related cases also bring claims under the Alien Tort Claims Act.

A sixth case, *Bennett v. Arab Bank*, 05–CV–3183, was filed on July 1, 2005, and a sev-

enth, *Roth v. Arab Bank*, 05–CV–3738, was filed on August 5, 2005.

**2.** Defendant has submitted affidavits and other matters outside the pleadings in the course of briefing its motions to dismiss. Because motions for summary judgment would be premature, the Rule 12(b)(6) motions will not be converted to Rule 56 motions, and the court will not consider these factual submissions in support of the motions.

tiations between the State of Israel and the Palestinian Authority, Palestinian terrorist groups launched what quickly became known in Arab parlance as the Al Aqsa Intifada or Intifada Al Quds—the "Second Intifada" in western parlance. This Second Intifada was marked from the outset by numerous acts of extreme violence, including multiple murders of civilians by Palestinian terrorist groups. These terrorists utilize suicide bombers as their preferred method of carrying out such attacks. The suicide bombers are regarded as martyrs by the terrorist groups and their sympathizers.[3] The objectives of the Second Intifada include intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli government to withdraw from territory it presently controls.

The complaints identify the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad ("PIJ"), and the Al Aqsa Martyrs Brigade ("AAMB") as prominent terrorist organizations operating in Palestinian controlled territory. Each of these organizations has been designated as a Foreign Terrorist Organization ("FTO") by the United States Secretary of State. The complaints also identify several charities that plaintiffs allege operate as front organizations for HAMAS, assisting it in carrying out its terrorist activities. These include Al–Ansar Charity, Ramalla Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamay Al–Islamiya, Al Mujama Al–Islami, Nablus Charitable Committee, Jenin Charitable Committee, and Islamic

Charity Society of Hebron. Plaintiffs allege that these charitable organizations are in reality agents of HAMAS. Although these organizations hold themselves out as legitimate charities and collect money in the name of humanitarian purposes, they in fact route large sums of money to support the violent activities of HAMAS and other terrorist organizations. These organizations thus serve as agents of HAMAS and are able both to solicit and to launder money on HAMAS's behalf. They raise money to support all areas of HAMAS's operations. Several of the charities maintain bank accounts at Arab Bank through which the Bank provides them with financial services, such as receiving deposits and processing wire transfers. The complaints allege that the Bank knows that these organizations are fronts which support HAMAS's terrorist activities, and that the Bank's continued provision of banking services to these groups facilitates their illegal activities. The complaints identify one Arab Bank account number that plaintiffs allege belongs to HAMAS itself, and which HAMAS uses to collect funds in support of violent activities.[4]

On or about October 16, 2000, the Saudi Committee In Support of the Intifada Al Quds ("Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia. According to the Saudi Committee, its purpose is to support the "Intifada Al Quds" and "all suffering families—the families of the martyrs and the injured Palestinians and the disabled." According to plaintiffs, the Saudi Committee constitutes a professional fundraising apparatus intended to subsi-

---

**3.** Defendant's attempt to discount this allegation on the basis that the term "martyr" has several different usages is disingenuous. Plaintiffs' allegations clearly concern the use of the term martyr to describe those who are killed or injured while carrying out suicide attacks in support of the Second Intifada.

**4.** According to the Declaration of Shukry Bishara, the Chief Banking Officer of Arab Bank, in Support of Defendant's Motion to Dismiss, the Bank "closed this account, froze the balance of its funds and reported it to the appropriate authorities" following the commencement of plaintiffs' suits.

dize the Palestinian terror campaign and to bankroll HAMAS and the PIJ.

The Saudi Committee furnishes what plaintiffs variously term a "comprehensive insurance death benefit" or a "universal death and dismemberment plan," consisting of a payment of $5,316.06, to the families of Palestinian terrorists killed in service of the Intifada. (At oral argument, plaintiffs explained that this sum is the U.S. Dollar equivalent of 20,000 Saudi Riyals.) Lesser benefits are provided when the terrorist is either injured or captured by Israeli security forces. Although plaintiffs sometimes refer to these payments as "insurance" benefits, the scheme is not alleged to be a traditional pooled risk insurance plan, where individuals pay premiums against the risk of some future event. Rather, plaintiffs are alleging that the plan is, in effect, a reward for perpetrators of suicide attacks. Families claim this reward by obtaining an official certification of their deceased relative's status as a martyr, which includes an individualized martyr identification number. In order to obtain this certificate, families must provide the Saudi Committee with the martyr's name, personal information, and details concerning the date and manner of death.

Plaintiffs allege that the Bank is the exclusive administrator of the death and dismemberment benefit plan. Once the Saudi Committee prepares a list of eligible martyrs, the list is provided to the Bank. Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS, finalizes the lists, maintains a database of persons eligible to receive benefits under the death and dismemberment plan, and opens a dollar account for each beneficiary. Families who choose to collect the benefit must present to the Bank an official certification from the Palestinian Authority that includes the individualized identification number of the martyr. If the documentation proves satisfactory, Arab Bank issues a receipt to the designated recipient of the benefit. Plaintiffs allege that these payments create an incentive to engage in terrorist acts by rewarding all Palestinian terrorists, regardless of their affiliation with a particular group.

The complaints detail the numerous terrorist attacks in which plaintiffs themselves or their decedents were injured. For the sake of brevity, only one attack from each complaint will be described. The Linde complaint describes an attack on May 18, 2003. On that day, plaintiff Steven Averbach, a citizen of the United States and of Israel, was seated on a commuter bus heading toward Jerusalem when a man dressed as a religious Jew boarded the bus and then detonated explosives. Seven people were killed and twenty injured in the attack, including plaintiff Averbach, who sustained severe damage to his spinal cord when a ball bearing that had been packed in the explosives lodged between his C3 and C4 vertebrae, rendering him a quadriplegic. HAMAS claimed responsibility for the attack, and the bomber was later identified by his family as Bassem Jamil Tarkrouri.

The Litle complaint describes the bombing of Bus No. 2 in Jerusalem on August 19, 2003, from which a number of plaintiffs derive their injuries. HAMAS claimed responsibility for the bombing, in which plaintiff Mendy Reinitz, a citizen of the United States and of Israel, sustained shrapnel wounds in the shoulder and back and underwent surgery. Although some shrapnel was removed, some will remain in his body for the rest of his life. Mendy's brother, Yissocher Dov Reinitz, and father, Mordechai Reinitz, were also riding the bus that day; both were killed in the attack. Other relatives are also plaintiffs.

The Coulter complaint describes the suicide bombing of a Sbarro pizza restaurant on August 9, 2001, in Jerusalem. Fifteen people were killed and approximately 130 injured in this attack, in which a suicide bomber detonated a bomb packed with nails and metal bolts. The claims of the Nachenberg, Finer, Green, Greenbaum, and Danzig families, brought in the Coulter complaint, stem from this attack. The bomber was identified as Izz Ad–Din Shuhail Ahmad Al–Masri, a terrorist acting on behalf of HAMAS. The Al–Masri family received two payments into an Arab Bank account following this act, one from the Saudi Committee, totaling $5,316.16 (or 20,000 Saudi Riyals), and one from the Al–Ansar charity, totaling $6000.

All three complaints describe a specific benefit transaction for a suicide bomber named Dia A–Tawil. After perpetrating a suicide bombing attack on behalf of HAMAS on March 27, 2001, he was designated Palestinian Authority martyr number 449. His father, Hussien Mohamed Favah Tawil, presented the martyr certification to the Bank and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

Plaintiffs also allege that funds raised by the Saudi Committee in Saudi currency, and deposited in the Committee's Arab Bank accounts, are then routed through the Bank's New York branch office, where they are converted to U.S. dollars, since Saudi currency cannot easily be converted into Israeli currency; the funds are then transferred to Arab Bank branches located in the West Bank in Israel and used to fund terrorist activities.

Based on these allegations, the Linde plaintiffs assert the following claims: Count One alleges that Arab Bank aided and abetted the murder, attempted murder, and serious bodily injury of United States nationals, in violation of 18 U.S.C. § 2332(a), (b), and (c), by providing substantial assistance to terrorists through the administration of the universal death and dismemberment plan for families of suicide bombers, and through the provision of other financial services. Count One alleges that Arab Bank "knew or recklessly disregarded" that it was providing material support for acts of international terrorism, that the charities were fronts that played a major role in raising funds for HAMAS, and that the Bank's activities substantially assisted dangerous criminal acts.

Count Two alleges that Arab Bank conspired to commit murder and attempted murder, in violation of 18 U.S.C. § 2332(b), by agreeing to "perform extraordinary banking and administrative services for the Saudi Committee, Hamas, the PIJ, and AAMB," including exclusive administration of the death and dismemberment benefit plan, in order to "support terrorist activities pursuant to a common scheme to encourage and incentivize acts of terrorism."

Count Three alleges that Arab Bank provided material support to terrorists, in violation of 18 U.S.C. § 2339A, by providing "extraordinary financial and administrative services," including exclusive administration of the death and dismemberment benefit plan to the families of suicide bombers and other terrorists.

Count Four alleges that Arab Bank provided material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, by knowingly transferring funds from and to agents of HAMAS.[5] Plaintiffs further allege that, without the Bank's assistance in this regard, it would have been substantially more difficult to

---

**5.** Counts Four and Five contain erroneous statutory citations. However, the actual allegations contained in those counts, as well as subsequent briefing and argument, make clear to which statutory sections plaintiffs are referring.

implement the death and dismemberment benefit plan.

Count Five alleges that the Bank's failure to comply with regulatory requirements to retain the assets of designated foreign terrorist organizations and report them to the Secretary of State, as required by 18 U.S.C. § 2339B(a)(2), itself constitutes the provision of material support to a designated FTO.

Count Six alleges that Arab Bank provided financial services to HAMAS, the PIJ, AAMB, and the Saudi Committee by collecting funds, with the knowledge that such funds have been and will be used to facilitate acts intended to cause death or serious bodily injury to civilians, such as plaintiffs. Plaintiffs contend that these financial services constitute financing of terrorism in violation of 18 U.S.C. § 2339C.

Count Seven alleges that Arab Bank's provision of banking and other services to HAMAS, the PIJ, the AAMB and other international terrorists, including administering the death and dismemberment benefit plan, was itself an act of international terrorism as defined by the ATA, in that these actions were "involved" in violent criminal acts that injured plaintiffs and appeared to be intended to coerce or intimidate the people, government policy, or government conduct of Israel. Although the complaint does not cite a specific criminal provision identifying a specific act of international terrorism defendant is alleged to have committed or aided and abetted or conspired to commit, the briefs make clear that the crimes are violations of the material support and financing provisions, Sections 2339A, 2339B, and 2339C.

Finally, Count Eight alleges claims for intentional infliction of emotional distress.

The legal claims of the Litle plaintiffs and the Coulter plaintiffs are identical, except that the Litle plaintiffs omit Count Five of the Linde complaint (which is based on defendant's failure to comply with regulatory requirements), and the Coulter complaint omits Count Eight of the Linde complaint, which asserts claims of intentional infliction of emotional distress.[6]

## DISCUSSION

In considering a motion to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of plaintiffs. *Bolt Electric, Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir.1995). Dismissal is appropriate only where it appears beyond doubt that plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. *Id.*

### *Pleading Standard*

**[1]** Defendant, relying heavily on cases from the racketeering and securities fraud contexts, argues that plaintiffs are required to plead specific facts from which its knowledge of the wrongful acts alleged could be inferred. Although the Bank claims that it is not trying to impose a heightened pleading standard, the effect of the Bank's argument would indeed be to impose a higher standard.

Rule 8(a) of the Federal Rules of Civil Procedure requires only that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has recently reiterated that the notice pleading standard is a limited one:

---

**6.** Thus, both the Litle First Amended Complaint and the Coulter complaint consist of a total of seven counts, compared to the eight counts in the Linde First Amended Complaint.

Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' *Hishon v. King & Spalding,* 467 U.S. 69, 73 [104 S.Ct. 2229, 81 L.Ed.2d 59] (1984). If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding. Moreover, claims lacking merit may be dealt with through summary judgment under Rule 56. The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim.

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167–69, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). The first circuit court of appeals to address a private damages claim brought under the ATA applied the liberal pleading standard of Rule 8(a). *See Boim v. Quranic Literacy Institute,* 291 F.3d 1000, 1008 (7th Cir. 2002). I agree that there is no reason to do otherwise.

### *Statutory Claims Under 18 U.S.C. § 2333*

**[2]** Plaintiffs bring their suit pursuant to 18 U.S.C. § 2333, enacted as part of the Anti–Terrorism Act ("ATA" or "the Act"), which provides in relevant part:

Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover three-fold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). The ATA, at Section 2331(1), defines "international terrorism" as "activities that"

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended—

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

Thus, in order to state a claim for civil damages under Section 2333(a), plaintiffs must allege that they were injured "by reason of" a crime that constitutes an act of international terrorism, as so defined.

Plaintiffs identify the following crimes as the predicate acts of international terrorism on which they are basing civil liability under Section 2333: murder, attempted murder, and serious bodily injuries to United States citizens, in violation of 18 U.S.C. § 2332(a), (b), and (c); conspiracy to commit murder and attempted murder of United States citizens, in violation of 18 U.S.C. § 2332(b); provision of material support to terrorists, in violation of 18 U.S.C. § 2339A; provision of material support to designated foreign terrorist organizations, in violation of 18 U.S.C. § 2339B;

and financing of terrorism, in violation of 18 U.S.C. § 2339C.

**[3]** The violent acts alleged by plaintiffs as giving rise to their injuries, *i.e.*, murder, attempt or conspiracy to commit murder, and physical violence that results in serious bodily injury, clearly qualify as "activities that involve violent acts or acts dangerous to human life," and thus fall within Section 2331(1)(A). Defendant does not challenge the sufficiency of plaintiffs' allegations with respect to the apparent purpose and location of these acts, as required by Section 2331(1)(B) and (C).[7] Thus, plaintiffs have alleged that they were injured "by reason of an act of international terrorism," as required by Section 2333(a). Defendant's argument that plaintiffs must allege that they were injured by reason of Arab Bank's conduct simply misstates the statutory requirement. As will be explained below, Arab Bank's liability in this case depends on whether the Bank can be held liable, directly or secondarily, for its conduct in allegedly assisting the terrorists, but there can be no dispute that plaintiffs have plead adequately that they were injured by acts of international terrorism.

**[4]** In addition to murder, plaintiffs identify violations of the material support and terrorist financing laws as predicate crimes. Violations of 18 U.S.C. §§ 2339A and 2339B, which make it a crime to provide material support to terrorists and to designated foreign terrorist organizations,

respectively, are included in Section 2331(1)'s broad definition of "international terrorism," *see Boim*, 291 F.3d at 1014–15, as are violations of 2339C, which prohibits the financing of terrorism. Thus, violations of these provisions can serve as predicate crimes giving rise to civil liability under the ATA.

Section 2339A, entitled "Providing material support to terrorists," provides that "[w]hoever provides material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, [various federal crimes], . . . or attempts or conspires to do such an act," shall be guilty of a crime. 18 U.S.C. § 2339A(a).

Section 2339B deals with material support for organizations that have been formally designated as foreign terrorist organizations by the Secretary of State under the procedures set out in Section 219 of the Immigration and Nationality Act, codified at 8 U.S.C. § 1189. *See* 18 U.S.C. § 2339B(g)(6) (defining "terrorist organization" as an organization designated as a terrorist organization under Section 219 of the Immigration and Nationality Act). It provides that "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be" guilty of a crime. 18 U.S.C. § 2339B(a)(1).

---

**7.** In briefing these motions, defendant has not seriously disputed that the majority of the attacks qualify as acts of international terrorism within the meaning of the ATA. With respect to defendant's argument that a few plaintiffs have alleged injuries resulting from drive-by shootings and other street crime, as opposed to acts of international terrorism, there is nothing on the face of the complaints to indicate that these crimes were not intended as acts of international terrorism as required by the statute. None of the facts alleged as to these acts establish that they were ordinary violent crimes, for example, robberies or personal vendettas, and none of the facts alleged remove the possibility that plaintiffs can prove they were acts of terrorism.

If, at trial, plaintiffs fail to prove that these acts were terror attacks, rather than "mere" street crime, they will have failed to establish a claim under the ATA. However, at this stage of the litigation, dismissing these claims would be premature.

Both Section 2339A and Section 2339B define "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, *financial services,* lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel …, and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b) (emphasis added); *see* 18 U.S.C. § 2339B(g)(4) (incorporating the definition of "material support or resources" used in Section 2339A).

Section 2339C addresses the financing of terrorism, and provides that whoever, meeting the jurisdictional requirements set forth in subsection (b),

> by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out—
>
> (A) an act which constitutes an offense within the scope of a treaty specified in subsection (e)(7), as implemented by the United States, or
>
> (B) any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act, shall be [guilty of a crime].

18 U.S.C. § 2339C(a)(1). An act may constitute an offense under the statute without a showing that the funds were actually used to carry out the predicate act of terrorism. 18 U.S.C. § 2339C(a)(3).

Plaintiffs' claims under the ATA are based on two factual theories of conduct.

The first factual theory is that the Bank's activities in administering the death and dismemberment benefit plan created an incentive for the commission of the terrorist acts by Palestinians in Israel which injured plaintiffs and thus substantially assisted their commission. The second factual theory concerns the banking services the Bank provides to the various organizations which plaintiffs allege are fronts for, or agents of, HAMAS, a designated foreign terrorist organization. Plaintiffs contend that, on the basis of these two factual courses of conduct, the Bank may be held secondarily liable for their injuries under theories of civil aiding and abetting and civil conspiracy. Plaintiffs also maintain that the Bank's actions constituting material support for terrorists and terrorist organizations in violation of 18 U.S.C. §§ 2339A and 2339B and financing in violation of 18 U.S.C. § 2339C create direct bases for liability.

*The Availability of Secondary Liability*

Defendant contends that plaintiffs have failed to allege facts from which it can be inferred that its own acts, as opposed to those of the terrorists, proximately caused their injuries, and challenges plaintiffs' reliance on secondary liability under theories of civil aiding and abetting and civil conspiracy. However, Section 2333 does not limit the imposition of civil liability only to those who directly engage in terrorist acts. The statute specifies the class of plaintiffs who may sue under the civil remedy provision—*i.e.,* those U.S. nationals who are injured "by reason of an act of international terrorism." As noted above, plaintiffs have alleged that their injuries were caused by suicide bombings or other attacks that, for pleading purposes, meet the definition of "international terrorism." When it comes to determining the proper defendants for claims under Section 2333, however, the statute is silent. *See Boim,*

291 F.3d at 1010 ("Although the statute defines the class of plaintiffs who may sue, it does not limit the class of defendants, and we must therefore look to tort law and the legislative history to determine who may be held liable for injuries covered by the statute.").

**[5]** Defendant, relying principally on the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), where the Court refused to allow civil aiding and abetting liability under Section 10(b) of the Securities and Exchange Act of 1934, argues that plaintiffs may not proceed on theories of civil aiding and abetting and civil conspiracy liability. For the reasons set forth comprehensively by the Court of Appeals for the Seventh Circuit in *Boim*, I conclude that aiding and abetting liability is available under the ATA. *See Boim*, 291 F.3d at 1018–21. In *Boim*, the court found *Central Bank* not determinative and summarized its reasons as follows:

> First, *Central Bank* addressed extending aiding and abetting liability to an implied right of action, not an express right of action as we have here in section 2333. Second, Congress expressed an intent in the terms and history of section 2333 to import general tort law principles, and those principles include aiding and abetting liability. Third, Congress expressed an intent in section 2333 to render civil liability at least as extensive as criminal liability in the context of the terrorism cases, and criminal liability attaches to aiders and abettors of terrorism. *See* 18 U.S.C. § 2. Fourth, failing to extend section 2333 liability to aiders and abettors is contrary to Congress' stated purpose of cutting off the flow of money to terrorists at every point along the chain of causation.

*Boim*, 291 F.3d at 1019. *Boim* also noted that the government, in an amicus brief,

which the Court had solicited on appeal, supported the availability of secondary civil liability under the ATA.

**[6]** I further find that civil conspiracy liability, not addressed in *Boim*, is also available. The statute expressly includes conspiracy to engage in terrorist acts under its criminal provisions, and there is no reason to treat the civil provisions as excluding this type of liability. *See Boim*, 291 F.3d at 1020 (noting that Congress, in Section 2333, expressed an intent "to make civil liability at least as extensive as criminal liability").

*The Scope of Secondary Liability*

The scope of civil aiding and abetting liability was set forth in *Halberstam v. Welch*, 705 F.2d 472 (1983), in what the Supreme Court in *Central Bank* described as a "comprehensive opinion on the subject." *Central Bank*, 511 U.S. at 181, 114 S.Ct. 1439. In *Halberstam*, the Court of Appeals for the D.C. Circuit, relying heavily on The Restatement (Second) of Torts, § 876 (1979), upheld civil aiding and abetting and liability, and also civil conspiracy liability, against a woman who had knowingly and substantially assisted her co-defendant, a murderer, by performing otherwise legal services, such as acting as banker, bookkeeper and secretary, knowing that these activities assisted his illegal activities, even though she had no specific knowledge of, or intent to commit, the particular illegal activity, *i.e.*, murder, with which she and he were civilly charged. As the court stated, "Although her own acts were neutral standing alone, they must be evaluated in the context of the enterprise they aided, *i.e.*, a five-year-long burglary campaign against private homes." *Halberstam*, 705 F.2d at 488. The Court noted that "the implications of tort law in this area [civil remedies for criminal acts] as a supplement to the criminal justice process

and possibly as a deterrent to criminal activity cannot be casually dismissed." *Halberstam*, 705 F.2d at 489. Here, Congress has expressly made criminal the providing of financial and other services to terrorist organizations and expressly created a civil tort remedy for American victims of international terrorism.

> Section 876 of the Restatement provides, For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Plaintiffs rely on all three provisions of Section 876 of the Restatement, paragraph (a) for their conspiracy claim, paragraph (b) for their aiding and abetting claim, and paragraph (c) for their claims under the material support and financing statutes, 18 U.S.C. §§ 2339A, 2339B and 2339C.

**[7]**  Plaintiffs' allegations are sufficient to establish secondary liability under each one of these theories. As to conspiracy, they adequately allege that Arab Bank knowingly and intentionally agreed to provide services to organizations it knew to be terrorist organizations and that they were injured by an overt act which was done in furtherance of the common scheme. It is not necessary that they allege that Arab Bank either planned, or intended, or even knew about the particular act which injured a plaintiff. *See Halberstam*, 705 F.2d at 487. The factual allegations of the complaints sufficiently support an inference that Arab Bank and the terrorist

organizations were participants in a common plan under which Arab Bank would supply necessary financial services to the organizations which would themselves perform the violent acts. Administering the death and dismemberment benefit plan further supports not only the existence of an agreement but Arab Bank's knowing and intentional participation in the agreement's illegal goals. No more is required.

**[8]**  The same allegations support aiding and abetting liability. The complaints allege that the financial services provided by Arab Bank, and the administration of the death and dismemberment benefit plan, provided substantial assistance to international terrorism. They also allege that the Bank's administration of the benefit plan encouraged terrorists to act. These allegations are well within the mainstream of aiding and abetting liability. They describe the wrongful acts performed by the terrorists, the defendant's general awareness of its role as part of an overall illegal activity, and the defendant's knowing and substantial assistance to the principal violation. *See Halberstam*, 705 F.2d at 477. With respect to defendant's administration of the death and dismemberment benefit plan, as the Court in *Halberstam* noted, quoting from Comment d to Clause (b) of Section 876 of the Restatement: "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance."

Defendant's protestations about causation and knowledge are contrary to these principles. Just as there was no requirement for aiding and abetting liability in *Halberstam* that the murderer would not have acted as he did but for his co-defendant's conduct, there is no requirement of a finding that the suicide bomber would

not, or could not, have acted but for the assistance of Arab Bank. Plaintiffs readily acknowledge that, in order to prevail on their claims premised on the Bank's alleged administration of the death and dismemberment benefit plan, they must prove that each of the victims was in fact killed by terrorists (as defined in the statute and as opposed, for example, to apolitical criminals) and that each of the killers was within the coverage of the plan. Such proof would be sufficient to hold the Bank secondarily liable, assuming the other elements of liability were established, even though it would not satisfy a "but for" causation requirement. As to plaintiffs' claims premised on their second factual theory—*i.e.*, that the Bank's provision of financial services constitutes material support to, or financing of, foreign terrorist organizations-plaintiffs acknowledge that they will have to prove that the Bank provided these services to the particular group responsible for the attacks giving rise to their injuries.

Defendant also argues that plaintiffs' claims must fail because they do not allege, and cannot prove, that the death and dismemberment benefit payments motivated the attacks which caused their injuries. However, plaintiffs need not prove motive in order to succeed in their claims. Plaintiffs acknowledge that they are unlikely to be able to prove the motive behind any particular attack. Their theory is that the death and dismemberment benefit plan, allegedly administered by Arab Bank, creates an incentive for suicide bombings, whether or not it is also a motive in any particular instance. The Bank's active participation in creating such an incentive is a sufficient basis for liability under the broad scope of the ATA, which imposes

secondary liability on those who substantially assist acts of terrorism. *See Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir.2000), *cert. denied*, 532 U.S. 904, 121 S.Ct. 1226, 149 L.Ed.2d 136 (2001) (noting that "even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive"). Plaintiffs also argue that the willingness of Arab Bank, a major institution in the Middle East, to perform services for the terrorists helps to legitimize terrorism and, in that way as well, furthers its assistance to them.

**[9]** Finally, the allegations that Arab Bank breached independent duties, indeed committed criminal acts in violation of the material support and financing statutes, are sufficient to establish secondary liability under Section 876(c) of the Restatement.

*Scienter*

**[10]** Arab Bank seeks dismissal of the first seven counts of the Linde complaint, and the corresponding counts of the Litle and Coulter complaints, on the ground that plaintiffs have not sufficiently alleged knowledge and intent. To the extent that defendant is arguing that plaintiffs have not alleged sufficient facts to establish an evidentiary basis for their allegations of knowledge and intent, defendant simply misapprehends the pleading standard. It is not entitled to dismissal based on the argument that plaintiffs must plead more than the requisite knowledge and intent, either as to their substantive claims or their claims of aiding and abetting and conspiracy.[8]

---

8. To the extent that plaintiffs have pled reckless conduct, as well as knowledge, the allegations of recklessness do not defeat their allegations of knowledge. There is, however, no

statutory basis for plaintiffs' argument that recklessness would be sufficient to meet the statutory requirements.

Arab Bank also argues, in effect, that the requisite intent is the specific intent to cause the acts of terrorism which injured the plaintiffs. The Bank is incorrect.

Each of the various statutory provisions upon which plaintiffs rely for the underlying criminal activity alleged to meet the standards of Section 2333 has a different formulation of the required *mens rea*. *See Humanitarian Law Project v. Gonzales*, 380 F.Supp.2d 1134, 1145–48 (C.D.Cal. 2005) (describing the history of the enactment of these statutes). Under Section 2332, murder, as defined in 18 U.S.C. § 1111(a), requires "malice aforethought." No one disputes that plaintiffs have sufficiently alleged that the mental state of the persons who performed the acts which injured them meet that standard.

[11] The dispute centers on the mental state required of the Bank. Section 2339A makes it a crime to provide material support or resources "knowing or intending that [the resources] are to be used in preparation for, or in carrying out" terrorist attacks. Section 2339C also requires knowledge or intent that the funds are to be used to carry out terrorist attacks and, in addition, requires that the conduct be willful. To violate Section 2339B, it is required only that one "knowingly provide[ ] material support or resources" to a designated foreign terrorist organization. *See Humanitarian Law Project*, 380 F.Supp.2d at 1144–48. None of these provisions, however, requires specific intent to commit specific acts of terrorism.[9]

With respect to Section 2339B, in *Humanitarian Law Project v. Reno*, the Court of Appeals for the Ninth Circuit, addressing a First Amendment challenge to Section 2339B's prohibition against providing material support to designated foreign terrorist organizations, rejected the claim that the prohibition is unconstitutional unless the person providing material support has the specific intent to aid in the organization's unlawful purposes. *Humanitarian Law Project*, 205 F.3d at 1133. The court noted that "[m]aterial support given to a terrorist organization can be used to promote the organization's unlawful activities, regardless of donor intent. Once the support is given, the donor has no control over how it is used." *Id.*, 205 F.3d at 1134. Moreover, "all material support given to such organizations aids their unlawful goals." *Id.*, 205 F.3d at 1136; *see also id.*, 205 F.3d at 1138 n. 5 (explaining that the term "knowingly" in Section 2339B "modifies the verb 'provides,' meaning that the only scienter requirement here is that the accused violator have knowledge of the fact that he has provided something, not knowledge of the fact that what is provided in fact constitutes material support"); *Humanitarian Law Project*, 380 F.Supp.2d at 1148.

That the intent urged by Arab Bank is not required has been confirmed by Congress's December 17, 2004 amendment of Section 2339B to add the language:

> To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act) [8 U.S.C. § 1182(a)(3)(B) ], or that the organization has engaged or engages in terrorism (as defined in sec-

---

9.    The district court in *Humanitarian Law Project v. Gonzales* describes Sections 2339A and 2339C as including a "specific intent requirement," while explaining that Congress dispensed with this requirement in Section 2339B. 380 F.Supp.2d at 1145–47. However,

as that court held, Sections 2339A and 2339C only require knowledge or intent that the resources given to terrorists are to be used in the commission of terrorist acts. Neither requires the specific intent to aid or encourage the particular attacks that injured plaintiffs.

tion 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989) [22 U.S.C. § 2656f(d)(2) ].

*See Humanitarian Law Project v. Reno,* 205 F.3d at 1133–34.[10] Congress thus appears to have expressed its disagreement with decisions, relied upon by Arab Bank, imputing an intent requirement into Section 2339B equivalent to the intent requirement of Section 2339A, *e.g., U.S. v. Al–Arian,* 308 F.Supp.2d 1322, 1337–39 (M.D.Fla.2004).[11] *See Humanitarian Law Project,* 380 F.Supp.2d at 1147 (noting that, in adopting the 2004 amendment, Congress incorporated the Ninth Circuit's holding in *Humanitarian Law Project v. Reno* and rejected the holding of *United States v. Al–Arian* ).

As explained by the district court in *Humanitarian Law Project v. Gonzales,* the legislative history of Section 2339B indicates that it was enacted in order to close a loophole left by Section 2339A, which would have allowed terrorist organizations to raise funds "under the cloak of a humanitarian or charitable exercise" and then divert the funds to terrorist activities. *Humanitarian Law Project,* 380 F.Supp.2d at 1146 (citing H.R. Rep. 104– 383, at \*43 (1995)). Also, Congress expressly found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996,

Pub.L. 104–32, § 301(a)(7), 110 Stat. 1214, 1247 (1996). Thus, Section 2339B is violated if the Bank provides material support in the form of financial services to a designated foreign terrorist organization and the Bank either knows of the designation or knows that the designated organization has engaged or engages in terrorist activities.

Defendant cites the decision in *In re Terrorist Attacks on September 11, 2001,* 349 F.Supp.2d 765 (S.D.N.Y.2005), in which claims brought against a number of Middle Eastern banks under the ATA were dismissed, as dispositive of the claims in this case. *In re Terrorist Attacks* concerned a group of consolidated actions bringing claims against a range of defendants related to the terrorist attacks of September 11, 2001. Each of the pleadings contained only a few paragraphs of allegations against the defendant banks. The Court held that, absent knowledge of the terrorist activities, the banks could not be liable for injuries caused by money routinely passing through them. Although plaintiffs in those cases did allege that some of the banks had ties to HAMAS, there was no allegation of any connection between HAMAS and Osama Bin Laden, Al Qaeda, or the September 11th attacks, so those allegations were insufficient to state a claim against the banks for injuries arising from the September 11th attacks. *See In re Terrorist Attacks,* 349 F.Supp.2d at 831–35.

---

**10.** Defendant does not argue that the December 2004 amendment to Section 2339B does more than clarify the statute's reach; that is, it does not argue that the amendment changed the statute from one requiring specific intent to one no longer requiring specific intent. *See also Humanitarian Law Project,* 380 F.Supp.2d at 1147 (noting that the 2004 amendment "clarified" the *mens rea* requirement).

**11.** I note that the court in *Al–Arian* considered its conclusion consistent with the Seventh Circuit's decision in *Boim* insofar as *Boim* required, for civil liability, that the defendant intend to help in the terrorist organization's unlawful activities. *Al–Arian,* 308 F.Supp.2d at 1339 n. 33. Insofar as *Boim* is read as requiring more than knowledge that the organization to which material support is provided is designated or is engaged in terrorist activities, I find that it is not consistent with the language of Section 2339B.

By contrast, here, plaintiffs allege both that the Bank plays a central role in a well-publicized plan to reward terrorists killed and injured in Palestinian suicide attacks in Israel and that the Bank knows that the groups to which it provides services are engaged in terrorist activities. The very groups that the Bank is alleged to support are the same groups alleged to be responsible for the terrorist attacks that injured the plaintiffs. Nothing in the complaints suggests that Arab Bank is a mere unknowing conduit for the unlawful acts of others, about whose aims the Bank is ignorant. Although the Bank would like this court to find, as did the court in *In re Terrorist Attacks,* that it is engaged in "routine banking services," *see* 349 F.Supp.2d at 835, here, given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities, there is nothing "routine" about the services the Bank is alleged to provide.

[12]   Arab Bank also seeks dismissal on the ground that plaintiffs fail to allege the involvement of upper level management employees in the misconduct alleged. Once again, defendant attempts to impose a standard of pleading beyond that required by the rules. It is sufficient, for pleading purposes, for plaintiffs to allege the knowledge and intent of Arab Bank and not spell out their proof. For that reason, it is unnecessary to address whether the allegations made regarding the conduct of certain high level employees, including the Chairman of the Arab Bank, are sufficient as an evidentiary matter.

*Claims Based Upon Violations of 18 U.S.C. § 2339C*

[13]   Each of the three complaints asserts a claim that the Bank provided and collected funds "with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians,"

in violation of 18 U.S.C. § 2339C. Arab Bank argues that plaintiffs' allegations are insufficient to plead a violation of this section. As used in Section 2339C, "the term 'provides' includes giving, donating, and transmitting," and "the term 'collects' includes raising and receiving." 18 U.S.C. § 2339C(e)(4) & (5). Reading this section together with the material support provisions, the statute thus distinguishes between providing "financial services," which is addressed in Sections 2339A and 2339B (which include "financial services" in their definition of "material support"), and financing, *i.e.,* the providing or collecting of funds, which is addressed in Section 2339C. However, as just noted, the term "provides" includes "transmitting" funds, and the term "collects" includes "receiving" funds. It is these terms upon which plaintiffs rely in pleading a violation of Section 2339C. Plaintiffs seek to reach the banking activities of receiving deposits and transmitting funds between accounts on the basis that the accounts (and funds) belong to groups engaged in terrorist activity, *i.e.,* the charity fronts that operate as agents of HAMAS.

Plaintiffs acknowledge that, under this claim, they will have to prove that Arab Bank knew that the funds it received as deposits and transmitted to various organizations were to be used for conducting acts of international terrorism. Because the complaints allege such knowledge on the part of the Bank, this claim will not be dismissed.

*Scope of Injuries Actionable Under the ATA*

Defendant argues that the claims of over fifty plaintiffs in the Coulter case and over fifty plaintiffs in the Litle case must be dismissed because they have failed to allege that their claims arise from an injury to a U.S. national. Section 2333(a) states, in relevant part, that "[a]ny national of the

United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor.... " Defendant argues that the scope of this language is not sufficiently broad to reach these plaintiffs, who are U.S. citizens suing for various non-physical injuries, such as emotional distress and loss of consortium, after their family members, who were not U.S. nationals, became victims of acts of international terrorism. The specific question raised by defendants' argument is whether Section 2333(a)'s language specifying that a U.S. national may recover for injuries to his or her "person, property, or business" encompasses the injuries alleged by these plaintiffs. Defendant has not sought dismissal of the similar claims brought by other nationals whose decedents were also nationals. In effect then, defendant argues that the claims it seeks to dismiss are derivative, not independent, and must be dismissed for that reason.[12]

The parties recognize that only one court has examined this issue. That court concluded that injuries of this type constitute injuries in the plaintiff's "person" under the ATA, stating, "[t]he statute does not specifically require that a plaintiff suffer *physical* harm prior to filing suit" and that "the plain language, as well as a common-sense interpretation, of the ATA" dictate that such plaintiffs should be able to recover. *See Biton v. Palestinian Interim Self–Government Authority,* 310 F.Supp.2d 172, 181–182 (D.D.C.2004) (emphasis in original). The court expressed doubt that Congress could have intended that U.S. nationals could recover for losses of property yet not for losses of family

members, simply because those family members were not U.S. nationals. *See id.* Defendant argues that the *Biton* holding is inconsistent with the legislative history of the ATA, and cites the minutes from the Senate Anti–Terrorism Act Hearing and the House Committee report on the ATA. Def't's Reply Mem. at 19–20, citing ATA Hearing at 31 ("These tragedies reinforce our belief that it is essential that both the Congress and the Executive Branch take measures, such as the present bill, to deter terrorist attacks against American nationals overseas...."); H.R.REP. NO. 102–1040 at 4 ("Summary and Purpose: The purpose of H.R. 2222, the 'Antiterrorism Act of 1991' is to provide a new civil cause of action for international terrorist attacks against U.S. nationals.").

[14] These general statements of purpose, not addressed to the issue here in dispute, offer little if any guidance. In the absence of any limiting language in the statute, the court will not limit the scope of Section 2333(a) to physical injuries to U.S. nationals. The congressional purpose was to grant a remedy to U.S. nationals and their families who suffered from injury to an individual or property as a result of international terrorism. The claims of the U.S. nationals suing based on their non-physical injuries resulting from acts of international terrorism will not be dismissed.

*Claims Based Upon Violations of 18 U.S.C. § 2339B(a)(2)*

The fifth counts of the Linde and Coulter complaints each allege that the Bank, by failing to comply with its obligation under 18 U.S.C. § 2339B(a)(2) to retain

---

**12.** Different American jurisdictions have treated spousal claims either as derivative, and therefore requiring the existence of a claim in the physically injured spouse, see, e.g., *Liff v. Schildkrout,* 49 N.Y.2d 622, 632, 427 N.Y.S.2d 746, 404 N.E.2d 1288 (1980), RESTATEMENT (SECOND) OF TORTS § 693 cmt. e

(1977), or as independent. *See, e.g., Lareau v. Page,* 39 F.3d 384, 390 (1st Cir.1994) (noting that, "[u]nder Massachusetts law, claims for loss of consortium are independent, rather than derivative, of the claim of the injured person").

any funds under its control in which it knows a foreign terrorist organization has an interest and to report the existence of such funds to the Secretary of the Treasury, provides material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). (The Litle complaint does not assert this claim.) Section 2339B(a)(2) provides that,

> Except as authorized by the Secretary [of the Treasury], any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, shall—
>
> (A) retain possession of, or maintain control over, such funds; and
>
> (B) report to the Secretary the existence of such funds in accordance with regulations issued by the Secretary.

Subsection (b) of Section 2339B provides for civil penalties imposed by the government against financial institutions that violate these requirements.

**[15]** Plaintiffs appear to contend that violations of Section 2339B(a)(2) constitute, in and of themselves, material support for foreign terrorist organizations. As I held in my decision denying a preliminary injunction based on alleged violations of Section 2339B(a)(2), violations of the reporting requirements "are neither criminal violations nor acts of international terrorism, as defined by the statute." *Linde*, 353 F.Supp.2d at 331. Because this claim is an attempt to recast civil violations of the reporting requirements as criminal acts of providing material support, it must be dismissed. Thus, Count Five of the Linde First Amended Complaint and Count Five of the Coulter complaint are each dismissed.

I note, however, that plaintiffs' claim that the Bank provided material support to a designated FTO (found in Count Four of all three complaints), which does constitute an act of international terrorism, may be shown through a variety of evidentiary means, which may include proof of violations of the requirements regarding retention and reporting of FTO funds.

### Intentional Infliction of Emotional Distress

Finally, those Linde and Litle plaintiffs who sue as survivors bring common law claims for intentional infliction of emotional distress. Defendant argues that the complaints fail to state a claim for intentional infliction of emotional distress and that the claims of a number of plaintiffs are time barred.

**[16]** The tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *E.g., Howell v. New York Post Co., Inc.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993).

**[17, 18]** Violent terrorist attacks, almost by definition, qualify as the type of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," as to come within the ambit of the tort. *See* Restatement (Second) of Torts, § 46 cmt. d (1965). However, plaintiffs' claims of intentional infliction of emotional distress do not seek to reach the conduct of the terrorists who carried out the suicide attacks; rather, they are aimed at the Bank's conduct in supporting those who are responsible for carrying out the attacks. Although plaintiffs' allegations are sufficient to make out statutory claims under the ATA, which is aimed at "cut[ting] off the flow of money to terrorists at every point along the causal chain of violence,"

*Boim*, 291 F.3d at 1021, the Bank's conduct is too removed to support common law claims for intentional infliction of emotional distress. If plaintiffs succeed in proving their civil claims under the ATA, they will be able to recover for their emotional damages. However, the allegations in the complaints fall short of stating a separate claim for intentional infliction of emotional distress against the Bank under the common law.[13]

## CONCLUSION

The motions to dismiss are granted in part and denied in part. The following claims are dismissed: Count Five (violation of the reporting requirements in 18 U.S.C. § 2339B(a)(2)) and Count Eight (intentional infliction of emotional distress) of the Linde Complaint; Count Seven (intentional infliction of emotional distress) of the Litle Complaint; and Count Five (violation of the reporting requirements in 18 U.S.C. § 2339B(a)(2)) of the Coulter Complaint. Defendant's motions to dismiss the remaining claims are denied.

**SO ORDERED.**



---

**13.** Defendant also argues that the complaints should be dismissed on the ground of *forum non conveniens* and that plaintiffs should refile their claims in Jordan. The ATA has a provision that deals expressly with issues concerning convenience of the forum in cases brought under Section 2333. It reads:

The district court shall not dismiss any action brought under section 2333 of this title on the grounds of the inconvenience or inappropriateness of the forum chosen, unless—

(1) the action may be maintained in a foreign court that has jurisdiction over the subject matter and over all the defendants;

(2) that foreign court is significantly more convenient and appropriate; and

---

Wilmy **GARRIDO–VALDEZ**, Petitioner,

v.

Thomas **POOLE**, Respondent.

No. 03–CV–6215.

United States District Court,
W.D. New York.

Aug. 31, 2005.

**Background:** Following affirmance on direct appeal of petitioner's state court convictions for intentional murder and depraved indifference to murder, 299 A.D.2d 858, 749 N.Y.S.2d 450, he filed petition for writ of habeas corpus.

**Holdings:** The District Court, Bianchini, United States Magistrate Judge, held that:

(1) admission of audiotape of voice mail message left with investigator of the Immigration and Naturalization Service (INS) was not unfairly prejudicial, and thus did not violate due process;

(2) trial court's failure to exclude two jurors for cause who initially hesitated when asked if they could remain impartial did not violate petitioner's right to impartial jury trial;

(3) claim that prison sentence was excessive was not cognizable in habeas proceeding;

---

(3) that foreign court offers a remedy which is substantially the same as the one available in the courts of the United States.

18 U.S.C. § 2334(d).

Defendant has failed to meet its burden of showing that this heightened standard for dismissal under the ATA has been met. Given the deference owed to plaintiffs' choice of forum; that the locations of the activities alleged are Israel and New York; the defendant's failure to establish that a Jordanian court would be significantly more convenient and appropriate; and the absence of "substantially the same" remedy in a Jordanian court, dismissal on *forum non conveniens* grounds is denied.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
**COURTNEY LINDE, et al.,**

                        **Plaintiffs,**

    - against -

**ARAB BANK, PLC,**

                        **Defendant.**
--------------------------------------------------------x
**PHILIP LITLE, et al.,**

                        **Plaintiffs,**

    - against -

**ARAB BANK, PLC,**

                        **Defendant.**
--------------------------------------------------------x
**ROBERT L. COULTER, SR. et al.,**

                        **Plaintiffs,**

    - against -

**ARAB BANK, PLC,**

                        **Defendant.**
--------------------------------------------------------x

                        <u>**ORDER**</u>
                        **04 CV 2799 (NG)(VVP)**

                        **04 CV 5449 (NG)(VVP)**

                        **05 CV 365 (NG)(VVP)**

**GERSHON, United States District Judge:**

       Defendant Arab Bank moves for certification of this court's order of September 2, 2005 for

an immediate interlocutory appeal pursuant to 28 U.S.C. 1292(b).  Upon review of all of the papers

**SPA22**

submitted on the motion, the court denies the motion.

**SO ORDERED.**


*/s/ Nina Gershon*
**NINA GERSHON**
**United States District Judge**


**Dated:** **Brooklyn, New York**
**July 18, 2006**

2

**SPA23**

sparked some controversy during discovery proceedings before Judge Levy, *see* Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 7, the system appears to have contributed no evidence that will help the Court dispose of this motion. There are no undisputed facts regarding the CLS system before the Court. *See generally* Def.'s Statement of Undisputed Material Facts. Moreover, this Court's view of the CLS system evidence is that while it does not demonstrate that Slamowitz reviewed plaintiff's file prior to sending his initial letter, neither does it demonstrate conclusively that he did *not* do so.

In sum, defendant's account of its own review of plaintiff's case, prior to the July 18, 2000 debt collection letter, does not require the conclusion, as a matter of law, that its review was sufficient to satisfy the Section 1692e(3) requirement for meaningful attorney involvement. Defendant has not adduced facts showing that attorney Slamowitz, who signed the letter, was sufficiently familiar with his client's contracts and practices to justify his reliance on the client's assessment of plaintiff's case. Meanwhile, defendant's account of the process attorney Slamowitz followed in conducting his own review of plaintiff's case does not differ significantly from the record that was before the Second Circuit when it denied defendant's earlier summary judgment motion. In addition, while not sufficient to prove a violation of Section 1692e(3), the volume of cases handled by defendant during the relevant time period suggests that the Court should exercise particular caution in considering defendant's present motion. Accordingly, the Court declines to grant summary judgment on the basis of defendant's review of plaintiff's case.

### E.  Conclusion

As explained above, the Court finds that although defendant UCS was entitled to

reasonable reliance on defendant W & A with regard to defendant's individual circumstances, it has not adduced facts sufficient to require the conclusion, as a matter of law, that its reliance on W & A in this instance was reasonable, and therefore permissible under Section 1692e(3). The Court likewise finds that neither defendant's account of its familiarity with its client, nor its description of the process it followed in reviewing plaintiff's case, constitute facts sufficient to require the conclusion that its own review of plaintiff's case was sufficient to satisfy Section 1692e(3). Accordingly, the Court denies defendant's motion for summary judgment.

SO ORDERED.



**Oran ALMOG, et al., Plaintiffs,**

v.

**ARAB BANK, PLC, Defendant.**

**Gila Afriat–Kurtzer, et al., Plaintiffs,**

v.

**Arab Bank, PLC, Defendant.**

**Nos. 04–CV–5564(NG)(VVP),
05–CV–0388(NG)(VVP).**

United States District Court,
E.D. New York.

Jan. 29, 2007.

**Background:**  Multiple plaintiffs, United States and foreign nationals allegedly injured, or the survivors of those injured or killed, in terrorist attacks in Israel, brought actions under, respectively, the Anti–Terrorism Act (ATA) and the Alien

Tort Claims Act (ATS) against Jordanian bank alleged to have knowingly provided banking and other services that facilitated the actions of terrorist organizations. Bank moved to dismiss.

**Holdings:** The District Court, Gershon, J., held that:

(1) allegations were insufficient to state claim that bank violated ATA by failing to retain possession of or control over funds or report them;

(2) allegations were sufficient to state claims for violations of ATA provisions prohibiting providing material support or resources to terrorists and financing terrorism;

(3) allegations were sufficient to state claims for genocide and crimes against humanity; and

(4) allegations were sufficient to state claims under ATS as violations of international law.

Motions granted in part and denied in part.

### 1. Federal Courts ⇔33

Court may look beyond the pleadings in determining international law, for purposes of a motion to dismiss for lack of subject matter jurisdiction.    Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

### 2. War and National Emergency ⇔50

Allegations were insufficient to state claim that Jordanian bank violated Anti–Terrorism Act (ATA) by failing to retain possession of or maintain control over funds or report to the Secretary of Treasury the existence of funds in which terrorist organizations had an interest when it became aware that it had possession of, or control over, such funds; acts alleged were neither criminal violations nor acts of international terrorism.    18 U.S.C.A. § 2339B(a)(2).

### 3. War and National Emergency ⇔50

Allegations that bank knowingly and intentionally provided services to organizations it knew to be terrorist organizations, that plaintiffs were injured by an overt act committed in furtherance of the common scheme, and that bank played a role in plan to reward terrorists and knew that groups to which it provided services were engaged in terrorist activities and that funds it received were to be used for conducting acts of international terrorism, were sufficient to state claims for violations of Anti–Terrorism Act (ATA) provisions prohibiting providing material support or resources to terrorists and financing terrorism.    18 U.S.C.A. §§ 2333, 2339A, 2339B(a)(1), 2339C.

### 4. Conspiracy ⇔1.1
### War and National Emergency ⇔50

Civil aiding and abetting liability, as well as conspiracy liability, is available under the Anti–Terrorism Act (ATA).    18 U.S.C.A. § 2331 et seq.

### 5. Aliens, Immigration, and Citizenship ⇔763

Allegations, that bank provided financial services to terrorist organizations which intended to eradicate the State of Israel and murder or throw out the Jews, were sufficient to state claims for genocide and crimes against humanity, for purposes of action under Alien Tort Claims Act (ATS); organizations planned and commissioned attacks which resulted in systematic and continuous killing and injury of thousands of unarmed innocent civilians in Israel, the West Bank, and the Gaza Strip. 28 U.S.C.A. § 1350.

### 6. Aliens, Immigration, and Citizenship ⇔763

Allegations, that bank provided financing for terrorist organizations which engaged in organized, systematic suicide

bombings and other murderous attacks against innocent civilians for the purpose of intimidating a civilian population, were sufficient to state claims under Alien Tort Claims Act (ATS) as violations of international law. 28 U.S.C.A. § 1350.

**7. Aliens, Immigration, and Citizenship**
   **⟜765**

Complaint by victims of terrorist acts in Israel, alleging that Jordanian bank knowingly and intentionally provided banking services to organizations it knew to be terrorist, and that it knew the accounts were being used to fund suicide bombings and other attacks, sufficiently alleged liability under an aiding and abetting theory, for purposes of determining whether victims stated cause of action under Alien Tort Claims Act (ATS). 28 U.S.C.A. § 1350; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**8. Aliens, Immigration, and Citizenship**
   **⟜765**

Complaint which alleged that Jordanian bank administered benefit plan for families of deceased, wounded, or imprisoned terrorists, sufficiently alleged bank's liability under an aiding and abetting theory, for purposes of determining whether victims stated cause of action under Alien Tort Claims Act (ATS); conduct allegedly facilitated and provided an incentive for suicide bombings and other attacks. 28 U.S.C.A. § 1350; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**9. Aliens, Immigration, and Citizenship**
   **⟜760**

   **Federal Courts ⟜192.10**

Claims against Jordanian bank, brought by victims of terrorist attacks in Israel and alleging violations of federal common law, would be dismissed, where there was no sound basis for the claims and victims agreed that the claims were redundant of their claims under the Alien

Tort Claims Act (ATS). 28 U.S.C.A. § 1350.

**10. Federal Courts ⟜45**

Dismissal, pursuant to the doctrine of forum non conveniens, of claims against Jordanian bank, brought by victims of terrorist attacks in Israel and alleging violations of federal common law, was not warranted, where bank failed to overcome the deference to which victims' choice of forum was entitled, failed to establish that Jordan provided an adequate alternative forum, and failed to establish that private and public interests favored trial of the cases in Jordan. 28 U.S.C.A. § 1350.

———————

Allan Gerson, Attorney at Law, Washington, DC, Donald Migliori, Motley Rice, Llc, Providence, RI, Jodi Westbrook Flowers, John M. Eubanks, Justin B. Kaplan, Michael E. Elsner, Ronald L. Motley, Motley Rice, Llc, Mount Pleasant, SC, Douglas James Pepe, Gregory P. Joseph, Peter Rolf Jerdee, Gregory P. Joseph Law Offices, Llc, New York, NY, for Plaintiffs.

Kevin Walsh, Leboeuf Lamb Greene & Macrae Llp, New York, NY, Michael E. Elsner, Motley Rice Llc, Mount Pleasant, SC, for Defendant.

*OPINION AND ORDER*

GERSHON, District Judge:

More than 1,600 plaintiffs, consisting of United States and foreign nationals, bring claims for damages against Defendant Arab Bank, PLC, for knowingly providing banking and administrative services to various organizations identified by the U.S. government as terrorist organizations, that sponsored suicide bombings and other murderous attacks on innocent civilians in

Israel.[1]  The U.S. nationals assert claims under the Anti–Terrorism Act ("ATA"), 18 U.S.C. §§ 2331 *et seq.*, essentially identical to those brought in *Linde v. Arab Bank*, 04–CV–02799, *Litle v. Arab Bank*, 04–CV–05449, and *Coulter v. Arab Bank*, 05–CV–00365, which were addressed in *Linde v. Arab Bank, PLC*, 384 F.Supp.2d 571 (E.D.N.Y.2005) ("*Arab Bank I* ").[2]  The foreign nationals make similar factual allegations, but assert violations of the law of nations and base jurisdiction on the Alien Tort Claims Act ("ATS"), 28 U.S.C. § 1350.[3]  Both the U.S. nationals and the foreign nationals also assert federal common law claims, namely, assisting in the intentional injury of others, reckless disregard of injury to others, wrongful death, survival, and negligent and intentional infliction of emotional distress.  Defendant moves to dismiss the amended complaints for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, and for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS AND CLAIMS

Plaintiffs allege that, since the formation of Israel in 1948, Palestinian paramilitary and terrorist organizations have sought to destroy it through, *inter alia*, the systematic murder of Jews and other civilians in Israel.[4]  In December 1987, a collective Palestinian uprising, or *intifada*, erupted against Israel in the West Bank and in Gaza. In late September 2000, a second Palestinian *intifada*, or Al Aqsa Intifada or Intifada Al Quds (the "Second Intifada"), erupted after the collapse of peace negotiations between the State of Israel and the Palestinian Authority.  Each *intifada* was characterized by systematic and widespread terror campaigns designed to kill Jews and Israelis, as well as to coerce the civilian population of Israel to cause Israel to cede territory to the Palestinians and ultimately to destroy the Jewish state. With the outbreak of the Second Intifada, several terrorist organizations intensified the terror campaign of widespread and systematic suicide bombings and other murderous attacks in Israel, the West Bank, and the Gaza Strip, resulting in the death and injury of thousands of individuals, the majority of which were innocent civilians.

Plaintiffs identify the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad ("PIJ"), the Al Aqsa Martyrs' Brigade ("AAMB"), and the Popular Front

---

**1.**  Plaintiffs include individuals injured in the alleged attacks and family members of those killed and injured in the attacks.

**2.**  In addition to the above-captioned suits and the *Linde, Litle,* and *Coulter* suits, Arab Bank is the sole defendant in five other related cases:  *Bennett v. Arab Bank*, 05–CV–03183, filed on July 1, 2005; *Roth v. Arab Bank*, 05–CV–03738, filed on August 5, 2005; *Miller v. Arab Bank*, 05–CV–05518, filed on November 28, 2005; *Weiss v. Arab Bank*, 06–CV–01623, filed on April 7, 2006, in which there is a motion to dismiss pending; and *Jesner v. Arab Bank*, 06–CV–03869, filed on August 9, 2006. There is also a pending motion to dismiss newly-added plaintiffs in the *Coulter* suit.

**3.**  The foreign nationals consist mostly of Israeli citizens but also include Afghani, Argentinian, Australian, Belarusian, Canadian, French, Iranian, Iraqi, Peruvian, South African, Turkmenian, Ukranian, and Uzbeki citizens.

**4.**  The facts alleged are assumed true for purposes of defendant's motions to dismiss. *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir.2006).  The allegations of Arab Bank's conduct and plaintiffs' theories of liability are virtually identical in the Almog and Afriat–Kurtzer complaints and will be summarized together.  Allegations unique to individual plaintiffs in the amended complaints will be summarized separately.

for the Liberation of Palestine ("PFLP") (collectively "the terrorist organizations") as prominent terrorist organizations in the Second Intifada, operating in Palestinian-controlled territory and acting with the united purpose of eradicating the State of Israel through a campaign of terror, geno-cide, and crimes against humanity. HA-MAS was named a Specially Designated Terrorist entity ("SDT") by the U.S. gov-ernment in 1995 and designated a Foreign Terrorist Organization ("FTO") by the U.S. Secretary of State in 1997. The PIJ was named as an SDT in 1995 and desig-nated an FTO by the U.S. Secretary of State in 1997. The PFLP was named an SDT in 1995 and an FTO in 1997. Finally, HAMAS, the PIJ, and the AAMB were each designated a Specially Designated Global Terrorist Entity ("SDGT"). Plain-tiffs allege that these terrorist organiza-tions openly adhere to a shared mission, "to topple and eradicate the State of Isra-el, murder or throw out the Jews, and liberate the area by replacing it with an Islamic and/or Palestine state . . . ." The terrorist organizations seek to accomplish their shared goal by cooperating in the planning and commission of suicide bom-bings and other murderous attacks and by providing financial support to the relatives of "martyrs" and those injured in or im-prisoned for perpetrating attacks. This has resulted in the systematic and continu-ous killing and injury of thousands of un-armed innocent civilians in Israel, the West Bank, and the Gaza Strip.

Plaintiffs allege that several purported charitable organizations, including the Popular Committee for Support of the In-tifada (the "Popular Committee"), the Co-alition of Benevolence (the "Coalition"), the Humanitarian Relief Association (the "HRA"), the Al–Ansar Society, and the Tulkarem Charitable Committee, are in fact front organizations for the terrorist organizations and act as fund-raising appa-ratuses that raise and launder funds to subsidize the Second Intifada and to bank-roll the terrorist organizations. Plaintiffs allege that two specific committees were created in Saudi Arabia to raise funds to aid in the proliferation of the objectives of HAMAS, the PIJ, the AAMB, and the PFLP: (1) the Popular Committee for As-sisting the Palestinian Mujahideen (the "Mujahideen Committee"); and (2) in 2002, the Saudi Committee for Aid to the Al–Quds Intifada (the "Saudi Committee"). These two organizations set up accounts labeled "Account 98" accounts at various banks in Saudi Arabia, including the Arab National Bank (of which defendant Arab Bank owns a 40% interest), to raise funds for the families of "martyrs" of HAMAS, the AAMB, the PIJ, and the PFLP. In addition, public and private donations were deposited in numerous accounts estab-lished in various financial institutions in the Middle East, primary among them Arab Bank, for the explicit purpose of providing funds to families of "martyrs" of HAMAS, the PIJ, the AAMB, and the PFLP.

According to the amended complaints, Arab Bank "knowingly and intentionally, both directly and indirectly, aided and abetted and intentionally facilitated the at-tacks by HAMAS, the PIJ, the AAMB, and the PFLP by soliciting, collecting, transmitting, disbursing and providing the financial resources that allowed those or-ganizations to flourish and to engage in a campaign of terror, genocide, and crimes against humanity in an attempt to eradi-cate the Israeli presence from the Middle East landscape." According to plaintiffs, Arab Bank is one of the largest financial institutions in the Middle East and is headquartered in Jordan. It operates through various sister institutions, subsid-iaries, and affiliates, which collectively make up the Arab Bank Group. To this

end, Arab Bank owns a 40% interest in Saudi Arabia's Arab National Bank. Arab Bank has over 400 branch offices in over twenty-five countries, including branches located in Jordan, Saudi Arabia, the West Bank, the Gaza Strip, and the United States. Its U.S. branch, located in New York, provides financial services that include clearing and correspondent banking services to its foreign bank branches, affiliated banking institutions (those that are owned or controlled by Arab Bank Group), and other foreign banks.

Plaintiffs allege that Arab Bank was part of a formalized system of financing that HAMAS, the PIJ, the AAMB, and the PFLP rely upon to plan, fund, and carry out the suicide bombings and other murderous attacks. Specifically, plaintiffs allege that Arab Bank materially supported the efforts and goals of the terrorist organizations in two ways. First, Arab Bank provided banking services, including maintaining accounts, for HAMAS and other terrorist organizations. With respect to HAMAS specifically, plaintiffs allege that Arab Bank provided banking services to HAMAS directly by collecting funds into HAMAS accounts in its Beirut, Lebanon and Gaza Strip branches. Supporters knew to donate to HAMAS directly through Arab Bank because the HAMAS website directed supporters to make contributions to Arab Bank's Gaza Strip branch and because there were various advertisements publicized throughout the Middle East calling for donations to Arab Bank accounts. Arab Bank knew that the donations were being collected for terrorist attacks.

Plaintiffs also allege that Arab Bank maintained accounts and solicited and collected funds for the various charitable organizations, including the Popular Committee, organizations that are part of the Coalition, the HRA, the Al–Ansar Society and the Tulkarem Charitable Committee, all of which it knew are affiliated with the various terrorist organizations. In addition, plaintiffs allege that Arab Bank maintained accounts for individual supporters of terrorist organizations, such as HAMAS and al Qaeda. Arab Bank knew that the accounts of these various organizations and individuals were being used to fund the suicide bombings and other attacks sponsored by the terrorist organizations. Finally, Arab Bank laundered funds for the terrorist and front organizations, including the Holy Land Foundation for Relief and Development ("HLF"), which raised funds for HAMAS in the United States.

Plaintiffs' second factual theory is that Arab Bank administered the financial infrastructure by which the Saudi Committee distributed a comprehensive benefit of $5,316.06 to designated families of Palestinian "martyrs" and those wounded or imprisoned in perpetrating terrorist attacks. Despite its knowledge that the Saudi Committee was distributing this benefit to families of "martyrs," Arab Bank essentially served as a "paymaster" through its branch offices within the West Bank and the Gaza Strip. Plaintiffs allege that the Saudi Committee, as of November 2001, had paid millions of dollars to suicide bombers or their beneficiaries through Arab Bank. Additionally, Arab Bank has transmitted millions of dollars to, among others, various institutions and individuals on behalf of the Saudi Committee.

According to plaintiffs' allegations, Arab Bank played an integral role in the structured financial process by which the funds in the "Account 98" accounts were transferred to their intended beneficiaries. The first step was to create and maintain a database of persons eligible to receive payments. To accomplish that, the Saudi Committee prepared a list of potential

beneficiaries, including the families of "martyrs" and of prisoners. After verifying the names of the beneficiaries, their contact information, and their injury with Palestinian officials, the Saudi Committee coordinated with Arab Bank. Specifically, the Saudi Committee consulted with Arab Bank and local representatives of HAMAS to finalize the lists of beneficiaries.

The next step, as alleged by plaintiffs, was to transfer the funds contained in the "Account 98" accounts in the various banks to accounts at Arab Bank for the beneficiaries. The Saudi Committee opened an account at Arab Bank in the beneficiary's name and deposited a standard amount of U.S. dollars or Saudi Riyals into the account. Because Saudi Riyals cannot be conveniently converted to Israeli currency, Arab Bank facilitated that conversion by routing those funds through its New York branch, where they were converted to U.S. dollars and then to Israeli currency. Thus, "Account 98" funds "often, if not always," went through Arab Bank's branch in New York before being transferred to accounts in the Middle East.

Plaintiffs allege that, after the funds were transferred to designated accounts in the Arab Bank branches in the West Bank and the Gaza Strip, Arab Bank distributed the money to beneficiaries with appropriate documentation. To ensure that only families of bona fide "martyrs" received disbursements, the Saudi Committee required beneficiaries to present registration cards to Arab Bank to receive remittances. The registration card was an official certification from the Palestinian Authority establishing the bona fides of the "martyr." Arab Bank allegedly provided instructions to the general public on how to qualify and collect money. Thus, plaintiffs claim that Arab Bank not only disbursed the funds to the beneficiaries, but also participated in the formalized process that required the families of "martyrs" to obtain official certification of their deceased relatives' status as bona fide "martyrs."

According to plaintiffs, the Saudi Committee paid and transmitted benefits to approximately 200 fallen "martyrs" through the program administered by Arab Bank in the first year of its existence alone. They also allege that the Saudi Committee openly declared that its funds were transmitted and distributed to the families of "martyrs" through Arab Bank. Plaintiffs allege that there is a direct correlation between the number of attacks, including suicide bombings, and the amount of funds held by the Mujahideen and Saudi Committees. Plaintiffs allege that the payment and promise of payment to families of "martyrs" incentivized and encouraged potential suicide bombers. Thus, plaintiffs allege that Arab Bank facilitated and provided an incentive for the suicide bombings and other murderous attacks in that the individual attackers knew that, if they committed an attack, their families would be supported by the funds held in their names by Arab Bank.

Each plaintiff alleges that he or she is a victim, or family member of a victim, of the actions of suicide bombers and murderers who were supported, encouraged, and enticed by funds collected and disbursed by Arab Bank. In their amended complaints, plaintiffs provide the names of various suicide bombers and gunmen whose families received payment through the financing process described above and whose attacks caused the injuries or deaths which are the subject of these suits. While the allegations of each plaintiff are unique, to summarize each plaintiffs' allegations would be impractical given the number of plaintiffs; thus, this opinion will summarize only the allegations of a few representative individuals from each of the amended complaints.

The following allegations are from the Almog amended complaint:

On February 22, 2004, an AAMB suicide bombing of a bus in Jerusalem killed eight people and injured over sixty others, including family members of plaintiffs who are Iraqi, Moroccan, and Israeli citizens.

On October 4, 2003, a PIJ suicide bombing at the Maxim Restaurant in Haifa killed twenty-one people, including family members of plaintiffs who are Israeli and U.S. citizens.

On May 19, 2003, a PIJ suicide bombing at the Amakim Mall in Afula, killed three and wounded seventy people, including family members of plaintiffs who are Ukranian and Israeli citizens.

On April 30, 2003, a suicide bombing in a beach-side pub in Tel Aviv killed two and injured over fifty people, including family members of plaintiffs who are United States, French, Israeli, United Kingdom, South African, Canadian, and Australian citizens.

On October 20, 2002, a HAMAS sniper shot and killed Keivan Chen, son of plaintiff Rahel Cohen, a citizen of Iran.

On December 1, 2001, two HAMAS suicide bombers detonated explosive devices in Jerusalem, killing eleven people, including family members of plaintiffs who are French and Israeli citizens.

On June 18, 2001, a HAMAS suicide bombing of a dance club in Tel Aviv killed and injured several youths, including family members of plaintiffs who are Russian, Israeli, Belarusian, Turkmenian, Uzbeki, and Ukranian citizens.

The allegations in the Afriat–Kurtzer amended complaint arise from a single suicide bombing on January 22, 1995, at the Beit Lid junction near Netanya. The PIJ claimed responsibility for the attack, which killed nineteen people and injured many others, whose family members are plaintiffs of Israeli, Argentinian, and U.S. citizenry.

Based on these allegations, both the Almog and Afriat–Kurtzer plaintiffs assert the following claims:[5] In Count One, the U.S. nationals claim that Arab Bank violated various provisions of the ATA.[6] Specifically, the U.S. nationals allege Arab Bank violated: (1) 18 U.S.C. § 2339A by providing material support, such as financial services, knowing or intending that such services would be used to carry out prohibited criminal acts; (2) 18 U.S.C. § 2339B(a)(1) by knowingly providing material support, such as financial services, to a terrorist organization; (3) 18 U.S.C. § 2339B(a)(2) by failing to retain possession of or maintain control over funds or report to the Secretary of the Treasury the existence of funds in which terrorist organizations had an interest when it became aware that it had possession of, or control over, such funds; and (4) 18 U.S.C. § 2339C by directly and indirectly collecting funds to finance terrorism.

In Count Two, the U.S. nationals allege that Arab Bank aided and abetted violations of the ATA by collecting and disbursing funds knowing they would be used to, *inter alia*, support, encourage, and reward terrorist activities in Israel, including suicide bombings and murder.

In Count Three, the foreign nationals claim that Arab Bank violated the law of

---

**5.** Because the Almog and Afriat–Kurtzer plaintiffs assert the identical claims in each count of their respective amended complaints, references to a "Count" include counts of both the Almog and Afriat–Kurtzer pleadings, unless otherwise indicated.

**6.** The claims in Counts One and Two are alleged by the U.S. nationals only. The claims in Counts Three through Five are alleged by the foreign nationals only. The claims in Counts Six through Ten are alleged by all plaintiffs.

nations by financing the suicide bombings and other murderous attacks directed at civilians committed by HAMAS, the PIJ, the AAMB, and the PFLP. They further allege that Arab Bank aided and abetted and intentionally facilitated a violation of international law by providing funds to or collecting funds for HAMAS, the PIJ, the AAMB, and the PFLP, intending or knowing that such funds would be used to carry out an offense under international law.

The foreign nationals allege in Count Four that Arab Bank aided and abetted, was complicit in, intentionally facilitated, and participated in a joint venture to engage in acts of genocide in violation of the law of nations by providing financial and other practical assistance, encouragement or moral support to HAMAS, the PIJ, the AAMB, and the PFLP.

In Count Five, the foreign nationals claim that Arab Bank aided and abetted, was complicit in, intentionally facilitated, and participated in a joint venture to engage in the planning, preparation, or execution of crimes against humanity in violation of the law of nations by providing financial and other practical assistance, encouragement, or moral support to HAMAS, the PIJ, the AAMB, and the PFLP.

The remainder of the Counts of both amended complaints allege various torts said to arise under federal common law. Specifically, Count Six alleges that Arab Bank assisted in the intentional injury of others by a third party by allowing its facilities to be used by HAMAS, the PIJ, the AAMB, and the PFLP in order to support and encourage suicide bombings and other murderous attacks; Count Seven alleges that Arab Bank recklessly disregarded injury to others; Count Eight alleges claims for wrongful death; Count Nine alleges "survival" claims; and Count Ten alleges claims for negligent and intentional infliction of emotional distress.

# DISCUSSION

## I. Pleading and Motion to Dismiss Standards

[1] Under Rule 8(a) of the Federal Rules of Civil Procedure, a pleading sets forth a claim for relief if it contains: (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Under this simplified pleading standard, a court should not dismiss a complaint unless no relief could be granted under any set of facts that could be proved consistent with the complaint. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted, the court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006). On the issue of subject matter jurisdiction, the court may look beyond the pleadings in determining international law. *Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 255 n. 30 (2d Cir. 2003). When reviewing a motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6), a court should decide the jurisdictional question first. *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n,* 896 F.2d 674, 678 (2d Cir.1990).

## II. Anti–Terrorism Act Claims

### A. Brief Background of the ATA

There have been a series of acts of Congress each entitled the "Anti–Terrorism Act." The first Anti–Terrorism Act was enacted in 1987. *See* Pub.L. No. 100–204, §§ 1001–1005, 101 Stat. 1406 (1987).

The ATA of 1987 contained Congressional findings and determinations, including the determination that the Palestine Liberation Organization ("PLO") is a terrorist organization. *Id.* § 1002. The first ATA also enacted 22 U.S.C. § 5202, which prohibits certain actions with regard to the PLO. *Id.* § 1003.

The second Anti–Terrorism Act was enacted in 1990, and it created several terrorism-related provisions, as well as redesignating § 2331 of Title 18 of the U.S.Code to § 2332. *See* Pub.L. No. 101–519, § 132, 104 Stat. 2240, 2250 (1990). The newly-redesignated § 2332 provided for criminal penalties for conduct occurring outside the United States that harmed, either by death or serious bodily injury, U.S. nationals. *Id.* The newly-enacted § 2331 provided definitions for various terms as used in that particular chapter of Title 18. *Id.* The other sections of the Anti–Terrorism Act of 1990, §§ 2333–2338 (excluding sections 2332a-h), provided, *inter alia*, U.S. nationals with civil remedies for acts of international terrorism, the district courts with jurisdiction, and a statute of limitations period for civil claims. *Id.*

In 1991, the Anti–Terrorism Act of 1990 was repealed in its entirety. *See* Pub.L. No. 102–27, § 402, 105 Stat. 130, 155 (1991), *as amended*, Military Construction Appropriations Act, Pub.L. No. 102–136, § 126, 105 Stat. 637, 643 (1991) (stating that "[e]ffective November 5, 1990, chapter 113A of title 18, United States Code, is amended to read as if section 132 of Public Law 101–519 [the Anti–Terrorism Act of 1990] had not been enacted"). The substantive provisions of the Anti–Terrorism Act of 1990 were reenacted in 1992. *See* Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 1003, 106 Stat. 4506, 4521–24 (1992). Although the substance of the provisions remained virtually unchanged, the newly-enacted public law did not designate a short title, previously the Anti–Terrorism Act, for the collection of provisions.[7] The terrorism-related provisions, as reenacted, are codified in §§ 2331–2338 of chapter 113B of Title 18 of the U.S.Code (excluding sections 2332a-h). The remainder of the sections of Chapter 113B of Title 18 of the U.S.Code, §§ 2332a-h and §§ 2339–2339D, which also relate to terrorism, were enacted by various other laws, including the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub.L. No. 107–56, 115 Stat. 272 (2001).[8]

## B. Anti–Terrorism Act Claims

Arab Bank moves to dismiss the claims of the U.S. nationals brought under the

---

7. For the sake of simplicity, however, I use the acronym "ATA" to refer to the terrorism-related provisions contained in Chapter 113B of Title 18 of the U.S.Code.

8. *See also, e.g.,* AEDPA, Pub.L. No. 104–132, § 303, § 321, § 521, § 702, 110 Stat. 1214 (1996) (enacting 18 U.S.C. § 2332b (Acts of Terrorism Transcending National Boundaries), § 2332c (Use of Chemical Weapons) (repealed by Pub.L. No. 105–277, § 201(c)(1), 112 Stat. 2681–871 (1998)), § 2332d (Financial Transactions), and § 2339B (Providing Material Support or Resources to Designated Foreign Terrorist Organizations)); USA PATRIOT Act, Pub.L. No. 107–56, § 803(a), 115 Stat. 272, 376 (2001) (enacting 18 U.S.C. § 2339 (Harboring or Concealing Terrorists)); Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, § 60023, § 120005, 108 Stat. 1796, 1980, 2022 (1994) (enacting 18 U.S.C. § 2332a (Use of Weapons of Mass Destruction) and § 2339A (Providing Material Support to Terrorists)); and Implementation of the International Convention for the Suppression of Terrorist Bombings, Pub.L. No. 107–197, § 102, § 202, 116 Stat. 721, 724 (2002) (enacting 18 U.S.C. § 2332f

ATA on essentially the same grounds raised in *Arab Bank I*.[9] For the reasons stated in the opinion in that case, Arab Bank's motion to dismiss the ATA claims is denied in part and granted in part.

Like the plaintiffs in *Arab Bank I*, the current plaintiffs bring their suit pursuant to 18 U.S.C. § 2333, which provides that any U.S. national may sue for an injury sustained "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). "International terrorism" is defined as activities that:

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended—

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]

18 U.S.C. § 2331(1).

[2] Plaintiffs allege that Arab Bank violated: (1) 18 U.S.C. § 2339A by providing material support or resources to terrorists;[10] (2) 18 U.S.C. § 2339B(a)(1) by providing material support to foreign terrorist organizations;[11] (3) 18 U.S.C. § 2339B(a)(2) by failing to retain possession of or maintain control over funds or report to the Secretary of Treasury the existence of funds in which terrorist organizations had an interest when it became aware that it had possession of, or control over, such funds;[12] and (4) 18 U.S.C. § 2339C by financing terrorism.[13] As de-

---

(Bombings of Places of Public Use, Government Facilities, Public Transportation Systems and Infrastructure Facilities) and § 2339C (Prohibitions Against the Financing of Terrorism)).

9. Arab Bank specifically directed this court's attention to its briefs in support of its motions to dismiss in the *Linde*, *Litle*, and *Coulter* cases.

10. Section 2339A defines the term "material support or resources" to include the provision of any property, service, including currency or monetary instruments or financial securities, or financial services.

11. Section 2339B(a)(1) prohibits knowingly providing material support or resources to a foreign terrorist organization. To violate this subsection, a person must have knowledge that the organization: (1) is a designated terrorist organization; (2) has engaged or engages in terrorist activity; or (3) has engaged

or engages in terrorism. Section 2331(3) defines the term "person" as "any individual or entity capable of holding a legal or beneficial interest in property."

Section 2339B(g)(6) defines the term "terrorist organization" as "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act."

12. Section 2339B(a)(2) requires any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, to: (A) retain possession of, or maintain control over, such funds; and (B) report to the Secretary of Treasury the existence of such funds.

13. Section 2339C(a)(1) makes it a crime to directly or indirectly, unlawfully and willfully provide or collect funds intending, or know-

scribed in *Arab Bank I*, violations of Sections 2339A, 2339B(a)(1), and 2339C can serve as predicate crimes giving rise to liability under the ATA. *See Arab Bank I*, 384 F.Supp.2d at 580–81 (citing *Boim v. Quranic Literacy Inst. and Holy Land Found. For Relief And Dev.*, 291 F.3d 1000, 1014–15 (7th Cir.2002)). Thus, for the reasons stated in *Arab Bank I* with respect to those claims, plaintiffs have sufficiently alleged that they were injured by reason of an act of international terrorism. However, plaintiffs' claims under § 2339B(a)(2) "are neither criminal violations nor acts of international terrorism, as defined by the statute" and must therefore be dismissed. *See id.* at 590 (stating that "this claim is an attempt to recast civil violations of the reporting requirements as criminal acts of providing material support").

[3, 4]   Civil aiding and abetting liability, as well as conspiracy liability, is available under the ATA, and Arab Bank's alleged conduct falls within the scope of such liability. *Id.* at 582–85 (citing *Boim*, 291 F.3d at 1018–21 and *Halberstam v. Welch*, 705 F.2d 472, 488–89 (D.C.Cir.1983)). With respect to conspiracy, plaintiffs adequately allege that Arab Bank knowingly and intentionally provided services to organizations it knew to be terrorist organizations and that they were injured by an overt act which was committed in furtherance of the common scheme. Arab Bank and the terrorist organizations were participants in a common plan under which Arab Bank supplied necessary financial services to the organizations and adminis-

tered the "martyr" benefit plan. These allegations support not only the existence of an agreement, but also Arab Bank's knowing and intentional participation in the agreement's illegal goals. *See id.* at 584. With respect to aiding and abetting liability, the financial services provided by Arab Bank, and the administration of the benefit plan, are alleged to have provided substantial assistance to international terrorism and encouraged terrorists to act. *See id.* Thus, Arab Bank's alleged conduct is a sufficient basis for liability under the broad scope of the ATA.

Finally, plaintiffs' allegations are sufficient with respect to Arab Bank's knowledge and intent. *See id.* at 585–87. None of the provisions of the ATA imposes a heightened pleading standard, nor do any require that Arab Bank have had the specific intent to cause the specific acts which injured plaintiffs. *See Arab Bank I*, 384 F.Supp.2d at 585–86. It is sufficient that Arab Bank played a role in a well-publicized plan to reward terrorists killed and injured in suicide bombings and other attacks in Israel; knew that the groups to which it provided services were engaged in terrorist activities; and knew that the funds it received as deposits and transmitted to various organizations were to be used for conducting acts of international terrorism. *See id.* at 588.

In conclusion, as in *Arab Bank I*, the claims in Count One of both the Almog and Afriat–Kurtzer amended complaints alleging violations of 18 U.S.C. § 2339B(a)(2) (failure to retain funds and to report the

---

ing, that such funds will be used to carry out: (A) an act which constitutes an offense within the scope of, among other treaties, the International Convention for the Suppression of Terrorist Bombings; or (B) any other act intended to cause death or serious bodily injury to a civilian, or to a person not taking an active part in the hostilities in a situation of

armed conflict with the purpose of intimidating a population, or to compel a government to do or to abstain from doing any act.

Section 2339C also defines certain terms. The term "provides" is defined to include giving, donating, and transmitting, and the term "collects" is defined to include raising and receiving.

existence of certain funds) are dismissed. *See id.* at 589–90. The motion to dismiss is denied as to all other ATA claims in Counts One and Two pursuant to the reasoning in *Arab Bank I*.[14]

### III. Alien Tort Claims Act Claims

The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. On its face, the statute requires that plaintiffs must 1) be aliens, 2) claiming damages for a tort only, 3) resulting from a violation of the law of nations or a treaty of the United States. *Flores,* 414 F.3d at 242. Arab Bank moves to dismiss the claims of the foreign nationals brought under the ATS, arguing that this court lacks jurisdiction and that plaintiffs have failed to state a claim because plaintiffs have failed to plead a violation of the law of nations. Neither the Almog nor the Afriat–Kurtzer plaintiffs assert that the torts they allege are in violation of a treaty of the United States; rather, they assert a violation of the law of nations. The essential issues in contention are therefore whether plaintiffs have pled a violation of the law of nations that should be recognized by this court under the ATS, and whether Arab Bank can be liable for aiding and abetting those violations.[15]

Any discussion of the ATS must begin with the Supreme Court's recent decision in *Sosa v. Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Humberto Alvarez–Machain, the plaintiff in *Sosa,* was a Mexican national who had been indicted for the torture and murder of an agent of the United States Drug Enforcement Agency (the "DEA"). *Id.* at 697–98, 124 S.Ct. 2739. The DEA authorized a plan whereby a group of Mexican nationals, including Jose Francisco Sosa, seized Alvarez–Machain and brought him back to the United States for trial. *Id.* Alvarez–Machain brought a civil action against Sosa, among others, seeking damages under the ATS for a violation of the law of nations, namely, arbitrary arrest and detention. *Id.* at 699, 124 S.Ct. 2739. The defendant argued that the ATS provides courts only with subject matter jurisdiction and neither creates nor authorizes a court to recognize a cause of action for an alleged violation of the law of nations. *Id.* at 712, 124 S.Ct. 2739.

The Supreme Court, in *Sosa,* stated that, "although the ATS is a jurisdictional statute creating no new causes of action .... [t]he jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time" the ATS was enacted. *Id.* at 724, 124 S.Ct. 2739.

---

**14.** Defendant argues that the claims of three plaintiffs are time-barred under the ATA. Defendant's argument with respect to these plaintiffs will be addressed in the *Coulter* motion currently pending before the court.

**15.** In the context of the ATS, the phrase "law of nations" is consistently used interchangeably with the phrases "norm of international law" and "international law." *See Sosa v. Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (using interchangeably the phrases "norm of internation-

al law" and "law of nations"); *United States v. Yousef,* 327 F.3d 56, 104 n. 38 (2d Cir. 2003) (per curiam) (stating that, although the phrases are not entirely synonymous, the phrases "international law" and the "law of nations" frequently are used interchangeably). In addition, the law of nations can encompass customary international law, and, to the extent that it does, the phrase "customary international law" is also used interchangeably with the phrase "the law of nations." *See Flores,* 414 F.3d at 237 n. 2.

Thus, under the ATS, courts can hear a limited category of claims "defined by the law of nations and recognized at common law." *Sosa,* 542 U.S. at 712, 124 S.Ct. 2739. The Court reasoned:

> [T]here is every reason to suppose that the First Congress did not pass the ATS as a jurisdictional convenience to be placed on the shelf for use by a future Congress or state legislature that might, someday, authorize the creation of causes of action or itself decide to make some element of the law of nations actionable for the benefit of foreigners. The anxieties of the preconstitutional period cannot be ignored easily enough to think that the statute was not meant to have a practical effect . . . . the reasonable inference from the historical materials is that the statute was intended to have practical effect the moment it became law.

*Id.* at 719, 724, 124 S.Ct. 2739. The Court assumed that the "First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations . . . ." *Id.* at 724, 124 S.Ct. 2739. In particular, the Court stated, "[i]t would take some explaining to say now that federal courts must avert their gaze entirely from any international norm intended to protect individuals." *Id.* at 730, 124 S.Ct. 2739.

As the *Sosa* Court noted, the federal courts have previously recognized causes of action under the ATS for a violation of the law of nations. *Id.* at 731, 124 S.Ct. 2739. For example, in *Filartiga v. Pena–Irala,* 630 F.2d 876, 885, 890 (2d Cir.1980), the seminal Second Circuit ATS case, which is cited repeatedly and favorably in *Sosa,* the Second Circuit recognized a cause of action for violation of the law of nations under the ATS. In *Filartiga,* the plaintiffs Dolly M.E. Filartiga and Joel Filartiga, citizens of Paraguay, brought an action under the ATS against the Inspector General of Police in Asuncion, Paraguay, for allegedly torturing and killing Joel Filartiga's son. 630 F.2d at 878. The court held that an act of torture committed by a state official against an alien of the same nationality violates the law of nations and is thus actionable under the ATS. *Id.* at 884–85.

Having held that, under the ATS's jurisdictional grant, federal courts can recognize a cause of action that arose after enactment of the ATS, the *Sosa* Court set out the standard for doing so: "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." [16] 542 U.S. at 732, 124 S.Ct. 2739. The norm of international law may not be merely aspirational; rather, it must be specific and well-defined. *Id.* at 738, 124 S.Ct. 2739. The Court rejected Alvarez–Machain's contention that there was an international norm against arbitrary detention on the ground that it was not specific enough to create a federal remedy. *Id.* ("Whatever may be said for the broad principle Alvarez advances, in the present, imperfect world, it expresses an aspiration that exceeds any binding customary rule having the specificity we require. Creating a private cause of action to further that aspiration would go beyond any residual common law discretion we think it appropriate to exercise."). The Court then considered the specific conduct alleged by Alvarez–Machain and concluded that "a single illegal detention of less than a day, followed by the transfer of custody to lawful author-

---

**16.** These include the violation of safe conducts, infringement of the rights of ambassa- dors, and piracy. *Sosa,* 542 U.S. at 724, 124 S.Ct. 2739.

ities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy." *Id.*

*Sosa* instructs that courts consider the *current* state of the law of nations in deciding whether to recognize a claim under the ATS. *Id.* at 733, 124 S.Ct. 2739. As the *Filartiga* Court stated, "courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." 630 F.2d at 881. That rules of international law evolve and ripen over time was acknowledged by the Supreme Court as early as 1900 in *The Paquete Habana*, 175 U.S. 677, 694, 20 S.Ct. 290, 44 L.Ed. 320 (1900) ("[T]he period of a hundred years which has [elapsed since the enactment of the ATS] is amply sufficient to have enabled what originally may have rested in custom or comity, courtesy or concession, to grow, by the general assent of civilized nations, into a settled rule of international law.").

The current law of nations "is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Flores,* 414 F.3d at 248; *see also Sosa,* 542 U.S. at 714–15, 124 S.Ct. 2739. First, then, in order for a rule to become a norm of international law, States must universally abide by or accede to it. *Flores,* 414 F.3d at 248; *Filartiga,* 630 F.2d at 881 ("The requirement that a rule command the 'general assent of civilized nations' to become binding upon them all is a stringent one."). The question is not one of whether the rule is often violated, but whether virtually all States recognize its validity. *Filartiga,* 630 F.2d at 884 (citing the Department of State, Country Reports on Human Rights for 1979, published as Joint Comm. Print, House Comm. on Foreign Affairs, and Senate Comm. on Foreign Relations, 96th Cong.2d Sess. (Feb. 4,

1980), Introduction at 1.). Thus, that a norm of international law is honored in the breach does not diminish its binding effect as a norm of international law. *Filartiga,* 630 F.2d at 884 n. 15; *cf. Sosa,* 542 U.S. at 738 n. 29, 124 S.Ct. 2739.

Second, States must abide by or accede to the rule from a sense of *legal obligation* and not for moral or political reasons. *Flores,* 414 F.3d at 248. Whether States abide by or accede to a rule out of a sense of legal obligation is shown by, among other things, state practice.

Third, "[i]t is only where the nations of the world have demonstrated that the wrong is of *mutual,* and not merely *several,* concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the statute." *Filartiga,* 630 F.2d at 888 (emphasis added). Matters of "mutual" concern are those involving States' actions performed with regard to each other. *Flores,* 414 F.3d at 249. Matters of "several" concern are "matters in which States are separately and independently interested." *Id.* "[O]ffenses that may be purely intra-national in their execution, such as official torture, extrajudicial killings, and genocide, do violate customary international law because the nations of the world have demonstrated that such wrongs are of mutual concern and capable of impairing international peace and security." *Id.* (internal quotation marks, citations, and alterations omitted).

The sources of law from which a court discerns the current state of the law of nations were specified by the Supreme Court in *Paquete Habana:*

> International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented

for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.[17]

175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); *see also Sosa*, 542 U.S. at 734, 124 S.Ct. 2739; *Filartiga*, 630 F.2d at 880. As the *Filartiga* Court noted, 630 F.2d at 881 n. 8, this method of discerning the current state of the law of nations is consistent with Article 38 of the Statute of the International Court of Justice ("ICJ"), which provides in pertinent part:

1. The Court, whose function is to decide in accordance with international law such disputes as are submitted to it, shall apply:

(a) international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;

(b) international custom, as evidence of a general practice accepted as law;

(c) the general principles of law recognized by civilized nations;

(d) subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary

---

**17.** In accordance with *Paquete Habana*, both parties have submitted affidavits by various commentators regarding current international law.

Plaintiffs have submitted declarations by:

1) Ruth Wedgwood, Edward Burling Professor of International Law and Diplomacy at the Nitze School of Advanced International Studies, at John Hopkins University, in Washington, D.C., who specializes in scholarship and teaching in public international law, the law of armed conflict, international criminal law, international human rights law, United Nations politics, and the constitutional law of foreign affairs. In 2002, Professor Wedgwood was elected by 148 State parties to a four-year term as the U.S. member of the United Nations Human Rights Committee in Geneva, and she is currently Vice President of the American Society of International Law.

2) Yoram Dinstein, former President of Tel Aviv University (1991–1998) and Professor of International Law and Yanowicz Professor of Human Rights. He has served twice as the Charles H. Stockton Professor of International Law at the U.S. Naval War College in Newport, RI. Professor Dinstein is a member of the Institute of International Law and the San Remo International Institute of Humanitarian Law.

3) Mark A. Drumbl, Associate Professor and Ethan Allen Faculty Fellow at Washington & Lee University School of Law. Professor Drumbl has published various articles and has contributed to several books on topics of international law.

Defendant has submitted declarations by:

1) Eric A. Posner, Kirkland and Ellis Professor of Law at the University of Chicago. Professor Posner teaches courses in public international law, foreign relations law, and theories of international law. He specializes in international law, and he is a widely-published scholar on various topics of international law.

2) Stephan Talmon, University Lecturer in Public International Law at the University of Oxford, United Kingdom. Professor Talmon specializes in research and teaching public international law, including the law of international organizations, international criminal law, international environmental law, international humanitarian law, and international human rights law. He regularly advises governments and private clients on questions of public international law, and he has published various articles and has contributed to several books on topics concerning international law.

means for the determination of the rules of law.[18]

art. 38, June 26, 1945, 59 Stat. 1055, 1060, T.S. No. 993.

Accordingly, treaties, also referred to as conventions or covenants, that create legal obligations on the States party to them, constitute primary evidence of the law of nations. *Flores*, 414 F.3d at 256. A State's ratification of a treaty is evidence of its intent to be legally obligated by the principles embodied in the treaty and therefore evidences the "customs and practices" of that State.[19] *Id.* at 256. Treaties ratified by at least two States provide some evidence of the law of nations; if enough States ratify a treaty, a norm of international law may be established. The more States that have ratified a treaty, especially those States with greater relative influence in international affairs, the greater the treaty's evidentiary value. *Id.* at 256–57. Likewise, a treaty's evidentiary value is increased if the State parties actually implement and abide by the principles set forth in the treaty either internationally or within their own borders.[20] *Id.* In addition to treaties, United Nations Security Council resolutions, which are binding on all Member States, are evidence of the law of nations. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F.Supp.2d 331, 338 (S.D.N.Y.2005) (citing

Chapter 5 of the United Nations Charter, art. 25).

Finally, under *Sosa*, in deciding whether to recognize a claim under the ATS, a court must consider the practical consequences of making the claim available to litigants in the federal courts. 542 U.S. at 732–33, 124 S.Ct. 2739. For instance, there may be collateral consequences, such as implications on foreign relations, that advise against recognizing a claim. *Id.* at 727, 124 S.Ct. 2739. The Court in *Sosa* also cautioned courts to tread lightly in exercising their discretion because courts generally have to look for "legislative guidance before exercising innovative authority over substantive law" and because the "decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Id.* at 726, 727, 124 S.Ct. 2739.

It is against this backdrop and mindful of *Sosa's* direction that the court's "judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today," *Sosa*, 542 U.S. at 729, 124 S.Ct. 2739, that I address the motion to dismiss the ATS claims. The first issue I address is whether plaintiffs have pled a violation of the law of nations. Later, I address whether the

---

**18.** Article 59 of the ICJ states that "[t]he decision of the Court has no binding force except between the parties and in respect of that particular case."

According to the Charter of the United Nations, all Members of the United Nations are *ipso facto* parties to the Statute of the International Court of Justice. *Yousef*, 327 F.3d at 101 n. 34 (citing the Charter of the United Nations, art. 93, June 26, 1945, 59 Stat. 1031, T.S. No. 993, and stating that the United States ratified the Charter of the United Nations on July 28, 1945).

**19.** States are not bound by simply signing a treaty—signing serves only to authenticate the

text of the treaty. *Flores*, 414 F.3d at 256. A treaty is legally binding on a State only when it ratifies the treaty. *Id.*

**20.** Thus, in the United States, a treaty that is self-executing (i.e., immediately creates rights and duties that are enforceable by domestic tribunals), or that has been executed through implementation by an Act of Congress, giving rise to legally enforceable rights in our courts, provides greater evidence of the customs and practices of the United States than a treaty that has not been executed. *Flores*, 414 F.3d at 257 n. 34.

allegations against Arab Bank are sufficient for it to be held liable for those violations.

## A.  Violation of the Law of Nations

### 1.  Genocide and Crimes Against Humanity

Acts of genocide and crimes against humanity violate the law of nations and these norms are of sufficient specificity and definiteness to be recognized under the ATS. *See Flores*, 414 F.3d at 244 n. 18 ("Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II."); *Kadic v. Karadzic*, 70 F.3d 232, 241–42 (2d Cir.1995) ("In 1946, the General Assembly of the United Nations declared that genocide is a crime under international law that is condemned by the civilized world, whether the perpetrators are private individuals, public officials or statesmen." (internal quotation marks omitted)); *In re Agent Orange Prod. Liab. Litig.*, 373 F.Supp.2d 7, 136 (E.D.N.Y.2005) ("[C]rimes against humanity are also deemed to be part of jus cogens—the highest standing in international legal norms. Thus, they constitute a non-derogable rule of international law."); *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *9 (S.D.N.Y. Feb.28, 2002) (stating that crimes against humanity violate "a norm that is customary, obligatory, and well-defined in international jurisprudence").

Defendant does not contest the availability of genocide or crimes against humanity claims under the ATS but argues that plaintiffs have not sufficiently pled a claim for genocide and crimes against humanity.[21]  The Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention") defines genocide as:

> any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
>
>> (a) Killing members of the group;
>>
>> (b) Causing serious bodily or mental harm to members of the group;
>>
>> (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;
>>
>> (d) Imposing measures intended to prevent births within the group;
>>
>> (e) Forcibly transferring children of the group to another group.

Genocide Convention, art. 2, Dec. 9, 1948, 78 U.N.T.S. 227, *implemented in* Genocide Convention Implementation Act of 1987 (the Proxmire Act), 18 U.S.C. § 1091 (2000).[22]  The Second Circuit has found a violation of the international norm proscribing genocide where the plaintiffs alleged that the defendant "personally planned and ordered a campaign of murder, rape, forced impregnation, and other forms of torture designed to destroy the religious and ethnic groups of Bosnian Muslims and Bosnian Croats." *Kadic*, 70 F.3d at 242.

---

**21.**  Defendant also argues that the claim must be dismissed because, other than during the Holocaust and in Rwanda, there is "no international consensus that genocide has occurred in other situations." But there need not be an international consensus that genocide has occurred in a particular place and at a particular time before a claim of genocide

may be brought; the issue of consensus relates to whether there is such a norm. As stated above, acts of genocide indisputably violate the law of nations.

**22.**  The Genocide Convention has been ratified by more than 120 States, including the United States (Nov. 25, 1988).

Article 7 of the Rome Statute of the International Criminal Court (the "Rome Statute"), defines crimes against humanity:

1. For the purpose of this Statute, "crime against humanity" means any of the following acts when committed as part of a *widespread or systematic attack directed against any civilian population*, with knowledge of the attack:

(a) Murder;

(b) Extermination;

. . . .

(h) Persecution against any identifiable group or collectivity on political, racial, national, ethnic, cultural, religious, gender . . . or other grounds that are universally recognized as impermissible under international law, in connection with any act referred to in this paragraph or any crime within the jurisdiction of the Court;

. . . .

(k) Other inhumane acts of a similar character intentionally causing great suffering, or serious injury to body or to mental or physical health.

2. For the purpose of paragraph 1:

(a) "Attack directed against any civilian population" means a course of conduct involving the multiple commission of acts referred to in paragraph 1 against any civilian population, pursuant to or in furtherance of a State or organizational policy to commit such attack;

(b) "Extermination" includes the intentional infliction of conditions of life, inter alia the deprivation of access to food and medicine, calculated to bring about the destruction of part of a population. . . .

July 17, 1998, 37 I.L.M. 999, 1004–05 (emphasis added).[23]

"Customary international law defines 'widespread' as 'massive, frequent, large scale action, carried out collectively with considerable seriousness and directed against a multiplicity of victims,' and 'systematic' as 'thoroughly organised action, following a regular pattern on the basis of a common policy and involving substantial public or private resources.' " *Wiwa*, 2002 WL 319887, at *10 (quoting *Prosecutor v. Rutaganda*, Case No. ICTR–96–3–T, 69 (Dec. 6, 1999)). To be a crime against humanity, the emphasis must not be on the individual but rather on the collective—the individual is victimized not because of his or her individual attributes but because of membership in a targeted civilian population. *Id.* (citing *Prosecutor v. Tadic*, Case No. IT–94–1–T, Opinion and Jud., 644 (May 7, 1997)). Although the requirement of widespread or systematic action ensures that a plaintiff must allege not just one act but, instead, a course of conduct, "a single act by a perpetrator, taken within the context of a widespread or systematic attack against a civilian population entails individual criminal responsibility and an individual perpetrator need not commit numerous offences to be held liable." *Id.*

**[5]** Applying the standards provided in the Genocide Convention and the Rome Statute to the facts alleged here, plaintiffs have successfully stated claims for genocide and crimes against humanity. The amended complaints allege that HAMAS, the PIJ, the AAMB, and the PFLP act with the united purpose and shared mission to eradicate the State of Israel, murder or throw out the Jews, and liberate the area by replacing it with an Islamic or Palestinian State through the use of suicide bombings and other shockingly egregious violent acts. These goals reflect an

---

**23.** Although the United States has not joined the International Criminal Court, U.S. law recognizes the definition of crimes against humanity as stated in the Rome Statute. *See Wiwa*, 2002 WL 319887, at *9–10.

intent to target people based on criteria prohibited by both the Genocide Convention and the Rome Statute.[24]

Plaintiffs allege that the terrorist organizations seek to accomplish their shared goal by cooperating in the planning and commission of suicide bombings and other murderous attacks using explosives, incendiary weapons, and lethal devices in public places, which has resulted in the systematic and continuous killing and injury of thousands of unarmed innocent civilians in Israel, the West Bank, and the Gaza Strip. These are precisely the sorts of acts proscribed in both the Genocide Convention and the Rome statute.

Plaintiffs also allege that the terrorist organizations have developed and implemented a sophisticated financial structure through which they seek to accomplish their goals. The amended complaints describe dozens upon dozens of instances in which hundreds of innocent civilians were killed, and countless others injured, in attacks caused by individuals sponsored by the terrorist organizations. The acts as alleged constitute the "widespread" and "systematic" action necessary for claims of genocide and crimes against humanity. Even the acts other than suicide bombings, specifically those that defendant contends are nothing more than street crimes, may be sufficient for liability if plaintiffs can prove they were committed as part of a genocidal scheme or crimes against humanity.

2. *Suicide Bombings and Other Murderous Attacks on Innocent Civilians Intended to Intimidate or Coerce a Civilian Population*

The third international norm which plaintiffs allege Arab Bank has violated is the financing of suicide bombings and other murderous attacks on innocent civilians which are intended to intimidate or coerce a civilian population. The underlying norm thus differs from the genocide norm with respect to the purpose of the perpetrators, and it differs from the more general crimes against humanity norm in that it specifically condemns bombings and other attacks intended to coerce or intimidate a civilian population. This particular claim for liability under the ATS is similar to the U.S. nationals' claims under the ATA, but the alien plaintiffs do not rely on domestic law; rather, they rely on the body of international law described above under the discussion of genocide and crimes against humanity, plus the additional sources of international law in the ensuing discussion.

In 1997, the United Nations General Assembly adopted the International Convention for the Suppression of Terrorist Bombings ("Bombing Convention"). G.A. Res. 52/164, 1, U.N. Doc A/RES/52/164 (Dec. 15, 1997). The Bombing Convention states in pertinent part:

Article 2

1. Any person commits an offence within the meaning of this Convention if that person unlawfully and intentionally delivers, places, discharges or detonates an explosive or other lethal device in, into or against a place of public use, a State or government facility, a public transportation system or an infrastructure facility:

(a) With the intent to cause death or serious bodily injury; or

(b) With the intent to cause extensive destruction of such a place, facility or

---

**24.** Defendant's argument that plaintiffs will be unable to prove the required genocidal intent is insufficient to warrant dismissal of the pleadings. A motion to dismiss tests a complaint's legal sufficiency, not plaintiffs'

proof. *See Kadic,* 70 F.3d at 244 ("Of course, at this threshold stage in the proceedings it cannot be known whether appellants will be able to prove the specific intent that is an element of genocide . . . .").

system, where such destruction results in or is likely to result in major economic loss.

   . . . .

Article 5

Each State Party shall adopt such measures as may be necessary, including, where appropriate, domestic legislation, to ensure that criminal acts within the scope of this Convention, in particular where they are intended or calculated to provoke a state of terror in the general public or in a group of persons or particular persons, are under no circumstances justifiable by considerations of a political, philosophical, ideological, racial, ethnic, religious or other similar nature and are punished by penalties consistent with their grave nature.

Dec. 15, 1997, S. TREATY DOC NO. 106–6 (1998), *implemented in* 18 U.S.C. § 2332f, Pub.L. No. 107–197, 116 Stat. 721 (2002). This Convention focuses on the principal method of attacking civilians alleged in the amended complaints in that it specifically makes it an offense to bomb public places or public transportation systems with the intent to cause death or serious bodily harm. The Bombing Convention particularly condemns such acts when they are, as alleged here, intended to provoke a state of terror in the general public or a group of persons. It specifies that such acts are not justifiable by any racial, ethnic, religious, political, or other similar considerations. In terms of its evidentiary weight, the Bombing Convention is significant. It has been ratified by over 120 United Nations Member States, including the United States (June 26, 2002). *Cf. Kadic*, 70 F.3d at 241 (noting that the Genocide Convention "has been ratified by more than 120 nations, including the United States. . . ."). In addition, the United States has implemented the Bombing Convention in the Terrorist Bombings Convention Implementation Act of 2002. *See* Pub.L. No. 107–197, 116 Stat. 721 (2002), *enacting* 18 U.S.C. § 2332f.[25]

Two years after the Bombing Convention was adopted by the General Assembly, the International Convention for the Suppression of the Financing of Terrorism ("Financing Convention") was also adopted by the General Assembly of the United Nations. G.A. Res. 54/109, 1, U.N. Doc A/RES/54/109 (Dec. 9, 1999). It has been ratified by over 130 countries, including the United States (June 26, 2002). The United States implemented the Financing Convention via the Suppression of the Financing of Terrorism Convention Implementation Act of 2002. *See* 18 U.S.C. § 2339C.[26] The Convention makes it an

---

**25.** Section 2332f(a) of Title 18 of the U.S.Code states in its entirety:

  (a) Offenses.—

  (1) In general.—Whoever unlawfully delivers, places, discharges, or detonates an explosive or other lethal device in, into, or against a place of public use, a state or government facility, a public transportation system, or an infrastructure facility—

    (A) with the intent to cause death or serious bodily injury, or

    (B) with the intent to cause extensive destruction of such a place, facility, or system, where such destruction results in or is likely to result in major economic loss,

shall be punished as prescribed in subsection (c).

  (2) Attempts and conspiracies.—Whoever attempts or conspires to commit an offense under paragraph (1) shall be punished as prescribed in subsection (c).

**26.** Section 2339C(a) of Title 18 of the U.S.Code states in its entirety:

  (a) Offenses.—

  (1) In general.—Whoever, in a circumstance described in subsection (b), by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out—

offense to finance certain acts, including those proscribed in the Bombing Convention. Article 2 of the Financing Convention states:

1. Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:

(a) An act which constitutes an offence within the scope of and as defined in [the Bombing Convention]; or

(b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a Government or an international organization to do or to abstain from doing any act.

Dec. 9, 1999, S. TREATY DOC. NO. 106–49 (2000). Thus, the Financing Convention, along with the Bombing Convention, specifically condemns suicide bombings and other murderous attacks against innocent civilians intended to intimidate or coerce a population. Once again, this Convention provides that such acts "are under no circumstances justifiable by considerations of a political, philosophical, ideological, racial, ethnic, religious or other similar nature." Financing Convention, art. 6.

The prohibition against attacks on innocent civilians that is reflected in both of these Conventions is not a new one. The three-century-old "principle of distinction," which requires parties to a conflict to at all times distinguish between civilians and combatants, forbids the deliberate attacking of civilians. *See* 2 L. OPPENHEIM, INTERNATIONAL LAW § 214 *ea*, at 524 (H. Lauterpacht ed., 7th ed.1961); 1 JEAN-MARIE HENCKAERTS & LOUISE DOSWALD-BECK, CUSTOMARY INTERNATIONAL HUMANITARIAN LAW 3–4 (2005). State practice establishes the principle of distinction as a long-established norm of the customary law of armed conflict. HENCKAERTS & DOSWALD-BECK, *supra*, at 3. This principle is also reflected in Common Article 3 of the Geneva Conventions of 1949 (the "Geneva Conventions"),[27] which provides in pertinent part:

In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:

(A) an act which constitutes an offense within the scope of [among other treaties, the Bombing Convention], as implemented by the United States, or

(B) any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act,

shall be punished as prescribed in subsection (d)(1).

(2) Attempts and conspiracies.—Whoever attempts or conspires to commit an offense under paragraph (1) shall be punished as prescribed in subsection (d)(1).

(3) Relationship to predicate act.—For an act to constitute an offense set forth in this subsection, it shall not be necessary that the funds were actually used to carry out a predicate act.

27. The Geneva Conventions, which are among the major treaties on the law of war, *Hamdan v. Rumsfeld,* —— U.S. ——, 126 S.Ct. 2749, 2781, 165 L.Ed.2d 723 (2006), have been ratified by more than 180 States, including the United States, which implemented them via 18 U.S.C. § 2441, Pub.L. No. 104–192, 110 Stat. 2104 (1996).

(1) *Persons taking no active part in the hostilities,* including members of armed forces who have laid down their arms and those placed *hors de combat* by sickness, wounds, detention, or any other cause, *shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.*

To this end the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;

. . . .

Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3316; Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3316; Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, art. III, Aug. 12, 1949, 6 U.S.T. 3316 (emphasis added).

Under the customary law of armed conflict, as reflected in the Geneva Conventions, all "parties" to a conflict, including insurgent military groups, must adhere to these most fundamental requirements. *Kadic,* 70 F.3d at 243. While the principle of distinction and the Geneva Conventions apply expressly only in situations of armed conflict, their long-standing existence supports the conclusion, made explicit in the Bombing and Financing Conventions, that attacks against innocent civilians of the type alleged here are condemned by international law.

United Nations Security Council Resolution 1566 also supports this conclusion. It states, in pertinent part, that the Security Council:

3. *Recalls* that criminal acts, including against civilians, committed with the intent to cause death or serious bodily injury, or taking of hostages, with the purpose to provoke a state of terror in the general public or in a group of persons or particular persons, intimidate a population or compel a government or an international organization to do or to abstain from doing any act, which constitute offences within the scope of and as defined in the international conventions and protocols relating to terrorism, are under no circumstances justifiable by considerations of a political, philosophical, ideological, racial, ethnic, religious or other similar nature, and *calls upon* all States to prevent such acts and, if not prevented, to ensure that such acts are punished by penalties consistent with their grave nature.

S.C. Res. 1566, ¶ 3, U.N. Doc. S/RES/1373 (Oct. 8, 2004). Resolution 1566 specifically condemns attacks against civilians intended to intimidate a civilian population, regardless of who commits the attacks or what the motivation behind such attacks may be. While such resolutions cannot be relied on as a sole source of international law, they are informative as to what the current state of international law is. *See Filartiga,* 630 F.2d at 882 n. 9 (observing that non-self-executing agreements serve as evidence of binding principles of international law and relying on several United Nations General Assembly Resolutions); *Presbyterian Church of Sudan,* 374 F.Supp.2d at 338; *Bodner v. Banque Paribas,* 114 F.Supp.2d 117, 128 (E.D.N.Y. 2000) ("Plaintiffs refer to United Nations resolutions and the work of the Nuremberg tribunals as further evidence of the content of customary international law and

**SPA46**

the Court finds that such analogies have merit.").

In the face of all these sources evidencing universal condemnation of the types of acts alleged here, Arab Bank does not address the actual conduct condemned by these sources. Rather, it argues that the underlying suicide bombings and other murderous acts alleged in Count Three, which it says are "commonly referred to as terrorism," Def. Mem. at 15, cannot be a violation of the law of nations because there is no consensus on the meaning of "terrorism." In support of its argument, Arab Bank relies on *United States v. Yousef,* a pre-*Sosa* case, in which the court stated that "customary international law currently does not provide for the prosecution of 'terrorist' acts under the universality principle, in part due to the failure of States to achieve anything like consensus on the definition of terrorism." 327 F.3d 56, 97 (2d Cir.2003) (per curiam).

Arab Bank's reliance on *Yousef* is misplaced. First, the court in *Yousef* was reviewing whether the district court had criminal jurisdiction under the universality principle and not whether the district court should recognize a claim under the civil jurisdictional grant of the ATS. The *Yousef* Court held that "the universality principle permits jurisdiction over only a limited set of crimes that *cannot be expanded judicially*" whereas *Sosa* held, with regard to the ATS, that federal courts *can* recognize new causes of action, albeit with restraint, under the ATS. *Compare Yousef,* 327 F.3d at 103 (emphasis added), *with Sosa,* 542 U.S. at 725, 124 S.Ct. 2739.

Second, the court in *Yousef,* in addressing the issue as framed by the parties, whether "terrorism" was a violation of the law of nations, criticized the lower court's reliance on the Restatement (Third) of the Foreign Relations Law of the United States, a non-authoritative source, for the finding that "terrorism" violates international law. 327 F.3d at 98–103, n. 37. The parties in *Yousef* had not addressed specific international law sources, and the district court relied, not on such sources, but on the Restatement. The appellate briefs also did not address accepted sources of international law. The court in *Yousef* emphasized that the proper sources for determining international law are the sources described in *Kadic* and *Filartiga,* that is, the sources this court relies on here. *See id.*

Defendant also errs in relying on the following language in *Yousef:* "nor have we shaken ourselves free of the cliché that 'one man's terrorist is another man's freedom fighter.'" *Id.* at 107. This court does not accept that the Court of Appeals, in referring to this cliché, was accepting, as defendant suggests it did, what Professor Wedgwood aptly calls this "antinomian" principle. On the contrary, if anything, the Court of Appeals seemed concerned that defining terrorism in a way that would receive international agreement could exclude outrageous conduct that should properly be condemned. *See, e.g., id.* at 108 n. 42 ("This attempt to distinguish 'terrorists' from 'freedom fighters' potentially could legitimate as non-terrorist certain groups nearly universally recognized as terrorist, including the Irish Republican Army, Hezbollah, and Hamas.").

In any event, in this case, there is no need to resolve any definitional disputes as to the scope of the word "terrorism," for the Conventions expressing the international norm provide their own specific descriptions of the conduct condemned. Although the Conventions refer to such acts as "terrorism," the pertinent issue here is only whether the acts as alleged by plaintiffs violate a norm of international law, however labeled. *See Sosa,* 542 U.S. at

738, 124 S.Ct. 2739 (examining whether the specific conduct alleged by plaintiff violated a norm of international law). In exploring that question, this court has examined the very sources of international law found to be valid by the Second Circuit in *Kadic, Filartiga* and *Yousef,* and by the Supreme Court in *Sosa.* These authoritative sources establish that the specific conduct alleged—organized, systematic suicide bombings and other murderous attacks on innocent civilians intended to intimidate or coerce a civilian population—are universally condemned.

In a similar way, the *Yousef* court, after holding that there was no jurisdiction under the universality principle, held that there was jurisdiction in the district court to try the defendant for bombing a Philippines Airlines flight under the Montreal Convention, which expressly addresses offenses against aircraft. 327 F.3d at 108–110. It did so because it found that the conduct charged, "whether it is termed 'terrorist'—constitutes the core conduct proscribed by the Montreal Convention and its implementing legislation." *Id.* at 97–98; *cf. Filartiga,* 630 F.2d at 882 ("For although there is no universal agreement as to the precise extent of the 'human rights and fundamental freedoms' guaranteed to all by the Charter, there is at present no dissent from the view that the guaranties include, at a bare minimum, the right to be free from torture."); *but see Saperstein v. Palestinian Authority,* No. 04–CV–20225, 2006 WL 3804718, at *7 (S.D.Fla. Dec.22, 2006) (stating that, because politically motivated terrorism has not reached the status of a violation of the law of nations, "if the conduct of the Defendants is construed as terrorism, then Plaintiffs have not alleged a violation of the law of nations"). In sum, regardless of whether there is universal agreement as to the precise scope of the word "terrorism," the conduct involved here is specifically condemned in the Conventions upon which this court relies.

Arab Bank attempts to undermine the weight of the international sources discussed above by arguing that state practice does not support the existence of a universal norm. The basis for this argument is that "some 80 nations in Africa, in the Arab world and elsewhere expressly exempt from the definition of terrorism conduct that they believe furthers the rights of self-determination of a people." Oral Argument, Tr. at 7, July 31, 2006. To begin with, Arab Bank ignores that the international sources relied upon here themselves evidence state practice. As stated in *Flores,* 414 F.3d at 256, treaties evidence the "customs and practices" of the States that ratify them. This is so because ratification of a treaty that embodies specific norms of conduct evidences a State's acceptance of the norms as legal obligations. Here, the international sources specifically articulate a universal standard that condemns the conduct alleged.

In addition, Arab Bank's state practice argument is based upon a flawed premise and is devoid of factual support. As for the premise, Arab Bank's argument is that the acts alleged here—organized, systematic suicide bombings and other murderous acts intended to intimidate a civilian population—are viewed by some States as acceptable acts in furtherance of the right to self-determination. However, Arab Bank offers no authority for the proposition that the right to self-determination can be effectuated in violation of the law of nations. On the contrary, Professor Talmon, on whose declaration defendant relies in making its argument, recognizes that acts of self-determination must be in accordance with principles of international law. Professor Talmon's declaration states in pertinent part:

In view of the Israeli–Palestinian conflict the 1998 Arab Convention on Combating Terrorism ("Arab Convention"), the 1999 Convention of the Organization of the Islamic Conference on Combating International Terrorism ("OIC Convention"), and 1999 Convention of the Organization of African Unity on the Prevention and Combating of Terrorism ("OAU Convention") expressly exclude certain acts of violence from the scope of these conventions. For example, Article 3(1) of the OAU Convention provides:

"the struggles waged by peoples *in accordance with the principles of international law* for their liberation or self-determination, including armed struggle against colonialism, occupation, aggression and domination by foreign forces shall not be considered as terrorist acts."

Similar provision[s] are found in Article 2(a) of the Arab Convention and Article 2(a) of the OIC Convention. The Arab League represents 10, the OIC 56 and the OAU (now: African Union) 52 member States. The organizations under whose auspices these Conventions were drawn up have a membership of 80 States in total.

Talmon Decl. 12, July 18, 2005 (emphasis added) (footnotes omitted). Indeed, the Bombing Convention, the Financing Convention and Resolution 1566 all expressly acknowledge that violation of the principles embodied in those documents are under no circumstances justifiable by political, philosophical, ideological, racial, ethnic, or religious considerations. Moreover, there have been no formal reservations to either of the Conventions purporting to assert that a right to self-determination justifies committing otherwise condemned acts.[28] On the contrary, even the statements relied upon, which are made by officials of varying official stature, never expressly state that the type of conduct alleged here is a legitimate means of asserting the right to self-determination.

Turning to the lack of factual support for defendant's state practice argument, it is significant that the United States prohibits the specific conduct alleged in the cases at hand. *See* 18 U.S.C. § 2332f (implementing the Bombing Convention); 18 U.S.C. § 2339C (implementing the Financing Convention); *see also* 18 U.S.C. §§ 2331 *et seq.* (setting forth the criminal penalties and civil remedies for enforce-

---

**28.** Only one State, Pakistan, has submitted a declaration to the Bombing Convention relating to acts in furtherance of self-determination. The government of Pakistan, in making a formal declaration with respect to the Bombing Convention, stated that "nothing in this Convention shall be applicable to struggles, including armed struggle, for the realization of right of self-determination launched against any alien or foreign occupation or domination, in accordance with the rules of international law." Even by its own declaration, that State acknowledges that any acts must be in accordance with the rules of international law.

The States of Egypt, Jordan, and the Syrian Arab Republic made similar declarations with respect to the Financing Convention. The State of Egypt stated: "[w]ithout prejudice to the principles and norms of general interna-

tional law and the relevant United Nations resolutions, the Arab Republic of Egypt does not consider acts of national resistance in all its forms, including armed resistance against foreign occupation and aggression with a view to liberation and self-determination, as terrorist acts within the meaning of article 2, paragraph 1, subparagraph (b), of the Convention." Jordan stated: "The Government of the Hashemite Kingdom of Jordan does not consider acts of national armed struggle and fighting foreign occupation in the exercise of people's right to self-determation [sic] as terrorist acts within the context of paragraph 1(b) of article 2 of the Convention." The Syrian Arab Republic stated: "the Syrian Arab Republic considers that acts of resistance to foreign occupation are not included under acts of terrorism."

ment of these laws); *cf. Flores,* 414 F.3d at 257, n. 33 (citing *Yousef,* 327 F.3d at 92 n. 25 ("While it is not possible to claim that the practice or policies of any one country, including the United States, has such authority that the contours of customary international law may be determined by reference only to that country, it is highly unlikely that a purported principle of customary international law in direct conflict with the recognized practices and customs of the United States and/or other prominent players in the community of States could be deemed to qualify as a *bona fide* customary international principle.")). Arab Bank has offered no evidence that it is lawful in any State to engage in organized, systematic murderous attacks on civilians for the purpose of coercing or intimidating the civilian population. *Cf. Filartiga,* 630 F.2d at 884 ("We have been directed to no assertion by any contemporary state of a right to torture its own or another nation's citizens."). Both sides to this litigation note that the Palestinian Authority has explicitly condemned suicide bombings and that it "arrests, convicts, and sentences to imprisonment terrorists who kill Israeli citizens in the occupied territories." Def. Reply Mem. at 20; Pl. Opposition Mem. at 4 n. 7, 31 n. 31. The international sources cited above, coupled with the fact that no State has expressly stated that such conduct would be legal in its country, provide further support for the conclusion that the alleged conduct violates a norm of international law. *Cf. Filartiga,* 630 F.2d at 880 ("In

light of the universal condemnation of torture in numerous international agreements, and the renunciation of torture as an instrument of official policy by virtually all of the nations of the world (in principle if not in practice), we find that an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights, and hence the law of nations.").

The next issue to be addressed is whether the international norm is of mutual, and not merely several, concern. Suicide bombings and other murderous attacks to intimidate or coerce a civilian population are indisputably of mutual concern. *See Flores,* 414 F.3d at 249 (stating that "other offenses that may be purely intra-national in their execution, such as official torture, extrajudicial killings, and genocide, do violate customary international law because the nations of the world have demonstrated that such wrongs are of mutual ... concern and capable of impairing international peace and security" (internal citation and quotations omitted)). The Bombing Convention states that the occurrence of terrorist attacks by means of explosives or other lethal devices is a matter of grave concern to the international community as a whole.[29] The Financing Convention states that "the financing of terrorism is a matter of grave concern to the international community as a whole."[30] Preamble, Dec. 9, 1999, S. TREATY DOC. NO. 106–49 (2000). In addition, Congress has found

---

**29.** As noted above, although the Bombing Convention refers to acts of terrorism, it explicitly describes the acts which it condemns as the unlawful and intentional use of an explosive in a place of public use with the intent to cause death or serious bodily injury.

**30.** Again, although the Financing Convention refers to acts of terrorism, the specific acts which it condemns the financing of are those

which violate the Bombing Convention or "any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population...." Art. 2(1)(b), Dec. 9, 1999, S. TREATY DOC. NO. 106–49 (2000).

that "international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States." [31] AEDPA, Pub.L. No. 104–132, § 301(a)(4), 110 Stat. 1214, 1247 (1996). Indeed, the scope of the nationalities represented by plaintiffs in this very case illustrates one type of impact on the international community that arises when innocent civilians are targeted to be attacked.

[6] In sum, in light of the universal condemnation of organized and systematic suicide bombings and other murderous acts intended to intimidate or coerce a civilian population, this court finds that such conduct violates an established norm of international law. The court further finds that the conduct alleged by plaintiffs is sufficiently specific and well-defined to be recognized as a claim under the ATS. This becomes evident when the conduct alleged here and condemned by the law of nations is viewed in contrast to the conduct alleged in cases where it was found not to be sufficiently specific or well-defined. For instance, in *Flores* the plaintiffs, who alleged that they developed lung disease from pollution arising from defendant's copper mining and refining operations within the plaintiffs' country, asserted international norms of the "right to life" and the "right to health." 414 F.3d at 254–55. Those rights were insufficiently definite because they were "vague and amorphous," "boundless and indeterminate," "abstract rights and liberties devoid of articulable or discernible standards and regulations." [32] *Id.* (internal citations and quotations omitted). Similarly, in *Sosa*, the Court stated that "[a]ny credible invocation of a principle against arbitrary detention that the civilized world accepts as binding customary international law requires a factual basis beyond relatively brief detention in excess of positive authority." 542 U.S. at 737, 124 S.Ct. 2739. It noted that such a rule "expresses an aspiration that exceeds any binding customary rule having the specificity we require" and held that "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy." *Id.* at 738, 124 S.Ct. 2739. Here, in contrast, the conduct alleged falls precisely within the norm evidenced by the sources discussed. As already explained, plaintiffs' allegations essentially track the conduct specifically condemned in the Financ-

---

**31.** As stated above, the ATA defines "international terrorism" as activities that:
  (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
  (B) appear to be intended—
    (i) to intimidate or coerce a civilian population;
    (ii) to influence the policy of a government by intimidation or coercion; or
    (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and

  (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.
  18 U.S.C. § 2331(1).

**32.** The court also held that plaintiffs failed to demonstrate the existence of a more "narrowly-defined customary international law rule against *intra* national pollution" because they did not submit evidence sufficiently establishing such a norm. *Flores*, 414 F.3d at 255–66.

ing and Bombing Conventions, as well as in the ATA sections which implement those Conventions. Thus, the norm is of sufficiently definite content and acceptance among nations of the world as the historical paradigms familiar when § 1350 was enacted.

This court's consideration of whether to exercise its discretion to recognize a claim under the ATS is informed by the legislative guidance provided by Congress. *See Sosa*, 542 U.S. at 726–27, 124 S.Ct. 2739 (expressing concern about the importance of legislative guidance and judgment in creating new common law claims). Although Congress has not created a cause of action under the ATS, it has created criminal penalties and, with respect to U.S. nationals, civil liability for the acts alleged by plaintiffs. *See* 18 U.S.C. § 2332f and § 2339C; *see also Arab Bank I*, 384 F.Supp.2d 571 (finding that the acts alleged here violate the ATA).

Finally, the collateral consequences about which the *Sosa* Court expressed concern seem limited here. The Court in *Sosa* specifically noted the potential consequences on U.S. foreign policy that could accompany recognition of new claims under the ATS. The Court stated:

Another possible limitation that we need not apply here is a policy of case-specific deference to the political branches. For example, there are now pending in Federal District Court several class actions seeking damages from various corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa. See *In re South African Apartheid Litigation*, 238 F.Supp.2d 1379 (JPML 2002) (granting a motion to transfer the cases to the Southern District of New York). The Government of South Africa has said that these cases interfere with the policy embodied by its Truth and Recon-

ciliation Commission, which "deliberately avoided a 'victors' justice' approach to the crimes of apartheid and chose instead one based on confession and absolution, informed by the principles of reconciliation, reconstruction, reparation and goodwill." The United States has agreed. In such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy.

*Sosa*, 542 U.S. at 733 n. 21, 124 S.Ct. 2739 (some internal citations omitted). The United States, undoubtedly aware of the current litigation, has opted to make no statement to the court regarding its position on the cases at hand. *Cf. Presbyterian Church of Sudan v. Talisman*, No. 01 Civ. 9882, 2005 WL 2082846 (S.D.N.Y. Aug. 30, 2005) (upholding a claim even where the United States submitted a Statement of Interest expressing concerns regarding the impact of the litigation on U.S. foreign affairs and on Canada's foreign policies towards Sudan).

Based upon all of the factors set forth above, organized, systematic suicide bombings and other murderous attacks against innocent civilians for the purpose of intimidating a civilian population are a violation of the law of nations for which this court can and does recognize a cause of action under the ATS.

## B. Arab Bank's Liability

Whether Arab Bank is liable for its alleged conduct under the ATS, like the question of whether the suicide bombings and attacks alleged by plaintiffs violate the law of nations, is a question of international law. *Sosa*, 542 U.S. at 732 n. 20, 124 S.Ct. 2739; *Talisman Energy, Inc.*, 374 F.Supp.2d at 333 (*Talisman II*). In a variety of ATS cases, courts have concluded that international law provides for the

imposition of liability on a party that does not directly perform the underlying act.[33] There is nothing novel or unusual under international law about imposing such liability.[34] And the Genocide, Bombing, and Financing Conventions explicitly condemn acts of complicity or aiding and abetting by non-primary actors. Indeed, under the Financing Convention, the acts of Arab Bank alleged by plaintiffs amount to primary violations, as the entire focus of that Convention is on stopping the financing of terrorists and terrorist organizations which support offenses against civilians as defined in the Convention.

Standards for imposing liability where a non-primary actor is alleged to be liable for a violation of the law of nations emerge from the case law and Conventions. *Talisman I* sets forth the international law

applicable in assessing aider and abettor liability under the ATS. In that case, the court relied on Article 7(1) of the Statute of the International Criminal Tribunal for the former Yugoslavia ("ICTY") and Article 6(1) of the Statute of the International Criminal Tribunal for Rwanda ("ICTR"), both of which provide for liability for planning, instigating, ordering, committing, or otherwise aiding and abetting in the planning, preparation or execution of acts of genocide or crimes against humanity. *Talisman I*, 244 F.Supp.2d at 322. The court stated that "the *actus reus* of aiding and abetting in international criminal law requires practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime." *Talisman I*, 244 F.Supp.2d at 323

---

**33.** *Talisman I* and *Talisman II* have collected a large number of such cases. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 320–21 (S.D.N.Y.2003) (*Talisman I* ); *Talisman II,* 374 F.Supp.2d at 337–38. *See also Cabello v. Fernandez–Larios,* 402 F.3d 1148, 1157–58 (11th Cir.2005) (per curiam); *Abebe–Jira v. Negewo,* 72 F.3d 844, 845–48 (11th Cir.1996); *Kiobel v. Royal Dutch Petroleum Co.,* 456 F.Supp.2d 457, 463–64, (S.D.N.Y.2006) (stating that "where a cause of action for violation of an international norm is viable under the ATS, claims for aiding and abetting that violation are viable as well"); *In re Terrorist Attacks on September 11, 2001,* 392 F.Supp.2d 539, 565 (S.D.N.Y. 2005); *In re Agent Orange Prod. Liab. Litig.,* 373 F.Supp.2d at 52–54; *Bodner,* 114 F.Supp.2d at 122; *cf. Hilao v. Estate of Marcos,* 103 F.3d 767, 779 (9th Cir.1996) (upholding a jury instruction that a foreign leader could be found liable if he " 'directed, ordered, conspired with, or aided' in torture, summary execution, and disappearance, or that he had knowledge of that conduct and failed to use his power to prevent it" under the Torture Victim Protection Act, which was enacted as a note to the ATS).

**34.** Going back over 200 years, contemporaneous with the enactment of the ATS, aider and abettor liability was contemplated under the

ATS. As Attorney General Bradford stated in 1795:

> It is stated by the memorialists that certain American citizens trading to the coast of Africa, on the 28th of September last, voluntarily joined, conducted, *aided, and abetted* a French fleet in attacking the settlement, and plundering or destroying the property of British subjects on that coast. . . .
>
> [T]here can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a civil suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States. . . .

Opinion of Attorney General Bradford, 1 U.S. Op. Atty. Gen. 57, 58, 59 (1795) (emphasis added). Attorney General Bradford also noted that the President had warned that citizens of the United States "committing, aiding, or abetting hostilities" in violation of the law of nations will not receive the protection of the United States. *Id.* at 59. While we cannot know precisely the scope of aiding and abetting liability contemplated by Attorney General Bradford, it seems reasonable to conclude that he recognized that some level of participation, short of committing the act directly, was sufficient to give rise to liability.

(quoting *Prosecutor v. Furundzija*, Case No. IT–95–17/1–T, Judgment, 235, Dec. 10, 1998). "While the assistance must be substantial, it 'need not constitute an indispensable element, that is, a *conditio sine qua non* for the acts of the principal.'" *Id.* at 324 (quoting *Furundzija* ¶ 209). Participation in a crime is substantial if "the criminal act most probably would not have occurred in the same way had not someone acted in the role that the accused in fact assumed." *Id.* (quoting *Tadic* ¶ 688). The court also made clear that "some knowledge that the assistance will facilitate the crime is necessary." *Id.*

*Talisman II*, decided after the Supreme Court's decision in *Sosa*, reassessed the issue in light of *Sosa* and fully endorsed the analysis in *Talisman I*.[35] 374 F.Supp.2d at 337–41. The court explained that ICTY and ICTR decisions are appropriate sources for clarifying the content of aider and abettor liability in international law because the entire purpose of the ICTY and ICTR is to adjudicate violations of customary international law; although the tribunals do not create new rules of customary international law, they occupy a special role in enunciating the current content of customary international law norms. *Id.* at 338. The court noted that "ICTY and ICTR opinions typically engage in nuanced and exhaustive surveys of international legal sources, and as such, they are exceedingly useful as persuasive evidence of the content of customary international

law norms." *Id.* at 338. The court also held that the international standards of liability with respect to the conduct of non-primary actors were defined with the specificity required to meet the requirements of *Sosa. Id.* at 340–41.[36]

In contrast to the vast body of law finding aiding and abetting liability available under the ATS, one district court judge in this circuit has found otherwise. *See In re South African Apartheid Litig.*, 346 F.Supp.2d 538 (S.D.N.Y.2004) ("*South African Apartheid Litig.*"), appeal filed. The court's reasoning is not persuasive. First, the court in *South African Apartheid Litig.* concluded that the ATS did not provide for aiding and abetting liability because the ATS itself "presently does not provide for aider and abettor liability." *Id.* at 550. However, *Sosa* makes clear that the ATS is purely a jurisdictional statute under which courts can recognize a cause of action under the law of nations. 542 U.S. at 724, 124 S.Ct. 2739. Thus, the ATS itself does not provide the theory of liability; rather, courts must look to international law. Second, insofar as *South African Apartheid Litig.* held that *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), precludes aiding and abetting liability under the ATS, it erroneously applied domestic law where international law is applicable. *See Talisman II*, 374 F.Supp.2d at 335–37; *cf. Arab Bank I*,

---

**35.** *Talisman I* was decided by the late Judge Allen G. Schwartz. *Talisman II* was decided by Judge Denise Cote.

**36.** The standards set forth in *Talisman I* and *Talisman II* have been applied by other courts, *see, e.g., In re Agent Orange Prod. Liab. Litig.*, 373 F.Supp.2d at 54, *Cabello*, 402 F.3d at 1148, 1158–59, *Bowoto v. Chevron Corp.*, No. C 99–02506, 2006 WL 2455752, at *4 (N.D.Cal. Aug.22, 2006), and are persuasive. In a later decision, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453

F.Supp.2d 633, 668 (S.D.N.Y.2006) ("*Talisman III*"), the court granted defendant's motion for summary judgment, reasoning that the plaintiffs had not "identified sufficient evidence to raise a material question of fact that Talisman can be found liable for aiding and abetting ... because among other things they have not identified evidence that Talisman itself performed any act that could be construed as substantial assistance to the Government in its violation of international law."

384 F.Supp.2d at 583–85 (holding that conspiracy and aider and abettor liability are available under the ATA notwithstanding *Central Bank of Denver*). Finally, the specific rationales relied on by the court in *South African Apartheid Litig.* for dismissing that case do not apply here. Unlike the Apartheid Convention, the Bombing and Financing Conventions, both of which provide for liability of non-primary actors, as discussed below, have been ratified by a majority of the member States of the United Nations, including the United States, Great Britain, Germany, France, Canada, and Japan. Also, the collateral consequences identified in *South African Apartheid Litig.* are not present here, nor have any adverse collateral consequences been identified by any governmental source in this case.[37]

The Conventions establishing the norms alleged here fully support the conclusion that aiding and abetting liability is available. They also support the use of the standards described above in assessing whether Arab Bank's conduct amounts to aiding and abetting under international law. The Genocide Convention expressly provides liability for actors who conspire, incite, or are complicit in acts of genocide.[38] Article 2 of the Bombing Convention provides for liability for an accomplice or one who *in any way intentionally contributes* to the bombing of a public place, which is intended to cause death, serious bodily injury, or extensive destruction.[39] The Bombing Convention requires that the contributor either have the aim of furthering the "general criminal activity" or purpose of the group sponsoring the bombers

**37.** The court found that the consequences are not only far-reaching but would raise the prospect of serious impediments to the flow of international commerce. Indeed, the South African government has indicated that it does not support this litigation and that it believes that allowing this action to proceed would preempt the ability of the government to handle domestic matters and would discourage needed investment in the South African economy. Similarly, the United States government has expressed its belief that the adjudication of this suit would cause tension between the United States and South Africa and would serve to hamper the policy of encouraging positive change in developing countries via economic investment.
*South African Apartheid Litig.*, 346 F.Supp.2d at 553. See also *Sosa*, 542 U.S. at 733 n. 21, 124 S.Ct. 2739, which, as noted earlier, specifically referred to *South African Apartheid Litig.*, stating that "[i]n such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy."

**38.** The Genocide Convention states, in relevant part:

The following acts shall be punishable:
  (a) Genocide;

  (b) Conspiracy to commit genocide;
  (c) Direct and public incitement to commit genocide;
  (d) Attempt to commit genocide;
  (e) Complicity in genocide.
Art. 3, Dec. 9, 1998, 78 U.N.T.S. 227.

**39.** The Bombing Convention states, in pertinent part:

3. Any person also commits an offence [within the meaning of this convention] if that person:
(a) Participates as an accomplice in an offence as set forth in paragraph 1 or 2 [of the present article]; or
(b) Organizes or directs others to commit an offence as set forth in paragraph 1 or 2 [of the present article]; or
(c) In any other way contributes to the commission of one or more offences as set forth in paragraph 1 or 2 [of the present article] by a group of persons acting with a common purpose; such contribution shall be intentional and either be made with the aim of furthering the general criminal activity or purpose of the group or be made in the knowledge of the intention of the group to commit the offence or offences concerned.
Art. 2  Dec. 15, 1997, S. TREATY DOC. NO. 106–6 (1998).

or have knowledge of the intention of the sponsoring group to commit the bombings. The Financing Convention provides for liability for directly or indirectly, unlawfully and wilfully, provides or collects funds with the knowledge that they are to be used, in full or in part, in order to carry out violations of the Bombing Convention or attacks intended to cause death or serious bodily injury to civilians when the purpose of such acts is to intimidate a population.[40] The Financing Convention also provides for the liability of non-primary actors.[41] It is worth noting that the U.S. statutes implementing the Bombing and Financing Conventions also provide for the liability of non-primary actors. *See* 18 U.S.C. § 2332f and § 2339C; *Arab Bank I*, 384 F.Supp.2d at 582–85.[42]

**40.** The Financing Convention states, in pertinent part:

1. Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:

(a) An act which constitutes an offence within the scope of and as defined in [the Bombing Convention]; or

(b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a Government or an international organization to do or to abstain from doing any act.

Art. 2, Dec. 9, 1999, S. TREATY DOC. NO. 106–49 (2000).

**41.** The Financing Convention states, in pertinent part:

5. Any person also commits an offence if that person:

(a) Participates as an accomplice in an offence as set forth in paragraph 1 or 4 of this article;

(b) Organizes or directs others to commit an offence as set forth in paragraph 1 or 4 of this article;

(c) Contributes to the commission of one or more offences as set forth in paragraph 1 or 4 of this article by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:

(i) Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of an offence as set forth in paragraph 1 of this article; or

(ii) Be made in the knowledge of the intention of the group to commit an offence as set forth in paragraph 1 of this article.

Art. 2, Dec. 9, 1999, S. TREATY DOC. NO. 106–49 (2000).

**42.** International resolutions also support the availability of aiding and abetting liability. United Nations Security Council Resolution 1373, adopted after the September 11, 2001 suicide bombing attacks and seeking to prevent similar acts, directs States, among other things, to prohibit any one from making any funds, financial assets or economic resources or financial or other related services available for the benefit of persons who facilitate or participate in the commission of terrorist acts. Resolution 1373 provides, in pertinent part, that all States shall:

(a) Prevent and suppress the financing of terrorist acts;

(b) Criminalize the wilful provision or collection, by any means, directly or indirectly, of funds by their nationals or in their territories with the intention that the funds should be used, or in the knowledge that they are to be used, in order to carry out terrorist acts;

. . . .

(d) Prohibit their nationals or any persons and entities within their territories from making any funds, financial assets or economic resources or financial or other related services available, directly or indirectly, for the benefit of persons who commit or attempt to commit or facilitate or participate in the commission of terrorist acts, of entities owned or controlled, directly or indirectly, by such persons and of persons and entities acting on behalf of or at the direction of such persons.

S.C. Res. 1373, 1. U.N. DOC S/RES/1373 (Sept. 28, 2001).

Applying the standards discussed above, plaintiffs allege two factual theories regarding Arab Bank's liability, both of which sufficiently allege Arab Bank's mental state, conduct, and the substantial effect of its conduct in bringing about the underlying violations of the law of nations.[43]

[7] With respect to Arab Bank's mental state and conduct, plaintiffs' first factual theory focuses on Arab Bank's knowing provision of banking services, including the maintenance of accounts, for HAMAS and other terrorist organizations, terrorist front organizations, and individual supporters of terrorist organizations. According to plaintiffs, Arab Bank knew that the accounts of these various organizations and individuals were being used to fund suicide bombings and other attacks sponsored by the terrorist organizations. Plaintiffs allege that the terrorist organizations act with an openly and publicly stated united purpose of eradicating the State of Israel through a campaign of terror, genocide, and crimes against humanity. The terrorist organizations allegedly sought to accomplish their goals principally by widespread and systematic suicide bombings, which resulted in the death and injury of thousands of individuals in Israel, the West Bank, and the Gaza Strip, the majority of who were innocent civilians.

Despite knowledge of HAMAS's purposes and its status as a Specially Designated Global Terrorist Entity, Arab Bank provided banking services to HAMAS directly by collecting funds into HAMAS accounts in its Beirut, Lebanon and Gaza Strip branches. The funds collected by Arab Bank were solicited by HAMAS through its website and through advertisements it publicized throughout the Middle East. These solicitations sought financial support for the Second Intifada. With respect to the charitable front organizations, plaintiffs allege that, despite knowledge that they were affiliated with the various terrorist organizations, Arab Bank maintained accounts and solicited and collected funds for them. In their amended complaints, plaintiffs specifically allege that the various charitable committees they identify are terrorist front organization which raise and launder funds to subsidize

Resolution 1373 was adopted by the Security Council of the United Nations, and, therefore, as discussed in Section III *supra* is legally binding on all member States.

Resolution 1566, discussed *supra* at Section III.A.2, also adopted by the Security Council, similarly contemplates liability for those who facilitate, participate or attempt to participate in the financing, planning, preparation or commission of terrorist acts.

**43.** Although the focus of the parties' briefs is on whether aiding and abetting liability is available under the ATS and, if so, whether defendant's alleged conduct gives rise to aiding and abetting liability, plaintiffs have also alleged liability under different rubrics including "concerted action," "complicity," and "intentional facilitation." This is undoubtedly because a variety of terms for non-primary actor liability are used in the ATS cases and

in the international law sources. In light of the court's conclusions that aiding and abetting liability is available under the ATS and that plaintiffs have adequately alleged aiding and abetting by Arab Bank, there is no need to pursue, at this stage of the proceedings, these other theories of liability.

Plaintiffs also make brief mention of "conspiracy" as a ground for liability under the Genocide Convention, but again that theory has not been addressed in the briefs and therefore the availability of conspiracy liability as to the claims of international law violations raised here will not be addressed at this time.

Plaintiffs also allege liability for Arab Bank's "reckless disregard" of the underlying violations of the law of nations. Plaintiffs offer no basis for this allegation, and none of the international sources discussed contemplate such liability.

the Second Intifada and bankroll the terrorist organizations.

Arab Bank argues that it merely provided routine banking services. Arab Bank ignores that acts which in themselves may be benign, if done for a benign purpose, may be actionable if done with the knowledge that they are supporting unlawful acts. Nothing in the amended complaints suggests that Arab Bank is a mere unknowing conduit for the unlawful acts of others, about whose aims the Bank is ignorant. Given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities, there is nothing "routine" about the services the Bank is alleged to have provided. Thus, plaintiffs' allegations with respect to Arab Bank's knowledge and conduct are sufficient under their first factual theory.

**[8]** Plaintiffs' allegations with respect to Arab Bank's mental state and conduct are also sufficient under their second factual theory, which is that Arab Bank administered the program by which the Saudi Committee distributes a comprehensive benefit of $5,316.06 to designated families of Palestinian "martyrs" and to those individuals wounded or imprisoned in perpetrating suicide bombings and other attacks on innocent civilians. The Saudi Committee openly declares that its funds are transmitted and distributed to the families of "martyrs" through Arab Bank. Plaintiffs allege that Arab Bank knew that the Saudi Committee was soliciting and paying funds to the families of "martyrs." Arab Bank is alleged to have consulted with the Saudi Committee to finalize the lists of beneficiaries of those who attacked innocent civilians. In light of the allegations that the Saudi Committee widely and publicly solicited funds that were deposited directly into accounts at Arab Bank and that Arab Bank consulted with the Saudi Committee and local representatives of HAMAS to

finalize the lists of beneficiaries, the inference is unmistakable that Arab Bank knew it was administering a financial benefit to designated families of Palestinian "martyrs" and those wounded or imprisoned in perpetrating terrorist attacks, i.e., those who perpetrated the primary violations of the law of nations. *Cf. Bodner,* 114 F.Supp.2d at 128 (holding that a violation of the law of nations is alleged under the ATS where the plaintiffs claimed that the defendant banks conspired with and aided and abetted the Vichy and Nazi regimes by blocking and confiscating deposit accounts and safety deposit boxes of the plaintiffs in advance of any official compulsion to do so, requiring depositors to fill out detailed, anti-semitic, genealogical questionnaires, and distributing a circular of the French Banking Association detailing a common plan to seize Jewish assets). The standards for aiding and abetting liability discussed above do not require that Arab Bank had the specific intent to cause the specific acts which injured plaintiffs; under both the Conventions and the general standards of aiding and abetting liability it is sufficient that Arab Bank acted intentionally and with knowledge that its conduct would, as described below, facilitate the underlying violations when it engaged in the acts alleged.

Plaintiffs' allegations with respect to the substantial effect of Arab Bank's conduct in bringing about the underlying violations of a norm of international law are also sufficient under both factual theories. Plaintiffs have alleged that their injuries were caused by suicide bombings or other attacks perpetrated by the terrorist organizations to which Arab Bank provided banking services. Arab Bank's provision of banking services facilitated money laundering and also facilitated the payments from the Saudi Committee to the suicide bombers' beneficiaries. Through the pro-

gram allegedly administered by Arab Bank, the Saudi Committee paid and transmitted benefits on behalf of approximately 200 fallen "martyrs" during the first year of the program's existence alone.

According to plaintiffs, Arab Bank played an integral role in the structured financial path through which the funds in the "Account 98" accounts—accounts set up by the Saudi and Mujahideen Committees to raise funds for the families of "martyrs"—were transferred to their intended beneficiaries. Arab Bank allegedly consulted with the Saudi Committee and local representatives of HAMAS to finalize the lists of eligible beneficiaries. It also provided instructions to the general public on how beneficiaries could qualify and collect money. Arab Bank held accounts in the beneficiaries' names to which funds contained in the "Account 98" accounts were transferred. Not only did Arab Bank collect and maintain those funds, but it facilitated the conversion of such funds from Saudi Riyals to Israeli currency by routing the transfers through its New York branch, where the funds were converted to U.S. dollars and then to Israeli currency. Arab Bank distributed the money to beneficiaries who presented a Palestinian Authority-issued registration card establishing the bona fides of the "martyr."

Plaintiffs allege that, by its conduct, Arab Bank facilitated and provided an incentive for the suicide bombings and other murderous attacks. Specifically, plaintiffs allege that the individual attackers knew that, if they committed attacks, their families would be supported by the funds held in their name by Arab Bank. Plaintiffs delineate a direct correlation between the number of attacks, including suicide bombings, and the amount of Mujahideen Committee and Saudi Committee funds, some of which were eventually paid to the beneficiaries through Arab Bank.

Contrary to defendant's argument, plaintiffs need not prove that each perpetrator of an underlying attack was motivated by the "martyr" benefit plan in order to succeed on their claims. Their theory is that the "martyr" benefit plan, allegedly administered by Arab Bank, created an incentive for suicide bombings, whether or not it was also a motive in any particular instance. The Bank's active participation in creating such an incentive is a sufficient basis for liability under the standards of aiding and abetting liability discussed above, which imposes secondary liability on those who substantially assist violations of the law of nations. Nor is there a requirement of an allegation that the suicide bombers would not, or could not, have acted but for the assistance of Arab Bank. As discussed above, substantial assistance need not be a *conditio sine qua non* of the acts of the perpetrators. As with their ATA claims, plaintiffs readily acknowledge that, in order to prevail on their claims premised on the Bank's alleged administration of the "martyr" benefit plan, they must prove that each of the victims was in fact killed by an attacker who was within the coverage of the plan. As to plaintiffs' claims premised on the Bank's provision of financial services to terrorist organizations, plaintiffs acknowledge that they will have to prove that the Bank provided these services to the particular group responsible for the attacks giving rise to their injuries. For all of these reasons, defendant's argument that plaintiffs have not sufficiently alleged causation is rejected.

In sum, the amended complaints adequately allege Arab Bank's knowledge that its assistance would facilitate the terrorist organizations in accomplishing the underlying violations of the law of nations and that its provision of banking and administrative services substantially assisted the

perpetration of those violations. Arab Bank provided practical assistance to the organizations sponsoring the suicide bombings and helped them further their goal of encouraging bombers to serve as "martyrs." Indeed, as already noted, the allegations state a primary violation of the Financing Convention, under which it is sufficient that Arab Bank is alleged to have provided or collected funds with the knowledge that they were to be used in any way to contribute to acts that include using an explosive with the intent to cause death or serious bodily injury or to attack innocent civilians with the purpose of intimidating or coercing a civilian population.

Finally, that defendant is a private entity not acting under color of state law does not affect its liability. *See generally Sosa*, 542 U.S. at 732 n. 20, 124 S.Ct. 2739. The rule against genocide and crimes against humanity is enforceable against non-state actors. *Kadic*, 70 F.3d at 239–44 (discussing liability of non-State actors for genocide and war crimes but not for torture and summary execution). The third international norm alleged to have been violated here, the prohibition of suicide bombings and other murderous attacks on civilians designed to intimidate or coerce a civilian population, also creates responsibility without regard to whether the actions are taken under color of state law. As with plaintiffs' genocide and crimes against humanity allegations, plaintiffs here allege widespread, organized and systematic attacks on civilians. There is no sound reason that a state action requirement be imposed on this norm any more than one is imposed on the genocide and crimes against humanity norms. Neither the Bombing Convention, the Financing Convention nor the other sources of international law which give rise to this norm require state action. *Cf. Kadic*, 70 F.3d at 243 (noting that the international law sources prohibiting tor-

ture define torture to require actions performed by State officials or under color of law).

In addition, contrary to defendant's argument, international law establishes that entities, as well as individuals, may be held accountable. Article 5 of the Financing Convention expressly contemplates liability for "legal entities." Similarly, Resolution 1373 contemplates the liability of "entities." *See also Bodner*, 114 F.Supp.2d at 128 (holding that plaintiffs stated a claim under the ATS against banking institutions for aiding and abetting and facilitating acts of genocide).

That plaintiffs' allegations regarding Arab Bank's conduct are sufficient for liability under the ATS is further supported by the fact that Arab Bank's alleged conduct is exactly the type of conduct that the applicable Conventions and related U.S. laws are aimed at preventing. Both the Conventions and the ATA highlight the enabling nature of such conduct in bringing about the underlying violations of international law. Specifically, the Financing Convention states that "the number and seriousness of acts of international terrorism depend on the *financing* that terrorists may obtain." Preamble, Dec. 9, 1999, S. TREATY DOC. NO. 106–49 (2000). Congress, in enacting its prohibition under the ATA of providing material support—which is defined to include the provision of financial services—to foreign terrorist organizations, itself has found that "some foreign terrorist organizations, acting through affiliated groups or individuals . . . use the United States as a conduit for the receipt of funds raised in other nations" and that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." AEDPA, Pub.L. No.

104–132, § 301(a)(6), (7), 110 Stat. 1214, 1247 (1996).

In addition to these findings, Congress expressed that it was enacting its prohibition on material support to foreign terrorist organizations pursuant to its power under Article I, Section 8, Clause 10, of the U.S. Constitution, to "define and punish . . . Offenses against the Law of Nations" and thus appears to have recognized that providing material support to a foreign terrorist organization is a violation of the law of nations. *See* AEDPA, Pub.L. No. 104–132, § 301(a), 110 Stat. 1214, 1247 (1996).[44] This provides further support that Arab Bank's conduct renders it liable under the ATS and alleviates *Sosa's* concern that there has been "no congressional mandate to seek out and define new and debatable violations of the law of nations . . . ." 542 U.S. at 728, 124 S.Ct. 2739.

Accordingly, plaintiffs have sufficiently alleged facts giving rise to Arab Bank's liability for aiding and abetting the violations of the law of nations alleged here.

### C.  Specific Plaintiffs

Defendant argues that the claims of those plaintiffs, specifically, forty-four Almog plaintiffs and all of the Afriat–Kurtzer plaintiffs, who allege injuries from incidents prior to October 2000 must be dismissed as a matter of law on the ground that the systematic and widespread attacks alleged by plaintiffs as the basis for their claims under Counts Four and Five did not begin until October 2000. While the amended complaints do emphasize Arab Bank's conduct with respect to the beginning of the Second Intifada, both the Almog and Afriat–Kurtzer amended complaints make allegations regarding Arab Bank's conduct dating back to the early 1990's. The amended complaints allege that the HAMAS founding charter, dated August 18, 1988, "pledges the group to carry out armed struggle in order to destroy Israel and its Jewish citizens . . . ." Despite this, Arab Bank provided banking services to HAMAS in 1995, when it was named a Specially Designated Terrorist Entity. The amended complaints also allege, *inter alia*, that Arab Bank provided financial services and direct financial contributions to PIJ knowing that, as of 1995, it was named a Specially Designated Terrorist Entity. Thus, given the liberal pleading standard of Rules 8 and 12(b)(6), defendant's argument is rejected.

For all of the reasons stated, defendant's motion to dismiss the ATS claims contained in Counts Three, Four, and Five of both amended complaints is denied.

### IV.  Federal Common Law Claims

[9] Plaintiffs assert various "federal common law" claims (Counts Six through Ten), under the court's federal question jurisdiction, 28 U.S.C. § 1331, which include survival and wrongful death claims. Plaintiffs have offered no sound basis for these "federal common law" claims. *See Sosa*, 542 U.S. at 729, 124 S.Ct. 2739 (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (noting that, with few exceptions, there is no general federal common law)). Moreover, at oral argument plaintiffs agreed that such claims would be "redundant" of the ATS claims. Thus, plaintiffs' "federal common law" claims under § 1331 are dismissed.

---

**44.** Section 301(a)(2) of AEDPA states:

    (2) the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States, and therefore Congress

may by law impose penalties relating to the provision of material support to foreign organizations engaged in terrorist activity.
Pub.L. No. 104–132, § 301(a), 110 Stat. 1214, 1247 (1996).

### V. *Forum Non Conveniens*

**[10]** Defendant alternatively argues that the amended complaints should be dismissed on the ground of *forum non conveniens* and that plaintiffs should refile their claims in Jordan. Defendant has failed to overcome the deference accorded to plaintiffs' choice of forum, has failed to establish that Jordan provides an adequate alternative forum, and has failed to establish that private and public interests favor trial of these cases, which seek to vindicate important human rights under both domestic and international law, in Jordan. Its request is therefore denied. *See Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 99–108 (2d Cir.2000) (reversing a *forum non conveniens* dismissal in favor of a British forum and stating that "[i]f in cases of torture in violation of international law our courts exercise their jurisdiction conferred by the 1789 Act only for as long as it takes to dismiss the case for *forum non conveniens,* we will have done little to enforce the standards of the law of nations.").[45]

### CONCLUSION

For the foregoing reasons, the motions to dismiss are granted in part and denied in part. Specifically, the following claims are dismissed: The claims for violation of 18 U.S.C § 2339B(a)(2) (violation of reporting requirements) contained in Count One of both the Almog and Afriat–Kurtzer amended complaints, Count Six (assisting in the intentional injury of others), Count Seven (reckless disregard of injury to others), Count Eight (wrongful death), Count Nine (survival), and Count Ten (negligent and intentional infliction of emotional distress) of both the Almog and Afriat–Kurtzer amended complaints. Defendant's motions to dismiss the remaining claims are denied.

**SO ORDERED.**



**CITIZENS AGAINST CASINO GAMBLING IN ERIE COUNTY, Rev. G. Stanford Bratton, D. Min., Executive Director of the Network of Religious Communities, National Coalition Against Gambling Expansion, Preservation Coalition of Erie County, Inc., Coalition Against Casino Gambling in New York—Action, Inc., the Campaign for Buffalo—History Architecture and Culture, Assemblyman Sam Hoyt, Maria Whyte, John McKendry, Shelly McKendry, Dominic J. Carbone, Geoffrey D. Butler, Elizabeth F. Barrett, Julie Clearly, Erin C. Davison, Alice E. Patton, and Maureen C. Schaeffer, Plaintiffs,**

**and**

**County of Erie and Joel A. Giambra, Intervenor–Plaintiffs,**

**v.**

---

**45.** Also, for the first time at oral argument, defendant argued that this case raises nonjusticiable political questions. Defendant did not make its argument in a timely fashion, and, in any event, this case does not present any of the factors that would merit dismissal. *See Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (reciting the factors that indicate a case contains a non-justi-

ciable political question). As the Second Circuit stated in *Kadic,* "[a]lthough these cases present issues that arise in a politically charged context, that does not transform them into cases involving nonjusticiable political questions. [T]he doctrine is one of 'political questions,' not one of 'political cases.' " 70 F.3d at 249 (alteration in original) (some internal quotation marks omitted).



**COURTNEY LINDE, et al., Plaintiffs, - v - ARAB BANK, PLC., Defendant.**

**CV-04-2799 (NG)(VVP)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2009 U.S. Dist. LEXIS 52510*

**June 1, 2009, Decided**
**June 1, 2009, Filed**

**SUBSEQUENT HISTORY:** Modified by, On reconsideration by *Linde v. Arab Bank, PLC, 2009 U.S. Dist. LEXIS 51569 (E.D.N.Y., June 18, 2009)*

**PRIOR HISTORY:** *Linde v. Arab Bank, PLC, 2009 U.S. Dist. LEXIS 43439 (E.D.N.Y., May 22, 2009)*

**COUNSEL:** [*1] For Courtney Linde, individually and for the Estate of John Linde Jr., Plaintiff: Mark S Werbner, LEAD ATTORNEY, Sayles Werbner, Dallas, TX; Peter A. Binkow, LEAD ATTORNEY, Law Offices of Lionel Z. Glancy, Los Angeles, CA; Steven M. Steingard, LEAD ATTORNEY, Kohn, Swift & Graf, PC, Philadelphia, PA; Aaron Schlanger, Osen LLC, Oradell, NJ; James P. Bonner, Shalov Stone & Bonner LLP, New York, NY; Naomi B Weinberg, OSEN LLC, Oradell, NJ; Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA; Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY.

For Frances Boland, Kimberly Jasper, Steven Averbach, Julie Averbach, Tamir Averbach, Devir Averbach, Sean Averbach, Dr. David Averbach, LEAD ATTORNEY, Dr., Maida Averbach, Eugene Goldstein, Lorraine Goldstein, Michael Goldstein, Richard Goldstein, Barbara Ingardia, Chana Nathansen, Matanya Nathansen, Matanya and Chana Nathansen, for the Estate of Tehilla Nathansen, Shoshana Nathansen, Yehudit Nathansen, Hezekial Toporowitch, David Toporowitch, Rivka Toporowitch, Shaina Chava Nadel, Blumy Rom, Frederick Mandell, Sherri Mandell, Frederick and Sherri Mandell, for the Estate of Jacob Mandell, Daniel Mandell, Eliana [*2] Mandell, Avraham Mandell, Plaintiffs: Mark S Werbner, LEAD ATTORNEY, Sayles Werbner, Dallas, TX; Peter A. Binkow, LEAD ATTORNEY, Law Offices of Lionel Z. Glancy, Los Angeles, CA; Aaron Schlanger, Gary M. Osen, Osen LLC, Oradell, NJ; James P. Bonner, Shalov Stone & Bonner LLP, New York, NY; Naomi B Weinberg, OSEN LLC, Oradell, NJ; Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA; Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY.

For Jennifer Hawkinson, Plaintiff: Mark S Werbner, LEAD ATTORNEY, Sayles Werbner, Dallas, TX; Peter A. Binkow, LEAD ATTORNEY, Law Offices of Lionel Z. Glancy, Los Angeles, CA; Aaron Schlanger, Osen LLC, Oradell, NJ; James P. Bonner, Shalov Stone & Bonner LLP, New York, NY; Naomi B Weinberg, OSEN LLC, Oradell, NJ; Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA; Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY.

For Adam Averbach, Plaintiff: Gary M. Osen, LEAD ATTORNEY, Aaron Schlanger, Osen LLC, Oradell, NJ; Mark S Werbner, LEAD ATTORNEY, Sayles Werbner, Dallas, TX; Peter A. Binkow, LEAD ATTORNEY, Law Offices of Lionel Z. Glancy, Los Angeles, CA; James P.

Bonner, Shalov [*3] Stone & Bonner LLP, New York, NY; Naomi B Weinberg, OSEN LLC, Oradell, NJ; Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA; Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY.

For Deborah Fenichel, Ilanet Fenichel, Netanel Fenichel, Plaintiffs: Mark S Werbner, LEAD ATTORNEY, Sayles Werbner, Dallas, TX; Peter A. Binkow, LEAD ATTORNEY, Law Offices of Lionel Z. Glancy, Los Angeles, CA; Aaron Schlanger, Osen LLC, Oradell, NJ; James P. Bonner, Shalov Stone & Bonner LLP, New York, NY; Naomi B Weinberg, OSEN LLC, Oradell, NJ; Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA; Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY.

For Naphtali Nevies, Rebecca Nevies, Moshe Fenichel, Plaintiffs: Mark S Werbner, LEAD ATTORNEY, Sayles Werbner, Dallas, TX; Peter A. Binkow, LEAD ATTORNEY, Law Offices of Lionel Z. Glancy, Los Angeles, CA; James P. Bonner, Shalov Stone & Bonner LLP, New York, NY; Naomi B Weinberg, OSEN LLC, Oradell, NJ; Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA; Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY.

For Danielle Teitelbaum, David Kirschenbaum, [*4] Joshua Kirschenbaum, Shoshana Burgette, Mathew Parsons, Martin Kirschenbaum, Isabelle Kirschenbaum, Jason Kirschenbaum, Gloria Kushner, Clara Ben-Zaken, Chaya Ben-Zaken Zilberstein, Ran Zilberstein, Yehuda Toporowitch, Pearl B. Toporowitch, Chana Freedman, Eileen Sapadin, Michael Averbach, John Linde Sr., Plaintiffs: Mark S Werbner, LEAD ATTORNEY, Sayles Werbner, Dallas, TX; Peter A. Binkow, LEAD ATTORNEY, Law Offices of Lionel Z. Glancy, Los Angeles, CA; Aaron Schlanger, Gary M. Osen, Osen LLC, Oradell, NJ; James P. Bonner, Shalov Stone & Bonner LLP, New York, NY; Naomi B Weinberg, OSEN LLC, Oradell, NJ; Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA; Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY.

For Courtney Linde, et al. (Plaintiffs), Plaintiff: Mark S Werbner, LEAD ATTORNEY, Sayles Werbner, Dallas, TX; Peter A. Binkow, LEAD ATTORNEY, Law Offices of Lionel Z. Glancy, Los Angeles, CA; Aaron Schlanger, Gary M. Osen, Joshua D. Glatter, Osen LLC, Oradell,

NJ; James P. Bonner, Shalov Stone & Bonner LLP, New York, NY; Naomi B Weinberg, OSEN LLC, Oradell, NJ; Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA.

For All Plaintiffs, [*5] Plaintiff: Aaron Schlanger, Ari Ungar, Gary M. Osen, Osen LLC, Oradell, NJ; James P. Bonner, Shalov Stone & Bonner LLP, New York, NY; Naomi B Weinberg, OSEN LLC, Oradell, NJ; Neil L. Glazer, Kohn Swift & Graf P.C., Philadelphia, PA; Stephen H. Schwartz, Kohn, Swift & Graf, P.C., Philadelphia, PA.

For Arab Bank, PLC, Defendant: Kevin Walsh, LEAD ATTORNEY, Steven J. Young, Dewey & LeBoeuf LLP, New York, NY; Eric L. Lewis, Baach Robinson & Lewis, Washington, DC; Sean Gorman, LeBoeuf, Lamb, Greene & MacRae LLP, Reliant Energy Plaza, Houston, TX.

For Israel Discount Bank, Ltd., Respondent: Matthew E. Fishbein, LEAD ATTORNEY, Debevoise & Plimpton LLP, New York, NY; Peter Adam Chavkin, LEAD ATTORNEY, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., New York, NY; David L. Barres, Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., New York, NY.

For Israel Discount Bank Ltd., ThirdParty Defendant: Jennifer R. Cowan, LEAD ATTORNEY, Debevoise & Plimpton LLP, New York, NY; Matthew E. Fishbein, Debevoise & Plimpton, New York, NY.

For Mercantile Discount Bank Ltd., Bank Hapoalim, Defendants: Matthew E. Fishbein, Debevoise & Plimpton LLP, New York, NY.

For Israel Discount Bank of New York, ThirdParty [*6] Defendant: Matthew E. Fishbein, Debevoise & Plimpton LLP, New York, NY; Narges Maneck Kakalia, Mintz Levin Cohn Ferris Glovsky & Popeo P.C., New York, NY.

For Bank Hapoalim, Interested Party: Jay Cohen, Paul, Weiss, Rickind, Wharten & Garrison, New York, NY.

**JUDGES:** VIKTOR V. POHORELSKY, United States Magistrate Judge.

**OPINION BY:** VIKTOR V. POHORELSKY

**OPINION**

**REPORT AND RECOMMENDATION**

**AND ALL RELATED CASES**

<sup>1</sup>

 1 The following related cases have been consolidated with the instant case for purposes of discovery and other pretrial proceedings: *Philip Litle, et al. v. Arab Bank, PLC*, CV-04-5449 (NG)(VVP), *Oran Almog, et al. v. Arab Bank, PLC*, CV-04-5564 (NG)(VVP), *Robert L. Coulter Sr., et al. v. Arab Bank, PLC*, CV-05-365 (NG)(VVP), *Gila Afriat-Kurtzer, et al. v. Arab Bank, PLC*, CV-05-388 (NG)(VVP), *Michael Bennett et al. v. Arab Bank, PLC*, CV-05-3183 (NG)(VVP), *Arnold Roth, et al. v. Arab Bank, PLC*, CV-05-3738 (NG)(VVP), Stewart *Weiss, et al. v. Arab Bank, PLC*, CV-06-1623 (NG)(VVP), and *Joseph Jesner, et al. v. Arab Bank, PLC*, CV-06-3869 (NG)(VVP).

The plaintiffs have moved for sanctions pursuant to *Rule 37(b)(2) of the Federal Rules of Civil Procedure* because of the failure by the defendant to provide court-ordered discovery. [*7] The unproduced discovery consists of financial records and other information located in various foreign jurisdictions. In prior proceedings in these related actions, familiarity with which is presumed, the court found that, although the bank secrecy laws of those foreign jurisdictions bar disclosure of the unproduced discovery, the privacy interests served by those laws had to yield to the interests served by the disclosure of the information in these actions. *Linde v. Arab Bank, PLC, 463 F. Supp. 2d 310, 315-16 (E.D.N.Y. 2006)*. Notwithstanding that ruling, the defendant has continued to decline, on foreign bank secrecy law grounds, to produce the information. The plaintiffs therefore seek an order with a variety of measures to remedy the defendant's refusal to produce the information, as well as an award of attorney's fees and costs for the defendant's failure to comply with discovery orders.

**I. LEGAL AND JURISPRUDENTIAL CONSIDERATIONS**

 *Rule 37* of course authorizes the court to impose sanctions for a party's failure to produce discovery. *See*

*Fed. R. Civ. P. 37(b)*. Although the degree of culpability of the offending party is a consideration in determining an appropriate sanction, sanctions [*8] may be imposed even if a party has not acted wilfully or in bad faith, because sanctions serve not only a punitive function but the remedial function of restoring the prejudiced party to the same position he would have been in absent the non-production of evidence by the opposing party. *Residential Funding Corp. v. Degeorge Fin. Corp., 306 F.3d 99, 108 (2d Cir. 2002)* (*quoting Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 75 (S.D.N.Y. 1991)*). The *Restatement (Third) of the Foreign Relations Law of the United States* (hereinafter "Restatement"), to which the Supreme Court and courts in the Second Circuit look to resolve issues involving the production of evidence in violation of the laws of foreign jurisdictions, *see, e.g., Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court, 482 U.S. 522, 541-46, 107 S. Ct. 2542, 96 L. Ed. 2d 461 (1987)*; *United States v. Davis, 767 F.2d 1025, 1033-34 (2d Cir. 1985)*; *Minpeco, S.A. v. Conticommodity Serv., Inc., 116 F.R.D. 517, 529-30 (S.D.N.Y. 1987)*, likewise recognizes the propriety of sanctions even in the absence of fault or bad faith. *Section 442 of the Restatement* thus provides that

> a court may, in appropriate cases, make findings of fact adverse to a party that has [*9] failed to comply with the order for production, even if that party has made a good faith effort to secure permission from the foreign authorities to make the information available and that effort has been unsuccessful.

*Restatement (Third) § 442 (2)(c)*. In this litigation, the court has already determined that the withheld evidence is essential to the proof of the plaintiffs' case. *Linde, 463 F. Supp. 2d at 311-12*. Accordingly, some sanction must be imposed if for no other reason than to restore the "evidentiary balance" that has been disturbed by the non-production of important evidence. *Turner, 142 F.R.D. at 75*.

 *Rule 37(b)(2)* provides broad discretion to a district court in fashioning an appropriate sanction when a party withholds evidence in breach of discovery obligations. *Residential Funding, 306 F.3d at 107*. Severe sanctions such as entry of default or dismissal of claims may be imposed in extreme circumstances. *See, e.g., Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130,*

140 (2d Cir. 2007) (citing John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988). Ordinarily, however, severe sanctions require a determination that a party's failure [*10] to comply with discovery obligations is due to wilfulness or bad faith, e.g., Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1367 (2d Cir. 1991), and before imposing severe sanctions the court must consider whether lesser sanctions will provide an effective remedy. See, e.g., Shcherbakovskiy, 490 F.3d at 139-40; West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999); Outley v. City of New York, 837 F.2d 587, 591 (2d Cir. 1988). Lesser available sanctions include orders directing that "designated facts be taken as established for purposes of the action," or precluding the offending party from offering evidence concerning designated matters. Fed. R. Civ. P. 37(b)(2)(A)(i) and (ii). Adverse inference instructions are also an option. See, e.g., Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers, 357 U.S. 197, 212-13, 78 S. Ct. 1087, 2 L. Ed. 2d 1255(1958); Residential Funding, 306 F.3d at 107 (citing Reilly v. Natwest Markets Group Inc., 181 F.3d 253, 267 (2d Cir. 1999)).

The court's broad discretion in fashioning sanctions must be guided by several important considerations. The sanction must be "just," see Fed. R. Civ. P. 37(b)(2)(A), and "the severity of the sanction [*11] must be commensurate with the non-compliance." Shcherbakovskiy, 490 F.3d at 140; accord, Daval Steel Prods., 951 F.2d at 1368. As noted above, sanctions serve both a punitive and a remedial purpose. Whether a sanction serves those purposes and is "commensurate with the non-compliance" requires the weighing of two objective factors: (1) the intent of the party withholding evidence -- that is, whether the party is motivated by a bad faith desire to deprive the court of evidence that would be damaging to it; and (2) the likely content of the withheld evidence -- that is, what would the evidence likely prove. See Turner, 142 F.R.D. at 74; accord, Kronisch v. United States, 150 F.3d 112, 127 (2d Cir. 1998) ("Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence."). The first factor informs the punitive function of sanctions, while the second informs the remedial function.

## II. THE SANCTIONS TO IMPOSE

Determining what sanctions to impose begins with an analysis of the two factors identified above -- the defendant's intent in withholding [*12] evidence and the content and significance of that evidence.

### A. INTENT

The facts on this question are decidedly mixed. As explained in more detail in the discussion below regarding their content, the withheld bank records bear directly on a central element of the plaintiffs' proof here -- whether the defendant provided financial services to terrorists. Without the evidence the plaintiffs face a difficult, and perhaps insurmountable, hurdle in establishing their case. The defendant, of course, has argued that the evidence would actually establish that they have not knowingly provided financial services to terrorists. Nevertheless, the fact that the withheld records may disclose a large volume of payments and other transactions made to or for the benefit of terrorists, as well as other information linking the defendant's accountholders to terrorist organizations, furnishes a powerful incentive to withhold them.

On the other hand, there is no question that the Bank faces a difficult choice in deciding whether to produce the information at issue here. The court previously determined, and the plaintiffs do not dispute, that disclosure of the information would violate the laws of foreign jurisdictions [*13] and expose not only the Bank, but its employees, to criminal sanctions in those jurisdictions. Linde, 463 F. Supp. 2d at 313. As the Supreme Court noted in a similar context, "fear of criminal prosecution constitutes a weighty excuse for nonproduction." Societe Internationale, 357 U.S. at 211. It is difficult to assess how real that threat actually is, as the defendant has not brought to the court's attention any prosecutions or other penalties that the Bank, or any bank in those jurisdictions for that matter, has ever faced for violations of the laws in question. Nevertheless, compliance with the disclosures ordered by the court would expose large volumes of protected information relating to the defendant's accountholders in derogation of specific warnings already given to the defendant by foreign authorities in response to the Bank's requests for authorization to make the disclosures ordered by this court. Clearly, compliance with the court's order carries some risk for the defendant.

The plaintiffs cast doubt on the extent to which the defendant actually fears any risk of adverse consequences

for violating foreign bank secrecy laws by pointing out that the defendant has previously [*14] produced documents in violation of those laws -- including documents relevant to the claims here -- to federal regulatory authorities and pursuant to a grand jury subpoena during a federal criminal investigation. They argue that the defendant's decision to produce some protected documents to federal authorities, while refusing to produce other protected documents here, is evidence of bad faith because it demonstrates that the defendant has chosen whether or not to make disclosures based, not on whether disclosure will violate bank secrecy laws, but on whether disclosure will help them or hurt them in a given situation. The plaintiffs point to *Remington Prods., Inc. v. North Am. Philips Corp., 107 F.R.D. 642 (D. Conn. 1984)*, where the court found the defendant to be acting in bad faith when it refused to produce documents on grounds that to do so violated a Dutch blocking statute. 2 Among other reasons supporting that finding, the court there pointed out that the defendant had chosen to ignore the same blocking statute in an earlier case when disclosure of the same types of information served their interests. *Id. at 654-55.* The situation here is somewhat different, however, because [*15] the defendant's prior disclosure was made to governmental authorities, whose requests are typically viewed as exemplifying strong national interests particularly in criminal proceedings. *See, e.g., In re Grand Jury Subpoena dated August 9, 2000, 218 F. Supp. 2d 544, 562-63 (S.D.N.Y. 2002)*; *see also Restatement § 442* rep. note 9 (1987). Arguably the defendant would be less fearful that foreign governments would pursue sanctions against it for disclosures made to governmental authorities than for disclosures made in private civil litigation. It is also noteworthy that the Bank's disclosures to United States governmental authorities is not public information, and the fact that those disclosures were made apparently remains unknown to foreign authorities.

2 The "blocking statute" at issue in *Remington Products* differs significantly from the bank secrecy laws involved here. The Dutch law prevented the disclosure of broad ranges of information only in antitrust cases, and was enacted for the specific purpose of frustrating enforcement of United States antitrust law. *See Remington Prods., 107 F.R.D. at 651-52.* In contrast, the bank secrecy laws here prevent disclosure of specific types of information [*16] to anyone, whether for purposes of litigation or any other purpose.

Moreover, the defendant points out that, in contrast to the situation in *Remington Products*, the defendant has made various good faith efforts, some of which have been quite successful, to obtain permission to produce substantial quantities of documents otherwise prohibited from disclosure. The bank secrecy laws involved here permit disclosure of protected information with the consent of those to whom the information pertains. The defendant thus has obtained the permission of the Saudi Committee for the Support of the Intifada Al Quds ("Saudi Committee") to disclose all documents relating to transactions handled by the defendant on the Saudi Committee's behalf, resulting in the production of some 180,000 transactional documents. The defendant also sought and obtained the permission of the Lebanese Special Investigation Commission ("SIC") to produce documents relating to an account at a Lebanese branch which was held in the name of an individual who has been identified as a high-ranking member of HAMAS. In addition, the defendant made a number of unsuccessful efforts, first through its own petitions to governmental authorities [*17] and then through letters rogatory signed by the court, to obtain permission from authorities in Lebanon, Jordan, and at the Palestinian Monetary Authority to disclose documents within those jurisdictions. Except for the one request granted by the SIC above, those requests were denied. 3 Finally, the defendant has disclosed to the plaintiffs the records that were previously disclosed to federal authorities as mentioned above. Overall, the defendant's efforts have resulted in the disclosure of over *200,000* documents that are subject to bank secrecy laws.

3 Early on in the discovery process, before sending the letters rogatory, the defendant had succeeded in petitioning a lower court in Jordan for permission to disclose records subject to that country's bank secrecy law. The lower court ruling was overturned upon the appeal of one of the affected accountholders.

The plaintiffs challenge the good faith of the defendant on several additional grounds. They argue that the defendant's second request to the Lebanese SIC for authorization to disclose records relating to several accounts in Lebanon is not evidence of good faith because it was made in a manner calculated to fail. The request was [*18] made by letter dated September 25,

2006, prior to this court's determination that the defendant was required to produce documents notwithstanding the prohibitions of foreign bank secrecy laws. The plaintiffs find fault with the letter because it advised the SIC that the claims in these cases were baseless and that a decision by this court had "provided for respecting confidentiality laws in the countries of these accounts." Arab Bank Letter to SIC, Sept. 25, 2006, at p. 2 (found at Ungar Decl. Ex. 40). The plaintiffs argue these assertions were false because the court's decision denying the defendant's motion to dismiss the claims had already demonstrated that the claims were not baseless and because the question whether foreign "confidentiality laws" would be "respected" had not yet been decided. The false assertions, in the plaintiffs' view, tended to encourage denial of the request, similar to unsuccessful requests that were made in *Remington Products* which the court there found to be evidence of bad faith.

Although the letter could have been more forceful in its effort to convince the SIC to permit disclosure, the court does not find as much fault in it as the plaintiffs. One can [*19] hardly expect a litigant applying to a governmental agency such as the SIC, which is charged with investigating terrorism, not to deny, in strong terms, any complicity in terrorist conduct that is alleged against it by others. As to the statement that this court had "provided for respecting confidentiality laws," that statement was a reference to this court's statement in an early order concerning foreign discovery which asserted that the order did not constitute "a ruling concerning the laws, rules and regulations applicable in other countries that limit the disclosure of documents (hereinafter "bank secrecy laws"), or the appropriate remedies, if any, for the failure or refusal by the defendant to produce documents because of bank secrecy laws." Doc. Prod. Order, Mar. 3, 2006 P 12. That statement obviously recognized the potential applicability of foreign bank secrecy laws, and the possibility that such laws might interfere with production of documents here. The Bank's characterization of that statement as one that "provided for respecting confidentiality laws" is not inaccurate and does not constitute evidence of bad faith.

Finally, the plaintiffs point to two discovery disputes [*20] where the defendant's opposition to discovery demands on relevance grounds was overruled by the court as further evidence of the defendant's lack of good faith in conducting discovery. Neither dispute involved foreign bank secrecy laws. It is of course

common for parties to resist discovery based on arguments that the discovery is irrelevant, and also common that such arguments are rejected. In the circumstances, the court is not prepared to find that the overruled assertions of lack of relevance here constitute any evidence of bad faith.

On balance, although the court is not convinced that the defendant has acted in the utmost good faith in withholding evidence subject to foreign bank secrecy laws, the court cannot find that it is acting in bad faith. As the Second Circuit observed in *Reilly v. Natwest Markets Group Inc.*, "failures [to produce relevant evidence] occur 'along a continuum of fault -- ranging from innocence through the degrees of negligence to intentionality.'" *181 F.3d 253, 267-68 (2d Cir. 1999) (quoting Welsh v. United States, 844 F.2d 1239, 1246 (6th Cir. 1988)).* The court is unable to determine precisely where on that continuum the defendant's refusal to produce [*21] discovery lies, but doubts about the defendant's motivations must be tempered with the acknowledgment that the defendant has undertaken a number of steps contemplated to permit disclosure of documents prohibited by foreign bank secrecy laws, and by virtue of those steps has been able to produce a substantial quantity of documents sought by the plaintiffs.

B. CONTENT

The withheld evidence consists of a variety of bank records as well as incomplete responses to requests for admissions. The unproduced documents were the subject of various discovery orders entered by the court, but were ultimately narrowed and set forth in a production order entered by the court on May 7, 2007 (hereinafter the "Document Production Order") after the court had overruled the defendant's objections to discovery based on foreign bank secrecy laws. Briefly described, the unproduced documents fall into the following categories:

(1) account documents and transaction records for all individuals who received payments from the Saudi Committee;

(2) [*22] account documents and transaction records for a listed group of 36 entities which purport to be charitable organizations but which the plaintiffs allege act as fronts for HAMAS;

(3) account documents and

transaction records for 8 organizations (including HAMAS) designated as either terrorist organizations or their affiliates and 56 individuals alleged to be agents of those organizations; and

(4) records, including wire transfer records, for 8 organizations that have been listed by the United States government as Specially Designated Global Terrorists.

The requests for admissions the defendant declined to answer were made in the Plaintiffs' First Set of Requests for Admissions and Related Interrogatories and asked the defendant to authenticate various documents that appeared to be business records of the defendant but which had been seized from third parties.

Understanding the significance of the withheld evidence requires consideration of the theories of proof the plaintiffs will pursue to establish their claims. The plaintiffs will seek to prove two factual theories. First, they will seek to prove that the defendant helped to administer a so-called "death and dismemberment benefit plan" [*23] under which the Saudi Committee made cash payments to terrorists and to their family members or other representatives which served as an incentive for suicide bombers and others who killed or caused injuries to the plaintiffs. The defendant's role, according to the plaintiffs, included distributing the payments through its branches in the West Bank and Gaza in accordance with instructions provided by the Saudi Committee. Second, apart from the death and dismemberment plan, the plaintiffs will seek to prove that the defendant provided financial services -- such as the opening of accounts, wire transfers, and other activities to facilitate the transmission of funds -- to various organizations and individuals who were acting as fronts for HAMAS, a designated foreign terrorist organization, and to several other designated foreign terrorist organizations.

Given those two theories of liability, the importance of the withheld documents is readily apparent. The transaction records constitute direct evidence of financial services. Account records and other information would serve to identify the accountholders and others for whom those financial services were provided, and would thus provide [*24] direct evidence about whether any of those financial services were provided to terrorist organizations and individual terrorists or their relatives either as part of the death and dismemberment benefit plan or to fund other activities. It would also permit the plaintiffs to follow money trails, to see whether funds and other financial services provided to ostensibly legitimate entities ended up in the hands of terrorists and terrorist organizations, or were used for terrorist activities. There is little doubt that the withheld information would yield at least some information about financial services that were provided by the Bank to terrorists. The Saudi Committee records produced by the defendant disclose that payments distributed by the defendant on behalf of the Saudi Committee were made to persons who were identified as having committed terrorist attacks. Other records produced by the defendant and other evidence obtained by the plaintiffs establish that the defendant provided financial services to some of the entities alleged by the plaintiffs to be "fronts" for HAMAS. It would require a suspension of disbelief to conclude that the only financial services the Bank ever provided [*25] to those alleged by the plaintiffs to be terrorists or their affiliates are reflected in the documents that have been produced. The full extent of any such financial services can thus only be proven through an examination of the withheld evidence.

## C. SANCTIONS PROPOSED BY THE PLAINTIFFS

The court turns now to an examination of the specific sanctions requested by the plaintiffs. The plaintiffs have submitted a proposed order that would impose essentially three kinds of sanctions. The proposed order (1) deems various facts central to the plaintiffs' claims to be established, (2) deems certain documents to be authentic business records of the defendant, and (3) precludes the defendant from offering evidence withheld on grounds of foreign bank secrecy as well as testimony that could be cross-examined through the use of such evidence.

### 1. *Facts To Be Deemed Established*

The facts the plaintiffs ask to be deemed established are found in the first eight numbered paragraphs of the proposed order they have submitted on this motion. Five of the paragraphs concern factual findings with respect to the death and dismemberment benefit plan; the other three concern findings with respect to the providing [*26] of financial services to HAMAS and other terrorist organizations either directly, or through fronts or agents.

a. Findings Concerning the Death and Dismemberment Plan

The five proposed findings concerning the death and dismemberment plan are various iterations on the same theme. Thus, the first reads:

> At all relevant times between 2000 and 2004, Arab Bank provided financial services on behalf of the Saudi Committee in Support of the Intifada Al Quds to more than one thousand terrorists or to the relatives or representatives of terrorists (including the relatives or representatives listed as account holders in paragraphs 2-10 of the Plaintiffs' Joint Modified Phase I Request for the Production of Documents to Defendant Arab Bank, PLC (June 27, 2005), incorporated in Decision and Order (July 27, 2005)), affiliated with Hamas, PIJ, PFLP or the Al Aqsa Martyrs Brigade, knowing or intending that the financial services were to be used, in full or in part, in preparation for, or in carrying out, terrorist acts. [4]

Pl. Proposed Order P 1. The second proposed finding is virtually identical except that it does not specify any particular number of terrorists and applies to terrorists not affiliated [*27] with a foreign terrorist organization like those identified in the first proposed finding. The third proposed finding is different from the second in two respects: it states that Arab Bank "*knowingly* provided financial services" rather than simply "provided financial services," and it applies both to terrorists affiliated with the foreign terrorist organizations identified in the first proposed finding and to terrorists unaffiliated with any foreign terrorist organization. The fourth proposed finding asserts that Arab Bank agreed with the Saudi Committee to provide financial services to terrorists whether or not they were affiliated with a terrorist group, and the fifth asserts that the Bank agreed with the Saudi Committee to provide financial services to the terrorists affiliated with the foreign terrorist organizations identified in the first proposed finding "knowing that the financial services provided material support within the meaning of *18 U.S.C § 2339A(b)(1)* to these foreign terrorist organizations."

> [4] "PIJ" refers to the Palestinian Islamic Jihad and "PFLP" refers to the Popular Front for the Liberation of Palestine.

Each of the five paragraphs seek essentially two kinds of [*28] findings: one concerning the actual provision of financial services to various categories of individuals and another concerning the knowledge or state of mind of the defendant with respect to those financial services. To the extent that these proposed findings seek to deem established the fact that Arab Bank provided financial services on behalf of the Saudi Committee to terrorists, including terrorists affiliated with specified foreign terrorist organizations and terrorists unaffiliated with terrorist groups, they are reasonably commensurate with the Bank's non-compliance with the court's discovery orders. The documents withheld by the Bank includes information about the identities of the accountholders and other recipients of payments distributed by the Bank on behalf of the Saudi Committee, as well as transaction records reflecting the amounts and timing of those payments. The withheld documents would also reflect other transactions conducted by, and financial services provided to, those who received payments from the Saudi Committee. By withholding all records relating to those who received payments, the Bank has deprived the plaintiffs of the opportunity to prove the identities [*29] of all the terrorists to whom financial services were provided and the full scope of the financial services that were provided. And, because the plaintiffs are unable to learn the identities of the terrorists to whom financial services were provided, they are unable to establish whether or not they were affiliated with foreign terrorist organizations such as HAMAS and the others listed in their proposed findings.

Given the importance of the withheld evidence as demonstrated above, an order that deems established that Arab Bank provided financial services to terrorists affiliated with the foreign terrorist organizations identified by the plaintiffs, as well as to terrorists unaffiliated with terrorist groups will serve the remedial function of placing the plaintiffs in substantially the position they would have been in had the defendant complied with the court's discovery orders and prevents the defendant from gaining an advantage from non-compliance.

On the other hand, as to the defendant's knowledge or state of mind in the plaintiffs' proposed findings -- i.e., those deeming established the knowledge and intent of the defendant in providing financial services and that the defendant [*30] had an agreement with the Saudi Committee to provide financial services with certain

knowledge and intent -- the findings go beyond that remedial function. There has been no showing that the withheld evidence would be likely to provide direct evidence of the knowledge and intent of the Bank in providing the financial services at the heart of this case or in entering an agreement, if any, with the Saudi Committee.

For much the same reason, an adverse inference instruction concerning the defendant's state of mind is also unwarranted. Such an instruction requires, among other things, a sufficient showing that unproduced material is "relevant," that is, that it would be of such a nature that it would tend to prove the opposing party's claim. *See, e.g., Residential Funding, 306 F.3d at 107-09*; *Kronisch, 150 F.3d at 127* ("before we permit the drawing of an adverse inference, we require some showing indicating that the destroyed evidence would have been relevant to the contested issue"). Here, although the unproduced material is clearly "relevant" to the claim that the Bank provided financial services to terrorists, a sufficient showing that it would tend to prove the claim that the Bank did [*31] so knowingly or intentionally has not been made. [5] The plaintiffs should of course be permitted to bring to the jury's attention that numerous records were not produced, and to make arguments about how those missing records could have shed light on the Bank's knowledge and intent. But without a clearer showing that the unproduced material could provide direct evidence of the Bank's state of mind, an instruction by the court about the inferences to be drawn from the absent records is not warranted.

   5   An adverse inference instruction also requires a showing that the withholding party acted "with a culpable state of mind." *See, e.g., Residential Funding, 306 F.3d at 107-08.* In spoliation cases, where the standards for adverse inference instructions have been primarily developed, that inquiry is satisfied if evidence has been destroyed "knowingly, even if without intent to [breach a duty to preserve it], or negligently." *Id.* No Second Circuit decision has yet discussed what constitutes a "culpable state of mind" in a situation like the one here where the withholding of evidence is intentional, but arguably justified by concerns about the consequences of violating foreign laws. Nevertheless, [*32] the defendant's decision not to comply with the court's order likely suffices to establish the necessary "culpable

state of mind." Justifiable or not, that decision prevents the plaintiffs from obtaining necessary evidence, and thus is not unlike the destruction of evidence because of simple negligence, which constitutes a sufficiently "culpable state of mind" for an adverse inference instruction. *See id.*

   b. Findings Concerning Financial Services To HAMAS and Other Foreign Terrorist Organizations

As noted earlier, separate from the death and dismemberment benefit plan, the plaintiffs will seek to establish that the defendant provided financial services to entities that have been designated as foreign terrorist organizations ("FTOs") by the federal government. The facts that the plaintiffs seek to deem established with respect to this theory are contained in three paragraphs in their proposed order, each of which deals with a separate group of entities or individuals. The first of the three relates to the charitable organizations which allegedly serve as fronts for FTOs, and contains the following factual findings:

> At all relevant times between 1994 and 2004, Arab Bank provided financial [*33] services to the entities listed in Document Production Order, Appendix A (May 7, 2007, and June 26, 2007), knowing that each entity was operated and controlled by an organization that is a foreign terrorist organization, or knowing that the entity was operated and controlled by an organization that has engaged in or engages in terrorist activity or terrorism within the meaning of *18 U.S.C. § 2339B(a)(1)*, including any activity that was the basis for the designation.

Proposed Order P 6. (The entities listed in the Appendix A referred to above are all ostensibly charitable organizations.)

The second of the three paragraphs contains similar findings but relates to 56 individuals, listed in an Appendix B to the Document Production Order, who are alleged to be agents of FTOs. The findings proposed by the plaintiff with respect to those individuals are that the defendant provided financial services to those individuals "knowing that the individual was an agent for an organization that is a foreign terrorist organization, or

knowing that the individual was an agent for an organization that has engaged in or engages in terrorist activity or terrorism within the meaning of *18 U.S.C. § 2339B(a)(1)*, [*34] including any activity that was the basis for the designation."

The final paragraph relates to four FTOs -- HAMAS, the Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, and the Al Aqsa Martyrs Brigade -- and four organizations known to be their affiliates. The findings proposed by the plaintiff assert that the defendant provided financial services to those eight entities knowing that they were either FTOs or "organizations that have engaged in or engages in terrorist activity or terrorism within the meaning of *18 U.S.C. § 2339B(a)(1)*, including any activity that was the basis for the designation."

In analyzing the factual findings set forth in the above three paragraphs, the court again draws a distinction between findings concerning the provision of financial services and findings concerning the defendant's knowledge about the entities and individuals to whom the financial services were rendered. As to the provision of financial services, documents produced by the defendant and other evidence obtained by the plaintiffs from other sources establish that the defendant did provide some financial services directly to several of the charitable organizations covered [*35] in the first paragraph and to several of the individuals covered in the second. As to those entities and individuals, findings that they received financial services are hardly necessary. The question for the court is whether it is appropriate to deem established that the Bank provided financial services to all of the other entities and individuals covered by the three paragraphs including HAMAS and the other FTOs.

In the absence of any evidence that the defendant actually provided financial services to those other entities covered by the factual findings proposed by the plaintiffs, the more appropriate remedy for restoring the evidentiary balance is an adverse inference instruction that permits the jury to draw the inference, based on the fact that the defendant withheld highly relevant records, that the defendant provided financial services to those individuals and entities either directly or indirectly. That the withheld records could provide such proof is hardly debatable. Any documents concerning accounts held by any of those entities and individuals and transactions conducted on their behalf would provide direct evidence that the defendant provided them with financial services. [*36] More importantly, the withheld documents would also provide information concerning the sources and beneficiaries of funds flowing through their accounts. To the extent that those sources and beneficiaries of funds could be connected to the four FTOs, the withheld documents would serve to establish that the defendant provided financial services, indirectly, to the FTOs. Account opening documents, which would provide the names and other identifying information about those with signature authority on the accounts, could conceivably also provide information linking the charitable organizations and individuals to the FTOs. By declining to produce complete information concerning the charitable organizations and individuals alleged to be acting on behalf of the FTOs, the defendant has deprived the plaintiffs of a clear opportunity to obtain evidence proving that the defendant also provided financial services, at least indirectly, to the FTOs.

Although the withheld documents are of a nature that they would clearly establish whether financial services were provided to the entities and individuals named by the plaintiffs, the likelihood that they would provide evidence concerning the knowledge [*37] of the defendant about the connection between those financial services and terrorist organizations and activities is decidedly less clear. It is certainly conceivable that withheld documents concerning the charitable organizations and the individuals referred to in the proposed findings would provide some information disclosing an affiliation with the FTOs. At least one document produced relating to one individual for whom the Bank provided financial services contains a notation referring to "Hamas." But any documents disclosing such connections between charitable organizations or individuals, on the one hand, and the FTOs, on the other, would serve only as circumstantial evidence that the Bank knew they were either controlled by or acting as agents of those FTOs, as the plaintiffs have asked the court to find. Indeed, absent a confession, knowledge and intent are always matters of circumstantial evidence. Accordingly, as with the factual findings proposed concerning the defendant's knowledge with respect to the Saudi Committee payments, the factual findings proposed by the plaintiffs concerning the defendant's knowledge with respect to the financial services that the defendant provided, [*38] or may have provided, to charitable organizations and individuals are not adequately supported by the record developed thus far. Neither the

proposed factual findings nor an adverse inference instruction are warranted with respect to the defendant's knowledge or state of mind.

### 2. *The Requests for Admissions*

Under *Rule 36*, if a party fails to provide a proper response to a request for admission, "the court may order either that the matter is admitted or that an amended answer be served." *Fed. R. Civ. P. 36(a)(6)*. As the court has specifically overruled the defendant's bank secrecy objections to the plaintiffs' First Set of Requests for Admissions, and the defendant has declined to serve an amended answer to those requests, the court must order that the matters that the defendant has refused to answer on bank secrecy grounds are deemed admitted. In addition, to the extent the requests for admissions asked that the defendant confirm the authenticity of the defendant's records obtained from other sources, those records should be deemed admissible as authentic business records of the defendants.

### 3. *The Requested Preclusion Order*

The plaintiffs request an order that would preclude the defendant [*39] from offering in evidence any documents that have been withheld on foreign bank secrecy law grounds. As the defendant concedes, such an order is appropriate and should be entered. The plaintiffs also seek the preclusion of any testimony that would be subject to cross-examination with evidence that has been withheld. Although the court may prohibit a party from introducing designated matters in evidence, *see Fed. R. Civ. P. 37(b)(2)(A)(ii)*, the preclusion sought by the plaintiffs could be interpreted to prevent the defendant from offering a broad range of evidence, including testimony concerning their knowledge about various matters, because the plaintiffs could argue that the withheld evidence could provide material to challenge such testimony. Thus, although limitations on testimony the defendant can offer should be imposed to prevent the defendant from gaining an unfair advantage from their failure to produce documents, the complete extent to which testimony should be precluded is best left to trial, when the court can assess the nature of testimony offered by the defendant and how the plaintiffs are prejudiced by the absence of records in countering that testimony.

### 4. *Attorneys'* [*40] *Fees and Costs*

Although neither the plaintiffs nor the defendant

have addressed this issue in any detail, the plaintiffs have requested that the defendant be required to pay "their reasonable expenses, including attorney's fees, caused by its failure to comply with the discovery orders identified in the [Plaintiffs' Proposed] Order." Pl. Mem. at 31. *Rule 37(b)(2)(C)* provides that when a party has failed to comply with a discovery order "the court must order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Here, given that disclosure of the information ordered by the court would subject the defendant to criminal liability, and the Supreme Court's own observation that "fear of criminal prosecution constitutes a weighty excuse for nonproduction," *Societe Internationale, 357 U.S. at 211*, the defendant's failure to provide court-ordered discovery is substantially justified and an award of fees and expenses is therefore not appropriate.

## CONCLUSION

For the reasons discussed above, I recommend that an order be entered imposing the [*41] following sanctions on the defendant for failure to comply with discovery orders: [6]

> 1. A direction that the following facts be deemed established for purposes of these actions: between 2000 and 2004 the defendant provided financial services on behalf of the Saudi Committee in Support of the Intifada Al Quds to numerous terrorists or to the relatives or representatives of terrorists affiliated with HAMAS, PIJ, PFLP or the Al Aqsa Martyrs Brigade, as well as terrorists or the relatives or representatives of terrorists not affiliated with any terrorist organizations.

> 2. An instruction to be given to every jury that addresses the issue of liability advising that because the defendant has refused to produce relevant documents in its possession the jury may, but are not required, to infer that the records would prove that during the period from 1994 to 2004 the defendant provided financial services, either directly or indirectly, to

foreign terrorist organizations -- including HAMAS, the Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, and the Al Aqsa Martyrs Brigade -- and to individuals affiliated with foreign terrorist organizations.

3. A direction that all requests [*42] for admissions in the plaintiffs' First Set of Requests for Admissions which the defendant has declined to answer on foreign bank secrecy law grounds are deemed admitted, and that any documents referred to in those requests as to which the plaintiffs sought confirmation of their authenticity as business records of the defendant are admissible at trial as such.

4. A direction that the defendant is precluded from offering in evidence at any trial any documents or other information withheld from discovery on bank secrecy law grounds.

6  In view of the nature of the consequences of the court's decisions concerning sanctions, this

opinion is made in the form of a recommendation, which is subject to *de novo* review under *Rule 72(b)*, rather than an order reviewable only for clear error under *Rule 72(a)*.

Any objections to this Report and Recommendation must be submitted to Judge Gershon within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. *28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see, e.g., Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985);* [*43] *IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825, 121 L. Ed. 2d 696 (1992); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)* (per curiam).

/s/ Viktor V. Pohorelsky

VIKTOR V. POHORELSKY

United States Magistrate Judge

Dated: Brooklyn, New York

June 1, 2009

2009 WL 1743988
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.

Courtney LINDE, et al., Plaintiffs,

v.

ARAB BANK, PLC, Defendant.

No. CV–04–2799 (NG)(VVP).
|
June 18, 2009.

**Attorneys and Law Firms**

Mark S. Werbner, Sayles Werbner, Dallas, TX, Peter A. Binkow, Law Offices of Lionel Z. Glancy, Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA, Steven M. Steingard, Kohn, Swift & Graf, PC, Philadelphia, PA, Aaron Schlanger, Naomi B. Weinberg, Osen LLC, Oradell, NJ, James P. Bonner, Shalov Stone & Bonner LLP, Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY, for Plaintiffs.

### *ORDER MODIFYING REPORT AND RECOMMENDATION*

### **AND ALL RELATED CASES** [1]

[1]    The following related cases have been consolidated with the instant case for purposes of discovery and other pretrial proceedings: *Philip Litle, et al. v. Arab Bank, PLC,* CV–04–5449 (NG)(VVP), *Oran Almog, et al. v. Arab Bank, PLC,* CV–04–5564 (NG)(VVP), *Robert L. Coulter Sr., et al. v. Arab Bank, PLC,* CV–05–365 (NG)(VVP), *Gila Afriat–Kurtzer, et al. v. Arab Bank, PLC,* CV–05–388 (NG)(VVP), *Michael Bennett et al. v. Arab Bank, PLC,* CV–05–3183 (NG) (VVP), *Arnold Roth, et al. v. Arab Bank, PLC,* CV–05–3738 (NG)(VVP), *Stewart Weiss, et al. v. Arab Bank, PLC,* CV–06–1623 (NG)(VVP), and *Joseph Jesner, et al. v. Arab Bank, PLC,* CV–06–3869 (NG) (VVP).

VIKTOR V. POHORELSKY, United States Magistrate Judge.

**\*1** The defendant has moved by letter dated June 2, 2009 for reconsideration of a portion of my Report and Recommendation dated June 1, 2009 concerning sanctions to be imposed for the defendant's non-production of certain discovery. The plaintiff has opposed the motion by letter dated June 3, 2009, and the court heard argument on the motion at a hearing on June 16, 2009. For the reasons below, the motion is granted and on reconsideration the Report and Recommendation is modified accordingly.

The defendant's motion is directed to that portion of the Report and Recommendation which recommended that certain facts be deemed established concerning payments made by the defendant at the request of the Saudi Committee in Support of the Intifada Al Quds (the "Saudi Committee"). The defendant argues that the court overlooked facts concerning the nature and extent of the information it had disclosed about those payments which led to the erroneous conclusion that the plaintiff had been deprived of information about the identities of those who received payments and transaction records reflecting the amounts and timing of the payments.

Motions for reconsideration, which are governed in general by Rule 6.3 of the Local Rules for the United States Courts for the Southern and Eastern Districts of New York, *see, e.g., Zinnamon v. Bank of New York,* Dkt. No. 06–CV–1805, 2006 WL 1652662, at \*1 (E.D.N.Y. June 8, 2006), usually are granted only when the moving party offers controlling decisions or facts that the court had originally overlooked and that might reasonably be expected to alter the court's original decision. *See Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995) (citing *Schonberger v. Serchuk,* 742 F.Supp. 108, 119 (S.D.N.Y.1990).* "A movant may not, however, 'advance new facts, issues or arguments not previously presented to the Court,' or 'reargue those issues already considered.' " *Hayles v. Advanced Travel Mgmt. Corp.,* No. 01 Civ. 10017(BSJ), 2004 WL 117597 at \*1 (S.D.N.Y. Jan.26, 2004) (quoting *Gjoni v. Home Depot Inc.,* 99 Civ. 1849, 2002 WL 91623, \*1 (S.D.N.Y. Jan.23, 2002)). Courts have adopted this strict standard to prevent litigants from making repetitive arguments on issues that already have been considered by the court or from offering new arguments on a motion the court has already decided. *Id.*

SPA75

These limitations serve to ensure finality and to prevent losing parties from using motions for reconsideration as a vehicle by which they may then plug the gaps of a lost motion with additional matters. *Zoll v. Jordache Enter. Inc.,* No. 01 Civ. 1339, 2003 WL 1964054, at *2 (S.D.N.Y. Apr. 24, 2003), *quoting Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y.1988).

The defendant is correct that the court reached erroneous conclusions about the nature of the information withheld by the defendant concerning the payments made on behalf of the Saudi Committee. In doing so the court overlooked factual information and arguments submitted by the defendant in their opposition to the plaintiffs' sanctions motion which demonstrate that the documents produced by the bank did in fact provide a good deal of information about the identity of each recipient of such a payment, the amount and timing of each payment, and other information concerning each payment transaction such as the location of the branch where payment was made and whether the payment was made in cash or by deposit into the recipient's account. *See* Def't Mem. In Opp. 15–17, 42–43; Howard Decl. Ex. A, Tabs 1 & 2. The failure to appreciate the nature and extent of the information provided by the defendant led the court to overestimate the importance of the evidence that has been withheld and the extent of the consequent prejudice to the plaintiffs. This in turn resulted in an overstatement of the remedy necessary to restore the evidentiary balance that is a central object of any sanction. *See, e.g., Residential Funding Corp. v. Degeorge Fin. Corp.,* 306 F.3d 99, 108 (2d Cir.2002) (*quoting Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 75 (S.D.N.Y.1991))

**\*2** To be sure, the withheld documents could well provide valuable evidence concerning financial services provided to terrorists and the affiliation of those terrorists with designated terrorist organizations such as HAMAS. For example, account opening documents for the accounts of the recipients of payments might disclose addresses or other identifying information that reveal a familial or other relationship between payment recipients and terrorists. Similarly, transactions reflected in the account records of the recipients of payments might also assist in identifying them as terrorists and in disclosing their relationships to terrorist organizations or their fronts. The potential relevance of the withheld documents is thus sufficient to justify an adverse inference under the applicable standards in the Second Circuit. *See, e.g.,*

*Residential Funding Corp.,* 306 F.3d at 108–09; *Kronisch v. United States,* 150 F.3d 112, 127–28 (2d Cir.1998). But whether the withheld documents would actually disclose any relevant information, and how much information they would disclose, is necessarily a subject of speculation. The uncertainty about what might be proved by the withheld information is such that the findings of fact recommended by the court in the Report and Recommendation go too far, particularly in light of the amount of information concerning the recipients, including their names and other identifying information, that has been provided by the defendant.

Accordingly, the court withdraws that part of the Report and Recommendation concerning facts to be deemed established as set forth in the first numbered paragraph on page 22 of the Report. Instead I recommend that an adverse inference instruction along the following lines be given to every jury that addresses the issue of liability:

> Because the defendant has not produced relevant documents in its possession the jury may, but are not required, to infer that the withheld records would prove that between 2000 and 2004 the defendant processed and distributed payments on behalf of the Saudi Committee in Support of the Intifada Al Quds to terrorists, or to the relatives or representatives of terrorists, including terrorists affiliated with HAMAS, the Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine or the Al Aqsa Martyrs Brigade, as well as terrorists or the relatives or representatives of terrorists not affiliated with any terrorist organizations.

Objections to this modification to the Report and Recommendation are to be submitted in the same manner and on the same schedule as those that will be made with respect to the Report and Recommendation.

**SO ORDERED:**

SPA76

2009 WL 1743988

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1743988

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

SPA77

*inter alia,* deposition testimony that Operations Managers were indeed compensated using salary ranges created at the corporate level, and were denied overtime pay without individual inquiry. Pintoff Dep. at 47:20–23; 91:18–92:19.

United Rentals also cites *Morisky v. Public Service Elec. and Gas Co.,* 111 F.Supp.2d 493 (D.N.J.2000), a case in which the court denied FLSA certification where "[w]hat plaintiffs [we]re really challenging . . . is defendant's determination that they are exempt under the FLSA." *Id.* at 498; *see also* Mem. in Opp. at 30. *Morisky,* however, is also clearly distinguishable. Rather than providing the court, as Aros has, with a job description that is applicable to all employees nationwide in his position, the plaintiffs in *Morisky* "d[id] not even discuss the job responsibilities of the opt-in plaintiffs. Instead, plaintiffs reference[d] an extremely broad 'general connection' all plaintiffs have to the production of electricity." 111 F.Supp.2d at 498. Further, *Morisky* was decided at the second stage of the two-stage FLSA certification inquiry. 111 F.Supp.2d at 498. Here, as stated above, the focus is on whether Aros has made a "modest" showing that he was similarly situated to potential opt in plaintiffs to the case.

In sum, the court is satisfied that Aros has sufficiently shown "some identifiable factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged discrimination." *Heagney,* 122 F.R.D. at 127. While the court recognizes the possibility that the evidence in this case will ultimately show that the prospective collective action members in this case are not similarly situated, Aros has made at least a modest showing, as he is required to do at this stage, "that he and the putative collective action members are similarly situated in that they all held the same or similar position and had the same or similar responsibilities and daily tasks." *Neary,* 517 F.Supp.2d at 620.

### IV.  PROPOSED COLLECTIVE ACTION NOTICE

While United Rentals objects to the proposed Collective Action Notice that Aros has

submitted along with his Motion for Conditional Certification, the Memorandum in Opposition devotes only a short paragraph to this issue and does not describe United Rentals' objections in any level of detail. Mem. in Opp. at 34. United Rentals is ordered to submit, by October 22, 2010, additional briefing as to its specific objections to Aros' Proposed Collective Action Notice, including a proposed counter notice, a red-lined edit of plaintiff's notice, or, after consultation with plaintiff's attorney, an agreed upon notice. The court will then resolve issues related to the Notice.

### V.  CONCLUSION

The Motion for Conditional Certification (Doc. No. 25) is **granted in part.** It is granted as to Aros' request to conditionally certify the FLSA collective action. However, the court will not authorize notice to the prospective class until it resolves United Rentals' objections to the proposed notice that Aros has already submitted.

**SO ORDERED.**



**Courtney LINDE, et al., Plaintiffs,**

v.

**ARAB BANK, PLC, Defendant.**

**No. 04 CV 2799(NG)(VVP) and all related cases.[1]**

United States District Court, E.D. New York.

July 12, 2010.

Order Denying Reconsideration Oct. 5, 2010.

**Background:** American and foreign victims of terrorist attacks in Israel, the West

---

1.  The following related cases have been consoli-           dated with this case for the purposes of discovery

Bank, and Gaza, or their family members, brought actions, under the Anti-Terrorism Act (ATA) and the Alien Tort Claims Act (ATCA), against Jordanian bank alleged to have provided banking and administrative services to terrorist organizations. Following consolidation for pretrial proceedings, plaintiffs moved for imposition of discovery sanctions. The District Court, Viktor V. Pohorelsky, United States Magistrate Judge, 2009 WL 1743988, recommended a variety of sanctions, and both parties filed objections.

**Holdings:** The District Court, Gershon, J., held that:

(1) imposition of significant sanctions, based on bank's intentional failure to meet its discovery obligations, was both just and commensurate with its non-compliance;

(2) bank's alleged fear of criminal prosecution under bank secrecy laws was not, alone, sufficient justification for its failures to comply with discovery requirements;

(3) evidence that bank withheld materials supported inference that the withheld materials would substantiate plaintiffs' claims;

(4) no finding of bad faith was necessary to support imposition of adverse inference sanctions;

(5) plaintiffs were entitled to adverse inference sanctions;

(6) bank would be precluded from asserting any argument about its state of mind that would find proof or refutation in the withheld documents;

(7) plaintiffs were entitled to attorneys' fees and costs; and, on bank's motion for reconsideration,

(8) bank's argument that District Court should have given greater consider-

ation to comity did not warrant reconsideration.

Motion for sanctions granted; motion for reconsideration denied.

**1. Federal Civil Procedure ⬤1278**

Under Civil Procedure rule allowing the imposition of sanctions for a party's failure to obey a discovery order, the court has broad discretion in fashioning an appropriate sanction.  Fed.Rules Civ.Proc.Rule 37(b), 28 U.S.C.A.

**2. Federal Civil Procedure ⬤1278**

Under Civil Procedure rule allowing the imposition of sanctions for a party's failure to obey a discovery order, sanctions may include, but are not limited to, orders deeming certain facts established, permitting an adverse inference instruction, striking pleadings, prohibiting the "disobedient" party from making specific claims or introducing certain matters into evidence, dismissing a claim or the entire action or granting default judgment against the disobedient party, or entering an order of contempt.  Fed.Rules Civ.Proc.Rule 37(b), 28 U.S.C.A.

**3. Federal Civil Procedure ⬤1278**

Under Civil Procedure rule allowing the imposition of sanctions for a party's failure to obey a discovery order, the sanctions must be "just," meaning that the severity of the sanction must be commensurate with the non-compliance.  Fed.Rules Civ.Proc.Rule 37(b)(2)(A), 28 U.S.C.A.

**4. Federal Civil Procedure ⬤1278**

Discovery sanctions should, insofar as possible, restore the prejudiced party to the same position it would have been in absent the wrongful withholding of evidence by the opposing party.  Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

and other pretrial proceedings: *Litle v. Arab Bank, PLC,* 04–CV–5449; *Almog v. Arab Bank, PLC,* 04–CV–5564; *Coulter v. Arab Bank, PLC,* 05–CV–365; *Afriat–Kurtzer v. Arab Bank, PLC,* 05–CV–388; *Bennett v. Arab Bank, PLC,* 05–CV–

3183; *Roth v. Arab Bank, PLC,* 05–CV0378; *Weiss v. Arab Bank, PLC,* 06–CV–1623; *Jesner v. Arab Bank, PLC,* 06–CV–3869; *Lev v. Arab Bank, PLC,* 08–CV–3251; and *Agurenko v. Arab Bank, PLC,* 10–CV–626.

**5. Federal Civil Procedure ⬤1636.1**

A "prejudiced party" will be permitted discovery sanctions so long as it has produced some evidence suggesting that a document or documents relevant to substantiating its claim would have been included among the withheld or destroyed files. Fed.Rules Civ.Proc.Rule 37(b), 28 U.S.C.A.

**6. Federal Civil Procedure ⬤1278**

Whatever level of proof a court requires, when imposing discovery sanctions, to support an inference about the content of non-produced evidence, it must be less than the amount that would suffice to survive summary judgment on the issue for which the inference is sought. Fed.Rules Civ.Proc. Rule 37(b), 28 U.S.C.A.

**7. Federal Civil Procedure ⬤1278**

While courts consider at the sanctions stage whether the party resisting discovery has acted in good faith, a court may impose sanctions, including findings of fact adverse to the noncompliant party, even if it does not find bad faith or willful conduct; the harshest sanctions, including dismissal, contempt, or default, are reserved for cases in which the court makes a determination that the non-producing party has acted willfully or in bad faith. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**8. Federal Civil Procedure ⬤1278**

In instances where no bad faith is found, the party seeking sanctions for failure to comply with discovery must demonstrate that the evidence sought is of specific relevance, i.e., that it would have been of the nature alleged by the party affected by its unavailability. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**9. Federal Civil Procedure ⬤1636.1**

Imposition of significant sanctions, based on Jordanian bank's intentional failure to meet its discovery obligations in action alleging that it provided various banking services to terrorist organizations, was both just and commensurate with its non-compliance, despite bank's assertion that bank secrecy laws required it to refrain from producing the documents, where plaintiffs made specific requests and showed that the withheld evidence was not only relevant but also essential to proof of their claims, plaintiffs had no alternative means of securing the information sought, and defendant articulated no reason for its recalcitrance other than the bank secrecy grounds already rejected. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**10. Federal Civil Procedure ⬤1278**

Jordanian bank's alleged fear of criminal prosecution under bank secrecy laws was not, alone, sufficient justification for its failures to comply with discovery requirements in action alleging that it provided various services to terrorist organizations; nothing in the record indicated that bank faced a real risk of prosecution. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**11. Federal Civil Procedure ⬤1636.1**

Evidence that Jordanian bank, in action alleging that it provided various services for terrorist organizations, withheld materials, including account records for ten terrorists and over 90 percent of other entities listed in the parties' agreed production order, internal bank communications relating to a Saudi organization that provided financial support for terrorists, and all of that organization's documentation of beneficiaries of its activities, supported inference that the withheld materials would substantiate plaintiffs' claims and thus provided a sufficient basis for sanctions. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**12. Federal Civil Procedure ⬤1278**

No finding of bad faith, on the part of a Jordanian bank alleged to have provided various services for terrorists, was necessary to support imposition of adverse inference sanctions based on bank's failure to comply with its discovery obligations, where district court was not imposing the most severe sanctions available. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**13. Federal Civil Procedure ⬤1278**

It is the content, not the quantity, of the discovered material that may indicate the existence or absence of good faith in complying with discovery orders. Fed.Rules Civ. Proc.Rule 37, 28 U.S.C.A.

**14. Federal Civil Procedure ⟨⟩1636.1**

An adverse inference sanction, based on a party's failure to comply with its discovery obligations, is adverse to the nonproducing party not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its nonproduction. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**15. Federal Civil Procedure ⟨⟩1636.1, 2173**

Evidence that Jordanian bank provided financial services to terrorist organizations was sufficient to show that evidence withheld by the bank, during discovery in action arising out of its alleged provision of those services, would likely substantiate plaintiffs' claims, such that plaintiffs were entitled to adverse inference sanctions; jury would be instructed that it could infer that bank provided financial services to terrorist organizations and individuals and could infer that bank processed and distributed payments to named terrorists or their relatives or representatives. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**16. Federal Civil Procedure ⟨⟩1636.1, 2173**

In order to be entitled to a jury instruction permitting jury, in action alleging that a Jordanian bank provided various services to terrorists, to infer that the documents and testimony withheld by the bank during discovery would have demonstrated that it acted with the culpable state of mind of knowledge and purposeful intent, plaintiffs would be required to introduce evidence tending to show that the documents actually withheld were the ones as to whose contents it was desired to draw an inference. Fed.Rules Civ.Proc. Rule 37, 28 U.S.C.A.

**17. Federal Civil Procedure ⟨⟩1636.1, 2173**

In light of the high likelihood that evidence withheld by Jordanian bank, during discovery in action alleging that it provided various services to terrorists, would show repeated transfers to terrorists, terrorist organizations, or their fronts, or on their behalf, plaintiffs were entitled to a jury instruction permitting jury to infer that the documents and testimony withheld by the bank would have demonstrated that it acted

with the culpable state of mind of knowledge and purposeful intent; inference was both appropriate and necessary to restore the evidentiary balance. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**18. Federal Civil Procedure ⟨⟩1636.1**

Jordanian bank would be precluded, as a discovery sanction in action alleging that it provided various services to terrorists, from asserting, through evidence and/or argument, any argument about its state of mind that would find proof or refutation in the withheld documents; inference was necessary to restore the evidentiary balance. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**19. Federal Civil Procedure ⟨⟩1636.1**

Magistrate Judge did not clearly err, in action alleging that Jordanian bank provided various services for terrorists, in recommending sanctions providing for the authentication of bank records obtained by sources other than the bank, and prohibiting bank from introducing in pre-trial motions or at trial any evidence withheld on foreign bank secrecy grounds. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**20. Federal Civil Procedure ⟨⟩1278, 1453**

Plaintiffs were entitled to attorneys' fees and costs arising out of Jordanian bank's failure to comply with discovery obligations in action alleging that it provided various services to terrorists, where bank failed to demonstrate that its recalcitrance was substantially justified or that an award of fees and costs would be unjust; plaintiffs spent massive amounts of time and large sums of money flying to Jordan to depose witnesses who did not answer plaintiffs' questions. Fed.Rules Civ.Proc.Rule 37(b)(2)(C), 28 U.S.C.A.

**21. Federal Civil Procedure ⟨⟩1278**

That Jordanian bank took issue with District Court's labeling of its actions as "recalcitrance," in action alleging that bank provided various banking services to terrorist organizations, did not warrant reconsideration of order imposing discovery sanctions on bank; such alleged overlooking or misinterpretation of fact did not meet strict stan-

dard for extraordinary remedy of reconsideration.  Fed.Rules  Civ.Proc.Rule 37, 28 U.S.C.A.; U.S.Dist.Ct.Rules E.D.N.Y., Rule 6.3.

**22. Federal Civil Procedure ⚌1636.1**

In action alleging that Jordanian bank provided various banking services to terrorist organizations, bank's downplaying of import of District Court order directing it to produce documents it had previously produced to Office of the Comptroller of the Currency (OCC) and Financial Crimes Enforcement Network (FinCEN) did not warrant reconsideration of order imposing discovery sanctions on bank; while bank may have produced some documents from its New York branch before issuance of order, it had withheld other documents showing funds transfers through New York which plaintiffs sought to make their case.  Fed.Rules Civ. Proc.Rule 37, 28 U.S.C.A.; U.S.Dist.Ct.Rules E.D.N.Y., Rule 6.3.

**23. Federal Civil Procedure ⚌1636.1**

Jordanian bank's argument that District Court, in imposing discovery sanctions on bank, should not have relied on bank's interrogatory response admitting that it maintained accounts for "at least eleven" designated terrorists, did not warrant reconsideration of sanctions order, in action alleging that bank provided various banking services to terrorist organizations; bank's argument illustrated necessity of sanctions imposed, in that bank argued it bore no responsibility because it closed terrorists' accounts as soon as account holders were so designated, but plaintiffs could not refute or challenge bank's argument because bank itself possessed documents that would prove or undercut its argument and refused to produce them.  Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.; U.S.Dist.Ct.Rules E.D.N.Y., Rule 6.3.

**24. Federal Civil Procedure ⚌1636.1, 2173**

Discovery sanction against Jordanian bank, in form of jury instruction concerning bank's state of mind, imposed in action alleging that bank provided various banking services to terrorist organizations, was based on correct standard of requiring plaintiffs to demonstrate both that the withheld documents were relevant to plaintiffs' claims, and that withheld documents were likely to support plaintiffs' claims, and reconsideration of order imposing sanction thus was not warranted, where order stated, inter alia, that plaintiffs had shown high likelihood that withheld documents would show repeated transfers by bank to terrorists.  Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.; U.S.Dist.Ct. Rules E.D.N.Y., Rule 6.3.

**25. Constitutional Law ⚌3987**
    **Federal Civil Procedure ⚌1636.1**

In action alleging that Jordanian bank provided various banking services to terrorist organizations, discovery sanction precluding bank from asserting any argument about its state of mind that would find proof or refutation in documents bank had withheld did not infringe bank's due process rights, inasmuch as sanction served remedial function, did not prevent bank from being heard, and simply barred bank from defending itself by relying on documents that it had withheld from plaintiffs and from making evidentiary submissions or arguments in its defense that withheld documents could disprove. U.S.C.A. Const.Amend. 5; Fed.Rules Civ. Proc.Rule 37, 28 U.S.C.A.

**26. Federal Civil Procedure ⚌1636.1**

Jordanian bank's argument that District Court, in imposing discovery sanctions on bank, should have given greater consideration to comity, in that it should have afforded greater consideration to hardship that full production, in face of foreign bank secrecy laws, would impose on bank, did not warrant reconsideration of sanctions order, in action alleging that bank provided various banking services to terrorist organizations, inasmuch as Court did not overlook comity issue, and bank simply disagreed with Court's analysis. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.; U.S.Dist.Ct.Rules E.D.N.Y., Rule 6.3.

———

Mark S. Werbner, Sayles Werbner, Dallas, TX, Peter A. Binkow, Law Offices of Lionel Z. Glancy, Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA, Steven M. Steingard, Kohn, Swift & Graf, PC, Philadelphia, PA, Aaron Schlanger, Naomi B. Wein-

berg, Osen LLC, Oradell, NJ, James P. Bonner, Shalov Stone & Bonner LLP, Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY, for Plaintiffs.

Kevin Walsh, Dewey & Leboeuf LLP, New York, NY, Eric L. Lewis, Baach Robinson & Lewis, Washington, DC, Sean Gorman, Leboeuf, Lamb, Greene & Macrae LLP, Houston, TX, for Defendant.

### OPINION AND ORDER

GERSHON, District Judge:

The issue presented here is what sanctions to impose for defendant's recalcitrance in meeting its discovery obligations. Defendant's objections to discovery on the basis of foreign bank secrecy were overruled in 2006. Since then, defendant has continued in its refusal to comply with its production obligations. In light of defendant's production failures, plaintiffs moved before Magistrate Judge Viktor V. Pohorelsky for sanctions pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure. Judge Pohorelsky's Report & Recommendation ("R & R"), dated June 1, 2009, recommended a variety of sanctions, one of which was modified by Judge Pohorelsky by order dated June 18, 2009. Each side has filed objections to both the factual and the legal analysis performed by Judge Pohorelsky. Therefore, under Rule 72 of the Federal Rules of Civil Procedure, this court reviews *de novo* any portion the R & R to which there have been written objections. Fed.R.Civ.P. 72(b)(3); *see also, e.g., Lewis v. Zon,* 573 F.Supp.2d 804, 811 (S.D.N.Y.2008). I now grant plaintiffs' motion for sanctions to the extent indicated below.

### FACTUAL BACKGROUND

This court has detailed plaintiffs' claims in previous opinions, *see, e.g., Linde v. Arab Bank, PLC,* 384 F.Supp.2d 571 (E.D.N.Y. 2005); *Almog v. Arab Bank, PLC,* 471 F.Supp.2d 257 (E.D.N.Y.2007), but they warrant restating briefly here. Thousands of plaintiffs, both United States nationals and foreign nationals, bring claims for damages against defendant Arab Bank, PLC ("the

Bank" or defendant) for knowingly and purposefully aiding and abetting terrorists and terrorist organizations which sponsored suicide bombings and other murderous attacks on innocent civilians in Israel by providing banking and administrative services to various organizations identified by the United States government as terrorist organizations. Each plaintiff alleges that he or she is a victim, or family member of a victim, of such attacks. Plaintiffs who are United States nationals seek recovery against Arab Bank pursuant to the Anti–Terrorism Act ("ATA"), 18 U.S.C. §§ 2332 *et seq.,* while foreign national plaintiffs, based upon similar factual allegations, allege violations of the law of nations and seek recovery against Arab Bank pursuant to the Alien Tort Claims Act ("ATS"), 28 U.S.C. § 1350.

Plaintiffs allege that Arab Bank knowingly and intentionally, both directly and indirectly, facilitated the attacks by the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad ("PIJ"), the Al Aqsa Martyrs' Brigade ("AAMB"), and the Popular Front for the Liberation of Palestine ("PFLP") by "soliciting, collecting, transmitting, disbursing and providing the financial resources that allowed those organizations to flourish and to engage in a campaign of terror, genocide, and crimes against humanity in an attempt to eradicate the Israeli presence from the Middle East landscape." Plaintiffs allege that the Bank was part of a formalized system of financing that the above-referenced terrorist organizations—all designated by the United States government as Foreign Terrorist Organizations ("FTOs"), or Specially Designated Terrorist Entities ("SDTs"), or Specially Designated Global Terrorist Entities ("SDGTs")—relied upon to plan, fund, and carry out the suicide bombings and other murderous attacks in support of their shared mission to "topple and eradicate the State of Israel, murder or throw out the Jews, and liberate the area by replacing it with an Islamic and/or Palestine state."

Specifically, plaintiffs allege that Arab Bank materially supported the efforts and goals of the terrorist organizations in two ways. First, the Bank provided banking ser-

vices, including maintaining accounts, for HAMAS and other terrorist organizations. With respect to HAMAS, for example, plaintiffs allege that Arab Bank provided banking services to HAMAS directly by collecting funds into accounts maintained for the benefit of HAMAS in its Beirut, Lebanon, and Gaza Strip branches. Supporters knew to donate to HAMAS directly through Arab Bank because the HAMAS website directed supporters to make contributions to Arab Bank's Gaza Strip branch and because there were various advertisements publicized throughout the Middle East calling for donations to Arab Bank accounts. And Arab Bank knew that the donations were being collected to support terrorist attacks.

Plaintiffs also allege that Arab Bank maintained accounts and solicited and collected funds for various charitable organizations, or "zakats", which it knew were affiliated with the various terrorist organizations or were fronts for terrorist organizations. In addition, plaintiffs allege that Arab Bank maintained accounts for individual supporters of terrorist organizations, such as HAMAS. Arab Bank knew that the accounts of these various organizations and individuals were being used to fund the suicide bombings and other attacks sponsored by the terrorist organizations. Finally, Arab Bank laundered funds for the terrorist and front organizations, including the Holy Land Foundation for Relief and Development ("HLF"), which raised funds for HAMAS in the United States.

Plaintiffs additionally allege that Arab Bank administered the financial infrastructure by which the Saudi Committee for the Support of the Intifada Al Quds (the "Saudi Committee") distributed a comprehensive benefit of $5,316.06 to designated families of Palestinian "martyrs" and those wounded or imprisoned in perpetrating terrorist attacks.[2] Despite its knowledge that the Saudi Committee was distributing this benefit to families of "martyrs," Arab Bank essentially served as a "paymaster" through its branch offices within the West Bank and the Gaza Strip. Plaintiffs allege that the Saudi Committee, as of November 2001, had paid millions of dollars to suicide bombers or their beneficiaries through Arab Bank. Arab Bank also has transmitted millions of dollars to, among others, various individuals and institutions, whom plaintiffs allege to be terrorists or their fronts, on behalf of the Saudi Committee.

For purposes of determining the sanctions issue now before the court, it is important to recognize that plaintiffs must prove both that (1) Arab Bank actually engaged in the financial and administrative transactions alleged, and that (2) it did so knowingly and intentionally, *i.e.*, with the purpose of financing or incentivizing the terrorist acts alleged. That is, plaintiffs must prove "that Arab Bank was not merely the indifferent provider of 'routine banking services' to terrorist organizations, but instead [knowingly and] purposefully aided their violations of international law." *Lev v. Arab Bank*, No. 08–CV–3251, 2010 WL 623636, at *2 (E.D.N.Y. Jan. 29, 2010) (referencing ATA claims); *see also Almog v. Arab Bank*, 471 F.Supp.2d 257, 268 (E.D.N.Y.2007) (finding that plaintiffs had alleged sufficiently for Rule 12(b)(6) purposes, "Arab Bank's knowing and intentional participation in [the terrorist scheme's] illegal goals."); *id.* at 290.

## PROCEDURAL HISTORY

Discovery in these cases began five years ago, in mid–2005. From the beginning of discovery, defendant refused to produce certain documents, to respond to Requests for Admission ("RFAs"), to reveal bank account information, or to answer deposition questions on the ground that various foreign bank secrecy laws prevented such disclo-

---

**2.** Plaintiffs allege that the term "martyr" describes "those who are killed or injured while carrying out suicide attacks in support of the second intifada." *Linde*, 384 F.Supp.2d at 576 n. 3. Although defendant asserts that the Saudi Committee uses the word "martyr" to refer to anyone killed in any manner as a result of the conflict between Israel and the Palestinian territories, *see* Def.'s Mem. of Law in Opp'n to Pls.' Rule 37(b)(2)(A) Motion at 18, 18 n. 8 ("Defendant's Rule 37 Opposition"), the allegations of the complaints are taken as true at this stage of the proceedings.

sure.[3] Upon learning that defendant had previously produced some such documentation to the Department of Justice ("DOJ") in connection with the DOJ's criminal prosecution in the Northern District of Texas of the Holy Land Foundation, and to the Office of the Comptroller of the Currency ("OCC") and the Financial Crimes Enforcement Network ("FinCEN"), plaintiffs moved before Judge Pohorelsky for an order compelling defendant to produce the previously-disclosed documentation in this case. Judge Pohorelsky denied the request, stating that he was "confident that any relevant documents that may be found within the production the plaintiffs seek are covered by their other requests and are therefore subject to production anyway." Decision and Order (March 24, 2006) at 4.[4] On December 13, 2006, I granted plaintiffs' Rule 72(a) appeal of Judge Pohorelsky's decision and ordered defendant to produce to plaintiffs the records it had produced to the OCC and FinCEN, stating that it was "simply not acceptable" for the Bank to "withhold the documents showing the funds transfers through New York which plaintiffs seek to make their case." Order (Dec. 13, 2006) at 6.[5] Defendant thereafter produced to plaintiffs the documents previously provided to the OCC and FinCEN.

Plaintiffs obtained the documents defendant had produced to the U.S. government in connection with the Holy Land Foundation prosecution from other sources.

Plaintiffs also moved to overrule defendant's foreign bank secrecy objections and asked Judge Pohorelsky to impose sanctions for defendant's refusal to produce. On November 25, 2006, after consideration of the five factors set out in Section 442 of the Restatement (Third) of Foreign Relations Law ("the Restatement"), Judge Pohorelsky held that defendant's foreign bank secrecy

concerns must yield to United States interests in combating terrorism, as expressed in the Anti–Terrorism Act, 18 U.S.C. §§ 2331 *et seq.* ("ATA"). *Linde v. Arab Bank*, 463 F.Supp.2d 310, 315 (E.D.N.Y.2006) ("November 25 Order"). Section 442 of the Restatement specifies five factors courts are to consider in "deciding whether to issue an order directing production of information located abroad, and in framing such an order." Restatement § 442(1)(c). The factors are: (1) "the importance to the investigation or litigation of the documents or other information requested;" (2) "the degree of specificity of the request;" (3) "whether the information originated in the United States;" (4) "the availability of alternative means of securing information;" and (5) "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." Restatement § 442(1)(c). Judge Pohorelsky found that (1) "the discovery sought here is essential to the proof of plaintiffs' case"; (2) plaintiffs' RFAs and other discovery requests were "highly specific"; (3) "[r]easonable alternative means for obtaining the discovery sought . . . is not available"; and (4) "important interests of the United States would be undermined by non-compliance with the discovery orders issued by the court." *Linde*, 463 F.Supp.2d at 315. Judge Pohorelsky noted that the only Restatement factor weighing in defendant's favor was that the vast majority of the discovery sought concerned information originating outside the United States. *Id.*

Rather than requiring defendant to immediately produce the previously-withheld documents, Judge Pohorelsky permitted the Bank to "make a good faith effort to secure permission from the foreign authorities to make

---

**3.** The Bank asserted the Bank Secrecy laws of Jordan, Lebanon, and the Palestinian Monetary Authority—the U.S.-recognized entity that has jurisdiction over the financial system in the West Bank and Gaza. Violations of these laws may carry criminal penalties. *Linde,* 463 F.Supp.2d 310, 313, 313 n. 3 (E.D.N.Y.2006) (describing the foreign bank secrecy statutes at issue). However, Jordan and Lebanon have both "adopted a policy not to rely on bank secrecy laws as a basis

for protecting information relating to money laundering or terrorist financing." *Id.* at 315–16.

**4.** This Order may be found at entry number 166 in docket number 04–CV–2799.

**5.** This Order may be found at entry number 272 in docket number 04–CV–2799.

the information available." *Id.* at 316 (quoting the Restatement (Third) of For. Rel. L. § 442(2)(a)). On March 14, 2007, I affirmed the November 25 Order and urged Judge Pohorelsky to set a prompt deadline by which the Bank would determine whether it could secure permission to turn over the documents. The parties conferred and agreed to a production order, which Judge Pohorelsky entered on May 7, 2007 ("May 7 Order").

In June 2007, defendant prepared and Judge Pohorelsky issued Letters of Request to Palestinian and Jordanian banking authorities. These letters sought waiver of foreign bank secrecy laws and permission to disclose documents responsive to plaintiffs' requests. *See* Joint Appendix ("JA") II, Howard Decl. Ex. K. By letters dated September 2007, these requests were denied. JA II, Howard Decl. Exs. L–O. Thereafter, the Bank's counsel informed plaintiffs' counsel that, given the Palestinian and Jordanian responses to the Letters of Request, the Bank would not be making further disclosures because it could not do so "without violating foreign bank secrecy laws, which the Bank is not prepared to do." JA I, Ungar Decl. Ex. 8.

As a result of defendant's continued refusals to produce materials called for by the production orders on the basis of foreign bank secrecy,[6] plaintiffs filed their motion under Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure, seeking a range of sanctions against defendant for its failure to comply with the court's November 25 and May 7 orders. *See* JA I–III.

On June 1, 2009, Judge Pohorelsky issued his R & R, recommending that the court impose the following sanctions on defendant: (1) a direction that it be deemed established that between 2000 and 20004, defendant provided financial services on behalf of the Saudi Committee to "numerous terrorists, or to the relatives or representatives of terrorists" either unaffiliated or affiliated with various named terrorist organizations; (2) a jury instruction permitting, but not requiring, the jury to infer that defendant provided financial services between 1994 and 2004, "either directly or indirectly, to foreign terrorist organizations ... and to individuals affiliated with foreign terrorist organizations"; (3) a direction deeming admitted certain requests for admissions as to the admissibility of documents which defendant had refused to answer on foreign bank secrecy grounds, and permitting to be entered into evidence at trial any documents referred to in those requests for which plaintiffs sought authentication as business records; and (4) an order precluding defendant from offering into evidence at trial "any documents or other information withheld from discovery on bank secrecy law grounds." R & R at 22. Judge Pohorelsky's R & R did not include any sanction relating to defendant's knowledge or intent.

Defendant moved before Judge Pohorelsky for reconsideration of the R & R, arguing, *inter alia*, against a deemed finding regarding the bank's provision of financial services to terrorists on behalf of the Saudi Committee. On June 18, 2009, Judge Pohorelsky modified his R & R to recommend that, in place of the originally-recommended deemed finding, the court advise the trial jury that it can, but is not required to, infer that withheld documents would prove that defendant had provided financial services between 2000 and 2004, on behalf of the Saudi Committee, to terrorists, including those affiliated with HAMAS or several other named organizations, or their relatives or representatives. He also deleted the reference to "numerous" terrorists.

Both parties filed Rule 72(b) objections to Judge Pohorelsky's modified R & R. Plain-

---

**6.** Indeed, defendant continues to object to production requests based on assertions of foreign bank secrecy. *See, e.g.,* Pls.' April 21, 2010 letter (explaining that defendant refused to produce documents responsive to Request No. 12 of plaintiffs' Fourth Request for the Production of Documents, dated January 8, 2010, "to the extent it seeks production of documents that are subject to bank secrecy laws of foreign jurisdic-

tions in which Arab Bank operates."). The court considers that the November 25, 2006 Order, affirmed on March 14, 2007, overruled *all* of the Bank's foreign bank secrecy objections. Defendant therefore is under a continuing obligation to produce documents that are responsive to plaintiffs' requests and cannot rely on foreign bank secrecy objections.

tiffs ask this court to grant sanctions that: (1) deem found that, between 2000 and 2004, defendant "processed and distributed payments on behalf of the Saudi Committee to numerous terrorists," including those affiliated with named terrorist organizations and those who are unaffiliated, or their relatives or representatives; (2) deem found that, between 1994 and 2004, defendant directly or indirectly provided financial services to organizations designated by the United States as FTOs; (3) instruct the jury that it may infer that the withheld documents and testimony would have demonstrated that the Bank knowingly and intentionally provided the financial services referenced in (1) and (2); (4) prohibit defendant from offering into evidence any discovery withheld on foreign bank secrecy grounds and from "offering any evidence, including expert or fact witness testimony, regarding its then-current state of mind, or any other issue for which [d]efendant's production failures" affect plaintiffs' ability to cross-examine witnesses; and (5) award plaintiffs reasonable attorneys' fees and costs incurred as a result of defendant's noncompliance with discovery orders issued by this court and by Judge Pohorelsky. Pls.' Mem. of Law in Support of Their Objections to the Report and Recommendation at 2–3 ("Plaintiffs' Objections").

Defendant, in its "limited" objections, does not object to a sanction directing that plaintiffs' first RFAs are deemed admitted and that any documents referred to in those requests are deemed authenticated. Nor does defendant object to a sanction permitting a jury to infer that the Bank provided financial services indirectly (though not directly) to terrorist organizations. Def.'s Mem. of Law in Support of Its Objections to the Report and Recommendation at 22 ("Defendant's Objections"). However, defendant argues that, even a permissive adverse inference regarding defendant's provision of financial services on behalf of the Saudi Committee would be improper, since, defendant argues, there is no evidence that Bank records would show Saudi Committee beneficiaries to be terrorists. Defendant also argues that any instruction that would allow a jury to infer that the bank provided *direct* support to terrorists would be over-inclusive, as there

was "no production by Arab Bank of any such direct accounts or transactions." *Id.* at 29. Finally, defendant argues that, because none of the produced documents substantiate plaintiffs' allegations on the issue of defendant's intent, an inference on the Bank's knowledge and intent would be improper.

## ANALYSIS

### A. Legal Framework

**[1–4]** Rule 37 of the Federal Rules of Civil Procedure permits the court to impose sanctions for a party's failure to obey a discovery order. Fed.R.Civ.P. 37(b). Rule 37(b) affords the court "broad discretion in fashioning an appropriate sanction." *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 101 (2d Cir.2002). Such sanctions may include—but are not limited to—orders deeming certain facts established; permitting an adverse inference instruction; striking pleadings; prohibiting the "disobedient" party from making specific claims or introducing certain matters into evidence; dismissing a claim or the entire action or granting default judgment against the disobedient party; or entering an order of contempt. *Id.*; Fed.R.Civ.P. 37(b). Rule 37 does not identify the factors courts should weigh in considering whether to sanction a party for noncompliance with the court's discovery orders, but the Rule instructs that the sanctions must be "just", Fed.R.Civ.P. 37(b)(2)(A), meaning that "the severity of the sanction must be commensurate with the non-compliance." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.,* 490 F.3d 130, 140 (2d Cir.2007). Ultimately, discovery sanctions should, "insofar as possible, . . . restor[e] the prejudiced party to the same position [it] would have been in absent the wrongful [withholding] of evidence by the opposing party." *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998).

**[5, 6]** Whether a sanction strikes this balance requires consideration of two factors: the intent of the disobedient party, and the probable content of the non-produced evidence. *Id.* As the Second Circuit recognized in *Kronisch,* this "task is unavoidably imperfect, inasmuch as, in the absence of the [with-

held] evidence, [a court] can only venture guesses with varying degrees of confidence as to what the missing evidence may have revealed." *Id.* at 127. Nevertheless, a "prejudiced party" will be permitted sanctions-particularly, as discussed in *Kronisch,* the sanction of an inference in its favor—"so long as [it] has produced *some* evidence *suggesting* that a document or documents relevant to substantiating [its] claim would have been included among the [withheld or destroyed] files." *Id.* at 128 (emphasis added); *see also* 2 Wigmore, Evidence in Trials at Common Law § 291, at 228. While "[j]ust how much evidence is enough to support an inference about the content" of non-produced evidence "will necessarily vary from case to case," courts should "remain mindful of Wigmore's admonition that 'care should be taken' not to require too specific a level of proof" lest withholding parties profit from their disobedience and "innocent parties meant to benefit from the adverse inference . . . receive no benefit at all, having been deprived of evidence that may be crucial to their case." *Kronisch,* 150 F.3d at 128. Whatever level of proof a court requires, it "must be less than the amount that would suffice to survive summary judgment" on the issue for which the inference is sought. *Id.*[7]

As discussed *supra,* where the disobedient party has invoked foreign bank secrecy laws as a justification for its noncompliance, courts look to the factors contained in Section 442 of the Restatement for guidance in determining whether to compel production of documents located in foreign jurisdictions. Courts again consider these factors when deciding what sanctions to impose if parties fail to comply. *See, e.g., Société Aérospatiale v. U.S. Dist. Ct.,* 482 U.S. 522, 541–46, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987); *Minpeco, S.A. v. Conticommodity Servs., Inc.,* 116 F.R.D. 517, 529–30 (S.D.N.Y.1987).

Like Rule 37, the Restatement provides for the imposition of sanctions for "[f]ailure to comply with an order to produce." While the Restatement does not identify the method by which courts should determine whether and what sanctions are proper, the United States Court of Appeals for the Second Circuit and district courts in the circuit "employ[ ] the same analysis to decide whether to compel discovery and whether to impose sanctions for noncompliance." *In re Grand Jury Subpoena dated August 9, 2000,* 218 F.Supp.2d 544, 554 (S.D.N.Y.2002); *see also Minpeco,* 116 F.R.D. at 521. Thus, courts in this circuit weigh the five factors listed above both when setting sanctions and when deciding whether to issue production orders for information located in foreign states. Courts also consider the hardship imposed on the party ordered to produce at the compulsion stage, *Minpeco,* 116 F.R.D. at 522–23, but are not required to consider it anew in reviewing a request for sanctions based on noncompliance. *Weiss v. Nat'l Westminster Bank, PLC,* 242 F.R.D. 33, 55 (E.D.N.Y. 2007).

[7, 8]  In addition, while courts in the Second Circuit consider at the sanctions stage whether the party resisting discovery has acted in good faith, *Strauss v. Credit Lyonnais, S.A.,* 249 F.R.D. 429, 438–39 (E.D.N.Y. 2008), a court may impose sanctions—including findings of fact adverse to the noncompliant party—even if it does not find bad faith or willful conduct.[8] Restatement § 442(2)(c). The harshest sanctions, including dismissal, contempt, or default, are reserved for cases in which the court makes a determination that the non-producing party has acted willfully or in bad faith. Restatement § 442(2)(b). But sanctions are available even absent such a finding, since failure to comply with court-ordered discovery "occur[s] along a continuum of fault—ranging from innocence through the degrees of negligence to

---

**7.** In its briefing, the Bank argues that *Kronisch* requires more than this. Its interpretation of *Kronisch* ignores the Second Circuit's explicit warnings that the standard for adverse inferences should not be construed to place stringent requirements on parties seeking sanctions for non-production or destruction of evidence.

**8.** Although the court in *Minpeco* relied on an older version of the Restatement—Section 40 of the Restatement (Second) of Foreign Relations Law, which has since been replaced by Section 442 of the Restatement (Third)—courts continue to consider the resisting party's good faith when contemplating appropriate discovery sanctions. *See Strauss,* 249 F.R.D. at 439; *Nat'l Westminster Bank,* 242 F.R.D. at 56.

intentionality." *Residential Funding Corp.,* 306 F.3d at 101, 108 (internal quotation marks and citation omitted). In instances where no bad faith is found, the party seeking sanctions must demonstrate that the evidence sought is of "specific relevance," *i.e.,* that it "would have been of the nature alleged by the party affected by its [unavailability]." *Kronisch,* 150 F.3d at 127; *Residential Funding Corp.,* 306 F.3d at 108–09.

**B. Sanctions**

**[9, 10]** Defendant continues to assert that foreign bank secrecy laws require it to refrain from producing a range of documents plaintiffs seek to prove their case. This court has already rejected defendant's rationale for withholding the documents. Thus, as Judge Pohorelsky recognized, "some sanction must be imposed if for no other reason than to restore the evidentiary balance that has been disturbed by the non-production of important evidence." R & R at 2–3 (internal quotation and citation omitted). As described above, this court has broad discretion in crafting the sanctions. In this case, where defendant has intentionally failed to meet its production obligations, where plaintiffs have made specific requests and shown that the withheld evidence is not only relevant but also essential to proof of their claims, where plaintiffs have no alternative means of securing the information they seek from defendant, and where defendant has articulated no reason for its recalcitrance other than the bank secrecy grounds already rejected, significant sanctions are both "just" and "commensurate" with defendant's non-compliance. *See Shcherbakovskiy,* 490 F.3d at 140. Defendant's "weighty excuse" of fear of criminal prosecution, *see Societe Internationale,* 357 U.S. at 211, 78 S.Ct. 1087, is not, alone, sufficient justification for defendant's production failures. On the contrary, there is nothing in the record indicating that defendant faces a real risk of prosecution; nor does the record show that defendant or its employees have been prosecuted for the Bank's *voluntary* productions in other cases.

**1. Production to Date**

In its papers, defendant argues that its production has been "extensive" and has included "full production of records and deposition testimony on matters not covered by foreign bank secrecy, as well as a production of extensive additional records and testimony after obtaining governmental authorization or private party consent, or based on other exceptions to bank secrecy." Defendant's Objections at 6. The Bank also stresses that it "pursued foreign judicial remedies and official requests for further governmental authorizations." *Id.*

With regard to defendant's alleged provision of financial services to various terrorists and terrorist organizations, defendant asserts that it has made complete production, including, after successful application to the Lebanese Special Investigation Committee to waive bank secrecy, "all account records and transactional documents relating to an account formerly maintained at Arab Bank's Al–Mazra branch in Beirut, Lebanon (the "Beirut Account") that plaintiffs have alleged was opened and maintained directly for the benefit of the terrorist organization Hamas." *Id.* at 12–13. This production includes transactional records, Know Your Customer documentation, and internal bank communication related to this account. The documents— which defendant previously produced to the Office of the Comptroller of the Currency ("OCC") without seeking the consent of the Lebanese government but refused to produce to plaintiffs here without such permission— show that in 1998, Osama Hamdan,[9] an [alleged] HAMAS leader and an SDGT since his designation in 2003, opened a bank account at defendant's El–Mazra branch in Beirut, that he maintained the account until it was closed in 2004, and that transfers were made to and from his account in the intervening years.[10] *See* JA II, Howard Decl. Ex. A–7.

The Beirut Account is only one of eleven accounts that defendant admits it maintained

---

**9.** Hamdan is also known as Usama Hamdan or Usama Hamdan Abd el-Latif Hamdan. *See* JAI, Ungar Decl. Ex. 33.

**10.** The United States designated HAMAS a Foreign Terrorist Organization in 1997.

for FTOs, SDGTs, or SDTs. Defendant has refused to provide any documents for the other ten accounts.

Defendant also produced to plaintiffs the same incomplete account information for seven charitable organizations alleged to be terrorist fronts that it had previously produced pursuant to an order of the U.S. District Court for the Northern District of Texas in connection with the Department of Justice's prosecution of the Holy Land Foundation. In addition, the Bank asserts that it made "voluminous production" of documents "not subject to foreign bank secrecy laws," including documents from Arab Bank New York ("ABNY") of over 600 transaction records, including 73 records reflecting Saudi Committee transactions. Def.'s Obj. at 14–15.

With regard to the Saudi Committee, defendant states that it voluntarily obtained the Saudi Committee's consent to produce "more than 180,000 records relating to the payments it processed" for the Saudi Committee, including, for each record, "the name of every individual or entity that received money from the Saudi Committee through Arab Bank, and the amount of money received by such recipient." *Id.* at 8, 10. Defendant provided lists of Saudi Committee beneficiaries, some of which include the martyr's name, place, date, cause of death, and desired beneficiary, as well as one 1,485–page spreadsheet prepared by the Bank that lists all payments by the Bank at the request of the Saudi Committee. Defendant also states that it produced "all correspondence between Arab Bank and Arab National Bank relating to the Saudi Committee payments," as well as a witness for a Rule 30(b)(6) deposition regarding the services defendant provided to the Saudi Committee. *Id.* at 8–9. Defendant acknowledges that it did not produce account and other transaction records for the recipients of payments from the Saudi Committee, because, defendant claims, the Saudi Committee could not provide consent for the production of these documents.

Defendant's characterization overstates both the breadth of its production and the efforts it has made to meet its production obligations. Defendant gets little credit for its grudging production of the ABNY documents, which were produced only after this court rejected the Bank's attempt to obfuscate the production obligations of its local branch, or for its production of records for HAMAS-affiliated charities, which were already physically located in the United States, and regarding which the Bank's witnesses have refused to answer substantive deposition questions. While defendant has produced hundreds of thousands of pages of records relating to its provision of services to the Saudi Committee, it has neither produced a privilege log-like accounting of its withholding nor indicated how many pages of documents responsive to plaintiffs' requests have been withheld. The production lacks account statements; unredacted Know Your Customer material that the Bank is required to collect under international and local anti-terrorism laws; reports created by terrorism detection software that the Bank says it uses and that it acknowledges is required to use to comply with anti-terrorism laws; internal correspondence regarding Bank work for the Saudi Committee; unredacted minutes of Bank meetings at which the Saudi Committee was discussed; or any other documents that "might confirm an accountholder or payment beneficiary's identity or circumstantially evidence the Bank's knowledge of identity." Pls.' Objections at 4. Defendant argues in its opposition to plaintiffs' objections that its production has been more fulsome than plaintiffs claim, but cites only irrelevant deposition testimony to support its claim. Moreover, defendant's deposition witnesses consistently have refused to answer questions seeking information for accounts held by the Bank, asserting the same foreign bank secrecy objection that this court has already overruled, even when confronted with documents the Bank itself has already produced. *See, e.g.,* Osen Decl. Ex. B (Deposition of Tayseer Sadeq at 192:13–21; 71:11–16).

**[11]** The court has carefully reviewed plaintiffs' representations of the record and finds them to accurately reflect the state of production. The record establishes that defendant has withheld materials falling into the following categories: (1) account records for ten of eleven accounts defendant admits it

maintained for FTOs, Specially Designated Global Terrorists ("SDGTs"), or Specially Designated Terrorists; (2) account records for over 90 percent of the other entities listed in the parties' agreed May 7, 2007 production order, to which defendant stipulated, for whom defendant was obligated to produce relevant records; (3) internal Bank communications relating to the Saudi Committee; and (4) all Saudi Committee documents, including Know Your Customer documentation for thousands of Saudi Committee beneficiaries.

As shown in detail below, plaintiffs have provided ample evidence from which the court can infer that the withheld evidence would be of the character asserted and would substantiate plaintiffs' claims. Plaintiffs' showing is a sufficient basis for sanctions. Plaintiffs are not required to do the impossible, *i.e.*, provide direct evidence of the contents of the non-produced documents.

**2. Good Faith**

**[12]** Because, as described below, the court is not imposing the most severe sanctions available, no finding of bad faith is necessary here.[11] Nevertheless, the court notes that defendant's argument that it has acted in the utmost good faith and that it has "sought every possible means for lawful disclosure" is not supported by the record. Def.'s Mem. of Law in Opp'n to Pls.' Objections at 6 ("Defendant's Rule 72 Opposition"). Defendant's letters requesting permission from foreign banking authorities to disclose information protected by bank secrecy laws are not reflective of an "extensive effort" to obtain waivers. *See, e.g.,* Ungar Decl. Ex. 40 (letter dated September 25, 2006, from Arab Bank, PLC—Lebanon, to the Lebanese Special Investigation Commission ("LSIC")). Instead, the letters were calculated to fail. Despite the fact that this court had already denied defendant's motion to dismiss at least one of plaintiffs' complaints, defendant represented to LSIC that plaintiffs' allegations have "no basis in reality or in the law." *Id.*

at 1. Defendant's letter further stated that the court had "provided for respecting confidentiality laws in the countries of these accounts," even though Judge Pohorelsky was at that time considering the merits of the Bank's foreign bank secrecy objections—which he ultimately overruled. Defendant was permitted to deny plaintiffs' allegations, but it was not permitted to mischaracterize the status of the lawsuit. Its false or exaggerated assertions hardly support a finding of good faith. *See Remington Prods., Inc. v. North Am. Philips Corp.,* 107 F.R.D. 642, 653 (D.Conn.1985).[12]

**[13]** In addition, defendant claims credit for its production of Arab Bank New York documents. Defendant forgets that it produced documents touching its New York branch only after I ordered it to do so, noting that defendant's actions thus far had not inspired "confidence that reliance on other [production] requests [would] be effective," given that the Bank had "failed to produce New York documentation ... admittedly called for by plaintiffs' requests." Dec. 13, 2006 Order. The Bank had refused to produce despite its earlier production of many of the very same documents to the OCC, FinCen, and the DOJ. These prior disclosures were made to governmental authorities, whose requests are thought to embody a "strong" national interest, especially in the context of criminal prosecutions. *See In re Grand Jury Subpoena,* 218 F.Supp.2d at 562. But the fact that this is a lawsuit between private parties cannot excuse defendant's refusal to match its prior production here. As far as this court knows, the Bank has not faced any repercussions as a result of its prior disclosures. *See Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 30 (S.D.N.Y.1984). Yet it emphasizes its fear of such reprisals as a reason for its noncompliance here. Moreover, defendant stresses throughout its papers that it has produced

---

**11.** In its papers, defendant repeatedly refers to adverse inferences and deemed findings as "severe" sanctions, but the case law is clear that these sanctions are not properly considered "severe". In this context, the term "severe" refers to sanctions of dismissal and contempt, not to

the more limited sanctions imposed here. *See, e.g.,* Shcherbakovskiy, 490 F.3d at 140.

**12.** Judge Pohorelsky viewed defendant's letter more generously, *see* R & R at 8–9, but I respectfully disagree.

hundreds of thousands of pages of documents. But defendant's assertion is devoid of context—defendant nowhere indicates how many pages it has withheld—and, as plaintiffs argue, many of the documents defendant did produce were either publicly available, had previously been produced in connection with other investigations, or are incomplete. "[I]t is the content not the quantity of the discovered material that may indicate the existence or absence of good faith." *Compagnie Francaise*, 105 F.R.D. at 31.

Finally, the years of delay caused by defendant's refusals to produce weigh against a finding of good faith. *Weiss v. Nat'l Westminster Bank*, 242 F.R.D. at 56. It is now apparent that the delay was for no purpose at all; defendant never intended to produce certain documents, regardless of this court's rulings on the Bank's foreign bank secrecy objections. Defendant's objections were overruled in 2006, but it continues to assert these same rejected objections as grounds for its withholding.

What is more, in making its limited production, defendant "has decided when it will be cooperative, and when it will not be cooperative," which it has no right to do. *Cine Forty–Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1065 (2d Cir.1979). Its selective compliance with foreign bank secrecy laws, as described above, highlights the limits of its supposed good faith and casts doubt on its claims of hardship.

**[14]** In sum, I cannot accept that the Bank has undertaken its discovery obligations with the utmost good faith. Instead, defendant's conduct places it at a location approaching willfulness on the "continuum of fault". *Residential Funding Corp.*, 306 F.3d at 108. Even absent bad faith, adverse inference sanctions are appropriate here. *Id.* "The inference is *adverse* to the [nonproducing party] not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its [nonproduction]." *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y.1991).

### 3. Acts

#### a. Various Terrorists and Terrorist Organizations

Plaintiffs have presented evidence that between 1994 and 2004, defendant provided financial services to several Foreign Terrorist Organizations, including the Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, and HAMAS. This evidence includes the Beirut Account records discussed *supra*, as well as documentation of transfers by other HAMAS leaders, such as a 2002 transfer by Mousa Mohammed Abu Marzook, a designated SDGT since 1995, and Salah Mostafa Mohamed Shehadad, a founder of HAMAS and, plaintiffs allege, the "supreme leader" of the Izz al-Din al-Qassam Brigades—HAMAS's military wing. *See* Pls.' Rule 72 Opp'n at 20; JA I, Pls.' Rule 37 B.R. at 39; JA I, Ungar Decl. Exs. 35, 36. Defendant also processed a payment to Ismail Haniyah, the "prime minister" of HAMAS in Gaza. *See* Pls.' Rule 72 Opp'n, Schlanger Decl. Ex. F. (Deposition of Tayseer Sadeq at 191:7–193:4); JA I, Ungar Decl. Ex. 37.

Furthermore, plaintiffs have provided proof that defendant processed transfers from or to "zakat" committees and other charitable organizations that plaintiffs allege are fronts for HAMAS. For example, plaintiffs have offered records of at least one 2004 wire transfer to the Al–Salah Society, a charitable organization affiliated with HAMAS that the United States designated as an SDGT in August 2007, and whose funds the Palestinian Monetary Authority froze in August 2003. *See* Pls.' Obj., Schlanger Decl. Exs. G, H. In another instance, Hamid Sulaiman Khdeir, a.k.a. Hamid Sulaiman Jabar Khudeir al-Bitwai, who plaintiffs allege to be among HAMAS's senior leaders, was a signatory for the Nablus Zakat Committee's Arab Bank account. *See* JA III, Pls.' Rule 37 Reply Br., Schlanger Decl. Ex. D. Another zakat, the Ramallah Zakat Committee, an Arab Bank accountholder, received a transfer from Interpal in 2004—the year after Interpal was designated as an SDGT. *See* Pls.' Rule 72 Opp'n, Osen Decl. Ex. B. The transfer was not stopped by the Bank's programs

for detecting transactions linked to terrorism, and it appears to have been approved by an Arab Bank employee. *Id.*

These documents are sufficient to show that the withheld evidence would likely substantiate plaintiffs' claims. For example, defendant admits that it maintained accounts for eleven people or organizations that had already been designated as Terrorists. Pls.' Rule 72 Opp'n, Osen Decl. Ex. A at 1 (Def.'s Resp. to Pls.' First Amended Interrogatory) ("Bank's Interrogatory Response").[13] But defendant has produced only the account information for one of these eleven-the Beirut Account discussed at length above. This production, which represents the only set of complete account records provided to plaintiffs, included, among other things, Know Your Customer information, picture identification, and wire transfer records. Plaintiffs reasonably expect that the Bank has similar information for the other ten accounts it has admitted belonged to terrorists, and plaintiffs were entitled to receive that information. In its absence, plaintiffs are entitled to an inference that the withheld documents would support their claim. In addition, defendant, in RFAs, interrogatories, and depositions, refused to confirm that certain people—including alleged and designated terrorists-were its customers. The withheld documents would confirm or disprove the identities of defendant's customers whom plaintiffs allege to be terrorists, including Haniyah, Marzook, and al-Bitawiand—particularly important clarification in light of defendant's refusal to confirm its customers' identities at depositions and its already-expressed mistaken identity defense.

**b. Saudi Committee**

Plaintiffs have offered evidence to support their claim that between 2000 and 2004, the Bank facilitated the Saudi Committee's "martyr" payment program. Included in plaintiffs' exhibits is a Saudi Committee spreadsheet listing, among other things, the names of martyrs and their beneficiaries, as well as the martyrs' causes of death. *See* JA I, Ungar Decl. Ex. 14.[14] Among the martyrs listed are at least eight identified as people who died in the commission of various "martyrdom operations," including Yatem Yaqin al-Shweiki, who was killed in the execution of the so-called "French Hill operation," named for the Jerusalem neighborhood in which he opened fire with an M–16 machine gun while riding a bus, killing two, including Shoshana Ben–Yishai, whose survivors are plaintiffs in this litigation.[15] JA I, Ungar Decl. Ex. 12; *see also, e.g.,* JA I, Ungar Decl. Ex. 14 at 11 (martyr Ahmed Abdel Monem Ahmed and martyr Ashraf Muhammad Sobhi Mahmoud); JA II, Howard Decl. Ex. A–3. The listed causes of death for other martyrs are ambiguous. Numerous martyrs are listed as dying by "assassination"-the same cause of death listed on the Saudi Committee webpage documenting the Bank's transfer to the beneficiaries of Izz Ad–Din Shuhail Ahmad al-Masri, the person who carried out the *suicide bombing* at the Sbarro pizzeria in Jerusalem on August 9, 2001, in which 130 people, including plaintiffs in this case, were injured or killed.[16] *See* JA I, Ungar Decl. Exs. 15, 16 at 2 (reporting on Hamas's acceptance of responsibility for the bombing and identification of al-Masri as the suicide bomber).

Plaintiffs also have offered records of wire transfers by the Bank on behalf of the Saudi Committee to recipients not featured in any Saudi Committee list, including documentation of a transfer to the father of al-Masri,

---

**13.** Defendant states that it no longer maintains accounts for any presently or formerly designated Terrorists. *See* Pls.' Opp'n to Def.'s Obj., Osen Decl. Ex. A at 2. However, the record contains no information regarding what it did with the funds contained in those accounts when they were closed, and no documentation of the account closings.

**14.** The document is entitled "List of Names of Martyrs to Substitute the Existing Transfers at the Bank Substituting the Name of One Beneficiary with Another."

**15.** Ben–Yishai's survivors are American citizen plaintiffs in *Coulter, et al. v. Arab Bank, PLC,* 05–CV–365. *See* Coulter Complaint at 21–23. Al-Shweiki was shot dead by police while fleeing the scene of the massacre.

**16.** Plaintiffs are either the injured victims themselves or the surviving family members of those killed in the Sbarro attack.

the Sbarro bomber discussed above; and evidence of a transfer to Ibrahim Sa'id Ibrahim Ramadan, allegedly the father of Sa'id Ibrahim Ramadan, a suicide attacker who opened fire on a Jerusalem bus with an M–16 on January 22, 2002, killing two people and wounding forty, including three plaintiffs, before being shot and killed.[17]  *See* JA I, Ungar Decl. Ex. 20, 21.  Plaintiffs allege that these wire transfer payments—and many others— were made to the relatives of terrorists.  If plaintiffs can so prove, the documents are direct evidence of the Bank's facilitation of terrorist activity.

In addition, plaintiffs' proffer includes documentation of transfers by the Bank on behalf of the Saudi Committee directly to six individual terrorists.  At least one of these was an over-the-counter payment to a person named Ibrahim Ahmad Khaled al-Muqadama—the name of a founder of HAMAS—who received a payment from the Saudi Committee at the Bank's Al Rimal Branch in May 2001.  *See* JA I, Pls.' Rule 37 B.R. at 26; Pls.' Rule 72 Opp'n, Osen Decl. Ex. C. Defendant processed Saudi Committee payments to Ahmad Sa'id Khalil al-Ja'bari, the leader in the Gaza Strip of HAMAS's military wing, and an "invalid" payment to Jamal Ataya Zayed Abu Samhadana, a founder of the Popular Resistance Committees in Gaza. *See* JA I, Pls.' Rule 37 B.R. at 26.

Defendant maintains that "there is no basis to infer that [the withheld] records would establish" that the Bank knew the Saudi Committee sponsored terrorism and that the Bank supported the Saudi Committee's efforts.  But the content of the Saudi Committee records that have been produced suggests otherwise.  Plaintiffs argue, and I agree, that the withheld records would include documentation (including photographic identification) for the approximately 3,000 beneficiaries of "martyr" payments who did not hold accounts at the Bank and received

their payments (which together totaled $20 million) over the counter.  This group includes Mr. Muqadama, for whom the Bank has refused to provide the identification that he must have provided to the Bank in order to receive the payment—documentation essential to plaintiffs' ability to prove that the Muqadama who was the Bank's customer was the same person leading HAMAS's militia and who was arrested by the Palestinian Authority.  Full production also would include account and other transaction records of the recipients of Saudi Committee payments who *did* maintain accounts at the Bank, including Know Your Customer information and photo identification—documents defendant admits exist and acknowledges it did not produce.  As discussed above, this material will be particularly important given defendant's intent to pursue a mistaken identity defense.

#### c.  Adverse Inferences

**[15]**  For the above reasons, I impose adverse inference sanctions on the issue of defendant's acts.  At trial, the jury will be instructed, in sum and substance, (1) that it may infer that defendant provided financial services to organizations designated by the United States as Foreign Terrorist Organizations, and to individuals affiliated with the FTOs; and (2) that it may infer that defendant processed and distributed payments on behalf of the Saudi Committee to terrorists, including those affiliated with named terrorist organizations and those who are unaffiliated, their relatives, or representatives.

### 4.  State of Mind

**[16]**  Plaintiffs seek a jury instruction permitting the jury to infer that the withheld documents and testimony would have demonstrated that defendant acted with a culpable state of mind—here, knowledge and purposeful intent.  *See Lev*, 2010 WL 623636, at *1–

---

**17.**  Defendant produced the wire transfer record, which evidences payment of $5,316.06 to a person named Shuhail Ahmad Isma'il al-Masri, who identified himself as the bomber's father and acknowledged in a 2005 *NBC News* report that he had received money from Arab Bank as a "salary" and compensation for his son's "sacrifice".  *See* JA I, Pls.' Rule 37 Br. at 23–24 (citing

NBC report: Lisa Myers, *Terror Ties at Middle Eastern Bank?* (May 11, 2005), available at www. msnbc.msn.com/id/7806333/ (last accessed July 8, 2010)).  The Saudi Committee website memorializing the Committee's payment to al-Masri's survivors lists al-Masri's cause of death as "assassination".  *See* JA I, Ungar Decl. Ex. 15.

*2. As set forth above, in order to receive such an inference, plaintiffs must introduce evidence "tending to show that the document[s] actually . . . withheld [are] the one[s] as to whose contents it is desired to draw an inference." *Kronisch*, 150 F.3d at 127–28 (quoting 2 Wigmore, Evidence in Trials at Common Law § 291, at 228).

Plaintiffs have demonstrated that the withheld evidence is essential, not only to proving both that defendant provided financial services to terrorists, but also that it did so knowingly and purposefully. For example, the Saudi Committee spreadsheets listing hundreds of martyrs and the dates and causes of their deaths indicate that defendant knew—or should have known—that some of the "martyrs" died while engaged in terrorist activities. Plaintiffs also have offered evidence supporting the Bank's knowledge that one of its accountholders was inextricably linked to HAMAS. Wire transfer records from the Beirut Account demonstrate that, on at least three occasions in 2000, Arab Bank officials approved the transfer of funds into that account despite the fact that the transfers listed Harakat al-Mukawama al-Islamiya, HAMAS, or the "Islamic Resistance" as the beneficiary. *See* JA I, Ungar Decl. Ex. 34.[18] The Bank argues that these three transfers are an aberration—in essence, that they slipped through the cracks and therefore provide no proof of defendant's knowledge or intent—or, in the alternative, that Bank employees did not realize that their customer Osama Hamdan was in fact the same person known to be a leader of HAMAS, *i.e.*, a defense of mistaken identity.[19] In the absence of records from other accounts, especially those of the ten Palestinian FTOs, SDGTs, or SDTs that defendant admits were its customers but whose account records it has not produced, *see* Bank's Interrogatory Response at 1–2, plaintiffs face tremendous obstacles in proving the identities of the Bank's customers and will have difficulty challenging the Bank's stated defenses. They will be hard-pressed to show that the Beirut Account transfers were not approved by mistake, but instead are representative of numerous other transfers to terrorists. Without an inference, plaintiffs would be prejudiced by defendant's incomplete production.

**[17]** In light of the record, an inference regarding defendant's knowledge and intent is both appropriate and necessary to restore the evidentiary balance. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir.2009), demonstrates both the difficulties ATS (and ATA) plaintiffs face in proving intent, and the importance of full document production in allowing plaintiffs to make their case. There, the Second Circuit upheld the district court's grant of summary judgment to defendant because plaintiffs had not provided sufficient support for an inference that the defendant had knowingly and intentionally aided in violations of the law of nations. *Talisman*, 582 F.3d 244, 261–64 (2d Cir.2009). The Court in *Talisman* acknowledged that "intent must often be demonstrated by the circumstances," but found that "in this case, there were insufficient facts or circumstances suggesting that Talisman acted with the purpose to advance violations of international humanitarian law." *Id.* at 264. The quantity of evidence plaintiffs can offer from which a jury could infer intent therefore is crucial to their ability to prove their claim. Simply put, if the withheld documents support plaintiffs' claims—and I am satisfied that plaintiffs have shown the high likelihood that the withheld documents would show repeated transfers by the Bank to terrorists, terrorist organizations, or their fronts, or on their behalf—the documents are powerful additional direct evidence of defendant's knowledge and circumstantial evidence of defendant's intent.

18. These transfers were made after HAMAS was designated an FTO but before Hamdan was listed as an SDGT in 2003. Each transfer was reviewed and initialed by a senior Bank official.

19. Defendant's papers also suggest that the Bank will argue at trial that evidence external to Bank records "is not evidence of what the Bank knew." Def.'s Rule 72 Opp'n at 42. This argument, too, puts into stark relief the necessity of full production of Bank documentation. Absent complete production, plaintiffs will be unable to respond to defendant's claim, giving defendant—by virtue of its own disobedience of discovery orders—a distinct, and unfair, advantage.

**5. Other Sanctions**

In addition to the above-described sanctions, plaintiffs request an order precluding defendant "from offering any evidence, including expert or fact witness testimony, regarding its then-current state of mind, or any other issue for which [d]efendant's production failures impact [p]laintiffs' ability to effectively cross-examine witnesses." Judge Pohorelsky rejected plaintiffs' requested sanction without explanation.

Plaintiffs argue that such a sanction is necessary and appropriate to prevent defendant from "affirmatively profiting from gaps in the evidentiary chain that it is solely responsible for creating," *e.g.*, presenting "third-party fact witnesses" that plaintiffs would be "unable to probe, test or impeach . . . with reference to the Bank's [unproduced] internal documents, memos, or emails." Pls.' Obj. at 48. Plaintiffs argue that, absent this sanction, Bank witnesses would "continue to offer sworn testimony that [d]efendant would never knowingly transact business with HAMAS . . . yet provide [p]laintiffs with no means of effectively cross-examining whether that representation is credible." Defendant counters that plaintiffs' requested preclusion sanction would "prevent the Bank from proffering any meaningful defense at all" and therefore would violate the Bank's due process rights. The Bank also invokes its status as a foreign corporation and the fact that the terrorist acts at issue took place in the Middle East as proof that its withholding based on foreign bank secrecy reflects circumstances not within the Bank's control, thus mitigating its culpability and the need for the preclusion sanction.

**[18]** Plaintiffs are entitled to the sanction requested. While it is not possible to identify every question that might require application of a preclusion sanction, the parties' papers provide illustrations. For example, I agree with plaintiffs that defendant should be barred from asserting, through evidence and/or argument, that it did not have a culpable state of mind because certain people or organizations were not "generally known" to be terrorists. General knowledge is irrelevant; what matters is whether *the Bank*

knew that a customer or beneficiary was a terrorist, and whether it intended to support or enable that person's or organization's terrorist activities. The Bank must be precluded from making any argument about its state of mind that would find proof or refutation in the withheld documents. Defendant is entitled to rely on the documents it did produce to make its case that it did not have the required state of mind. In addition, defendant can argue to the jury that it had no knowledge that certain accountholders, whose records have been produced, were terrorists. But it cannot argue that it had no knowledge a certain Bank customer was a terrorist if it did not produce that person's complete account records. To permit the Bank to make such an argument would allow it to profit from evidentiary gaps that it chose to create. A preclusion sanction therefore is necessary to restore the evidentiary balance.

**[19]** Finally, I adopt Judge Pohorelsky's recommended sanctions (1) providing for the authentication of Bank records obtained by sources other than defendant, and (2) prohibiting defendant from introducing in pre-trial motions or at trial any evidence withheld on foreign bank secrecy grounds. No written objections were filed to either sanction, and I find no clear error. *See Zon*, 573 F.Supp.2d at 811.

## ATTORNEYS' FEES AND COSTS

Plaintiffs request that the court order defendant to pay an award of reasonable attorneys' fees and costs. Under Rule 37 of the Federal Rules of Civil Procedure, when a party fails to produce in spite of a court order, a "court must order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances might make an award of expenses unjust." Fed.R.Civ.P. 37(b)(2)(C). While the Second Circuit has never held that expenses are a mandatory sanction, the Court has acknowledged that the Rule's language "certainly suggests that an award of expenses is mandatory" absent one of the enumerated exceptions. *Novak v.*

*Wolpoff & Abramson LLP*, 536 F.3d 175, 178 (2d Cir.2008).[20] Given this, the disobedient party bears the burden to show that one of the exceptions has been met; otherwise, fees and costs will be awarded. *Id.* (citing the Advisory Committee Note to the 1970 Amendments to the Rule).

[20] Here, defendant has demonstrated neither that its recalcitrance was substantially justified nor that an award of fees and costs would be unjust. I have already rejected defendant's argument that the potential for criminal prosecution, which can be "a weighty excuse for non-production," provided sufficient excuse for noncompliance with the May 7 production order. Plaintiffs spent "massive" amounts of time and large sums of money flying to Jordan, to depose witnesses who, as defendant admits, did not answer plaintiffs' questions on the grounds of foreign bank secrecy—an excuse this court has already rejected. Defendant's refusal to produce has caused plaintiffs "extensive delays and waste of resources," *Gutman v. Klein*, No. 03–CV1570, 2008 WL 4682208, at *13 (E.D.N.Y. Oct. 15, 2008), *adopted by* 2008 WL 5084182 (E.D.N.Y. Dec.2, 2008), for which plaintiffs should not have to bear the costs. I therefore grant plaintiffs' request and direct plaintiffs to submit an application for their fees and expenses by September 17, 2010.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for sanctions is GRANTED. At trial, the jury will be instructed that, based on defendant's failure to produce documents, it may, but is not required to, infer: (1) that defendant provided financial services to organizations designated by the United States as Foreign Terrorist Organizations, and to individuals affiliated with the FTOs; (2) that defendant processed and distributed pay-

ments on behalf of the Saudi Committee to terrorists, including those affiliated with named terrorist organizations and those who are unaffiliated, their relatives, or representatives; and (3) that defendant did these acts knowingly and purposefully. In addition, (4) defendant is precluded from making any argument or offering any evidence regarding its state of mind or any other issue that would find proof or refutation in withheld documents; (5) all requests for admissions in plaintiffs' First Set of Requests for Admissions which defendant refused to answer on foreign bank secrecy grounds are deemed admitted, and any documents referred to in those requests, which plaintiffs obtained from sources other than defendant, are deemed authentic and are admissible as such at trial; and (6) defendant is prohibited from introducing in pre-trial motions or at trial any evidence withheld on foreign bank secrecy grounds. Finally, plaintiffs are awarded attorneys' fees and costs incurred as a result of defendant's production failures and the resulting sanctions litigation.

SO ORDERED.

### *ORDER*

By motion dated July 26, 2010, defendant Arab Bank moves for reconsideration of this court's July 12, 2010, opinion and order directing the entry of sanctions against defendant for its failure to comply with its production obligations ("the Sanctions Order"). *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, No. 04 CV 2799(NG) (VVP), 2010 WL 2803031 (E.D.N.Y. July 12, 2010). The Bank's motion for reconsideration takes issue primarily with my imposition of an adverse inference sanction regarding the Bank's state of mind, and with the preclusion sanction, which bars defendant from "making any argument or offering any evidence regarding its state of mind or any other issue that

**20.** The Second Circuit in *Novak* cited the version of Rule 37(b)(2)(C) in effect in 2006, which stated that "the court *shall* require the party failing to obey the order . . . to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." *Novak*, 536 F.3d at 177 (quoting the 2006 version of Rule

37(b)(2)). In 2007, the Rule was "amended as part of the general restyling of the Civil Rules to make them more easily understood and to make the terminology consistent throughout the rules. These changes are intended to be stylistic only." Fed.R.Civ.P. 37 (Advisory Committee Note, 2007 Amendment). Thus the change in wording from "shall" to "must" does not affect the analysis in the text.

would find proof or refutation in the withheld documents." Defendant also argues that the Sanctions Order violates principles of international comity. Reconsideration is warranted only where the court has "overlooked" "matters or controlling decisions." Local Civil Rule 6.3. For the reasons set forth below, defendant's motion is denied. Essentially, the Bank's arguments reflect merely disagreement with the Sanctions Order on grounds already argued or on newly-raised grounds that could have been raised before. None is a basis for reconsideration.

**[21, 22]** The Bank raises several issues of fact it alleges I overlooked or misinterpreted. None of these meets the "strict" standard for the "extraordinary remedy" of reconsideration. *See Spencer v. Int'l Shoppes, Inc.*, No. 06–CV–2637, 2010 WL 2653325, at *1 (E.D.N.Y. June 22, 2010). For example, that the bank takes issue with my labeling of its actions as "recalcitrance" provides no basis for reconsideration. Nor does the Bank's downplaying of the import of my order directing it to produce to plaintiffs the documents it had previously produced to the Office of the Comptroller of the Currency ("OCC") and the Financial Crimes Enforcement Network ("FinCEN"); while the Bank may have produced some documents from its New York branch ("ABNY") before my December 2006 order, it had withheld other "documents showing the funds transfers through New York which plaintiffs [sought] to make their case." *Linde v. Arab Bank, PLC*, No. 04 CV 2799(NG)(VVP), at 6 (E.D.N.Y. Dec. 13, 2006) (order granting production of documents).

**[23]** The Bank argues that the Sanctions Order "[d]raws [e]rroneous [c]onclusions from [c]ertain of the Bank's [i]interrogatory [r]esponses." Def.'s Mot. Reconsideration at 18. Specifically, defendant objects to the court's reliance on its interrogatory response admitting that it maintained accounts for "at least eleven" designated terrorists. I acknowledged in the Sanctions Order that the Bank represents that it froze or closed those accounts, but noted that defendant has provided "no information regarding what it did with the funds contained in those accounts when they were closed, and no documenta-

tion of the account closings." *Linde v. Arab Bank*, 2010 WL 2803031, at 205–206, *17 n. 13. The power to provide such documentation is in defendant's hands, but defendant continues to withhold on already-rejected foreign bank secrecy grounds the documents relating to the closure of those accounts. The Bank's argument on this point illustrates the necessity of the sanctions imposed. The Bank argues that it bears no responsibility because it closed the terrorists' accounts as soon as the accountholders were so designated. Plaintiffs cannot refute or challenge the Bank's argument because the Bank itself possesses the documents that would prove or undercut its argument and refuses to produce them. The Bank also objects that the Sanctions Order made "erroneous and unjustified" findings regarding the Saudi Committee. In so doing, the Bank mischaracterizes the Sanctions Order and fails to identify anything the court overlooked.

**[24]** In addition to its supposedly fact-based arguments, the Bank contends that, in imposing the adverse inference sanction regarding the Bank's state of mind, I required only a showing that the withheld documents were relevant to plaintiffs' claims, rather than proof that the documents were both relevant to plaintiffs' claims and would likely substantiate them, as the law requires. The Bank is wrong, as is clear from the section in the Sanctions Order addressing the Bank's state of mind, in which I stated: "Simply put, if the withheld documents *support* plaintiffs' claims—and I am satisfied that plaintiffs have shown the high likelihood that the withheld documents would show repeated transfers by the Bank to terrorists, terrorist organizations, or their fronts, or on their behalf—the documents are powerful additional direct evidence of defendant's knowledge and circumstantial evidence of defendant's intent." *Linde v. Arab Bank*, 2010 WL 2803031 at 203–04 *15. The Sanctions Order plainly required plaintiffs to demonstrate *both* that the withheld documents were relevant to plaintiffs' claims, and that the withheld documents were likely to support plaintiffs' claims. *See id.* at 201 *12 ("These documents are sufficient to show that the withheld evidence would likely substantiate

plaintiffs' claims."); *id.* at 201–02 *13 (finding sufficient plaintiffs' proffer that the withheld documents would provide "direct evidence of the Bank's facilitation of terrorist activity."); *id.* ("Plaintiffs argue, and I agree, that the withheld records would include documentation . . . for the approximately 3,000 [Saudi Committee] beneficiaries of 'martyr' payments who did not hold accounts at the Bank and received their payments (which together totaled $20 million) over the counter."). Defendant's argument on this point is without merit.

**[25]** The Bank argues that reconsideration is required because the preclusion sanction infringes the Bank's due process rights under the Fifth Amendment of the United States Constitution. The Bank is entitled to disagree with the sanction, but its argument that the sanction entirely prevents the Bank from presenting a defense misrepresents the sanction and is without merit. The sanction, which serves a remedial function, does not prevent defendant from being heard; it simply bars the Bank from defending itself by relying on documents that *it has withheld* from plaintiffs and from making evidentiary submissions or arguments in its defense that the withheld documents could disprove. Reconsideration on this point is denied.

**[26]** The Bank also seeks reconsideration because, it argues, the court should have given greater consideration to comity in ruling on plaintiff's motion for sanctions. The Bank did not voice concern in its Rule 72 Objections regarding the absence of a lengthy discussion of comity in Judge Pohorelsky's Report and Recommendation ("R & R"), and its Motion for Reconsideration is not the proper avenue through which to raise objections for the first time. In any event, the heart of the Bank's argument regarding comity is that I should have afforded greater consideration to the hardship that full production, in the face of bank secrecy laws, would impose on the Bank. Both Magistrate Judge Pohorelsky and I have recognized at numerous junctures that fear of criminal prosecution can provide what the Supreme Court has labeled a "weighty excuse" for nonproduction. *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 211, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).[1] We both considered hardship to the Bank in determining whether to sustain the Bank's foreign bank secrecy objections. Judge Pohorelsky and I again discussed this issue in our respective decisions regarding sanctions. *See, e.g., Linde v. Arab Bank,* 2010 WL 2803031 at 197, 198–200, 204–05 *8, *10, *16. It was not overlooked. Once again, the Bank simply disagrees with the court's analysis, which included reference to the speculative nature of any hardship and the fact that, despite its professed fear of reprisal, the Bank has "decided when it will be cooperative and when it will not be cooperative," which it has no right to do. *Cine Forty–Second Street Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1065 (2d Cir.1979); *see also Linde*

---

**1.** The Bank's heavy reliance on *Rogers* ignores not only other relevant case law, but also key differences between *Rogers* and this case. In *Rogers,* the Court held *not* that the "weighty excuse" of fear of criminal prosecution alone is sufficient to preclude *any* sanction, but rather that "Rule 37 [of the Federal Rules of Civil Procedure] should not be construed to authorize *dismissal* of this complaint because of petitioner's noncompliance with a pretrial production order *when it has been established that failure to comply has been due to inability and not to willfulness, bad faith, or any fault* of petitioner." *Id.* at 212 (emphasis added). Here, the Bank's invocation of foreign bank secrecy laws does not preclude the imposition of the sanctions awarded, particularly in light of my finding that the Bank has not acted in complete good faith.

The Bank similarly overreaches with its interpretation of *In re Westinghouse Elec. Corp. Uranium Contracts Litigation,* 563 F.2d 992 (10th Cir. 1977). The Bank selectively quotes the Tenth Circuit's opinion in that case, providing that "the fact of foreign illegality may prevent imposition of sanctions for subsequent disobedience to the discovery order." *Id.* at 997. However, the Bank ignores what the court in *Westinghouse* provided as a corollary: "[I]mplicit in [*Rogers* is] that foreign illegality does not necessarily prevent a local court from imposing sanctions when, due to the threat of prosecution in a foreign country, a party fails to comply with a valid discovery order. In other words, [*Rogers* ] calls for a 'balancing approach' on a case-by-case basis." *Id.* The called-for "balancing approach" is precisely what this court has engaged in at both the order and the sanctions stage.

*v. Arab Bank*, 2010 WL 2803031 at 200–01 *11.

In addition to considering alleged hardship to the Bank, as a result of foreign bank secrecy laws, Judge Pohorelsky and I both considered the interests of the United States and the foreign jurisdictions whose foreign bank secrecy laws are at issue. For example, in his November 25, 2006 order overruling the Bank's foreign bank secrecy objections, which I affirmed, Judge Pohorelsky found that "important interests of the United States" embodied in the Anti–Terrorism Act ("ATA") "would be undermined by noncompliance with" his previously-issued discovery orders, and that the interests of the foreign jurisdictions where discovery sought in this case resides "must yield to the interests of combating terrorism and compensating its victims." *Linde v. Arab Bank, PLC*, 463 F.Supp.2d 310, 315 (E.D.N.Y.2006), *affirmed* 2007 WL 812918 (E.D.N.Y. Mar.14, 2007).

The Bank's suggestion that comity was not considered at the sanctions stage is incorrect. At the outset of his R & R on sanctions, Judge Pohorelsky noted that "[i]n prior proceedings in these related actions, familiarity with which is presumed, the court found that, although the bank secrecy laws of those foreign jurisdictions [where the unproduced discovery is located] bar disclosure of the unproduced discovery, the privacy interests served by those laws had to yield to the interests served by disclosure of the information in these actions." *Linde v. Arab Bank, PLC*, No. 04 CV 2799(NG)(VVP), at 1 (E.D.N.Y. June 1, 2009) (R & R regarding sanctions). In the Sanctions Order of July 12, 2010, I expressly held that comity must be considered at the sanctions stage as well as at the compulsion stage. *Linde v. Arab Bank*, 2010 WL 2803031 at 196–97 *7. Other than disagreeing with Judge Pohorelsky and me as to the Bank's alleged hardship in the face of bank secrecy laws, Arab Bank made no effort to challenge the R & R on the grounds that it did not sufficiently address comity, and there was no reason for this court to repeat the comity analysis that had already been fully developed. Put another way, Arab Bank, at the time that sanctions were under consideration, did not suggest that any new or different analysis of comity would be appropriate.

Only now, on its motion for reconsideration, does Arab Bank suggest that a new comity analysis, under "new" Supreme Court precedent, should be made. The flaw in this suggestion is that the "newly announced" Supreme Court precedent upon which the Bank relies is not new and raises no comity concerns that were not previously considered. The Bank also relies on newly submitted letters to the court: One, from the Minister of Finance of the Republic of Lebanon, undated but received by the court on August 9, 2010; one from the Palestine Monetary Authority, dated August 25, 2010; and one from the Prime Minister of the Palestinian National Authority, dated August 30, 2010, confirming the latter. These late submissions, expressing support for their respective bank secrecy laws, raise no issues not previously considered.

Moreover, at the sanctions stage in this case, the issue is no longer one of "coercing violation of those laws," as the Bank describes it; the Bank has already made its decision to disobey this court's discovery orders. And nothing in the nature of the sanctions that have been imposed raises any new or different issue regarding comity. On the contrary, the sanctions merely seek to restore the balance of fairness in these proceedings, as described in detail in the underlying Sanctions Order. The Bank, in its submissions to this court on sanctions, focused on the details of the discovery to date and argued against the inferences which plaintiffs asked the court to draw from that discovery; it did not suggest that comity would be affected differently by one sanction rather than another. And it seems clear that the Bank is simply attempting to avoid meaningful sanctions altogether, despite this court's decision to give greater weight to the United States' interest in preventing the financing of terrorism than to other jurisdictions' enforcement of their bank secrecy laws. The evidence set forth in the Sanctions Order (describing the nature of the documents and information withheld by the Bank on foreign bank secrecy grounds) confirms that international comity issues continue to weigh in favor of disclosure and of sanctions for failure to disclose.

Because defendant has not made any argument on which reconsideration is appropriate, *see* Local Civil Rule 6.3, defendant's motion is denied.

**SO ORDERED.**



Paulino UTO, Jose Edwin Lopez and Jose Alas, On Behalf of themselves and others similarly situated, Plaintiffs,

v.

JOB SITE SERVICES INC., John O'Shea in his individual capacity, Defendants.

No. CV 10–0529(SJF)(ETB).

United States District Court, E.D. New York.

Sept. 20, 2010.

**Background:** Former employees brought collective action against construction company, alleging violations of the Fair Labor Standards Act (FLSA). After company's document demands and interrogatory requests were served, employees filed motion for protective order.

**Holdings:** The District Court, Boyle, United States Magistrate Judge, held that:

(1) employees established good cause for a protective order from requests for employees' social security numbers or immigration status;

(2) employees were entitled to protective order from request for their income tax returns; and

(3) company was not able to assert affirmative defense of unclean hands.

Motion granted.

**1. Federal Civil Procedure ⟐1271.5**

A trial court has broad discretion to decide when a protective order from a discovery request is appropriate and what degree of protection is required. Fed.Rules Civ. Proc.Rule 26(c), 28 U.S.C.A.

**2. Federal Civil Procedure ⟐1271.5**

A party seeking to obtain a protective order from a discovery request bears the burden of demonstrating that there is good cause for the order. Fed.Rules Civ.Proc. Rule 26(c), 28 U.S.C.A.

**3. Federal Civil Procedure ⟐1271.5**

To establish good cause for a protective order from a discovery request, a moving party must demonstrate a particular need for protection, such that disclosure will result in a specific injury. Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.

**4. Federal Civil Procedure ⟐1271.5**

Former employees established good cause for a protective order from construction company's discovery requests for employees' social security numbers or immigration status in employees' collective action against company alleging violations of the Fair Labor Standards Act (FLSA); allowing discovery would cause employees embarrassment, and if their status were found to be illegal, they would be subject to criminal charges, and, possibly, deportation. Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.

**5. Privileged Communications and Confidentiality ⟐372**

To compel the disclosure of income tax returns, a two-part test must be satisfied: (1) the returns must be relevant to the subject matter of the action; and (2) there must be a compelling need for the returns because the information is not otherwise readily obtainable.

**6. Privileged Communications and Confidentiality ⟐372**

Generally, a party seeking discovery of income tax returns bears the burden of demonstrating relevancy.

**SPA101**

Slip Copy, 2010 WL 3926080 (E.D.N.Y.)
**(Cite as: 2010 WL 3926080 (E.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.
Courtney **LINDE**, et al., Plaintiffs,
v.
**ARAB BANK**, PLC, Defendant.

No. 04 CV 2799(NG)(VVP) FN1.

FN1. The following related cases have been consolidated with this case for the purposes of discovery and other pretrial proceedings: *Philip Litle, et al. v. Arab Bank, PLC,* 04-CV-5449; *Oran Almog, et al. v. Arab Bank, PLC,* 04-CV-5564; *Robert L. Coulter, Sr., et al. v. Arab Bank, PLC,* 05-CV-365; *Gila Afriat-Kurtzer, et al. v. Arab Bank, PLC,* 05-CV-388; *Michael Bennett, et al. v. Arab Bank, PLC,* 05-CV-3183; *Arnold Roth, et al. v. Arab Bank, PLC,* 05-CV-0378; *Stewart Weiss, et al. v. Arab Bank, PLC,* 06-CV-1623; *Joseph Jesner, et al. v. Arab Bank, PLC,* 06-CV-3869; *Yaffa Lev, et al. v. Arab Bank, PLC,* 08-CV-3251; and *Viktoria Agurenko, et al. v. Arab Bank, PLC,* 10-CV-626.

Oct. 5, 2010.

***ORDER***
GERSHON, District Judge.

**\*1** Moving under 28 U.S.C. § 1292(b), Arab Bank asks this court for leave to take an interlocutory appeal of the court's July 12, 2010 order, *Linde v. Arab Bank, PLC,* --- F.R.D. ----, No. 04 CV 2799(NG)(VVP), 2010 WL 2803031 (E.D.N.Y. July 12, 2010), imposing sanctions under Rule 37(b)(2) of the Federal Rules of Civil Procedure. Certification is available where the district judge

"shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation...." As should be clear from the decision itself, as well as the denial of the Bank's motion for reconsideration, issued today, the Sanctions Order the Bank seeks to appeal does not meet any of the requirements for certification. The decision as to the nature and scope of the sanctions to impose involved not only legal issues but a detailed appraisal of the facts, the inferences to be drawn from those facts, and the exercise of the court's discretion. Moreover, the exact impact of the sanctions on the remainder of the proceedings, including the trial, cannot as yet be determined. Under these circumstances, it cannot be said that an immediate appeal could materially advance the ultimate termination of the litigation. The motion for certification is denied.

**SO ORDERED.**

E.D.N.Y.,2010.
Linde v. Arab Bank
Slip Copy, 2010 WL 3926080 (E.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

SPA102

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                     :

LINDE, ET AL.,         :04-CV-02799 (NG)
                     :
      Plaintiff,     :
                     :
                     :United States Courthouse
   -against-      :Brooklyn, New York
                     :
                     :
                     :Wednesday, April 24, 2013
ARAB BANK, PLC,     :11:00 a.m.
                     :
      Defendant.     :
                     :
                     :

- - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE NINA GERSHON
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For the          OSEN LLC
Plaintiffs:       700 Kinderkamack Road
               Oradell, New Jersey 07649
           BY:GARY M. OSEN, ESQ.

          THE GEORGE WASHINGTON
          UNIVERSITY LAW SCHOOL
           2000 H Street N.W.
           Washington, D.C. 20052
           BY:PETER RAVEN-HANSEN, Professor

VB    OCR    CRR

1    THE COURT:  All right.  Good afternoon.

2         Counsel, as I've said, I'm going to put my rulings

3    on the motion for summary judgment on the record.  We already

4    addressed the aiding and abetting claims and those will be

5    dismissed.  I think Mr. Walsh you referred to the plaintiffs

6    withdrawing them.  I don't think they are withdrawing them.  I

7    think you are accepting the dismissal.  I don't know if it

8    makes any difference at all.  They should be dismissed.

9         With respect to the conspiracy claims I indicated

10   earlier why I thought that they should be dismissed as well.

11   But I didn't have the benefit of Mr. Osen's argument which I

12   have not heard before.  So while I still think it is likely

13   they will be dismissed, I will await the transcript and review

14   the argument and review my proposed analysis and I'll issue a

15   decision once I get the additional materials.

16        But just to be clear, as I think is set forth very

17   clearly in what the parties I believe are calling Boim III,

18   which is the Boim vs. The Holy Land Foundation for Relief and

19   Development, an en banc decision of the Seventh Circuit was an

20   opinion by Judge Posner that's 549 F.3d 685.  As set forth

21   clearly in that decision, which also had dismissed aiding and

22   abetting claims, there remain direct claims against the bank

23   under the ATA.

24        So what I have to say about the other issues that

25   are raised in the motion for summary judgment relate to the

1  direct claims.  One issue that was not addressed today and
2  perhaps for obvious reasons is the attribution of the attack
3  of Hamas.  I'm satisfied there's a factual issue on that
4  subject.

5       The second issue was the role of the charitable
6  organizations and I'm satisfied, again, that there's a factual
7  issue presented as to whether or not the charitable
8  organizations were, in fact, alteregos or agents of Hamas.

9       The next issue that was raised by the bank has to do
10  with the scienter of the bank.  As the bank has argued, the
11  plaintiffs must prove that the bank had knowledge of an
12  alterego relationship, that is, that it was aware that the
13  alleged charitable fronts were, in fact, charitable fronts for
14  Hamas.  The plaintiffs have argued that various facts and
15  circumstances, including the connection of individuals and
16  entities who are designated SDGT's as to both the Hamas and
17  the charities or who are otherwise known to be involved in
18  terrorist activities, that those facts and circumstances
19  provide a sufficient link between Hamas and the charities.

20       The plaintiffs argue they can circumstantially prove
21  that the bank's provision of services for these charities was
22  performed with the requisite knowledge.  Again, I'm satisfied
23  based upon the voluminous record in this case that there is a
24  factual issue on that subject.

25       Speaking more generally about knowledge and intent,

1   again, I'm satisfied that the plaintiffs have proffered

2   sufficient direct and circumstantial evidence as to the bank's

3   knowledge and intent as is required under the various

4   provisions of the ATA under which the plaintiffs are suing.

5       I did want to address some specific issues regarding

6   scienter which have been briefed and possibly some that

7   haven't been briefed because they will be important to all of

8   us going forward.

9       The statutory standard under each of the provisions

10  of the ATA are slightly different, one from the other, and

11  they were laid out in my Linde decision at page 586, at 384 F.

12  Supp. 2d., 581 at 586.  I already ruled -- and I adhered to

13  that ruling -- that the bank did not have to be aware of the

14  specific attacks and I think that the supreme court decision

15  in Holder vs. Humanitarian Law Project, 130 Supreme Court

16  2705, makes clear that this would not be required.

17      As the court stated at page 2717:  "Congress plainly

18  spoke to the necessary mental state for a violation of section

19  2339(b) and it shows knowledge about the organization's

20  connection to terrorism, not specific intent, to further the

21  organization's terrorist activities."

22      The court noted that a showing of specific intent

23  under Section 2339(b) would be inconsistent with the

24  provisions of 2339(a) and 2339(c), both of which explicitly

25  require a showing of intent to further terrorist activities.

They distinguish that.

Now, nothing in Holder suggests that the specific intent required under (a) and (c) must be to further a specific terrorist attack or that the bank have knowledge of a specific attack under any of the ATA's provisions that are at issue.

The next issue I would address would be something that was addressed by the parties about knowledge -- and I guess by Judge Weinstein -- that the intended victims were American nationals. It seems to me that the statute's reference to American nationals simply defines who may bring a civil suit. I find no statutory basis for requiring the bank's knowledge to include knowledge that the intended victims were American nationals.

I also want to address the concept of wilful blindness, which was raised by the plaintiffs with respect to the Saudi committee, etcetera. I agree that depending upon the facts established at a trial a wilful blindness charge as to knowledge may be appropriate. A wilful blindness or conscience avoidance charge, as we sometimes call it, is permissible to prove knowledge if the proper factual predicates are established, even in criminal cases. But I do not view wilful blindness as equivalent to reckless conduct. I ruled in the Linde case -- and I adhere to that ruling -- in footnote eight that there is no statutory basis for imposing a

1   recklessness standard of care. Plaintiffs challenge that,

2   relying on Judge Posner's decision in Boim. They also cite

3   Holder and the Humanitarian Law Project.

4         First, I don't see anything in the Holder case

5   suggests anything than what I have just held about

6   recklessness. With respect to Judge Posner's decision, he

7   repeatedly says that the mental element required to fix

8   liability on a party who provides material support to Hamas is

9   knowledge of the character of that organization. I agree with

10   that.

11         Insofar as Judge Posner discusses recklessness, it

12   seems to me to be an explanation of why such knowledge is

13   sufficient under the statute and why no more is required. But

14   I would not use recklessness in a charge to the jury in this

15   case.

16         There was also a discussion in the briefs regarding

17   respondeat superior principles. The bank has argued that such

18   principles would not apply under the ATA. I see no reason

19   that traditional tort principles do not apply here. There's

20   so much in the history of the ATA that tells us that we are to

21   apply traditional tort principles and of course those

22   principles include that entity is liable for the acts of

23   agents who act with apparent authority. The bank has relied

24   in particular on foreign sovereign immunity act cases. But I

25   think those cases are different. They deal with foreign

1  states and they do not provide persuasive reasoning for this

2  case.

3          Also, I think in Rothstein -- while the Second

4  Circuit didn't expressly address this issue -- the circuit

5  also makes clear that ordinary tort principles do apply to ATA

6  claims.

7          Now, this brings me to the issue that was addressed

8  a lot this morning, as well as in the briefs, the question of

9  whether or not the plaintiffs can prove sufficient causation

10  for direct liability against the bank.

11          As we I think all understand, the Rothstein case is

12  a critical case here.  It held that nothing less than

13  proximate causes, as the term is ordinarily used -- and that's

14  a quote from Rothstein -- is required.  In the Rothstein case,

15  in describing what proximate cause is, under the ATA, the

16  court said that a defendant is liable "To those with respect

17  to whom his acts were a substantial factor in the sequence of

18  responsible causation and whose injury was reasonably

19  foreseeable or anticipated as a natural consequence."

20          Now, here factually in contrast to Rothstein the

21  facts proffered support a direct connection between the bank's

22  provision of services and the terrorist acts that caused

23  injury and they meet the standard of causation and

24  foreseeability that are laid out in Rothstein.  In my Linde

25  decision, 384 F. Supp. 2d. 588 I said:  "Plaintiffs allege

1    both that the bank plays a central role in a well-publicized

2    plan to reward terrorists killed and injured in Palestinian

3    suicide attacks in Israel and that the bank knows that the

4    groups to which it provides services are engaged in terrorist

5    activities.  The very groups that the bank is alleged to

6    support are the same groups alleged to be responsible for the

7    terrorist attacks that injured the plaintiffs.  Nothing in the

8    complaint such that Arab Bank is a mere unknowing conduit for

9    the unlawful acts of others about whose aims the bank is

10   ignorant.  Here, given plaintiffs' allegations regarding the

11   knowing and intentional nature of the bank's activities there

12   is nothing routine about the services the bank is alleged to

13   provide."

14          Now, that was dealing with the allegations in the

15   pleadings.  In the response to the bank's summary judgment

16   motion, plaintiffs have supported each of these allegations

17   with a proffer of facts which create factual issues.  So I do

18   find that there is a factual issue there.

19          Finally, nothing in the Second Circuit's recent

20   decision in the Al-Rajhi Bank case, which is 2013 Westlaw,

21   159, 1883, an April 16 decision, regarding proximate cause,

22   leads me to a different conclusion.  That case essentially

23   adopted the reasoning of the Rothstein case.  I reject the

24   bank's reading of the Al-Rajhi Bank decision as requiring that

25   the plaintiffs establish a tracing of each dollar submitted by

1  the bank as to a weapon or act of a terrorist.  I reject their

2  reading of requiring that, as well as of proximate cause.

3  Proximate cause in my view is the standard.  Such causation,

4  the causation that the bank has argued for, cannot be required

5  in the context of a civil ATA claim.  Apart from the fact that

6  the plaintiffs have proffered today a direct link -- what they

7  are calling a direct link -- between some transactions and

8  some of the terrorists' activities, what the bank has argued

9  for would contradict the basic holding of the humanitarian Law

10  Project decision and its recognition that money is fungible.

11  In my view neither Rothstein nor Al-Rajhi Bank

12  requires more than the ordinary tort law requirement of

13  proximate cause, that is, they require proof that the bank's

14  acts with respect to the plaintiff's injuries were a

15  substantial factor in the sequence of responsible causation

16  and their injuries were reasonably foreseeable or anticipated

17  as a natural consequence of those acts.

18  In reaching this conclusion I am also persuaded by

19  Judge Posner's opinion which came down earlier in the Boim

20  case in which he refused to impose a requirement of but-for

21  causation and also I'm persuaded by Judge Weinstein, who

22  expressly addressed the RICO cases which were addressed at

23  length this morning and reached the same conclusion, namely,

24  that but-for causation cannot be required in the section

25  2333(a) context.

1      And also I should say I found Mr. Raven-Hansen's

2 analysis of the significance and meaning of the RICO case,

3 including the Hemi case, which Judge Weinstein referred to, to

4 be persuasive.

5      So, on the basis of that, with the exception that I

6 have indicated for aiding and abetting claims, the motion for

7 summary judgment is denied.

8      So what I would like to do is speak a little bit

9 with you about some of our open issues.  One obvious issue for

10 me is how long the anticipated trial will take.  I don't know

11 if the plaintiffs are prepared to answer that today.

12      MR. WERBNER:  Your Honor, we've conferred about that

13 and some other aspects that are related.  We were hoping that

14 the court's calendar would permit something at the end of

15 September, as far as the trial.  We looked at the Muslim

16 holidays, the Jewish holidays and all those are concluded by

17 the end of September.  So September 30, early October.

18      But regardless of when the court sets it, we think

19 that probably four weeks of evidence -- and not counting

20 opening and the charge and closing -- to present all of the

21 plaintiffs' case.  I built in I think a little bit where it

22 could be somewhat less.  I think that at this stage that would

23 be a very fair estimate.

24      THE COURT:  Are you including cross-examination of

25 your witnesses?

aiding and abetting liability, the Second Circuit is likely to hold that § 2333(a) does not provide for claims for civil conspiracy.

At oral argument, plaintiffs suggested that *Rothstein* is best read as holding only that, in the absence of explicit language, a court should not read into a civil cause of action a "common law" aiding and abetting theory. Conspiracy liability, according to plaintiffs, is different because §§ 2339A, 2339B, and 2339C specifically refer to criminal conspiracy. This argument ignores the reasoning of *Rothstein*, 708 F.3d at 98, that inclusion of criminal aiding and abetting liability in the ATA counsels against interpreting silence in the civil statute to include aiding and abetting liability. Put another way, under *Rothstein*, silence regarding civil conspiracy liability in § 2333(a) speaks louder than criminal conspiracy liability set forth in other provisions of the ATA.

For the reasons stated above, all conspiracy claims under the ATA are dismissed.

**SO ORDERED.**



**Courtney LINDE, et al., Plaintiffs,**

v.

**ARAB BANK, PLC, Defendant.**

**No. 04–cv–2799 (NG)(VVP)
and related cases.[1]**

United States District Court,
E.D. New York.

May 14, 2013.

**Background:** United States citizens, and estates, survivors, and heirs of United States citizens who had been victims of terrorist attacks in Israel, brought actions against Jordanian bank, alleging that bank had provided financial services and support to agents of terrorist organization, and asserting claims under Anti-Terrorism Act (ATA) and for intentional infliction of emotional distress. Bank moved to submit evidence of foreign law.

**Holding:** The District Court, Nina Gershon, J., held that it was not appropriate to put laws of Palestinian Authority, Jordan, Lebanon, and Israel before jury.

Motion denied.

**1. Federal Civil Procedure ⚷2154**

In accordance with governing Federal Rule of Civil Procedure, foreign law determinations are to be made by the court and not by the jury. Fed.Rules Civ.Proc.Rule 44.1, 28 U.S.C.A.

---

**1.** The following related cases have been consolidated with this case for the purposes of discovery and other pretrial proceedings: *Philip Litle, et al. v. Arab Bank, PLC,* 04–CV–5449; *Oran Almog, et al. v. Arab Bank, PLC,* 04–CV–5564; *Robert L. Coulter, Sr., et al. v. Arab Bank, PLC,* 05–CV–365; *Gila Afriat–Kurtzer, et al. v. Arab Bank, PLC,* 05–CV–388;

*Michael Bennett, et al. v. Arab Bank PLC,* 05–CV–3183; *Arnold Roth, et al. v. Arab Bank, PLC,* 05–CV–0378; *Stewart Weiss, et al. v. Arab Bank, PLC,* 06–CV–1623; *Joseph Jesner, et al. v. Arab Bank, PLC,* 06–CV–3869; *Yaffa Lev, et al. v. Arab Bank, PLC,* 08–CV–3251; and *Viktoria Agurenko, et al. v. Arab Bank, PLC,* 10–CV–626.

**2. War and National Emergency**
⚖️**1132(2)**

It was inappropriate to put laws of Palestinian Authority, Jordan, Lebanon and Israel before jury in actions brought by United States citizens, and estates, survivors, and heirs of United States citizens who had been victims of terrorist attacks in Israel, against Jordanian bank, alleging bank had provided financial services and support to agents of terrorist organization, and asserting claims under Anti-Terrorism Act (ATA) and for intentional infliction of emotional distress; bank's claimed compliance with foreign laws was not relevant to its mental state vis-a-vis compliance with United States law and ATA, whether foreign law permitted bank to provide financial services to terrorists did not support inference that bank had innocent mental state regarding compliance with United States law, and bank was not entitled to rebut adverse inferences raised in sanction order by introducing evidence of foreign financial privacy laws. 18 U.S.C.A. § 2331 et seq.; Fed.Rules Civ.Proc.Rule 44.1, 28 U.S.C.A.

———

Mark S. Werbner, Sayles Werbner, Dallas, TX, Peter A. Binkow, Law Offices of Lionel Z. Glancy, Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA, Steven M. Steingard, Kohn, Swift & Graf, PC, Philadelphia, PA, Aaron Schlanger, Naomi B. Weinberg, Joshua D. Glatter, Osen LLC, Hackensack, NJ, Aitan David Goelman, Peter R. Kolker, Semra Aylin Mesulam, Zuckerman Spaeder LLP, Washington, DC, Clyde T. Turner, Turner and Associates, North Little Rock, AR, James P. Bonner, Stone Bonner & Rocco LLP, Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY, for Plaintiffs.

Kevin Walsh, Douglas Walter Mateyaschuk, Steven J. Young, DLA Piper LLP, New York, NY, for Defendant.

### *ORDER*

NINA GERSHON, District Judge:

Defendant Arab Bank moves under Rule 44.1 of the Federal Rules of Civil Procedure "to submit evidence of foreign law." That Rule provides:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

**[1]** I have previously rejected the Bank's proffer of expert witness testimony to be given to the jury on the issue of foreign law, noting that, under Rule 44.1, foreign law determinations are to be made by the court and not by the jury. *Linde v. Arab Bank, PLC,* 920 F.Supp.2d 282, 285–87, 2011 WL 9974899, at *3 (E.D.N.Y. 2011). I also noted in that Order: "Moreover, defendant offers no legal authority to support the contention that compliance with Lebanese law, or any law other than American law, is relevant to whether it violated the [Anti–Terrorism Act, 18 U.S.C. §§ 2331 *et seq.* ("ATA") ], nor does the Bank offer any legal authority that such compliance would provide an affirmative defense." *Id.*

**[2]** The Bank on the current motion purports to acknowledge that only United States law governs the Bank's liability in this case, but nonetheless seeks to have the court put before the jury the laws of the Palestinian Authority, Jordan, Leba-

non, and Israel. It makes three arguments. First, it argues that foreign law is relevant to the Bank's state of mind—a central issue in this case; second, it argues that the jury "should be instructed to find the Bank not liable for [its return of an account balance to a known Hamas leader] if it determines that the Bank acted under compulsion of foreign [Lebanese] law," Def.'s Mem. Supp. Rule 44.1. at 12; and finally, it argues that the Bank should be allowed to introduce evidence of foreign bank secrecy laws to rebut the permissive adverse inference sanction imposed by the court.

Given the record in this case, that some of the Bank's challenged activities took place in foreign jurisdictions—and a significant number of the transactions at issue took place in New York—does not establish that the Bank's claimed compliance with foreign laws is relevant to its mental state vis-a-vis compliance with United States law. The Bank argues that its "duties" were to comply with foreign laws, but never explains how such compliance would affect its "duties" to comply with United States law under the extraterritorial ATA. According to the Bank, "exposing foreign banks to liability for failing to apply American laws to their foreign operations would have dire consequences for the international banking industry." Def.'s Mem. Reply Rule 44.1 at 10. In so arguing, the Bank, while purporting to accept that the ATA is the law applicable to this case, suggests that it can argue to the jury that the jury should simply ignore the ATA in favor of the foreign laws the Bank chose to follow. Such an argument is an invitation to nullification. And whether foreign law permitted the Bank to provide financial services to terrorists—or even required the Bank to return money to a known terrorist, as the Bank asserts was the case with Hamdan—offers no basis for the supposed inference that the Bank had an inno-

cent mental state regarding compliance with United States law.

Turning to the Bank's third theory of relevance, the Bank has offered no sound basis for the proposition that, after a court has overruled a foreign bank secrecy law objection and issued sanctions for non-production, the sanctioned party can re-argue to the jury the validity of its objection. Therefore, the Bank's argument that it is entitled to rebut the permissive adverse inferences, described in the sanctions order, by introducing evidence of foreign financial privacy laws is rejected.

As the Second Circuit observed, "[d]ue process allows courts to impose, pursuant to Rule 37(b), such sanctions 'as are just' on parties that defy discovery orders." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 115 (2d Cir.2013) (citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)). In this case, it is just to instruct the jury regarding permissive adverse inferences without allowing the Bank to introduce evidence of foreign financial privacy laws in rebuttal. The justness of the award of sanctions was determined after a careful analysis of the relevant factors. As the Court of Appeals for the Second Circuit has described, I applied "the existing legal framework, including Restatement [ (Third) of Foreign Relations Law of the United States (1987) ] § 442, in weighing plaintiffs' need for the required discovery and the lack of alternative means to obtain it against the interests of foreign states in enforcing their bank secrecy laws and the hardship faced by Arab Bank because of its conflicting legal obligations." *Linde*, 706 F.3d at 120. I also balanced the factors required within this Circuit when imposing sanctions, weighing, "among other factors, the harshness of the sanctions, the extent to which the sanctions are necessary to re-

store the evidentiary balance upset by incomplete production, and the non-disclosing party's degree of fault." *Id.* at 115. Weighing the factors in ordering production and later imposing sanctions was the job of the court, not the jury. Granting the Bank's application would defeat the court's analysis, mislead and confuse the jurors, and improperly invite them to decide legal issues. Finally, as the Second Circuit observed, in rejecting the Bank's argument that the sanctions will deprive it of a defense:

> Arab Bank will still be entitled to emphasize its substantial Saudi Committee disclosures, including the Bank's own internal documentation, to persuade a jury that it was not aware that the beneficiaries of its financial services were terrorists. Arab Bank could rely on these disclosures, and related testimony, to rebut plaintiffs' assertion that Arab Bank intended to support the Saudi Committee's alleged efforts to finance terrorists, and urge the jury to extrapolate from this evidence that Arab Bank had lacked a culpable state of mind with regard to the other transfers at issue.

*Id.* at 116. Nowhere did the Second Circuit suggest, in its recital of permissible rebuttal arguments, that the Bank would be permitted to introduce evidence of foreign financial privacy laws to the jury. *Id.*[2]

The Rule 44.1 motion is denied.

**SO ORDERED.**



---

Christa LORENZ, Plaintiff,

v.

GE CAPITAL RETAIL
BANK, Defendant.

No. 12–CV–3564 (ADS)(WDW).

United States District Court,
E.D. New York.

May 16, 2013.

**Background:** Credit card account holder brought action against credit card issuer, alleging violation of the Fair Debt Collection Practices Act (FDCPA), negligence, and other state law claims. Defendant moved to dismiss.

**Holdings:** The District Court, Spatt, J., held that:

(1) credit card issuer was "creditor," and did not qualify as a "debt collector," under the false name exception to the FDCPA;

(2) credit card issuer did not violate FDCPA provision prohibiting making any false, deceptive, or misleading representation in connection with the collection of a debt;

(3) issuer's alleged conduct could violate the FDCPA; and

(4) Court would decline to exercise supplemental jurisdiction over state law claims.

Motion granted.

**1. Federal Civil Procedure ⚌1772**

Only a complaint that states a plausible claim for relief survives a motion to

---

**2.** The Bank relies on spoliation cases, involving jury instructions allowing for a defendant's explanation of spoliation, which are different in kind from this case. *See, e.g., Stevenson v. Union Pac. R.R. Co.,* 354 F.3d 739 (8th Cir.2004). While there may have been bad faith in the destruction of documents, the litigants in those cases were not subject to a court order compelling production and a judicially crafted sanction.

**Courtney LINDE, et al., Plaintiffs,**

v.

**ARAB BANK, PLC, Defendant.**

**No. 04–cv–2799 (NG)(VVP)
and related cases.[1]**

United States District Court,
E.D. New York.

June 17, 2013.

**Background:** American and foreign victims of terrorist attacks in Israel, the West Bank, and Gaza, or their family members, brought actions, under the Anti-Terrorism Act (ATA) and the Alien Tort Claims Act (ATCA), against Jordanian bank alleged to have provided banking and administrative services to terrorist organizations. Following consolidation for pretrial proceedings, plaintiffs moved for imposition of discovery sanctions.

**Holdings:** After determining that plaintiffs were entitled to attorneys' fees and costs, 269 F.R.D. 186, the District Court, Nina Gershon, J., held that:

(1) attorney's fees at requested rates of up to $655 per hour for partners were reasonable;

(2) victims' counsel did not unreasonably duplicate their efforts, as would warrant reduction in award of attorney's fees;

(3) award of 25% of attorney's fees and expenses incurred in preparing for and attending depositions of Jordanian bank witnesses in Amman, Jordan was reasonable; and

(4) award of 75% of attorney's fees incurred in non-deposition activities was reasonable.

Ordered accordingly.

**1. Federal Civil Procedure ☞1278**

Determining reasonable attorney's fees to be awarded as a discovery sanction is a matter that is committed to the sound discretion of trial court. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**2. Federal Civil Procedure ☞1278**

In determining amount of attorney's fees to be awarded as a discovery sanction, presumptively reasonable fees for an attorney's work is what a reasonable client would be willing to pay for that work. Fed.Rules Civ. Proc.Rule 37, 28 U.S.C.A.

**3. Federal Civil Procedure ☞1278**

Potential dismissal of plaintiffs' claims did not preclude award of attorney's fees to plaintiffs as sanction for defendant's failure to comply with its obligations to produce discovery; role of sanction was to compensate plaintiffs for unnecessarily expended attorneys' fees and expenses, not to reward the prevailing party in the suit. Fed.Rules Civ. Proc.Rule 37, 28 U.S.C.A.

**4. Federal Civil Procedure ☞1278**

Attorney's fees at requested rates of up to $655 per hour for partners were reasonable when calculating award of attorney's fees to victims of overseas terrorist attacks as sanction for discovery violations by Jordanian bank that was alleged to have provided banking and administrative services to terrorist organizations; rates sought were those at which victims' counsel billed their paying clients and which those clients had paid, and rates sought were less than those charged by bank's own lawyers. Fed.Rules Civ.Proc. Rule 37, 28 U.S.C.A.

**5. Federal Civil Procedure ☞1278**

Counsel for victims of overseas terrorist attacks did not unreasonably duplicate their efforts, as would warrant reduction in award of attorney's fees to victims as sanction for

---

**1.** The following related cases have been consolidated with this case for the purposes of discovery and other pretrial proceedings: *Philip Litle, et al. v. Arab Bank, PLC,* 04–CV–5449; *Oran Almog, et al. v. Arab Bank, PLC,* 04–CV–5564; *Robert L. Coulter, Sr., et al. v. Arab Bank, PLC,* 05–CV–365; *Gila Afriat–Kurtzer, et al. v. Arab Bank, PLC,* 05–

CV–388; *Michael Bennett, et al. v. Arab Bank, PLC,* 05–CV–3183; *Arnold Roth, et al. v. Arab Bank, PLC,* 05–CV–0378; *Stewart Weiss, et al. v. Arab Bank, PLC,* 06–CV–1623; *Joseph Jesner, et al. v. Arab Bank, PLC,* 06–CV–3869; *Yaffa Lev, et al. v. Arab Bank, PLC,* 08–CV–3251; and *Viktoria Agurenko, et al. v. Arab Bank, PLC,* 10–CV–626.

discovery violations by Jordanian bank that was alleged to have provided banking and administrative services to terrorist organizations; there were over 6000 plaintiffs and various groupings of plaintiffs, some asserting different claims from the others, were represented by different lawyers, and plaintiffs' counsel generally worked in coordinated fashion, for example by dividing among themselves subjects to be addressed at conferences, filing joint motion papers where possible, and even dividing oral arguments. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**6. Federal Civil Procedure ⇌1453**

Award of 25% of attorney's fees and expenses incurred in preparing for and attending depositions of Jordanian bank witnesses in Amman, Jordan was reasonable for victims of overseas terrorist attacks, as sanction for witness's refusal to answer deposition questions based on foreign bank secrecy objections that had already been overruled, in action arising from Jordanian bank's alleged provision of financial and administrative services to terrorist organizations; depositions were not limited to questions that drew foreign bank secrecy objections. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**7. Federal Civil Procedure ⇌1278**

Award of 75% of attorney's fees incurred in non-deposition activities was reasonable for victims of overseas terrorist attacks, as sanction for non-deposition discovery violations by Jordanian bank that allegedly provided financial and administrative services to terrorist organizations; great bulk of attorneys' time entries fell within sanctions order and were reasonable, but some entries lacked specificity and others were not properly allocated as between compensable and non-compensable activities, or were excessive, such as entry of attorney who charged normal hourly rate for photocopying. Fed.Rules Civ.Proc. Rule 37, 28 U.S.C.A.

**8. Federal Civil Procedure ⇌1278**

Where billing records include a large number of block-billed entries and there is an issue as to the reasonableness of the number of hours counsel spent on the matter, an across-the-board reduction in billing hours is appropriate when determining award of attorney's fees as sanction for discovery violations. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

———

Joshua D. Glatter, Aaron Schlanger, Naomi B. Weinberg, Cindy T. Schlanger, Gary M. Osen, Peter Raven–Hansen, Osen, LLC, Hackensack, NJ, James P. Bonner, Stone, Bonner & Rocco, LLP, New York, NY, Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY, Mark S. Werbner, Sayles Werbner, Dallas, TX, Peter A. Binkow, Law Offices of Lionel Z. Glancy, Neal Dublinsky, Glancy, Binkow & Goldberg, LLP, Los Angeles, CA, Steven M. Steingard, Kohn, Swift & Graf, PC, Philadelphia, PA, Aitan David Goelman, Peter R. Kolker, Semra Aylin Mesulam, Zuckerman, Spaeder, LLP, Washington, DC, Clyde T. Turner, Turner and Associates, North Little Rock, AR, for Plaintiffs.

Kevin Walsh, Anthony Paul Coles, Douglas Walter Mateyaschuk, Steven J. Young, DLA Piper LLP US, New York, NY for Defendant.

## ORDER

NINA GERSHON, District Judge:

In an order filed July 12, 2010, pursuant to Rule 37 of the Federal Rules of Civil Procedure, the plaintiffs were awarded a variety of sanctions against the defendant Arab Bank for its failure to comply with its obligations to produce discovery. The sanctions included "attorneys' fees and costs incurred as a result of the defendant's production failures and the resulting sanctions litigation." *Linde v. Arab Bank, PLC,* 269 F.R.D. 186, 205 (E.D.N.Y.2010), *collateral order appeal dismissed and mandamus denied,* 706 F.3d 92 (2d Cir.2013). Among other things, the order noted that the plaintiffs had spent massive amounts of time and money flying to Jordan to depose witnesses who were directed not to answer questions on the previously rejected ground of foreign bank secrecy and that the defendant's conduct had caused extensive delays and waste of resources. *Linde,* 269 F.R.D. at 205. The issue present-

ed now is the amount of reasonable fees and expenses to be awarded.

[1, 2] "Determining a 'reasonable attorney's fee' is a matter that is committed to the sound discretion of a trial judge . . . ." *Perdue v. Kenny A.,* 559 U.S. 542, 130 S.Ct. 1662, 1676, 176 L.Ed.2d 494 (2010). The "presumptively reasonable fee" for an attorney's work is what a reasonable client would be willing to pay for that work. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany and Albany Cnty. Bd. of Elections,* 522 F.3d 182, 190 (2d Cir.2008).

The plaintiffs have requested four categories of fees and expenses: fees for the nine depositions of Arab Bank employees conducted in Jordan; fees for non-deposition activities related to the Bank's withholding of documents and information on foreign bank secrecy grounds, including briefing and attendance at hearings; fees associated with the instant application; and expenses associated with these activities. The defendant raises various objections to the requests which are addressed below.

### I.   General Objections

**Relevance of the ATS Claims**

[3] In recent correspondence, the Bank argues that the claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, which constitute the greater number of the approximately 6000 claims in these related cases, will likely be dismissed under *Kiobel v. Royal Dutch Petroleum Co.,* —— U.S. ——, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013), and therefore any attorneys' fees related to ATS claims would be inappropriate.

The Bank's argument is rejected. All of the claims in these cases were consolidated for pretrial purposes and discovery, including the issue of the Bank's assertion of foreign bank secrecy laws, and the parties and the court have treated them together. More importantly, whether or not claims are ultimately successful, a violator of discovery orders is not relieved of the monetary sanctions imposed for those violations. *See* GREGORY

**2.** The briefing on the Bank's motion to dismiss the ATS claims is set to conclude on August 2,

P. JOSEPH, SANCTIONS: THE FEDERAL LAW OF LITIGATION ABUSE § 47(B) (4th ed. 2008). The role of a monetary sanction under Rule 37 is to compensate a party for unnecessarily expended attorneys' fees and expenses; it is not to reward the prevailing party in the suit. Therefore, the potential dismissal of the ATS claims is immaterial to the plaintiffs' fee application.[2]

### Date From Which Fees and Expenses Should be Calculated

The plaintiffs' lawyers request fees and expenses beginning in April 2007. The defendant argues that the plaintiffs should not recover for any work performed before October 31, 2007, when, it argues, the conduct which the court found "noncompliant" first occurred. Based upon the history of the litigation over the Bank's foreign bank secrecy objections, I conclude that the plaintiffs' starting date is amply supported.

On November 25, 2006, Magistrate Judge Pohorelsky overruled the Bank's foreign bank secrecy objections to producing documents and responding to other discovery requests. *Linde v. Arab Bank, PLC,* 463 F.Supp.2d 310, 317 (E.D.N.Y.2006). I affirmed that order on March 14, 2007. *Linde v. Arab Bank, PLC,* No. 04–cv–2799 (ECF No. 320).

The Bank's argument that, because Judge Pohorelsky had allowed the Bank some time to obtain permission to disclose the information sought from pertinent governments and authorities, there was not yet any "noncompliance" on its part, is simply wrong. It was clear from Judge Pohorelsky's order that, whether or not the Bank received permission to comply, foreign bank secrecy laws were not a valid basis for not complying with discovery demands. Moreover, as I noted in the sanctions order filed July 12, 2010, the Bank was required to make a good faith effort to secure permission from the foreign authorities, and it did not establish that it had done so. *Linde,* 269 F.R.D. at 193–94, 199. On the contrary, I found, for example, that its letters to the Lebanese authority "were calculated to fail." *Id.* at 199. Final-

2013.

ly, the Bank argues that three of the depositions of bank officials in Jordan, at which bank secrecy was used to bar answers to questions, should not be compensated because they were taken too early, in May 2007. The Bank relies upon an order of Judge Pohorelsky, from June 22, 2006 (ECF No. 198 at 3), stating that the depositions of Arab Bank's employees residing outside of the United States "should not proceed until the bank secrecy issue is decided." *Id.* What the Bank ignores is that the issue *was* decided by March 14, 2007, well before those depositions.

**Hourly Rates**

[4] The plaintiffs' attorneys seek fees at rates varying up to $655 per hour for partners. The defendant, noting the body of case law to the effect that partners in the Eastern District of New York typically are awarded no more than $300 to $400 per hour in routine cases, argues that these rates are too high.

In determining the appropriate hourly rate, the district court should, among other things, "attempt to approximate the 'market rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Green v. City of New York*, 403 Fed.Appx. 626, 629 (2d Cir.2010) (citing *Arbor Hill*, 522 F.3d at 190 and quoting *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir.1998)). "[I]n order to provide adequate compensation where the services were performed many years before the award is made, the rates used by the court ... should be 'current rather than historic hourly rates.'" *Gierlinger*, 160 F.3d at 882 (quoting *Missouri v. Jenkins*, 491 U.S. 274, 284, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989)). Current rates, rather than historic rates, are used in an effort to "compensate [the attorney] for the delay in payment" of fees. *Le-Blanc–Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir.1998).

The defendant's argument that the plaintiffs' rates should be reduced ignores several highly significant considerations. To begin with, the Bank does not dispute that the rates sought are those at which the plaintiffs' counsel have billed their paying clients and which those clients have paid. Second, this case, or more accurately, these ten cases, involving over 6000 individual, not class, plaintiffs are unusually complex in terms of facts, law, and case management; and the plaintiffs' lawyers have demonstrated their unusual qualifications and experience to handle them. Most importantly, the plaintiffs have established without dispute that Arab Bank's own lawyers, in this very case, have charged their own client at an even higher rate. At the direction of Judge Pohorelsky, who ordered the plaintiffs to pay Arab Bank's fees and expenses if the plaintiffs were not deposed in New York, the plaintiffs paid for two lawyers for Arab Bank at such depositions, one at the hourly rate of $725, including travel time to Israel. Under these circumstances, the Bank's claim that the rates sought by the plaintiffs on the sanctions motion are excessive and inconsistent with rates prevailing in the community is unpersuasive. In *Mendez v. Teachers Ins. and Annuity Ass'n and College Retirement Equities Fund*, 982 F.2d 783, 789 (2d Cir. 1992), the Court of Appeals rejected an identical argument as "untenable" "in view of the fact that TIAA–CREF's attorneys have billed their services at approximately the same rate."

**Duplication of Effort**

[5] The Bank argues that the fee requests should be severely restricted because the various attorneys for the plaintiffs have duplicated their efforts. In particular, with regard to the depositions, the Bank argues that it was not necessary for five separate law firms to prepare and attend. The Bank also complains that there was duplication in the non-deposition proceedings. Unreasonable duplication of effort would of course warrant a reduction. But here it is worth remembering that there are over 6000 plaintiffs; and various groupings of plaintiffs, some asserting different claims from the others, are represented by different lawyers. In general, the plaintiffs' counsel in these cases have worked in a coordinated fashion to avoid duplication, for example, by dividing among themselves subjects to be addressed at conferences, filing joint motion papers where possible, and even dividing oral arguments. Indeed, the fee application now be-

fore the court, although containing time records from five separate law firms, was put together and briefed by a single firm. With respect to the depositions, it was reasonable for different plaintiffs' counsel to prepare for, and attend the depositions, with an eye to their particular clients' interests. There is no claim by the Bank that duplicative questions were asked. The claim of unnecessary duplication is rejected.

## II. Reasonable Fees and Expenses

**Reasonableness of Fee Requests for Depositions**

[6]  The plaintiffs seek legal fees incurred in preparing for, and attending, nine depositions of bank witnesses in Amman, Jordan, where, despite the court orders cited above overruling the Bank's foreign bank secrecy objections, the witnesses refused to answer questions regarding bank accounts at the Bank on that ground. The plaintiffs point out that they did not bill for counsel's travel time to these depositions or for review of the relevant deposition transcripts after they were held, and that they have applied a 50% reduction across the board to their deposition fees to reflect that the depositions were not limited to questions that drew foreign bank secrecy objections. They further note that, once a witness indicated he would not answer questions as to one account, there was no reason to fill the record with more questions and more objections as to other accounts.

The defendant responds that the witnesses answered hundreds of questions, and only a tiny fraction of the questions went unanswered on bank secrecy grounds. In light of the potential significance of the account information, and the fact that, had the witnesses been allowed to answer by the Bank's counsel, there undoubtedly would have been substantial follow-up, it is reasonable to accept the plaintiffs' representation that the preparation for these depositions included considerable preparation on issues as to which the witnesses did not testify. Thus, the Bank's percentage-of-questions analysis does not tell the whole story.

But it remains difficult to assess how much of the plaintiffs' counsel's time was spent on

bank secrecy issues. It is not possible, based upon the time records, to accept that simply leaving out their travel time, time reviewing relevant depositions, and reducing their fees by 50% yields a sufficient reduction. For example, some of the lawyers' time entries specify preparation as to customer accounts, and others just state, generally, "deposition preparation." Under all the circumstances, the award will be reduced, and the plaintiffs will be awarded fees for 25% of the time spent in preparing for and taking the nine depositions. Thus, the plaintiffs are awarded attorneys' fees for the nine depositions in the amount of $185,121 ($740,484 × 0.25).

**Reasonableness of Fees Requested for Non-deposition Activities**

[7]  In determining the reasonableness of the fees requested in this category, it is especially pertinent to note here that "in litigating a matter, an attorney is in part reacting to forces beyond the attorney's control, particularly the conduct of opposing counsel. . . ." *Kassim v. City of Schenectady*, 415 F.3d 246, 252 (2d Cir.2005), As made clear in the underlying decision ordering sanctions, including attorneys' fees, *Linde*, 269 F.R.D. at 197, 200, the defendant's own conduct and delaying tactics have forced the plaintiffs to engage in far more litigation than should have been necessary.

[8]  Nonetheless, the plaintiffs' requests must still be reasonable, and they have been reviewed for excess. The defendant argues that a reduction in fees sought should be made because some time entries are "block-billed." Block-billing is a practice by which counsel record the total number of hours spent on a matter each day, without separating the time spent on separate tasks. *E.S. v. Katonah–Lewisboro School Dist.*, 796 F.Supp.2d 421, 432 (S.D.N.Y.2011). Though not forbidden, block-billing makes it "difficult if not impossible for a court to determine the reasonableness of the time spent on each of the individual services or tasks provided. . . ." *Simmonds v. N.Y.C. Dep't of Corr.*, 2008 WL 4303474, at *8 (S.D.N.Y. Sept. 16, 2008) (quoting *Williams v. New York City Hous. Auth.*, 975 F.Supp. 317, 327 (S.D.N.Y. 1997)). Where billing records include a large number of block-billed entries and there is an

issue as to the reasonableness of the number of hours counsel spent on the matter, an across-the-board reduction in billing hours is appropriate. *See, e.g., Green,* 403 Fed.Appx. at 630.

Based upon review of the time records, the plaintiffs have sufficiently established that the great bulk of items claimed fall within the sanctions order and are reasonable. While the plaintiffs have not block-billed, as that term is described above, some entries are less informative than others, making a determination as to the reasonableness of the work more difficult than had they been more detailed. The plaintiffs acknowledge that some of the entries in the time records are not specific but argue that was necessary to protect their work product. Whatever the reason, the lack of specificity impairs the ability to review the reasonableness of certain items. Also, some time items are not properly allocated as between compensable and non-compensable activities, or seem excessive. For example, as the Bank points out, in one instance an attorney charged his normal hourly rate for tasks, including photocopying, that should not have been charged at such a rate. An across-the-board reduction is appropriate. Seventy-five percent of the hours billed for non-deposition activities will be awarded. Therefore, the award for non-deposition attorneys' fees is $1,023,738.75 ($1,364,985 × .75).

**Reasonableness of Fee Requests for This Application**

The plaintiffs seek, and will be awarded, the reasonable sum of $32,125 for 73.8 hours of work required for preparation of this fee application.

**Reasonableness of Expenses**

The plaintiffs seek recovery of expenses, related to the work described, above totaling $365,135. All but a small part of these expenses related to the overseas depositions. Once again, the amounts claimed must have been reasonably expended.

The plaintiffs have corrected some limited errors discovered by the Bank, such as including one paralegal's travel time, when the plaintiffs had agreed that they were omitting

travel time, and an occasional personal expense.

The Bank claims the amount sought is excessive, primarily on the ground that the plaintiffs' lawyers should have traveled more frugally and stayed in less expensive hotels. This argument is rejected, as the hotels that the plaintiffs' counsel used were either the same as those used by the Bank's lawyers or less expensive than those hotels. The same is true of their flight arrangements. However, the plaintiffs have offered no reduction based upon an allocation of the content of the depositions, which, as described above, contained many substantive responses beyond the foreign bank secrecy objections. For the sake of fairness, only 25% of the expenses claimed will be awarded; this mirrors the reduction applied to fees for the depositions. The award shall be $91,283.75 ($365,135 × .25).

### III.  Conclusion

In sum, the Bank is ordered to pay the following amounts incurred as a result of its failure to comply with its discovery obligations: $185,121 for attorneys' fees related to depositions; $1,023,738.75 for attorneys' fees related to non-deposition work; $32,125 for attorneys' fees related to the instant application; and $91,283.75 for expenses associated with the work described above. The total amount awarded is $1,332,268.50. The Bank is ordered to pay this amount to the plaintiffs' counsel no later than forty-five days after the date on which this order is filed.

**SO ORDERED.**



**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 1 8 2013 ☆

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
COURTNEY LINDE, et al.,

        Plaintiffs,

  - against -

ARAB BANK, PLC,

        Defendant.
--------------------------------------------------------------x

**ORDER**

04-cv-2799 (NG)(VVP)
and related cases[1]

NINA GERSHON, United States District Judge:

      Arab Bank moves for partial reconsideration of the April 24, 2013, bench ruling denying

in substantial part its motion for summary judgment or, alternatively, for certification of an

interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

      The motion for reconsideration is denied.  Under Local Rule 6.3, reconsideration is

warranted only where the court has "overlooked" "matters or controlling decisions."  The

standard is "strict" for the "extraordinary remedy" of reconsideration. *Spencer v. Int'l Shoppes,*

*Inc.*, 2010 WL 2653325 (E.D.N.Y. 2010).  Arab Bank has failed to make such a showing.  On

the contrary, the Bank seeks merely to reargue the positions it presented unsuccessfully on the

underlying motion.

      The motion for certification of an interlocutory appeal is also denied.  Such certification

under §1292(b) is available where the district judge "shall be of the opinion that such order

involves a controlling question of law as to which there is substantial ground for difference of

---

[1] The following related cases have been consolidated with this case for the purposes of discovery and other pretrial proceedings: *Philip Litle, et al. v. Arab Bank, PLC*, 04-CV-5449; *Oran Almog, et al. v. Arab Bank, PLC*, 04-CV-5564; *Robert L. Coulter, Sr., et al. v. Arab Bank, PLC*, 05-CV-365; *Gila Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-CV-388; *Michael Bennett, et al. v. Arab Bank, PLC*, 05-CV-3183; *Arnold Roth, et al. v. Arab Bank, PLC*, 05-CV-0378; *Stewart Weiss, et al. v. Arab Bank, PLC*, 06-CV-1623; *Joseph Jesner, et al. v. Arab Bank, PLC*, 06-CV-3869; *Yaffa Lev, et al. v. Arab Bank, PLC*, 08-CV-3251; and *Viktoria Agurenko, et al. v. Arab Bank, PLC*, 10-CV-626.

**SPA123**

opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation . . . ."  The Bank has not demonstrated that there are any such questions of law, nor that an immediate appeal will materially advance the termination of this case.

SO ORDERED.

_____
**NINA GERSHON**
**United States District Judge**

Dated: June *17*, 2013
        Brooklyn, New York

2

**SPA124**

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ---------------------------------------x
     LINDE, ET AL,
3
                         Plaintiffs,
4
              versus                    04cv2799(BMC)
5
     ARAB BANK, LLC,
6
                         Defendant.      U.S. Courthouse
7                                        Brooklyn, New York
     ---------------------------------------x
8                                        July 14TH, 2014
                                         10  a.m.
9

10         TRANSCRIPT OF CIVIL CAUSE FOR PRETRIAL CONFERENCE

11            BEFORE THE HONORABLE BRIAN M. COGAN,

12                UNITED STATES  DISTRICT JUDGE

13

14                         APPEARANCES

15   Attorneys for Plaintiffs:
     MARK WERBNER, ESQ.
16   RICHARD HEIDEMAN, ESQ.
     MICHAEL EISNER, ESQ.
17   GARY OLSEN, ESQ.
     C. TAB TURNER, ESQ.
18
     Attorney for Defendant:
19   SHAND STEPHENS, ESQ.

20

21   Court Reporter:
     LISA SCHMID, CCR, RMR
22   Official Court Reporter
     225 Cadman Plaza East
23   Brooklyn, New York 11201
     Phone:  718-613-2644 Fax:  718-613-2379
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.

Proceedings

```
 1            THE CLERK:  All rise.

 2            THE COURT:  Be seated, please.

 3            THE CLERK:  Linde versus Arab bank, LLC Docket Number

 4    04 cv 2799 .

 5            Counsel, please state your appearances, starting with

 6    the plaintiff.

 7            MR. WERBNER:  My name is Mark Werbner, representing in

 8    the Litle case as well as the other cases shown on the docket

 9    sheet, Your Honor.

10            THE COURT:  Okay.

11            MR. OSEN:  Gary Osen, Your Honor, for the Linde

12    plaintiffs and Coulter plaintiffs.

13            MR. HEIDEMAN:  Richard Heideman for the Little

14    plaintiffs.

15            MR. ELSNER:  Good morning, Your Honor.  Michael

16    Elsner for the Almog plaintiffs.

17            THE COURT:  Before we go on, can I only have

18    appearances from the people who think it's reasonably likely

19    that they'll say something, just to keep it short?

20            Who else?  Anyone?

21            MR. TURNER:  Tab Turner for the Linde plaintiffs.

22            THE COURT:  Okay.  Any other plaintiffs?

23            (No response.)

24            THE COURT:  Okay.  Defendant?

25            MR. STEPHENS:  Shand Stephens for Arab Bank.
```

**SPA126**

Proceedings

| | |
|---|---|
| 1 | THE COURT: Anybody else? |
| 2 | MR. STEPHENS: Perhaps Mr. Tony Coles. |
| 3 | THE COURT: Okay. Let me go through my agenda and |
| 4 | then the I'll hear from you as to any other items that you |
| 5 | have. |
| 6 | Obviously, I've gotten pretty extensive submissions on |
| 7 | the open matters in this case, and I'm disposing of them as |
| 8 | follows: First, as to defendant's motion for reconsideration |
| 9 | in light of the Solicitor General's brief, I'm denying that. I |
| 10 | found that brief unpersuasive. I didn't understand why the |
| 11 | Solicitor General would write 20 pages of what was wrong with |
| 12 | Judge Gershon's order and then two pages on how the Supreme |
| 13 | Court shouldn't hear that. Whatever was going on there, Judge |
| 14 | Gershon and I are obviously of one view. The Solicitor |
| 15 | General, at least in what would be dictum in a judicial |
| 16 | opinion, seems to be of another view, but I'm not persuaded by |
| 17 | it. |
| 18 | As to the defendant's motion to delay trial until |
| 19 | January, that's denied. The defendant could not wait for cert |
| 20 | to be granted or not and say, by the way, we need a further |
| 21 | delay because of these problems. This should have been raised |
| 22 | much earlier. And the fact is, the plaintiffs have cut down on |
| 23 | the number of translations. They've indicated that they're |
| 24 | going to be submitting what they have imminently. |
| 25 | Right, plaintiffs? |

**SPA127**

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - - - - - X
 3

 4
                                  :  04 CV 02799 (BMC)
 5  COURTNEY LINDE, et al.,           And all related cases
                 Plaintiffs,      :  04 CV 05449 (Litle)
 6                                   04 CV 05564 (Almog)
                                  :  04 CV 00365 (Coulter)
 7                                   05 CV 00388 (Afrial-Kurtzer)
         - against--             :  05 CV 03183 (Bennett)
 8                                   05 CV 03768 (Roth)
                                  :  06 CV 01623 (Weiss)
 9  ARAB BANK, PLC,               :
                                     United States Courthouse
10               Defendant.       :  Brooklyn, New York

11                                :  September 18, 2014
                                     9:30 o'clock p.m.
12
    - - - - - - - - - - - - - - - - - X
13

14                   TRANSCRIPT OF JURY TRIAL
                     BEFORE THE HONORABLE BRIAN M. COGAN
15                   UNITED STATES DISTRICT JUDGE, and a jury.

16
    APPEARANCES:
17
    For the Linde and           OSEN, LLC
18  Coulter Plaintiffs:           By:  GARY M. OSEN, ESQ.

19                                TURNER & ASSOCIATES, PLLC
                                  By:  CLYDE T. TURNER, ESQ.
20
    For the Litle,              SAYLES WERBNER
21  Bennett and Roth              By:  MARK S. WERBNER, ESQ.
    Plaintiffs:
22  For the Almog              STONE, BONNER & ROCCO, LLP
    Plaintiffs:                   By:  JAMES P. BONNER, ESQ.
23
                                  MOTLEY RICE, LLC
24                                By: MICHAEL E. ELSNER, ESQ.
                                       JODI FLOWERS, ESQ.
25
```

1              (The following occurred in the absence of the jury.)

2              THE COURT:  I understand you have some issues with

3     the exhibits.  That's fine.  We will work it out.

4              Let's get the jury charged and instructed and we can

5     work out the exhibits even while they are deliberating.  So

6     don't worry about it.

7              Bring in the jury, please.

8              (Jury present.)

9              THE COURT:  All right.  Be seated, please.

10             Ladies and gentlemen, now that the evidence in this

11    case has been presented and the attorneys have concluded their

12    closing arguments, it is my responsibility to instruct you on

13    the law that governs this case.  The instructions I am going

14    to give you will be in three parts.

15             First, I am going to instruct you on the general

16    rules that govern your duty as jurors in a civil case.

17    That's the longest part of the instructions.

18             Second, I am going to instruct you on the legal

19    elements of the plaintiffs' claims; and then, third -- and

20    it's very brief, the third section -- I will give you some

21    principles that you will use in your deliberations.

22             You are about to enter your final duty, which is to

23    decide the fact issues in this case.  It has been very obvious

24    to me, and I'm sure to counsel for the parties, that you have

25    faithfully discharged your duty to listen carefully and

1  observe each witness who testified.  Your interest never

2  lagged in this long trial and you followed the testimony with

3  close attention.  I also want to thank each of the attorneys

4  for the very conscientious efforts that they undertook on

5  behalf of their clients.

6        Please give me the same careful attention now that

7  you did the evidence during the trial.

8        You have heard all the evidence in the case, as well

9  as the final arguments of the lawyers for the parties.  My job

10  at this point is to instruct you on the law.  It is your duty

11  to accept these instructions and apply them to the facts as

12  you determine them, just as it has been my duty to preside

13  over the trial and decide what testimony and evidence is

14  relevant under the law for your consideration.

15        On these legal matters, you have to take the law as

16  I give it to you.  If any attorney has stated a legal

17  principle different from any that I state to you in these

18  instructions, it is my instructions that you have to follow.

19        Don't single out any one instruction alone as

20  stating the law.  You have to consider the instructions as a

21  whole when you retire to deliberate in the jury room.

22        You also cannot be concerned about the wisdom of any

23  rule that I state.  Regardless of any opinion that you may

24  have as to what the law may be, or should be, it would violate

25  your sworn duty to base a verdict upon any view of the law

**SPA130**

1   other than that which I am about to give you.

2           As members of the jury, you are the sole and

3   exclusive judges of the facts.  You pass upon the evidence.

4   You determine the credibility of the witnesses.  You resolve

5   such conflicts as there may be in the testimony.  You draw

6   whatever reasonable inferences you decide to draw from the

7   facts as you have determined them, and you determine the

8   weight of the evidence.  In determining these issues, no one

9   may invade your province or functions as jurors.

10          Remember that in carrying out your duty, you took an

11  oath to render judgment impartially and fairly, without

12  prejudice or sympathy, and without fear, solely upon the

13  evidence in the case and the applicable law.  I know that you

14  will do this and reach a just and true verdict.

15          Now, in the course of the trial, it has been

16  necessary for me to rule on the admission of evidence.  You

17  must not conclude from any ruling that I have made, or from

18  any question I may have asked, or from anything that I may

19  have said during the course of the trial, that I favor any

20  party to this lawsuit.  I do not.  I hold no such view, I

21  assure you.  It is going to be your recollection of the

22  evidence and your decisions on the issues of fact that will

23  decide this case.  You are also to draw no inference from the

24  fact that I occasionally asked questions of certain witnesses.

25  When I did that, that was only intended for clarification or

GR      OCR      CM      CRR      CSR

SPA131

1  to expedite matters and certainly it wasn't intended to

2  suggest any opinion on my part as to what verdict you should

3  render, or whether any of the witnesses may have been more

4  credible than any of the other witnesses.  You are expressly

5  to understand that I have no opinion as to the verdict you

6  should render in this case.  It is entirely up to you.

7       It is the duty of the attorneys on each side of the

8  case to object when the other side offers testimony or other

9  evidence that an attorney believes is not properly admissible.

10  Counsel also have the right and the duty to ask me to make

11  rulings of law and to request conferences at the side bar out

12  of your hearing.  All those questions of law have to be

13  decided by me.  You should not concern yourselves with, or

14  speculate about, the contents of any discussion that I may

15  have had with the lawyers at the side bar.  You also must not

16  bear any prejudice against any attorney or that attorney's

17  client because that attorney objected to the admissibility of

18  evidence or asked for a side bar conference out of your

19  hearing, or asked me to make a ruling on a point of law.

20  That's their job.  They are supposed to do that.

21       In reaching your verdict, you are not to be swayed

22  by sympathy for the parties; nor what the reaction of the

23  parties or of the public to your verdict may be, or whether it

24  will please or displease anyone; or be popular or unpopular

25  or, indeed, by any consideration outside the case as it has

1   been presented to you in this courtroom.  You should consider

2   only the evidence, find the facts from what you consider to be

3   the believable evidence, and apply the law as I am now giving

4   it to you.  Your verdict will be determined by the conclusion

5   you reach, no matter whom the verdict helps or hurts.

6           It would be improper for you to consider any

7   personal feelings you may have about any of the parties' or

8   the witness' race, religion, national origin, sex or age.

9   Those considerations have no place in this court.

10          The parties in this case are entitled to a trial

11  that is free from prejudice.  Our judicial system can't work

12  unless you reach your verdict through a fair and impartial

13  consideration of the evidence.

14          In this case, the defendant is a foreign bank.  The

15  mere fact that one of the parties is a bank and is foreign

16  does not mean that it is entitled to any lesser or greater

17  consideration by you.  All litigants are equal before the law,

18  and corporations and banks, big or small, foreign or domestic,

19  are entitled to the same fair consideration as you would give

20  any other individual party.

21          In deciding this case, you may only consider the

22  exhibits which have been admitted into evidence, the testimony

23  of the witnesses as you have heard it in this courtroom, and

24  has been read from their sworn testimony before trial --

25  that's the depositions -- and the stipulations entered into by

GR      OCR      CM      CRR      CSR

**SPA133**

1  the parties.

2          Arguments, remarks, and summations of the attorneys

3  are not evidence.  Nor is anything that I may have said with

4  regard to the facts of this case.  Anything you may have seen

5  or heard about this case outside the courtroom, although I

6  know you all tried really hard not to let that happen, if you

7  did hear anything, that is not evidence and it has to be

8  disregarded.

9          There are two types of evidence that you can

10 consider.

11         One type is called direct evidence.  Direct evidence

12 is a witness' testimony, or the contents of a document, about

13 what the witness saw, heard, or observed.  In other words,

14 when a witness testifies about what is known to that witness

15 by virtue of the witness' own senses -- what the witness sees,

16 feels, hears or touches -- that's called direct evidence.

17         Circumstantial evidence is evidence that tends to

18 prove a fact by proof of other facts.  Here is the example

19 that we use to demonstrate the difference between direct and

20 circumstantial evidence.  If you are outside and it is raining

21 and you see rain coming down, you've got direct evidence of

22 it.  You see it, with your own eyes.  You know it is

23 happening.  But we are here in a courtroom and you can't

24 really tell from the window what it is doing outside.  You

25 really don't know.  But if someone were to walk in here

1  wearing a dripping wet raincoat and carrying a dripping wet

2  umbrella, you could conclude that it is raining outside.  On

3  the other hand, if people keep walking in in coats and they

4  are dry, you could conclude that it is not raining outside.

5       That's all there is to circumstantial evidence.  You

6  infer on the basis of reason and experience and common sense

7  from an established fact the existence or the nonexistence of

8  some other fact.  Circumstantial evidence is of no lesser

9  value than direct evidence.  You alone decide what weight to

10  give to all of the evidence.

11       Some of the evidence that I have admitted in this

12  case or that was shown to you, I told you I was letting that

13  happen for a limited purpose only.  When I instructed that an

14  item of evidence was admitted for a limited purpose, you must

15  consider it only for that limited purpose and for no other.

16       If you have any question about whether a particular

17  item of evidence was admitted or shown to you for a limited

18  purpose, just send out a note and we will clarify that for

19  you.

20       The law does not require you to accept all of the

21  evidence that I admitted.  In deciding what evidence you will

22  accept, you must make your own evaluation of the testimony

23  given by each of the witnesses, and decide how much weight you

24  choose to give to that testimony.  As I mentioned when we

25  started the trial, there is, unfortunately, no magic formula

GR      OCR      CM      CRR      CSR

**SPA135**

1   by which you can evaluate testimony.  You bring with you to

2   this courtroom all of the experience and background of your

3   lives.  In your everyday affairs, you decide for yourselves

4   the reliability or unreliability of things that people say to

5   you.  The same tests that you use in your everyday dealings

6   apply in your jury deliberations here.  For example, the

7   interest or lack of interest of any witness in the outcome of

8   the case; the bias or prejudice of a witness, if there is any;

9   the manner in which the witness gives testimony on the stand;

10  the opportunity that the witness had to observe the facts

11  about which the witness has testified; and the probability or

12  improbability of the witness' testimony when considered in

13  light of all of the other evidence in the case, all these are

14  items for you to consider in deciding how much weight, if any,

15  you are going to give to that witness' testimony.

16          If it appears there is a discrepancy in the

17  evidence, you will have to consider whether the apparent

18  discrepancy can be reconciled by fitting the two stories

19  together.  If that's not possible, then you will have to

20  decide which of the conflicting stories you will accept.

21          The parties to this lawsuit and some of the other

22  witnesses testified before you.  The parties, and some of

23  these witnesses, are considered interested witnesses, which

24  means, they may stand to benefit in some way from the outcome

25  of the case.

1       An interested witness is not necessarily less

2   believable than a disinterested witness.  The fact that the

3   witness is interested in the outcome of the case does not mean

4   that the witness hasn't told the truth.  It is for you to

5   decide from the demeanor of the witness on the stand and such

6   other tests as your experience dictates whether or not the

7   testimony has been influenced, whether intentionally or

8   unintentionally, by any interest that the witness has.  You

9   may, if you consider it proper under all of the circumstances,

10  not believe the testimony of such a witness, even though it is

11  not otherwise challenged or contradicted.  However, you are

12  not required to reject the testimony of such a witness, and

13  you can accept all or such part of that witness' testimony as

14  you find reliable and reject the part that you find unworthy

15  of acceptance.

16      Certain witnesses in this case did not speak English

17  as their first language and had limited abilities speaking and

18  understanding English.  An interpreter, as you know, was used

19  during their testimony.  You must not make any assumptions

20  about a witness based solely upon the use of an interpreter to

21  assist that witness.  The fact that witness' testimony was

22  translated from a foreign language must not be considered in

23  deciding the credibility of the witness:  Testimony must not

24  be discounted or disregarded solely because it was translated.

25      The evidence to be considered by you is only that

1   provided through the official court interpreters for

2   testimony.  The same applies with respect to documents in this

3   case, where the parties have agreed to translations.  Unless

4   you have been informed of some objection or dispute, you must

5   accept the agreed English interpretation or translation.

6          You have also seen video of and heard the lawyers

7   read portions of documents referred to as examinations before

8   trial, or more familiarly depositions.

9          At some point before this trial began, the witness,

10  under oath, answered certain questions put to him by the

11  lawyers for the parties, or her.  We had one female witness, I

12  think.  A stenographer recorded the questions and answers and

13  transcribed them into a document which the witness later

14  signed before a notary public.  The portions of the transcript

15  of the examination before trial that you heard are to be

16  considered as if the witness were testifying from the witness

17  stand.

18         You have heard testimony from witnesses described as

19  experts.  Experts are witnesses who by education, experience,

20  or training have acquired learning or experience in a science

21  or other specialized area of knowledge.  Such witnesses are

22  permitted to give their opinions as to relevant matters in

23  which they profess to be experts and give their reasons for

24  their opinions.  Expert testimony is presented to you on the

25  theory that someone who is experienced in the field can assist

1  you in understanding the evidence or in reaching an

2  independent decision on the facts.

3        Your role in judging credibility applies to experts

4  as well as to other witnesses.  You should judge this

5  testimony in the same way that you judge the testimony of any

6  other witness.  The fact that such a person has given an

7  opinion does not mean that you are required to accept it.  In

8  weighing the testimony, you should consider the factors that

9  generally bear upon the credibility of a witness, as well as

10  the expert witness' education, training and experience, the

11  soundness of the reasons given for the opinion, and all other

12  evidence in the case.  You should consider the expert opinions

13  which were received in evidence in this case and give them as

14  much or as little weight as you think they deserve.  If you

15  decide that the opinion of an expert was not based on

16  sufficient education, experience or sufficient data, or if you

17  should conclude that the trustworthiness or credibility of the

18  expert is questionable for any reason, then you might

19  disregard the opinion of that expert.  Furthermore, if the

20  opinion of an expert was outweighed, in your judgment, by

21  other evidence in the case, then you might disregard the

22  opinion of that expert entirely or in part.

23        On the other hand, if you find that the opinion of

24  an expert is based on sufficient data, education, training and

25  experience, and the other evidence does not give you reason to

GR      OCR      CM      CRR      CSR

**SPA139**

1  doubt his or her conclusions, you would be justified in

2  placing great reliance on the expert's testimony.

3           (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SPA140**

1      THE COURT:  The expert's opinion is what you must

2   consider.  The facts and data upon which an expert based that

3   opinion are not evidence, unless those facts were

4   independently admitted into evidence.

5          Now, you heard me say that the plaintiffs must prove

6   their case by a preponderance of the evidence.  The question

7   you naturally have is, "what does a preponderance of the

8   evidence mean?" To establish a fact by a preponderance of the

9   evidence, means to prove that something is more likely true

10  than not true.  In other words, preponderance of the evidence

11  means, such evidence that when considered and compared with

12  the evidence opposed to it, has more convincing force, and

13  produces in your mind, the belief, that what is sought to be

14  proved is more likely so than not so.

15         A preponderance of the evidence means, a greater

16  weight of the evidence.  It refers to the quality and

17  persuasiveness of the evidence, not the number of witnesses or

18  documents produced by either party.

19         In determining whether a claim has been proved by a

20  preponderance of the evidence, you may consider the relevant

21  testimony of all witnesses, regardless of who may have called

22  them, and all the relevant exhibits received in evidence,

23  regardless of who may have produced them.

24         The burden of proof rests on the plaintiffs.  That

25  means, that in order for the plaintiffs to prevail, the

1   evidence that supports their claim must appeal to you as more

2   nearly representing the truth than the evidence opposed to

3   their claim. If it does not, or if it weighs so evenly that

4   you are unable to say that there is a preponderance on either

5   side, then you must decide the question in favor of the

6   defendant. It is only if the evidence favoring the plaintiffs'

7   claim outweighs the evidence opposed to it that you can find

8   in favor of the plaintiffs.

9          Now, during these instructions, you have heard me

10  use the term, "inference," and in the lawyers' arguments, they

11  asked you to infer on the basis of your reason, experience and

12  common sense from one or more established facts, the existence

13  of some other fact.

14         An inference is not a suspicion or guess.  It is a

15  reasoned, logical decision to conclude that a fact exists on

16  the basis of another fact, that you know exists. There are

17  times when different inferences maybe drawn from facts,

18  whether proved by direct or circumstantial evidence.  The

19  plaintiffs want you to draw one set of inferences, while the

20  defendant wants you to draw another set of inferences. It is

21  for you and you alone to decide what inferences you are going

22  to draw.

23         The process of drawing inferences from facts in

24  evidence is not a matter of guesswork or speculation.  An

25  inference is a deduction or conclusion that you, the jury, are

**SPA142**

1  permitted, but not required to draw, from the facts that have

2  been established by direct or circumstantial evidence.

3          Now, before a case goes to trial, the litigants go

4  through a process called "discovery".  In that process, each

5  party is required to turn over documents in their possession

6  that are relevant to the other side's case, as well as have

7  witnesses answer questions posed by that other party.

8  Nevertheless, in this case, the defendant refused to produce

9  certain documents that the plaintiffs requested and refused to

10 permit their witnesses to answer questions during depositions.

11         Accordingly, based on this refusal, you may, but you

12 are not required to infer the following:

13         First, that the defendant provided financial

14 services to Hamas, and to individuals affiliated with Hamas.

15         Second, that defendant processed and distributed

16 payments on behalf of the Saudi Committee to terrorists,

17 including those affiliated with Hamas, the relatives or

18 representatives.

19         And, three, that the defendant did these acts

20 knowingly.

21         Now, because the bank made a complete production of

22 the account records of Osama Hamdan, it is entitled to rely on

23 the files it produced with respect to its state of mind as to

24 that account.

25         Now, the mere existence of an inference against the

1  defendant, does not by itself relief the plaintiffs of the

2  burden of establishing their case by a preponderance of the

3  evidence.

4         If the plaintiffs are to obtain a verdict, you must

5  still find from the credible evidence that they have sustained

6  the burden cast upon them.  If plaintiffs have failed, then

7  your verdict must be for the defendant. If you should find

8  that all of the evidence is evenly balanced, then the

9  plaintiffs have failed to sustain the burden of proof and your

10 verdict should be for the defendant. If and only if you

11 determine after carefully weighing all the evidence, that the

12 facts favor the plaintiffs by the standard I have articulated,

13 then they have met their burden of proof.

14         All right.  Let me turn now to the legal elements of

15 the claim you are going to decide.  It is the second part of

16 these instructions.

17         First, let me define for you the word, "knowingly".

18 Because plaintiffs' claims implicate the concepts of knowledge

19 and intent, I'm going to discuss these concepts before

20 addressing the elements of those claims. You should consider

21 the term "knowingly", to have the definition I am about to

22 give, wherever it is mentioned in these instructions.

23         A person acts knowingly, if he acts intentionally

24 and voluntarily, and not because of ignorance, mistake,

25 accident or carelessness. Whether the defendant acted

RB        OCR

1  knowingly maybe proven by its conduct and by all of the facts

2  and circumstances surrounding the case.

3       One way in which plaintiffs can prove that defendant

4  acted knowingly, is by proving that the defendant deliberately

5  closed its eyes to a fact that otherwise would have been

6  obvious to it. In order to infer that defendant deliberately

7  closed its eyes to a fact, you must find that two things have

8  been established.

9       First, that the defendant was aware of a high

10  probability of the fact in question.  Second, that the

11  defendant consciously and deliberately avoided learning of

12  that fact. That is to say, defendant willfully made itself

13  blind to the fact. It is entirely up to you to determine

14  whether the defendant deliberately closed its eyes to the

15  fact, and if so, what inference if any should be drawn.

16       However, it is important to bear in mind, that mere

17  negligence or mistake in failing to learn the fact, is not

18  sufficient.  There must be a deliberate effort to remain

19  ignorant.

20       Now, the law to be applied to the plaintiffs' claims

21  is the federal Anti-Terrorism Act, Title 18 of the United

22  States Code, Section 2333(a).

23       That statute provides a remedy for individuals who

24  allege they have suffered injury to their person, property, or

25  business by reason of an act of international terrorism.

1    As part of their claims, plaintiffs must prove that

2  the attacks in which they were allegedly injured were acts of

3  international terrorism. Here, the parties have stipulated

4  that each of the 24 attacks at issue, were acts of

5  international terrorism within the meaning of this statute.

6  Therefore, I instruct you to find that plaintiffs have

7  satisfied this element of their claim.

8    Plaintiffs must also prove that the defendant

9  committed an act of international terrorism.  Plaintiffs

10  allege that the defendant committed an act of international

11  terrorism by violating 18 U.S.C., that is United States Code,

12  Section 2339B.

13    A violation of 18 U.S.C. 2339B is itself an act of

14  international terrorism.  Therefore, I instruct you as a

15  matter of law, if you find that plaintiffs have proved by a

16  preponderance of the evidence, that the defendant violated

17  section 2339B of Title 18, you must find that plaintiffs have

18  proved that defendant committed an act of international

19  terrorism.

20    So let me now turn to 2339B.

21    Plaintiffs allege that the defendant violated 2339B

22  by knowingly providing material support to a foreign terrorist

23  organization.  To prove this portion of their claim,

24  plaintiffs must establish the following elements by a

25  preponderance of the evidence:

1    First, that the defendant provided material support

2  or resources.  For the purposes of this case, the term

3  "material support or resources", means any property, tangible

4  or intangible, or service, including currency, monetary

5  instruments, financial securities, or financial services. If

6  you should find by a preponderance of the evidence that the

7  defendant provided support or resources in any of these forms,

8  then plaintiffs' burden with respect to this first element is

9  met.

10    Second, the plaintiffs must prove that the defendant

11  provided this support or these resources to a foreign

12  terrorist organization, specifically, Hamas. I instruct you as

13  a matter of law, that Hamas has been designated a foreign

14  terrorist organization, by the United States Secretary of

15  State, and was so designated by the Secretary on October 8th,

16  1997.

17    Consequently, if you find by a preponderance of the

18  evidence that the defendant provided any of the types of

19  "material support or resources" that I have just described, to

20  Hamas, or furnished it to any person acting on behalf of

21  Hamas, then plaintiffs' burden with respect to this element

22  will have been met.

23    You should find that the defendant provided material

24  support or resources to Hamas, if you find that the person or

25  entity to which the defendant provided the support or

**SPA147**

1  resources was operating under Hamas' direction or control or

2  if that person or entity was organizing, managing supervising

3  or otherwise directing the operation of Hamas' personnel or

4  resources.

5        Conversely, if plaintiffs do not prove that the

6  person or entity to which the defendant provided the support

7  or resources, was operating under Hamas' direction or control,

8  or that the person or entity was organizing, managing,

9  supervising, or otherwise directing the operation of Hamas'

10  personnel or resources, then you should find that the

11  defendant did not provide material support or resources to

12  Hamas.

13        The third element that plaintiffs have to prove is

14  that in providing material support or resources to a foreign

15  terrorist organization, the defendant did so, knowingly.

16        Now, I previously explained to you the definition of

17  "knowingly", and you should follow those instructions here.

18  For this element to be satisfied, plaintiffs must prove by a

19  preponderance of the evidence, that the defendant knew that it

20  was providing material support to Hamas, and that the

21  defendant also knew:

22        One, that Hamas had been designated by the Secretary

23  of State, as a "foreign terrorist organization", or

24        Two, that Hamas engaged in "terrorist activity", or

25        Three, that Hamas engaged in terrorism.

**SPA148**

1    Now, I have already explained to you that Hamas was

2  designated as a foreign terrorist organization, by the U.S.

3  Secretary of State.  If you find that the defendant knew that

4  it was providing material support to Hamas, and knew that

5  Hamas was designated as a foreign terrorist organization,

6  plaintiffs' burden with respect to this element will be met.

7    Alternatively, if you find that the defendant knew

8  it was providing material support to Hamas, and knew that

9  Hamas engaged in "terrorist activity", then plaintiffs' burden

10  with respect to this element would also be met.

11    The term "terrorist activity", includes hijacking or

12  sabotage of an aircraft, vessel, vehicle, train, or other

13  conveyance; seizing, detaining or threatening to kill, injure

14  or further detain any person to compel or coerce some third

15  party, including a government, to do or not do some act; or a

16  violent attack upon an internationally protected person,

17  including employees and officials of governments, and

18  international organizations; assignations; or the use of any

19  explosive, firearm or other weapon or dangerous device, other

20  than for monetary gain, and with intent to endanger the safety

21  of one or more individuals or to cause substantial damage to

22  property.

23    As a further alternative, if you find that the

24  defendant knew it was providing material support to Hamas, and

25  knew that Hamas engaged in "terrorism", plaintiffs' burden

1   with respect to this element would also be met.

2          The term "terrorism" means premeditated, politically

3   motivated violence against noncombatant targets by

4   sub-national groups or clandestine agents.

5          Now, those are the elements of this statute.

6          If you find that the defendant violated this Section

7   2339B, by knowingly providing material support or resources to

8   Hamas, you then will have to consider whether the provision of

9   that material support or those resources proximately caused

10  plaintiffs' injuries.

11         To show this, plaintiffs must show that the

12  defendant's unlawful acts were a substantial factor in the

13  sequence of events responsible for causing plaintiffs'

14  injuries and that plaintiffs' injuries were reasonably

15  foreseeable or anticipated as a natural consequence of such

16  acts.

17         An injury is proximately caused by unlawful activity

18  only when the activity, in natural and continuous sequence

19  produces or contributes substantially to producing, such

20  injury.

21         In other words, the unlawful activity at issue must

22  be a substantial and identifiable cause of the injury that

23  plaintiffs claim.  Activities that are too remote, too

24  indirect, or too attenuated are insufficient.

25         The plaintiffs are not required to prove the

1    defendant's alleged unlawful acts were the sole cause of their

2    injuries; nor do plaintiffs need to eliminate all other

3    possible causes of injury. It is enough if plaintiffs have

4    proved that the defendant's acts substantially contributed to

5    their injury, even though other factors may also have

6    significantly contributed as well.

7           I further instruct you that if you find that

8    plaintiffs have not proven that it is more likely than not

9    that Hamas committed a particular attack, you must also find

10   the defendant's acts did not proximately cause plaintiffs'

11   injuries from that attack.

12          By the way, I should let you know, I will give you a

13   copy of these instructions to take in, all right.  Don't feel

14   like this is a memory test, you have to remember every word.

15   You will be able to consult.

16          Now, in this trial, the plaintiffs claim that they

17   were injured by 24 separate terrorist attacks allegedly

18   carried out by Hamas.  You have to consider each of those

19   attacks separately.  To establish defendant's liability for

20   any specific attack, the plaintiffs must prove the elements of

21   liability that I have just explained to you with regard to

22   that specific terrorist attack.

23          That is, for each attack, plaintiffs must prove that

24   Hamas committed the attack, that defendant knowingly provided

25   material support to Hamas, and that defendant's unlawful acts

1  proximately caused plaintiffs' injuries from that attack.

2          Proof of liability relating to one alleged terrorist

3  attack, does not automatically constitute proof of liability

4  relating to any other alleged terrorist attack. You have to

5  consider each of the 24 attacks at issue here, separately.

6          Similarly, evidence that might be relevant to one

7  attack, might not be relevant to others.  In considering

8  whether a particular item of evidence is relevant to a

9  particular attack, you should use your common sense. Evidence

10  of events or actions that occurred long before or long after a

11  particular terrorist attack, may not be relevant to that

12  attack.

13          Now, as I noted, the defendant is a corporate,

14  corporation, corporate entity.  A corporation is a legal

15  entity that may act only through its agents.  The agents of a

16  corporation are its officers, directors, employees, and

17  certain others who are authorized by the corporation to act

18  for it.

19          In order for plaintiffs to sustain their burden of

20  proof for their claims against defendant, plaintiffs must

21  prove by a preponderance of the evidence that the elements

22  required for liability that I have just explained to you in

23  these instructions, were committed by an officer, director,

24  employee, or agent of the corporation.

25          The law holds a corporation responsible for all

1   unlawful acts of its directors, or officers, or employees, or
2   other agents, provided the unlawful acts are done within the
3   scope of their authority.  As would usually be the case if
4   done in the ordinary course of their employment or in the
5   ordinary course of the corporation's business.
6           Authority to act for a corporation in a particular
7   matter, or in a particular way or manner, maybe inferred from
8   the surrounding facts and circumstances shown by the evidence
9   in the case.
10          Authority to act for a corporation, like any other
11  fact in issue, in a civil case, need not be established by
12  direct evidence, but maybe established by indirect or
13  circumstantial evidence.
14          (Transcript continues on next page.)
15
16
17
18
19
20
21
22
23
24
25

1      Now, you heard evidence concerning defendant's

2   policies and procedures, and banking industry standards and

3   practices.  You may consider this evidence in deciding whether

4   the defendant acted knowingly.  A defendant who violates an

5   industry standard is not necessarily liable under the Anti

6   Terrorism Act if the defendant did not knowingly provide

7   material support to a foreign terrorist organization, as I

8   have already defined those terms for you.  Conversely,

9   compliance with industry standards does not necessarily shield

10  a defendant who knowingly provides material support to a

11  foreign terrorist organization.  However, I instruct you that

12  you are only to consider evidence concerning defendant's

13  policies and procedures or compliance with banking industry

14  standards and practices with regard to its mental state

15  regarding the account for which it produced complete records.

16  That is, the Beirut account of Osama Hamdan.  You recall

17  that's the only account for which the plaintiffs were given

18  complete financial records.

19      Now, at times during the trial, you have also heard

20  references to the laws of foreign nations, including Israel,

21  Palestine, Jordan, Lebanon and others.  You are not to

22  consider whether any conduct was illegal or legal under the

23  laws of any other nation.  You are to concern yourself solely

24  with the laws of the United States that I have described in

25  these instructions.

1      All right.  That completes part two.

2      Part three is very short.  Bear with me here.

3      Now, I have outlined for you the rules of law

4  applicable to the allegations in this case and the processes

5  by which you should weigh the evidence and determine the

6  facts.  I will give you some guidance to use in your

7  deliberations.

8      You are about to go into the jury room to begin your

9  deliberations.  More likely, I'll have you start tomorrow

10 morning.  Your function, to reach a fair conclusion from the

11 law and the evidence is a very important one.  Your verdict

12 has to be unanimous.  That is, all of you must ultimately

13 reach the same conclusion.

14     Each juror is entitled to his or her opinion.  Each

15 should, however, exchange views with their fellow jurors.

16 That's the very purpose of jury deliberations -- to discuss

17 and consider the evidence; to listen to the arguments of

18 fellow jurors; to present your individual views; to consult

19 with one another; and to reach an agreement based solely and

20 wholly on the evidence, if you can do so without violence to

21 your own individual judgment.

22     Each of you has to decide the case for yourself

23 after consideration of the evidence in the case with your

24 fellow jurors.  You should not hesitate to change an opinion

25 which, after discussion with your fellow jurors, appears

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

**SPA155**

1   erroneous.  However, if, after carefully considering all of

2   the evidence and the arguments of your fellow jurors, you

3   entertain a conscientious view that differs from the others,

4   you are not to yield your conviction simply because you are

5   outnumbered.  Your final vote must reflect your conscientious

6   conviction as to how the issues should be decided.

7           Now, no member of the jury should attempt to

8   communicate with me or any court personnel by any means other

9   than a signed writing.  All communication has to be signed in

10  writing by your foreperson -- and I'll tell you how you get

11  your foreperson -- and given to one of the marshals, who is

12  going to be standing right outside your door at all times.

13  I'll respond to any questions or requests that you have as

14  promptly as possible, either in writing or, more likely, I'll

15  bring you back into open court, so I can speak to you in

16  person.  In any event, if we have any of those written

17  communications, or are bringing you into court, you are not to

18  tell me, even here in open court nor in a note that you send

19  to me, how the jury stands numerically or otherwise on the

20  issue of defendant's liability until after a unanimous verdict

21  is reached.  I'm not going to communicate with any member of

22  the jury on any subject touching on the merits of the case

23  other than in writing or orally here in open court.

24          Now, all exhibits admitted into evidence are going

25  to be brought in to you in the jury room.  The only exception

1   to that is, we don't have any machines by which you could

2   watch the videos.  So, if there's any video that you want to

3   see, just let us know, and we'll bring you into the courtroom

4   so that you can watch it here.

5          If you find you need to have a portion of the

6   testimony read back to you, that can be done.  However, please

7   remember that it's not always easy to locate what you want.

8   So, if you want something read back to you, please be as

9   specific as you possibly can in requesting portions of

10  testimony that you may want to review.  You know, tell us what

11  witness, what topic from that witness, anything else you can

12  to help us hone in on the portion of the transcript that you

13  want to hear.

14         When you've reached a verdict, what you do is, you

15  take an ordinary piece of note from your notepad -- your

16  foreperson will do this -- sign it, and say, We have reached a

17  unanimous verdict.  That's all the note says.  Don't indicate

18  in that note what the verdict is.  I prepared a verdict form,

19  which I think both sides showed you during their closing

20  argument, and it's very straightforward.  It basically

21  says, "Applying all the instructions that I have given you and

22  considering each of the elements of the claims as to each

23  attack, is the defendant liable?"  And then

24  there's "Twenty-four attacks," and you check yes or no as to

25  each one.

1      After the questions are completed, the foreperson

2  should sign and date that verdict form, and you bring it into

3  the courtroom with you when I call you back to deliver your

4  verdict, so that the way it works, the first thing we get from

5  you is a note from your foreperson which says, "We have

6  reached a unanimous verdict," signed, foreperson.  I then

7  bring you back into the courtroom, and I will ask you, "Is

8  that right?  Do you have a unanimous verdict?"  And when you

9  tell me you do, then I'll have Ms. Clark pick up the verdict

10  form from you, and she'll hand it to me.

11      Now, with regard to the verdict form, you may not

12  infer, from the fact that questions are submitted to you or

13  from the wording of how the form is set up or from anything

14  that I have said or say in instructing you concerning those

15  questions that I said just now, that I have any view as to how

16  you should answer those questions.  I have no view.  Again,

17  this is your job.  You're going to have to answer those

18  questions yourself.

19      Your oath sums up your duty, and that is, that you

20  will, without fear or favor to any person, conscientiously and

21  truly try the issues before you according to the evidence

22  given to you in court under the law.

23      Now, let me say two more things to you.  First, it's

24  been very clear to me that you are a very collegial jury and

25  you're getting along very well.  I therefore am going to let

1  you pick your own foreperson.  I recommend to you that you

2  spend very little time doing that.  The foreperson doesn't get

3  paid any more, really doesn't have any more authority than

4  anybody else.  They serve as the communication point with the

5  Court.  Get it out of the way fast.

6          And then I think the way we'll work it now, we'll

7  have a court officer come up, have him sworn to take you to a

8  secluded place, because that's the way we have been doing this

9  for 300 years, then he'll take you into the jury room now.

10  Once you're in the jury room, you are dismissed and you can go

11  home.  I think it would be foolish to have you start

12  deliberating tonight.  What I want you to do instead is come

13  back promptly again by 9:30 tomorrow morning and start your

14  deliberations then.

15          I'm not going to call you into open court to do

16  that, but I do want to advise you that you can't start your

17  deliberations tomorrow morning at 9:30 until all eleven of you

18  are in the room.  So, don't start talking about the case until

19  everyone is there, and then you'll pick your foreperson and

20  your deliberations will commence.

21          With that, I'll have the court officer sworn, and

22  then I'll give you your normal admonition for today:  Please,

23  no research, Internet or otherwise.  Stay away from any media

24  coverages.  No communications.  No postings on any web sites,

25  anything about the case.  And we will see you tomorrow morning

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

**SPA159**

1    at 9:30.  Report directly to that jury room behind us, as you

2    have been doing.

3                Let's have the court officer sworn.

4                (Court officer sworn.)

5                THE COURT:  All right.  Ladies and gentlemen, you

6    are dismissed for the evening.  Once you hit the jury room,

7    have a good night.

8                (Jury excused.)

9                THE COURT:  All right.  Be seated.  I think I took

10   care of Mr. Osen's problem with the videos; right?

11               MR. OSEN:  The videos?

12               THE COURT:  I thought you had a problem.  You wanted

13   to make sure they knew they had access to the videos.

14               MR. OSEN:  I think the issue with the videos is

15   resolved.  But to be honest, I don't really know what it was.

16               THE COURT:  That's fine.

17               Now, it should not be a big deal to put together the

18   exhibits and get it into the jury room.  Do I have any reason

19   to think there's going to be a problem with that?

20               MR. INGERMAN:  I think we worked through all of the

21   issues except for one.  The plaintiffs suggested that the

22   deposition designations go back.  That's never been my

23   experience, and your Honor's instruction, it's as if they

24   testified from the witness stand.

25               THE COURT:  I agree with that.  I don't send back

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

COURTNEY LINDE et al.,

                  Plaintiffs,           04-cv-2799 (BMC)

      -against-

ARAB BANK PLC,

                  Defendant.

------------------------------------------------------------- X


**VERDICT FORM**

SPA161

Taking each of the attacks listed below and considering each one separately, please determine if plaintiffs have proven by a preponderance of the evidence that defendant is liable to plaintiffs. For each alleged attack (if any) for which you conclude defendant is liable to plaintiffs, please place an **X** in the **"Yes"** box provided below.  For each alleged attack (if any) for which you conclude defendant is not liable to plaintiffs, please place an **X** in the **"No"** box provided below.

|  |  |  | Is Defendant Liable? | |
|---|---|---|---|---|
|  |  |  | **Yes** | **No** |
| 1. | March 28, 2001 | Bombing at Neve Yamin | ☑ | ☐ |
| 2. | June 1, 2001 | Bombing at the Dolphinarium in Tel Aviv | ☑ | ☐ |
| 3. | August 9, 2001 | Bombing at Sbarro in Jerusalem | ☑ | ☐ |
| 4. | December 1, 2001 | Bombings on Ben Yehuda Street | ☑ | ☐ |
| 5. | December 12, 2001 | Attack on Bus No. 189 at Emmanuel | ☑ | ☐ |
| 6. | March 7, 2002 | Attack at Atzmona | ☑ | ☐ |
| 7. | March 10, 2002 | Bombing at Café Moment | ☑ | ☐ |
| 8. | March 27, 2002 | Bombing at the Park Hotel, Netanya | ☑ | ☐ |
| 9. | May 7, 2002 | Bombing at the Sheffield Club, Rishon Le-Zion | ☑ | ☐ |
| 10. | September 19, 2002 | Bombing on Bus No. 4, Allenby Street | ☑ | ☐ |

2

**SPA162**

| | | | | |
|---|---|---|---|---|
| 11. | June 18, 2002 | Bombing on Bus No. 32-A, Patt Junction, Jerusalem | ☑ | ☐ |
| 12. | July 31, 2002 | Bombing of the Frank Sinatra Cafeteria at Hebrew Univ. | ☑ | ☐ |
| 13. | January 29, 2003 | Shooting Attack on Road 60 | ☑ | ☐ |
| 14. | March 5, 2003 | Bombing on Bus No. 37, Haifa | ☑ | ☐ |
| 15. | March 7, 2003 | Shooting Attack in Kiryat Arba | ☑ | ☐ |
| 16. | April 30, 2003 | Bombing at Mike's Place, Tel Aviv | ☑ | ☐ |
| 17. | May 18, 2003 | Bombing on Bus No. 6, French Hill, Jerusalem | ☑ | ☐ |
| 18. | June 11, 2003 | Bombing on Bus No. 14A, Jaffa Road, Jerusalem | ☑ | ☐ |
| 19. | June 20, 2003 | Shooting Attack on Road 60 | ☑ | ☐ |
| 20. | August 19, 2003 | Bombing on Bus No. 2, Jerusalem | ☑ | ☐ |
| 21. | September 9, 2003 | Bombing at Café Hillel, Jerusalem | ☑ | ☐ |
| 22. | October 22, 2003 | Shooting Attack in Tel Rumeida | ☑ | ☐ |
| 23. | January 29, 2004 | Bombing on Bus No. 19, Jerusalem | ☑ | ☐ |
| 24. | September 24, 2004 | Mortar Attack on Neve Dekalim | ☑ | ☐ |

3

SPA163

**Your foreperson must now sign and date the verdict sheet.**

_____ 9/22/14
Signature of foreperson

**SPA164**

## OBJECTIONS

A copy of this Report and Recommendation is being served by the Court on all parties. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010); *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir.1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir.1996).

**SO ORDERED.**

Filed Feb. 10, 2015.



**Courtney LINDE, et al., Plaintiffs,**

**v.**

**ARAB BANK, PLC, Defendant.**

**No. 04–cv–2799 (BMC)(VVP)** [1].

United States District Court,
E.D. New York.

Signed April 8, 2015.

**Background:** After American citizens who were victims or relatives of victims of 24 terrorist attacks committed in Israel and the Palestinian Territories won judgment, in action under the Anti-Terrorism Act (ATA), against a Jordanian bank which was found to have provided financial services to the terrorist organization that carried out the attacks and its allies, bank moved for judgment as a matter of law or new trial, and for certification of an interlocutory appeal.

**Holdings:** The District Court, Brian M. Cogan, J., held that:

(1) sanctions imposed on Jordanian bank did not have such strong effect on its defense as would warrant judgment as a matter of law;

(2) evidence was sufficient to support jury's finding that 22 of the attacks were committed by the terrorist organization;

(3) testimony of plaintiffs' expert witness was sufficient to authenticate two websites as mouthpieces for terrorist organization;

(4) terrorist organization's claims of responsibility for attacks were properly admitted;

(5) video wills of suicide bombers were properly admitted as declarations against penal interest;

(6) video depicting children dressed up as terrorists at an event for a charity run

---

production process, produces the same products, and basically has the same body of customers. While EHPA argues that "the NOITU Fund took over most, if not all of the BIW Fund's participants," it relies solely on Mr. Silverman's statement that the NOITU Fund had an "infusion of over 3,000 members" when the BIW Fund participants transferred. *Id.* at 17. Mr. Silverman himself, however, also stated that only a "sub-total" of BIW participants transferred to the NOITU Fund, DE 253–17, Ex. P, which is consistent with Ms. Stark's affidavit and Ms. Carmichael's letter. Thus, it is clear from the record that not all of BIW Fund's participant "customers" transferred their business to the NOITU Fund. Accordingly, it cannot be said that the NOITU Fund has "basically the same body of customers" as the defunct BIW Fund once had.

---

**1.** The following related cases have been consolidated with this case for the purposes of this trial: *Philip Litle, et al. v. Arab Bank, PLC,* 04–cv–5449; *Oran Almog, et al. v. Arab Bank, PLC,* 04–cv–5564; *Robert L. Coulter, Sr., et al. v. Arab Bank, PLC,* 05–cv–365; *Gila Afriat–Kurtzer, et al. v. Arab Bank, PLC,* 05–cv–388; *Michael Bennett, et al. v. Arab Bank, PLC,* 05–cv–3183; *Arnold Roth, et al. v. Arab Bank, PLC,* 05–cv–03738; *Stewart Weiss, et al. v. Arab Bank, PLC,* 06–cv–1623.

by a terrorist organization was properly authenticated; and

(7) new trial was not warranted by admission of those portions of Financial Crimes Enforcement Network's (FinCEN) settlement with bank.

Motions granted in part and denied in part.

**1. Federal Civil Procedure** ⬦**2127, 2609**

A court reviewing a motion for judgment as a matter of law must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence. Fed.Rules Civ.Proc.Rule 50(a), 28 U.S.C.A.

**2. Federal Civil Procedure** ⬦**2608.1**

Burden on party that moved for judgment as a matter of law is particularly heavy where the jury has deliberated in the case and actually returned its verdict in favor of non-movant. Fed.Rules Civ. Proc.Rule 50(a), 28 U.S.C.A.

**3. Federal Civil Procedure** ⬦**2334, 2336, 2339**

Court has discretion to grant a new trial if it is persuaded that there were, among other things, errors of law in charging the jury or improper admission or exclusion of evidence, but the court may not disturb jury's verdict unless there was no substantial evidence to support it. Fed. Rules Civ.Proc.Rule 59, 28 U.S.C.A.

**4. Federal Civil Procedure** ⬦**2331**

Judge's duty in considering a motion for new trial is essentially to see that there is no miscarriage of justice. Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.

**5. Federal Courts** ⬦**3278**

Interlocutory appeal is not a vehicle to provide early review of difficult rulings in hard cases. 28 U.S.C.A. § 1292(b).

**6. Federal Courts** ⬦**3278**

Only exceptional circumstances justify a departure from basic policy of postponing appellate review until after entry of final judgment. 28 U.S.C.A. § 1292(b).

**7. War  and  National  Emergency** ⬦**1132(1)**

Sanctions imposed on Jordanian bank after it failed, in action under the Anti-Terrorism Act (ATA) alleging that it provided financial services to the terrorist organization that carried out 24 attacks in Israel, to comply with discovery order compelling production of key account records, did not have such strong effect on bank's defense as would warrant judgment as a matter of law; bank's violation of the production order was intentional, the extensive circumstantial evidence strongly suggested that the withheld records kept the most direct inculpatory evidence from jury and that bank either had or deliberately ignored evidence that it was dealing with operatives of the terrorist organization, and sanctions, including the permissive inference instruction and the preclusion order, did not play a very large, if any, role in the verdict, given the strength of the plaintiffs' evidence and the illogic of bank's defense theory. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**8. Federal Civil Procedure** ⬦**613.11**

Solicitor General's brief offering views of the United States in action under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, which argued that District Court's comity analysis was erroneous in some respects, did not provide good reason to revisit District Court's prior holding that the foreign states' asserted interests in their bank secrecy laws had to yield to the interests of combatting terror-

ism and compensating its victims. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ. Proc.Rule 50, 28 U.S.C.A.

**9. Courts �019**

Dictum from a higher court is not controlling precedent; even less is dictum from one or more government agencies.

**10. War and National Emergency �01132(1)**

Jordanian bank's acts of providing financial services to terrorist organization that carried out 24 attacks in Israel itself constituted an act of international terrorism for purposes of action under the Anti-Terrorism Act (ATA), if bank knew if was providing material support to a terrorist organization. 18 U.S.C.A. §§ 2331, 2333(a), 2339B.

**11. War and National Emergency �01132(1)**

District Court's previous ruling, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, that plaintiffs were not required to show "but for" causation or to trace specific dollars to specific terrorist attacks, did not warrant judgment as a matter of law. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ. Proc.Rule 50, 28 U.S.C.A.

**12. War and National Emergency �01132(1)**

Jury instructions in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, conformed to District Court's ruling that plaintiffs were not required to show "but for" causation or to trace specific dollars to specific terrorist attacks, and thus it was not unreasonable for jury to find causation. 18 U.S.C.A. § 2333 et seq.

**13. War and National Emergency �01132(1)**

Although there is no aiding and abetting liability under the Anti-Terrorism Act (ATA), primary liability in the form of material support to terrorism has the character of secondary liability, and Congress has expressly imposed liability on a class of aiders and abettors. 18 U.S.C.A. § 2333 et seq.

**14. Torts �034**

When a tortfeasor acts with knowledge that its conduct will, in concert with that of others, result in harm that would not otherwise occur, it is appropriate to hold each tortfeasor accountable.

**15. War and National Emergency �01132(1)**

Jury instructions in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, correctly focused solely on whether bank's acts were a substantial factor in causing plaintiffs' injuries, and whether such injuries were a foreseeable result of those acts, such that judgment as a matter of law was not warranted on that issue. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**16. War and National Emergency �01132(1)**

Evidence was sufficient, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, to support jury's finding that 22 of the attacks were committed by the terrorist organization to which bank had provided financial services, such that judgment as a matter of law in favor of bank was not warranted; evidence showed that during the relevant time period the bank processed approximately $3.2

million in transfers to accounts identified as belonging to leaders of the terrorist organization and their wives, and 11 charities controlled by the organization received approximately $32 million into their accounts in the bank, much of which was from parties that were part of the terrorist organization's worldwide fundraising network.  18 U.S.C.A. § 2333 et seq.; Fed. Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**17. War and National Emergency ⚖1132(1)**

Evidence was insufficient, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, to support jury's finding that two of the attacks were committed by the terrorist organization to which bank had provided financial services, warranting grant of judgment for bank as a matter of law as to those two attacks; uncontroverted evidence showed that bomb used in first of those attacks was supplied by a different terrorist group, and the bomber himself stated in his will that he was a member of that group, and only evidence that the second of the two attacks at issue was carried out by the organization to which bank provided services was an uncorroborated claim of responsibility which lacked detail.  18 U.S.C.A. § 2333 et seq.; Fed. Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**18. War and National Emergency ⚖1132(1)**

Evidence that Jordanian bank knowingly provided financial services directly to leaders of a terrorist organization and its allied charities satisfied scienter element in action, under the Anti-Terrorism Act (ATA), alleging that bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, such that judgment as a matter of law was not warranted on that issue; ample evidence at trial demonstrated that bank knowingly

provided financial services directly to senior leaders and operatives of the organization, from which evidence a reasonable jury could infer that bank did so knowingly, there was substantial evidence from which jury could reasonably conclude that many of the charities were founded by senior leaders of the terrorist organization or had organization operatives on their boards, and there was sufficient evidence to support a jury finding that bank was aware of, or at least willfully blind to, the charities' connections to terrorists.  18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ. Proc.Rule 50, 28 U.S.C.A.

**19. War and National Emergency ⚖1132(1)**

Section of statute prohibiting provision of material support to foreign terrorist organizations (FTO) that provided for treble damages required proof of intentional misconduct.  18 U.S.C.A. § 2333(a).

**20. War and National Emergency ⚖1132(1)**

An organization's knowing provision of material support to a terrorist organization (or its deliberate indifference as to whether it provided material support to a terrorist organization) qualifies as intentional misconduct for purposes of damages provision in statute prohibiting provision of material support to foreign terrorist organizations (FTO).  18 U.S.C.A. § 2333(a).

**21. Corporations and Business Organizations ⚖1051**

Traditional corporate veil-piercing factors are: (1) disregard of corporate formalities, (2) inadequate capitalization, (3) intermingling of funds, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) degree of discretion shown by the allegedly dominated corporation, (7) whether the dealings between the entities are at arms

length, (8) whether the corporations are treated as independent profit centers, (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

**22. War and National Emergency** ⬳1132(1)

General respondeat superior charge given in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, stating that a corporation is liable for its agents' unlawful acts, provided the unlawful acts are done within the scope of their authority, as would usually be the case if done in the ordinary course of their employment, or in the ordinary course of the corporation's business, correctly incorporated general principles of tort law, such that judgment as a matter of law was not warranted on that issue. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**23. War and National Emergency** ⬳1132(1)

Anti-Terrorism Act (ATA) incorporates general principles of tort law. 18 U.S.C.A. § 2333 et seq.

**24. Evidence** ⬳373(1)

Federal Rules of Evidence do not erect a particularly high hurdle for authenticating evidence; standard for authentication is one of reasonable likelihood, and is minimal. Fed.Rules Evid.Rule 901, 28 U.S.C.A.

**25. Evidence** ⬳373(1)

Generally, a document is properly authenticated if a reasonable juror could find in favor of authenticity. Fed.Rules Evid. Rule 901, 28 U.S.C.A.

**26. Evidence** ⬳373(1)

Proponent of evidence does not need, when authenticating evidence, to eliminate all possibilities inconsistent with authenticity or to prove beyond any doubt that the evidence is what it purports to be. Fed. Rules Evid.Rule 901, 28 U.S.C.A.

**27. Evidence** ⬳373(1)

The hurdle for authenticating evidence may be cleared by circumstantial evidence. Fed.Rules Evid.Rule 901, 28 U.S.C.A.

**28. Evidence** ⬳373(1)

Although Federal Rules of Evidence set forth examples of evidence that satisfy the authentication requirement, these methods are not exhaustive. Fed.Rules Evid.Rule 901(b), 28 U.S.C.A.

**29. Evidence** ⬳373(1)

Federal Rules of Evidence permit authentication by the appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances. Fed. Rules Evid.Rule 901(b)(4), 28 U.S.C.A.

**30. Evidence** ⬳571(1), 572

Testimony of plaintiffs' expert witness was sufficient, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, to authenticate two websites as mouthpieces for that terrorist organization; witness had given similar testimony in criminal prosecutions, he was more than qualified to give such testimony in context of civil cases, and he testified in detail as to the factors that led him to conclude that the two websites were authentic, including the reliance of the United States and other governments on the webpages as authentic sources of the organization's communications, language and facts used in postings, the posting of exclusive interviews with organization leaders and nonpublic details of their lives, and fact that the websites contained official

seals and watermarks of the organization. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Evid.Rule 901(b), 28 U.S.C.A.

**31. Evidence ⟿373(1)**

Proponent seeking to authenticate a website posting must show a reasonable likelihood that the information was posted by the individual or organization to which the postings were attributed. Fed.Rules Evid.Rule 901, 28 U.S.C.A.

**32. Evidence ⟿380**

Circumstantial evidence was sufficient, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, to authenticate two video recordings. 18 U.S.C.A. § 2333 et seq.; Fed. Rules Evid.Rule 901(b), 28 U.S.C.A.

**33. Evidence ⟿380**

Videos may be authenticated on the same principles as still photographs, and still photographs may be authenticated by a witness familiar with what is pictured. Fed.Rules Evid.Rule 901(b), 28 U.S.C.A.

**34. Evidence ⟿380**

Evidence of how video tapes were made and handled before they came into their proponent's possession is not necessarily required to authenticate them. Fed. Rules Evid.Rule 901(b), 28 U.S.C.A.

**35. Federal Civil Procedure ⟿2334**

Jordanian bank failed, in action, under the Anti-Terrorism Act (ATA), alleging that it provided financial services to the terrorist organization that carried out 24 attacks in Israel, to raise new arguments regarding admission of web postings in which the terrorist organization made claims of responsibility for various of the attacks, as required in its new trial motion. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ. Proc.Rule 59, 28 U.S.C.A.

**36. Evidence ⟿272**

Even though the action was not a criminal case, terrorist organization's claims of responsibility for terrorist attacks were plainly against its penal interest, such that those claims were properly admitted in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, and no new trial was warranted; claims could subject organization to penal consequences, crackdowns, arrests and even assassination by Israel. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ. Proc.Rule 59, 28 U.S.C.A.; Fed.Rules Evid. Rule 804(b)(3), 28 U.S.C.A.

**37. Evidence ⟿272**

For a statement to be admissible pursuant to the evidentiary rule governing statements against penal interest, court must determine that a reasonable person in declarant's shoes would perceive the statement as detrimental to his or her own penal interest; rule does not require that declarant be aware that the incriminating statement could subject him to immediate criminal prosecution, but only that it tended to subject him to criminal liability. Fed.Rules Evid.Rule 804(b)(3), 28 U.S.C.A.

**38. Evidence ⟿272**

Even though the action was not a criminal case, website posting calling for donations to a particular account in a Jordanian bank was plainly against the penal interest of the group which created the website and was thus admissible on such basis, such that new trial was not warranted in action, under the Anti-Terrorism Act (ATA), alleging that the bank mentioned in the posting provided financial services to the terrorist organization that carried out 24 attacks in Israel; soliciting donations for the terrorist organization was a crime under laws of the United States, Israel, and

other countries. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed.Rules Evid.Rule 804(b)(3), 28 U.S.C.A.

### 39. Evidence ⟺380

Fact that videos originated from website which plaintiffs' expert witnesses had authenticated as belonging to terrorist organization weighed in favor of authentication of the videos and thus did not warrant new trial in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed.Rules Evid.Rule 901(b), 28 U.S.C.A.

### 40. Evidence ⟺380

Fact that video wills of suicide bombers originated from website which plaintiffs' expert witnesses had authenticated as belonging to terrorist organization weighed in favor of authentication of the videos, and thus did not warrant new trial, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel; the witnesses were both familiar with the likenesses of those terrorists from their extensive review of other organization materials. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed.Rules Evid.Rule 901(b), 28 U.S.C.A.

### 41. Evidence ⟺272

Video wills of suicide bombers originating from website which plaintiffs' expert witnesses had authenticated as belonging to terrorist organization were properly admitted as declarations against penal interest and thus did not warrant new trial in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 at-

tacks in Israel; wills would have subjected the declarants to significant criminal liability if they were captured before they killed themselves. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed.Rules Evid.Rule 804(b)(3), 28 U.S.C.A.

### 42. Evidence ⟺380

Video of funeral for terrorist organization bombmaker, which originated from website which plaintiffs' expert witnesses had authenticated as belonging to that organization, was properly authenticated, and thus did not warrant new trial in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel; one of plaintiffs' witnesses testified that he recognized and personally met some of the individuals depicted in the video, and he recognized the area portrayed in the video. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed.Rules Evid.Rule 901(b), 28 U.S.C.A.

### 43. Evidence ⟺380

Video depicting children dressed up as terrorists at an event for a charity run by a terrorist organization was properly authenticated, and thus did not warrant new trial in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel; video was authenticated by one of plaintiffs' expert witnesses, who testified that he recognized logo of television station on which it was broadcast and that he was personally familiar with the video and its use by law enforcement in several countries. 18 U.S.C.A. § 2333 et seq.; Fed. Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed. Rules Evid.Rule 901(b), 28 U.S.C.A.

**44. Evidence ☞272**

Video in which a leader of a terrorist organization made statements on a cable television news program, declaring that the organization was responsible for the bombing of a hotel in Israel, was properly admitted, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, as declarations against penal interest, and thus did not warrant new trial; declarant identified himself as a member of the terrorist organization, which was a crime under United States, Israeli, and other law, and terrorist bombings were illegal everywhere, and in any case the statements were also extensively corroborated by other evidence, including convictions of organization operatives for the bombing and Israeli government reports assigning blame to the terrorist organization. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed.Rules Evid.Rule 804(b)(3), 28 U.S.C.A.

**45. Evidence ☞380**

Video in which a leader of a terrorist organization made statements on a cable television news program, declaring that the organization was responsible for the bombing of a hotel in Israel, was properly authenticated, and thus did not warrant new trial in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel; one of plaintiffs' expert witnesses testified that the individual in the video was the spokesman for the terrorist organization, the record also contained the declarant's passport, which demonstrated that the declarant was the same individual who held an account at the defendant bank, and in any case the video itself was effectively self-authenticating, since it bore logos of the cable network and showed no signs of being edited. 18

U.S.C.A. § 2333 et seq.; Fed.Rules Civ. Proc.Rule 59, 28 U.S.C.A.; Fed.Rules Evid. Rule 901(b), 28 U.S.C.A.

**46. Evidence ☞380**

**War and National Emergency ☞1132(1)**

Video in which a leader of a terrorist organization made statements on a cable television news program, declaring that the organization was responsible for the bombing of a hotel in Israel, was properly admitted, and thus did not warrant new trial, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, for the not-for-truth purpose of rebutting bank's argument that operatives of the terrorist organization hid their affiliations with the group and conducted their affairs in a secretive manner. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.

**47. Evidence ☞272**

Although primarily relevant to show the connection between purported charity led by one of the declarants and a terrorist organization, video in which a leader of the terrorist organization and a leader of the charity made statements at a conference, in which they discussed raising money for the terrorist organization, supporting suicide bombings, and joking about how they were both terrorists, was properly admitted as declarations against penal interest, and thus did not warrant new trial in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel; membership in the terrorist organization and raising money for that organization were crimes under United States and Israeli law, and in any case the association between the purported charity and the

terrorist organization was corroborated by U.S. designation of the purported charity as a Specially Designated Global Terrorist (SDGT). 18 U.S.C.A. § 2333 et seq.; Fed. Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed. Rules Evid.Rule 901(b), 28 U.S.C.A.

**48. Evidence ☞318(1)**

Video in which an individual connected to some purported charities that raised money for a terrorist organization was shown speaking at the funeral of two alleged leaders of that organization was properly admitted, and thus did not warrant new trial, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel; video was not admitted for the truth of any statements contained in it, but to depict the connection between the individuals portrayed therein, the terrorist organization, and the purported charities. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.

**49. Evidence ☞146**

Although provocative to varying degrees, probative value of videos which either proved a terrorist organization's responsibility for particular attacks or showed the connection between certain individuals and purported charities to that organization, outweighed the risk of undue prejudice, and thus did not warrant new trial, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel. 18 U.S.C.A. § 2333 et seq.; Fed. Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed. Rules Evid.Rule 403, 28 U.S.C.A.

**50. Federal Civil Procedure ☞2334**

**War and National Emergency ☞1132(1)**

New trial was not warranted, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided fi-

nancial services to the terrorist organization that carried out 24 attacks in Israel, on issue of whether or not it was legal under foreign law for bank to do business with terrorists; that issue was plainly irrelevant to issue of whether bank knowingly violated ATA, which applied extraterritorially. 18 U.S.C.A. § 2333 et seq.; Fed. Rules Civ.Proc.Rule 59, 28 U.S.C.A.

**51. Federal Civil Procedure ☞2335**

**War and National Emergency ☞1132(1)**

New trial was not warranted, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, on issue of whether or not District Court erred in prohibiting defendant from rearguing to jury its discovery objection regarding foreign bank secrecy laws; since Court had already held that defendant's bank secrecy objections were not a valid excuse for refusing to participate in discovery, permitting such argument would have allowed defendant to defeat the Court's analysis, mislead and confuse the jurors, and improperly invite jury to decide legal issues. 18 U.S.C.A. § 2333 et seq.; Fed. Rules Civ.Proc.Rule 59, 28 U.S.C.A.

**52. Evidence ☞373(1), 571(6)**

**Federal Civil Procedure ☞2334**

**War and National Emergency ☞1132(1)**

New trial was not warranted, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, on issue of whether or not District Court erred in admitting an Israeli government list of unlawful associations and terrorist organizations; admission of the list was not irrelevant, since issue was not whether the listed entities were deemed, as a matter of

Israeli law, to be controlled by the terrorist organization to which defendant bank allegedly provided financial services, but whether the Israeli government found as a matter of fact that those organizations were controlled by that terrorist organization, and list's authenticity was established by fact that the document itself contained a certification, by an Israeli government official, that the listed organizations were illegal, as well as by testimony of one of plaintiffs' expert witnesses, that he recognized the document as authentic. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ. Proc.Rule 59, 28 U.S.C.A.; Fed.Rules Evid. Rule 901(b), 28 U.S.C.A.

**53. Evidence ⟺146**

**Federal Civil Procedure ⟺2334**

New trial was not warranted, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, on issue of whether or not District Court erred in admitting an Israeli government list of unlawful associations and terrorist organizations; that the listed entities were declared illegal by the Israeli government due to their affiliations with the terrorist organization to which the bank allegedly provided financial services was highly probative evidence that they were affiliated with that terrorist organization, and bank suffered no unfair prejudice by its admission. 18 U.S.C.A. § 2333 et seq.; Fed. Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed. Rules Evid.Rule 403, 28 U.S.C.A.

**54. Federal Civil Procedure ⟺2334**

New trial was not warranted by admission, on cross-examination of defendant bank's head of compliance for its New York branch, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, of those portions of Financial Crimes Enforcement Network's (FinCEN) settlement with bank, resulting from its investigation regarding bank's compliance programs, which directly impeached witness's characterization of the bank as an eminently compliant financial institution; those portions of the assessment which plaintiffs used were the factual findings made by FinCEN in process of discharging its legal duty to investigate, which contained no statements by defendant, no offers of compromise, no evidence of the amount defendant paid, no evidence of defendant's conduct during compromise negotiations, nor any reference to fact that defendant declined to litigate FinCEN's findings. 18 U.S.C.A. § 2333 et seq.; Fed. Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed. Rules Evid.Rule 408, 28 U.S.C.A.

**55. Federal Civil Procedure ⟺2334**

New trial was not warranted by exclusion, in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, of testimony from two of defendant bank's expert witnesses as to the purportedly legitimate, humanitarian motives of a purported charity which allegedly provided financial resources to the terrorist organization to which the bank allegedly provided financial services; the proffered witnesses were found to be wholly unqualified to offer opinions regarding the purported charity, and in any case issues of motive and intent were not proper subject of expert testimony. 18 U.S.C.A. § 2333 et seq.; Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**56. Federal Civil Procedure ⟺2333.1**

New trial was not warranted by fact that trial structure in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel, grouped together the liability trials for the 24 attacks; plain-

tiffs' theory of the case met minimal requirements for relevance, evidence relating to attribution of each of the 24 attacks was relatively simple, evidence as to the material support defendant provided was similarly straightforward, inefficiency and wasted resources would have resulted from holding 24 liability trials, and risks of prejudice and confusion were not substantial, since trial involved just one defendant, engaged in a single course of conduct, allegedly in violation of a single statute, and there were no individualized claims of damages by the plaintiffs for jury to consider. 18 U.S.C.A. § 2333 et seq.; Fed. Rules Civ.Proc.Rule 59, 28 U.S.C.A.; Fed. Rules Evid.Rule 401, 28 U.S.C.A.

**57. Federal Courts** ⬯3376

Certification for interlocutory appeal was inappropriate in action, under the Anti-Terrorism Act (ATA), alleging that Jordanian bank provided financial services to the terrorist organization that carried out 24 attacks in Israel; upcoming damages trial in the case would allow a judgment which would bring all the issues raised by defendant in its motion before the Circuit, and no pure question of law existed that could be resolved by Court of Appeals without resort to the record. 18 U.S.C.A. § 2333 et seq.; 28 U.S.C.A. § 1292(b).

**58. Federal Courts** ⬯3278

Interlocutory appeal is reserved for those cases where an intermediate appeal may avoid protracted litigation. 28 U.S.C.A. § 1292(b).

————

Mark S. Werbner, Sayles Werbner, Dallas, TX, Peter A. Binkow, Law Offices of Lionel Z. Glancy, Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA, Steven M. Steingard, Stephen H. Schwartz, Kohn, Swift & Graf, PC, Philadelphia, PA, Aaron Schlanger, Naomi B. Weinberg, Joshua D. Glatter, Cindy T. Schlanger, Gary M. Osen, Osen LLC, Hackensack, NJ, Clyde T. Turner, Turner and Associates, North Little Rock, AR, James P. Bonner, Stone Bonner & Rocco LLP, Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., Shawn Patrick Naunton, Zuckerman Spader LLP, New York, NY, Peter R. Kolker, Semra Aylin Mesulam, Zuckerman Spaeder LLP, Washington, DC, Peter Raven–Hansen, Osen LLC, Oradell, NJ, for Plaintiffs.

Kevin Walsh, Anthony Paul Coles, Douglas Walter Mateyaschuk, Eric M. Falkenberry, Shand Scott Stephens, Steven J. Young, DLA Piper LLP, New York, NY, Brett Ingerman, DLA Piper US LLP, Baltimore, MD, for Defendant.

*MEMORANDUM OPINION AND ORDER*

BRIAN M. COGAN, District Judge.

*Table of Contents*

INTRODUCTION ................................................................. 298
EVIDENCE AT TRIAL ........................................................... 299

    I.  Plaintiffs' Case .................................................... 299

    II.  Defendant's Case ................................................... 305

STANDARD OF REVIEW ........................................................ 310
DISCUSSION ..................................................................... 310

**SPA175**

I. Sanctions Order .................................................... 311
   A. Background ................................................... 311
   B. The Effect of the Permissive Inference ........................ 313
   C. The Effect of the Preclusion Order ............................ 315
   D. The Solicitor General's Certiorari Brief ....................... 318

II. "Act of International Terrorism" ................................. 322

III. Causation ...................................................... 323
   A. Governing Law ............................................... 324
   B. Jury Charge ................................................. 328
   C. Sufficiency of the Evidence .................................. 328

IV. Attribution to Hamas ............................................ 330

V. Scienter ........................................................ 331

VI. *Respondeat Superior* ........................................... 335

VII. Evidentiary Rulings ............................................ 337
   A. Authentication Generally ..................................... 337
   B. Declarations Against Interest ................................ 338
   C. Foreign Law ................................................. 343
   D. Israeli List of Unlawful Associations and Terrorist Organizations ..... 344
   E. FinCEN Assessment ........................................... 345
   F. Saudi Committee Experts ..................................... 346

VIII. Trial Structure ............................................... 348

IX. Defendant's 1292(b) Motion ...................................... 350

CONCLUSION ......................................................... 350

## INTRODUCTION

This case involves claims brought under the civil liability provisions of the Anti–Terrorism Act ("ATA"), 18 U.S.C. § 2333(a) *et seq.*, against defendant Arab Bank, PLC. Plaintiffs are American citizens who were the victims, or relatives of victims, of 24 terrorist attacks in Israel and the Palestinian Territories. After a lengthy trial, a jury found that those attacks were perpetrated by the Palestinian terrorist group Harakat al-Muqawama al-Islamiya ("Hamas") during the Second Intifada, a time of great violence between 2000 and 2005.[2] It also found that defen-

---

**2.** The 24 attacks are: the March 28, 2001 bombing at Neve Yamin; the June 1, 2001 bombing at the Dolphinarium in Tel Aviv; the August 9, 2001 bombing at Sbarro in Jerusalem; the December 1, 2001 bombings on Ben Yehuda Street; the December 12, 2001 attack on Bus No. 189 at Emmanuel; the March 7, 2002 attack at Atzmona; the March 10, 2002 bombing at Café Moment; the March 27, 2002 bombing at the Park Hotel, Netanya; the May 7, 2002 bombing at the Sheffield Club, Rishon Le–Zion; the September 19, 2002 bombing on Bus No. 4, Allenby Street; the June 18, 2002 bombing on Bus No. 32–A, Pratt Junction, Jerusalem; the July 31, 2002 bombing of the Frank Sinatra Cafeteria at

Hebrew University; the January 29, 2003 shooting attack on Road 60; the March 5, 2003 bombing on Bus No. 37, Haifa; the March 7, 2003 shooting attack in Kiryat Arba; the April 30, 2003 bombing at Mike's Place, Tel Aviv; the May 18, 2003 bombing on Bus No. 6, French Hill, Jerusalem; the June 11, 2003 bombing on Bus No. 14A, Jaffa Road, Jerusalem; the June 20, 2003 shooting attack on Road 60; the August 19, 2003 bombing on Bus No. 2, Jerusalem; the September 9, 2003 bombing at Café Hillel, Jerusalem; the October 22, 2003 shooting attack in Tel Rumeida; the January 29, 2004 bombing on Bus No. 19,

dant knowingly provided financial services to Hamas by providing financial services to its operatives; to 11 charities controlled by Hamas; and to an organization called the Saudi Committee for the Support of the Intifada Al–Quds, an entity connected to the Saudi Arabian government that made payments to beneficiaries identified by Hamas-controlled organizations, including the families of Hamas suicide bombers and prisoners.

Before me is defendant's timely motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. In the alternative, defendant has moved for a new trial under Rule 59 and for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

### EVIDENCE AT TRIAL

Much of the evidence that was introduced at trial had been previewed in detail in numerous pretrial rulings in this decade-old litigation. *See, e.g., Linde v. Arab Bank, PLC,* 269 F.R.D. 186 (E.D.N.Y. 2010); *Linde v. Arab Bank, PLC,* 384 F.Supp.2d 571 (E.D.N.Y.2005). The following is a partial summary of the evidence presented over the course of the approximately six-week trial.

### I.  Plaintiffs' Case

Plaintiffs first called Evan Kohlmann, an international terrorism consultant, principally to determine whether or not Hamas—"a terrorist organization that was founded in approximately December of 1987"—had ever issued claims of responsibility for the 24 terrorist attacks at issue in this case. Mr. Kohlmann is an expert in international terrorism specializing in terrorist communications and previously has been so qualified in domestic and foreign cases. He has given similar testimony in criminal prosecutions. *See United States v. Ali,* No. 10–cr–187, 2011 WL 4583826, at

*6 (D.Minn. Sept. 30, 2011) ("Kohlmann will testify regarding several communiques posted to the official al-Shabaab website, and that these communiques claim responsibility for certain events. Kohlmann's testimony as to these claims of responsibility, their source and their authenticity will assist the jury in understanding the discussions between the conspirators."). Mr. Kohlmann testified that he had reviewed a list of the 24 attacks at issue and had concluded, based on his approximately twenty years researching Hamas communications, that "Hamas has indeed[ ] issued communiques or other claims of responsibility, in which they have indicated their involvement or at least claimed their involvement in these various attacks." Mr. Kohlmann testified that Hamas issues claims of responsibility for terrorist attacks in order to: (1) "announce their presence both on a local stage as well as international stage"; (2) "attract new members"; and (3) "solicit financial donations."

As part of his testimony, Mr. Kohlmann authenticated two websites as sources of Hamas communications: Palestine-info.com and alqassam.ps. He explained that the first website represents the political wing of Hamas, and the second is the website for Hamas' military wing. Mr. Kohlmann described the factors, which were "both extrinsic as well as intrinsic," that led him to conclude that these were Hamas websites. He testified that those factors included: the reliance by the United States and other governments on the webpages as authentic sources of Hamas communications; the language and facts used in postings; the posting of exclusive interviews with Hamas leaders and non-public details of their lives; and the fact that the websites contained official Hamas seals and watermarks.

Jerusalem; and the September 24, 2004 mor-      tar attack on Neve Dekalim.

After authenticating the websites, Mr. Kohlmann also authenticated many communiques, which he testified are official communications from a terrorist group, in which Hamas took credit for the attacks at issue in this case. Among them were video wills of individuals who were about to commit terrorist attacks. For instance, Mr. Kohlmann authenticated the video will of Raed Abdul Hamid Misk, which was received in evidence over defendant's objection.[3] Mr. Kohlmann identified Misk and concluded that his video will was an authentic claim of responsibility by Hamas because, among other reasons, the video will was available in the "martyr" subsection of the alqassam.ps website and because Misk identified himself as being part of the military wing of Hamas. Mr. Kohlmann also authenticated portions of the websites that were not claims of responsibility, but were calls for donations to Hamas at a particular Arab Bank account. These postings were also admitted in evidence over defendant's objection.

Mr. Kohlmann identified Osama Hamdan as a senior Hamas spokesman and an account holder at Arab Bank in Lebanon. The latter was based on an authentication of Hamdan's passport, which was filed in connection with Hamdan's obtaining an Arab Bank account, and which was received in evidence. In connection with this testimony, Mr. Kohlmann authenticated certain bank transfer ("SWIFT") records processed through Arab Bank for Hamdan's account, and in which the beneficiary of the transfer was listed as "Harakat al Muqawamah al Islamiyah Hamas." Through Mr. Kohlmann, plaintiffs introduced a CNN interview with Hamdan, in which Hamdan claimed responsibility for the March 27, 2002 Park Hotel bombing on behalf of Hamas.

During cross-examination, Mr. Kohlmann conceded that with respect the January 29, 2004 suicide bombing on Bus No. 19 (discussed further below), another terrorist organization, the Al–Aqsa Martyrs Brigade ("AAMB"), along with Hamas, issued a claim of responsibility for the attack. In addition, defendant pointed out the lack of corroboration for some of Hamas' claims of responsibility and Mr. Kohlmann acknowledged that Hamas has motives to lie about such claims for propaganda purposes. Ultimately, however, this did not change Mr. Kohlmann's conclusion that Hamas claimed responsibility for each of the attacks at issue in this case.

Plaintiffs next called Dr. Matthew Levitt, a director at the Washington Institute for Near East Policy, who has been qualified as an expert on Hamas in federal court on numerous other occasions. Prior to his current role, Dr. Levitt did counterterrorism work for the United States Department of Treasury, the FBI, and the United States Department of State. Initially, Dr. Levitt provided "a little bit of Hamas 101," describing the organization as an "extremist group" that was designated as a terrorist group by the United States. He explained that terrorist designations—which include the terms Foreign Terrorist Organization ("FTO"), Specially Designated Terrorist ("SDT"), and Specially Designated Global Terrorist ("SDGT")—are labels used by the United States Departments of State and Treasury to "make it more difficult for organizations that are involved in illicit activity, in this case terrorist activity, to be able to raise, launder, move and access money." Dr. Levitt also introduced the jury to the role of designation lists, or "black list[s]," issued by the United States Office of Foreign Asset Control ("OFAC").[4]

---

**3.** In August 2003, Misk blew himself up on Bus No. 2 in Jerusalem, killing approximately 23 people and wounding as many as 125 others.

**4.** As discussed below, a central element of

Dr. Levitt testified about numerous Hamas leaders. One of the key individuals among those was Sheikh Ahmed Yassin, a paraplegic, who was a religious figure and one of the founders of Hamas, and who was regarded as Hamas' spiritual leader. Dr. Levitt also spoke about Salah Shehadah, the one-time leader of Hamas' military wing, which is known as the Izz al-Din al-Qassam Brigades. During this testimony, Dr. Levitt authenticated the terrorist designations of various individuals by the United States government. He also authenticated SWIFT transfers which showed funds being wired through Arab Bank to various individuals associated with Hamas. For example, Dr. Levitt testified about a wire transfer for $20,000 to Ismail Abd Al Salam Haniyeh, whom he described as "the one time Hamas prime minister, another time the head of the Hamas political branches that were in the Gaza Strip."

In addition, Dr. Levitt testified about the relationship of certain charities to Hamas.[5] He concluded that these charities were controlled by Hamas and funneled money to it via Arab Bank. This conclusion was based, in part, on evidence that many of the charities were founded by senior Hamas leaders or had Hamas operatives on their boards, as well as on findings by the United States government. One such charity, the Al Salah Islamic Society, he described as "a fairly significant Hamas-affiliated charity in the Gaza Strip." In fact, he explained that another Hamas leader, Ismail Abu Shanab, called the Al Salah Islamic Society an "important early Hamas-affiliated charity." Two other

charities, the Nablus Zakat and the al-Tadamun Society, were associated with Sheikh Bitawi, "a long time Hamas leader in the West Bank."

Through Dr. Levitt, plaintiffs put in evidence the terrorist designations of various charities, including the Al Salah Islamic Society and the Union of Good, an "umbrella organization" which encompasses many of the groups at issue in this case and which was created by the leadership of Hamas.

Dr. Levitt also offered testimony about the Saudi Committee, one of the charities included in the Union of Good. He stated, in concurrence with a German intelligence report, that the Saudi Committee passed donations through to the families of martyrs, which included suicide bombers. Dr. Levitt testified that, based on his investigation, he had concluded that defendant processed those payments on behalf of the Saudi Committee. Dr. Levitt also authenticated SWIFT transfers showing money being wired through Arab Bank to various charities that he identified as being associated with Hamas. As just one example, he authenticated a SWIFT transfer showing $7,800 being sent to the Islamic Society, Gaza, one of the charities at issue in this case, through Arab Bank. He also authenticated a wire transfer showing $12,000 going to the Ramallah Zakat Committee, another of the charities at issue.

Finally, through Dr. Levitt (and over defendant's objection), plaintiffs entered certain videos in evidence, including one produced by Al–Manar television—which is the television station of Hezbollah, a

---

defendant's case was that its use of the OFAC list to screen transactions was sufficient to show that it had not acted knowingly in providing financial services to Hamas.

**5.** The 11 charities at issue are: the Islamic Charitable Society of Hebron; the Jenin Zakat Committee; the Al Tadamun Islamic

Charitable Society; the Nablus Zakat Committee; the Tulkarem Zakat Committee; the Ramallah Al Bireh Zakat Committee; the Al Islah Charitable Society; Mujama Al Islamiya (Islamic Center, Gaza); Al Jamiya Al Islamiya (Islamic Society, Gaza); Al Salah Islamic Society; and the Al Nur Prisoner Society.

terrorist organization in Lebanon—depicting school children dressed up as terrorists at an event for one of the charities at issue. Dr. Levitt testified that he recognized the logo of the television station and was personally familiar with the video, as well as its use by law enforcement agencies in other countries.

Over the next three days of trial, plaintiffs presented the testimony of Mr. Ronni Shaked, a former paratrooper and intelligence analyst, now a researcher and journalist associated with Hebrew University in Jerusalem. Mr. Shaked testified that, in his assessment, the 24 attacks at issue in this case were, in fact, perpetrated by Hamas. His investigation relied on, among other things, Israeli Security Agency ("ISA") reports, local police reports, and claims of responsibility. Effectively, only two attacks are at issue in the instant motion.

With respect to the January 29, 2004 suicide bombing on Bus No. 19, Mr. Shaked explained that the suicide bomber, Ali Ja'ara, approached two individuals, Nufal Adawin and Muhammad Nashash, and indicated that he wanted to carry out a suicide attack. They prepared an explosive device and planned an attack. Adawin was later convicted of various terror-related crimes, including membership in Hamas. But the initial attack was never carried out, because Ja'ara encountered a checkpoint on the way to his target and was forced to turn back. Sometime later, Ja'ara approached operatives from the AAMB and reiterated his desire to carry out a suicide attack. Cross-examination revealed that Nashash was, in fact, convicted of membership in another Palestini-

an terrorist group, the AAMB.[6] Mr. Shaked acknowledged that the AAMB, not Hamas, provided Ja'ara with the bomb and drove him to his target, where he boarded a bus and detonated it. Ja'ara identified himself as an AAMB operative in his will. Four AAMB operatives were convicted for the Bus No. 19 attack. The ISA report on which plaintiffs heavily relied stated that the AAMB claimed responsibility for the Bus No. 19 attack.

Mr. Shaked also attributed the September 24, 2004 mortar attack on Neve Dekalim, in Gaza, to Hamas. He based his determination on Hamas' claim of responsibility, and on an assessment that Hamas was the only Palestinian organization commonly using certain types of mortars at that time. On cross-examination, he conceded that other terrorist organizations were, in fact, using the same mortars during this time period.

Plaintiffs next called Arieh Spitzen. Mr. Spitzen was employed by the Israeli Defense Force between 2001 and 2009, and was the head of the Palestinian Affairs Department for the Coordinator of Government Activities in the Territories. Like Dr. Levitt, Mr. Spitzen offered corroborative testimony regarding the Hamas affiliations of many individuals discussed above, such as Sheik Yassin and Salah Shehadah.[7] Similarly, Mr. Spitzen evaluated many of the charities at issue in this case from 1999 through 2005 and identified numerous prominent Hamas officials who occupied leadership roles in these charities.

Mr. Spitzen repeatedly qualified his opinions by reminding the jury that he had

---

**6.** Due to an apparent translation error, the copy of Nashash's conviction that plaintiffs originally submitted stated that Nashash was convicted of membership in Hamas. Mr. Shaked conceded, upon reviewing the document from the stand, that Nashash was actually convicted of membership in the AAMB.

**7.** Mr. Spitzen also added that Yassin was killed by the IDF in 2004, while Shehadah was killed by the IDF in 2002.

not been able to review the full set of defendant's customer files because defendant had refused to transfer the records to him. Nevertheless, he explained that he was able to find wire transfers for many Hamas leaders that went through Arab Bank. For instance, Mr. Spitzen was able to locate certain wire transfers to Sheikh Yassin in 2001. He testified that it was Yassin's account that was referred to in an internet posting where Abd al-Azis al-Rantisi, another Hamas leader, stated that those who wished to donate money to support Hamas and those harmed in the Second Intifada should send donations to the account of Sheikh Yassin at Arab Bank: "[H]ere is the account number: The Arab Bank—Gaza, account number 36444, the sheikh Ahmad Yassin." In fact, Mr. Spitzen testified that on May 30, 2001, this same account, number 36444, belonging to Yassin, received a $60,000 wire transfer processed through Arab Bank from an individual named Yousef El–Hayek.

Mr. Spitzen identified a transfer to El–Hayek from Osama Hamdan, who sent El–Hayek a check for $10,000 from his Arab Bank account. He also identified 223 individuals, either leaders of Hamas or their family members, who received transfers of funds (including many from El–Hayek) that were processed by Arab Bank.

Based on the records that he was able to obtain, Mr. Spitzen testified that the following individuals received transfers through Arab Bank:

1. Halima Hassan Yassin, Sheikh Yassin's wife, received six Arab Bank transfers between November 2000 and May 2001 in the amount of $153,435.

2. Salah Shehadah received seven Arab Bank transfers between November 2000 and February 2001 in the amount of $109,500.

3. Ismail Haniyeh, the Bureau Chief of Sheikh Yassin's Bureau, received 19 Arab Bank transfers between July 2000 and September 2001 in the amount of $420,100.

4. Ismail Abu Shanab, another Hamas founder, received nine Arab Bank transfers between August 2000 and August 2001 in the amount of $173,172.

5. Abbas Al–Sayyed, the individual who confessed responsibility for the Park Hotel bombing in 2002, received nine Arab Bank transfers between February 2001 and May 2001 in the amount of $123,000.

Mr. Spitzen also testified extensively about the charities at issue in this case, all of which had Arab Bank accounts, and all of which he testified were controlled by Hamas. He authenticated an Israeli list of Unlawful Associations and Terrorist Organizations, which he testified was published in the Official Gazette of Israel, the Israeli equivalent of the Federal Register. The list was received in evidence over defendant's objection. Mr. Spitzen testified that various organizations on this list were controlled by Hamas, and that he was able to locate money transferred through Arab Bank for virtually all of the charities at issue in this case during the Second Intifada.

Using figures calculated by another of plaintiffs' experts, forensic accountant Wayne Geisser, Mr. Spitzen testified that $32,312,170 was transferred to the Arab Bank accounts of these charities. In particular, Mr. Spitzen testified about the Saudi Committee, which is one of the 50 member organizations of the Union of Good. He stated that the Union of Good is an umbrella organization that "was established with the special purpose by Hamas leaders to transfer funds to Hamas." [8] He

---

**8.** Mr. Spitzen also read from the U.S. Department of Treasury's press release designating

the Union of Good as a SDGT which said that

further testified that through Arab Bank, the Saudi Committee "transferred funds to the families of Hamas suicide bombers, to Hamas prisoners and operatives." Of the $32,312,170 transferred to the charities, Mr. Spitzen testified that "some 15 million plus dollars" was transferred by the Saudi Committee to nine of those charities.

Mr. Spitzen also testified that many of the charities at issue handed out Hamas propaganda, and often gave funds to terrorists and their family members. Specifically, he testified that he was familiar with "lists showing martyr payments to families of suicide bombers and other terrorists" from his time working for the Israeli government.[9] Mr. Spitzen explained that these "martyr files" were similar to social security files in that they described the martyr, the circumstances of his death, his background, and any money transferred to him or his family.

He discussed the lists of payments to martyrs' families produced by defendant, which were admitted in evidence. From these martyr lists, Mr. Spitzen concluded that the Saudi Committee made 24 payments to the families of suicide bombers from Hamas via Arab Bank from 2000 through 2002. He testified that these included payments to the immediate relatives of Hamas suicide attackers who perpetrated four of the terrorist attacks at issue: (1) the June 1, 2001 Dolphinarium bombing; (2) the August 9, 2001 Sbarro Pizzeria bombing; (3) the December 1, 2001 Ben Yehuda Street bombings; and (4) the December 12, 2001 shooting attack on Bus No. 189 in Emmanuel.

Plaintiffs also put into evidence two of defendant's interrogatory answers. The first interrogatory asked defendant to "[s]tate the total number of fund transfers you processed for Palestinian Foreign Terror Organizations, Specially Designated Terrorist and Specially Designated Global Terrorists from the date of designation of those individuals or entities by the United States Government through December 31, 2007." Defendant answered "Arab Bank processed 282 funds transfers in which parties identified on Exhibit A were either the originator or the beneficiary from the date of the designation of those individuals or entities by the United States Government through December 31, 2007."

The second asked defendant to "[s]tate the total dollar amount" of all such funds transfers. Defendant answered that "Arab Bank processed $2,563,275 in funds transfers in which parties identified on Exhibit A were either the originator or the beneficiary from the date of designation of those individuals or entities by the United States Government through December 31, 2007."[10]

Plaintiffs supported their case-in-chief, throughout, with the videotaped deposition testimony of numerous bank employees. For example, the jury watched the deposition testimony of Mohammad al-Tahan, one of defendant's operations managers, who acknowledged a 2001 letter from Arab National Bank (the Bank's correspondent bank in Saudi Arabia) titled "Outward Transfers As Per the Request of the Saudi Committee For Support of the Intifada Al Quds." This document appended lists of payments to the families of deceased indi-

---

"the Union of Good Facilitates the transfer of tens of millions of dollars a year to Hamas managed associations in the West Bank and Gaza Strip."

**9.** For example, he recalled some "martyr files" that were seized by the Israeli govern-

ment from one of the charities, the al-Tadamun Society in Nablus.

**10.** The jury was not permitted to consider the names of the parties identified in Exhibit A as evidence in the case.

viduals, whose cause of death was noted as
*amaliya istashidaya*, which Mr. al-Tahan
testified means "martyrdom operations."
Mr. al-Tahan also testified that when he
came into possession of these lists, he sim-
ply passed them along to the attention of
another bank employee, Assad Saleh (who,
for his part, testified that in processing
these transfers he had simply "carried out
[his] duties" to the correspondent bank).

The videotaped deposition testimony of
certain of defendant's employees also evi-
denced that some of its employees knew
that Sheikh Yassin was a leader of Hamas.
For instance, Mr. al-Tahan admitted that
he knew that Sheikh Yassin was "a terror-
ist leader of a terrorist group." Defen-
dant's Chief Compliance Officer in the
Palestinian Territories, Tayseer Sadeq,
testified that Yassin "is known throughout
the world" as "the head of the Hamas or-
ganization in the Palestinian Territories,
and this is no secret."

Plaintiffs also played the video deposi-
tion testimony of David Blackmore, a for-
mer compliance officer for defendant's
London branch. The significance of this
testimony, in terms of undermining defen-
dant's central theory of the case—that its
sole obligation was to make sure that it
was not dealing with OFAC-designated en-
tities or individuals—is hard to overstate.
When Mr. Blackmore was asked to provide
his view of the Saudi Committee wire
transfer made payable to "[t]he family of
the martyr Ibrahim Abdul Karim Bani
Awdah," and processed by defendant, he
testified as follows:

Q. And the beneficiary name is not
   specific in the sense that it doesn't
   say exactly who is to receive the
   wire transfer, it's the family of that
   particular martyr. Were there poli-
   cies and procedures in effect at
   Arab Bank in the United Kingdom
   that would have prevented execut-
   ing a wire transfer where there is

no specific account number listed
and no specific beneficiary name
provided?

A. There would have been a number of
   reasons why this would not have
   been applied, firstly, because as you
   rightly say . . . the beneficiary name
   is not specific, there's no account
   number, the payment for the origi-
   nal transaction I notice is in cash.
   *We would never in a million years
   have dealt with a payment order
   such as this.*

(Emphasis added).

## II.  Defendant's Case

Defendant opened its case by calling
Sabih Al–Masri, who has been the chair-
man of Arab Bank for two years and has
sat on its board since 1998. He testified
as to the history of Arab Bank and its
operations, including its expansion in the
Palestinian Territories during the period
after the Oslo Accords were signed in the
mid–1990s. Specifically, he testified that
the Second Intifada had a substantial neg-
ative impact on defendant's operations in
Gaza and the West Bank during the time
period of the attacks at issue in this case.
Over plaintiffs' objection, he testified as to
the operation of defendant's audit commit-
tee. On cross-examination, he conceded
that he has limited day to day involvement
with defendant's operations, and that he
had never heard of the Saudi Committee
until the commencement of this suit.

Defendant next called Dr. Beverly Mil-
ton–Edwards, an author and scholar who
has written extensively on Hamas. She
testified that she had conducted extensive
field work traveling with Hamas during
the Second Intifada, including with mem-
bers of the al-Qassam Brigades. She was
called for the purpose of giving her assess-
ment of the 11 *zakat* (charitable) commit-
tees, specifically (1) to opine on whether

they were controlled by Hamas, and (2) whether the public perceived them as being controlled by Hamas during the relevant period (2002–04). Based on her field work and research, she concluded, in short, that the answer to both questions was no.

The effect of cross-examination on Dr. Milton–Edwards' testimony, and its potential spillover effect on the credibility of defendant's entire case, is again hard to overstate. First, asked on direct examination whether she had "observe[d] any evidence at all that Hamas was controlling . . . any of these eleven Zakats and charitable organizations during the relevant time period," she answered that she had seen none, nor had she seen Hamas "paraphernalia" during her visits to all but two of the charities in question during the relevant period.

On cross-examination, among other things, Dr. Milton–Edwards was shown a photograph (in fact, a still frame taken from a promotional video which had been released in connection with the launch of her book, *Hamas: The Islamic Resistance Movement*, in 2010). She identified several individuals appearing in the photo, including Sheikh Yassin, Abd al-Azis al-Rantisi, and Salah Shehadah. Other than a "symbol of Hamas" appearing on a billboard in the photo, she could not point to "anything else on it that tells you it's a Hamas image." On the billboard, however, were the words *Muka Mahal Islamiah*, which means "Islamic Resistance Movement," followed by the word "Hamas." She was asked: "Can you tell us what it says right here on the bottom?" She replied: "No, I can't. It's in Arabic."

In other respects, Dr. Milton–Edwards' testimony was contradicted by her own book. For example, she testified about the whether the Islamic Society, Gaza, a charity for which defendant processed transactions, was controlled by Hamas:

Q: Did you apply your research criteria to determine whether or not . . . the Islamic society was controlled or perceived to be controlled by Hamas during the 2000–2004 time period?

A: Yes, I did.

Q: And what conclusion did you reach?

A: I reached the conclusion that they weren't controlled by Hamas, nor did the Palestinians perceive them as being controlled by Hamas.

On cross-examination, she was confronted with a passage from her book, which stated:

But the work of the Islamic Society and the rest of Hamas's network in the decades up to, during and after the second intifada, when families needed it most, represented not so much a donation as an investment by Hamas, one that reached a lucrative political dividend in the 2006 election.

Dr. Milton–Edwards also testified that when she had met Musri Al–Masri, an "emerging leader" of Hamas, in 2005 or 2006, she was "never informed" of him having any connection with the Al Nur Prisoner Society. She was confronted with an excerpt from her book in which Al–Masri is identified as someone "involved as a Board member of the Gaza based charity Al–Nour." She dismissed the inconsistency with the telling observation that "you know my book much, much better than I do," and, when pressed, acknowledged that she had "forgotten I had written this in the book with my co-author."

Defendant's next witness was Shukry Bishara, who is the head of the Palestinian Monetary Authority and a former executive of the Bank. He explained the impact of the Second Intifada—including the Sbarro Pizzaria attack on September 21,

2001—on both his family and on defendant's operations.

Because his knowledge of defendant's policies extended beyond the Palestinian Territories, he was allowed to authenticate plaintiffs' exhibits 1 and 41, which were examples of defendant's internal guidance from the beginning of the Second Intifada concerning its anti-money-laundering policies. Despite an instruction limiting his testimony on these subjects to defendant's policies outside of the Palestinian Territories, he testified that they were in force "across the institution." [11]

Bishara testified that, to his knowledge, during 2000–01, the Saudi Committee offered three categories of "programs and benefits," specifically humanitarian aid; repair and construction; and unemployment benefits. He also testified that the account of Osama Hamdan had received five transfers after his OFAC designation, and had been closed as a result of his designation, in 2004; about $8,000 was returned to him out of escrow. In fact, as noted above, defendant had long since admitted in its interrogatory responses that it had returned over $2 million to account-holders whose accounts were frozen after their designation by OFAC. Bishara and others testified that defendant "had to" return frozen assets to known terrorists in such cases.[12]

On cross-examination, Bishara acknowledged a 2001 letter titled "Payment of incoming transfers for the benefit of the families of the martyrs and the injured of the Al–Aqsa Intifada," in which he wrote that defendant "strive[s] for the success"

of this party's [*i.e.*, the Saudi Committee's] project." He acknowledged defendant's possession of the payment lists for survivor benefit payments from the Saudi Committee, on which the cause of death for certain beneficiaries was listed as *amaliya istashidaya*, which, as noted above, was translated as "martyrdom operations," and which defendant's regional compliance manager acknowledged means "suicide operation."

Defendant also called Jamal Hurani, defendant's CEO for the Palestinian Territories. He testified extensively, as the others before him, about the impact of the Second Intifada on his family and on bank operations. Over plaintiffs' objections, Hurani also testified at length about defendant's policies for compliance with Palestinian Monetary Authority regulations (although he was not allowed to testify as to defendant's adherence to such policies in that area). Hurani, who rose to the executive ranks from being a programmer, also testified about the automated operation of defendant's OFAC compliance software, and the manner in which transactions are flagged by the system for review.

Defendant then called Brian Billard, a New York-based Arab Bank executive who, from 1999 to 2004, was its comptroller and compliance officer. Billard testified that from the outset, he had been "very impressed" with defendant's compliance policies because "everybody was involved" in that function. Because defendant's department heads "had many years

---

**11.** As discussed below, defendant was precluded from offering evidence of its policies in Lebanon and the Palestinian Territories, where account records that could show defendant's adherence to such policies had not been produced.

**12.** Defendant attempted to justify these returns by pointing to Lebanese law requiring

it, but such reliance on foreign law to explain otherwise knowing conduct had been precluded by Judge Gershon in a pre-trial ruling. As discussed in greater detail below, this ruling also prohibited defendant from explaining the non-production of account records, which gave rise to the discovery sanctions that are at issue in the instant motions, by resort to its foreign bank secrecy obligations.

of knowledge" in compliance, he was "very comfortable."

Billard explained at length the role of defendant's New York branch (since converted to an agency), specifically its role in "dollar clearing" for overseas transactions in U.S. dollars and service to U.S. companies generally. Again consistent with the central theory of defendant's case, he explained the central role of the OFAC list in defendant's U.S. compliance procedures, and opined that decisions about who should be on the list are properly the role of law enforcement, not the banks that must comply with the list.

Billard recounted his pre-trial review of several hundred individual transactions that had passed through the New York branch, and cleared the OFAC list, including some initiated by Yousef El–Hayek. He also acknowledged payments to and from nine charitable organizations, for example, from the Al–Aqsa foundation of Saudi Arabia (a charity designated by OFAC in 2003) to the Ramallah Zakat Committee. Billard noted only two missed transactions from designated entities, both from Interpal, which had been missed due to "human error."

He emphasized the strength of defendant's compliance efforts generally, calling those efforts "strict," defendant's record-keeping "very good," and its approach "conservative." He also testified to certain specifics, such as that defendant was "prompt" in filing mandatory Suspicious Activity Reports.

However, on cross-examination, Billard was confronted with certain findings issued in a 2004 assessment by the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN"). The assessment included findings that defendant had not filed "the majority of its Suspicious Activity Reports referencing terrorist financing until after the [United States] Office of Controller of the Currency ["OCC"] com-

menced a review of its funds transfer activity in June of 2004," which was also after the commencement of this lawsuit; that "names similar to those of originators and beneficiaries of funds transfers cleared by Arab Bank–New York appeared in credible and publicly available sources of information, including Congressional testimony, indictments in the United States, and well publicized research and media reports linking the originators and beneficiaries to illicit activities"; and that "[o]nce a designation occurred, Arab Bank–New York failed to review recent activity occurring prior to the designation and associated with the designated entities to identify potentially suspicious activity." He testified, however, that he had never read the FinCEN report in full, in part because "[t]hat was being handled by counsel."

With respect to defendant's reliance on the OFAC list to identify suspect transactions, Billard also conceded that a number of payments that had been "straight through processed"—*i.e.*, without human intervention—by the branch were made by or to designated individuals. These transactions included those made, for example, by Yousef El–Hayek to Sheik Yassin. Billard also conceded that, beyond the OFAC list, there would be other ways to obtain personal knowledge that a particular bank customer was a terrorist.

Defendant then called Mohammed Dabbour, defendant's senior vice president and director of compliance, based at defendant's Amman headquarters. Over plaintiffs' continued objections and requests for limiting instructions, he testified at length regarding international banking standards, including those established by the Basel Committee and Financial Action Task Force ("FATF"). He explained the "know your customer" rules, use of blacklists, training, and the "150, [or] 200 people" whose "primary responsibility was combat-

ting money laundering and terrorism financing" at the Bank. He also explained "home and host" standards, which apply local regulations to banks doing business anywhere other than their home jurisdictions. Finally, he explained defendant's policy of required photo identification for any non-customer who is the beneficiary of a wire transfer.

On cross-examination, Dabbour was asked whether he was aware that defendant had admitted (which it had) "that it maintained accounts for eleven United States designated terrorists on the OFAC list?" He answered that he was. When asked to name them, he refused to answer, invoking the right to privacy of defendant's account holders. He also admitted knowing that defendant had transferred over $2.5 million to former customers whose accounts had been closed as a result of OFAC designation.

Like the testimony of David Blackmore, Dabbour's cross-examination undercut the central theory of the Bank's defense, that it could not be expected to do more than check transactions against the OFAC list. He was confronted by testimony at his deposition, at which he had stated: "[I]f upon discovering an unusual transaction by—by one of our customers as part of the investigation in the account of our customer, we might look to see if there is any information available in the public domain. And that would be part of the investigative process."

Defendant called three other former employees of the Bank in the Palestinian Territories during the relevant time. They were Mazen Abu Hamdan, the regional head of compliance, Baker Mohammed Ahmad Al–Omari, a former manager of a branch in the West Bank, and George Kawwas, a retired Bank employee from Bethlehem, located close to the border between Israel and the West Bank, just south of Jerusalem. They testified as

to the catastrophic impact of the Second Intifada on the Bank's operations. In addition, among other things, these Bank employees testified to the widespread dissemination of posters bearing "pictures of martyrs" throughout the Palestinian Territories, including on the fronts of Arab Bank branches.

Defendant's final fact witness was Manny Caravanos, the Bank's vice president of operations for (*i.e.,* the head of) the New York branch. He testified that he was responsible for ensuring defendant's compliance with OFAC. He explained the technical standard (SWIFT) by which international transfers are processed and, like Mr. Billard, opined that a person or entity's presence on the OFAC list was a matter for law enforcement, not banks. Yet on cross-examination, Mr. Caravanos acknowledged that he was not aware of the 11 accounts held by the Bank in the Palestinian Territories for designated individuals, nor the $2.5 million that had been returned to these individuals when their accounts were closed.

Defendant closed its case with the expert testimony of Anne Vitale, a former prosecutor and consultant to the financial services industry with respect to money laundering and antiterrorism compliance. Her testimony was focused on explaining international standards, including the Basel Committee on Banking Supervision, the Financial Action Task Force, and the Wolfsberg Group. She explained in detail the mechanism by which banks can process wire transfers to non-account holders, and the know-your-customer protections that govern such transactions. She provided the jury with a detailed picture of the use of blacklists such as the OFAC list. Over plaintiffs' objection, she testified that it was not common during the relevant period for foreign banks to use this country's OFAC list, but that of the host coun-

try. She opined that defendant's OFAC-only approach to screening for transfers to terrorists or terrorist organizations was consistent with the international standards of the time.

## STANDARD OF REVIEW

**[1, 2]** Rule 50 provides for entry of judgment as a matter of law where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on the issue or issues that are the subject of the motion. Fed.R.Civ.P. 50(a). A court reviewing a Rule 50 motion "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Cross v. New York City Transit Auth.*, 417 F.3d 241, 247 (2d Cir.2005) (citations omitted). The burden on the moving party is "particularly heavy where the jury has deliberated in the case and actually returned its verdict" in favor of the non-movant. *Id.* at 248.

**[3, 4]** Rule 59 provides a court with discretion to grant a new trial if it is persuaded that there were, among other things, errors of law in charging the jury or improper admission or exclusion of evidence. *See Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992). A court "may not disturb the jury's verdict unless there was no substantial evidence to support it." *Compton v. Luckenbach Overseas Corp.*, 425 F.2d 1130, 1133 (2d Cir. 1970). "The judge's duty is essentially to see that there is no miscarriage of justice." *Id.*

**[5, 6]** Under § 1292(b), a court may certify an interlocutory order for appellate review if (1) it "involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Interlocutory appeal is not a "vehicle to provide early review of difficult rulings in hard cases." *German v. Fed. Home Loan Mortg. Corp.*, 896 F.Supp. 1385, 1398 (S.D.N.Y.1995). Only "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475, 98 S.Ct. 2454, 2461, 57 L.Ed.2d 351 (1978).

## DISCUSSION

Defendant's Rule 59 motion assigns error to a number of the Court's charges to the jury, *i.e.*, it argues that the verdict was reached under incorrect legal standards, including the ATA's causation and scienter standards, and as a result of the improper application of a pretrial sanctions order. It also argues that the Court made certain evidentiary rulings in error and that it was prejudiced the structure of the trial.

Defendant's Rule 50 motion, which of course challenges the sufficiency of the evidence presented in this case, is almost entirely focused on demonstrating that plaintiffs have failed to meet the legal standard that defendant argues is correct, as opposed to the one that Judge Gershon, to whom this case was previously assigned, and I have held applicable. I have therefore assessed the sufficiency of the evidence at trial under the correct legal standards.

Another problem with defendant's Rule 50 motion is that it begins with, and heavily rests upon, the unsupported assertion that "[e]ach of the banking services that Plaintiffs placed at issue must be evaluated separately to determine if it provides an evidentiary basis for the elements of proof required by the ATA." Defendant then proceeds to analyze separately the financial services it provided to senior Hamas leaders, the financial services it provided

to Hamas-controlled charities, and the financial services it provided to the Saudi Committee, without ever addressing the *collective* weight of all of these forms of support as evidence of either proximate causation or scienter. As did the jury, I reject this focus on the trees over the forest.

For the following reasons, defendant's Rule 50 motion is granted in part and denied in part, and defendant's Rule 59 and § 1292(b) motions are denied.

## I. Sanctions Order

### A. *Background*

[7] Before trial, Judge Gershon imposed sanctions on defendant for its failure to comply with a prior discovery order compelling production of key account records, despite the fact that its objections based on foreign bank secrecy laws had been considered and overruled. *See generally Linde,* 269 F.R.D. 186 (the "Sanctions Order"). Defendant argues that I erred in applying those sanctions too broadly, and in declining to reconsider them in light of a brief filed by the United States Solicitor General in connection with defendant's unsuccessful interlocutory appeal.

The Sanctions Order sets forth the history of discovery in this action in great detail, but as is most relevant here, defendant refused to produce full account records for its customers in Lebanon and the Palestinian Territories (Gaza and the West Bank). Defendant admitted that it maintained accounts for 11 individuals or entities that were designated as FTOs, SDTs, or SDGTs during the relevant time period, but refused to specify the identity of these account holders.

Defendant produced full account records for only one account, the Beirut account of Osama Hamdan. Osama Hamdan is a spokesman for and leader of Hamas, designated as a SDGT by OFAC in 2003. Several transfers into his Arab Bank account in Beirut explicitly listed "Hamas" as the beneficiary party. *See, e.g., Linde,* 269 F.R.D. at 197–98. Even assuming his account was among the 11 to which defendant admitted, there remain at least 10 of defendant's accountholders who were admittedly OFAC-designated terrorists, but whom defendant refused to identify, much less produce their full account records.[13]

In imposing sanctions, Judge Gershon found that defendant had "intentionally failed to meet its production obligations." *Id.* at 197. She also found, with respect to defendant's claim that it would face criminal prosecution in Jordan if it complied with its discovery obligations, that "there is nothing in the record indicating that defendant faces a real risk of prosecution." *Id.*

There can be no question that defendant's violation of Judge Gershon's production order was intentional. Defendant may or may not have had a good faith basis for arguing that it was not obligated to produce the records in the first instance (in reliance on local bank secrecy laws), but once Judge Gershon rejected that argument and ordered the records produced, defendant made the deliberate decision to disregard that Order.

I note also that, as demonstrated below, the circumstantial evidence at trial demonstrated that defendant's reliance on local law was, in all likelihood, a convenient pretext for the non-production of docu-

---

**13.** As discussed below, defendant sought to enter evidence that it closed the accounts of all OFAC-designated individuals and entities, but produced neither supporting documentation for such account closures nor any indica-

tion of what it did with the funds in those accounts. *Linde,* 269 F.R.D. at 201 & n. 13. Defendant was precluded from making this argument, because it would have found proof or refutation in the withheld documents.

ments that would have definitively answered the question as to defendant's knowledge that it was helping to finance Hamas. Judge Gershon entered the Sanctions Order in an effort to mitigate the effects of defendant's non-production of this highly probative evidence.

The Sanctions Order had two aspects. First, it provided for a permissive adverse inference instruction as follows:

> [The jury] may, but is not required to, infer: (1) that defendant provided financial services to organizations designated by the United States as Foreign Terrorist Organizations, and to individuals affiliated with the FTOs; (2) that defendant processed and distributed payments on behalf of the Saudi Committee to terrorists, including those affiliated with named terrorist organizations and those who are unaffiliated, their relatives, or representatives; and (3) that defendant did these acts knowingly and purposefully.

*Linde*, 269 F.R.D. at 205. This instruction was given both near the end of plaintiffs' case and as part of the final jury charge. (The Court modified the wording slightly, although not materially, because after the Sanctions Order was issued, the focus of the trial was narrowed to Hamas and alleged violations of 18 U.S.C. § 2339B, a statute that requires only knowing conduct.)

Second, the Sanctions Order restricted defendant's ability to submit evidence of, or argue, certain facts that would likely have been illuminated by the withheld documents and testimony. It provided:

> The Bank must be precluded from making any argument about its state of mind that would find proof or refutation in the withheld documents. Defendant is entitled to rely on the documents it did produce to make its case that it did not have the required state of mind. In addition, defendant can argue to the

jury that it had no knowledge that certain accountholders, whose records have been produced, were terrorists. But it cannot argue that it had no knowledge a certain Bank customer was a terrorist if it did not produce that person's complete account records.

*Id.* at 204. Thus, the Sanctions Order permitted defendant to make arguments about its intent as to the account for which it produced full records, the account of Osama Hamdan in Lebanon, but it precluded defendant from arguing that it did not know that other customers were terrorists. On the other hand, it did not direct the jury to find that defendant had such knowledge; it left plaintiffs with the burden of proving defendant's knowledge.

It is clear from her decision why Judge Gershon chose these particular sanctions. This extensive circumstantial evidence strongly suggests that the withheld records would have shown what defendant knew about the Hamas connections of its customers, which means that defendant's invocation of bank secrecy kept the most direct inculpatory evidence from the jury, as Judge Gershon predicted. For example, the evidence at trial demonstrated that defendant's policies required customers to provide photo identification when opening an account or receiving cash over the counter and that defendant would retain a photocopy of that identification. Thus, the withheld records would likely have removed any need to speculate about whether "Ahmad Ismail Yasine" was, in fact, Sheikh Yassin—one or more people at the Bank were looking right at this person, and made a copy of his photograph identification. The same would be true of the account records for other alleged Hamas leaders who received transfers from Yousef El–Hayek. In all such cases, the withheld records would have shown the volume, amount, timing, and sender and

recipient information for transfers that were not routed through New York.

Moreover, as Judge Gershon noted, there were significant shortcomings in defendant's production of records related to Saudi Committee payments. *See Linde,* 269 F.R.D. at 198. For instance, documents that defendant withheld as the "private account information" of Saudi Committee beneficiaries may have included photo identification of individuals who plaintiffs contend were terrorists. Nothing could be more probative as to the presence, or absence, of defendant's knowledge as to with whom it was dealing. The Sanctions Order was an effort to "level the playing field" by replacing the withheld evidence with jury instructions and trial rules intended to put plaintiffs in a position comparable to that which they would have occupied had defendant complied with the Court's orders to produce, while attempting to achieve a balance that stopped short of striking defendant's answer or instructing the jury that the element of knowledge must be deemed proven. However, in hindsight, it seems to me that the Sanctions Order fell short of accomplishing even those modest goals.

### B. *The Effect of the Permissive Inference*

In light of the evidence that was adduced at trial even without the withheld documents, both by plaintiffs and defendant, it is now apparent that the permissive inference jury instruction had far less of a detrimental effect on defendant's case than defendant contends. As a practical matter, it was effectively lost in the nearly seven weeks of trial proceedings. It took only a moment to mention in plaintiffs' lengthy case and was buried in the lengthy final charge, although plaintiffs of course referred to it in their closing.

In any event, the verdict was based on volumes of damning circumstantial evi-

dence that defendant knew its customers were terrorists.

Consider, for example, the compelling circumstantial evidence that plaintiffs were able to adduce—despite the withheld documents—relating to an Arab Bank account held by Sheikh Ahmed Ismail Hasan Yassin, a founding member and senior leader of Hamas. He was first designated as a SDT by the United States in 1995, and was described as the "[f]ounder and chief ideological figure of HAMAS." He was designated as a SDGT in 2003. In issuing that designation, the United States government described Yassin as "the head of HAMAS in Gaza" and stated that "he maintain[ed] a direct line of communication with other HAMAS leaders on coordination of HAMAS's military activities." He was killed by Israel in 2004. The evidence showed that the wheelchair-bound Yassin, a man with a highly distinctive appearance, was well-known as a Hamas leader both internationally, and particularly in the Palestinian Territories, during the relevant time period; indeed, he could fairly be described as the face of Hamas. Sheikh Yassin was also, according to substantial circumstantial evidence, an Arab Bank customer.

That circumstantial evidence begins with the wire transfer from Yousef El–Hayek in Lebanon for $60,000—which, because it was routed through defendant's New York branch, was produced—to a beneficiary named "Ahmad Ismail Yasine." The transfer went to an account numbered 36444 in Arab Bank's branch in Gaza. As discussed in more detail above, El–Hayek also initiated and received wire transfers, routed through New York, to and from other accounts at Arab Bank held in names of (or similar to) Hamas leaders.

This evidence of transactions that seem to have involved known Hamas leaders certainly is relevant to defendant's culpa-

bility for those transfers themselves. But its cumulative effect is even greater, in light of the possibility that any given transfer was not to a designated individual, but to someone with a similar name. In other words, for example, transfers from El–Hayek to accounts likely held by Hamas leaders are significant circumstantial evidence that the recipient of the transfer from El–Hayek to "Ahmad Ismail Yasine" was made to *the* Sheikh Yassin.

As if that were not enough evidence that Yassin was defendant's customer, plaintiffs showed the jury an interview on a Bahrain web forum with Abd al-Azis al-Rantisi, another founding member of Hamas who was also killed by Israel in 2004, who expressly called for donations to an Arab Bank account matching that of Sheik Yassin. This is compelling evidence that Sheikh Yassin was among the 10 or more accounts of designated terrorists for which defendant refused to produce documents.

In addition to the circumstantial evidence discussed above, defendant's decision to argue that its obligations began and ended by screening transactions against the OFAC list was completely undermined by the testimony of its own former employee. Defendant's counsel emphasized this theory of the case both in his opening and in his closing. Defendant argued, for example, that

> [t]here is no international banking standard that requires banks to do more than clear the transactions through the OFAC list in the United States of America. There is no need to check the Internet or do independent research by banks in order to figure this out. They use the OFAC list. That's the unrebutted testimony of the only banking expert that we had in this case.

This theory, the central tenet of the Bank's defense, was myopic. It allowed the possibility that a well-known Hamas figure could enter the Bank, be recognized as such by every employee there, and yet, if his name did not yet show up on an OFAC list, the Bank not only could, but would be required to treat him like any other non-terrorist customer. This theory not only tolerated willful blindness—it mandated it.

It is therefore no wonder that in making its "OFAC list-only" argument to the jury, defense counsel made no mention at all of the testimony at trial of its own employees, who utterly rejected it—like that their head of U.K. compliance, Mr. Blackmore, who said that if the words "martyrdom operation" showed up as a payment designation, he "would never in a million years have dealt with a payment order such as" that, or that of their compliance director, Mr. Dabbour, who testified that: "[I]f upon discovering an unusual transaction by—by one of our customers as part of the investigation in the account of our customer, we might look to see if there is any information available in the public domain. And that would be part of the investigative process."

It may be that defense counsel did not address this testimony in his lengthy closing argument because there was no way to explain it within his OFAC list-only argument. But it left an enormous gap in defendant's central theory, and plaintiffs thoroughly exploited it. This failing in defendant's case had nothing to do with the brief instruction to the jury under the Sanctions Order and, in my view, it cast a much bigger shadow over defendant's case than did the instruction.

Finally, any prejudice to defendant from the permissive inference instruction in the Sanctions Order was also greatly overshadowed by the testimony of defendant's expert, Dr. Milton–Edwards, which backfired in spectacular fashion. I have to assume that the jury was as surprised as I was when, after testifying on direct exami-

nation that she had visited almost all of the Palestinian charities for a prolonged period and had never seen any pro-Hamas literature, and therefore had concluded that they were not in league with Hamas, it came out on cross-examination that she could not read Arabic. She apparently based her opinion on her lack of encountering any pro-Hamas literature written in the Queen's English.

And the way it came out on cross-examination made it seem like she, and defendant as the party who had proffered her, had attempted to conceal the lack of basis for her opinion on direct testimony by not drawing the teeth on this point—such as when plaintiffs showed her a photograph bearing the words "Islamic Resistance Movement, Hamas" (taken from her own promotional video). By that point in the trial, I had seen the word "Hamas" in Arabic so many times that I immediately recognized it, and I suspect some of the jury may have as well. Yet the expert had to be prompted before she recognized it, and it only then came out that she could not read Arabic.

This was the most dramatic, but not the only, incident of friendly fire directed at the Bank by Dr. Milton–Edwards. As noted above, her testimony that the charities at issue were not Hamas affiliates was directly contradicted by what she had written in her book about Hamas. Her response to being confronted with that was flippant. She was similarly flippant when her knowledge of Hamas was tested by asking her to identify a picture of Salah Shehadah, the founder of the al-Qassam Brigades. She said she was unable to identify him because of the "whole big beard phenomenon," suggesting that all terrorists look alike to her.

When a party calls an expert witness, it essentially vouches for her expertise. The jury knows that these witnesses are prepared by the lawyers and it evaluates a party's case in conjunction with evaluating the expert's testimony. A reasonable disagreement with a point that an expert expresses does not necessarily doom the proponent's case. But when an expert is profoundly careless, there is a risk that the jury will attribute that carelessness to the proponent, not just the expert.

In short, given the abundance of circumstantial evidence in plaintiffs' case showing that defendant either had or deliberately ignored evidence that it was dealing with Hamas operatives, coupled with the miscues in defendant's theory and evidence, I do not believe that the modest permissive inference instruction played a very large, if any role, in the jury's verdict.

### C. *The Effect of the Preclusion Order*

With respect to the preclusion aspect of the Sanctions Order, it was applied in a way that allowed defendant to present ample evidence supporting its "OFAC-only" and "routine banking practice" defenses. In an effort to avoid transforming it into that which Judge Gershon expressly did not intend—a dispositive sanction—the net effect was that defendant was, in fact, allowed to introduce extensive evidence and argument that it did not know that its customers were terrorists. Indeed, aside from an effort to raise doubts about the responsibility of Hamas for the 24 attacks (which comprised about one-third of the trial), virtually all of defendant's evidence (and its cross-examinations of plaintiffs' witnesses) was aimed at demonstrating its lack of knowledge that its customers were terrorists. As one commentator noted, "the jury heard evidence from both sides on Arab Bank's knowledge or ignorance of its customers and their financial transactions." David L. Hall and Claire Coleman, OUTSIDE COUNSEL, *Banking and Bombs: What the 'Linde' Verdict Portends*, NEW YORK LAW JOURNAL (October 15, 2014).

In opening, closing, and at every possible opportunity, defendant hammered the point that only a few of the many individuals identified by plaintiffs as Hamas leaders or operatives were designated as terrorists by the United States, the European Union, or United Nations. The Court permitted defendant to do so over plaintiffs' objections, reasoning that whether a given individual was designated or not was not something that would find "proof or refutation" in banking records. Further, this evidence was relevant to whether these individuals actually were Hamas leaders—albeit evidence of dubious weight in the case of people like Salah Shehadah, whose link to Hamas was well-established. But its primary purpose was plainly to convince the jury that defendant could not possibly have known that a given individual was a terrorist in the absence of designation.

It also proved difficult, in practice, to preclude much of defendant's evidence relating to its compliance programs. The reason for this difficulty was that this evidence straddled the line drawn by the Sanctions Order. For example, although

defendant was permitted to argue that it did not know that Osama Hamdan was a terrorist, defendant's compliance evidence did not concern only his account. Instead, because defendant had adopted policies that applied broadly across its global operations, and had specific policies at branches in each country in which it operated, the Court allowed defendant to describe its programs generally, subject to a limiting instruction that the jury could only consider those programs with regard to the Osama Hamdan account. In contrast, when it became clear that defendant intended to discuss its programs in the Palestinian Territories specifically—branches for which no account records were produced—the Court precluded such testimony.[14]

These examples are only the beginning of the evidence that defendant was allowed to adduce regarding its knowledge of whether its customers were terrorists: defendant argued that Hamas operatives worked in secret;[15] that the Saudi Committee was purely a humanitarian effort to aid needy Palestinians;[16] that the names of Hamas leaders on certain wire transfers that defendant processed were spelled dif-

---

14. This limited preclusion makes sense in light of the circumstantial evidence relating to Sheikh Yassin's alleged account, discussed above. Testimony and evidence that defendant's policies and procedures in the Palestinian Territories were in line with industry standards could have been rebutted by plaintiffs if those programs failed to detect documented donations to Sheikh Yassin. Further, defendant's non-production left plaintiffs with no way of testing on cross-examination how defendant's on-paper policies were applied in practice. Because no emails or internal reports were produced, whether any of defendant's employees raised suspicions about any accounts will never be known. Testimony concerning the strength of defendant's compliance programs in the Palestinian Territories would thus have invited the jury to take defendant at its word—an unfair proposition, when on cross-examination those witnesses would have refused to answer even the ques-

tion "Did Sheikh Yassin have an account at Arab Bank?"

15. *Cf. Linde,* 269 F.R.D. at 204 ("[D]efendant should be barred from asserting, through evidence and/or argument, that it did not have a culpable state of mind because certain people or organizations were not ''generally known'' to be terrorists. General knowledge is irrelevant; what matters is whether *the Bank* knew that a customer or beneficiary was a terrorist.") (emphasis in original).

16. *Cf. id.* at 202 ("Defendant maintains that 'there is no basis to infer that [the withheld] records would establish' that the Bank knew the Saudi Committee sponsored terrorism and that the Bank supported the Saudi Committee's efforts. But the content of the Saudi Committee records that have been produced suggests otherwise.").

ferently than the way those names appeared on the OFAC list; that USAID and other organizations worked with many of the same charities that plaintiffs alleged were Hamas fronts; and that the English government investigated Interpal, designated by the United States as a Hamas fundraiser, and reached a contrary conclusion.

Indeed, the Court permitted several of defendant's employees to describe in some detail how they or their families had narrowly escaped physical injury or death or had in fact suffered financial loss as a result of the Hamas attacks at issue in this case. In one instance, the Court received testimony that a Bank officer's children attended a school very near to one of the attacks at issue in the case—the obvious purpose being to ask the jury to draw the inference that Bank officers would not knowingly support an organization that threatened their own families. The same was true of the testimony of the Bank's chairman that the Bank's operations were negatively affected by the Second Intifada—the clear purpose of this testimony was to encourage the jury to infer that the Bank would not knowingly support terrorism. All of this evidence was offered to show circumstantially that defendant did not know its customers were terrorists. This evidence was all received, and emphasized in summation, despite the Sanctions Order.

What had a greater impact on the case than the Sanctions order was the scenario that defendant itself created—the very absence of key records that gave rise to the Sanctions Order in the first place. This enabled plaintiffs' attorneys to ask most of defendant's witnesses if they had produced records, and required the witnesses to say "no." It enabled plaintiffs to have their own witnesses, principally their expert Mr. Spitzen, emphasize the point that they could not complete their analyses because

defendant had failed to produce requested records. And it enabled plaintiffs' counsel, during closing argument, to stress the fact that the issues at trial could, in all likelihood, have been answered if defendant had merely produced the account records—and to ask the jury to draw the obvious inference from that. The persuasiveness of that argument would not have been lessened by the absence of either the permissive adverse inference instruction or the preclusion order, and thus was not significantly enhanced by their presence.

In the same vein, it is worth noting that throughout defendant's moving papers, it deems plaintiffs' proof deficient due to gaps in the evidentiary record that it created. To give just one example, defendant stresses in its lengthy appendix that Abbas Al–Sayyed, the mastermind of the Park Hotel bombing, received only two transfers totaling $54,000 to his Tulkarem Arab Bank account a year before that attack was carried out. Maybe he did, and maybe he didn't—defendant never produced Al–Sayyed's account records, and thus to argue that the handful of transfers that happened to be routed through New York is the entire universe of funds defendant transferred to Al–Sayyed might have been regarded by the jury as disingenuous at best.

I also cannot accept defendant's contention that it would have been "futile" to proffer the in-court testimony of Mohammed Al–Tahan, Tayseer Sadeq, or Assad Saleh because of the Sanctions Order. The inculpatory deposition testimony from these Bank officers that plaintiffs showed to the jury concerned records that had been produced, and I have no reason to think that I would have excluded their live testimony to explain those statements. We can only speculate, of course, what would have happened, because defendant

did not call them, despite having promised the jury that it would.

Finally, although I agree with Judge Gershon's exclusion of foreign law from this case, I do not believe that permitting defendant to argue its overruled bank secrecy objections to the jury would have appreciably changed matters either. Under Federal Rule of Evidence 403, I determined not to permit the jury to be presented with a mini-trial on whether foreign bank secrecy law trumped defendant's obligations under the Federal Rules of Civil Procedure. That was a question of law for the Court. Judge Gershon ruled on it, correctly in my view. It was then defendant's choice to disregard her ruling. I was not going to have a mini-trial on the proper balancing of United States law against alleged foreign law.

In sum, the Sanctions Order did not play out to be a critical factor in the case. The strength of the plaintiffs' evidence of defendant's knowledge, the illogic of defendant's OFAC-only theory, the miscues within defendant's own case, and the gaping hole which defendant admittedly created by refusing to produce the key documents and testimony substantially overshadowed the Sanctions Order.

### D. *The Solicitor General's Certiorari Brief*

[8] Defendant sought mandamus review of the Sanctions Order in the Second Circuit; when mandamus was denied, defendant petitioned the Supreme Court for certiorari. While defendant's petition was pending, the Supreme Court invited the Solicitor General to file a brief offering the views of the United States. *See Arab Bank, PLC v. Linde,* —— U.S. ——, 134 S.Ct. 500, 187 L.Ed.2d 315 (2013). Although I had serious reservations about delaying this 2004 case further, I stayed the trial pending disposition of the petition for a writ, since the request to Solicitor General indicated an increased likelihood

that the Supreme Court might grant certiorari.

The Solicitor General filed his brief, and argued that Judge Gershon's comity analysis was erroneous in some respects, but that the Supreme Court should nevertheless deny certiorari. After the Court denied certiorari, at the pretrial conference, I declined to reconsider the Sanctions Order in light of the Solicitor General's brief.

Defendant now argues that this was error because the Solicitor General's views "pertained to issues of national interest and foreign policy that fall squarely within the province of the Executive Branch." Defendant argues that "when the United States Government submits statements of interest to federal courts, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy," citing *Whiteman v. Dorotheum GmbH & Co. KG,* 431 F.3d 57, 69 (2d Cir.2005) (alterations and quotations omitted).

As an initial matter, *Whiteman* is inapposite because it concerned a Statement of Interest invoking foreign policy to urge dismissal of the plaintiffs' claims. *See id.* Judge Gershon long ago rejected defendant's invocation of the political question doctrine, and defendant has not requested reconsideration of that decision. *See Lev v. Arab Bank, PLC,* No. 08–cv–3251, 2010 WL 623636, at *4 (E.D.N.Y. Jan. 29, 2010) (holding that defendant offered "no sound support" for its argument that the complaint should be dismissed under the political question doctrine). And, as was true at the time the Sanctions Order was entered, after a decade of litigation the United States government has never submitted a Statement of Interest suggesting that this case be dismissed. *See id.; see also Almog v. Arab Bank, PLC,* 471 F.Supp.2d 257, 285 (E.D.N.Y.2007). The Solicitor General did not argue otherwise.

Whatever weight the Solicitor General's views in this context are due, they are not dispositive. *See Presbyterian Church of Sudan v. Talisman*, No. 01–cv–9882, 2005 WL 2082846, at *3 (S.D.N.Y. Aug. 30, 2005). And although the views of the Solicitor General were certainly entitled to appropriate weight, they do not persuade me to reconsider Judge Gershon's carefully-reasoned Sanctions Order.

At the outset, I have to note the very peculiar structure of the Solicitor General's submission to the Supreme Court. It spends almost 13 pages arguing that the Sanctions Order was erroneous—and then urges the Supreme Court *not* to grant certiorari. It may be questioned why the Solicitor General would expend such an effort in persuading the Supreme Court that an error has been committed and then urge the Court not to correct the error. What is the point of asserting error that one does not wish to see corrected? The answer may lie in the suggestion in at least one newspaper article that the Departments of State and Justice had opposing positions on this issue, and the Solicitor General's submission reflects a political compromise of those positions. *See* Charlie Savage, *Terror Suit Tests Diplomacy and Bank Secrecy Laws*, N.Y. TIMES, at A3 (April 2, 2014) (describing the Solicitor General's need to balance the interests of different executive agencies, in other words the "unusual trade-offs between . . . diplomatic efforts to achieve Middle East peace, the rights of American victims of terrorism, and an American campaign to tear down Swiss banking secrecy laws that have long aided tax evasion").

**[9]** Any such disagreement is of no moment to this Court. It is axiomatic that dictum from a higher court is not controlling precedent; even less is dictum from one or more government agencies. It is enough for me to reject that one portion of the Solicitor General's argument that

urges error because the argument is flawed.

The brief, and defendant's position, disregard a critical aspect of other interests purportedly overlooked by Judge Gershon—including undermining the United States' close relationship with Jordan, and threats to stability in the Middle East— issues that would appear to be implicated not just by the Sanctions Order, but by *any* verdict against defendant. But again, the United States has not sought dismissal of this case. *Cf. Rosenberg v. Pasha*, 577 Fed.Appx. 22 (2d Cir.2014) (summary order) (affirming dismissal of certain defendants in ATA case where Department of State provided Statement of Interest asserting that those defendants were protected by sovereign immunity).

In any event, the brief also misunderstands certain facts, *e.g.,* that Judge Gershon concluded that defendant did not act in good faith "simply because petitioner previously produced some of the documents to the Departments of the Treasury and Justice." First, there were many other reasons for that finding, namely defendant's mischaracterization of the lawsuit to foreign authorities, and the years of delay caused by defendant's recalcitrance in discovery. *See Linde*, 269 F.R.D. at 199–200.

Moreover, even as to that production, "selective disclosure" was only part of the story. Judge Gershon noted not only that defendant was not prosecuted for producing to the United States government, but also that defendant never sought permission before doing so. *See Linde*, 269 F.R.D. at 197. In other words, defendant produced records without hesitation to the United States government, but claimed it needed to seek permission before producing records to plaintiffs, which could very well indicate that defendant's purported need to seek permission was pretextual. Viewed in light of Judge Gershon's actual

reasoning, the Solicitor General (and defendant, and Jordan, and the Union of Arab Banks) grossly overstated the impact of the Sanctions Order as a disincentive to cooperate with United States anti-terrorism and anti-money laundering efforts.

In this respect, the Solicitor General's brief appears to go beyond merely explaining the foreign policy implications of the Sanctions Order, and offers its own analysis of how the various comity factors should have been weighed in light of the facts as he understood them. *Cf. Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d 712, 724 (9th Cir.2014) ("This factual discrepancy also makes us wary of giving too much credence to the Solicitor General's brief because it demonstrates that the Solicitor General goes beyond explaining federal foreign policy and appears to make factual determinations.").

I believe that Judge Gershon and Magistrate Judge Pohorelsky accurately described and balanced the core interests to be weighed in determining the appropriateness of sanctions: the interest of the United States (and of the foreign jurisdictions at issue here) in combating terrorism, against the interest of foreign states in enforcing their bank secrecy laws. *See Linde*, 269 F.R.D. at 208; *see also Linde v. Arab Bank, PLC*, 463 F.Supp.2d 310, 315 (E.D.N.Y.2006) (Magistrate Judge decision), *aff'd*, No. 04–cv–2799, 2007 WL 812918 (E.D.N.Y. Mar. 14, 2007). Although the Solicitor General's brief suggested that the balance of these interests "is materially different when a private party seeks documents located in foreign jurisdictions," courts have often reached the opposite conclusion in litigation under other statutes that similarly encourage the advancement of the United States' interests through private litigation. *See Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y.1987) ("[A]lthough the interest of the United States in

criminal and civil enforcement suits is normally stronger than its interest in private disputes, the formal posture of these cases is less significant in that the plaintiffs here are asserting private rights of action under the antitrust, commodities, and racketeering statutes" that Congress intended to be enforced by private attorneys general); *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 54 (E.D.N.Y.2010) ("[T]his is a case involving violations of antitrust laws whose enforcement is essential to the [United States'] interests in a competitive economy.... [E]nforcement through private civil actions such as this one is a critical tool for encouraging compliance with the country's antitrust laws.").

Particularly in light of the extensive delays throughout discovery, I did and do not believe that the Solicitor General's brief provided good reason to revisit, just before this decade-old case finally went to trial, the previous holdings that the foreign states' asserted interests in their bank secrecy laws "must yield to the interests of combating terrorism and compensating its victims." *Linde*, 463 F.Supp.2d at 315.

Moreover, in my view, any interest in enforcing foreign bank secrecy laws only withstands scrutiny when described in the abstract, as in the Solicitor General's statement that the laws at issue "reflect legitimate sovereign interests in protecting foreign citizens' privacy and confidence in the nations' financial institutions." This sounds like an important interest until one considers exactly whose privacy defendant is seeking to protect. Specifically, plaintiffs are correct that the Solicitor General misunderstood the nature of the account information being withheld. These were not accounts that were "allegedly maintained ... for certain terrorist organizations," they were accounts that defendant

had *admitted* were held in the name of designated terrorists.

For example, Abbas Al–Sayyed was convicted and sentenced to thirty-five life terms for his role in orchestrating Hamas terrorist attacks, including the Park Hotel bombing on March 27, 2002. According to Israeli court documents, Al–Sayyed strapped a bomb to a young man, Abdal–Baset Odeh, who subsequently detonated it amidst a group of elderly Holocaust survivors enjoying Passover Seder at the Park Hotel. American citizens were among the thirty people killed and 160 injured. There is no need to rely on circumstantial evidence to determine whether Al–Sayyed had an Arab Bank account or used money sent to it to further Hamas' "military activities," because he admitted it himself.

Vindicating the right of a convicted mass-murderer like Al–Sayyed to the privacy of his financial records over the right of his victims to compensation is not in the interest of any nation. As defendant continually emphasizes, Jordan is staunchly opposed to terrorism and a strong ally in the United States' counter-terrorism efforts. It thus seems unlikely that the Jordanian authorities would criminally prosecute defendant for disclosing the bank records of imprisoned terrorists like Al–Sayyed or those who were killed long ago, like Sheikh Yassin or Salah Shehadah. Yet defendant's position is that even answering a question at a deposition as to whether these individuals ever had bank accounts would result in criminal prosecution.

Even at this late date, defendant has not pointed the Court to any cases where banks have faced criminal prosecution for violating the foreign bank secrecy laws at issue. In the absence of such evidence, and given the close relationship between defendant and the governments of Jordan and Palestine—the Kingdom of Jordan is a 16% shareholder, numerous Bank executives have served in government roles, and the current head of the Palestinian Monetary Authority, Shukry Bishara, is a former Bank employee—Judge Gershon had an adequate basis to conclude that defendant did not face a real risk of prosecution should it produce the documents at issue. *Cf. Wultz v. Bank of China Ltd.,* 942 F.Supp.2d 452, 468 (S.D.N.Y.2013) (Bank of China made inadequate showing of hardship where it "produced no evidence of a bank or its employees being meaningfully punished for disclosing confidential information to a U.S. court in contravention of Chinese law" and stating that "it cannot be ignored that the PRC has a majority interest in BOC, and thus has a special interest in protecting BOC from discovery and the risk of liability"); *Tiffany (NJ) LLC v. Forbse,* No. 11–cv–4976, 2012 WL 1918866, at \*9 (S.D.N.Y. May 23, 2012) ("Although we are reluctant to conclude with any certainty how a foreign nation will choose to implement its own laws, we cannot ignore the reality that the Chinese government holds large ownership interests in the Banks and that the Banks have not been sanctioned for complying with discovery orders issued by a U.S. court under similar circumstances."); *Milliken & Co. v. Bank of China,* 758 F.Supp.2d 238, 250 (S.D.N.Y.2010).

The Solicitor General was at best equivocal in asserting otherwise. The brief did not say outright that defendant would have been prosecuted for complying in discovery. Instead, it argued that a foreign state considering whether to prosecute "may view the matter differently based on whether the party requesting the information is a government entity or a private one." As the Second Circuit pointed out, while this does not necessarily mean that a foreign government would not prosecute, "the converse is also not necessarily true: The foreign states would not necessarily

prosecute the Bank or any of its employees for the disclosure of sensitive banking information to private civil litigants in the context of the current proceedings." *Linde v. Arab Bank, PLC,* 706 F.3d 92, 114 (2d Cir.2013).

Most tellingly, *amicus* the Hashemite Kingdom of Jordan does not challenge this aspect of Judge Gershon's ruling. Jordan argues for certification of the broader issue to the Court of Appeals, but carefully avoids any assertion that in fact, defendant (to whom its "economic wellbeing is tightly linked") was likely to have been prosecuted for violations of the secrecy laws in question. If anyone were in a position to rebut Judge Gershon's determination, it would be *amicus,* and it has declined to do so. While I give weight to Jordan's interest in its sovereign prerogative to regulate its financial services industry, I cannot find that the balancing of interests that underlie the Sanctions Order warrant reconsideration.

## II. "Act of International Terrorism"

**[10]** Defendant assigns error to a number of legal principles on which the jury charges in this case were based; it makes sense to first address the threshold question of whether the provision of financial services can constitute an "act of international terrorism" under the ATA. Defendant requested that the jury be charged on each constituent element of an "act of international terrorism" under 18 U.S.C. § 2331. Specifically, defendant requested that the jury be charged that the Bank's actions must (1) "involve violent acts or acts dangerous to human life"; (2) "qualify as 'a violation of the criminal laws of the United States or of any State' if it were committed within a United States jurisdic-

tion"; (3) "'appear to be intended' to intimidate a civilian population, influence government policy, or affect the conduct of government by certain specified means"; and (4) "occur primarily outside the United States or transcend national boundaries." *See Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 68 (2d Cir.2012).[17]

I agree with those courts that have held that a violation of 18 U.S.C. § 2339B is itself an act of international terrorism. *See Goldberg v. UBS AG,* 690 F.Supp.2d 92, 112–15 (E.D.N.Y.2010) (collecting cases); *Strauss v. Credit Lyonnais, S.A.,* No. 06–cv–0702, 2006 WL 2862704, at *1 (E.D.N.Y. Oct. 5, 2006) ("Violations of 18 U.S.C. § 2339B and § 2339C are recognized as international terrorism under 18 U.S.C. § 2333(a)."). Defendant misstates *Weiss v. National Westminster Bank PLC,* 768 F.3d 202, 207 n. 6 (2d Cir.2014), in stating that the Second Circuit "expressly held that a violation of Section 2339B is not, by itself, 'an act of international terrorism.'" On the contrary, the Circuit expressly did not reach the issue.

Completing a wire transfer generally cannot be described as "violent" or "dangerous to human life" in the colloquial sense. But other courts have concluded, and I agree, that providing material support to a terrorist organization is an act "dangerous to human life." *See, e.g., Boim v. Holy Land Found. for Relief & Dev.,* 549 F.3d 685, 690 (7th Cir.2008) ("*Boim III*") ("Giving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life.'"). The same is true for the requirement that the act "appear to be intended" to intimidate. *See id.* at 694 (because donations to Hamas increase Hamas' ability

---

**17.** Shortly before trial, defendant stipulated that the attacks in which plaintiffs were injured were "acts of international terrorism" within the meaning of the ATA. Previously,

defendant maintained for over a decade of litigation that plaintiffs could not prove that suicide bombings fit the definition of "acts of international terrorism."

to launch terrorist attacks, "such donations would 'appear to be intended . . . to intimidate or coerce a civilian population' or to 'affect the conduct of a government by . . . assassination.' "). Defendant's suggestion that knowingly providing financial services should be treated differently than knowingly donating money is unpersuasive; such financial services increase Hamas' ability to carry out attacks in the same way, and Congress made no distinction between these different forms of material support in criminalizing them. *See* 18 U.S.C. §§ 2339A(b)(1), 2339B(a)(1), 2339B(g)(4).

The civil liability provisions of the ATA are derived from a complicated series of incorporations by reference. But for a claim brought under 18 U.S.C. § 2333(a) and 18 U.S.C. § 2339B(a)(1), those incorporations by reference distill to relatively simple questions: Did the defendant know that it was providing material support to Hamas, and did the defendant know that Hamas was a foreign terrorist organization (or "engaged in terrorist activity" or "terrorism")? If those are the only questions that need be answered to determine whether a defendant committed an "act of international terrorism" with the requisite mental state—and they are—then they are the only questions a jury should be asked.

### III. Causation

[11] In denying defendant's motion for summary judgment from the bench on April 24, 2013, Judge Gershon held that ATA plaintiffs are not required to show "but for" causation under either *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir.2013), or *In re Terrorist Attacks on September 11, 2001 (Al Rajhi Bank, et al.)*, 714 F.3d 118 (2d Cir.2013). She also rejected defendant's argument that plaintiffs were required to trace specific dollars to specific terrorist attacks. On June 18, 2013, Judge Gershon denied defendant's motion for reconsideration.

Over a year later, defendant's proposed jury instructions requested that the Court charge the jury with the causation standard that Judge Gershon twice rejected. Defendant again argued that Judge Gershon's previous ruling was erroneous, and added that the Supreme Court's subsequent decisions in *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, —— U.S. ——, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013), and *Burrage v. United States*, —— U.S. ——, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014), required plaintiffs to prove "but for" causation in order to recover under the ATA.

Proposed jury instructions, of course, are not the proper procedural vehicle for a motion for reconsideration. Defendant did not provide any reason why, if it viewed these decisions as an "intervening change of controlling law" justifying reconsideration, *see Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992), it failed to make any motion on this basis for over a year. The reason is apparent: *Nassar* and *Burrage* did not change the controlling law applicable here because in those cases, the Supreme Court was interpreting different statutes that involved different contexts and even used different language to establish their respective causation elements.

[12] For the reasons discussed below, I hold that Judge Gershon's original ruling was correct. As the only cases to directly address the issue have held, requiring "but for" causation would effectively annul the civil liability provisions of the ATA. That cannot have been the intent of Congress in enacting them. Requiring but-for causation would render it practically impossible for an ATA plaintiff to recover from a defendant that has knowingly provided material support to a terrorist group over an extended period of time, as the jury found happened here. I further hold that

the jury instructions given in this case conformed to that ruling and to the legal principles behind it, and that plaintiffs adduced sufficient evidence on this issue that it was not unreasonable for the jury to find causation.

### A. Governing Law

The ATA is different than other statutes that reference causation. The tort it condemns is one of secondary action, not primary action. It assumes the existence of a tort by a third party, and then renders the defendant liable for providing support to that third party, not for supporting any particular conduct by that third party. That groups like Hamas are likely to continue to carry out terrorist attacks with or without specific sources of aid is inherent in their definition as foreign terrorist organizations. That is why, in passing 18 U.S.C. § 2339B, Congress "prohibited the provision of 'material support or resources' to certain foreign organizations that engage in terrorist activity. That prohibition is based on a finding that the specified organizations 'are so tainted by their criminal conduct that *any* contribution to such an organization facilitates that conduct.' " *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (emphasis added).

[13] Thus, although there is no aiding and abetting liability under the ATA, *see Rothstein*, 708 F.3d at 97, "[p]rimary liability in the form of material support to terrorism has the character of secondary liability. Through a chain of incorporations by reference, Congress has expressly imposed liability on a class of aiders and abettors." *Boim III*, 549 F.3d at 691–92.

But-for causation in that context is not simply absent from the facts of this case, it is nearly impossible to prove, because money is fungible. Even if an ATA plaintiff could show that a particular dollar was used in furtherance of a particular attack—a requirement rejected by this Court—that plaintiff still could never prove that absent the defendant's providing that dollar, a group like Hamas would not have made up the shortfall from elsewhere. *See Gill v. Arab Bank, PLC*, 893 F.Supp.2d 474, 507 (E.D.N.Y.2012) (" 'But for' cause cannot be required in the section 2333(a) context. In most instances, if a particular contribution was not made, money from other sources could be redistributed to make up for the shortfall, and an attack could take place without a substantial donation.").

As an initial matter, I agree with Judge Gershon's interpretation of *Rothstein* and *Al Rajhi*. To be perfectly clear, contrary to defendant's repeated assertions, neither case holds that but-for cause is a requirement of the ATA. To understand why, it is important to understand that proximate and but-for causation are analytically distinct concepts, and neither one is simply a less demanding subset of the other. But-for causation is a factual inquiry, which requires a fact-finder to assess the likelihood of a counterfactual: Would X still have happened if Y had not. Proximate cause is a legal inquiry—focusing largely on foreseeability—that asks whether X and Y are sufficiently connected to justify holding one accountable for the other as a matter of legal policy.

Defendant's assertion that those cases "expressly hold[ ] that the 'by reason of' language incorporated into the ATA requires a showing of both 'but for' and [ ]proximate causation" would be wholly unsupportable, were it not for the Second Circuit's passing reliance, without elaboration, on cases in which but-for cause was present, but not at issue. For example, examining the history of anti-trust legislation incorporating the same "by reason of" requirement that is found in the ATA, the Court noted the Supreme Court's holding

"that a plaintiff's right to sue under § 4 [of the Clayton Act] required a showing that the defendant's violation *not only* was a 'but for' cause of his injury, but was the proximate cause as well." *Rothstein*, 708 F.3d at 95 (citing *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)) (emphasis added).

Despite such language, there is no valid argument that *Rothstein* or *Al Rajhi* preclude relief here because they are factually analogous, *i.e.,* that they stand for the proposition that *proximate* cause was not shown here. The *Rothstein* Court held that "[w]e cannot agree that the Complaint sufficiently alleges proximate cause," and went on to note that there was no allegation that the defendant "was a participant in the terrorist attacks," that it "provided money to Hizbollah or Hamas," that the currency it transferred to Iran "was given to Hizbollah or Hamas," and that if it had not transferred currency to Iran, then that country, "with its billions of dollars in reserve, would not have funded the attacks. . . ." 708 F.3d at 97. While this list of absent proof cannot be taken as a holding that any of those things alone would have been sufficient, the nature of the proof listed is a strong indication that the Court did not intend to establish a but-for cause requirement simply by citing *Holmes.* The better view is that if the Second Circuit had intended to set forth a but-for cause requirement, it could have done so expressly, and I decline defendant's renewed invitation to read such a holding into that case or into *Al Rajhi,* which followed it.

More importantly, neither *Nassar* nor *Burrage* require a conclusion to the contrary, most significantly because both cases were interpreting statutes that differed significantly from the ATA. I therefore consider these cases in light of the background principle, stated in *Burrage,* that "*[w]here there is no textual or contextual indication to the contrary,* courts regularly read phrases like 'results from' to require but-for causality." 134 S.Ct. at 888 (emphasis added). The *Burrage* court also acknowledged, even though it declined to adopt, a "less demanding (but also less well established) line of authority, under which an act or omission is considered a cause-in-fact if it was a 'substantial' or 'contributing' factor in producing a given result." *Id.* at 890; *see also Paroline v. United States,* —— U.S. ——, 134 S.Ct. 1710, 1724, 188 L.Ed.2d 714 (2014) ("[T]ort law teaches that alternative and less demanding causal standards [than but-for cause] are necessary in certain circumstances to vindicate the law's purposes.").[18] The question, therefore, is not whether but-for causation is required by every statute using "by reason of" language, but whether the ATA is one of those statutes. I hold that it is not.

*Nassar* addressed the issue of causation in the context of a Title VII retaliation case. *See Nassar,* 133 S.Ct. at 2529–31. In that context, the causation inquiry is entirely different. The Court in *Nassar* was evaluating the extent to which impermissible motives led to otherwise permissible conduct. Although the majority established a requirement for but-for causation

**18.** Defendant cites *Paroline* for the proposition that if but-for cause is not required in this case, damages should be apportioned to that amount of plaintiffs' losses that can be ascribed to defendant. Although this argument is premature, because we have yet to try damages in this case, I note that *Paroline* so held in the context of criminal restitution, where there is a "bedrock principle that restitution should reflect the consequences of the defendant's own conduct," *id.* at 1725, a principle that is not unbending in the law of torts, where joint and several liability is commonplace. Moreover, neither the facts nor the jury instruction given in this case suggests that there was a finding of liability based on "very minor" contributions to plaintiffs' losses, as was the case in *Paroline.*

within the intent inquiry against a "background" of tort law and its "default rules," *id.* at 2525, its conclusions about the proper standard in that setting have little bearing on the application of the same background principles to this case, which concerns the causal link between conduct and injury. Moreover, I agree with the *Nassar* dissent's view that the Court oversimplified what "textbook tort law" requires, by disregarding alternatives to but-for causation. *See id.* at 2546.

*Burrage* is, admittedly, more closely analogous, as it concerned the causality requirement of a sentencing enhancement for certain drug offenses when death or bodily injury "results from the use" of the substance that the defendant provided. 134 S.Ct. at 885. I must give some weight to the Supreme Court's determination that in enacting the statute at issue in *Burrage,* Congress "chose . . . to use language that imports but-for causality." *Id.* at 891. But I am not bound by it, because the language of the statute at issue here is not "results from," but "by reason of." Moreover, the Court noted that its determination was made "[e]specially in the interpretation of a criminal statute subject to the rule of lenity." *Id.* at 891. In light of that, and the many other "textual and contextual" considerations at play, I reject the notion that, because of *Burrage,* I must view the *different* language of § 2333 as imposing a clear textual command to "import" but-for causation.

Even more importantly, in *Burrage,* the Court's review of the proof supporting convictions in past cases revealed that "but-for causation is not nearly the insuperable barrier the Government makes it out to be." 134 S.Ct. at 891 (citing *United States v. Krieger,* 628 F.3d 857, 870–71 (7th Cir. 2010), and *United States v. Webb,* 655 F.3d 1238, 1254–55 (11th Cir.2011), as examples where the Government demonstrated "but

for" causation under the Controlled Substances Act). In other words, the Court expressly noted that finding but-for causation was not impossible, avoiding a "policy disaster." *Id.* That is simply not the case with the ATA.

The ATA presents a different context than *Nassar* or *Burrage,* the impossibility of proving "but for" causation, and strong textual and contextual reasons for declining to impose a "but for" requirement. Those textual and contextual reasons lie in Congress' intent to impede terrorism by "the imposition of liability at any point along the causal chain of terrorism." S.Rep. No. 102–342, at 22 (1992). There is no question that "the 'by reason of' language of the statute restricts the imposition of such liability to situations where plaintiffs plausibly allege that defendants [sic] actions proximately caused their injuries." *Al Rajhi,* 714 F.3d at 125 (citing *Rothstein,* 708 F.3d at 95). But to also require proof of "but for" causation would make it impossible for the victims of terrorist attacks to hold a terrorist group's "financial angels" liable, *Boim III,* 549 F.3d at 690, and thereby eviscerate the civil liability provisions of the ATA.

And although it should go without saying, nothing in *Nassar* or *Burrage* changes what the Second Circuit did or did not say in *Rothstein* or *Al Rajhi.* The *Rothstein* Court's discussion of the construction of "by reason of" causation in anti-trust and RICO statutes, 708 F.3d at 95 (citing *Holmes,* 503 U.S. 258, 112 S.Ct. 1311), simply because there was also a passing citation to *Holmes* in *Burrage,* 134 S.Ct. at 889, does not suddenly mean that *Rothstein* created a but-for cause requirement under the ATA. That is because in *Holmes,* but-for causation was not at issue; the question before the Court was whether proximate causation was *also* required in a RICO case.[19] One might even question

---

**19.** Even if the statute in *Holmes* were proper-     ly viewed as analogous to the ATA in every

whether the *Burrage* Court's characterization of *Holmes,* which it cites as "explaining that a statute permitting recovery for injuries suffered by reason of the defendant's unlawful conduct requires a showing that the defendant's violation was, among other things, a but for cause of his injury," 134 S.Ct. at 889 (internal quotation marks omitted), is a fair characterization of the proposition stated in that case, in which the Supreme Court analogized the RICO case before it to prior anti-trust cases, and recalled that "we held [in a prior case] that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a "but for" cause of his injury, but was the proximate cause as well." *Holmes,* 503 U.S. at 268, 112 S.Ct. at 1317.

[14] In short, nothing in these later cases, in my view, disturbs the reasoning that Judge Posner applied to this question in *Boim III,* upon which this Court relied in its extant ruling on this issue. The principle is that when a tortfeasor acts with the knowledge that its conduct will, in concert with that of others, result in harm that would not otherwise occur, it is appropriate to hold each tortfeasor accountable. For example, in an environmental nuisance case,

> [e]ven if the amount of pollution caused by each party would be too slight to warrant a finding that any one of them had created a nuisance [*i.e.,* caused injury,] pollution of a stream to even a slight extent becomes unreasonable [and therefore a nuisance] when similar pollution by others makes the condition of the stream approach the danger point. The single act itself becomes wrongful

because it is done in the context of what others are doing.

*Boim III,* 549 F.3d at 696–97 (quoting W. Page Keeton et al., *Prosser and Keeton on Torts* § 52, p. 354 (5th ed.1984)). As to the somewhat more problematic situation in which three fires, one of natural origin, combine to burn down a house, Judge Posner observes that traditional tort law "requires proof only that there was a substantial probability that the defendants' fires (or rather either of them) were the cause." *Id.* at 697. This is exactly the level of causation that the jury was instructed to apply here.

In short, *Boim III*'s reasoning is precisely on point with this case, and remains the only decision by a Court of Appeals to address this particular question under this particular statute. As Judge Posner made clear, a but-for causation requirement would eviscerate the civil remedy available under § 2333. I cannot conclude that Congress enacted a meaningless provision here.

In light of these considerations, although defendant strenuously urges that *Rothstein, Al Rajhi, Burrage,* and *Nassar* command a result different than the one that has been reached here, it is clear to me that none of them do. The Second Circuit's cases, as Judge Gershon has already held, are not addressing the question presented here. The Supreme Court's cases have nothing to do with the ATA, and are distinguishable on their facts. The fact remains that no court has expressly held that the ATA's civil remedy requires a showing of but-for causation. And in the only Court of Appeals decision to actually

respect, which it clearly is not, the Court's assumption that but-for causation is required in that context is not the same as a holding to that effect. *See In re Stegall,* 865 F.2d 140, 142 (7th Cir.1989) ("A point of law merely assumed in an opinion, not discussed, is not

authoritative."); *cf. Getty Petroleum Corp. v. Bartco Petroleum Corp.,* 858 F.2d 103, 113 (2d Cir.1988) ("[A] *sub silentio* holding is not binding precedent.") (internal quotation marks omitted).

decide the issue, Judge Posner set forth a detailed and compelling explanation of why it does not.

### B. Jury Charge

**[15]**  The jury charge given in this case conformed to the legal principles set forth above.  Plaintiffs requested that the jury be charged that plaintiffs must prove that defendant's alleged support "by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel and the Palestinian Territories at the time of the 24 attacks at issue in this trial," and that it was reasonably foreseeable that the alleged support would do so.  This charge was rejected as too argumentative and fact-specific.  Instead, the Court proposed what it viewed as a generic proximate cause charge.  *See Rothstein*, 708 F.3d at 95–96.

Plaintiffs rightly pointed out, however, that some of the Court's proposed language concerning the "directness" of the relation between plaintiffs' injury and defendant's acts was inappropriate in the ATA context.  No one has ever "directly" been injured by a wire transfer, and further, the language was too suggestive of a requirement to trace specific dollars to specific terrorist attacks, a requirement that had been rejected by this Court and others.  *See Gill*, 893 F.Supp.2d at 507; *see also Strauss v. Credit Lyonnais, S.A.*, 925 F.Supp.2d 414, 433–34 (E.D.N.Y.2013) ("[P]laintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard.  Such a task would be impossible and would make the ATA practically dead letter.").  The Court therefore adopted plaintiffs' proposed changes.  The causation charge the Court gave focused solely on whether defendant's acts were a substantial factor in causing plaintiffs' injuries, and whether such injuries were a foreseeable result of those acts.  The Court instructed the jury that "[a]ctivities that are too remote, too indirect, or too attenuated are insufficient" to show proximate causation.

### C. Sufficiency of the Evidence

**[16]**  Plaintiffs provided evidence that from 2000–2001, defendant processed approximately $3.2 million in transfers from Yousef El–Hayek to accounts that plaintiffs identify as belonging to Hamas leaders and their wives.  From 1999–2004, the 11 Hamas-controlled charities received approximately $32 million into their Arab Bank accounts, approximately $15 million of which was originated by the Saudi Committee.  The originating parties for much of the remaining funds were organizations that plaintiffs identified as part of the Hamas worldwide fundraising network, including Interpal, a British charity designated by OFAC in 2003; Comité de Bienfaisance et de Secours aux Palestinians ("CBSP"); Association de Secours Palestinian ("ASP"); the Al–Aqsa foundation, all designated in 2003; and the Holy Land Foundation, a United States charity designated in 2001.

Hamas carried out the terrorist attacks in which plaintiffs were injured between 2001 and 2004, the time period during which tens of millions of dollars were flowing to the Arab Bank accounts of Hamas leaders and charities.  Just as the *Strauss* court concluded in denying summary judgment in similar litigation involving the Hamas fundraiser CBSP,

> [o]n this record, a reasonable juror could conclude that the sizable amount of money sent from Defendant to Hamas front organizations was a substantial reason that Hamas was able to perpetrate the terrorist attacks at issue, and that Hamas' increased ability to carry out deadly attacks was a foreseeable consequence of sending millions of dollars to groups controlled by Hamas.

925 F.Supp.2d at 432. This reasoning applies with even greater force here: The charities' accounts at Arab Bank provided a place to which international Hamas fundraisers could send money, and unlike in *Strauss*, the evidence in this case also included funds transfers to accounts held directly by senior Hamas leaders.

Defendant does little to contest this evidence, focusing its argument on plaintiffs' failure to prove but-for causation. But defendant is even incorrect that plaintiffs have failed to trace specific funds transfers to any of the terrorist attacks at issue, although they were not required to do so. Plaintiffs identified Saudi Committee "martyr" payments to the immediate relatives of the Hamas suicide attackers who perpetrated four of the terrorist attacks at issue: (1) the June 1, 2001 Dolphinarium bombing; (2) the August 9, 2001 Sbarro Pizzeria bombing; (3) the December 1, 2001 Ben Yehuda Street bombings; and (4) the December 12, 2001 shooting attack on Bus No. 189 in Emmanuel. Defendant's emphasis on the fact that these payments were made after the attacks occurred misses the point; the jury was entitled to find that the prospect that the families of dead Hamas terrorists would be financially rewarded was a substantial factor in increasing Hamas' ability to carry out attacks such as these. *See Boim III,* 549 F.3d at 698 ("Hamas's social welfare activities reinforce its terrorist activities both directly by providing economic assistance to the families of killed, wounded, and captured Hamas fighters and making it more costly for them to defect (they would lose the material benefits that Hamas provides them), and indirectly by enhancing Hamas's popularity among the Palestinian population and providing funds for indoctrinating schoolchildren.").

Plaintiffs were similarly able to trace some of the transfers for Hamas leaders to specific attacks, despite defendant's failure to produce account documents. On December 18, 2000, Osama Hamdan sent a check for $10,000 to Yousef El–Hayek in Lebanon. From February 2001 to May 2001, El–Hayek sent $123,000 to Abbas Al–Sayyed in Palestine, routed through Arab Bank New York. Al–Sayyed planned and supervised the Park Hotel bombing that occurred less than a year later, on March 27, 2002. In his interrogation by the Israeli police, Al–Sayyed stated that he used funds sent to his Arab Bank account from abroad to buy weapons.

Defendant argues that even this evidence is insufficient, because Al–Sayyed stated only that he used the funds he received through Arab Bank to purchase rifles and pistols, and not the bomb that was detonated during the Park Hotel Passover Seder. As an initial matter, I disagree; even if plaintiffs were required to trace specific dollars to specific attacks—and again, they were not—a jury could reasonably infer that because Al–Sayyed confessed to using money sent through Arab Bank for some terrorist purposes, he also used it for others, including the Park Hotel bombing for which he was convicted.

Defendant's argument on this point does not persuade me that the evidence is insufficient, but it does reinforce my view that the causation standard that has been applied in this case is the correct one.[20] The

---

20. As discussed above, defendant's motion suffers from a failure to address the sufficiency of the evidence under the correct causation standard. Judge Gershon held over a year ago that plaintiffs had to prove neither but-for nor "direct" causation. Defendant addresses the causation standard she held applicable in

a single conclusory footnote, stating that "[p]laintiffs have also failed to prove that the Bank's financial services were a substantial factor in causing each of the 24 attacks and that their injuries were the foreseeable result of those financial services."

Al–Sayyed confession is a rare, possibly unique, piece of evidence. A terrorist, who has been convicted in a court of law both of planning a terrorist attack in which some plaintiffs were injured and of leading a Hamas terrorist cell, specifically tells the police that he used money transferred to his Arab Bank account from abroad to further Hamas "military activities." But according to defendant, this is still not enough, because the terrorist stated that he used those funds to purchase rifles rather than bombs.

This underscores why the ATA is not a statute that requires tracing dollars to bombs. Congress has found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–32, § 301(a)(7), 110 Stat. 1214, 1247 (1996). Defendant's position is precisely to the contrary: Only specific, identifiable contributions directly connected to terrorist activities facilitate an FTO's criminal conduct, and such contributions can facilitate only the specific crimes to which they are connected and no others. In order to cut terrorist groups off from their sources of financing, the ATA takes the more commonsense view that putting money in the hands of terrorist groups increases their ability to carry out attacks. *See Boim III,* 549 F.3d at 698; *Strauss,* 925 F.Supp.2d at 434.

### IV.  Attribution to Hamas

[17]  Although defendant states in passing that it believes that plaintiffs "have failed to prove Hamas' responsibility for perpetrating all 24 attacks," an assertion not remotely supported by the record, defendant moves for judgment as a matter of law only as to two: the January 29, 2004 suicide bombing on Bus No. 19, and the mortar attack on Neve Dekalim on Sep-

tember 24, 2004. As to these two attacks, defendant is correct.

The facts surrounding the Bus No. 19 attack, although somewhat complicated, are not substantially in dispute. Plaintiffs do not contest the evidence of the Al–Aqsa Martyrs Brigade's role in the attack. Rather, they rely on Mr. Shaked's testimony that Hamas and the AAMB shared responsibility for the attack, essentially because Hamas' role in preparing the suicide bomber for the initial, aborted attack made it easier for the AAMB to recruit him for the one that was actually carried out.

Hamas certainly bears some moral responsibility for the bombing of Bus No. 19. But that is not enough, in light of the uncontroverted evidence that the AAMB built and supplied the bomb, that the bomber himself wrote in his will that he was working on behalf of the AAMB, and that several AAMB operatives were convicted for planning the attack. Ultimately, attribution of the attack to Hamas is not a question of moral responsibility, but one of whether Hamas's involvement in bringing about the attack was sufficient for a reasonable jury to find by a preponderance of the evidence that Hamas committed the attack. The evidence demonstrated that the AAMB used its resources to carry out the Bus No. 19 attack, including building the actual bomb used. If Hamas did not use its resources to carry out the attack in which plaintiffs were injured, then defendant's support in augmenting those resources could not have been a substantial factor in causing that attack.

As for the mortar attack on Neve Dekalim, plaintiffs' only evidence was Hamas' claim of responsibility. That claim of responsibility did not identify the perpetrators, who were never arrested or captured. Although this does not, as discussed below, render the claim inadmissible, it does lessen its probative value. Further, unlike for

the other attacks, plaintiffs did not corroborate the claim of responsibility with other evidence, for example from either Hamas or Israeli sources. And, as plaintiffs' expert conceded on cross-examination, there were reports that another terrorist group had also claimed responsibility for this attack. In all, this evidence was at best evenly balanced.

With respect to both of these attacks, I find as a matter of law that there was insufficient evidence to support the jury's finding that plaintiffs had proven that Hamas committed these attacks by a preponderance of the evidence. Defendant's Rule 50 motion is therefore granted as to these two attacks only.

## V.  Scienter

[18]  At trial, defendant requested a jury charge that the improper intent required for an ATA claim brought pursuant to 18 U.S.C. § 2339B(a)(1) could be demonstrated by a finding that defendant "engaged in deliberate wrongdoing with malice or an evil motive or in such conscious or deliberate disregard of the interests of others and of the potential for harm to American nationals that the conduct may be called willful or wanton." Only now, in its post-trial motions, does defendant argue that plaintiffs could only satisfy the scienter element by proving that defendant acted with "an evil motive" or an "intent to harm someone." This argument is incorrect.

[19, 20]  The cases agree that 18 U.S.C. § 2333(a), because it provides for treble damages, requires proof of intentional misconduct. *See, e.g., Boim III*, 549 F.3d at 692. An organization's knowing provision of material support to a terrorist organization (or its deliberate indifference as to whether or not it provided material support to a terrorist organization) qualifies as intentional misconduct. *See id.* ("To give money to an organization that com-mits terrorist acts is not intentional misconduct unless one either knows that the organization engages in such acts or is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care."); *see also, e.g., Goldberg*, 690 F.Supp.2d at 113–14. Since a knowing violation of § 2339B(a)(1) constitutes "intentional misconduct" sufficient to send a criminal defendant to prison for decades, it is more than enough to require a civil defendant to pay money.

Therefore, the Court instructed the jury that it could find defendant acted with the requisite intent if it found, for example, that defendant "knew that it was providing material support to Hamas, and also knew that Hamas engaged in terrorist activity." The jury was also charged that it could find that defendant acted knowingly if it found that defendant "deliberately closed its eyes" to the fact that it was providing material support to Hamas. In order to make such an inference, the jury had to find that (1) "defendant was aware of a high probability of the fact in question," and (2) "defendant consciously and deliberately avoided learning of that fact." Days later, the Second Circuit described the scienter requirement in nearly identical terms. *See Weiss*, 768 F.3d at 208 ("Thus, to fulfill § 2339B(a)(1)'s scienter requirement, incorporated into § 2333(a), Plaintiffs must show that NatWest both knew that it was providing material support to Interpal and knew that Interpal engaged in terrorist activity.").

*Weiss* is fatal to defendant's arguments concerning the scienter required for an ATA claim brought pursuant to § 2339B(a)(1). *Weiss* involved neither evidence nor an allegation that the defendant had a subjective intent to "harm someone" by its provision of financial services to the

Hamas fundraiser Interpal. Even in this context, the Second Circuit expressly held that the defendant's knowledge that Interpal provided material support to a terrorist organization was sufficient. In fact, *Weiss* held that the district court erred by suggesting that the plaintiffs were required to show the defendant's knowledge that Interpal was funding Hamas' terrorist attacks, rather than the defendant's knowledge that Interpal was providing funds to Hamas. *See id.* at 206 ("Plaintiffs were obliged to show that NatWest had actual knowledge that, or exhibited deliberate indifference to whether, Interpal provided material support to a terrorist organization, irrespective of whether the support aided terrorist activities."). The nexus is even more direct in this case. Plaintiffs put forth evidence that defendant knowingly provided financial services *directly* to Hamas leaders and charities.

Defendant's argument that *Weiss* only addressed the intent requirements imposed by § 2339B, and not the issue of whether § 2333(a) imposes a separate and additional intent requirement, is expressly contradicted by the Second Circuit's opinion. *Weiss* held that "[w]hile § 2333(a) does not include a mental state requirement on its face, it incorporates the knowledge requirement from § 2339B(a)(1), which prohibits the knowing provision of *any* material support to terrorist organizations without regard to the types of activities supported." *Id.* at 207. Therefore, in this context, the scienter standards for § 2339B(a)(1) and § 2333(a) are one and the same.

Undaunted by the express holding of *Weiss,* defendant argues that plaintiffs have failed to show that it acted with an "evil motive" or an "intent to harm some-

one," which is defendant's preferred liability standard, not the correct one. Notwithstanding this fact, plaintiffs satisfied their burden of proving defendant's intent under the proper legal framework. Plaintiffs needed to prove that defendant knew that it was providing financial services to Hamas, and that defendant knew Hamas was a foreign terrorist organization (or engaged in terrorism or terrorist activity). *See Weiss,* 768 F.3d at 206.

Plaintiffs introduced ample evidence at trial demonstrating that defendant provided financial services directly to senior Hamas leaders and operatives (and other U.S.-designated terrorists), and from which a reasonable jury could infer that defendant did so knowingly. First and foremost, defendant processed several transactions into the account of Osama Hamdan, a well-known spokesman for Hamas who regularly appeared on television to claim responsibility for terrorist attacks, on which the transferor listed the beneficiary party as "Hamas." Some of these transactions were apparently initialed and approved by one of defendant's senior executives.[21]

Defendant argues that the transfers "misidentified the accountholder as Hamas," and that the Bank "confirmed that the proper accountholder was Osama Hamdan (and *not Hamas* )." Therefore, defendant seemingly draws a distinction between funds transferred to Hamas and funds transferred in Hamas' name to the account of Osama Hamdan, who is undisputedly a member of Hamas.

I find this distinction unpersuasive, to say the least. Defendant's argument implies that unless a terrorist formally opens up an account in the name of Hamas, that terrorist should be presumed to be acting

---

**21.** Although defendant maintains that these transactions were small both in number and in amount, which is true, defendant did not produce full account records for any accounts

other than Hamdan's. Therefore, it is unknown whether defendant processed other transfers for the benefit of Hamas.

in his personal capacity, rather than as a member of Hamas. Terrorist groups do not operate this way. Given that terrorist groups "do not maintain legitimate financial firewalls" between funds used for charity and funds used for violent activities, *Humanitarian Law Project*, 561 U.S. at 31, 130 S.Ct. at 2725–26, there is even less reason to believe that individual terrorists would maintain separate bank accounts for "personal activities" and "terrorist activities."

The notoriety of the Hamas terrorists for whom defendant maintained accounts also provided circumstantial evidence of defendant's knowledge. As discussed above, Sheikh Yassin, an Arab Bank customer, was the most famous founding member and leader of Hamas. Several of defendant's employees confirmed that they knew this. Yassin was designated a SDT by the United States in 1995, but remained an Arab Bank customer until 2001. Defendant offered no evidence to refute plaintiffs' contention that Yassin was a customer of the Bank, and it was defendant's policy to require photo identification of its customers.

Plaintiffs also provided evidence that Ismail Haniyeh, Yassin's chief of staff and a Hamas leader who was acknowledged as such by defendant's employee Mohammad al-Tahan, was an account holder who received payments via the Bank totaling more than $420,000. In addition, as discussed above, the Bank completed trans-

fers for 11 accountholders, each of whom the Bank admitted were United States designated terrorists at the time. Finally, defendant transferred funds to numerous designated terrorists after they were designated as such, in amounts totaling over $2.5 million.[22]

Based on this evidence that defendant maintained accounts for well-known senior leaders of Hamas (and other designated terrorists), and processed transactions explicitly for the benefit of Hamas (and other designated terrorists), the jury could reasonably infer that defendant did so knowingly.

Defendant's principal response is that most of the Hamas operatives who held accounts with the Bank were not designated as terrorists by OFAC, the United Nations, or the European Union. For those that were designated on the OFAC list, defendant points out that their names were spelled differently on the transfer forms than they were on the OFAC list. These were arguments for the jury, and the jury rejected them.

**[21]** Plaintiffs also submitted evidence that defendant provided financial services to the 11 Hamas-controlled charities. Defendant first contends that plaintiffs failed to prove that the charities at issue were controlled by Hamas. It claims that plaintiffs were required to satisfy all of the traditional corporate veil-piercing factors in order to establish that the charities were controlled by Hamas.[23] In support of

---

**22.** We cannot know whether these payments were made only to Hamas, or whether they included other terrorist groups, because the Bank refused to turn over its records. However, again, defendant cannot profit from such withholding.

**23.** Those factors are: "(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and tele-

phone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities." *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir.2001).

its position, defendant cites *Strauss v. Credit Lyonnais*, 2006 WL 2862704, at *10, where the court adopted the D.C. Circuit's "alias status" concept and explained that "[f]actors to be considered include whether the organizations share leadership, whether they commingle finances, publications, offices, etc., and whether one operates as a division of the other." *See also Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 157–58 (D.C.Cir.2004).

I share the skepticism later expressed by the court in *Strauss* as to whether "legitimate corporations are sufficiently analogous to terrorist groups such that every corporate veil piercing factor applies." *Strauss*, 925 F.Supp.2d at 435 n. 14. The absurdity of instructing a jury to consider whether Hamas observes corporate formalities is self-evident. Additionally, the traditional corporate veil-piercing factors do not include whether governments or intelligence services have found an organization to be controlled by Hamas, which would be strong evidence of such a link. Therefore, although these factors can serve as a useful guide in determining whether an entity is dominated and controlled by a terrorist group, they are not a rigid checklist.

Indeed, on similar evidence, the defendants in the Holy Land Foundation trial were convicted for providing material support to Hamas in violation of 18 U.S.C. § 2339B for providing funds to many of the very same charities at issue in this case. *See generally United States v. El–Mezain*, 664 F.3d 467 (5th Cir.2011). The jury instructions in that case did not mention any of the corporate veil piercing factors that defendant claims should apply here, and the Fifth Circuit concluded that "[t]he evidence of Hamas control of the zakat committees was substantial." *Id.* at 489. If the government can prove Hamas' control of these charities beyond a reasonable doubt in a criminal case and without reference to the alter ego test advocated by defendant, plaintiffs can do the same in this civil case.

The testimony of plaintiffs' experts, Dr. Levitt and Mr. Spitzen, supplied a substantial record on which the jury could reasonably conclude that these charities were controlled by Hamas. For example, the evidence included that many of the charities were founded by senior Hamas leaders or had Hamas operatives on their boards; findings by the governments of the United States, Germany, and Israel that the charities were controlled by Hamas; funds routed to these charities from United States designated Hamas fundraisers like Interpal; and the charities' promotion of Hamas' ideology and political goals. *See Strauss*, 925 F.Supp.2d at 435–36 (similar evidence regarding several of the same charities sufficient to withstand summary judgment). Defendant's expert, Dr. Milton–Edwards, of course, gave her opinion that none of the charities at issue were controlled by Hamas. Deciding between these competing accounts was the province of the jury.

The record also contained sufficient evidence to support a jury finding that defendant was aware of, or at least willfully blind to, the charities' Hamas connections. Again, plaintiffs' expert Mr. Spitzen identified numerous well-known Hamas leaders who occupied leadership roles in the charities, and it was defendant's policy to collect information about the boards of its customers who were entities, whether or not those entities had charitable purposes. For instance, there was testimony that the Islamic Center, Gaza was founded by Sheikh Yassin, who, along with other founding members of Hamas, participated in the charity's activities. Yassin was also featured in the charity's promotional materials and was listed as its founder and

spiritual authority even after his death. Another of the charities, the Al Nur Prisoner Society, was founded by Salah Shehadah, the leader of Hamas' military wing, for the purpose of providing support to Hamas prisoners. Sheikh Bitawi, who held leadership positions in the Nablus Zakat and the al-Tadamun Society, was also publicly associated with Hamas. There was also testimony that Hamas made little effort to conceal its control of these charities because it needed to publicly promote its charitable activities in order to reap political benefits.[24] In sum, there was a cornucopia of circumstantial evidence to support a jury finding that defendant knew or was willfully blind to the charities' Hamas affiliations.

Lastly, the testimony of David Blackmore and evidence of "martyrdom" payments, discussed above, provided ample basis on which the jury could reasonably have found defendant knew or was deliberately indifferent to its clients' association with terrorism. In particular, as to the latter, when asked about these lists at his deposition, Mohammed Al–Tahan, one of defendant's senior employees, stated that he now found the lists suspicious, but only "for one reason: the Bank does not pay persons who are deceased." In other words, he found the lists suspicious only because they did not list the names of the beneficiaries' family members and were therefore "incomplete," not because the Bank was facilitating payments to the families of suicide bombers. Defendant was free to argue to the jury, as it did, that there was nothing wrong with facilitating these transactions, and that distributing such "charity" provided neither support to Hamas nor incentive for suicide attackers. The jury was equally free to reject that argument, as it did.

Similarly, the evidence indicated that defendant was aware that Hamas-controlled charities like the Al–Salah Society and Islamic Society of Hebron selected Saudi Committee beneficiaries, and defendant relayed instructions from these charities to the Saudi Committee. Combined with the circumstantial evidence of defendant's knowledge of these charities' Hamas control, there was sufficient evidence for the jury to infer defendant's knowledge.

Finally, defendant ignores the collective weight of the evidence. Plaintiffs provided evidence that defendant maintained accounts for senior Hamas leaders, *and* Hamas-controlled charities, *and* facilitated Saudi Committee payments to Hamas charities, Hamas prisoners, and the families of Hamas suicide bombers, all during the extreme violence of the Second Intifada. It was reasonable for the jury to consider the totality of this evidence and to conclude that defendant acted knowingly.

### VI. *Respondeat Superior*

[22] In what can be viewed as another procedurally infirm motion for reconsideration, defendant's proposed jury charges renewed its contention, also previously rejected by Judge Gershon, that it could only be held liable if one of its high-ranking officers or directors committed the unlawful acts of which plaintiffs complained. In the alternative, defendant requested a charge adapted from the criminal context, which included the instruction that the Bank could not be held liable if its agent "performs an act which the Bank has, in good faith, forbidden its officers, directors, employees, or agents to perform."

[23] Judge Gershon rejected defendant's effort to impose a standard higher than traditional *respondeat superior*. She

---

**24.** Defendant's expert Dr. Milton–Edwards disagreed that there was any public affiliation

between these charities and Hamas, but it was up to the jury to decide whom to credit.

was correct to do so. The ATA incorporates "general principles of tort law." *See Gill*, 893 F.Supp.2d at 493 ("Applying general principles of *respondeat superior*, it is essential that plaintiff can rely on that doctrine . . . ."). I agree with the careful reasoning of Circuit Judge Janice Rogers Brown's concurrence in *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 148 (D.C.Cir.2011) (Brown, C.J., concurring). The basic presumption is that Congress creates federal torts against the background of general tort law, and "[*r*]*espondeat superior* liability is an elementary principle of tort law and must therefore inform our interpretation of the federal torts created in the Anti–Terrorism Act." *Id.*

Defendant analogizes to the civil RICO statute, pointing to the fact that both it and the ATA are quasi-criminal in nature and impose treble damages. But a treble damages provision alone is not sufficient to overcome the presumptive application of general *respondeat superior* principles. *See id.* More fundamentally, the cases that defendant cites that hold *respondeat superior* liability unavailable in RICO actions make clear that this conclusion is based in the unique language and purpose of that statute. *See Banque Worms v. Luis A. Duque Pena E Hijos, Ltda.*, 652 F.Supp. 770, 772 (S.D.N.Y.1986) ("By its plain terms, RICO only imposes liability on corporations that benefit from the racketeering activity. Indeed, the initial intent of the statute was to *protect* corporations from criminal infiltration, not to make them the responsible parties.") (emphasis in original); *Rush v. Oppenheimer & Co., Inc.*, 628 F.Supp. 1188, 1194 (S.D.N.Y. 1985) ("[Plaintiff] cannot rely on theories of *respondeat superior* to accomplish an end-run around this required distinction between person and enterprise under section 1962."). Defendant does not point to anything in the language or legislative history of the ATA that suggests that Con-

gress intended the statute to protect anyone other than the victims of terrorism, nor that it intended the application of anything other than the traditional principles of *respondeat superior*.

As for defendant's alternative charge, traditional principles of *respondeat superior* provide that the principal is liable for his agents' unlawful acts committed in the course of the agent's employment, even if those acts were contrary to the principal's instructions:

> The rule of *"respondeat superior,"* or that the master shall be civilly liable for the tortious acts of his servant, is of universal application, whether the act be one of omission or commission, whether negligent, fraudulent, or deceitful. If it be done in the course of his employment, the master is liable; and it makes no difference that the master did not authorize, or even know of the servant's act or neglect, or even if he disapproved or forbade it, he is equally liable, if the act be done in the course of his servant's employment.

> There may be found, in some of the numerous cases reported on this subject, dicta which, when severed from the context, might seem to countenance the doctrine that the master is not liable if the act of his servant was in disobedience of his orders. But a more careful examination will show that they depended on the question, whether the servant, at the time he did the act complained of, was acting in the course of his employment, or in other words, whether he was or was not at the time in the relation of servant to the defendant.

*Philadelphia & Reading R.R. Co. v. Derby*, 55 U.S. 468, 486, 14 How. 468, 14 L.Ed. 502 (1852) (citing Joseph Story, COMMENTARIES ON THE LAWS OF AGENCY § 452, at 465 (1839)); *see also In re Parmalat Sec. Litig.*, 598 F.Supp.2d 569, 575–76 (S.D.N.Y.

2009) ("For centuries, the principal has been liable for the torts, including the intentional torts, of its agent as long as the agent acted within the scope of its employment—and regardless of whether the principal directed or caused the agent to engage in the tortious activity.").

Here, the unlawful acts of which plaintiffs complain were wire transfers and other financial services. It is difficult to see how opening an account, initiating or receiving a wire transfer, or paying a customer would be outside the scope of any bank employee's employment.

What defendant really wanted was for the Court to suggest to the jury that, because defendant had a general policy against providing financial services to terrorists, whatever employee processed the transactions or opened the accounts at issue surely must have been acting outside the scope of his or her employment. This not only would have represented an incorrect legal standard; it would have been fundamentally unfair, because defendant itself blocked the necessary discovery to meet that standard.

No one but defendant knows who the employee was who opened an account for Sheikh Yassin, the founder and leader of Hamas—if indeed it was his account. Defendant requested a "rogue agent" charge, but blocked all evidence that would identify who those rogue agents might be, what acts they committed, and whether those acts were within the scope of those agents' employment. The Court therefore gave a general *respondeat superior* charge, stating in relevant part that a corporation is liable for its agents' unlawful acts, "provided the unlawful acts are done within the scope of their authority, as would usually be the case if done in the ordinary course of their employment, or in the ordinary course of the corporation's business."

## VII. Evidentiary Rulings

### A. *Authentication Generally*

**[24–28]** Federal Rule of Evidence 901 "does not erect a particularly high hurdle" for authenticating evidence. *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir.2001). "[T]he standard for authentication is one of 'reasonable likelihood,' and is 'minimal.'" *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir.2007). "Generally, a document is properly authenticated if a reasonable juror could find in favor of authenticity." *Id.* The proponent does not need to eliminate "all possibilities inconsistent with authenticity or to prove beyond any doubt that the evidence is what it purports to be." *Id.* (quotations omitted). The hurdle for authenticating evidence may be cleared by circumstantial evidence. *See Dhinsa*, 243 F.3d at 659. Although Rule 901(b) sets forth examples of evidence that satisfy the authentication requirement, these methods are not exhaustive. *See id.*

**[29]** Most relevant here is Rule 901(b)(4), which permits authentication by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." The Advisory Notes to Rule 901(b)(4) state that "[t]he characteristics of the offered item itself, considered in the light of circumstances, afford authentication techniques in great variety."

### 1. *Authentication of Website Postings*

**[30, 31]** A proponent seeking to authenticate a website posting must show a reasonable likelihood that the information was posted by the individual or organization to which the postings were attributed. *See, e.g., Boim III*, 549 F.3d at 703 (explaining that authentication of similar web postings "would typically require some type of proof that the postings were actu-

ally made by the individual or organization to which they are being attributed—in this case, Hamas—as opposed to others with access to the website") (quoting *Boim v. Holy Land Found. for Relief and Dev.,* 511 F.3d 707, 752–54 (7th Cir.2007)).

In this case, plaintiffs' expert Evan Kohlmann authenticated two websites, Palestine-info.com and alqassam.ps, as authentic mouthpieces for Hamas. Mr. Kohlmann has given similar testimony in criminal prosecutions, *see United States v. Ali,* 2011 WL 4583826, and was more than qualified to give such testimony in the context of this civil case.

At trial, Mr. Kohlmann testified in detail as to the factors, both extrinsic and intrinsic, that led him to conclude that these two websites were authentic. Those factors included: the reliance of the United States and other governments on the webpages as authentic sources of Hamas communications; the language and facts used in postings; the posting of exclusive interviews with Hamas leaders and nonpublic details of their lives; and the fact that the websites contained official Hamas seals and watermarks. *Cf. United States v. Vayner,* 769 F.3d 125, 131 (2d Cir.2014) (finding a website to be inadequately authenticated where witness testified only that he visited the website and that it was presently accessible, without providing evidence that the defendant was the webpage's author or otherwise tying the webpage to the defendant). In Mr. Kohlmann's expert opinion, Hamas had posted authentic claims of responsibility for each of the 24 attacks at issue in this case. His testimony was sufficient to show a "reasonable likelihood" that the postings were authentic, and to allow a reasonable jury to conclude that the claims of responsibility were indeed issued by Hamas.

### 2. *Authentication of Videos*

**[32–34]** The Court also admitted certain video recordings at trial. Videos may be authenticated "on the same principles as still photographs," *Mikus v. United States,* 433 F.2d 719, 725 (2d Cir. 1970) (citations omitted), and still photographs may be authenticated by a witness familiar with what is pictured. *See Kleveland v. United States,* 345 F.2d 134, 137 (2d Cir.1965) ("The witness qualifying a photograph, however, does not need to be the photographer or see the picture taken. It is only necessary that he recognize and identify the object depicted and testify that the photograph fairly and correctly represents it."). "Evidence of how the [video] tapes were made and handled" before they came into the proponent's possession is not necessarily required to authenticate them. *United States v. Damrah,* 412 F.3d 618, 628 (6th Cir.2005) (district court did not err in admitting video tapes seized from a third party that depicted the defendant speaking at Palestinian Islamic Jihad fundraising events, where defendant offered no proof that the Government had altered the tapes after their seizure, and there was no dispute that they accurately depicted the defendant's likeness and words). As described below, the circumstantial evidence in the record was sufficient such that a reasonable juror could find that the video recordings were authentic.

### B. *Declarations Against Interest*

#### 1. *Website Postings*

**[35]** All the web postings that the Court admitted, save one, were claims of responsibility by Hamas for terrorist attacks. The Court has noted its disagreement with decisions by other district courts that have held that a claim of responsibility by a terrorist group categorically cannot qualify as a declaration against interest. *See Gilmore v. Palestinian Interim Self–Gov't Auth.,* 53

F.Supp.3d 191, 204–06 (D.D.C.2014); *Strauss,* 925 F.Supp.2d at 449; *Gill,* 893 F.Supp.2d at 509.

Defendant's Rule 59 motion, which again objects to the admission of these claims of responsibility, raises no new arguments. It merely reiterates defendant's reliance on these cases, without addressing the Court's previous decision expressing its disagreement with them and the authorities cited therein. Nevertheless, I will explain my rationale once more.

**[36, 37]** First, claiming responsibility for a terrorist attack is plainly against Hamas' penal interest. For a statement to be admissible under Rule 804(b)(3), a court must determine that "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." *United States v. Saget,* 377 F.3d 223, 231 (2d Cir.2004). The rule does not require that the declarant be aware that the incriminating statement could subject him to immediate criminal prosecution, but only that it tended to subject him to criminal liability. *See United States v. Lang,* 589 F.2d 92, 97 (2d Cir.1978).

This part of the analysis is relatively straightforward. It is beyond reasonable dispute that Hamas' claim of responsibility for a violent terrorist attack on Israeli civilians could subject the organization and its members to penal consequences, including crackdowns, arrests and even assassination by Israel. For example, on August 19, 2003, a suicide bomber blew himself up on a bus in Jerusalem, and Hamas claimed responsibility that night. According to Mr. Spitzen's expert report, Ismail Abu Shanab, a senior Hamas leader, was killed by the IDF two days later, on August 21, 2003. This is not to say that Shanab's killing was solely in response to Hamas' claim of responsibility. However, it cannot be disputed that Israel takes punitive action against Hamas when it perceives that Hamas has committed a terrorist attack. Hamas claiming responsibility for a terrorist attack tends to increase that perception, and Hamas is aware of these facts.[25]

In its Rule 59 motion, defendant does not seriously contest that claiming responsibility for a terrorist attack could subject Hamas to the criminal consequences described above. Rather, it relies on select quotations from plaintiffs' experts to argue that Hamas had an ulterior motive to lie, negating the assumption underlying Rule 804(b)(3) that people "do not make statements which are damaging to themselves unless satisfied for good reason that they are true." This effort is not persuasive.

As I have previously held, the fact that Hamas may have other motivations for claiming responsibility for a terrorist attack does not automatically render such claims inadmissible. After all, it is rare for anyone to say anything purely for the sake of getting himself in trouble. Courts regularly admit statements under Rule 804(b)(3) despite the argument that the declarant had another motive for making the statement. *See United States v. Gupta,* 747 F.3d 111, 128–29 (2d Cir.2014) (rejecting argument that the declarant "was merely attempting to impress" the person to whom he was speaking); *see also United States v. Williams,* 506 F.3d 151, 155 (2d Cir.2007) (noting that declarant "was boastful regarding his participation in the murders"); *United States v. Hamilton,* 19 F.3d 350, 357 (7th Cir.1994) (rejecting argument that statements were mere "jailhouse boasting"); *United States v. Mills,*

---

**25.** Claiming responsibility for terrorist attacks can also contribute to other sanctions. The United States' August 22, 2003 designation of several Hamas fundraising charities and leaders as SDGTs specifically cited Hamas' claim of "responsibility for the despicable act of terror on August 19."

704 F.2d 1553, 1562 (11th Cir.1983) (rejecting as "disingenuous" the argument that "that under the circumstance of one inmate bragging to another about crimes committed, the statement was not against penal interest at the time it was made" because the declarant "well understood the possibility that his statement might be overheard by prison guards . . . and that penal consequences might result").

Thus, the question is not whether Hamas' claims of responsibility were undiluted by other motives, but whether Hamas, or rather, its members, were aware that they faced severe penal consequences for making these claims. The fact that Hamas claimed responsibility for these attacks signals only that it thought the risk of penal consequences was outweighed by its collateral goals, not that there were no penal consequences attached to the statements. Plaintiffs were entitled to argue to the jury that Hamas would not have made these statements unless they had a least a kernel of truth. With the potential penal consequences as severe as they are in this case, Hamas' propaganda motives are insufficient to render its statements inadmissible.

It bears mentioning that this is not a criminal case. Thus, Rule 804(b)(3)(B)'s requirement that a statement against interest "supported by corroborating circumstances that clearly indicate its trustworthiness" does not apply, because the statement is not "offered in a criminal case as one that tends to expose the declarant to criminal liability." Nevertheless, many of the claims of responsibility in this case were corroborated by Israeli government reports assigning blame to Hamas, and by court records showing convictions of Hamas operatives for the attacks.

Defendant rightly pointed out the lack of such corroboration for some of the statements on cross-examination. It also pointed to claims of responsibility by other groups,[26] and expounded on its argument that Hamas may have incentives to lie for propaganda purposes. But as a factor countervailing Hamas' motives to lie, plaintiffs' experts also testified that a claim of responsibility that turns out to be false can damage a terrorist organization's reputation.

These competing contentions were presented where they should have been presented: to the jury. *See Gupta*, 747 F.3d at 129. It is not the Court's role to determine the weight of the evidence before determining its admissibility, especially where the statements at issue so plainly carry significant penal consequences, and those penal consequences are not clearly outweighed by a motive to fabricate. A jury can and should consider all of the factors that each party pointed out when determining the weight to assign to Hamas' claims of responsibility. These factors do not, however, render the statements inadmissible.

Ironically, had defendant been successful in excluding all reference to Hamas' claims of responsibility for terrorist attacks, I may have been forced to grant a directed verdict to plaintiffs on the issue of attribution of many of the attacks. That is because with few exceptions, the only evidence that defendant offered to show that the attacks were not carried out by Hamas were claims of responsibility by other terrorist groups. Without those competing claims, plaintiffs' evidence and expert testimony would have gone uncontradicted. *See Boim III*, 549 F.3d at 704–05 ("[W]ith [expert testimony regarding attribution] in the record and *nothing* on the other side

---

**26.** The fact that certain of those claims were presented in newspaper articles, however, added an extra level of hearsay and rendered them inadmissible.

the court had no choice but to enter summary judgment for the plaintiffs with respect to Hamas's responsibility for the Boim killing.") (emphasis in original).

[38] Finally, the Court admitted one website posting that was not a claim of responsibility, but was instead a statement on the website Palestine-info.com, which called for donations to Hamas at a particular Arab Bank account. In hindsight, it is not clear what statements on this webpage were being offered for their truth, and thus they may not have been hearsay at all; certainly, plaintiffs were not contending the truth of the statement that supporters of Hamas should donate to a particular account. The document's primary relevance lies in the fact that an Arab Bank account number was listed on an authenticated Hamas website, not in the veracity of the statements featured on the website.

Nevertheless, there is a readily identifiable penal interest implicated by the statements on the website: soliciting donations for Hamas is a crime under the laws of the United States, Israel, and other countries. The purportedly "ulterior" motivation for making these statements is equally obvious: the desire to raise money. But again, a statement is admissible as a declaration against penal interest if it is sufficiently self-inculpatory, even though the statement might also serve the declarant's other interests. *See Saget*, 377 F.3d at 231 n. 4 ("To the extent that Saget's argument is that Beckham's statements were not truly against his interest because Beckham made the statements in an attempt to persuade the CI to enter into the conspiracy, it is misplaced. Even if the statements were in Beckham's *pecuniary* interest, they were clearly self-inculpatory and therefore against his *penal* interest, as required by Rule 804(b)(3).") (emphasis in original).

Moreover, to the extent that any statements on the website were offered for their truth, they were reliable and well-corroborated. The desire to raise money does not provide a motive to fabricate. Soliciting donations for a fake bank account would have the undesired effect of ensuring that the intended recipient never received those donations. In addition, the statements were corroborated by SWIFT transfers to the account number listed on the website—the account of Osama Hamdan. Some of those transfers bore the notation "Palestine Information Center," the name of the website that posted the statements.

### 2. *Hamas Website Videos*

[39, 40] Most of the videos at issue originated from the Hamas websites that Mr. Kohlmann authenticated. That each video was found on a Hamas website supports the finding that it is reasonably likely that the videos were what plaintiffs professed them to be. Another factor in favor of authenticity is that plaintiffs' expert witnesses, Messrs. Kohlmann and Shaked, who were both familiar with the likenesses of these terrorists from their extensive review of other Hamas materials, identified the individuals depicted in the "video wills" as the same individuals who carried out the attacks in question.

[41] The video wills of suicide bombers are declarations against interest—they expose a declarant to significant criminal liability. For example, if the video fell into Israel's hands before the declarant was able to carry out his attack, Israel would make great efforts to capture or kill the declarant before he could do so.

Defendant's argument that the video wills were not against the declarants' penal interests because the statements contained therein "cannot conceivably imply any fear of post-suicide prosecution" is without merit. First, as explained above, at the

time the videos were recorded, a declarant did face severe penal consequences if Israeli authorities obtained the video prior to his carrying out the attack. Second, for each video will that was admitted, there was corroborating evidence that the terrorist depicted ultimately did carry out a terrorist attack.

**[42]** For the remaining Hamas website video—a video of the funeral of a Hamas bombmaker—plaintiffs' expert Mr. Spitzen testified that he recognized and personally met some of the individuals depicted in the video, and he recognized the area portrayed in the video as the town square of Nablus. The video was not introduced for the truth of any statements made by the individuals appearing in it, but rather to depict those individuals appearing together, which tended to connect them to Hamas.

### 3. Videos From Other Sources

**[43]** The Court also admitted several video clips from other sources. All but one of these was adequately authenticated by testimony from plaintiffs' experts, who were familiar with the individuals depicted in the video clips. The lone exception was plaintiffs' exhibit 1132, a video depicting children dressed up as terrorists at an event for one of the charities at issue, which was authenticated by testimony from Dr. Levitt based on the fact that he recognized the logo of the television station on which it was broadcast, and that he was personally familiar with this video and its use by law enforcement in several countries.[27]

**[44–46]** Osama Hamdan's statements on CNN,[28] in which he declared Hamas' responsibility for the Park Hotel bombing, were admitted as declarations against penal interest.[29] He identified himself as a member of Hamas, and acknowledged that Hamas carried out the bombing. Membership in Hamas is a crime under United States, Israeli, and other law, and a terrorist bombing is illegal everywhere. The penal consequences that Hamdan faced from claiming responsibility for this terrorist attack on behalf of Hamas were significant enough to bring them well within the rationale behind the exception, *i.e.*, that a reasonable person would not likely have made these statements unless they were true. These statements were also extensively corroborated by other evidence in the record, including convictions of Hamas operatives for the Park Hotel bombing as well as Israeli government reports assigning blame to Hamas.

---

**27.** Defendant argued that this video may have been "staged." But this objection missed the relevance of the video. Obviously, the kindergarten video was staged: Children do not dress up as terrorists unless they are prompted to do so. However, the very fact that this event was "staged" at one of the charities at issue in this case is where the video's relevance is found.

**28.** In terms of authentication, Mr. Kohlmann testified that the individual in the video was Osama Hamdan, the spokesman for Hamas. The record also contained Mr. Hamdan's passport. The picture on that passport demonstrated that the Osama Hamdan in the CNN video was the same individual who held an account at Arab Bank. In addition, the

video itself was effectively self-authenticating. It bore CNN logos and showed no signs of being edited. Before beginning the interview, the anchor identified Osama Hamdan, both by name and as a spokesman for Hamas. Simply put, there is no doubt that the CNN video was authentic. Indeed, forging such a video would be extremely difficult. *Cf.* Advisory Committee Notes to Fed.R.Evid. 902(6) ("The likelihood of forgery of newspapers or periodicals is slight indeed. Hence no danger is apparent in receiving them.").

**29.** The video was also independently relevant for the not-for-truth purpose of rebutting defendant's argument that Hamas operatives like Hamdan hid their Hamas affiliations and conducted their affairs in a secretive manner.

**[47]** The Court also admitted a video of Khaled Mash'al, a Hamas leader, and Sheik Yousef Al–Qaradawi speaking at a conference in which they discussed raising money for Hamas, supporting suicide bombings, and joking about how they were both terrorists. The video's primary relevance was to show the connection between the Union of Good, the charity led by Al–Qaradawi, and Hamas. Nevertheless, to the extent the truth of certain statements in the video was relevant—most notably statements that the Union of Good had raised tens of millions of dollars to support Hamas and the Intifada—the penal interests implicated were clear: Membership in Hamas and raising money for Hamas are crimes under United States and Israeli law. Further, the association between the Union of Good and Hamas was corroborated by the United States' designation of the Union of Good as a SDGT in 2008, which described that organization's role in sending "tens of millions of dollars a year to Hamas-managed associations."

**[48]** The remaining video clip—one showing Sheikh Bitawi, an individual connected to some of the charities at issue, speaking at the funeral of Jamal Mansur and Jamal Salim, two alleged Hamas leaders—was not admitted for the truth of any statements contained in it, but to depict the connection between the individuals portrayed therein, Hamas, and the charities at issue in this case.

**[49]** Finally, with respect to Rule 403, the subject matter of each of these videos was provocative to varying degrees. But for each one, the probative value of the video—whether proving Hamas' responsibility for a given attack or showing the connection between certain individuals and charities to Hamas—outweighed the risk of undue prejudice.

### C. Foreign Law

**[50]** Judge Gershon denied defendant's motion to put foreign law before the jury. *See Linde v. Arab Bank, PLC*, 944 F.Supp.2d 217 (E.D.N.Y.2013). I will not now revisit that decision in detail, as this issue was thoroughly litigated before it was decided against defendant. However, a few brief points are worth mentioning.

Evidence of foreign law is irrelevant to whether certain bank transactions violated the ATA. The sagacity of Judge Gershon's holding to that effect was confirmed at trial when one of defendant's former senior executives, Shukry Bishara, testified that (to his knowledge) Osama Hamdan had not been blacklisted by the government of Lebanon to that day. In other words, Mr. Bishara testified that over one decade after the United States designated Hamdan as a terrorist based on his public association with Hamas, he still believed that it remained legal to do business with Hamdan under the laws of Lebanon.[30]

Indeed, Hezbollah, a foreign terrorist organization designated by the United States long ago, operates openly in Lebanon. Knowingly providing financial services to Hezbollah would be a violation of the ATA regardless of whether doing so would be illegal under Lebanese law. Therefore, whether or not it was legal for defendant to do business with terrorists under foreign law is plainly irrelevant to whether defendant knowingly violated the ATA, which applies extraterritorially. *See Weiss v. Nat'l Westminster Bank PLC*, 453 F.Supp.2d 609, 633 (E.D.N.Y.2006) (finding no case which holds that "an

---

**30.** As discussed above, Mr. Bishara was also permitted to testify that the Bank believed it had "no choice" but to return to Hamdan the funds in his account in order to close it despite knowing that Hamdan was a SDGT and senior Hamas leader because the Bank provided discovery concerning that account.

American Court must decline to apply the laws of this country to a defendant over which the court has jurisdiction because the laws of the defendant's own country are more lenient").

The jury's question in Court Exhibit 3— "What is the law regarding the return of money when the SIC [Lebanon's Special Investigation Commission] doesn't respond to an inquiry?"—does not indicate otherwise. It was obvious from the context that the jury's question was directed at what the SIC's failure to respond would mean under United States law, and not at whether Lebanese law was relevant to defendant's state of mind. Furthermore, Judge Gershon had already ruled that this meant nothing. The jury was specifically instructed that it was not to consider the legality or illegality of defendant's conduct under any foreign law. Defendant would have the Court infer that the jury disregarded this instruction based on its reference to the SIC. The law almost invariably presumes otherwise. *See, e.g., Zafiro v. United States,* 506 U.S. 534, 540–41, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

**[51]** Nor do I believe that Judge Gershon erred in prohibiting defendant from rearguing to the jury its discovery objection regarding foreign bank secrecy laws. Judge Gershon and Magistrate Judge Pohorelsky held that defendant's bank secrecy objections were not a valid excuse for refusing to participate in discovery. Despite these rulings, defendant proposed to argue to the jury that its reasons for not producing certain documents were valid. They were not; permitting this argument would have allowed defendant to "defeat the court's analysis, mislead and confuse the jurors, and improperly invite them to

decide legal issues." *Linde,* 944 F.Supp.2d at 220.

### D. *Israeli List of Unlawful Associations and Terrorist Organizations*

**[52]** Defendant also argues that I erred in admitting an Israeli list of Unlawful Associations and Terrorist Organizations, because it concerns foreign law, which is irrelevant (and was therefore excluded), and because the document was not properly authenticated and was prejudicial. These arguments are unpersuasive.

First, the Court's previous rulings on the applicability of foreign law do not control whether this list was properly admitted. The question was not whether the listed entities were deemed to be controlled by Hamas as a matter of Israeli *law,* but rather that the Israeli government found as a matter of *fact* that these organizations were controlled by Hamas. This distinction is critical. Therefore, the jury was able to consider the list in determining whether certain organizations were in fact controlled by Hamas.[31] The Court specifically instructed the jury that it could not consider whether defendant's actions were legal under Israeli law.

In addition, plaintiffs' expert Mr. Spitzen stated that the list was published in the Israeli equivalent of the Federal Register—a fact that cannot be disputed—and thus was publicly available during the relevant time period. Defendant's expert witness Dr. Milton–Edwards rebutted that testimony with her own opinion. She stated that while visiting some of the charities at issue during the relevant time period, she did not see any evidence of the Israeli list being enforced. Weighing this evidence was for the jury.

---

**31.** Defendant's related argument that during a sidebar I said the jury could draw an inference based on the list that the Bank knew or was reckless in not knowing about this list is moot. Plaintiffs never offered testimony or argued about defendant's knowledge of the Israeli list, and still do not do so.

Second, defendant's authenticity objection is without merit. The document itself contains a certification by a Yitzchak Blum, a Deputy Director of the Israeli Ministry of Justice, stating that he reviewed the Israeli Official Gazette and found that the listed organizations had been declared illegal. The Certification was "sealed and authenticated with the Seal of the Ministry of Justice of the State of Israel." The document contains other official logos as well as the relevant address of the Israeli Ministry of Justice. All of this is sufficient to authenticate the document through its distinctive characteristics. *See* Fed.R.Evid. 901(b)(4). If that were not enough, Mr. Spitzen testified that he recognized the document as authentic. Finally, as with all of the documents the Court admitted, defendant has had years to investigate the authenticity of this document, but offered no facts at all to suggest that it was inauthentic. *See* Fed.R.Evid. 902(3)(A).

[53] Finally, I reject defendant's Rule 403 argument. That certain charities were declared illegal by the Israeli government due to their Hamas affiliations is highly probative evidence that these charities were affiliated with Hamas. This list was one piece of evidence that tended to establish that fact. Also, as described above, defendant suffered no unfair prejudice by its admission.

### E. *FinCEN Assessment*

[54] Before trial, the Court ruled that plaintiffs could admit a certain portion of the 2004 assessment against defendant by FinCEN. However, plaintiffs failed to lay the proper foundation to introduce this evidence during their case-in-chief. Therefore, the Court refused to allow plaintiffs to read the document into the record.

That might have been the end of it. But then, defendant called Brian Billard, the head of compliance for defendant's New York branch, who described the Bank's compliance program in New York in glowing terms. For example, Mr. Billard repeatedly testified that defendant "strictly adheres" to the applicable U.S. laws and regulations, and always followed them to the "strictest degree." He also testified that in order to apply for a license at OFAC, the Bank needed to have, and in fact did have "very good records."

FinCEN's investigation, however, found the Bank's compliance programs lacking in several critical respects. FinCEN's factual findings included that "Arab Bank—New York did not file the majority of its suspicious activity reports regarding terrorist financing until after the Office of the Comptroller of the Currency commenced a review of its funds transfer activity in July 2004," and "Arab Bank—New York failed to review information in its possession that would have shown it was clearing funds transfers for individuals and entities dealing with subsequently designated terrorists and terrorists organizations, failed to analyze this information, and failed to file Suspicious Activity Reports."

Consequently, the Court permitted plaintiffs to use portions of the assessment for cross-examination because FinCEN's findings directly impeached Mr. Billard's characterization of defendant as an eminently compliant financial institution, but did not admit it into evidence. The portions of the assessment plaintiffs used to impeach the witness were the factual findings that FinCEN made in the process of discharging its legal duty to investigate. Those portions were detailed in a section headed "determinations." They contained no statements by defendant, no offers of compromise, no evidence of the amount defendant paid, no evidence of defendant's conduct during compromise negotiations, nor any reference to the fact that defen-

dant declined to litigate FinCEN's findings.

Courts have disagreed on Rule 408's effect on the admissibility of the factual findings of a government investigation, where the investigation ends in a settlement. *Compare Option Res. Grp. v. Chambers Dev. Co., Inc.,* 967 F.Supp. 846, 850 (W.D.Pa.1996) ("[T]he findings and opinions/conclusions of the SEC, being rendered pursuant to the SEC's independent obligations to enforce the securities laws and not as a part of the actual compromise negotiations, are not governed by Rule 408."), *with Carpenters Health & Welfare Fund v. Coca–Cola Co.,* No. 00–cv–2838, 2008 WL 9358563 (N.D.Ga. Apr. 23, 2008) (disagreeing with *Option Resource*). Nevertheless *Option Resource* continues to be cited with approval by courts in this Circuit. *See, e.g., Mazuma Holding Corp. v. Bethke,* 1 F.Supp.3d 6 (E.D.N.Y.2014); *S.E.C. v. Pentagon Capital Mgmt. PLC,* No. 08–cv–3324, 2010 WL 985205 (S.D.N.Y. Mar. 17, 2010).

Defendant points out that the latter two cases are inapposite because they permitted the use of settlement fact-finding to defend an action. But that is not the full story as to the *Pentagon Capital* case. There, the factual findings of the SEC in previous, settled enforcement actions were offered against the SEC, as tending to refute the SEC's allegations against the defendant. *See Pentagon Capital,* 2010 WL 985205, at *4–5. In other words, the SEC's prior factual findings were offered "to disprove the validity . . . of a disputed claim," Fed.R.Evid. 408, notwithstanding the fact that the SEC was a party to the settlements in the prior actions. Defendant's broad view of Rule 408 would thus have required a different result in *Pentagon Capital.*

Moreover, Rule 408 could not be used to preclude all mention of the investigation. Whether plaintiffs should have been permitted to ask defendant's witnesses whether FinCEN investigated the Bank implicates only Rule 403.

At the end of the day, defendant's position is essentially that because it settled the FinCEN investigation, its witnesses were free to testify as if that investigation had never occurred and the factual findings made by FinCEN did not exist. I do not believe that either Rule 408 or Rule 403 permitted defendant to mislead the jury this way, and the proper balance was to allow the agency findings to be used for impeachment only.

### F. Saudi Committee Experts

**[55]** Defendant argues that Judge Gershon erred in excluding the testimony of two of defendant's experts, Robert Lacey and David Rundell, who would have testified as to the Saudi Committee's purportedly legitimate, humanitarian motives.

Judge Gershon explained in detail the reasons for her finding that Mr. Lacey was "wholly unqualified" to offer opinions about the Saudi Committee. *See Linde v. Arab Bank, PLC,* 922 F.Supp.2d 316, 328–29 (E.D.N.Y.2013). Defendant offers no reason why this conclusion was incorrect, other than to say that Judge Gershon's observation that Mr. Lacey lacks any expertise whatsoever in terrorism "improperly presupposed the truth of plaintiffs' allegations that the Saudi Committee . . . was a terror-affiliated entity" and that Mr. Lacey should have been permitted to share his opinion to the contrary. This argument makes little sense. Expert testimony that the Saudi Committee was *not* "terror-affiliated" is just as reliant on expertise in terrorism as testimony that it was. Defendant implicitly concedes that Mr. Lacey lacks any such expertise, and his exclusion as an expert was therefore proper.

In addition, both the testimony of Mr. Lacey and of Mr. Rundell fell within Judge

Gershon's broader exclusion of expert testimony regarding the charitable intent of the Saudi Committee. *See Linde v. Arab Bank, PLC,* 920 F.Supp.2d 282, 285 (E.D.N.Y.2011). Judge Gershon held this testimony inadmissible because issues of motive and intent are not the proper subject of expert testimony.

Defendant next claims that this Court improperly applied a double standard by permitting plaintiffs' expert Mr. Spitzen to opine on the intent of the Saudi Committee to support Hamas. This argument distorts the record. Mr. Spitzen testified that the Saudi Committee was part of the Union of Good, an umbrella organization that was designated in 2008 as a Hamas fundraiser. The portion of the transcript that defendant quotes—a reference to the Union of Good having the "primary purpose" of "divert[ing] charitable donations to support Hamas members and the families of terrorist operatives"—is not even Mr. Spitzen's own words. Rather, it is a quote from the United States government's designation of the Union of Good as a SDGT. Mr. Spitzen simply agreed with the United States government. He also testified that the Saudi Committee made payments to Hamas, including its operatives and suicide bombers, which bolstered his conclusion regarding the relationship between the two organizations. Finally, Mr. Spitzen commented briefly on the stated purpose of the Saudi Committee, embodied in its full name, the "Saudi Committee for the Support of the Intifada Al–Quds," and noted that the death benefits distributed by the Saudi Committee were relatively high when compared to the per capita income of Palestine. None of this references the subjective intent of the Saudi Committee.

This testimony is fundamentally different in kind than the proposed testimony of defendant's experts that, for example, the Saudi Prince appointed to head the Saudi Committee "would be the last person to want the [Saudi Committee] money to fall into terrorist hands" or that Saudi Arabia is "inherently opposed to terrorism." Indeed, neither of defendant's experts even mentioned the Union of Good in their reports, much less disputed that the Saudi Committee was part of it.[32] Nor did either of these two experts dispute that the Saudi Committee distributed funds through charities that plaintiffs identify as Hamas-controlled. Rather, they opined that the Saudi Committee had good reasons for doing so, for example that "the Committee considered these organizations to have a well-developed and reliable understanding of who the neediest individuals were in the communities they served."

Finally, to the extent defendant objects that Mr. Spitzen's brief reference to the stated purpose of the Saudi Committee was improper testimony concerning the Saudi Committee's intent, that objection is without merit. Testimony that an organization called the "Saudi Committee for the Support of the Intifada" was founded to support the Intifada is not an expert opinion about intent; it is reading the organization's name out loud.

Moreover, expert testimony about the Saudi Committee's humanitarian efforts would be largely irrelevant. As most recently reiterated in *Weiss,* there is no such thing under United States law as "legitimate" charity distributed through Hamas. *See Weiss,* 768 F.3d at 208 (noting, *inter alia,* that "foreign terrorist organizations do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately

---

**32.** Defendant does not dispute Mr. Spitzen's opinion that the Saudi Committee was a part of the Union of Good; this opinion was based in part on the Union of Good website, which explicitly lists the Saudi Committee as a member organization.

used to support violent, terrorist operations. Thus, funds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives") (quoting *Humanitarian Law Project*, 561 U.S. at 31, 130 S.Ct. 2705). Testimony concerning the Saudi Committee's humanitarian activities would be relevant only to the extent that it might indicate that defendant was unaware that the Saudi Committee was sending money to Hamas-controlled charities and the families of Hamas suicide bombers and prisoners. But testimony about what defendant understood about the Saudi Committee's activities or aims cannot come from experts; it must come from defendant's employees. In any event, notwithstanding the Sanctions Order, I permitted defendant's employees to testify at some length about their understanding of the Saudi Committee's humanitarian efforts.

In sum, I adhere to Judge Gershon's holding that defendant's proffered Saudi Committee experts were unqualified, offered no relevant expert testimony, or both.

## VIII. Trial Structure

[56] Defendant argues that it was prejudiced by the trial structure, which grouped together the liability trials for the 24 attacks that plaintiffs allege were carried out by Hamas. Defendant raised this argument in the parties' Proposed Joint Pretrial Order. I rejected it as untimely and without merit in July 2013, and stick to that holding now.

Judge Gershon adopted plaintiffs' proposed trial structure over defendant's proposals at a pretrial conference held on July 22, 2010. Defendant filed a letter objecting to the trial structure on evidentiary and due process grounds on May 22, 2013. Although framed as an "evidentiary" objection, based on the purported irrelevance of certain evidence with regard to certain attacks, defendant's letter was clearly a vastly untimely motion to reconsider the trial structure. The letter did not seek the exclusion of any particular items of evidence, but rather that the entire trial structure be reconsidered.

Initially, it is at least surprising, if not entirely disingenuous, that defendant now complains about prejudice from aggregating 24 Hamas attacks under only the ATA when defendant at one time recommended a three-phase trial structure to "resolve all of the 6,580 plaintiffs' claims—arising from 389 separate alleged incidents." Defendant's position is in any event without merit. It is primarily based on the mistaken premise that evidence relating to one attack is necessarily irrelevant to all other attacks. That is true only if one accepts that the evidence must be viewed piecemeal, without consideration of the whole.

Plaintiffs' theory of the case, accepted by the jury, is that defendant engaged in a lengthy course of conduct that provided material support to Hamas. For example, the evidence included that defendant processed transactions for senior Hamas leaders in 2001, received lists of beneficiaries containing the names of suicide bombers in 2002, and returned a bank account balance to the known terrorist Osama Hamdan in 2005. Defendant's position is that each of these actions must be viewed in isolation, but a jury could reasonably infer from defendant's course of conduct subsequent to 2001 that it was deliberately indifferent to or even supportive of its customers' Hamas affiliations in 2001. The fact that defendant had no qualms about paying the families of suicide bombers in 2002 might suggest that defendant was equally indifferent to providing financial services to Hamas leaders in 2001. In other words, although defendant may have had an answer for everything, the jury could reason-

ably find that it had too much to answer for. That is enough to satisfy the minimal requirements for relevance under Rule 401.

Defendant, moreover, vastly overstates the complexity of the evidence before the jury. The evidence relating to attribution of each of the 24 attacks was relatively simple, consisting largely (although not entirely) of Hamas claims of responsibility, criminal convictions of Hamas operatives in Israeli courts, and the factual findings of the Israeli government as to responsibility for the attacks. Some attacks had evidence from all of these categories. Some did not. But this fact did not necessarily disadvantage defendant. Indeed, defendant could have compared the amount of evidence available for the different attacks to highlight the attacks for which plaintiffs' proof was thinner. Defendant attempted to do so, to a certain extent, but the credibility of this argument was likely undermined by defendant's somewhat quixotic attempt to persuade the jury that plaintiffs could not prove that Hamas had carried out *any* of the 24 attacks. It was of course defendant's right to hold plaintiffs to their proof, but the wisdom of doing so was questionable in the case of attacks like the Park Hotel bombing, where Hamas said they carried it out, the ISA said Hamas carried it out, and the Israeli courts convicted the perpetrators for both the bombing and their membership in Hamas.

The evidence as to the material support defendant provided was similarly straightforward, consisting solely of financial transactions it processed on behalf of Hamas leaders, charities, and the Saudi Committee. Defendant is correct that plaintiffs did not link certain attacks to specific transactions, but Judge Gershon held that they did not have to do so. Instead, the jury could—and did—consider the overall support that defendant provided to Hamas during the relevant time period.

In short, this case was nothing like the mass proceedings described in the authorities that defendant cites. *Malcom v. National Gypsum Co.,* 995 F.2d 346, 349 (2d Cir.1993), involved a mass asbestos trial and a "maelstrom of facts, figures, and witnesses, with 48 plaintiffs, 25 direct defendants, numerous third-and-fourth party defendants, and evidence regarding culpable nonparties and over 250 worksites throughout the world." The Second Circuit quite reasonably held that the jury's ability to focus on the liability of an individual defendant was unfairly compromised. *See id.* at 352. *In re Repetitive Stress Injury Litig.,* 11 F.3d 368, 373 (2d Cir.1993), similarly involved plaintiffs bringing claims under the laws of numerous states for various injuries based on an assortment of devices sold by different defendants.

Defendant appears to suggest that the only option was to hold 24 liability trials. The inefficiency and wasted resources that would have resulted from proceeding that way are obvious. Witnesses would have had to testify multiple times to multiple juries, for example, as to the background of Hamas as an organization and the relationship, or lack thereof, between the charities at issue and Hamas. Witnesses based abroad—which is most of them—would have had to fly to the United States repeatedly. The overwhelming expense of doing that might well sound the death knell to plaintiffs' ability to finance this case, and since I am cognizant of that, I have to assume that defendant is as well.

*Malcom* instructs that in considering whether to consolidate, courts must consider

> whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple

lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

995 F.2d at 350. Here, the risks of prejudice and confusion were not substantial. There were 24 attacks at issue, but the liability trial involved just one defendant, engaged in a single course of conduct, allegedly in violation of a single statute, and no individualized claims of damages by the plaintiffs for the jury to consider. In short, the evidence in this case was relatively simple, consolidation did not cause appreciable prejudice to defendant, and dividing this case into multiple additional proceedings would have been expensive, time-consuming, and wasteful.

### IX. Defendant's 1292(b) Motion

**[57, 58]** "Section 1292(b)'s legislative history reveals that although that law was designed as a means to make an interlocutory appeal available, it is a rare exception to the final judgment rule that generally prohibits piecemeal appeals.... [Section 1292(b) ] is reserved for those cases where an intermediate appeal may avoid protracted litigation." *Koehler v. Bank of Bermuda Ltd.,* 101 F.3d 863, 865–66 (2d Cir.1996). Accordingly there is an "historic federal policy against piecemeal appeals," *Curtiss–Wright Corp. v. Gen. Elec. Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980), and certification is only warranted in "exceptional cases." *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 690 F.Supp. 170, 172 (S.D.N.Y.1987). Indeed, the Second Circuit has held that

[i]t does not normally advance the interests of sound judicial administration or efficiency to have piecemeal appeals that require two (or more) three-judge panels to familiarize themselves with a given case, instead of having the trial judge, who sits alone and is intimately familiar with the whole case, revisit a

portion of the case if he or she has erred in part and that portion is overturned following the adjudication of the whole case.

*Harriscom Svenska AB v. Harris Corp.,* 947 F.2d 627, 631 (2d Cir.1991).

The upcoming damages trial in this case will allow a judgment under Rule 54(b) which will bring all of the issues defendant raises in its § 1292(b) motion before the Circuit. That by itself is sufficient reason to deny certification. In any event, defendant has not shown that the substantive standards of § 1292(b) are met for any of the issues on which it seeks certification. With respect to the ATA's causation standard and whether terror financing is an "act of international terrorism" under the ATA, I do not believe that there is "substantial ground for difference of opinion," as required by the statute. Moreover, even if there were substantial grounds for difference of opinion as to whether the Sanctions Order improperly balanced the relevant interests on its face, defendant clearly seeks to challenge it as applied. (Even defendant's *amicus* the Hashemite Kingdom of Jordan appears to concede the same, arguing that "[t]he sanctions order, as applied at trial," poses a controlling question of law.) There is therefore no pure question of law that could be resolved by the Court of Appeals without resort to the record, making certification inappropriate. *See Morris v. Flaig,* 511 F.Supp.2d 282, 315 (E.D.N.Y.2007).

### CONCLUSION

For the foregoing reasons, defendant's Rule 50 motion is granted in part and denied in part, and its Rule 59 and § 1292(b) motions are denied.

**SO ORDERED.**



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

COURTNEY LINDE, et al.,

                         Plaintiffs,

     - against -

ARAB BANK, PLC,

                         Defendant.

04-CV-2799 (BMC)(PK)
and related ATA cases[1]

-----------------------------------------------------------------

## STIPULATION TO ENTER FINAL JUDGMENT PURSUANT TO RULE 54(b) FOR SIXTEEN OF THE SEVENTEEN PLAINTIFFS IN THE BELLWETHER TRIAL

WHEREAS, the above-entitled actions (the "NY Actions") are assigned to the Hon. Brian M. Cogan; and

WHEREAS, trial of the NY Actions was bifurcated between a liability phase and damages phase; and

WHEREAS, the liability phase of the NY Actions for certain of the NY Actions Plaintiffs was brought to trial in August 2014; and

WHEREAS, the jury returned a verdict that was entered on September 22, 2014 finding liability against the Defendant; and

WHEREAS, by order dated December 10, 2014, Judge Cogan set a damages phase "bellwether" trial for the following seventeen NY Actions Plaintiffs who were parties to the liability phase trial and verdict: Eugene Goldstein, Lorraine Goldstein, Barbara Goldstein-Ingardia, Chana Freedman, Richard Goldstein, Michael Goldstein, Estate of Abigail Litle, Philip Litle, Heidi Litle, Hannah Litle, Josiah Litle, Elishua Litle, Noah Litle, Rachel Shaked (nee Rachel

---

[1]   *Philip Litle, et al. v. Arab Bank, PLC*, No. 04-CV-5449 (E.D.N.Y.) (BMC) (PK); *Oran Almog v. Arab Bank, PLC*, No. 04-CV-5564 (E.D.N.Y.) (BMC) (PK); *Robert L. Coulter, Sr., et al. v. Arab Bank, PLC*, No. 05-CV-365 (E.D.N.Y.) (BMC) (PK); *Gila Afriat-Kurtzer v. Arab Bank, PLC*, No. 05-CV-388 (E.D.N.Y.) (BMC) (PK); *Michael Bennett, et al. v. Arab Bank, PLC*, No. 05-CV-3183 (E.D.N.Y.) (BMC) (PK); *Arnold Roth, et al. v. Arab Bank, PLC*, No. 05-CV-3738 (E.D.N.Y.) (BMC) (PK); and *Stewart Weiss, et al. v. Arab Bank, PLC*, No. 06-CV-1623 (E.D.N.Y.) (BMC) (PK).

**SPA229**

Laham), Yossef Cohen, Ayelet Attias, and Yehuda Eliyahu a/k/a Jeff Elliot (the "Bellwether Plaintiffs"); and

WHEREAS, the Bellwether Plaintiffs and the Defendant (together "the Parties"), have agreed to stipulate to a final damages phase verdict in favor of sixteen of the Bellwether Plaintiffs, in the following amounts:

| | | |
|---|---|---|
| 1. | Eugene Goldstein | $13,500,000.00 |
| 2. | Lorraine Goldstein | $13,500,000.00 |
| 3. | Barbara Goldstein-Ingardia | $ 3,750,000.00 |
| 4. | Chana Freedman | $ 3,750,000.00 |
| 5. | Richard Goldstein | $ 3,750,000.00 |
| 6. | Michael Goldstein | $ 3,750,000.00 |
| 7. | Philip Litle | $ 10,500,000.00 |
| 8. | Heidi Litle | $ 10,500,000.00 |
| 9. | Hannah Litle | $ 4,500,000.00 |
| 10. | Josiah Litle | $ 4,500,000.00 |
| 11. | Elishua Litle | $ 4,500,000.00 |
| 12. | Noah Litle | $ 4,500,000.00 |
| 13. | Rachel Shaked (nee Rachel Laham) | $ 2,250,000.00 |
| 14. | Yossef Cohen | $12,250,000.00 |
| 15. | Ayelet Attias and | $ 2,250,000.00 |
| 16. | Yehuda Eliyahu a/k/a Jeff Elliot | $ 2,250,000.00 |

2

**SPA230**

inclusive of all costs, attorneys' fees, interest, and other charges or fees of any type, and the statutory trebling of damages under the Anti-Terrorism Act, 18 U.S.C. § 2333(a); and

WHEREAS, the Parties desire that the final judgment entered in favor of the Bellwether Plaintiffs be certified for immediate appeal pursuant to Rule 54(b) of the Federal Rules of Civil Procedure;

**ACCORDINGLY, IT IS HEREBY STIPULATED AND AGREED:**

1. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Defendant and the NY Actions Plaintiffs stipulate and agree to the entry of final judgment in favor of the Bellwether Plaintiffs, and against the Defendant, in the total amount of $100,000,000.00, inclusive of all costs, attorneys' fees, interest, and other charges or fees of any type, and the statutory trebling of damages under the Anti-Terrorism Act, 18 U.S.C. § 2333(a), divided among the sixteen Bellwether Plaintiffs as set forth above.

2. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Defendant and the NY Actions Plaintiffs stipulate and agree that there is no just reason for a delay in the entry of final judgment in favor of the sixteen Bellwether Plaintiffs as set forth above, and further stipulate and agree that the entry of such final judgment is in the best interests of all parties.

3. Pursuant to Rule 62(h) of the Federal Rules of Civil Procedure, the Defendant and the NY Actions Plaintiffs, including the Bellwether Plaintiffs, further stipulate and agree to stay (i) the enforcement of the final judgment as to the sixteen Bellwether Plaintiffs as set forth above and (ii) all further pre-trial and trial proceedings against the Bank in the NY Actions pending the resolution of a timely appeal filed by the Defendant, and waive any requirement for the Defendant to post a bond as a condition of taking such an appeal.

**SPA231**

DATED: May 18, 2016

TURNER & ASSOCIATES, P.A.
By: _____
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

OSEN LLC
Gary M. Osen, Esq.
Ari Ungar, Esq.
Aaron Schlanger, Esq.
Peter Raven-Hansen, Esq., Of Counsel
2 University Plaza, Suite 201
Hackensack, New Jersey 07601
(201) 265-6400

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard, Esq.
Stephen H. Schwartz, Esq.
Neil L. Glazer, Esq.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

ZUCKERMAN SPAEDER LLP
Shawn P. Naunton. Esq.
399 Park Ave
New York, NY 10022
(212) 704-9600
*Attorneys for Linde and Coulter Plaintiffs*

MOTLEY RICE LLC
By: _____
Michael Elsner, Esq.
John M. Eubanks, Esq.
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465
(843) 216-9000
*Attorneys for Almog and Afriat Kurtzer Plaintiffs*

DLA PIPER LLP (US)
By: _____
Jonathan D. Siegfried, Esq.
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500
*Attorneys for Defendant Arab Bank plc*

4

**SPA232**

SAYLES WERBNER
By: *Mark S. Werbner*
Mark S. Werbner, Esq.
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
(214) 939-8700

HEIDEMAN NUDELMAN & KALIK, P.C.
By: *Richard D. Heideman*
Richard D. Heideman, Esq.
Noel J. Nudelman, Esq.
Tracy Reichman Kalik, Esq.
1146 19th Street, NW
Fifth Floor
Washington, DC 20036
(202) 463-1818

PERLES LAW FIRM, PC
Steven R. Perles, Esq.
1050 Connecticut Ave, NW
Suite 500
Washington, DC 20036
(202) 955-9055

STONE BONNER & ROCCO LLP
James P. Bonner, Esq.
145 West 45th Street,
New York, New York 10036
(212) 239-4340
*Attorneys for Litle, Roth, Weiss and Bennett*
*Plaintiffs*

May 24, 2016

SO ORDERED:
Digitally signed by Brian M.
Cogan_____
U.S.D.J.

5

**SPA233**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COURTNEY LINDE, et al. | : |
| Plaintiffs, | : |
| | : |
| -against- | : |
| | : |
| ARAB BANK, PLC, | : |
| Defendant. | : |
| | : |

04-CV-2799 (BMC)(PK)
and related ATA cases[1]

**BMC**

### ~~ENTRY OF~~ FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)

In September 2014, Defendant Arab Bank, PLC was found liable under the civil

liability provisions of the Anti-Terrorism Act ("ATA"), 18 U.S.C. §2333(a) *et seq.*, for claims

brought by American citizens who were the victims, or relatives of victims, of terrorist attacks.

A bellwether damages trial (the "Bellwether Trial") was scheduled to commence on August 17,

2015 to determine the damages to be awarded certain Plaintiffs (the "Bellwether Plaintiffs") in

three (3) of the twenty-two (22) attacks.  At the request of the parties, the Court adjourned the

Bellwether Trial to May 16, 2016.

Pursuant to the global settlement agreement between the Defendant and all

Plaintiffs in these related actions, including the Bellwether Plaintiffs set forth below, the parties

have now filed a joint stipulation with the Court to enter a final judgment for the Bellwether

---

[1]   *Philip Litle, et al. v. Arab Bank, PLC*, No. 04-CV-5449 (E.D.N.Y.) (BMC)(PK); *Oran Almog v. Arab Bank, PLC*, No. 04-CV-5564 (E.D.N.Y.) (BMC)(PK); *Robert L. Coulter, Sr., et al. v. Arab Bank, PLC*, No. 05-CV-365 (E.D.N.Y.) (BMC)(PK); *Gila Afriat-Kurtzer v. Arab Bank, PLC*, No. 05-CV-388 (E.D.N.Y.) (BMC)(PK); *Michael Bennett, et al. v. Arab Bank, PLC*, No. 05-CV-3183 (E.D.N.Y.) (BMC)(PK); *Arnold Roth, et al. v. Arab Bank, PLC*, No. 05-CV-3738 (E.D.N.Y.) (BMC)(PK); and *Stewart Weiss, et al. v. Arab Bank, PLC*, No. 06-CV-1623 (E.D.N.Y.) (BMC)(PK).

**SPA234**

Plaintiffs set forth below (the "Stipulation") pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure.  The parties, in the Stipulation, agree, *inter alia*:

1. To entry of final judgment pursuant to Rule 54(b) in favor of the Bellwether Plaintiffs set forth below, including damages as set forth below which are inclusive of all costs, attorneys' fees, interest, and other charges or fees of any type, and the statutory trebling of damages under the ATA;

2. There is no just reason for a delay in the entry of final judgment pursuant to Rule 54(b) in favor of the Bellwether Plaintiffs set forth below;

3. To stay enforcement of the final judgment and all further pre-trial and trial proceedings against the Bank in this Court pending the resolution of a timely appeal filed by the Defendant; and

4. To waive any requirement for the Defendant to post a bond as a condition of taking such an appeal.

Because the parties have represented that recovery against the Defendant by all Plaintiffs in these related actions, including the Bellwether Plaintiffs set forth below, will be substantially affected by the outcome of an appeal of the liability verdict, there remains a live controversy between the parties, *see, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 371 (1982), and interests of sound judicial administration and efficiency would be served by an immediate appeal of a final judgment for the Bellwether Plaintiffs set forth below, *see, e.g.*, *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 10-12 (1980).  Thus, the Court finds that there is no just reason for a delay in the entry of final judgment pursuant to Rule 54(b) given:  (i) the agreement of the parties as set forth above to the entry of this judgment; (ii) that this final judgment resolves all claims asserted by the Bellwether Plaintiffs set forth below against Defendant; (iii) that a

**SPA235**

prompt appeal of this judgment will result in a definitive resolution of all these related actions

and the liability issues that continue to divide the parties and are common to all Plaintiffs; and

(iv) that issues of judicial economy will accordingly be served thereby.

Therefore, for the reasons stated herein, and the Stipulation having been So

Ordered by the Court, the Clerk of the Court is hereby directed to enter final judgment pursuant

to Rule 54(b) of the Federal Rules of Civil Procedure in favor of the following Plaintiffs and

against the Defendant in the amounts stated below:

| | | |
|---|---|---|
| 1. | Eugene Goldstein | $13,500,000.00 |
| 2. | Lorraine Goldstein | $13,500,000.00 |
| 3. | Barbara Goldstein-Ingardia | $3,750,000.00 |
| 4. | Chana Freedman | $3,750,000.00 |
| 5. | Richard Goldstein | $3,750,000.00 |
| 6. | Michael Goldstein | $3,750,000.00 |
| 7. | Philip Litle | $10,500,000.00 |
| 8. | Heidi Litle | $10,500,000.00 |
| 9. | Hannah Litle | $4,500,000.00 |
| 10. | Josiah Litle | $4,500,000.00 |
| 11. | Elishua Litle | $4,500,000.00 |
| 12. | Noah Litle | $4,500,000.00 |
| 13. | Rachel Shaked (nee Rachel Laham) | $2,250,000.00 |
| 14. | Yossef Cohen | $12,250,000.00 |
| 15. | Ayelet Attias | $2,250,000.00 |
| 16. | Yehuda Eliyahu a/k/a Jeff Elliot | $2,250,000.00 |

inclusive of all costs, attorneys' fees, interest, and other charges or fees of any type, and the

statutory trebling of damages under the ATA. The parties have agreed that the amounts set forth

above are compromises of disputed damages amounts so that this appeal can be taken without

further delay.

The Court certifies that its disposition of these claims presents no just reason for

delay. The Court further orders that enforcement of this judgment and all further pre-trial and

trial proceedings against the Bank in the above-captioned related actions are hereby stayed

pending the resolution of a timely appeal of this judgment by the Defendant. Pursuant to the

**SPA236**

Stipulation, it is further ordered that the Defendant shall not be required to post a bond as a condition of appealing this judgment.

IT IS SO ORDERED

  May 24, 2016

_____

Date

Digitally signed by Brian M. Cogan

_____

U.S. District Judge Brian M. Cogan

4

**SPA237**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

COURTNEY LINDE, *et al.*,                   :
                                            :
                           Plaintiffs,      :
                                            :
         - against –                        :    04-CV-2799 (BMC)(PK)
                                            :
ARAB BANK, PLC,                             :
                                            :
                           Defendant.       :
                                            :
---------------------------------------------------------------

PHILIP LITLE, *et al.*,                     :
                                            :
                           Plaintiffs,      :
                                            :
         - against –                        :    04-CV-5449 (BMC)(PK)
                                            :
ARAB BANK, PLC,                             :
                                            :
                           Defendant.       :
                                            :
---------------------------------------------------------------

ORAN ALMOG, *et al.*,                       :
                                            :
                           Plaintiffs,      :
                                            :
         - against –                        :    04-CV-5564 (BMC)(PK)
                                            :
ARAB BANK, PLC,                             :
                                            :
                           Defendant.       :
                                            :
---------------------------------------------------------------

**NOTICE OF APPEAL OF DEFENDANT ARAB BANK PLC**

Defendant Arab Bank plc ("the Bank") hereby appeals to the United States Court of
Appeals for the Second Circuit the final judgment entered by the district court pursuant to Fed.
R. Civ. P. 54(b) as to the claims of sixteen (16) plaintiffs[1] in the above-captioned actions on May

---
[1]     These sixteen plaintiffs are as follows: (1) Eugene Goldstein, Lorraine Goldstein, Barbara
Goldstein-Ingardia, Chana Freedman, Richard Goldstein and Michael Goldstein (all plaintiffs in the *Linde*
action); (2) Philip Litle, Heidi Litle, Hannah Litle, Josiah Litle, Elishua Litle and Noah Litle (all plaintiffs
in the *Litle* action); and (3) Rachel Shaked (nee Rachel Laham), Yossef Cohen, Ayelet Attias, Yehuda
Eliyahu a/k/a Jeff Elliot (all plaintiffs in the *Almog* action) (collectively the "Rule 54(b) Plaintiffs").

24, 2016 (*Linde* ECF No. 1390; *Litle* ECF No 1284; *Almog* ECF No. 1367) (the "Rule 54(b) Judgment"),[2] including all adverse interlocutory decisions entered before trial, during trial, and after trial that are rendered final and appealable by that judgment, including, without limitation:

    (i)     the April 8, 2015 order denying, in substantial part, the Bank's motions for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), and denying the Bank's motion for a new trial pursuant to Fed. R. Civ. P. 59 (*Linde* ECF No. 1241);[3]

    (ii)    the jury verdict accepted by the district court on September 22, 2014 (*Linde* ECF No. 1163);

    (iii)   the September 18, 2014 charge to the jury, over the Bank's objections, with regard to, *inter alia*, the elements of a civil claim for damages under the ATA, including, but not limited to, causation and intent, related standards of proof, and adverse inferences that the jury was permitted to draw against the Bank (*Linde* ECF Nos. 1162 & 1170 (Trial Tr. at 3316-47)); also

    (iv)   all orders denying, in their entirety, or in substantial part, the Bank's motions for summary judgment, motions to dismiss, and motions to reconsider the same (*e.g.*, *Linde* ECF Nos. 96, 937, 943 & 963; *Almog* ECF No. 267);

---

[2]     The Rule 54(b) Judgment was also entered in the following actions deemed "related" to the above-captioned actions: *Robert L. Coulter, Sr., et al. v. Arab Bank, PLC*, No. 05-CV-365 (E.D.N.Y.) (BMC)(PK); *Gila Afriat-Kurtzer v. Arab Bank, PLC*, No. 05-CV-388 (E.D.N.Y.) (BMC)(PK); *Michael Bennett, et al. v. Arab Bank, PLC*, No. 05-CV-3183 (E.D.N.Y.) (BMC)(PK); *Arnold Roth, et al. v. Arab Bank, PLC*, No. 05-CV-3738 (E.D.N.Y.) (BMC)(PK); and *Stewart Weiss, et al. v. Arab Bank, PLC*, No. 06-CV-1623 (E.D.N.Y.) (BMC)(PK) (collectively the "Related Actions"). Final judgment has not been entered as to any plaintiff in the Related Actions. However, pursuant to the Rule 54(b) Judgment, all district court proceedings in the Related Actions, as well as in the above-captioned actions, were stayed pending the resolution of the Bank's timely appeal of the Rule 54(b) Judgment as to the Rule 54(b) Plaintiffs. Accordingly, although the Rule 54(b) Judgment was entered in the Related Actions to effectuate a stay of those proceedings, this notice of appeal is entered solely in the above-captioned actions, as the only actions that contain Rule 54(b) Plaintiffs.

[3]     Citations are made to the *Linde* docket for the sake of convenience and to avoid redundancies. All corresponding entries for identical adverse rulings entered on the related *Almog* and *Litle* dockets are also appealed.

(v)     all orders imposing attorneys' fees, adverse inferences, evidentiary preclusion, or other sanctions against the Bank related to its inability to produce documents or information subject to foreign bank privacy laws and directives of foreign governments and all orders denying reconsideration of the same (*e.g.*, *Linde* ECF Nos. 320, 560, 567, 625, 674, 945, 1041 (Conf. Tr. at 3)), together with all related evidentiary rulings giving effect to these orders (*e.g.*, *Linde* ECF Nos. 983, 1041, 1060, 1075, 1103, 1167 (Trial Tr. at 2837-40, 2871-72, 2919-24), 1170 (Trial Tr. at 3179-82), 1183 (Trial Tr. at 1041-44), 1188 (Trial Tr. at 2354-59), 1189 (Trial Tr. at 2366-67, 2454-62), 1192 (Trial Tr. at 305-308), July 30, 2013 Conf. Tr. at 7-17, 17-28, 35-44, 49-55, Sept. 4, 2014 Trial Tr. at 1720-24, 1732, 1760 & Sept. 12, 2014 Trial Tr. at 2731-35, 2742-43) and all discovery orders ordering the Bank to produce documents or information subject to foreign bank privacy laws (*e.g.*, *Linde* ECF Nos. 81, 91, 92, 160, 261 & 748);

(vi)    other evidentiary and case management orders affecting the result at trial, including those excluding evidence related to the Bank's compliance with foreign law (*e.g.*, *Linde* ECF Nos. 773, 945, 983, 1192 (Trial Tr. at 820-24), 1189 (Trial Tr. at 2364-66), 1171 (Trial Tr. at 3360-65), July 30, 2013 Conf. Tr. at 7-12, 36-42, Sept. 12, 2014 Trial Tr. at 2752-54 & Sept. 15, 2014 Trial Tr. at 2842-47), excluding the Bank's experts and fact witnesses on the Saudi Committee and other matters central to the liability issues presented to the jury (*e.g.*, *Linde* ECF Nos. 773, 917, 954, 940, 983, 1013, 1156 & July 30, 2013 Conf. Tr. at 7-22, 35-42, 49-55), and ordering a joint trial on twenty-four disparate attacks involving hundreds of individual Plaintiffs and alleged assailants (*e.g.*, *Linde* ECF Nos. 644, 952 & July 30, 2013 Conf. Tr. at 6).

**SPA240**

All orders listed or described above are appealed in their entirety to the extent that they are adverse to the Bank.  The descriptions of orders provided should not be construed as limiting the scope of the Bank's appeal to the portions of the orders described.  The orders and docket entries contained herein are exemplary only.  All orders and rulings related to the topics described herein are appealed, even if not expressly listed.

Dated:       June 22, 2016
             New York, New York                  Respectfully submitted,

                                                 DLA PIPER LLP (US)

                                                 By:   /s/Jonathan D. Siegfried
                                                       Jonathan D. Siegfried

                                                 1251 Avenue of the Americas
                                                 New York, NY 10020-1104
                                                 (212) 335-4500
                                                 *Attorneys for Defendant Arab Bank plc*

**SPA241**

## CERTIFICATE OF SERVICE

I hereby certify that, on October 21, 2016, an electronic copy of the foregoing Special Appendix was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

s/Paul D. Clement
Paul D. Clement