# No. 16-2119(L)

## 16-2134(con), 16-2098(con)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

LINDE, et al.,

*Plaintiffs-Appellees,*

v.

ARAB BANK, PLC,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court for the
Eastern District of New York, Nos. 04-cv-2799, 04-cv-5449, 04-cv-5564

_____

**JOINT APPENDIX
VOLUME X OF XXV: JA2701-JA3000**

_____

JONATHAN D. SIEGFRIED
KEVIN WALSH
DOUGLAS W. MATEYASCHUK
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500

PAUL D. CLEMENT
 *Counsel of Record*
MICHAEL H. MCGINLEY
NICHOLAS T. MATICH
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellant Arab Bank, PLC*

October 20, 2016

# Joint Appendix
## Table of Contents

Docket Entries: *Linde et al v. Arab Bank, PLC*, 04-CV-02799 (BMC) (PK)
(filed July 2, 2004) (docket retrieved Oct. 18, 2016) ................................ JA1

Docket Entries: *Litle et al v. Arab Bank, PLC*, 04-CV-05449 (BMC) (PK)
(filed Dec. 15, 2004) (docket retrieved Oct. 18, 2016) ......................... JA201

Docket Entries: *Almog et al v. Arab Bank, PLC*, 04-CV-05564 (BMC) (PK)
(filed Dec. 21, 2004) (docket retrieved Oct. 18, 2016) ......................... JA384

Identity Card, dated June 1, 1982 (PX348) ..................................................... JA577

"List of Specially Designated Terrorists who Threaten to Disrupt
the Middle East Peace Process, Notice," Department of
the Treasury, dated Jan. 25, 1995 (PX4114) ......................................... JA580

Wire transfer from Mohd Kamil Bin M Som to Islamic Charitable Society
Hebron, dated Apr. 12, 1999 (PX1549) ................................................ JA584

Wire transfer from Holyland Foundation General to Ramallah Zakat
Committee, dated Sept. 23, 1999 (PX2229) .......................................... JA585

Wire transfer from Juma Almajed to Almojamaa al-Islami, dated
Nov. 26, 1999 (PX1836) ......................................................................... JA586

Arab Bank Banking Regulations, dated Apr. 2000 (PX1) .............................. JA587

Letter from A.H. Shoman to Arab Bank Managers, Regional
Management, dated Apr. 20, 2000 (DX41) ........................................... JA620

Letter from Palestinian National Authority, to Whom it May Concern,
dated July 9, 2000 (PX346) .................................................................... JA625

Wire transfers originated by Yousef El-Hayek, dated July 17, 2000 to Oct.
23, 2001 (PX Nos. 1930, 1968, 2209, 2212, 2202-04, 2206-08, 1929,
2196, 1967, 2197, 2199, 1963, 2180-81, 1928, 2183, 1964, 2184-86,
1965, 1979, 2187-91, 1966, 2193-94, 1960, 2162-65, 1961, 2167-72,
1977, 2174, 1962, 2175-76, 2178, 1985, 2149, 1958, 2150, 1976,
1986, 2154, 2156, 2158, 1959, 1987, 2160, 1921, 1957, 2139-40,
2142, 2144, 1975, 2145-47, 1955, 2124, 2126-27, 2132, 1956, 1998,
2135-37, 1983, 1990, 2104, 1922, 1954, 1994, 2107, 2109-12, 2116,
1912, 2117, 1992, 2121-22, 1925, 1993, 2082, 2084, 2086-89, 1974,
1995, 2093, 2095, 1996, 2101-02, 2057, 1952, 1972, 1991, 2060-62,
2064, 1953, 1997, 2068-70, 2074, 2078, 1973. 2080, 1951, 2054-55,
2216, 2222, 1931, 1989, 2224-25, 2034, 2038-39, 2042-43, 2045,
1949, 2019, 2022, 1924, 2029-30, 1946, 2003, 1947, 2006, 1948,
2009, 1970, 2017) ................................................................... JA628

Wire transfers originated by Mohamad Ali, dated July 17, 2000 to Sept. 27,
2001 (PX Nos. 1981-82, 1980, 1978, 4785, 1920, 1916, 1919, 1915,
4789, 1917, 1971, 1918) ........................................................ JA832

Letter from O. Asoli to A.M. Shoman, dated Oct. 4, 2000 (DX999) .............. JA854

Wire transfer from Abdel al-Baki Ahmed Al Kendi to Harakat Al
Mugawanah Al Islamiyah Hamas, dated Oct. 16, 2000 (PX136) ......... JA862

Wire transfer from Salamah Ahmed Sulaiman to  Harakat Al Mukawanah
Al Islamiyah Hamas, dated Oct. 16, 2000 (PX140) .............................. JA863

Wire transfer from WAMY to Al Jamiya Alsalah Alislamia,
dated Nov. 28, 2000 (PX1831) ............................................................. JA864

Wire transfers originated by Saudi Committee In Support of the Al-Quds
Intifada, dated Dec. 5, 2000 to June 6, 2002 (PX Nos. 1766, 685, 687-
88, 692, 694, 617, 708, 721, 722, 716, 1768, 1770, 614-15, 720, 711,
713, 710, 623, 627, 622, 624-25, 635, 648, 663, 667) ......................... JA865

Wire transfers originated by Alajnah AlSaudeyyah Ledaam Intefadhat
Alquds, dated Dec. 8, 2000 to Sept. 13, 2002
(DX925-97) ............................................................................. JA949

Letter from International Committee of the Red Cross, to Whom it May
    Concern, dated Dec. 12, 2000 (PX347)..............................................JA1022

Wire transfer from De Heer A. Aoulad Ahajan to Hamas Organisation,
    dated Dec. 29, 2000 (PX106) ..............................................................JA1025

Letter from Shukri Bishara to All Palestinian Branches, dated
    Jan. 10, 2001 (PX441) .........................................................................JA1026

Wire transfer from Malek Assaad to Salah Mustafa Mohamad
    Shehadah, dated Jan. 24, 2001 (PX1941) ..........................................JA1029

Letter from [ ] Al-Zafeiri & Abdel Al-Meidan to Muhammad
    Al-Tahhan, dated Jan. 26, 2001 (PX306) ..........................................JA1030

Wire transfer from Khadijah Shehadah to Salah Mustafa Mohamad
    Shehadah, dated Jan. 26, 2001 (PX1940) ..........................................JA1061

Letter from Arab Bank Banking Operations Department to All Palestine
    Branches, dated Jan. 28, 2001 (PX437) .............................................JA1062

Wire transfer from Mahmoud Okailan to Salah Mustafa Mohamad
    Shehadah, dated Feb. 13, 2001 (PX1938) ..........................................JA1065

Wire transfer from Mahmoud Okailan to Salah Mustafa Mohamad
    Shehadah, dated Feb. 13, 2001 (PX1939) ..........................................JA1066

Wire transfer from Intl Islamic Relief Organisation to Islamic Society -
    Gazza, dated Feb. 16, 2001 (PX1827) ................................................JA1067

Letter from Arab Bank Regional Management to Hon. Nabil al-Qadhi,
    dated Feb. 27, 2001 (PX345) ..............................................................JA1068

Memorandum from Dale L. Watson to R. Richard Newcomb,
    dated Mar. 12, 2001 (PX1297) ...........................................................JA1071

Letter from Nabil Al-Qadeihi & Abd Raboh Al-Majhed to
    Muhammad Al-Tahhan, dated Apr. 11, 2001 (PX327) ......................JA1121

Letter from Al-Salah Islamic Society to Manager of Arab Bank,
dated Apr. 15, 2001 (PX405) ............................................................ JA1128

Letter from Ahmad al-Kurd to Muhammad al-Tahan, dated
May 19, 2001 (PX382) ...................................................................... JA1131

Wire transfer from Wasim Hussein Sweid to Mehdi Chaker
Al Hanbali, dated June 13, 2001 (PX1950) ...................................... JA1134

Letter from Arab Bank, Regional Management, to Arab National
Bank, General Management, dated June 16, 2001 (PX362) .............. JA1135

Wire transfer from Hassan Ali to Khaled Mohammed Amin El Hajj,
dated July 3, 2001 (PX1988) ............................................................ JA1144

Letter from Al-Salah Islamic Association to Mr. Ghasan, dated July 31,
2001 (PX400) .................................................................................... JA1145

Wire transfer from Hassan Ali to Ismail Haniya, dated Aug. 7, 2001
(PX1934) ........................................................................................... JA1148

Wire transfer from Hassan Ali to Ismail Haniya, dated Aug. 10, 2001
(PX1935) ........................................................................................... JA1149

Wire transfer from Hassan Ali to Ismail Abou Shanab,
dated Aug. 10, 2001 (PX1936) ......................................................... JA1150

Letter from Nadil al-Qadihi & Abd Raboh al-Mujhid to Hon.
Muhammad al-Tahan, dated Aug. 13, 2001 (PX402) ....................... JA1151

Wire transfer from Malek Assaad to Ismail Abou Shanab,
dated Aug. 21, 2001 (PX1937) ......................................................... JA1154

Wire transfer from Husseim Ahmad to Ismail Haniya,
dated Sept. 27, 2001 ........................................................................ JA1155

Letter from Arab Bank, Regional Management, to Nabil al-Qadihi,
    dated Oct. 11, 2001 (PX 380) ............................................................ JA1156

Wire transfer from Mahmoud Abdallah to Mehdi Shaker Alhanbali,
    dated Nov. 15, 2001 (PX1944) .......................................................... JA1159

Wire transfer from Mahmoud Abdallah to Mehdi Shaker Alhanbali,
    dated Nov. 26, 2001 (PX1945) .......................................................... JA1160

Wire transfer from Noha Tawil to Mehdi Shaker El Hanbali,
    dated Dec. 14, 2001 (PX1943) .......................................................... JA1161

Wire transfer from Hassan Abdullah to Ghazi Ahmad Hamad,
    dated Jan. 2, 2002 (PX1969) ............................................................ JA1162

Wire transfer from Hassan Abdullah to Khaled Mohamad Amine El Hajj,
    dated Jan. 15, 2002 (PX4786) .......................................................... JA1163

Wire transfer from Mohamad Khaled to Mehdi Shaker Alhanbali,
    dated Feb. 14, 2002 (PX1942) .......................................................... JA1164

Wire transfer from Mohamad Khaled to Khaled Amin El Haj,
    dated Feb. 14, 2001 (PX1984) .......................................................... JA1165

Wire transfer from Lajnat Al Monasara to Islamic Charitable Society -
    Hebron, dated Mar. 4, 2002 (PX1572) ............................................. JA1166

Wire Transfer from Moussa Abumarzook to Tarik Abumarzook,
    dated Mar. 20, 2002 (PX1914) ......................................................... JA1167

"How Israel Fights Palestinian Suicide Bombers," Journeyman Pictures
    (still photos), dated April 2002 (PX1061) ....................................... JA1170

Expert Opinion, Igor Peckerman, dated July 28, 2002 (PX3485) ............... JA1174

Wire transfer from Islamic Society, Bahrain to Al Salah Islamic Association,
    Gaza, dated July 30, 2002 (PX1797) ................................................ JA1189

Wire transfer from Al Aqsa Foundation of SA to Al Wafa
     Charitable Society Dar Eslam Hospital, dated        Oct.
     11, 2002 (PX2456) ............................................................. JA1190

Letter from Arab Bank Regional Management to Hon. Abel al-Maiden,
     dated Oct. 21, 2002 (PX302) ............................................ JA1191

Wire transfer from Al-Aqsa Foundation of SA to Ramallah - Al Bireh
     Zakaat Committee, dated Nov. 10, 2002 (PX2265) ........................... JA1194

Web posting on Alqassam.ps, dated Mar. 7, 2003 (PX3775) ...................... JA1195

Wire transfer from Shayma H. Shaheen & Mohamad Shaeen to
     Palistan Info Center, dated June 18, 2003 (PX98) ............................. JA1199

Wire transfer from Palestinians Dev Fund Interpal to Al Salah Islamic
     Association, dated July 16, 2003 (PX2385) ....................................... JA1200

Wire transfers (2) from International Islamic Charitable to Lajnat Zakat
     Tolkarem, dated July 22, 2003 (PX1518) ......................................... JA1202

Wire transfer from Interpal to Al Salah Islamic Association,
     dated Aug. 1, 2003 (PX2384) ............................................ JA1204

Wire Transfer Policy, Emanuel Caravanos, dated Aug. 27, 2003
     (DX201) ............................................ JA1206

Falah Taher Abdallah Nada, Military Court Record,
     dated Nov. 10, 2003 (PX3476) ............................................ JA1209

*Linde v. Arab Bank, PLC*, First Amended Complaint,
     dated Aug. 10, 2004 ......................................................... JA1307

Abdallah Ghaleb Abdallah Barghuthi, Military Court Record,
     dated Nov. 30, 2004 (PX3336) ......................................... JA1374

Rajbi Munir, Apostilled Military Court Record,
     dated Dec. 1, 2004 (PX3756) ......................................... JA1391

Fadi Muhammad Ibrahim al-Jaaba, Apostilled Military Court Record,
        dated Feb. 13, 2005 (PX3755) ............................................................ JA1412

Muadh Wael Taleb Abu Sharakh, Apostilled Military Court Record,
        dated Feb. 15, 2005 (PX3754) ............................................................ JA1431

*Almog v. Arab Bank, PLC*, First Amended Complaint,
        dated Feb. 25 2005 .............................................................................. JA1445

Arab Bank, Cash From Internal Account, Osama Hamdan,
        dated Mar. 31, 2005 ............................................................................ JA1666

District Court's Order, Assigning Discovery to Magistrate Judge
        Pohorelsky, dated Feb. 6, 2005 .......................................................... JA1669

Plaintiffs' Letter to Magistrate Judge Pohorelsky, dated June 3, 2005,
        together with the following exhibits appended thereto: ..................... JA1670

        Exhibit 1: Plaintiffs' First Request to Defendant for the Production of
        Documents, dated Feb. 24, 2005 ....................................................... JA1689

        Exhibit 2: Defendant's Responses and Objections to Plaintiffs' First
        Request for the Production of Documents, dated Mar. 28, 2005 ........ JA1726

        Exhibit 3: Declaration of S. Bishara, dated Nov. 11, 2004 ............... JA1783

        Exhibit 4: Letter from M.D. Burrows to Judge Gershon,
        dated Oct. 7, 2004 .............................................................................. JA1799

        Exhibit 5: OCC Consent Order, dated February 24, 2005 ................. JA1804

        Exhibit 6: Wall Street Journal Article, dated Apr. 20, 2005 .............. JA1839

        Exhibit 7: Letter from M. Elsner to H. Sneed,
        dated May 25, 2005 ............................................................................ JA1846

        Exhibit 8: Transcript, Status Conference, Magistrate Judge
        Pohorelsky, dated April 20, 2005 ...................................................... JA1853

Defendant's Letter to Magistrate Judge Pohorelsky,
dated June 20, 2005 .......................................................................... JA1904

Transcript Excerpt (pp. 1, 20-35), Status Conference, Magistrate Judge
Pohorelsky, dated June 22, 2005 ....................................................... JA1926

Defendant's Responses and Objections to Plaintiffs' Joint Modified
Phase I Request for the Production of Documents,
dated July 7, 2005 ............................................................................... JA1944

Transcript, Oral Argument, Judge Gershon, dated July 26, 2005 ................ JA1965

Defendant's Letter to Plaintiffs, dated July 27, 2005 ................................... JA2026

Letter from T. Long to M. Elsner, dated Aug. 3, 2005 ................................. JA2028

Plaintiffs' Second Joint Request for the Production of Documents,
dated Aug. 19, 2005 ........................................................................... JA2032

Transcript Excerpt (pp. 1, 15-16), Status Conference, Magistrate
Judge Pohorelsky, dated Aug. 23, 2005 ............................................. JA2044

Order, Magistrate Judge Pohorelsky, dated Aug. 24, 2005 ......................... JA2048

Defendant's Response to Plaintiffs' Second Joint Request for
the Production of Documents, dated Sept. 12, 2005 .......................... JA2051

Khaled Abd al-Mu'az Zein al-Din Omar, Apostilled Military
Court Record, dated Sept. 13, 2005(PX4008) .................................... JA2067

Plaintiffs' Letter to Magistrate Judge Pohorelsky,
dated Sept. 29, 2005.......................................................................... JA2090

Defendant's Letter to Magistrate Judge Pohorelsky,
dated Oct. 5, 2005.............................................................................. JA2098

Web posting, Palestinian Media Center, dated Oct. 8, 2005 (PX289) ......... JA2111

Transcript, Status Conference, Magistrate Judge Pohorelsky,
    dated Oct. 11, 2005 ............................................................... JA2116

Plaintiffs' Letter to Defendant, dated Nov. 4, 2005 ..................................... JA2318

Order, Magistrate Judge Pohorelsky, dated Nov. 9, 2005 ............................ JA2332

Defendant's Letter to Plaintiffs, dated Nov. 30, 2005 .................................. JA2336

Plaintiffs' Letter to Magistrate Judge Pohorelsky, dated Dec. 16, 2005 ...... JA2346

Defendant's Letter to Magistrate Judge Pohorelsky,
    dated Dec. 21, 2005 ............................................................. JA2352

Defendant's Letter to Magistrate Judge Pohorelsky, dated Jan. 4, 2006,
    together with the following exhibits appended thereto: ...................... JA2359

    Exhibit A:  Letter from R. Zdrojeski to Magistrate
    Judge Pohorelsky, dated Dec. 21, 2005 ............................................. JA2367

    Exhibit B:  Text of Proposed Order Compelling Production
    of Documents ...................................................................... JA2376

*Linde v. Arab Bank, PLC*, Addition of Plaintiffs Pursuant to
    Fed. R. Civ. P. 15(d), dated Feb. 7, 2006 ........................................... JA2382

Hisham Abd al-Qader Ibrahim Hijaz, Apostilled Military
    Court Record, dated Feb. 13, 2006 (PX4007) .................................... JA2395

Transcript Excerpt (pp. 1, 25-34, 81-82), Status Conference,
    Magistrate Judge Pohorelsky, Feb. 28, 2006 ...................................... JA2430

Order, Magistrate Judge Pohorelsky, dated Mar. 3, 2006 ............................ JA2440

Defendant's Letter to Plaintiffs, dated Mar. 14, 2006 .................................. JA2451

Scheduling Order, Magistrate Judge Pohorelsky, dated Mar. 24, 2006 ....... JA2456

Opinion & Order, Magistrate Judge Pohorelsky, dated Mar. 24, 2006 ........ JA2460

Defendant's Further Statement Regarding Application of Specific
    Foreign Bank Secrecy Laws to the Court's Mar. 3, 2006
    Document Production Order, dated Mar. 31, 2006 ........................... JA2464

Defendant's Letter to Plaintiffs, dated Apr. 10, 2006 ................................. JA2471

*Almog v. Arab Bank, PLC*, Clarification of Complaint Pursuant
    to Fed. R. Civ. P. 15(d), dated Apr. 14, 2006 ..................................... JA2475

Defendant's Letter to Plaintiffs, dated Apr. 24, 2006 ............................... JA2754

Plaintiffs' Letter to Defendant, dated May 2, 2006 ................................... JA2758

Defendant's Letter to Plaintiffs, dated May 15, 2006 ............................... JA2762

Plaintiffs' Letter to Defendant, dated May 16, 2006 ................................. JA2766

Defendant's Letter to Plaintiffs, dated May 17, 2006 ............................... JA2767

Plaintiffs' Letter to Defendant, dated May 18, 2006 ................................. JA2774

Plaintiffs' Letter to Magistrate Judge Pohorelsky,
    dated May 18, 2006 ........................................................................... JA2776

Defendant's Letter to Plaintiffs, dated May 18, 2006 ............................... JA2801

Defendant's Letter to Plaintiffs, dated May 22, 2006 ............................... JA2803

Defendant's Letter to Plaintiffs, dated June 5, 2006 ................................. JA2807

Order, Magistrate Judge Pohorelsky, dated June 7, 2006 ......................... JA2811

Defendant's Letter to Magistrate Judge Pohorelsky,
    dated June 21, 2006 ........................................................................... JA2814

Order, Magistrate Judge Pohorelsky, dated June 22, 2006 ....................... JA2819

Yaser Hasan Muhammad Hamad, Apostilled Military Court Record,
dated July 16, 2006 (PX3742) ............................................................ JA2822

Ahmed Mustafa Saleh Hamed, Apostilled Military Court Record,
dated July 16, 2006 (PX4009) ............................................................ JA2838

Transcript Excerpt (pp. 1-2, 37-45, 119-24), Status Conference,
Magistrate Judge Pohorelsky, dated July 20, 2006 ............................ JA2885

Order, Magistrate Judge Pohorelsky, dated Aug. 31, 2006 .......................... JA2903

Order, Judge Gershon, dated Sept. 13, 2006 ................................................ JA2906

Transcript Excerpt (pp. 1-2, 49, 96), Status Conference, Magistrate
Judge Pohorelsky, dated Sept. 21, 2006 .............................................. JA2909

Plaintiffs' Letter to Magistrate Judge Pohorelsky,
dated Oct. 11, 2006 .............................................................................. JA2914

Defendant's Subpoena for Production of Documents from
Israel Discount Bank, Ltd., dated Oct. 31, 2006 ................................. JA2917

Murad Walid Khaled Barghouti, Apostilled Military Court Record,
dated Nov. 7, 2006 (PX4010) ............................................................. JA2936*

Decision & Order, Magistrate Judge Pohorelsky,
dated Nov. 25, 2006.............................................................................. JA2950

Order, Judge Gershon, dated Dec. 13, 2006 ................................................. JA2958

Mua'yed Shukri Abd al-Hamid Hamad, Apostilled Military
Court Record, dated Dec. 8, 2006 (PX3741) ...................................... JA2964

Declaration of A.T. Vitale, dated Dec. 27, 2006 .......................................... JA3013

Order, Judge Gershon, dated Jan. 11, 2007 .................................................. JA3023

Declaration of A. Howard, dated Jan. 22, 2007, together with
the following exhibits appended thereto:  ...........................................JA3026

Exhibit A: Declaration of A.Y. Odeh, dated Mar. 30, 2006  .............JA3030

Exhibit B: Declaration of Maher Masri, dated Mar. 29, 2006  ...........JA3043

Exhibit C: Declaration of Chakib Cortbaoui, dated Mar. 29, 2006  ...JA3053

Exhibit E: Statement of U. Toukan, dated Mar. 26, 2006  .................JA3062

Exhibit F: Statement of G.T. Abed, dated Apr. 3, 2006  ....................JA3065

Declaration of A. Schlanger, dated Jan. 22, 2007, together with the
following exhibits appended thereto:  ..................................................JA3068

Exhibit C:  Defendant's Letter to Plaintiffs, dated May 17, 2006 ......JA3072

Exhibit D: Second Defendant's Letter to Plaintiffs, dated May 17,
2006  ................................................................................................JA3075

Exhibit F:  Defendant's Letter to Plaintiffs, dated Jan. 12, 2007........JA3079

Exhibit G:  Expert Declaration of J.M. Winer,
dated June 13, 2006 ...........................................................................JA3090

Exhibit N:  Letter from Defendant to the Lebanese Special
Investigations Commission, dated Nov. 8, 2005................................JA3132

Exhibit O:  Letter from the Lebanese Special Investigations
Commission to Defendant, dated Nov. 8, 2005  .................................JA3136

Declaration of A. Lorch, dated February 23, 2007, together with the
following exhibit appended thereto:  ..................................................JA3142

Exhibit C:  Prohibition on Money Laundering Law,
dated 57/60-2000 ...............................................................................JA3149

Order, Judge Gershon, dated Mar. 14, 2007 ...................................................JA3169

Order, Magistrate Judge Pohorelsky, dated Apr. 6, 2007 ..............................JA3171

*Litle v. Arab Bank, PLC*, [Corrected] Second Amended Complaint,
    Apr. 10, 2007 ...................................................................................JA3174

Document Production Order, Magistrate Judge Pohorelsky,
    dated May 7, 2007 ...............................................................................JA3282

*Litle v. Arab Bank, PLC*, Third Supplemental Complaint,
    dated June 7, 2007 ...............................................................................JA3286

Document Production Order, Magistrate Judge Pohorelsky,
    dated June 29, 2007 .............................................................................JA3291

Plaintiffs' Third Joint Request for the Production of Documents,
    dated Aug. 29, 2007 .............................................................................JA3305

*Litle v. Arab Bank, PLC*, Litle Fourth Supplemental Complaint,
    dated Sept. 5, 2007...............................................................................JA3345

Defendant's Response to Plaintiffs' Third Joint Request for the Production
    of Documents, dated Oct. 25, 2007 ...................................................JA3349

Memorandum & Order, Magistrate Judge Pohorelsky,
    dated Dec. 10, 2007 .............................................................................JA3416

Declaration of A. Ungar, dated Dec. 24, 2007, Exhibit 40:  Defendant's
    Submission to the Lebanese Special Investigation Commission,
    dated Sept. 25, 2006 ............................................................................JA3419

Declaration of A. Howard, dated Feb. 6, 2008, together with the
    following exhibits appended thereto:  ................................................JA3431

    Exhibit C:  Jordanian Appeals Court, Ruling, dated Oct. 9, 2005 ......JA3438

Exhibit D:  Palestinian Supreme Judicial Council, Ruling,
dated Oct. 1, 2005 ................................................................................ JA3450

Exhibit E:  Ramallah Civil Court of Cassation, Judgment,
dated Dec. 12, 2007 ............................................................................ JA3459

Exhibit F:  Defendant's  Application to the Palestinian Monetary
Authority, dated Oct. 5, 2005 and the Palestinian Monetary
Authority's Response, dated Oct. 19, 2005 ........................................ JA3467

Exhibit G:  Stipulated Production Order, Magistrate Judge
Pohorelsky, dated  Nov. 8, 2005 ........................................................ JA3479

Exhibit H:  Defendant's Application to the Lebanese Special
Investigation Commission, dated Dec. 22, 2005 and the Lebanese
Special Investigation Commission's Response,
dated Jan. 19, 2006 ............................................................................ JA3484

Exhibit K:  Letters of Request issued to the Appropriate Judicial,
Governmental, Regulatory or Other Authority of the Hashemite
Kingdom of Jordan and to the Appropriate Judicial, Governmental,
Regulatory or Other Authority of the Palestinian National Authority,
including the Honourable Supreme Judicial Counsel and Ramallah
Preliminary Court, dated June 26, 2007 ............................................. JA3494

Exhibit L:  Response from the Governor of the Central Bank of
Jordan, dated Sept. 9, 2007 ................................................................ JA3538

Exhibit M:  Response of the Palestinian Ministry of Justice,
dated Sept. 29, 2007 .......................................................................... JA3542

Exhibit N:  Response of the Jordanian Ministry of Justice,
dated Sept. 25, 2007 ........................................................................... JA3545

Exhibit O:  Response of the Palestinian Monetary Authority, dated
Sept. 19, 2007 .................................................................................... JA3549

Exhibit U:  Defendant's Request to the Central Bank of Lebanon,
dated Oct. 23, 2004 and Response of The Bank of Lebanon,
Governor Riad Toufie Salame, dated Nov. 3, 2004 ............................JA3551

Transcript, Status Conference, Magistrate Judge Pohorelsky,
        dated Mar. 25, 2008 ...........................................................................JA3555

Defendant's Letter to Plaintiffs, dated May 9, 2008 ....................................JA3648

Memorandum & Order, Magistrate Judge Pohorelsky,
        dated Aug. 4, 2008 .............................................................................JA3652

Memorandum & Order, Magistrate Judge Pohorelsky,
        dated Feb. 27, 2009 ...........................................................................JA3654

Memorandum & Order, Magistrate Judge Pohorelsky,
        dated May 22, 2009 ...........................................................................JA3656

Defendant's Mem. in Supp. of Objections to the Magistrate
        Judge's Report and Recommendation on Sanctions,
        dated July 16, 2009 ...........................................................................JA3674

Declaration of A. Howard, dated July 16, 2009, together with
        the following exhibits appended thereto:  ...........................................JA3709

        Exhibit B:  Response to Letter of Request by the German
        Ministry of Justice, dated Sept. 12, 2008 ..........................................JA3714

        Exhibit C:  Response to Letter of Request by the Kingdom of
        Morocco Ministry of Justice, dated Jan. 20, 2009 ..............................JA3721

        Exhibit D:  Response to Letter of Request by the Qatar
        Central Bank, dated Feb. 25, 2009  ...................................................JA3727

        Exhibit E:  Response to Letter of Request by the
        Commercial Court of the United Kingdom,
        dated Jan. 27, 2009  ...........................................................................JA3732

Defendant's Opposition to Plaintiffs' Objections to Magistrate Judge's
Report and Recommendation on Sanctions,
dated Sept. 3, 2009 ...............................................................JA3737

Defendant's Letter to Judge Gershon, dated Nov. 18, 2009 ........................JA3799

Minute Order, Judge Gershon, dated July 22, 2010 ....................................JA3819

Letter from Minister of Finance of Republic of Lebanon to
Judge Gershon, dated Aug 12, 2010....................................................JA3820

Letter from Governor of Palestine Monetary Authority to
Judge Gershon, dated Aug. 25, 2010....................................................JA3822

Letter from Prime Minister of Palestinian National Authority to Judge
Gershon, dated Aug. 30, 2010 ...........................................................JA3825

Letter from Prime Minister of Hashemite Kingdom of Jordan to U.S.
Secretary of State Hillary Clinton, dated Aug. 31, 2010 ...................JA3826

Defendant's Responses to Plaintiffs' Amended Third Joint
Interrogatories, dated Jan. 12, 2011 (PX12) .....................................JA3828

Expert Rebuttal Report of B. Yadid, dated Apr. 5, 2011 ..............................JA3829

Expert Rebuttal Report of A.T. Vitale, dated Apr. 5, 2011 .........................JA3858

Web posting, Palestinian Information Center, dated May 9, 2011
(PX3744) ........................................................................................JA3887

Reply Brief for Defendant-Appellant, Excerpt (p.31), United
States Court of Appeals for the Second Circuit,
dated June 6, 2011 ...........................................................................JA3896

Order, Judge Gershon, dated Dec. 6, 2011 ...................................................JA3898

Revised Expert Report of A. Vitale, dated Jan. 31, 2012 (together
with the appendix attached thereto) ...................................................JA3904

Transcript, Conference, Judge Gershon, dated Feb. 24, 2012 ...................... JA3986

Transcript Excerpt (pp. 22-25), Oral Argument, United States Court of
       Appeals for the Second Circuit, dated Mar. 6, 2012 ......................... JA4019

Declaration of D.W. Mateyaschuk, II, dated Apr. 9, 2012, together
       with the following exhibits appended thereto: .................................. JA4025

       Exhibit A:  Notice of Intent to Raise Issues of Foreign Law
       through the Testimony of Dr. Goerge Tewfic Al Abed
       (without additional enclosures), dated Apr. 9, 2012 ......................... JA4030

       Exhibit B:  Notice of Intent to Raise Issues of Foreign Law
       through the Testimony of Umayya Toukan (without
       additional enclosures), dated Apr. 9, 2012 ....................................... JA4035

       Exhibit C:  Notice of Intent to Raise Issues of Foreign Law
       through the Testimony of Marwan M. Nsouli (without
       additional enclosures), dated Apr. 9, 2012 ....................................... JA4040

       Exhibit D:  Notice of Intent to Raise Issues of Foreign Law
       through the Testimony of Yair Dagan (without additional
       enclosures), dated Apr. 9, 2012 ........................................................ JA4045

       Exhibit E:  Expert Report of Dr. George Tewfic Al Abed, dated Feb.
       4, 2011 ............................................................................................... JA4049

       Exhibit F:  Expert Report of Marwan M. Nsouli,
       dated Jan. 21, 2011 .......................................................................... JA4082

       Exhibit Q:  Expert Report of Jonathan Burchfield, as publicly filed in
       Weiss v. National Westminster Bank PLC,
       dated Mar. 22, 2012 ........................................................................ JA4104

Declaration of A. Schlanger, dated Apr. 25, 2012, Exhibit A: Expert
       Testimony, Jonathan Benthall, dated Feb. 2, 2011 ............................ JA4129

Declaration of A. Schlanger, dated Apr. 25, 2012, Exhibit B: Expert
    Testimony, Pinhas Shmilovitch, dated Feb. 22, 2011 ........................JA4149

Declaration of J. Israel, dated May 7, 2012, Exhibit A:
    Excerpts from May 2, 2012 Transcript of Hearing
    before Judge Gershon .........................................................................JA4156

Declaration of J. Israel, dated May 7, 2012, Exhibit C: Excerpts
    from Nov. 15, 2010 Deposition of S. Bishara ....................................JA4162

Declaration of J. Israel, dated May 7, 2012, Exhibit D: Excerpts
    from Mar. 25, 2008 Transcript of Hearing before
    Magistrate Judge Pohorelsky ..............................................................JA4167

Declaration of J. Israel, dated May 7, 2012, Exhibit F:  Excerpts
    from May 5, 2007 Deposition of T. Sadiq .........................................JA4172

Declaration of S.J. Young, dated Aug. 8, 2012, together with the
    following exhibits appended thereto: ..................................................JA4179

    Exhibit 174:  Statement by the President on the Death
    of Crown Prince Nayif bin Abd al-Aziz Al Saud of
    Saudi Arabia, dated June 16, 2012 ......................................................JA4209

    Exhibit 175:  Statement by the Vice President on the
    Death of Crown Prince Nayif bin Abd al-Aziz Al Saud of Saudi
    Arabia, dated June 16, 2012 ................................................................JA4212

    Exhibit 184:  Testimony Excerpt (pp. 162, 332-33),
    A. Spitzen Dep., dated July 21, 2011 ..................................................JA4215

    Exhibit 185:  Testimony Excerpt (pp. 1-4, 139-41),
    M. Levitt Dep., dated June 16, 2011 ...................................................JA4219

Order, Judge Gershon, dated Jan. 22, 2013 ................................................JA4224

Order, Judge Gershon, Feb. 6, 2013 ..........................................................JA4225

Declaration of S.J. Young, dated Feb. 20, 2013, together with
the following exhibits appended thereto: ........................................... JA4244

Exhibit B: Expert Report of R. Lacey, dated Feb. 4, 2011 ................ JA4246

Exhibit C: Expert Rebuttal Report of R. Lacey,
dated Apr. 4, 2011 .............................................................................. JA4270

Exhibit D: Expert Report of D. Rundell, dated Feb. 17, 2011 .......... JA4285

Exhibit E: Expert Report of A. Shlaim, dated Jan. 26, 2011.............. JA4313

Exhibit F: Expert Report of Brig. Gen. (Ret.) I. Paz,
dated Oct. 24, 2010 .............................................................................. JA4345

Exhibit G: Expert Report of A. Kostelitz, dated Feb. 22, 2011 ......... JA4366

Exhibit I: Expert Report of E. Abington, dated Feb. 14, 2011.......... JA4385

Appendix A, Appended to Defendant's Mot. for Partial
Reconsideration of Feb. 6, 2013 Order, dated Feb. 2, 2013 ............... JA4406

Transcript, Hearing, Judge Gershon, dated Apr. 24, 2013 ........................... JA4415

Order, Judge Gershon, dated May 3, 2013 .................................................. JA4536

Opinion & Order, Judge Gershon, May 10, 2013 ........................................ JA4537

Order, Judge Gershon, dated May 24, 2013 ................................................. JA4539

Order, Judge Gershon, dated May 28, 2013 ................................................. JA4540

Order, Judge Gershon, dated June 1, 2013 .................................................. JA4549

First Supplement to Joint Pre-Trial Order (without exhibits),
dated July 12, 2013 .......................................................................... JA4551

Brief of the Hashemite Kingdom of Jordan, as *Amicus Curiae*,
    *Arab Bank v. Linde*, 12-1485 (U.S.), dated July 24, 2013 ................. JA4563

Transcript, Hearing, Judge Cogan, dated July 30, 2013 ............................... JA4591

Defendant's Letter to Judge Cogan, dated Aug. 7, 2013, Exhibit A:
    White House Press Briefing, dated Apr. 12, 2002 ............................. JA4769

Defendant's Letter to Judge Cogan, dated Aug. 7, 2013, Exhibit B:
    Interview with Secretary Colin Powell on NBC's Meet the Press,
    dated May 5, 2002 ............................................................... JA4779

Defendant's Letter to Judge Cogan, dated Aug. 12, 2013 ........................... JA4787

Defendant's Letter to Judge Cogan, dated Aug. 14, 2013, together
    with the following exhibits appended thereto: ................................... JA4790

    Exhibit 1:  Excerpts of the Testimony of Edward Abington, dated
    Mar. 22, 2012 ..................................................................... JA4800

    Exhibit 2:  Excerpts of the Testimony of E. Abington from
    the trial of the Holy Land Foundation, dated Nov. 6, 2008 ............... JA4820

    Exhibit 3:  Excepts of the Testimony of Brig. Gen. I. Paz,
    dated Apr. 19, 2012 ........................................................... JA4970

    Exhibit 4:  Letter from Commander of the Israel Defense Forces to
    Defendant, dated Sept. 2, 2009) ......................................... JA5042

    Exhibit 5:  Excerpts of the Testimony of D.H. Rundell,
    dated Apr. 5, 2012 ............................................................ JA5050

    Exhibit 6:  Diplomatic Cable from U.S. Embassy in Amman
    re Arab Bank, dated Nov. 24, 2012 ...................................... JA5089

    Exhibit 7:  Excerpts of the Testimony of E. Gnehm Jr.,
    dated Mar. 30, 2012 .......................................................... JA5099

Exhibit 8: Excerpts of the Testimony of Y. Dagan,
dated Mar. 20, 2012 ........................................................................ JA5156

Exhibit 9: Excerpts of the Testimony of George Abed,
dated Mar. 9, 2012 .......................................................................... JA5170

Defendant's Letter to Judge Cogan, dated Aug. 21, 2013 ........................... JA5214

Order, Judge Cogan, dated Aug. 23, 2013 ................................................. JA5225

Order, Judge Cogan, dated June 23, 2014 ................................................. JA5228

Defendant's Letter to Judge Cogan, dated July 1, 2014, Exhibit 1: Brief of
the United States as *Amicus Curiae*, *Arab Bank v. Linde*,
12-1485 (U.S.), dated May 23, 2014 ................................................. JA5234

Transcript, Hearing, Judge Cogan, dated July 14, 2014 .............................. JA5264

Order, Judge Cogan, dated July 23, 2014 .................................................. JA5294

Order, Judge Cogan, dated July 24, 2014 .................................................. JA5298

Order, Judge Cogan, dated July 31, 2014 .................................................. JA5300

Transcript Excerpt (pp. 1, 25-31), Pre-Trial Conference, Judge Cogan,
dated Aug. 12, 2014 ........................................................................ JA5304

Order, Judge Cogan, dated Aug. 12, 2014 ................................................. JA5313

Trial Transcript Day 1, Excerpts (pp. 216, 233-35, 251-96), dated Aug. 14,
2014 .............................................................................................. JA5319

Order, Judge Cogan, Aug. 17, 2014 .......................................................... JA5372

Trial Transcript Day 2, Excerpts (pp. 305-07), dated Aug. 18, 2014 ........... JA5381

Transcript of Designated Videotaped Testimony, Excerpt 1,
Aug. 18, 2014 ................................................................................. JA5386

Transcript of Designated Videotaped Testimony, Excerpt 2,
Aug. 18, 2014 ....................................................................... JA5410

Transcript of Designated Videotaped Testimony, Excerpt 3,
Aug. 18, 2014 ....................................................................... JA5420

Transcript of Designated Videotaped Testimony, Excerpt 4,
Aug. 18, 2014 ....................................................................... JA5449

Transcript of Designated Videotaped Testimony, Excerpt 5,
Aug. 18, 2014 ....................................................................... JA5492

Transcript of Designated Videotaped Testimony, Excerpt 7,
Aug. 18, 2014 ....................................................................... JA5500

Transcript of Designated Videotaped Testimony, Excerpt 8,
Aug. 18, 2014 ....................................................................... JA5557

Transcript of Designated Videotaped Testimony, Excerpt 9,
Aug. 18, 2014 ....................................................................... JA5586

Trial Transcript Day 3, Excerpts (pp. 587, 620-21, 631-34, 658-61, 688,
693-97, 704-07, 719-28, 734-35, 740-41, 746-47, 749-50, 754, 764,
768-71, 776-80, 782-86), dated Aug. 19, 2014 .................................. JA5616

Trial Transcript, Day 4, Excerpts (pp. 820-24, 836, 841, 874-76, 886, 888-
97, 901-02, 907-09), dated Aug. 21, 2014 ......................................... JA5673

F.R.E. 1006, Summary Exhibits, W. Geisser, testifying Aug. 21, 2014:

Summary of Financial Transactions for Nine (9) Selected Entities /
Organizations as Originator (1999 to 2004) (PX4747) ...................... JA5701

Summary of Financial Transactions for Nine (9) Selected Entities /
Organizations as Originator by Year (1999 to 2004) (PX4748) ......... JA5702

Summary of Transactions for Nine (9) Selected Entities / Organizations as Originator with Total US Dollar Value to Beneficiaries (PX4749) ....................................................JA5703

Annual Totals & Chart of Financial Transactions for Nine (9) Selected Entities / Organizations as Originator (PX4750) ...............................JA5704

Summary of Financial Transactions for Interpal as Originator (1999 to 2004) (PX4751) .................................................................JA5705

Summary of Financial Transactions for Twelve (12) Selected Entities / Organizations as Beneficiary (1999 to 2004) (PX4752)...................JA5706

Summary of Financial Transactions for Twelve (12) Selected Entities / Organizations as Beneficiary by Year (1999 to 2004) (PX4753) ..........................................................................................JA5707

Summary of Transactions for Twelve (12) Selected Entities / Organizations as Beneficiary with Total US Dollar Value from Originators (PX4754) ........................................................................JA5708

Annual Totals & Chart of Financial Transactions for Twelve (12) Selected Entities / Organizations as Beneficiary (PX4755) ...............JA5709

Annual Totals & Chart of Financial Transactions for: The Islamic Society - Gaza as Beneficiary (PX4756) ...........................................JA5710

Annual Totals & Chart of Financial Transactions for: Al-Salah Islamic Association - Gaza as Beneficiary (PX4757) ........................JA5711

Annual Totals & Chart of Financial Transactions for: Islamic Charitable Society - Hebron as Beneficiary (PX4758) ......................JA5712

Saudi Committee in Support of the Intifada Al Quds, Funds Transferred to Nine (9) Identified Organizations (PX4759) ..............JA5713

Saudi Committee in Support of the Intifada Al Quds,
Funds Transfers to Nine (9) Identified Organizations by
Year (Funds Transferred via Arab Bank) (PX4760) ..........................JA5714

Saudi Committee in Support of the Intifada Al Quds –
Payments to Individuals by Payment Amount via Arab
Bank (92.5% of Payments in Cash) (PX4761) ...................................JA5715

Saudi Committee in Support of the Intifada Al Quds - Payments to
Individuals by Payment Amount and Year (via Arab Bank)
(PX4762) ...........................................................................................JA5716

Wire Transfers Originated by Interpal to Beneficiaries at Arab Bank
Branches (PX4763) ............................................................................JA5717

Arab Bank – New York Branch Transactions - Summary of
Transactions for Identified Individual – Yousef Al Hayek
(PX4764) ...........................................................................................JA5718

Yousef Al-Hayek Wire Transfers via Arab Bank – New York By
Month and Year (PX4765) ................................................................JA5720

Yousef Al-Hayek Wire Transfers via Arab Bank – New York
(PX4766) ...........................................................................................JA5721

Trial Transcript, Day 5, Excerpts (pp. 981, 988, 1041-44), dated Aug. 25,
2014 ................................................................................................JA5722

Defendant's Letter to Judge Cogan, dated Aug. 25, 2014.............................JA5730

"Suicide Terrorists in the Current Conflict," Israeli Security Agency
[undated, presented at trial on Aug. 25, 2014] (PX3811) ..................JA5732

Order, Judge Cogan, dated Aug. 26, 2014 ....................................................JA5903

Trial Transcript, Day 8, Excerpts (pp. 1387, 1406-08),
dated Aug. 28, 2014 ..........................................................................JA5906

Demonstratives, A. Spitzen, testifying Aug. 28, 2014 (18-19, 96-100) ....... JA5912

Plaintiffs' Letter to Judge Cogan, dated Sept. 1, 2014 ................................. JA5919

Order, Judge Cogan, Sept. 1, 2014 ............................................................... JA5923

Trial Transcript, Day 9, Excerpts (pp. 1437-75, 1490-98, 1519, 1522-23,
    1528-30, 1535, 1554), dated Sept. 2, 2014 ......................................... JA5939

Trial Transcript, Day 10, Excerpts (1571-73, 1577, 1579, 1580-81, 1699),
    dated Sept. 3, 2014 ............................................................................. JA5997

Defendant's Letter to Judge Cogan, dated Sept. 3, 2014.............................. JA6007

Demonstratives, B. Milton-Edwards, submitted Sept. 3, 2014 .................... JA6011

Defendant's Letter to Judge Cogan, dated Sept. 3, 2014, together with the
    following exhibits appended thereto: .................................................. JA6132

    Exhibit A:  Defendant Arab Bank's Exhibit Supplement,
    dated Sept. 3, 2014............................................................................... JA6135

    Exhibit B:  Expert Report of B. Milton-Edwards,
    dated Jan. 31, 2011 ............................................................................. JA6141

Order, Judge Cogan, dated Sept. 4, 2014....................................................... JA6173

Trial Transcript, Day 11, Excerpts (pp. 1720-29, 1735, 1738, 1746, 1752,
    1754, 1757, 1761, 1763, 1767, 1771, 1775-76, 1779-81, 1784-85,
    1788-89), dated Sept. 4, 2014 ............................................................. JA6176

Trial Transcript, Day 12, Excerpts (pp. 1865, 1868-70, 1876-78, 1881-82,
    1884, 1888, 1890-1900, 1907-1909, 1920-22, 1931-40, 1945, 1954-
    60, 1987-88, 1969-71, 1978-80, 1985-87, 2005-06), dated Sept. 5,
    2014 .................................................................................................... JA6207

Defendant's Letter to Judge Cogan, dated Sept. 7, 2014, Exhibit 1: Expert
    Report of Y. Dagan,  dated Feb. 17, 2011 ........................................... JA6267

Trial Transcript, Day 13, Excerpts (pp. 2017, 2021-22, 2038, 2048-49, 2052-
54, 2057-61, 2064-66, 2071-85, 2095, 2097, 2113-14, 2116-19, 2121,
2123-30, 2133-36, 2153-55, 2167-68, 2170-81),
dated Sept. 8, 2014 ........................................................................... JA6334

Trial Management Order, Judge Cogan, dated Sept. 9, 2014 ....................... JA6406

Trial Transcript, Day 14, Excerpts (pp. 2187-2359),
dated Sept. 10, 2014 ......................................................................... JA6408

Trial Transcript, Day 15, Excerpts (pp. 2364-66, 2369-2426-26, 2429, 2435-
36, 2444-48, 2449, 2455-57, 2461-62, 2470-75, 2532, 2534-38, 2540-
42, 2544, 2548-58, 2560-76), dated Sept. 11, 2014 ........................... JA6583

Defendant's Letter to Judge Cogan, dated Sept. 12, 2014,
together with the following exhibits appended thereto ...................... JA6703

    Exhibit 1: Demonstratives, T. Sadeq ................................................. JA6704

    Exhibit 2: Demonstratives, A. Saleh ................................................. JA6708

    Exhibit 3: Demonstratives, G. Kawwas ............................................ JA6713

    Exhibit 4: Demonstratives, B. Al-Omari .......................................... JA6719

    Exhibit 5: Exhibits, T. Sadeq & A. Saleh ......................................... JA6723

Trial Transcript, Day 16, Excerpts (pp. 2579-2808),
dated Sept. 12, 2014 ......................................................................... JA6724

Defendant's Letter to Judge Cogan, dated Sept. 14, 2014,
together with the following exhibits appended thereto ...................... JA6955

    Exhibit 1: Demonstratives & Exhibits, M. Tahan ............................. JA6956

    Exhibit 2: Demonstratives & Exhibits, A. Saleh .............................. JA6957

Trial Transcript, Day 17, Excerpts (pp. 2815, 2817, 2827-29, 2833-51, 2871, 2873, 2884, 2886-93, 2895-97, 2902-04, 2906, 2911-12, 2918-24), dated Sept. 15, 2014 ....................................................................JA6958

Trial Transcript, Day 18, Excerpts (pp. 2946-47, 2957-61, 2977-80, 2982, 2986-88, 2993-95, 2998, 3003-07, 3009-10, 3012), dated Sept. 16, 2014 .................................................................................JA7010

Order, Judge Cogan, dated Sept. 16, 2014.....................................JA7039

Trial Transcript, Day 19, Excerpts (pp. 3044, 3075-81, 3083-85), dated Sept. 17, 2014 .............................................................................JA7043

Transcript, Charging Conference, Excerpts (pp. 3100-27), Judge Cogan, dated Sept. 17, 2014 ....................................................................JA7059

Jury Charge & Verdict Form Issued to Counsel, dated Sept. 17, 2014.........JA7087

Trial Transcript, Day 20, Excerpts (pp. 3144, 3161-62, 3179-82, 3215, 3245, 3252-55, 3258-60, 3263, 3267-68, 3277-78, 3285, 3300, 3303, 3310, 3329-30, 3341), dated Sept. 18, 2014 ................................................JA7114

Plaintiffs' Closing Argument, Slide 31, dated Sept. 18, 2014.......................JA7143

Trial Transcript, Day 21, Excerpts (pp. 3360, 3364-65), dated Sept. 19, 2014 ...........................................................................JA7144

Appendix A: "Transactional Analysis By Attack," filed with Defendant's Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b), dated Oct. 10, 2014 .................................................................JA7149

Appendix B: "Alleged Palestinian 'Front' Charities," filed with Defendant's Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b), dated Oct. 10, 2014 .................................................................JA7174

Appendix C: "Alleged 'Worldwide Fundraising Network,'" filed with Defendant's Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b), dated Oct. 10, 2014 ................................................JA7175

Appendix D: "Alleged Hamas 'Leaders and Operatives,'" filed with
　　Defendant's Motion for Judgment as a Matter of Law Pursuant
　　to Fed. R. Civ. P. 50(b), dated Oct. 10, 2014 ....................................JA7176

Declaration of A. Schlanger, dated Nov. 24, 2014, together with the
　　following exhibits appended thereto: .................................................JA7177

　　Exhibit 1: Excerpt Defendant's Letter to Judge Gershon, dated Mar.
　　22, 2007 ..........................................................................................JA7180

　　Exhibit 3: Slide 50, displayed to jury on Sept. 2, 2014 ......................JA7188

　　Exhibit 4: Excerpt, Hamas: The Islamic Resistance Movement,
　　displayed to the jury on Sept. 11, 2014 .............................................JA7190

　　Exhibit 7: Slide 22, displayed to jury on Aug. 14, 2014 ....................JA7194

　　Exhibit 11: Letter from J.F. Hacket to Plaintiffs,
　　dated Sept. 16, 2014..........................................................................JA7196

Declaration of D.W. Mateyaschuk, II, dated Dec. 12, 2014, together with the
　　following exhibits appended thereto .................................................JA7202

　　Exhibit 1: Unofficial Transcript, Excerpt (pp. 1-9), *Weiss v. National
　　Westminster Bank, Plc*, 11- 1618 (2d Cir.),
　　dated Mar. 11, 2014..........................................................................JA7204

　　Exhibit 2: Transcript, Excerpt (pp. 1-2, 25-31), *In re Chiquita Brands
　　Int'l Inc.*, 08-md-1916 (S.D. Fl.), dated Apr. 28, 2014 .......................JA7208

Appendix 1: "Examples of the Court's Application of the Sanctions Order,"
　　filed with Defendant's Motions for Judgment as a Matter of Law, a
　　New Trial, or, the Alternative, Certification of an Interlocutory
　　Appeal, dated Dec. 12, 2014 .............................................................JA7218

*Linde v. Arab Bank, PLC*, Second Amended Complaint,
　　dated Mar. 13, 2015 ..........................................................................JA7223

Order, Judge Cogan, July 24, 2015.................................................................JA7228

(b)     Ayelet Hashahar Levy.  Plaintiffs asserting claims related to and/or arising from this death are Zeev Wiesner (individually and as representative of the estate of Ayelet Hashahar Levy), a citizen of Israel and the United States, former husband of decedent; Oriya Wiesner, daughter of decedent; and Itshak Levy, father of decedent.

Among those injured are plaintiff Sonia Levy, wife of plaintiff Maor Levy and mother of plaintiff Oshry Levy; and Shmulik Or, Zuriel Or, and Rinat Or, children of plaintiff Amnon Or.

(144)   October 28, 2000:  An Israeli civilian is tortured, shot, and burned in his car between Beitunia and Ramallah.  Fatah Tanzim is responsible for the killing.

The individual killed is:

(a)     Marik Gavrilov.   Plaintiffs asserting claims related to and/or arising from this death are Yuri Gavrilov and Anna Gavrilov, parents of decedent; and Radion Gavrilov and Artur Gavrilov, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Marik Gavrilov.

(145)   October 3, 2000:  A stone[22] is thrown through the windshield of a vehicle traveling on Road 443 near Bet Shoron, injuring plaintiff Yair Azziz, husband of plaintiff Gila Azziz and father of plaintiffs Liron Azziz, Eviatar Azziz, and Inbal Azziz.

(146)   November 7, 1999:  Hamas operatives detonate three pipe bombs on the main street of Netanya, injuring 27, including plaintiff Elimelech Berkovitz, husband of plaintiff Marcela Berkovitz; and plaintiff Oleg Goncharov, husband of plaintiff Elena Goncharov.

 (147)  August 7, 1999:  An Israeli man is killed and burned in his car on the Shechem-Jenin road.  Hamas is responsible for the murder.

---

[22]  The nature of the attack was erroneously listed as a firebombing in previous filings.

JA2701

The individual killed is:

(a)      Edward Bradichanski.  Plaintiffs asserting claims related to and/or arising from this death are Fina Bradichanski, wife of decedent; and Roman Bradichanski and David Bradichanski, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Edward Bradichanski.

(148)   January 4, 1999:  Palestinian gunmen open fire on a vehicle in Kiryat Arba, wounding plaintiff Fanny El Ezra, wife of plaintiff Meir El Ezra and mother of plaintiff Kinneret Day; plaintiff Gracia Elmaliah, wife of plaintiff Yossef Elmaliah; and plaintiff Flora Chofi.

(149)   December 2, 1998:  A Hamas lynch mob attacks and stones a vehicle near Ramallah, nearly killing the passengers, among them plaintiff Asaf Myara, a citizen of Israel and the United Kingdom.

(150)   October 29, 1998:  A suicide terrorist drives an explosives-laden car into the side of a school bus in the Gaza Strip settlement of Kfar Darom, killing one and injuring several others, among them plaintiff Ziv Hazanovsky.

(151)   March 21, 1997:  Hamas suicide bomber Mousa Abdel Qader Ghneimat explodes on the terrace of a Tel Aviv café, killing three and injuring 48.

The individuals killed are:

(a)      Yael Gilad.  Plaintiffs asserting claims related to and/or arising from this death are Tamar Gilad and Moshe Gilad, parents of decedent; and Nurit Gilad, Michal Friedenthal and Anat Gilad, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yael Gilad.

JA2702

(b)     Michal Meidan Abrahamy.  Plaintiffs asserting claims related to and/or arising from this death are Shay Abrahamy, husband of decedent; and Iris Meidan Strijevski and Noah Meidan, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Michal Meidan Abrahamy.

(c)     Anat Rosen-Winter.  Plaintiffs asserting claims related to and/or arising from this death are Zahava Rosen and Zvi Rosen, parents of decedent; and Doron Rosen, a citizen of Israel and the United States, and Eyal Rosen, siblings of decedent. Each of these individuals asserts claims individually and/or as representative of the estate of Anat Rosen-Winter.

Among those injured are plaintiff Rivka Shekef, wife of Israel Shekef; plaintiff Lior Bort, husband of plaintiff Carmel Bort and father of plaintiffs Shy Bort and Stav Bort; plaintiff Tamara Lender, wife of plaintiff Abraham Lender; plaintiff Ilana Pollak, wife of plaintiff Moshe Pollak; plaintiff Rina Ronen, a citizen of Israel and Italy, wife of plaintiff Mark Ronen, a citizen of Israel and Italy, daughter of plaintiff Rachel Lavie, a citizen of Israel and the United Kingdom, and sister of plaintiff Nira Zohar; Liora Bernstein, mother of plaintiffs Itay Bernstein and Natalia Yefet; Yael Saig, daughter of plaintiff Yael Saig; and plaintiffs Dafna Alon, Hinda Alon, Maya Abrahamy, Shay Abrahamy, Zadok Abrass, Edna Doron, Hadas Katzav, and Shoshana Katzav.

(152) May 13, 1996:  Hamas gunmen open fire on Jewish settlers at the Ayosh Junction near Beit El in the West Bank, killing one and injuring others, including plaintiff Ravit Rivka David, wife of plaintiff Uzi David, mother of plaintiffs Omri David, Noa David, and Yair David, and daughter of plaintiffs Ahuva Salman and Adiv Salman; and

JA2703

plaintiff Yaeir Grinbaum, husband of plaintiff Naama Grinbaum and father of plaintiff Aria Rebeka Grinbaum.

(153)   March 4, 1996:   A PIJ suicide bomber detonates a 20-kilo nail bomb outside the Dizengoff Center in Tel Aviv.  Thirteen are killed and 115 wounded.

Among those killed are:

(a)     Inbar Attiya.  Plaintiffs asserting claims related to and/or arising from this death are Jacob Attiya (individually and as representative of the estate of Inbar Attiya) and Hermona Attiya, parents of decedent; and Assaf Attiya and Orit Attiya Tarkay, siblings of decedent.

(b)     Hadas Dror.  Plaintiffs asserting claims related to and/or arising from this death are Nahum Dror (individually and as representative of the estate of Hadas Dror) and Yael Dror, parents of decedent; and Nitzan Dror and Erez Dror, siblings of decedent.

(c)     Tali Gordon.  Plaintiffs asserting claims related to and/or arising from this death are Margalit Gordon, mother of decedent; and Alon Gordon, brother of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Tali Gordon.

(d)     Yovav Levi.  Plaintiffs asserting claims related to and/or arising from this death are Kochava Levi and Yosef Levi, parents of decedent; and Nadav Levi and Matan Levi, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Yovav Levi.

(e)     Bat-Hen Shahak.  Plaintiffs asserting claims related to and/or arising from this death are Tzvika Shahak and Ayelet Shahak, parents of decedent.  Each

JA2704

of these individuals asserts claims individually and/or as representative of the estate of Bat-Hen Shahak.

(f)     Assaf Wax.   Plaintiffs asserting claims related to and/or arising from this death are Shoshana Wax-Biterman and Dov Wax, parents of decedent; and Eitan Wax, Maytal Wax, and Sharon Wax, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Assaf Wax.

(g)     Lea Mizrachi.   The plaintiff asserting claims related to and/or arising from this death is David Baruch, brother of decedent.   This individual asserts claims individually and/or as representative of the estate of Lea Mizrachi.

(h)     Yaakov Zaharon.   Plaintiffs asserting claims related to and/or arising from this death are Ester Zaharon and Ezra Zaharon, parents of decedent; and Oranit Zaharon and Orly Zaharon, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Yaakov Zaharon.

(i)     Gail Belkin, a citizen of Israel and South Africa.   Plaintiffs asserting claims related to and/or arising from this death are Beverly Elyse Edri and Lauren Ruth Cohen, both citizens of Israel and South Africa, children of decedent; and Marlyn Hilary Butchins and Paul Anthony Butchins, both citizens of Israel and South Africa, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Gail Belkin.

(j)     Sylvia Cecilia Bernstein, a citizen of Israel and South Africa. Plaintiffs asserting claims related to and/or arising from this death are Marlyn Hilary Butchins and Paul Anthony Butchins, both citizens of Israel and South Africa, children of

128

**JA2705**

decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Sylvia Cecilia Bernstein.

Among those injured are plaintiff Tova Cagan, wife of plaintiff Eitan Cagen; plaintiff Maytal Wax, daughter of plaintiffs Shoshana Wax-Biterman and Dov Wax; plaintiff Avner Brener, husband of plaintiff Nina Brener and father of plaintiffs Moran Brener and Ofer Brener; plaintiff Menashe David Por, husband of plaintiff Liora David Por and father of plaintiffs Bat El David Por and Hana David Por; and plaintiffs Yael Ribak, Lior Gal, Aharon Gal, Sarah Mordecai, and Dikla Berger.

(154)   February 25, 2005:  PIJ suicide bomber Abdullah Said Badran detonates his explosives outside the Stage Club in Tel Aviv, killing five and wounding fifty others.

Among those killed are:

(a)   Audelia Hobara.  Plaintiffs asserting claims related to and/or arising from this death are Dalia Hobara and Simon Hobara, parents of decedent; and Oren Moshe Hobara and Alon Heber, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Audelia Hobara.

(b)   Itzhak Boozaglo.  The plaintiff asserting claims related to and/or arising from this death is Iris Lavi, sister of decedent.  This individual asserts claims individually and/or as representative of the estate of Itzhak Boozaglo.

(c)   Yael Orbach.  The plaintiff asserting claims related to and/or arising from this death is Israel Orbach, father of decedent.  This individual asserts claims individually and/or as representative of the estate of Yael Orbach.

JA2706

Among those injured are plaintiff Yael Barhom and her husband, plaintiff David Barhom; plaintiff Eytan Hayat and his wife, plaintiff Nava Hayat; and plaintiffs Izak Danino, Ishay Mizrahi, Offir Gonen, Shiri Siton, and Ofira Mor.

(155)   January 13, 2005:  Palestinian terrorists Muhannad Abdul Rahman al-Mansi, Samir Muhammad Jeha, and Mahmoud Majdi Muhammad al-Masri activate an explosive device on the Palestinian side of the Karni crossing, infiltrate the Israeli side, and fire at Israeli civilians, killing six and wounding five.  Hamas and AAMB claim joint responsibility.

Among those killed are:

(a)      Herzl Shlomo.  Plaintiffs asserting claims related to and/or arising from this death are Zehava Shlomo, wife of decedent; Ganit Shlomo, daughter of decedent; Chana Shlomo and Yoseph Shlomo, parents of decedent; and Pinchas Shlomo, Sarit Gabai, Moshe Shlomo, Tzion Shlomo, and Simcha Shlomo, siblings of decedent. Each of these individuals asserts claims individually and/or as representative of the estate of Herzl Shlomo.

(b)      Ivan Smilov.  Plaintiffs asserting claims related to and/or arising from this death are Malka Smilov, wife of decedent; Yuri Smilov and Stanislav Smilov, children of decedent; and Betish Abramov, mother of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Ivan Smilov.

(c)      Dror Gazari.  Plaintiffs asserting claims related to and/or arising from this death are Zohra Gazari, mother of decedent; and Margalit Gazari, sister of

130

**JA2707**

decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Dror Gazari.

(d)      Ofer Tayri.  The plaintiff asserting claims related to and/or arising from this death is Ayelet Oren, sister of decedent.  This individual asserts claims individually and/or as representative of the estate of Ofer Tayri.

Among those injured are plaintiff Nissim Shadadi.

(156)   January 12, 2005:  PIJ detonates a bomb near Morag in Gush Katif, in the Southern Gaza strip.  The explosion kills a civilian and wounds three IDF soldiers.

The individual killed is:

(a)      Gideon Rivlin.  Plaintiffs asserting claims related to and/or arising from this death are Simha Rivlin, wife of decedent; and Nir Rivlin, Asaf Rivlin, and Gilad Rivlin, all citizens of Israel and of the United States, and Ya'ara Rivlin and Omer Rivlin, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Gideon Rivlin.

(157)   July 4, 2004:  AAMB terrorists ambush, shoot, and kill an Israeli as he drives near the village of Yabed.

The individual killed is:

(a)      Victor Keiderman.  The plaintiff asserting claims related to and/or arising from this death is Ema Keiderman, wife of decedent.  This individual asserts claims individually and/or as representative of the estate of Victor Keiderman.

(158)   January 14, 2004:  Reem al-Rayashi, a female suicide bomber, detonates a bomb at the Erez Crossing in the Gaza Strip, killing four and wounding ten others. Hamas and AAMB claim joint responsibility for the attack.

131

**JA2708**

Among those killed is:

(a)   Gal Shapira.  Plaintiffs asserting claims related to and/or arising from this death are Ilena Shapira and Boris Shapira, parents of decedent; and Natalia Shapira Levinson, sister of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Gal Shapira.

Among those injured is plaintiff Roslan Shomilin.

(159)   September 26, 2003:  A PIJ terrorist infiltrates the Negohot settlement south of Hebron on the eve of Rosh Hashana and opens fire on the holiday meal, killing two.

The individuals killed are:

(a)   Shaked Avraham, aged seven months.  Plaintiffs asserting claims related to and/or arising from this death are Shay Avraham and Shira Avraham, parents of decedent; and Yhonatan-Haim Avraham, brother of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Shaked Avraham.

(b)   Eyal Yeberbuim.  The plaintiff asserting claims related to and/or arising from this death is Sara Yeberbuim, wife of decedent.  This individual asserts claims individually and/or as representative of the estate of Eyal Yeberbuim.

(160)   March 19, 2003:  AAMB gunmen shoot and kill a man driving in his car between Mevo Dotan and Shaked.

The individual killed is:

(a)   Zion Busharian.   Plaintiffs asserting claims related to and/or arising from this death are Bilha Busharian, wife of decedent; Oded Busharian, Uri

Busharian, and Ehud Busharian, children of decedent; Rachel Busharian, mother of decedent; and Orly Busharian and Shulamit Busharian, siblings of decedent. Each of these individuals asserts claims individually and/or as representative of the estate of Zion Busharian.

(161)    December 27, 2002:  Two PIJ terrorists dressed in IDF uniforms cut through the fence and infiltrate the Otniel settlement south of Hebron.  The gunmen enter the settlement's yeshiva and open fire, killing four students and injuring ten others.

Among those killed are:

(a)    Noam Apter.  Plaintiffs asserting claims related to and/or arising from this death are Yosef Apter and Perhiya Apter, parents of decedent; and Efrat Apter, Dafna Nir, Avraham Apter, Shmuel Apter, Osnat Apter, Rot Apter, Rivka Lerman, and David Apter, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Noam Apter.

(b)    Yehuda Bamberger.  Plaintiffs asserting claims related to and/or arising from this death are Zvi Bamberger and Avigail Bamberger, parents  of  decedent; and Yaacov Bamberger, Gila Bamberger, Raaya Bamberger, Ateret Bamberger, Shimon Bamberger, and Avia Bamberger, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yehuda Bamberger.

(c)    Zvi Zeeman.  Plaintiffs asserting claims related to and/or arising from this death are Uzi Zeeman and Ruth Zeeman, parents of decedent; and Einat Ruzenblum, Orit Yfrach, Avi Zeemen, Techia Zeeman, and Daniel Zeeman, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Zvi Zeeman.

133

**JA2710**

(162)   November 6, 2002:  A Hamas terrorist opens fire in a textile factory near Pe'at Sadeh in the Gaza Strip, killing two.

The individuals killed are:

(a)   Asaf Tzafira.  Plaintiffs asserting claims related to and/or arising from this death are Rivka Tzafira and Efrayim Tzafira, parents of decedent; and Shira Tzafira, Ariel Tzafira, Dvir Tzafira, Adi Tzafira, and Eden Tzafira, siblings of decedent. Each of these individuals asserts claims individually and/or as representative of the estate of Asaf Tzafira.

(b)   Amos Sa'ada.  Plaintiffs asserting claims related to and/or arising from this death are Esther Sa'ada, wife of decedent; and Chen Sa'ada, Aviran Sa'ada, Ayelet Sa'ada, David Sa'ada, Sharon Sa'ada, and Julie Sa'ada, children of decedent. Each of these individuals asserts claims individually and/or as representative of the estate of Amos Sa'ada.

(163)   November 4, 2002:  PIJ suicide bomber Nabil Sawalha explodes at the Harim Mall in Kfar Saba, killing two and wounding seventy.

Among those killed is:

(a)   Julio Pedro Magram.  The plaintiff asserting claims related to and/or arising from this death is Maria Magram-Rascovsky, sister of decedent.  This individual asserts claims individually and/or as representative of the estate of Julio Pedro Magram.

Among those injured are plaintiff Lior Gur, father of plaintiffs Peleg Gur and Rotem Gur; and plaintiff Diana Katz, a citizen of Israel and Zimbabwe.

134

**JA2711**

(164)   October 8, 2002:  Tanzim[23] gunmen led by Naji Taleb stage an ambush shooting south of Hebron, killing one Israeli and injuring three others.

The individual killed is:

(a)   Oded Volk.  Plaintiffs asserting claims related to and/or arising from this death are Adaya Volk, wife of decedent; Dvir Volk, Omri Volk, and Moran Volk, children of decedent; and Tikva Nave, reputed wife of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Oded Volk.

Among those injured are plaintiff Efrat Barak, wife of plaintiff Israel Barak; and plaintiff Eliezer Halfon.

(165)   September 18, 2002:  AAMB terrorists open fire on a car near Mevo Dotan, north of Jenin in the West Bank, killing the driver and wounding the other occupant of the car.

The individual killed is:

(a)   Yosef Ajami.  Plaintiffs asserting claims related to and/or arising from this death are Aliza Ajami, wife of decedent; Mai Ajami, Eden Ajami, Mor Ajami, and Itzhak Ajami, children of decedent; Simcha Ajami, mother of decedent; and Moshe Ajami, Hana Patihi, and Dorit Ajami, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yosef Ajami.

(166)   August 10, 2002:  AAMB terrorists infiltrate Moshav Mechora in the Jordan Valley, opening fire and killing an Israeli woman.

The individual killed is:

---

[23]   Additional reports indicate that Hamas claimed responsibility for this attack.

(a)     Yafit Herenstein.   Plaintiffs asserting claims related to and/or arising from this death are Shlomi Yihia and Iris Yihia, parents of decedent; and Oshra Yihia, Eilan Yihia, and Noam Yihia, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Yafit Herenstein.

(167)   August 4, 2002:  A pistol-wielding AAMB terrorist opens fire near the Damascus Gate of Jerusalem's Old City, killing two and wounding seventeen more.

One of those killed is:

(a)     Amitai Yekutiel.   Plaintiffs asserting claims related to and/or arising from this death are Rivka Yekutiel, wife of decedent; Chaya Yekutiel and Chaim Yekutiel, parents of decedent; and Elisha Yekutiel, Shoshana Yekutiel, Matya Yekutiel and Ya'ara Yekutiel, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Amitai Yekutiel.

(168)   June 20, 2002:  A terrorist enters the Itamar settlement, south of Nablus, and shoots and kills five.  Two other children and two soldiers are also injured in the attack. The PFLP and AAMB claim responsibility.

The individuals killed are:

(a)     Yosef Ya'akov Touitou.   Plaintiffs asserting claims related to and/or arising from this death are Elazar Touitou and Dina Touitou, parents of decedent. Each of these individuals asserts claims individually and/or as representative of the estate of Yosef Ya'akov Touitou.

(b)     Rachel Shabo.  Plaintiffs asserting claims related to and/or arising from this death are Boaz Shabo, husband of decedent; and Asael Shabo, Aviyah Shabo, Atara Shabo, and Yariv Emmanuel Shabo, children of decedent.   Each of these

136

**JA2713**

individuals asserts claims individually and/or as representative of the estate of Rachel Shabo.

(c)     Zvika Shabo.  Plaintiffs asserting claims related to and/or arising from this death are Boaz Shabo, father of decedent; and Asael Shabo, Aviyah Shabo, Atara Shabo, and Yariv Emmanuel Shabo, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Zvika Shabo.

(d)     Naria Shabo.  Plaintiffs asserting claims related to and/or arising from this death are Boaz Shabo, father of decedent; and Asael Shabo, Aviyah Shabo, Atara Shabo, and Yariv Emmanuel Shabo, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Naria Shabo.

(e)     Avishai Yosef Shabo.  Plaintiffs asserting claims related to and/or arising from this death are Boaz Shabo, father of decedent; and Asael Shabo, Aviyah Shabo, Atara Shabo, and Yariv Emmanuel Shabo, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Avishai Yosef Shabo.

(169)   May 22, 2002:  AAMB suicide bomber Issa Abed Rabbo Badeir blows himself up in a pedestrian mall in Rishon Lezion, killing two and wounding forty others.

One of those killed is:

(a)     Elmar Jabrailov.  Plaintiffs asserting claims related to and/or arising from this death are Karina Jabrailov, mother of decedent; and Elmira Jabrailov,

137

**JA2714**

sister of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Elmar Jabrailov.

(170)   April 27, 2002:   Terrorists dressed in IDF uniforms and combat gear cut through the perimeter fence and enter the Adora settlement, west of Hebron.   The gunmen enter several homes and fire on people in their bedrooms, killing five and injuring seven others.   Both Hamas and the PFLP claim responsibility for the attack.

Among those killed are:

(a)   Danielle Shefi.   Plaintiffs asserting claims related to and/or arising from this death are Shiri Shefi (individually and as representative of the estate of Danielle Shefi) and Jacob Shefi, parents of decedent; and Noia Shefi, Eliad Shefi and Uriel Shefi, siblings of decedent.

(b)   Yakob Katz.   The plaintiff asserting claims related to and/or arising from this death is Lubov Schneiderman, mother of decedent.   This individual asserts claims individually and/or as representative of the estate of Yakob Katz.

(c)   Arik Beker.   Plaintiffs asserting claims related to and/or arising from this death are Ada Becker, mother of decedent; and Nahum Beker, Moshe Becker, and Itzik Becker, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Arik Beker.

(d)   Ekaterina Greenberg.   Plaintiffs asserting claims related to and/or arising from this death are Vladimir Greenberg, husband of decedent; and Natan Greenberg, Albert Greenberg, and Ilia Greenberg, children of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Ekaterina Greenberg.

**JA2715**

Among those injured are plaintiff Shiri Shefi, wife of plaintiff Jacob Shefi and mother of plaintiffs Noia Shefi, Uriel Shefi and Eliad Shefi; plaintiff Eliad Shefi, son of plaintiffs Shiri Shefi and Jacob Shefi; plaintiff Natan Greenberg, son of plaintiff Vladimir Greenberg; and plaintiffs Ilia Greenberg and Vladimir Greenberg.

(171)   March 5, 2002:  An AAMB terrorist opens fire on two adjacent restaurants in Tel Aviv, killing three and wounding over thirty.

Among those killed are:

(a)   Yossef Haibi.  Plaintiffs asserting claims related to and/or arising from this death are Chaya Haibi, wife of decedent; Yitzhak Haibi, son of decedent; Simcha Haibi, mother of decedent; and Dalia Haibi, David Haibi, Meir Haibi, Miriam Haibi, and Yakov Haibi, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yossef Haibi.

(b)   Eliyahu Dahan.  Plaintiffs asserting claims related to and/or arising from this death are Ilana Dahan, wife of decedent; and Fany Shahar, Meital Ben-Ano, Yehoda Dahan, and Nisim Dahan, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Eliyahu Dahan.

Among those injured are plaintiff Gavriel Shitrit, husband of plaintiff Nili Shitrit and father of plaintiffs Daniel Shitrit, Mordechay Shitrit, and Moshe Shitrit; and plaintiff Chaya Haibi.

(172)   March 5, 2002:  AAMB gunmen open fire on a vehicle traveling the Bethlehem bypass tunnel road between El Hader and Jerusalem, killing an Israeli woman.

The individual killed is:

**JA2716**

(a)      Dvora Friedemann.  Plaintiffs asserting claims related to and/or arising from this death are Yona Friedemann, husband of decedent; and Shlomo Friedemann, Amihai Friedemann, Nessia Friedemann, and Eliraz Friedemann, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Dvora Friedemann.

(173)    January 25, 2002:  PIJ suicide bomber Safwat Abdul Rahman Khalil detonates at a crowded pedestrian shopping mall in Tel Aviv, wounding 24, including plaintiff Chaim Guetta.

(174)    January 15, 2002:  AAMB terrorists shoot and kill a woman and wound her aunt near the gas station at the entrance to Givat Ze'ev.

The individual killed is:

(a)      Yoala Chen.  Plaintiffs asserting claims related to and/or arising from this death are Shlomo Chen, husband of decedent; Liat Zadik and Tomer Chen, children of decedent; and Ali Brashe, Sason Brashe, Josef Brashe, Nahson Brashe, Simha Cohen, and Shalom Brashe, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yoala Chen.

(175)    November 4, 2001:  A PIJ member opens fire with a sub-machine gun on a No. 25 Egged bus at the French Hill junction in northern Jerusalem, killing two and wounding 45.

One of those killed is:

(a)      Menashe Regev.  Plaintiffs asserting claims related to and/or arising from this death are Shoshana Regev, mother of decedent; and Rahamim Regev,

140

**JA2717**

Shalom Shai Regev, and Liat Aharoni, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Menashe Regev.

Among those injured are plaintiff Avraham Mendelson, husband of plaintiff Batsheva Mendelson, a citizen of the United States; plaintiff Shlomo Zalman Kaye, a citizen of Israel and the United States and son of plaintiff Gitsche Kaye, a citizen of Israel and the United States; Rivka Ochion, daughter of plaintiffs Shoshana Ochion and Armon Ochion; plaintiff Abraham Tarshendgan, a citizen of Israel and Iran; and plaintiff Edita Yankovitch.

(176)   September 24, 2001:  A PIJ gunman opens fire on a car traveling on the Jordan Valley road, killing an Israeli woman.

The individual killed is:

(a)      Salit Shitrit.  Plaintiffs asserting claims related to and/or arising from this death are Barak Shitrit, husband of decedent; Malka Gutman, mother of decedent; and Ella Trabulsi, Meir Gutman, and Ya'akov Gutman, siblings of decedent. Each of these individuals asserts claims individually and/or as representative of the estate of Salit Shitrit.

(177)   September 9, 2001:  A Hamas suicide bombing near the Nahariya train station in northern Israel, perpetrated by Muhammad Saleh Hubeishi, kills three and injures ninety more, including plaintiff Ofra Cohen, wife of plaintiff Ofer Cohen and mother of plaintiff Yael Cohen; and plaintiffs Sara Dahir and Samerah Nzal.

(178)   September 9, 2001:  PIJ members overtake a van transporting teachers through the Jordan Valley and open fire with automatic weapons, killing two and wounding five others.

141

**JA2718**

The individuals killed are:

(a)     Yachov Hatzav.   Plaintiffs asserting claims related to and/or arising from this death are Aya Serfaty Hatzav, wife of decedent; and Shahar Hatzav and Elad Hatzav, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yachov Hatzav.

(b)     Sima Franco.  Plaintiffs asserting claims related to and/or arising from this death are Pnina Franco, a citizen of Israel and Algeria, and Ya'akov Franco, parents of decedent; and Sagit Franco Ben Adiva, Tzahi Franco, Maayan Franco, and Tali Franco, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Sima Franco.

(179)   August 27, 2001:  Palestinian Liberation Front terrorists shoot at a vehicle driving between Har Bracha and Itamar near Nablus, killing an Israeli man.

The individual killed is:

(a)     Meir Lixemberg.   Plaintiffs asserting claims related to and/or arising from this death are Kama Lixemberg, wife of decedent; and Mizmor Lixemberg, Ayelet Hashahar Lixemberg, Asor Yohanan Lixemberg, Hizkia Lixemberg, David Lixemberg, and Moria Lixemberg, children of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Meir Lixemberg.

(180)    August 12, 2001[24]:  PIJ operative Thabet Azmi Suleiman Mardawi perpetrates a suicide bombing at the Wall Street Café in Kiryat Motzkin.  21 are wounded in the blast, including plaintiff David Fridenson, husband of plaintiff Pnina Fridenson and father of plaintiff Shimrit Fridenson.

---

[24]     This attack was erroneously noted in the July 13, 2005 supplemental filing as having occurred August 12, 2003.

(181)   May 8, 2001:  Hizbullah terrorists with Kalashnikov rifles shoot and kill a man at the Binyamin Farm near Itamar.

The individual killed is:

(a)      Arnaldo Agraniony, a citizen of Israel and Brazil.   Plaintiffs asserting claims related to and/or arising from this death are Oren Agraniony, David Agraniony, and Oryan Agraniony, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Arnaldo Agraniony.

(182)   March 1, 2001:  Hamas activist Zeid Kiliani plants a bomb in a service taxi traveling from Tel Aviv.  The bomb detonates in Wadi Ara, killing one and injuring nine others.

The individual killed is:

(a)      Claude Knapp.  Plaintiffs asserting claims related to and/or arising from this death are Daniele Knapp, mother of decedent; and Ricardo Knapp and Igal Knapp, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Claude Knapp.

(183)   January 17, 2001:  Fatah Tanzim activists Mona Awana, Abdul Fattah Dullah, and Hassan Khadi lure a young man to Ramallah under the pretense of meeting an internet chat-room friend.  They then shoot him more than fifteen times and dump his body.

The individual killed is:

(a)      Ofir Rahum.  Plaintiffs asserting claims related to and/or arising from this death are Sholamit Rahum and Shalom Rahum, parents of decedent; and Shir

JA2720

Rahum, Sahar Rahum and Luiza Rahum, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Ofir Rahum.

(184)[25]

(185)   September 4, 1997:  Hamas operatives Bashar Sawalha, Tawfiq Yassin, and Yusuf Shouli execute three suicide bombings on the Ben-Yehuda pedestrian mall in Jerusalem.  Five are killed and 181 injured, including plaintiff Rahel Ben Shushan, wife of plaintiff Moshe Ben Shushan, mother of plaintiffs Gidi Ben Shushan, Osher Ben Shushan, Li-El Ben Shushan and Nicole Ben Shushan, and daughter of plaintiffs Zvi Shimon and Ida Shimon; and plaintiff Shmuel Avraham.

(186)   July 30, 1997:  Two consecutive suicide bombings, carried out by Hamas operatives in Jerusalem's Mahane Yehuda market, kill sixteen and wound 178.

Among those killed are:

(a)   Shalom Golan.  Plaintiffs asserting claims related to and/or arising from this death are Shula Golan, wife of decedent; Yossi Golan, Ronen Golan, Zevulon Golan, and Shiri Cohen, children of decedent; and Gershon Zevulon, brother of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Shalom Golan.

(b)   Ahna Bezelel.  Plaintiffs asserting claims related to and/or arising from this death are Riki Bezelel-Ortal and Aviva Moshe, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Ahna Bezelel.

---

[25] Please see Paragraph 135.  While originally listed as two separate attacks, those described in paragraphs 135 and 184 were in fact the same attack and the paragraphs have thus been combined.

JA2721

(c)      Eli Adorian.  Plaintiffs asserting claims related to and/or arising from this death are Tzafrira Adorian, wife of decedent; and Hamutal Adorian, Assaf Adorian, and Noam Adorian, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Eli Adorian.

Among those injured are plaintiff Maimon Avital, father of plaintiff Peer Avital; plaintiff Roni Barak, husband of Ludmila Barak and father of plaintiffs Daniel Barak and Talya Barak; plaintiff Tzion Maman, husband of plaintiff Tziona Maman and father of plaintiff Rafi Maman; plaintiff Ester Torjeman, mother of plaintiffs Erez Yakov Torjeman and Eyal Torjeman; plaintiff Meir Toubol, husband of plaintiff Shula Toubol and father of plaintiffs Ezra Asher, Aharon Totyan, Elhanan Yashar, Gabriella Elisha, Shani Toubol, Meirav Toubol, Efraim Toubol, and Assaf Toubol; and plaintiffs Yoel Biton, Shmuel Lebed, Gisele Medina, Yaakov Mirilashvili, Sivan Nargassi, and Riki Bezelel-Ortal.

(187)   March 3, 1996:  Hamas suicide bomber Islam Abu Abed explodes on a No. 18 bus on Jerusalem's Jaffa Road, killing nineteen and injuring six.

Among those killed are:

(a)      Shem Tov Shach.  The plaintiff asserting claims related to and/or arising from this death is Sarah Shach, wife of decedent.  This individual asserts claims individually and/or as representative of the estate of Shem Tov Shach.

(b)      Ana Shangalish.  Plaintiffs asserting claims related to and/or arising from this death are Ya'akov Shangalish, husband of decedent; and Galya Shangalish and Avivit Shangalish, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Ana Shangalish.

145

**JA2722**

(c)     Uzi Cohen.   Plaintiffs asserting claims related to and/or arising from this death are Varda Cohen, a citizen of Iraq, and Haya Itzhak, Naftali Cohen, Meir Cohen, Yehezkel Cohen, Amira Itzhak, and Aviva Sarusi, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Uzi Cohen.

Among those injured are plaintiff Galit Zabar, wife of plaintiff Yoram Zabar and daughter of plaintiffs Hadassa Tzona and Morris Tzona; plaintiff Avraham Cohen, brother of plaintiff Salim Cohen; and plaintiff Armon Ben Sa'adon, husband of plaintiff Ester Ben Sa'adon and father of plaintiffs Moriah Ben Sa'adon and Yakir Ben Sa'adon.

(188)   February 25, 1996:  A suicide bombing of bus No. 18 near the Central Bus Station in Jerusalem kills 26 and injures eighty more.   Hamas is responsible for the attack.

Among those killed are:

(a)     Gabriel Krauss.   Plaintiffs asserting claims related to and/or arising from this death are Michael Krauss and Yehudit Krauss, parents of decedent; and Rafael Krauss, brother of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Gabriel Krauss.

(b)     Moshe Reuven.   Plaintiffs asserting claims related to and/or arising from this death are Ezra Reuven and Rivka Reuven, parents of decedent; and Ilan Reuven and Karmit Reuven, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Moshe Reuven.

(c)     Gadi Shiloni.   Plaintiffs asserting claims related to and/or arising from this death are Yehudit Shiloni and Kral Shiloni, parents of decedent.  Each of these

146

**JA2723**

individuals asserts claims individually and/or as representative of the estate of Gadi Shiloni.

(d)     Sharon Hanuka.    Plaintiffs asserting claims related to and/or arising from this death are Naomi Hanuka and Izhak Hanuka, parents of decedent; and Aharon Hanuka and Dikla Hanuka, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Sharon Hanuka.

(e)     Shoshana Celine Zagury, a citizen of Israel and France.  Plaintiffs asserting claims related to and/or arising from this death are Paulette Zagury and Theodore Zagury, both citizens of Israel and France, parents of decedent; and David Shalom Zagury and Isabelle Hanna Zagury, both citizens of Israel and France, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Shoshana Celine Zagury.

Among those injured are plaintiff Shmulik Ittah, son of plaintiffs Eliyahu Ittah and Esther Ittah; plaintiff Keren Siman-Tov, daughter of plaintiffs Ben Zion Siman-Tov and Malka Siman-Tov; plaintiff Hanan Cohen, husband of plaintiff Vered Cohen and father of plaintiff Ariel Cohen; plaintiff Eyal Zizi, husband of plaintiff Yael Zizi and father of plaintiffs Matan Zizi and Ofir Zizi; and plaintiffs Shlomi Shimon and Dana Pinkhasov.

(189)   August 21, 1995: A Hamas suicide bomber blows up a bus near the Rene Cassin school in the Ramat Eshkol neighborhood of Jerusalem.  Five[26] are killed in the blast and 107 injured.

Among those killed are:

---

[26]  Official statistics note that four people were killed during this attack.  Though Yonah Malina was not killed instantly, he died thereafter as a result of injuries sustained in the blast.

JA2724

(a)      Yonah Malina.  Plaintiffs asserting claims related to and/or arising from this death are Jan Vladimir Malina and Eva Maria Malina, both citizens of Switzerland, parents of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yonah Malina.

(b)      Rivka Cohen Ben Haim.  Plaintiffs asserting claims related to and/or arising from this death are Sara Zadok and Nissim Ben Haim, parents of decedent; Diana Dina Ben Haim, stepmother of decedent; and Tal Ben Haim, Yosef Ben Haim, Moran Ben Haim, Hagit Ben Eliyahu, Reem Ben Haim, Yoav Ben Haim, and Roi Ben Haim, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Rivka Cohen Ben Haim.

(c)      Hana Naee.  Plaintiffs asserting claims related to and/or arising from this death are Adi Blouch and Batya Naee, children of decedent; and Shulamit Ben Yaacov, mother of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Hana Naee.

Among those injured are plaintiff Menashe Chamu, husband of plaintiff Regina Chamu; plaintiff Sara Tal Hof, daughter of plaintiff Hagit Hof; plaintiff Hagit Binyamin, daughter of plaintiffs Dvora Binyamin and Waitzman Binyamin; and plaintiffs Linoy Hazut, David Raz, and Michal Raveh.

(190)      July 24, 1995: Hamas suicide bomber Sufiyan Salaam Rabbo Sabiah blows up a bus in Ramat Gan, killing six and wounding 31.

Among those killed are:

(a)      Zehava Oren.  Plaintiffs asserting claims related to and/or arising from this death are Arie Oren, husband of decedent; and Galit Oren, Nir Oren, and Maoz

148

**JA2725**

Oren, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Zehava Oren.

(b)     Moshe Shkedi.  Plaintiffs asserting claims related to and/or arising from this death are Rachel Shkedi, wife of decedent; and Dalia Shkedi Niv and Hanita Ben-Nir, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Moshe Shkedi.

Among those injured are plaintiff Barak Nedvetski, son of plaintiff Yossef Nedvetski and brother of plaintiffs Shraga Nadiv and Shlomo Nedvetski; and plaintiffs Rachel Shkedi and Dvora Kaykov.

(191)   March 12, 2002[27]: AAMB gunmen dressed in IDF uniforms stage an attack on vehicles traveling near Kibbutz Matzouba, killing six Israelis.

Among those killed are:

(a)     Ofer Kanarik.  Plaintiffs asserting claims related to and/or arising from this death are Alice Kanarik, a citizen of Israel and Romania, wife of decedent; Roy Kanarik, Daniel Kanarik, and Mayan Kanarik, children of decedent; Yedida Kanarik, mother of decedent; and Eahud Kanarik, brother of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Ofer Kanarik.

(b)     Judith Cohen, a citizen of Israel and Romania.  Plaintiffs asserting claims related to and/or arising from this death are Ronen Cohen, a citizen of Israel and the United States, husband of decedent; Daniel Cohen, a citizen of Israel and the United States, son of decedent; Magdalena Kocsis and Csaba Kocsis, both citizens of Israel and Romania, parents of decedent; and Edit Kopel, sister of decedent.  Each of these

---

[27]  This attack was erroneously noted in the FAC as occurring on March 2, 2005.

JA2726

individuals asserts claims individually and/or as representative of the estate of Judith Cohen.

        (c)     Lin Livney.  Plaintiffs asserting claims related to and/or arising from this death are Tuvya Livney, husband of decedent; and Yehonatan Livney, Mirav Livney, and Talya Livney, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Lin Livney.

        (d)     Atara Livney.  Plaintiffs asserting claims related to and/or arising from this death are Tuvya Livney, father of decedent; and Yehonatan Livney, Mirav Livney, and Talya Livney, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Atara Livney.

(192) March 27, 2001:  A car bomb explodes in Jerusalem's East Talpiot industrial zone, injuring seven, including plaintiff David Kadosh, husband of plaintiff Haviva Kadosh and father of plaintiffs Simon Kadosh, Oded Kadosh, Maor Kadosh, and Noy Esther Kadosh; and plaintiff Zeharia Ashkenazi.  PIJ claims responsibility for the bombing.

(193)  May 27, 2001:  PIJ operatives plant a car bomb in downtown Jerusalem, which explodes and injures 22 people, among them plaintiff Eliyahu Mizrahi, husband of plaintiff Aliza Mizrahi and father of plaintiff Rinat Mizrahi.

(194)  February 27, 2002:  Dareen Abu Aysheh, a female AAMB suicide bomber, detonates prematurely at the Maccabim Roadblock in West Ramallah, injuring four Israelis, among them plaintiff Mordechai Tal, husband of plaintiff Miriam Tal and father of plaintiffs Yarin Tal, Ofek Tal, and Noa Tal.

JA2727

(195)   March 3, 2002:  AAMB terrorist Taher Hamed opens fire at a roadblock near Ofra, killing ten and injuring six others.

Among those killed are:

(a)     Ariel Chovav.  Plaintiffs asserting claims related to and/or arising from this death are Na'ama Chovav, wife of decedent; and Elad Yosef Chovav and Naria Chovav, children of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Ariel Chovav.

(b)     Sergey Baturov, a citizen of Israel and Russia.  Plaintiffs asserting claims related to and/or arising from this death are Ekaterina Bairamov, wife of decedent; Alisa Bairamov and Genadi Baturov, children of decedent; Marina Braschin, mother of decedent; and Dmitri Braschin, brother of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Sergey Baturov.

(c)     Rephael Levi.  The plaintiff asserting claims related to and/or arising from this death is Nili Levi, wife of decedent.  This individual asserts claims individually and/or as representative of the estate of Rephael Levi.

(196) June 8, 2002:  Hamas terrorists infiltrate the West Bank settlement of Karmei Tzur and open fire, killing three and injuring five others.

Among those killed is:

(a)     Yael Shorek.  Plaintiffs asserting claims related to and/or arising from this death are Yehuda Kandel and Elisheva Kandel, parents of decedent; and Ofer Kandel, Shay Kandel, Yaakov Kandel, and Nachshon Kandel, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yael Shorek.

JA2728

(197)   May 17, 2003:  Hamas suicide bomber Fuad al-Kawasma detonates on the street in Hebron and kills a woman and her husband.

One of those killed is:

(a)   Dina Ester Levy.  Plaintiffs asserting claims related to and/or arising from this death are Yosef Ben Shmuel and Rachel Shmualian, children of decedent; Lea Lalum, a citizen of Israel and France, mother of decedent; and Hana Tairi, Ouriel Lalum, Liora Lalum, and Judith Harel, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Dina Ester Levy.

(198)   November 21, 2003:  Two Israelis are shot dead at a construction site near Abu Dis in East Jerusalem.  The Jenin Martyrs' Brigades, an offshoot of AAMB, claims responsibility.

One of those killed is:

(a)   Ilya Rigger.  Plaintiffs asserting claims related to and/or arising from this death are Bela Rigger, wife of decedent; Leonid Rigger, son of decedent; and Michael Rigger, father of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Ilya Rigger.

(199)   July 11, 2004:  A bomb explodes at the central bus station in downtown Tel Aviv, killing one and injuring 33.  AAMB is responsible for the bombing.

The individual killed is:

(a)   Maayan Naim.  Plaintiffs asserting claims related to and/or arising

JA2729

from this death are Haim Naim and Mazal Naim, parents of decedent; and Dror Naim, Elad Naim, Meital Naim, and Liel Naim, siblings of decedent. Each of these individuals asserts claims individually and/or as representative of the estate of Maayan Naim.

Among those injured is plaintiff Orna Pinhasov, wife of plaintiff Lev Pinhasov and mother of plaintiff Noa Pinhasov.

(200) January 2, 2005: An Israeli civilian is shot to death at the Beit Guvrin National Park, where he worked as a security guard. AAMB is responsible for the killing.

The individual killed is:

(a) Vladimir Rivin. Plaintiffs asserting claims related to and/or arising from this death are Inna Rivin, wife of decedent; and Michael Rivin and Gregory Rivin, children of decedent. Each of these individuals asserts claims individually and/or as representative of the estate of Vladimir Rivin.

(201) January 2, 2005: Hamas terrorists launch a mortar attack on the Erez Industrial area and kill one Israeli.

The individual killed is:

(a) Nisim Arbib. Plaintiffs asserting claims related to and/or arising from this death are Sara Ravid, mother of decedent; and Hila Arbib, Shlomit Arbib, Yosi Arbib, and Atara Arbib, siblings of decedent. Each of these individuals asserts claims individually and/or as representative of the estate of Nisim Arbib.

(202) January 7, 2005: AAMB gunmen open fire on Road 505 between the Tapuah junction and Migdalim, south of Nablus, killing one and injuring four others.

The individual killed is:

JA2730

(a)      Yossef Atia.   Plaintiffs asserting claims related to and/or arising from this death are David Atia and Rahel Atia, parents of decedent; and Dikla Atia, Victor Dror Atia, Galit Moravia, and Idit Biton, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Yossef Atia.

(203)   February 23, 1996:  Ahmed Abdel Hamidah plows his car at high speed into a group of people waiting at a busy bus stop near Jerusalem's French Hill neighborhood, killing one and injuring 23.  Hamas claims responsibility for the attack.

The individual killed is:

(a)      Flora Yechiel.   Plaintiffs asserting claims related to and/or arising from this death are Yosi Yechiel, husband of decedent; and Bat-El Yechiel and Netanel Yechiel, children of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Flora Yechiel.

(204)   October 3, 2001:  Gunmen open fire on holiday worshippers at the Cave of the Patriarchs in Hebron, injuring two, one of whom is plaintiff Feige Fishman, a citizen of Israel and the United States;

(205)   August 3, 1999:  Hamas gunmen open fire on a car traveling near Hebron, wounding two, one of whom is plaintiff Baruch Ben Ya'akov, a citizen of Israel and the United States;

(206)   January 2, 2001:  Force 17 gunmen open fire on a vehicle at the Haravata Junction on Route 443, injuring plaintiff Aharon Kavirkov.

JA2731

(207[28])   December 12, 2003:   An AAMB gunman opens fire on a group of worshippers outside of Joseph's Tomb in Nablus, injuring seven, including plaintiff Nachman Ben Haroosh and his sister, plaintiff Tehila Ben Haroosh Tobol; plaintiff Moshe Barber, son of plaintiffs Binyamin Barber and Esther Restrepo and brother of plaintiff Barak Barber; and plaintiff Yosef Avhar.

(208)   April 3, 2004:   A Hamas terrorist shoots and kills a man and wounds his daughter at Avnei Hafetz.

The individual killed is:

(a)   Yakov Zagha.   Plaintiffs asserting claims related to and/or arising from this death are Ester Zagha, wife of decedent; Hana Zagha, daughter of decedent; and Nina Manne, sister of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Yakov Zagha.

The individual injured is plaintiff Hana Zagha.

(209)   May 28, 2002:   An AAMB gunman infiltrates the Itamar settlement and opens fire on a group of boys playing basketball.   Three are killed and two others wounded.

Among those killed is:

(a)   Avraham Siton.   Plaintiffs asserting claims related to and/or arising from this death are Moshe Siton (individually and as representative of the estate of Avraham Siton) and Perla-Pnina Siton, parents of decedent; and Yedida Zvi Siton, Gilad Zion Siton, Zipora Siton, Michal Yehudit Siton, and Aliza Siton, siblings of decedent.

(210)   March 26, 2001:   Tanzim sniper Muhammad Amrou takes aim and shoots at a ten-month-old baby, hitting the child in the head and killing her, in Hebron.

---

[28]   This attack was misnumbered as no. 203 in the supplemental filing of October 3, 2005.

155

**JA2732**

The individual killed is:

(a)     Shalhevet Pass, a citizen of Israel and France.  Plaintiffs asserting claims related to and/or arising from this death are Oriya Pass (individually and as representative of the estate of Shalhevet Pass), a citizen of Israel and France, and Itzhak Pass, parents of decedent.

(211)   January 25, 2001:  Gunmen stage an ambush near the Atarot industrial zone north of Jerusalem, killing an Israeli man.  A Fatah fringe group calling itself the "Brigades of Thabet Thabet" claims responsibility.

The individual killed is:

(a)     Akiva Pashkos.  Plaintiffs asserting claims related to and/or arising from this death are Hilary Pashkos (individually and as representative of the estate of Akiva Pashkos), wife of decedent; and Shlomo Pashkos, Itzhak Pashkos, and Pessiah Pashkos Yakobovitz, children of decedent.

(212)   February 25, 1996:  A Hamas suicide bomber sets off an explosion at a hitchhiking post outside Ashkelon, killing one.

The individual killed is:

(a)     Hofit Ayash.  Plaintiffs asserting claims related to and/or arising from this death are Michael Ayash and Ruth Ayash, parents of decedent; and Yamit Ayash, Shaaf Ayash, and Gal Ayash, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Hofit Ayash.

(213)   June 18, 2001:  AAMB gunmen open fire on a vehicle traveling between Shavei Shomron and Homesh, killing the driver and wounding one passenger.

The individual killed is:

**JA2733**

(a)      Dani Yehuda.  Plaintiffs asserting claims related to and/or arising from this death are Sigal Yehuda, wife of decedent; and Shalev Yehuda, Yogev Yehuda, and Shoval Yehuda, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Dani Yehuda.

(214)  January 14, 2001:   An Israeli man is murdered near the Kfar Yam greenhouses in Gush Katif.  Hamas claims responsibility.

The individual killed is:

(a)      Roni Tsalah.  Plaintiffs asserting claims related to and/or arising from this death are Naim Tsalah and Nava Tsalah, parents of decedent; and Moshe Tsalah and Mordehai Tsalah, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Roni Tsalah.

(215)  June 28, 2004:  Hamas operatives fire a Qassam rocket into the northern Negev town of Sderot.  The missile hits a nursery school, kills two, and injures eleven more.

The                              individuals                      killed                    are:

(a)      Mordechai Yosofov.  Plaintiffs asserting claims related to and/or arising from this death are Nina Yosofov, wife of decedent; and Edward Yosofov and Albina Yosofov, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Mordechai Yosofov.

(b)      Afik Zahavi-Ohayon.  Plaintiffs asserting claims related to and/or arising from this death are Ruth Zahavi and Yitzhak Ohayon, parents of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Afik Zahavi-Ohayon.

JA2734

Among those injured is plaintiff Yafim Tzinak.

(216)   September 29, 2004:  Hamas operatives fire Qassam rockets into Sderot, killing two children and wounding twenty other civilians.

The individuals killed are:

(a)     Dorit Mansat.  Plaintiffs asserting claims related to and/or arising from this death are Gabi Ganto Mansat and Yasest Mansat, parents of decedent; and Michael Mansat, Dislin Mansat, Shmulik Mansat, Edna Mansat, and Vered Mansat, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Dorit Mansat.

(b)     Yuval Ababa.  Plaintiffs asserting claims related to and/or arising from this death are Assraso Kasson, father of decedent; and Ron Argau Tzagi, brother of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yuval Ababa.

Among those injured are Heinech Hologarsh and Yaakov Ayalon Hologarsh, sons of plaintiff Bogla Hologarsh; plaintiff Vladislav Leviav, son of plaintiffs Olga Leviav and Azaria Leviav; and plaintiffs David Ravivo, Teresa Abayev, Angelika Leviav, and Azaria Leviav.

(217)   October 26, 1998:  Hamas activist Jamal Munir Jadallah Khalifa shoots and kills a man in Hebron.

The individual killed is:

(a)     Danny Vargas.  Plaintiffs asserting claims related to and/or arising from this death are Tali Vargas, wife of decedent; Lee Vargas and Ron Vargas, children of decedent; Sarah Vargas, mother of decedent; and Kaiser Mendez, Juan Mendez, and

JA2735

Gloria Dougherty, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Danny Vargas.

(218)   June 16, 1996:  PIJ member Muhammad Badran shoots and kills an Israeli man in a toy store in Bidya.

The individual killed is:

(a)   Meir Aloush.  Plaintiffs asserting claims related to and/or arising from this death are Nitza Aloush, wife of decedent; Hay Aloush and Avyatar Aloush, children of decedent; Juliette Aloush, mother of decedent; and Shmuel Aloush, Rachel Sella, Sharon Cohen, and Moshe Aloush, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Meir Aloush.

(219)   August 7, 2001:  AAMB gunmen shoot at a vehicle driving on the Trans-Samaria Highway, killing one.

The individual killed is:

(a)   Zohar Shurgi.  Plaintiffs asserting claims related to and/or arising from this death are Nava Shurgi, wife of decedent; Omer Shurgi, Itamar Shurgi, and Danielle Shurgi, children of decedent; Beca Shurgi, mother of decedent; and Ziva Ben Atav, sister of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Zohar Shurgi.

(220)   August 9, 2001:  Members of a Tanzim cell open fire on a car near Kibbutz Merav, killing one and wounding three others.

The individual killed is:

(a)   Aliza Malka.  Plaintiffs asserting claims related to and/or arising from this death are Shoshana Dahan, mother of decedent; and Yehuda Malka and Or

159

Dahan, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Aliza Malka.

(221)   January 17, 2000:  A pipe bomb hidden in a trashcan by PIJ operatives explodes in Hadera, injuring 21, including plaintiff Ahmed Saleh Muasi.

(222)   January 22, 2002:  An AAMB gunman opens fire with an M-16 assault rifle near a bus stop on Jaffa Road in downtown Jerusalem, killing two and injuring forty, including Yosef Druk, husband of plaintiff Chana Druk; and plaintiff Tamar Aladi.

(223)   February 27, 2004:  Terrorist gunmen shoot at a passing car near Kibbutz Lahav, killing two Israelis.  The PFLP and AAMB both claim responsibility.

The individuals killed are:

(a)   Rima Novikov Kukoi.  Plaintiffs asserting claims related to and/or arising from this death are Michele Kukoi, daughter of decedent; and Galina Novikov, mother of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Rima Novikov Kukoi.

(b)   Eitan Kukoi.  Plaintiffs asserting claims related to and/or arising from this death are Michele Kukoi, daughter of decedent; Alina Kukoi and Vasili Sahnkov, parents of decedent; and Igor Levin and Tal Levin, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Eitan Kukoi.

(224)   December 21, 2000:  PFLP terrorists waiting in ambush open fire on a car traveling Road 443 between Jerusalem and Modi'in, killing one Israeli.

The individual killed is:

JA2737

(a)      Eliyahu Cohen.  Plaintiffs asserting claims related to and/or arising from this death are Rotem Valler, wife of decedent; and Noam Valler-Cohen, son of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Eliyahu Cohen.

(225)  August 25, 2001:   AAMB gunmen shoot at a vehicle driving on the Jerusalem-Modi'in Road 443, killing three.

The individuals killed are:

(a)      Doron Swery.  Plaintiffs asserting claims related to and/or arising from this death are Zion Swery and Frida Swery, parents of decedent; and Alon Swery and Noam Swery, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Doron Swery.

(b)      Sharon Ben-Shalom.  Plaintiffs asserting claims related to and/or arising from this death are Efrat Ben-Shalom and Shahar Ben-Shalom, children of decedent; Zion Swery and Frida Swery, parents of decedent; and Alon Swery and Noam Swery, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Sharon Ben-Shalom.

(c)      Yaniv Ben-Shalom.  Plaintiffs asserting claims related to and/or arising from this death are Efrat Ben-Shalom and Shahar Ben-Shalom, children of decedent; Rahamim Ben-Shalom and Ester Ben-Shalom, parents of decedent; and Uriel Ben-Shalom, Odelia Moshe, and Betal Ben-Shalom, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yaniv Ben-Shalom.

JA2738

(226)  July 12, 2001:  PIJ gunman Mohammed Sidr shoots and kills a man on the road between Kiryat Arba and Hebron.

The individual killed is:

(a)     Yehezkel Mualem.   Plaintiffs asserting claims related to and/or arising from this death are Rachel Mualem, wife of decedent; and Amihay Mualem, Yael Mualem, Renana Mualem, and Yehonatan Mualem, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yehezkel Mualem.

(227)  July 2, 2001:   AAMB operatives murder an Israeli man at the Susiya settlement in Hebron.

The individual killed is:

(a)     Yair Har-Sinai.  Plaintiffs asserting claims related to and/or arising from this death are Dalia Har-Sinai, wife of decedent; and Leah Har-Sinai, Sarah Har-Sinai, Hana Rachel Har-Sinai, Tamar Sharabi, Rivka Har-Sinai, David Har-Sinai, Hodaya Har-Sinai, Yehuda Har-Sinai, and Ran Har-Sinai, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yair Har-Sinai.

(228)  July 26, 2001:  AAMB terrorists shoot and kill a man driving near Givon.

The individual killed is:

(a)     Ronen Landau.  Plaintiffs asserting claims related to and/or arising from this death are Michal Landau and Shmuel Landau, parents of decedent; and Yogev Landau and Elad Landau, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Ronen Landau.

JA2739

(229)   March 19, 2001:   PFLP gunmen shoot at a vehicle driving on the Bethlehem bypass road near the village of el-Hader, killing one.

The individual killed is:

(a)   Baruch Cohen.  Plaintiffs asserting claims related to and/or arising from this death are Esther Cohen, wife of decedent; Hadas Lasry, Amnon Cohen, Ahiva Cohen, Oren Cohen, and Avshalom Cohen, children of decedent; and Eytan Cohen, brother of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Baruch Cohen.

(230)   November 24, 2000:   Force 17 operatives shoot and kill a man east of Tapuach.

The individual killed is:

(a)   Ariel Grafi.  Plaintiffs asserting claims related to and/or arising from this death are Rachel Grafi, wife of decedent; Nufar Grafi, Dor Grafi, and Mor Grafi, children of decedent; Margalit Grafi and Itsak Grafi, parents of decedent; and Gabriela Aharoni, Havazelet Grafi, Yohai Grafi, Gohar Grafi, Elitzur Grafi, Adina Grafi, Avital Grafi, and Sharona Natan, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Ariel Grafi.

(231)   August 10, 1999:  Hamas terrorists plow into a crowd of people at the Hachshon Junction, injuring plaintiff Ortal Biton.

(232)   December 25, 2003:  A suicide bombing at a bus stop at the Geha Junction in Ramat Gan, east of Tel Aviv, kills four and injures over twenty more.  PFLP claims responsibility for the attack.

Among those killed are:

163

**JA2740**

(a)      Rotem Weinberger.   Plaintiffs asserting claims related to and/or arising from this death are Dalia Gruzman, mother of decedent; and Adi Gruzman and Shlomo Weinberger, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Rotem Weinberger.

(b)      Adva Zipora Fisher.   Plaintiffs asserting claims related to and/or arising from this death are Menahem Fisher and Revital Fisher, parents of decedent; and Yehuda Fisher and Nerya Israel Fisher, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Adva Zipora Fisher.

(233)   February 10, 2002:   Hamas operatives open fire on a restaurant in Beer Sheva in a drive-by shooting, killing two and wounding four others.

Among those killed is:

(a)      Keren Rothstein.   Plaintiffs asserting claims related to and/or arising from this death are Aviva Rothstein and Avraham Rothstein, parents of decedent; and Chen Rothstein and Idit Rothstein, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Keren Rothstein.

Among those injured are plaintiffs Shlomo Ferrera and Hilla Lustig.

(234)   September 15, 2001:   AAMB gunman Heitham al-Mutfak Hamdan opens fire on a vehicle traveling on Route 9 in northern Jerusalem, killing one and injuring plaintiff Moshe Weiss.

(235)   October 9, 1998:   A Hamas member stabs a woman to death near the Moshav Tomer junction.

The individual killed is:

**JA2741**

(a)     Michal Adato.  Plaintiffs asserting claims related to and/or arising from this death are Mordechai Adato and Ruth Adato, parents of decedent; and Boaz Adato and Yair Adato, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Michal Adato.

(236)   December 20, 2002:  PIJ gunmen shoot at a car driving through the Kissufim Corridor in Gaza, killing one.

The individual killed is:

(a)     Rabbi Yitzhak Arama.  Plaintiffs asserting claims related to and/or arising from this death are Oshrat Arama, wife of decedent; Levi Arama and Simcha Arama, parents of decedent; and Dina Gabai and Rivka Seles, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yitzhak Arama.

(237)   September 23, 2004:  Hamas operatives launch a Qassam rocket into Sderot, injuring plaintiff Larissa Charitananko.

(238)   August 19, 2004:  Hamas operatives launch two Qassam rockets into Sderot, injuring 25, including plaintiff Racheli Gabbai, wife of plaintiff Yaniv Gabbai.

(239)   June 26, 2003:  An AAMB member shoots and kills a man in Baqa al-Gharbiya.

The individual killed is:

(a)     Amos Mantin.  Plaintiffs asserting claims related to and/or arising from this death are Niza Mantin and Shalom Mantin, parents of decedent; and Ronen Mantin, Doron Mantin, Tal Or Mantin, and Galit Mantin, siblings of decedent.  Each of

JA2742

these individuals asserts claims individually and/or as representative of the estate of Amos Mantin.

(240)   August 2, 2004:  Hamas launches a Qassam rocket at Sderot, injuring four, including plaintiffs Beni Cohen, Idit Medinah and Ruti Medinah.

(241)   December 19, 2004:  Hamas launches four Qassam rockets at Sderot, injuring six, including plaintiff Olga Pelez.

(242)   October 3, 2004:  Hamas launches a Qassam rocket at Sderot, injuring plaintiffs Fani Peretz and Yitzchak Peretz.

(243)   January 12, 2003:  Hamas militants launch a Qassam rocket which lands near an elementary school in Sderot, injuring three, including Raziel Yehoshua Sasson, son of plaintiff Shulamit Sasson.

(244)   November 21, 2000:  A sniper shoots and kills an Israeli at the Kissufim Road – Gush Katif junction.

The individual killed is:

(a)   Itamar Yefet.  Plaintiffs asserting claims related to and/or arising from this death are Binyamin Yefet and Rachel Yefet, parents of decedent; and Gilad Yefet, Einat Yefet, Galit Yonati, and Adi Yefet Hedzel, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Itamar Yefet.

(245)   March 20, 2003:  Hamas operatives launch a volley of Qassam rockets from Gaza into Sderot, injuring plaintiff Baruch Weitzman.

166

JA2743

(246)   February 6, 2002:  A Hamas terrorist wearing an explosive belt detonates on the 176 bus en route to Maale Adumim, injuring plaintiff Karen Suissa and her mother, plaintiff Naomi Mizrachi, reputed wife of plaintiff Raphi Merzi.

(247)   April 15, 2003:  A Hamas gunman opens fire at the Karni Crossing, killing two and injuring four, including plaintiff Chodik Davidov.

(248)   May 14, 2001:  Tanzim operatives fire upon a vehicle traveling the Alon Highway, injuring plaintiff Kfir Berebi.

(249)   July 29, 2004:   Hamas militants launch Qassam rockets into Sderot, injuring nine, including plaintiff Masoudi Suissa.

(250)   April 28, 2001:   Militants launch a mortar attack on Moshav Netzer Hazani, wounding five, including Bat-El Reuven, daughter of plaintiffs Moshe Reuven and Avivit Reuven; and plaintiff Moshe Harel.  The Popular Resistance Committee, a Fatah splinter group, is responsible.

(251)   December 31, 2000:  AAMB gunmen open fire on a vehicle on the Atarot-Givat Ze'ev Road, injuring plaintiff Elior Gabay, husband of plaintiff Edna Gabay and father of plaintiffs Shachar Gabay and Ofek Gabay.

(252)   December 9, 2001:  AAMB gunman Anjas Raouf fires upon a vehicle near Na'aleh, injuring plaintiff Zvika Gotliv, husband of plaintiff Idit Gotliv and father of plaintiffs Hillel Gotliv, Renana Gotliv, and Itan Gotliv.

(253)   October 13, 2000:  A PIJ lynch mob attacks and wounds plaintiff David Amsalem near Zomet Haram.

(254)   January 29, 2001:  AAMB gunmen open fire on a vehicle traveling near Atarot, killing a man.

**JA2744**

The individual killed is:

(a)     Arye Hershkovich.  Plaintiffs asserting claims related to and/or arising from this death are Geula Hershkovich, wife of decedent; and Dor Hershkovich, son of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Arye Hershkovich.

(255)  May 29, 2001:  AAMB terrorists ambush a car outside the northern West Bank settlement of Kedumim, shooting a man and killing him.

The individual killed is:

(a)     Gilad Zar.  Plaintiffs asserting claims related to and/or arising from this death are Hagar Zar, wife of decedent; Zuria Brouyer, Shahar Zar, Igal Zar, Shira Zar, Renana Zar, Hadas Zar, Nava Zar, and Noam Zar, children of decedent; Moshe Zar and Yael Zar, parents of decedent; and Zvi Zar, Aran Zar, Yonadav Zar, Itay Zar, Anat Cohen, and Michal Shoham, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Gilad Zar.

(256)  July 25, 2002:  AAMB terrorists fire upon a car traveling by Alei Zahav, killing one Israeli and injuring another.

The individual killed is:

(a)     Rabbi Elimelech Shapira.   Plaintiffs asserting claims related to and/or arising from this death are Rivka Shapira, wife of decedent; and Reut Shapira, Ortal Shapira, Hadar Shapira, Elyashiv Shapira, Evyatar Shapira, Halel Shapira, Zimrat Shapira, and Yehuda Shapira, children of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Elimelech Shapira.

168

JA2745

(257)   July 7, 2003:  A PIJ suicide bomber enters a house in Moshav Kfar Yavetz and explodes, killing one and injuring three.

The individual killed is:

(a)   Mazal Ofri.  Plaintiffs asserting claims related to and/or arising from this death are Moshe Ofri, husband of decedent; and Zehorit Ofri, Netanel Ofri, Dvora Dagan, Tirza Nagar, Ahova Yitzhak, Avi Ofri, and Itamar Ofri, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Mazal Ofri.

(258)   August 13, 2004:  AAMB member Yusuf Ahmad Hassan Hanany opens fire outside the Itamar settlement gate, killing one man.

The individual killed is:

(a)   Shlomo Mordehay Miller.  Plaintiffs asserting claims related to and/or arising from this death are Ester Miller, wife of decedent; and Zeev Elyakim Miller, Mevaseret Hana Miller, Eliyahu Miller, Efraim Yakir Miller, Yohanan Miller, Naama Miller, and Tehila Miller, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Shlomo Mordehay Miller.

(259)   February 18, 2002:  Muhammad Al Katzir, a member of an AAMB cell, opens fire with an AK-47 on a Gush Katif road and kills a woman.

The individual killed is:

(a)   Ahuva Amergi.  Plaintiffs asserting claims related to and/or arising from this death are Rafael Amergi, husband of decedent; and Efraim Amergi and Izak Amergi, children of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Ahuva Amergi.

**JA2746**

(260)   January 13, 2004:  AAMB terrorists ambush and fire upon a car traveling near Talmon in the West Bank, killing one passenger and injuring two others.

The individual killed is:

(a)   Roi Arbel.  Plaintiffs asserting claims related to and/or arising from this death are Hagit Arbel, wife of decedent; Tal Arbel, Or Arbel, Odaya Arbel, Emuna Arbel, and Hananel Roi Arbel, children of decedent; David Arbel and Nehama Arbel, parents of decedent; and Eitan Arbel, Ornit Hacohen, Shlomit Adelman, Omer Arbel, and Reut Vatenshtein, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Roi Arbel.

(261)   July 26, 2002:  AAMB members stage an ambush attack on two cars traveling near the Zif Junction near Hebron, killing three members of a family and injuring two others.

The individuals killed are:

(a)   Yosef Dickstein.  Plaintiffs asserting claims related to and/or arising from this death are Aharon Freund (individually and as representative of the estate of Yosef Dickstein), executor of estate; and Tzvi Yehuda Dickstein, Tzofia Malka Dickstein, Ayelet Hashachar Dickstein, Moshe Yedidya Dickstein, Renana Rachel Dickstein, Shlomo Dickstein, Beniya Dickstein, Israel David Dickstein, and Azriel Yechezkiel Dickstein, children of decedent.

(b)   Chana Dickstein.  Plaintiffs asserting claims related to and/or arising from this death are Aharon Freund (individually and as representative of the estate of Chana Dickstein), executor of estate; and Tzvi Yehuda Dickstein, Tzofia Malka Dickstein, Ayelet Hashachar Dickstein, Moshe Yedidya Dickstein, Renana Rachel

**JA2747**

Dickstein, Shlomo Dickstein, Beniya Dickstein, Israel David Dickstein, and Azriel Yechezkiel Dickstein, children of decedent.

(c)   Shoval Dickstein.   Plaintiffs asserting claims related to and/or arising from this death are Aharon Freund (individually and as representative of the estate of Shoval Dickstein), executor of estate; and Tzvi Yehuda Dickstein, Tzofia Malka Dickstein, Ayelet Hashachar Dickstein, Moshe Yedidya Dickstein, Renana Rachel Dickstein, Shlomo Dickstein, Beniya Dickstein, Israel David Dickstein, and Azriel Yechezkiel Dickstein, siblings of decedent.

(262)   June 18, 2003:  Hamas members launch several mortar bombs toward the Neve Dekalim settlement, injuring two, including plaintiff Miriam Fryman.

(263)   December 15, 2004:   Asraf Mahmud Balusha and Hasan al-Banna infiltrate a Gush Katif checkpoint and attack the settlement.  While the two exchange fire with Israelis, other terrorists launch mortar shells.   Four Israelis are injured.   The operation was a coordinated effort between PIJ and AAMB.

Among those injured are plaintiffs Dalia Goita and Amitzur Goita, wife and son of plaintiff Yaakov Goita.

(264)   November 3, 2004:  PIJ launches a missile at the Agudat Gaza army base in Gush Katif, injuring a civilian, plaintiff Yoav Tal, husband of plaintiff Varda Tal.

(265)   February 28, 2001:  Hamas member Zeid Kiliani plants a bomb in a restaurant on Tel Aviv's Allenby Street.  It detonates, injuring plaintiff David Zrifin.

(266)   April 3, 2001:  Hamas terrorists fire three mortar shells at Atzmona, wounding three.

171

The individuals injured are plaintiff Lia Rivka Yered, wife of plaintiff Yossef Yered, and mother of plaintiffs Orith Yered, Tchia Yered, Herut Yered, and Shlomo Yered; plaintiff Ariel Yered, son of plaintiffs Lia Rivka Yered and Yossef Yered; and plaintiff Izak Yered, son of plaintiffs Lia Rivka Yered and Yossef Yered.

(267)  November 5, 2000:  AAMB gunmen shoot upon vehicles traveling near Maale Levona, injuring two.

The individuals injured are plaintiff Pinhas Cohen, husband of plaintiff Dalia Cohen and father of plaintiffs Bat Hen Sarah Cohen, Shimon Aviad Cohen, David Hai Cohen, Karin Klif, and Shirel Lea Cohen; and plaintiff Omra Riven, wife of plaintiff Michael Riven and mother of plaintiffs Gil Rai Riven, Shalom Hannanel Riven, Hachva Riven, Tzuria Ruth Riven, Nechamia Pinchas Riven, Maskit Bracha Riven, Auvia Haron Riven, Rivka Yocheved Riven, Yochai Riven, and Yeonathan Riven.

(268)  November 13, 2000:  AAMB gunmen attack a car traveling the road between Ofra and Neve Zuf, killing an Israeli woman.

The individual killed is:

(a)      Sara Golda Lisha.  Plaintiffs asserting claims related to and/or arising from this death are David Lisha, husband of decedent; Yocheved Lisha, Rut-Yaffa Lisha, Jacob Lisha, Moshe Menachem Lisha, and Shulamit Lisha, children of decedent; Ester Fischer and Bengamin Fischer, parents of decedent; and Refael Fischer, Zvika Izak Fischer, and Raichel Fairazen, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Sara Golda Lisha.

(269)  May 15, 2001:  AAMB members kill a woman and injure her father in a roadside ambush shooting along the Alon Highway.

**JA2749**

The individual killed is:

(a)     Idit Mizrahi.  Plaintiffs asserting claims related to and/or arising from this death are Moshe Mizrahi and Dalia Mizrahi, parents of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Idit Mizrahi.

The wounded individual is plaintiff Moshe Mizrahi, husband of plaintiff Dalia Mizrahi.

(270)  June 14, 2001:  A man is shot and killed by AAMB member Hasan Abu Sa'ireh on the Bethlehem bypass tunnel road.

The individual killed is:

(a)     Yehuda Hedri.  The plaintiff asserting claims related to and/or arising from this death is Anat Hedri, a citizen of Israel and Morocco, wife of decedent.  This individual asserts claims individually and/or as representative of the estate of Yehuda Hedri.

(271)  March 17, 2002:  An AAMB terrorist opens fire on a Kfar Saba street corner, killing a girl and wounding 16 other civilians.

Among those injured is plaintiff Adi Bittman.

(272)  September 23, 2002:  Hamas gunmen open fire on a family at the Tomb of the Patriarchs in Hebron, killing a man and injuring three of his sons.

The individual killed is:

(a)     Shlomo Itzhak Shapira.  Plaintiffs asserting claims related to and/or arising from this death are Rivka Shapira, wife of decedent; Ester Kreshinski, Pinchas Shapira, David Shapira, Mordechai Shapira, Sara Sadan, Yoel-Yehuda Shapira,

JA2750

and Yehoshua Shapira, children of decedent; Menachem Shapira and Shoshana Shapira, parents of decedent; and David Shapira, brother of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Shlomo Itzhak Shapira.

The individuals injured are plaintiffs Yoel-Yehuda Shapira, Yehoshua Shapira, and Pinchas Shapira, sons of plaintiff Rivka Shapira.

(273)   October 10, 2002:  Suicide bomber Rafik Hamad detonates outside a bus in Bar Ilan, killing one and wounding 16.  Hamas claims responsibility for the attack.

Among those injured is plaintiff Shmuel Ashbel, father of plaintiffs Rinat Ashbel and Morel Ashbel.

(274)   January 29, 2003:  Hamas gunmen shoot at a vehicle on the Jerusalem-Ofra Highway, injuring two.

Among those injured is plaintiff Dvir Nisan Kinarty, son of plaintiffs Esther Kinarty and Jacob Kinarty.

(275)   August 12, 2003:  An AAMB suicide bomber carries out an attack on a shopping mall in Rosh Ha'ayin, killing a man and wounding several others.

The individual killed is:

(a)      Yechezkel Yekutieli.  Plaintiffs asserting claims related to and/or arising from this death are Musli Yekutieli, mother of decedent; and Eldad Ratzon Yekutieli, Malka Reichani, and Orly Ba-Koach, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Yechezkel Yekutieli.

174

**JA2751**

Among those injured are plaintiff Irit Ran Cohen, mother of plaintiffs Omer Ran Cohen and Tamar Ran Cohen; and plaintiff Omer Ran Cohen.

(276)   August 18, 2003:  AAMB members shoot and injure two Israelis on the Nablus bypass road.

The individuals injured are plaintiff Zohara Saban, daughter of plaintiffs Emile Yoseph Saban and Ines Saban; and plaintiff Israel Moshe Mizrahi.

(277)   August 29, 2003:  AAMB gunmen ambush and fire upon a vehicle at the Alon intersection, killing a man and injuring his wife.

The individual killed is:

(a)   Shalom Har-Melech.  Plaintiffs asserting claims related to and/or arising from this death are Limor Har-Melech, wife of decedent; Ahuvia Har-Melech and Shara Har-Melech, children of decedent; Zipporah Har-Melech, a citizen of Israel and the United States, and Moshe Har-Melech, parents of decedent; and Ro'i Har-Melech, Shaarit Har-Melech, Haim Har-Melech, Shira Har-Melech, Shmuel Har-Melech, and Matanya Har-Melech, siblings of decedent.  Each of these individuals asserts claims individually and/or as representative of the estate of Shalom Har-Melech.

The individual injured is plaintiff Limor Har-Melech, mother of plaintiffs Ahuvia Har-Melech and Shara Har-Melech.

(278)   August 31, 2003:  A Hamas operative kills an Israeli man in a shooting attack in Gush Katif.

The individual killed is:

175

**JA2752**

(a)     Meir Ohayon.   The plaintiff asserting claims related to and/or arising from this death is Kochava Ohayon, wife of decedent.   This individual asserts claims individually and/or as representative of the estate of Meir Ohayon.

(279) February 17, 2004:  AAMB terrorists Rafa Saidi Ahmed Kassam, Yusuf Husni Muhammad Hamdan, and Mansur Muhammad Farhad Fuaka fire upon a vehicle near Ofra, injuring plaintiff Yehuda Eliyahu, husband of plaintiff Rivka Eliyahu and father of plaintiffs Abraham Itzhak Eliyahu, Matanya Yehushua Eliyahu, and Emuna Haya Eliyahu.

(280)   September 4, 1998:  Hamas gunmen kill two Israelis in Itzhar.

Among those killed is:

(a)     Harel Oz Bin Nun.   Plaintiffs asserting claims related to and/or arising from this death are Malka Bin Nun and Elchanan Bin Nun, parents of decedent; and Igal Bin Nun, Elichay Bin Nun, Avital Brand, Yael Bin Nun, Daniel Bin Nun, Shoshana Bin Nun, and Amitai Bin Nun, siblings of decedent.   Each of these individuals asserts claims individually and/or as representative of the estate of Harel Oz Bin Nun.

JA2753

# LeBoeuf, Lamb, Greene & MacRae llp

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

GOODWIN SQUARE
225 ASYLUM STREET, 13TH FLOOR
HARTFORD, CT 06103
(860) 293-3500
FACSIMILE: (860) 293-3555
E-MAIL ADDRESS: RONALD.ZDROJESKI@LLGM.COM
WRITER'S DIRECT DIAL: (860) 293-3537
WRITER'S DIRECT FAX: (860) 241-1337

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
BISHKEK
ALMATY
BEIJING

April 24, 2006

**_BY FED EX_**

James P. Bonner, Esq.
Shalov, Stone & Bonner LLP
485 Seventh Avenue, Suite 1000
New York, NY 10018

Michael E. Elsner, Esq.
Motley Rice LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

Steven M. Steingard, Esq.
Kohn Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107

Re:   *Linde, et al. v. Arab Bank, PLC*, 04-2799 (NG) (VVP)
      *Litle, et al. v. Arab Bank, PLC*, 04-5449 (NG)(VVP)
      *Almog, et al. v. Arab Bank, PLC*, 04-5564 (NG) (VVP)
      *Coulter, et al. v. Arab Bank, PLC*, 05-365 (NG) (VVP)
      *Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-388 (NG) (VVP)
      *Bennett, et al. v. Arab Bank, PLC*, 05-3183 (NG)(VVP)
      *Roth, et al. v. Arab Bank, PLC*, 05-3738 (NG)(VVP)
      <u>ABPLC 007144 - ABPLC009926</u>

Gentlemen:

Enclosed, please find a CD containing documents bearing Bates Numbers ABPLC 007144 through ABPLC009926, as well as the corresponding OCR files.

We produce this CD pursuant to Paragraph 4 of the March 24, 2006 Scheduling Order, which directs Arab Bank to produce documents identified in the March 3, 2006 Document Production Order (the "Production Order") located at Arab Bank plc, New York ("ABNY").

**JA2754**

James P. Bonner, Esq.
Michael E. Elsner, Esq.
Steven M. Steingard, Esq.

April 24, 2006
Page 2

       Arab Bank confirms that there are no additional documents located at ABNY which are responsive to the Production Order.

       Please note that the documents on the enclosed CD have been designated as Highly Confidential pursuant to the August 1, 2005 Protective Order.

Very truly yours,

*Ronald W. Zdrojeski /GB*

Ronald W. Zdrojeski

Enclosure

cc:    Attached Service List
       (by electronic mail without enclosure)

**JA2755**

<u>**SERVICE LIST**</u>

**BY ELECTRONIC DELIVERY:**

<u>**IN** *LITLE, ET AL. V. ARAB BANK, PLC,* **CV 04-5449 &** *BENNETT, ET AL. V. ARAB BANK, PLC,*
**CV 05-3183 &** *ROTH, ET AL. V. ARAB BANK, PLC, CV 05-3738 & WEISS, ET. AL. V. ARAB*
*BANK, PLC, CV 06-1623*</u>

**Liaison Counsel for** *Litle, Bennett and Roth* **Plaintiffs:**
James P. Bonner, Esq (jbonner@lawssb.com)
SHALOV, STONE & BONNER LLP
485 Seventh Avenue
Suite 1000
New York, N.Y. 10018
Telephone: (212) 239-4340
Facsimile: (212) 239-4310

**Co-Counsel for** *Litle, Bennett and Roth* **Plaintiffs:**
Mark S. Werbner, Esq. (mwerbner@swtriallaw.com)
SAYLES WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Telephone: (214) 939-8711
Facsimile: (214) 939-8787

Richard D. Heideman, Esq. (rdheideman@HLNKlaw.com)
HEIDEMAN LEZELL NUDELMAN & KALIK, P.C.
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
Telephone: (202) 462-8990
Facsimile: (202) 462-8995

Steven R. Perles, Esq. (sperles@perleslaw.com)
PERLES LAW FIRM, P.C.
1146 19th Street, NW
Washington DC 20036
Telephone: (202) 745-1300
Facsimile: (202) 745-1858

<u>**IN** *LINDE, ET AL. v. ARAB BANK, PLC,* **CV 04-2799 &** *COULTER, ET AL. v. ARAB BANK, PLC,*
**CV 05-365**</u>

**Liaison Counsel for** *Linde* **Plaintiffs; Co-counsel for the** *Coulter* **Plaintiffs**:
Andrew D. Friedman, Esq. (afriedman@whesq.com)
Joshua D. Glatter, Esq. (jglatter@whesq.com)
WECHSLER HARWOOD LLP
488 Madison Avenue
8th Floor
New York, NY 10022

**JA2756**

Telephone: (212) 935-7400
Facsimile: (212) 753-3630

**Counsel for the *Coulter* Plaintiffs; Co-Counsel for *Linde* Plaintiffs:**
Gary M. Osen, Esq. (gmo@osen.us)
Peter Raven-Hansen (praven@law.gwu.edu)
OSEN & ASSOCIATES, LLC
700 Kinderkamack Road
Oradell, NJ 07649
Telephone: (201) 265-6400
Facsimile: (201) 265-0303

Robert A. Swift, Esq. (rswift@kohnswift.com)
Steven M. Steingard, Esq. (ssteingard@kohnswift.com)
KOHN SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

**IN *ALMOG, ET AL. v. ARAB BANK, PLC,* CV 04-5564 & *AFRIAT-KURTZER, ET AL. V. ARAB BANK, PLC,* CV 05-388**

**Counsel for *Almog & Afriat-Kurtzer* Plaintiffs**
Ronald L. Motley, Esq. (rmotley@motleyrice.com)
Jodi W. Flowers, Esq. (jflowers@motleyrice.com)
John M. Eubanks, Esq. (jeubanks@motleyrice.com)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

**Co-Counsel for *Almog* Plaintiffs**
Alan Gerson, Esq. (gerson@gilgintl.org)
ATTORNEY AT LAW
2131 S. Street
Washington, D.C. 20008
Telephone: (202) 966-8557



## OSEN & ASSOCIATE, LLC

**ATTORNEYS AT LAW**
700 KINDERKAMACK ROAD, ORADELL, NEW JERSEY 07649
TELEPHONE 201.265.6400   FACSIMILE 201.265.0303
WWW.OSEN.US

May 2, 2006

<u>VIA E-MAIL</u>

Ronald W. Zdrojeski, Esquire
LeBoeuf, Lamb, Greene & MacRae LLP
Goodwin Square
225 Asylum Street, 13th floor
Hartford, CT  06103

      **RE:**      <u>Linde v. Arab Bank, plc</u>, No. 04 CV 2799 (NG)(VVP)
                   <u>Litle v. Arab Bank, plc</u>, No. 04 CV 5449 (NG)(VVP)
                   <u>Almog v. Arab Bank, plc</u>, No. 04 CV 5564 (NG)(VVP)
                   <u>Coulter v. Arab Bank, plc</u>, No. 05 CV 365 (NG)(VVP)
                   <u>Afriat-Kurtzer v. Arab Bank, plc</u>, No. 05 CV 388 (NG)(VVP)
                   <u>Bennett v. Arab Bank, plc</u>, No. CV 05 3183(NG)(VVP)
                   <u>Roth v. Arab Bank, plc</u>, No. CV 05 3738(NG)(VVP)

          **Bank Secrecy Briefing – Verifications Concerning Lebanese Account**

Dear Ron:

      Pursuant to the instructions of Magistrate Judge Pohorelsky to seek clarification by letter, we write to you on behalf of all Plaintiffs' counsel concerning a specific representation made by you on behalf of the Defendant in your letter dated March 14, 2006. Specifically, you stated that:

> In addition to making all of the records itemized above available to the OCC during the most recently concluded examination period, the Bank produced documents for a specific account in response to a specific letter request of the OCC. I can now verify that we have produced these documents pursuant to a previous document request. Neither the notification of annual examination nor the written request were in the form of a formal subpoena. Other than that single request, the Bank would not be able to reconstruct all of the particular documents the OCC reviewed during its examination.

      At the time that letter was written, Defendant had produced 73 S.W.I.F.T wire transactions regarding the Saudi Committee and documents pertaining to one (1) account; to wit – Account No. # 3-810-622473-0330 in Beirut which was the subject of Judge Pohorelsky's November 8, 2005 Document Production Order attached herein as <u>Exhibit A</u>. Accordingly, since at time your March 14th letter was written, Defendant had produced documents for only one (1) account, it is reasonable to surmise that your letter referred to the Beirut account. **<u>Plaintiffs are entitled to a verification and confirmation of this fact since it bears direct relevance to the</u>**

**JA2758**

Letter to Ronald W. Zdrojeski, Esquire
May 2, 2006
Page 2

<u>**pending briefing of the bank secrecy issue and the Defendant's good faith in making
representations concerning Lebanese law.**</u>

Specifically, in support of its opposition to Plaintiffs' bank secrecy motion, Defendant
has proffered a sworn declaration by Allan Howard, one of Defendant's counsel. Attached to that
declaration are copies of Defendant's application to the Special Investigation Commission in
Beirut (Howard Decl. Ex. K) as well as the Commission's January 25, 2006 response approving
release of the records set forth in the Court's November 8, 2005 Document Production Order.
Pursuant to Fed. R. Civ. P. 44.1, Defendant has also proffered an expert declaration on Lebanese
bank secrecy laws by Chakib Cortbaoui. At the same time, on April 27, 2006, in response to
Plaintiffs' First Joint Request For Admissions, Arab Bank refused to respond to Request No. 40:

> The Arab Bank Group did not seek waivers from the courts or any other branches or
> agencies of the government of Lebanon prior to November 1, 2005, concerning any
> account holder of the Arab Bank Group who maintained account # 3-810-622473-0330 at
> the Al Mazra'a Branch in Beirut, Lebanon.

To the extent, that your letter of March 14, 2006, indicates that the Lebanese account
documents were previously produced to the OCC in response to a "written request [that was not]
in the form of a formal subpoena" this fact calls into question previous assertions that (a) the
records could not be produced absent a court order because Defendant would be subject to
criminal prosecution in Lebanon[1] (b) and that even **after** the Court ordered the records produced,
it was necessary for the Defendant to procure the permission of Special Investigation
Commission in Beirut in order to release the records to the Plaintiffs. In short, the clear
implication of your March 14th letter is that the Lebanese records were previously produced to
the OCC in response to a letter request before Defendant's counsel made numerous factual and
legal assertions to both the Court and to Plaintiffs' counsel to the effect that production of these
records, absent the "blessing of local regulators,"[2] would result in Arab Bank executives going to
jail.

As you know, your representations to the Court have previously emphasized "Arab
Bank's efforts to obtain permission for lawful disclosure …in Lebanon" and declined to produce
other documents responsive to Plaintiffs' discovery requests on the grounds that complying with
discovery would risk "criminal liability for Arab Bank if it were to comply." Under these
circumstances, Plaintiffs and the Court are entitled to know whether the Lebanese records were
previously produced to the OCC without either a court order or a subpoena as your March 14,

---

[1] See, e.g. Statement of Kevin Walsh: "We ask only that the Court oversee that process in a away that doesn't
place Arab Bank executives in jail in Lebanon or Jordan because they have willfully violated bank secrecy laws."
June 22, 2005 Conference; Tr: 32?

[2] Statement of Kevin Walsh: "There is a Lebanese account noted here at the very bottom of the list, your Honor.
Again, we have not pursuant to the orderly process that this court has instituted, made any formal application to the
Lebanese courts and in the case of Lebanon as in the case of Jordan and the Palestinian territories, we very much
would like to be acting with the blessing of the local regulators rather than being put to the hard choice otherwise."
October 11, 2005 Conference; Tr: 86-87.[page 78 in a prior version of the transcript]

2006 letter strongly suggests and without a waiver being sought from the appropriate Lebanese authorities.

To be clear, the account records are NOT subject to bank examination privilege. As Judge Pohorelsky expressly noted during the February 28, 2006 status conference:

> I am not as concerned about that privilege anymore, I mean, at least as to transactional records. Tr. 42:11-13.

Likewise, the OCC itself has made clear that it will not and has not asserted bank examination privilege as to any transactional documents sought by the Plaintiffs. As noted in the OCC's letter to Mr. Elsner dated June 21, 2005: "[W]e can clarify that the OCC will not assert the bank examination privilege or the law enforcement privilege for documents prepared by Arab Bank in the ordinary course of business, even if OCC examiners reviewed or acquired copies of those documents."

For the reasons set forth above and because this issue is directly related to Plaintiffs' ability to fully and adequately brief the bank secrecy issue, unless we receive an unequivocal clarification and/or verification from you within the next five (5) business days, we intend to petition the court to immediately order a Rule 30(b) deposition on this matter. To be clear, we are seeking the following specific information:

1. Confirmation that the account referenced in your March 14, 2006, letter is in fact the same account that was the subject of the Court's November 8, 2005, Document Production Order;

2. If not, an explanation as to which account is in fact referenced in your March 14, 2006, letter;

3. If the account referenced in your March 14, 2006 letter is in fact the same account that was the subject of the Court's November 8, 2005, Document Production Order, the precise date upon which the Lebanese account was first produced to the OCC;[3]

4. Verification of whether Arab Bank Plc sought or received a waiver from the Special Investigation Commission in Beirut prior to producing the records of account # 3-810-622473-0330 to the OCC.

We look forward to your immediate response.

Sincerely,

Gary M Osen

---

[3] Please note that we are neither seeking the contents of the OCC's written request nor are we requesting that you produce any correspondence exchanged between the Defendant and the OCC pertaining to the account.

cc:    Ford Barrett, Senior Counsel: OCC
       All Counsel

**JA2761**

# LeBoeuf, Lamb, Greene & MacRae llp

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

GOODWIN SQUARE
225 ASYLUM STREET, 13TH FLOOR
HARTFORD, CT 06103
(860) 293-3500
FACSIMILE: (860) 293-3555
E-MAIL ADDRESS: RONALD.ZDROJESKI@LLGM.COM
WRITER'S DIRECT DIAL: (860) 293-3537
WRITER'S DIRECT FAX: (860) 241-1337

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
BISHKEK
ALMATY
BEIJING

May 15, 2006

**BY ELECTRONIC MAIL**
Gary M. Osen
Osen & Associates, LLC
700 Kinderkamack Road
Oradell, NJ 07649

Re:    *Linde, et al. v. Arab Bank, PLC*, 04-2799 (NG) (VVP)
             *Litle, et al. v. Arab Bank, PLC*, 04-5449 (NG)(VVP)
             *Almog, et al. v. Arab Bank, PLC*, 04-5564 (NG) (VVP)
             *Coulter, et al. v. Arab Bank, PLC*, 05-365 (NG) (VVP)
             *Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-388 (NG) (VVP)
             *Bennett, et al. v. Arab Bank, PLC*, 05-3183 (NG)(VVP)
             *Roth, et al. v. Arab Bank, PLC*, 05-3738 (NG)(VVP)
             **May 10, 2006 Correspondence**

Dear Gary:

We write on behalf of Arab Bank plc (the "Bank") in response to plaintiffs' letter dated May 10, 2006, Re: April 14, 2006 and April 24, 2006 Document Production (the "Letter").

The Letter identifies ten documents previously produced by the Bank, ABPLC008392, ABPLC008393, ABPLC008892, ABPLC008897, ABPLC008942, ABPLC008948, ABPLC008969, ABPLC008973, ABPLC009467, ABPLC009480, and requests information as to why the Bank has not produced the corresponding "SWIFT transactions" documents from Arab Bank plc, New York ("ABNY").[1]

---

[1] We assume that by "SWIFT transactions," you are referring to the straight-through-process ("STP") instructions of they type the Bank has previously produced. If this is not an accurate assumption, please let us know so that we may further clarify this issue.

JA2762

Gary M. Osen, Esq.
May 15, 2006
Page 2

The Bank has not produced such corresponding ABNY documents because the documents, are not responsive to the Court's March 3, 3006 Document Production Order.

Very truly yours,

*Ronald W. Zdrojeski/Hgf*

Ronald W. Zdrojeski

cc:     Attached Service List

**JA2763**

<u>**SERVICE LIST**</u>

**BY ELECTRONIC DELIVERY:**

**IN** *LITLE, ET AL. V. ARAB BANK, PLC,* **CV 04-5449 &** *BENNETT, ET AL. V. ARAB BANK, PLC,* **CV 05-3183 &** *ROTH, ET AL. V. ARAB BANK, PLC,* **CV 05-3738 &** *WEISS, ET. AL. V. ARAB BANK, PLC, CV 06-1623*

**Liaison Counsel for** *Litle, Bennett and Roth* **Plaintiffs:**
James P. Bonner, Esq (jbonner@lawssb.com)
SHALOV, STONE & BONNER LLP
485 Seventh Avenue
Suite 1000
New York, N.Y. 10018
Telephone: (212) 239-4340
Facsimile: (212) 239-4310

**Co-Counsel for** *Litle, Bennett and Roth* **Plaintiffs:**
Mark S. Werbner, Esq. (mwerbner@swtriallaw.com)
SAYLES WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Telephone: (214) 939-8711
Facsimile: (214) 939-8787

Richard D. Heideman, Esq. (rdheideman@hnklaw.com)
HEIDEMAN LEZELL NUDELMAN & KALIK, P.C.
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
Telephone: (202) 462-8990
Facsimile: (202) 462-8995

Steven R. Perles, Esq. (sperles@perleslaw.com)
PERLES LAW FIRM, P.C.
1146 19th Street, NW
Washington DC 20036
Telephone: (202) 745-1300
Facsimile: (202) 745-1858

**IN** *LINDE, ET AL. v. ARAB BANK, PLC,* **CV 04-2799 &** *COULTER, ET AL. v. ARAB BANK, PLC,* **CV 05-365**

**Liaison Counsel for** *Linde* **Plaintiffs; Co-counsel for the** *Coulter* **Plaintiffs**:
Andrew D. Friedman, Esq. (afriedman@whesq.com)
Joshua D. Glatter, Esq. (jglatter@whesq.com)
WECHSLER HARWOOD LLP
488 Madison Avenue
8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

**Counsel for the** *Coulter* **Plaintiffs; Co-Counsel for** *Linde* **Plaintiffs:**
Gary M. Osen, Esq. (gmo@osen.us)

Peter Raven-Hansen (praven@law.gwu.edu)
OSEN & ASSOCIATES, LLC
700 Kinderkamack Road
Oradell, NJ 07649
Telephone: (201) 265-6400
Facsimile: (201) 265-0303

Robert A. Swift, Esq. (rswift@kohnswift.com)
Steven M. Steingard, Esq. (ssteingard@kohnswift.com)
KOHN SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

**IN *ALMOG, ET AL. v. ARAB BANK, PLC*, CV 04-5564 & *AFRIAT-KURTZER, ET AL. V. ARAB BANK, PLC*, CV 05-388**

**Counsel for *Almog & Afriat-Kurtzer* Plaintiffs**
Ronald L. Motley, Esq. (rmotley@motleyrice.com)
Jodi W. Flowers, Esq. (jflowers@motleyrice.com
John M. Eubanks, Esq. (jeubanks@motleyrice.com)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

**Co-Counsel for *Almog* Plaintiffs**
Alan Gerson, Esq. (gerson@gilgintl.org)
ATTORNEY AT LAW
2131 S. Street
Washington, D.C. 20008
Telephone: (202) 966-8557



**OSEN & ASSOCIATE, LLC**

ATTORNEYS AT LAW
700 KINDERKAMACK ROAD, ORADELL, NEW JERSEY 07649
TELEPHONE 201.265.6400  FACSIMILE 201.265.0303
WWW.OSEN.US

May 16, 2006

**BY ELECTRONIC MAIL**

Ronald W. Zdrojeski, Esq.
LeBoeuf, Lamb, Greene and MacRae LLP
Goodwin Square
225 Asylum Street, 13th floor
Hartford, CT  06103

> Re:  <u>Linde v. Arab Bank, plc</u>, No. 04 Civ. 2799 (NG) (VVP)
> <u>Coulter v. Arab Bank, plc</u>, No. 05 Civ. 365 (NG) (VVP)
> <u>April 14, 2006 and April 24, 2006 Document Production</u>

Dear Ron:

I write on behalf of the <u>Linde</u> and <u>Coulter</u> Plaintiffs following up on your letters dated April 14, 2006, April 24, 2006 and May 15, 2006.  In your most recent letter dated May 15, 2006, you stated that the corresponding documents that we identified in our May 10th letter have not been produced because the documents are not responsive to the March 3, 2006 Document Production Order. This does not seem consistent with your April 24th letter, wherein the corresponding transactional documents were produced "pursuant to Paragraph 4 of the March 24, 2006 Scheduling Order, which directs Arab Bank to produce documents identified in the March 3, 2006 Document Production Order (the "Production Order") located at Arab Bank plc, New York ("Arab Bank New York")."

Our confusion is magnified by the fact that paragraph 5 of the Document Production Order requires the Defendant to produce all documents concerning wire transfers involving Holy Land Foundation.  Two (2) of the documents, ABPLC008393 and ABPLC008892, that we identified in our May 10, 2006 letter were produced by the Defendant on April 24, 2006 and appear to be wire transfers that involve the Holy Land Foundation.

In lieu of a further exchange of letters on this subject, I would propose that we simply add it to our agenda for the prescheduled telephone conference on Friday, May 19th. Should you wish to discuss this matter further before then, please feel free to contact me.

Sincerely,

Gary M. Osen

cc:  All counsel

**JA2766**

# LeBoeuf, Lamb, Greene & MacRae LLP

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

GOODWIN SQUARE
225 ASYLUM STREET, 13TH FLOOR
HARTFORD, CT 06103
(860) 293-3500
FACSIMILE: (860) 293-3555
E-MAIL ADDRESS: RONALD.ZDROJESKI@LLGM.COM
WRITER'S DIRECT DIAL: (860) 293-3537
WRITER'S DIRECT FAX: (860) 241-1337

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
BISHKEK
ALMATY
BEIJING

May17, 2006

**BY ELECTRONIC MAIL**

Gary M. Osen
Osen & Associates, LLC
700 Kinderkamack Road
Oradell, NJ 07649

    Re:    *Linde, et al. v. Arab Bank, PLC*, 04-2799 (NG) (VVP)
            *Litle, et al. v. Arab Bank, PLC*, 04-5449 (NG)(VVP)
            *Almog, et al. v. Arab Bank, PLC*, 04-5564 (NG) (VVP)
            *Coulter, et al. v. Arab Bank, PLC*, 05-365 (NG) (VVP)
            *Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-388 (NG) (VVP)
            *Bennett, et al. v. Arab Bank, PLC*, 05-3183 (NG)(VVP)
            *Roth, et al. v. Arab Bank, PLC*, 05-3738 (NG)(VVP)
            **May 2, 2006 Correspondence**

Dear Gary:

    We write on behalf of Arab Bank plc (the "Bank") in response to plaintiffs' letter dated May 2, 2006, Re: Bank Secrecy Briefing – Verifications Concerning Lebanese Account (the "Letter"). The Bank does not intend to thwart plaintiffs' legitimate requests for discovery materials. However, as the information sought by the Letter clearly implicates the bank examination privilege, the Bank is prohibited from providing such information.

    As you may recall, during the February 29, 2006 Status Conference, the Court directed the Bank to verify the fact it is unable to catalog all of the potentially responsive documents reviewed by the Office of the Comptroller of the Currency ("OCC") and prepare a log of responsive documents withheld from production on the basis of the bank examination privilege. *See* Tr. 54:4-6, 66:24-67:3; 67:23-25. In response, in our March 14, 2006 letter, we provided the plaintiffs with the following statement:

> *In addition to making all of the records itemized above available to the OCC during the most recently concluded examination period, the Bank produced documents for a specific account in response to a specific letter request of the OCC. I can now verify that we have*

**JA2767**

> *produced these documents pursuant to a previous document request. Neither the notification of annual examination nor the written request were in the form of a formal subpoena. Other than that single request, the Bank would not be able to reconstruct all of the particular documents the OCC reviewed during its examination.*

Plaintiffs are now using this statement to surmise "facts" about the Bank's communications with the OCC, and want the Bank to confirm and/or verify these "facts." Specifically, the Letter requests confirmation as to what account was the subject of the OCC request mentioned in the statement, and verification as to the manner in which the Bank responded to the request. Under the circumstances, we can only believe that this is a thinly disguised attempt to circumvent the decision of the Court respecting the bank examination privilege.

Although plaintiffs are not seeking the actual correspondence between the Bank and the OCC, they are nevertheless seeking privileged information concerning the work product of the OCC and the Bank's responses to the OCC's supervisory requests. (*See* August 3, 2005 letter from OCC Senior Deputy Comptroller Timothy Long to Michael Elsner: "the work product of the OCC staff, the OCC's letters to the bank and the bank's responses are privileged supervisory communications protected by the bank examination privilege.").

Because it is the OCC, not the Bank, that holds and thus, has the ability to waive the bank examination privilege, the Bank is not in a position to provide plaintiffs with "an unequivocal clarification and/or verification" of such privileged information. Given the OCC's previous denial to plaintiffs' requests for such non-public information related to the Bank on the grounds of the bank examination privilege, law enforcement investigatory privilege and attorney-client privilege, the Bank has no reason to believe that the OCC has authorized the disclosure of this privileged information.

Additionally, the Letter's claim that this issue is directly related to plaintiff's ability to brief the bank secrecy issue is unsupportable. Bank secrecy laws at issue in this matter are not waivable. (*See* Memorandum of Law of Defendant Arab Bank plc in Opposition to the Plaintiffs Motion for an Order Overruling Objections Deeming Facts as Admitted and Compelling Further Responses to Plaintiffs' First Set of Requests for Admissions and Related Interrogatories, at 22-23). Moreover in this instance, the Bank could not have waived bank secrecy protection by providing documents pursuant to the request of the OCC, a regulatory agency of the Bank.

Given these facts, frankly, it appears that the Letter is nothing more than another attempt to gain access to information that was already denied to them by the OCC and on multiple occasions by the Court.

Very truly yours,

Ronald W. Zdrojeski

Gary M. Osen, Esq.
May 17, 2006
Page 3

cc:     Attached Service List

NYC596740.3

JA2769

SERVICE LIST

**BY ELECTRONIC DELIVERY:**

**IN *LITLE, ET AL. V. ARAB BANK, PLC*, CV 04-5449 & *BENNETT, ET AL. V. ARAB BANK, PLC*, CV 05-3183 & *ROTH, ET AL. V. ARAB BANK, PLC*, CV 05-3738**

**Liaison Counsel for *Litle, Bennett and Roth* Plaintiffs:**
James P. Bonner, Esq (jbonner@lawssb.com)
SHALOV, STONE & BONNER LLP
485 Seventh Avenue
Suite 1000
New York, N.Y. 10018
Telephone: (212) 239-4340
Facsimile: (212) 239-4310

**Co-Counsel for *Litle, Bennett and Roth* Plaintiffs:**
Mark S. Werbner, Esq. (mwerbner@swtriallaw.com)
SAYLES WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Telephone: (214) 939-8711
Facsimile: (214) 939-8787

Richard D. Heideman, Esq. (rdheideman@HLNKlaw.com)
HEIDEMAN LEZELL NUDELMAN & KALIK, P.C.
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
Telephone: (202) 462-8990
Facsimile: (202) 462-8995

Steven R. Perles, Esq. (sperles@perleslaw.com)
PERLES LAW FIRM, P.C.
1146  19th Street, NW
Washington DC 20036
Telephone: (202) 745-1300
Facsimile: (202) 745-1858

**IN *LINDE, ET AL. v. ARAB BANK, PLC*, CV 04-2799 & *COULTER, ET AL. v. ARAB BANK, PLC*, CV 05-365**

**Liaison Counsel for *Linde* Plaintiffs; Co-counsel for the *Coulter* Plaintiffs**:
Andrew D. Friedman, Esq. (afriedman@whesq.com)
Joshua D. Glatter, Esq. (jglatter@whesq.com)
WECHSLER HARWOOD LLP
488 Madison Avenue
8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

**Counsel for the *Coulter* Plaintiffs; Co-Counsel for *Linde* Plaintiffs:**
Gary M. Osen, Esq. (gmo@osen.us)
Peter Raven-Hansen (praven@law.gwu.edu)
OSEN & ASSOCIATES, LLC
700 Kindermack Road
Oradell, NJ 07649
Telephone: (201) 265-6400
Facsimile: (201) 265-0303

Robert A. Swift, Esq. (rswift@kohnswift.com)
Steven M. Steingard, Esq. (ssteingard@kohnswift.com)
KOHN SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

**IN *ALMOG, ET AL. . v. ARAB BANK, PLC*, CV 04-5564 & *AFRIAT-KURTZER, ET AL. V. ARAB BANK, PLC*, CV 05-388**

**Counsel for *Almog & Afriat-Kurtzer* Plaintiffs**
Ronald L. Motley, Esq. (rmotley@motleyrice.com)
Jodi W. Flowers, Esq. (jflowers@motleyrice.com
John M. Eubanks, Esq. (jeubanks@motleyrice.com)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

**Co-Counsel for *Almog* Plaintiffs**
Alan Gerson, Esq. (gerson@gilgintl.org)
ATTORNEY AT LAW
2131 S. Street
Washington, D.C. 20008
Telephone: (202) 966-8557

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

GOODWIN SQUARE
225 ASYLUM STREET, 13TH FLOOR
HARTFORD, CT O6IO3
(860) 293-3500
FACSIMILE: (860) 293-3555

E-MAIL ADDRESS: RONALD.ZDROJESKI@LLGM.COM
WRITER'S DIRECT DIAL: (860) 293-3537
WRITER'S DIRECT FAX: (860) 241-1337

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
ALMATY
BEIJING

### CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY

May 17, 2006

**BY ELECTRONIC MAIL**

James P. Bonner, Esq.
Shalov, Stone & Bonner LLP
485 Seventh Avenue
Suite 1000
New York, NY 10018

Michael E. Elsner, Esq.
Motley Rice LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

Steven M. Steingard, Esq.
Kohn Swift & Graf, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107

Re:   *Linde, et al. v. Arab Bank, PLC*, 04-2799 (NG) (VVP)
      *Litle, et al. v. Arab Bank, PLC*, 04-5449 (NG)(VVP)
      *Almog, et al. v. Arab Bank, PLC*, 04-5564 (NG) (VVP)
      *Coulter, et al. v. Arab Bank, PLC*, 05-365 (NG) (VVP)
      *Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-388 (NG) (VVP)
      *Bennett, et al. v. Arab Bank, PLC*, 05-3183 (NG)(VVP)
      *Roth, et al. v. Arab Bank, PLC*, 05-3738 (NG)(VVP)

### Confidential Letter Pursuant to April 28, 2006 Order

Counsel,

     Pursuant to the April 28, 2006 Order of Magistrate Judge Pohorelsky, we provide this letter as a verification of certain matters concerning documents previously produced by Arab Bank plc (the "Bank").

     The matters discussed in this letter have been designated by the Court as Confidential pursuant to its April 28, 2006 Order; accordingly these matters shall not be disclosed to anyone beyond the group of attorneys directly involved in above referenced cases. (*See* Tr. 27:18 - 28:3).

LETTER CONTAINS CONFIDENTIAL INFORMATION
ATTORNEYS' EYES ONLY

**JA2772**

James P. Bonner, Esq.
Michael E. Elsner, Esq.
Steven M. Steingard, Esq.
May 17, 2006
Page 2

On April 24, 2006, we produced documents ABPLC 007144 - ABPLC009926, which were designated as Highly Confidential pursuant to the August 1, 2005 Protective Order (the "Documents"). The production of the Documents was made pursuant to Paragraph 4 of the March 24, 2006 Scheduling Order, which directs the Bank to produce all documents identified in the March 3, 2006 Document Production Order that are within the possession, custody or control of the Bank's New York office ("ABNY").

The Documents, which are not ABNY business records, are in the United States because they were previously provided by the Bank's outside counsel to either:

1) The U.S. Department of Justice pursuant to an August 24, 2004 Order Under the Seal of the U.S. District Court, Northern District of Texas, to wherein produce documents which were the subject of Grand Jury Subpoenas served on ABNY; or

2) The New Scotland Yard pursuant to a September 9, 2003 Order of the Bow Street Magistrates' Court, London, issued pursuant to the Criminal Justice (International Co-operation) Act 1990, Section 4(2) Notice granted on August 26, 2003, to produce documents which were the subject of a Request for Evidence submitted to the United Kingdom by the United States.

ABNY was not involved with the procurement or assembly of the Documents, and therefore, cannot authenticate, or otherwise confirm, the information contained on these Documents.

Nevertheless, ABNY, through its counsel, has maintained copies of the Documents, which are therefore legally within its custody or control. See *M.L.C., Inc. v. North American Philips Corp.*, 109 F.R.D. 134, 136 (S.D.N.Y. 1986); *Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595-596 (S.D.N.Y. 1978).

I trust this is satisfactory. If not, please contact me so that we can avoid any unnecessary expense in further clarifying this matter.

Very truly yours,

Ronald W. Zdrojeski

cc:   Attached Service List

**LETTER CONTAINS CONFIDENTIAL INFORMATION
ATTORNEYS' EYES ONLY**

**JA2773**



**OSEN & ASSOCIATE, LLC**

ATTORNEYS AT LAW
700 KINDERKAMACK ROAD, ORADELL, NEW JERSEY 07649
TELEPHONE 201.265.6400 FACSIMILE 201.265.0303
WWW.OSEN.US

May 18, 2006

**VIA E-MAIL**

Ronald W. Zdrojeski, Esquire
LeBoeuf, Lamb, Greene & MacRae LLP
Goodwin Square
225 Asylum Street, 13th floor
Hartford, CT 06103

RE:     **Account No. # 3-810-622473-0330 in Beirut**

**Linde v. Arab Bank, plc, No. 04 CV 2799 (NG)(VVP)**
**Litle v. Arab Bank, plc, No. 04 CV 5449 (NG)(VVP)**
**Almog v. Arab Bank, plc, No. 04 CV 5564 (NG)(VVP)**
**Coulter v. Arab Bank, plc, No. 05 CV 365 (NG)(VVP)**
**Afriat-Kurtzer v. Arab Bank, plc, No. 05 CV 388 (NG)(VVP)**
**Bennet v. Arab Bank, plc, No. CV 05 3183(NG)(VVP)**
**Roth v. Arab Bank, plc, No. CV 05 3738(NG)(VVP)**

Dear Ron,

In anticipation of our meet and confer telephone conference tomorrow, I write on behalf of all Plaintiffs' counsel in the above-captioned actions. To begin with, we appreciate the fact that your letter of March 14, 2006 corrected statements made by your colleague, Mr. Walsh, to the Court at the status conference on February 28th. At the same time, it should be noted that our concerns pertaining to documents marked ABPLC006883-ABPLC006902 ("the Beirut account") do not derive from the fact that the documents may have been produced by the Defendant to the OCC. It was *your* letter of March 14th that introduced the possible connection between the Beirut account documents and the documents produced "for a specific account in response to a specific letter request from the OCC."

Our concern regarding the Beirut account documents is directly related to the Defendant's assertions concerning Lebanese bank secrecy. Plaintiffs have the right to know whether the Beirut account documents were previously produced to *any* U.S. entity, including other courts, governmental agencies or private parties.

In order to properly evaluate the alleged "risks" faced by your client in producing Lebanese banking records and, more importantly, assessing whether your client's representations

**JA2774**

to the Court concerning Lebanese bank secrecy are accurate and made in good faith, the answer to the question of whether the Beirut account documents have ever been previously produced to *anyone* in the United States and whether the formal consent of the Special Investigation Commission in Beirut was obtained prior to that production (if any) is therefore essential.

It may very well be that the Beirut account documents have never been previously produced in the United States. If so, Plaintiffs' counsel are entitled to a clear and unambiguous statement to that effect.

If the documents have been previously produced with the prior consent of the Special Investigation Commission in Beirut, then Plaintiffs are entitled to concrete verification of that fact. It is our sincere hope that this issue can be resolved without the need to further involve the Court.

I look forward to speaking with you further about this tomorrow.

Sincerely,

Gary M. Osen

cc:     All counsel

**JA2775**



**OSEN & ASSOCIATE, LLC**

ATTORNEYS AT LAW
700 KINDERKAMACK ROAD, ORADELL, NEW JERSEY 07649
TELEPHONE 201.265.6400  FACSIMILE 201.265.0303
WWW.OSEN.US

<u>FILED UNDER SEAL</u>

May 18, 2006

Magistrate Judge Viktor V. Pohorelsky
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    <u>Re:</u>    **Conference Scheduled For May 23, 2006**

        <u>**Linde v. Arab Bank, plc,**</u> **No. 04 Civ. 2799 (NG) (VVP)**
        <u>**Litle v. Arab Bank, plc,**</u> **No. 04 Civ. 5449 (NG) (VVP)**
        <u>**Almog v. Arab Bank, plc,**</u> **No. 04 Civ. 5564 (NG) (VVP)**
        <u>**Coulter v. Arab Bank, plc,**</u> **No. 05 Civ. 365 (NG) (VVP)**
        <u>**Afriat-Kurtzer v. Arab Bank, plc,**</u> **No. 05 Civ. 388 (NG) (VVP)**
        <u>**Bennett v. Arab Bank, plc,**</u> **No. 05 3183 (NG) (VVP)**
        <u>**Roth v. Arab Bank, plc,**</u> **No. 05 Civ. 3738 (NG) (VVP)**

Dear Magistrate Judge Pohorelsky:

       We write on behalf of all Plaintiffs in the above-captioned actions. Plaintiffs are mindful of the fact that the Court has scheduled oral argument for Tuesday, May 23, 2006, concerning the question of the appropriate location for depositions of Defendant's Jordanian officers, directors and employees. In view of the fact that all counsel will be before the Court on that issue, Plaintiffs' counsel respectfully request that the parties be permitted to address any unresolved issues relating to three matters represented by the letters attached hereto as Exhibits A through C.

       Exhibit A contains two letters, one from Defendant's counsel dated May 17, 2006, addressing the documents which were the subject of the sidebar and sealed portion of the conference with Your Honor on April 28, 2006 and the second letter is Plaintiffs' May 18, 2006, response.

       Exhibit B contains three letters, one from Plaintiffs' counsel, dated May 2, 2006, one from Defendant's counsel, dated May 17, 2006, and Plaintiffs' response dated May 18, 2006. This correspondence regards Plaintiffs' counsel's attempt, as directed by the Court in the April

**JA2776**

28 conference, to seek clarification of certain representations made by Defendant's counsel regarding banking records from a Beirut account.

Exhibit C contains a letter from Plaintiffs' counsel regarding documents Defendant's counsel stated in a letter to the Court dated December 12, 2005 "are already being produced" which Plaintiffs believe they have yet to receive.

Plaintiffs' counsel and defense counsel have a scheduled a meet and confer telephone conference for May 19, 2006, in which the parties hope to address or narrow, to the extent possible, the issues arising in these letters, but Plaintiffs' counsel anticipate that some issues will remain unresolved and will therefore be appropriate for consideration by the Court.

We hope that presence of all counsel on May 23rd will afford the Court an opportunity to address any unresolved issues pertaining to these matters.

Respectfully submitted,

Gary M. Osen

Encls.

cc:     All Counsel

**JA2777**

# Exhibit A

# LeBoeuf, Lamb, Greene & MacRae LLP

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

GOODWIN SQUARE
225 ASYLUM STREET, 13TH FLOOR
HARTFORD, CT 06103
(860) 293-3500
FACSIMILE: (860) 293-3555

E-MAIL ADDRESS: RONALD.ZDROJESKI@LLGM.COM
WRITER'S DIRECT DIAL: (860) 293-3537
WRITER'S DIRECT FAX: (860) 241-1337

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
ALMATY
BEIJING

**CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY**

May 17, 2006

**BY ELECTRONIC MAIL**

James P. Bonner, Esq.           Michael E. Elsner, Esq.       Steven M. Steingard, Esq.
Shalov, Stone & Bonner LLP      Motley Rice LLC               Kohn Swift & Graf, P.C.
485 Seventh Avenue              28 Bridgeside Blvd.           One South Broad Street
Suite 1000                      P.O. Box 1792                 Suite 2100
New York, NY  10018             Mt. Pleasant, SC  29465       Philadelphia, PA  19107

Re:     *Linde, et al. v. Arab Bank, PLC*, 04-2799 (NG) (VVP)
        *Litle, et al. v. Arab Bank, PLC*, 04-5449 (NG)(VVP)
        *Almog, et al. v. Arab Bank, PLC*, 04-5564 (NG) (VVP)
        *Coulter, et al. v. Arab Bank, PLC*, 05-365 (NG) (VVP)
        *Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-388 (NG) (VVP)
        *Bennett, et al. v. Arab Bank, PLC*, 05-3183 (NG)(VVP)
        *Roth, et al. v. Arab Bank, PLC*, 05-3738 (NG)(VVP)

**Confidential Letter Pursuant to April 28, 2006 Order**

Counsel,

        Pursuant to the April 28, 2006 Order of Magistrate Judge Pohorelsky, we provide this
letter as a verification of certain matters concerning documents previously produced by Arab
Bank plc (the "Bank").

        The matters discussed in this letter have been designated by the Court as Confidential
pursuant to its April 28, 2006 Order; accordingly these matters shall not be disclosed to anyone
beyond the group of attorneys directly involved in above referenced cases. (*See* Tr. 27:18 - 28:3).

<div align="center">LETTER CONTAINS CONFIDENTIAL INFORMATION<br>ATTORNEYS' EYES ONLY</div>

**JA2779**

James P. Bonner, Esq.
Michael E. Elsner, Esq.
Steven M. Steingard, Esq.
May 17, 2006
Page 2

On April 24, 2006, we produced documents ABPLC 007144 – ABPLC009926, which were designated as Highly Confidential pursuant to the August 1, 2005 Protective Order (the "Documents"). The production of the Documents was made pursuant to Paragraph 4 of the March 24, 2006 Scheduling Order, which directs the Bank to produce all documents identified in the March 3, 2006 Document Production Order that are within the possession, custody or control of the Bank's New York office ("ABNY").

The Documents, which are not ABNY business records, are in the United States because they were previously provided by the Bank's outside counsel to either:

1) The U.S. Department of Justice pursuant to an August 24, 2004 Order Under the Seal of the U.S. District Court, Northern District of Texas, to wherein produce documents which were the subject of Grand Jury Subpoenas served on ABNY; or

2) The New Scotland Yard pursuant to a September 9, 2003 Order of the Bow Street Magistrates' Court, London, issued pursuant to the Criminal Justice (International Co-operation) Act 1990, Section 4(2) Notice granted on August 26, 2003, to produce documents which were the subject of a Request for Evidence submitted to the United Kingdom by the United States.

ABNY was not involved with the procurement or assembly of the Documents, and therefore, cannot authenticate, or otherwise confirm, the information contained on these Documents.

Nevertheless, ABNY, through its counsel, has maintained copies of the Documents, which are therefore legally within its custody or control. *See M.L.C., Inc. v. North American Philips Corp.*, 109 F.R.D. 134, 136 (S.D.N.Y. 1986); *Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595-596 (S.D.N.Y. 1978).

I trust this is satisfactory. If not, please contact me so that we can avoid any unnecessary expense in further clarifying this matter.

Very truly yours,

Ronald W. Zdrojeski

cc: Attached Service List

LETTER CONTAINS CONFIDENTIAL INFORMATION
ATTORNEYS' EYES ONLY

**JA2780**



**OSEN & ASSOCIATE, LLC**

ATTORNEYS AT LAW
700 KINDERKAMACK ROAD, ORADELL, NEW JERSEY 07649
TELEPHONE 201.265.6400  FACSIMILE 201.265.0303
WWW.OSEN.US

May 18, 2006

<u>VIA E-MAIL</u>

Ronald W. Zdrojeski, Esquire
LeBoeuf, Lamb, Greene & MacRae LLP
Goodwin Square
225 Asylum Street, 13th floor
Hartford, CT  06103

RE:     <u>Confidential Letter Pursuant to April 28, 2006 Order</u>

<u>Linde v. Arab Bank, plc,</u> **No. 04 CV 2799 (NG)(VVP)**
<u>Litle v. Arab Bank, plc,</u> **No. 04 CV 5449 (NG)(VVP)**
<u>Almog v. Arab Bank, plc,</u> **No. 04 CV 5564 (NG)(VVP)**
<u>Coulter v. Arab Bank, plc,</u> **No. 05 CV 365 (NG)(VVP)**
<u>Afriat-Kurtzer v. Arab Bank, plc,</u> **No. 05 CV 388 (NG)(VVP)**
<u>Bennet v. Arab Bank, plc,</u> **No. CV 05 3183(NG)(VVP)**
<u>Roth v. Arab Bank, plc,</u> **No. CV 05 3738(NG)(VVP)**

Dear Ron,

        In anticipation of our meet and confer telephone conference tomorrow, I write on behalf of all Plaintiffs' counsel in the above-captioned actions to respond to your letter of May 17, 2006, concerning the documents you previously produced on April 24, 2006. Rather than craft a long, detailed letter in advance of our conversation tomorrow, I will take this opportunity simply to flag some of the issues and concerns we have with your letter and which we can address more fully tomorrow:

- Plaintiffs request a copy of the August 24, 2004 Order and/or copies of the Grand Jury Subpoenas served on the Defendant <u>or</u> written verification that the documents produced by the Defendant on April 24, 2006, constitute the entirety of the records requested pursuant to the subpoenas.

- Plaintiffs will seek clarification of whether one or more subpoenas were served on the Defendant since your most recent letter uses the plural form "subpoenas".

- Plaintiffs will seek an explanation of why the September 9, 2003 Order of the Bow Street Magistrates' Court, London was not disclosed to the Court or

**JA2781**

Plaintiffs' counsel during the status conference on April 28, 2006 when the Grand Jury Subpoena issue was first raised.

- Plaintiffs will request a copy of the September 9, 2003 Order of the Bow Street Magistrates' Court, London, <u>or</u> written verification that the documents produced by the Defendant on April 24, 2006, constitute the entirety of the records requested pursuant to the Court's order.

- Plaintiffs will seek an exact delineation of which documents were produced in response to Grand Jury Subpoenas and which documents were produced in response to the previously unmentioned Order of the Bow Street Magistrates' Court, London.

- We are mindful of your statement that "ABNY was not involved with the procurement or assembly of the Documents, and therefore, cannot authenticate, or otherwise confirm, the information contained on these Documents." However, ABNY is not a distinct legal entity. The Defendant in this case is Arab Bank, Plc. The documents belong to Arab Bank Plc, i.e. your client.

- Accordingly, Plaintiffs wish to discuss our intention to notice a Fed. R. Civ. P. 30(b) deposition of Arab Bank Plc in order to "authenticate, or otherwise confirm" the information contained on these documents and more particularly to identify the person or persons at Arab Bank Plc who collected, reviewed and transmitted the documents to you or the unnamed "outside counsel" for the Bank.

- As we are certain you are aware, the production of these records and the circumstances and legal processes under which they were produced bears directly on Defendant's assertion of foreign bank secrecy. Moreover, the details concerning the notice dated August 26, 2003, to "produce documents which were the subject of a Request for Evidence submitted to the United Kingdom by the United States" bear directly on the bank's knowledge concerning certain customer accounts and transactions.

- Inasmuch as the <u>Almog</u> and <u>Afriat-Kurtzer</u> cases also include plaintiffs killed or injured as recently as February of 2005, the August 24, 2004 Grand Jury Subpoenas served on the Defendant and their particulars are also directly relevant to the bank's knowledge concerning certain customer accounts and transactions.

Finally, I note that we have not heard back from you in response to Steven Steingard's letter of May 12, 2006, regarding the Palestinian "circulars" and "orders" addressed therein. As you know, as mentioned in Steve's letter, we have raised this issue concerning our failure to receive this material a number of times since last December and would like to discuss this matter tomorrow as well.

It is our sincere hope that at least some of these issues can be resolved without the need to further involve the Court.

I look forward to speaking to you further about this tomorrow.

Sincerely,

Gary M. Osen

cc:     All counsel

**JA2783**

# Exhibit B

JA2784



**OSEN & ASSOCIATE, LLC**

ATTORNEYS AT LAW
700 KINDERKAMACK ROAD, ORADELL, NEW JERSEY 07649
TELEPHONE 201.265.6400  FACSIMILE 201.265.0303
WWW.OSEN.US

May 2, 2006

<span style="text-decoration: underline">VIA E-MAIL</span>

Ronald W. Zdrojeski, Esquire
LeBoeuf, Lamb, Greene & MacRae LLP
Goodwin Square
225 Asylum Street, 13th floor
Hartford, CT  06103

> **RE:**   <u>Linde v. Arab Bank, plc,</u> No. 04 CV 2799 (NG)(VVP)
> <u>Litle v. Arab Bank, plc,</u> No. 04 CV 5449 (NG)(VVP)
> <u>Almog v. Arab Bank, plc,</u> No. 04 CV 5564 (NG)(VVP)
> <u>Coulter v. Arab Bank, plc,</u> No. 05 CV 365 (NG)(VVP)
> <u>Afriat-Kurtzer v. Arab Bank, plc,</u> No. 05 CV 388 (NG)(VVP)
> <u>Bennett v. Arab Bank, plc,</u> No. CV 05 3183(NG)(VVP)
> <u>Roth v. Arab Bank, plc,</u> No. CV 05 3738(NG)(VVP)

**Bank Secrecy Briefing – Verifications Concerning Lebanese Account**

Dear Ron:

Pursuant to the instructions of Magistrate Judge Pohorelsky to seek clarification by letter, we write to you on behalf of all Plaintiffs' counsel concerning a specific representation made by you on behalf of the Defendant in your letter dated March 14, 2006. Specifically, you stated that:

> In addition to making all of the records itemized above available to the OCC during the most recently concluded examination period, the Bank produced documents for a specific account in response to a specific letter request of the OCC. I can now verify that we have produced these documents pursuant to a previous document request. Neither the notification of annual examination nor the written request were in the form of a formal subpoena. Other than that single request, the Bank would not be able to reconstruct all of the particular documents the OCC reviewed during its examination.

At the time that letter was written, Defendant had produced 73 S.W.I.F.T wire transactions regarding the Saudi Committee and documents pertaining to one (1) account; to wit – Account No. # 3-810-622473-0330 in Beirut which was the subject of Judge Pohorelsky's November 8, 2005 Document Production Order attached herein as <u>Exhibit A</u>. Accordingly, since at time your March 14th letter was written, Defendant had produced documents for only one (1) account, it is reasonable to surmise that your letter referred to the Beirut account. **<u>Plaintiffs are entitled to a verification and confirmation of this fact since it bears direct relevance to the</u>**

**pending briefing of the bank secrecy issue and the Defendant's good faith in making representations concerning Lebanese law.**

Specifically, in support of its opposition to Plaintiffs' bank secrecy motion, Defendant has proffered a sworn declaration by Allan Howard, one of Defendant's counsel. Attached to that declaration are copies of Defendant's application to the Special Investigation Commission in Beirut (Howard Decl. Ex. K) as well as the Commission's January 25, 2006 response approving release of the records set forth in the Court's November 8, 2005 Document Production Order. Pursuant to Fed. R. Civ. P. 44.1, Defendant has also proffered an expert declaration on Lebanese bank secrecy laws by Chakib Cortbaoui. At the same time, on April 27, 2006, in response to Plaintiffs' First Joint Request For Admissions, Arab Bank refused to respond to Request No. 40:

> The Arab Bank Group did not seek waivers from the courts or any other branches or agencies of the government of Lebanon prior to November 1, 2005, concerning any account holder of the Arab Bank Group who maintained account # 3-810-622473-0330 at the Al Mazra'a Branch in Beirut, Lebanon.

To the extent, that your letter of March 14, 2006, indicates that the Lebanese account documents were previously produced to the OCC in response to a "written request [that was not] in the form of a formal subpoena" this fact calls into question previous assertions that (a) the records could not be produced absent a court order because Defendant would be subject to criminal prosecution in Lebanon[1] (b) and that even *after* the Court ordered the records produced, it was necessary for the Defendant to procure the permission of Special Investigation Commission in Beirut in order to release the records to the Plaintiffs. In short, the clear implication of your March 14th letter is that the Lebanese records were previously produced to the OCC in response to a letter request before Defendant's counsel made numerous factual and legal assertions to both the Court and to Plaintiffs' counsel to the effect that production of these records, absent the "blessing of local regulators,"[2] would result in Arab Bank executives going to jail.

As you know, your representations to the Court have previously emphasized "Arab Bank's efforts to obtain permission for lawful disclosure …in Lebanon" and declined to produce other documents responsive to Plaintiffs' discovery requests on the grounds that complying with discovery would risk "criminal liability for Arab Bank if it were to comply." Under these circumstances, Plaintiffs and the Court are entitled to know whether the Lebanese records were previously produced to the OCC without either a court order or a subpoena as your March 14,

---

[1] See, e.g. Statement of Kevin Walsh: "We ask only that the Court oversee that process in a away that doesn't place Arab Bank executives in jail in Lebanon or Jordan because they have willfully violated bank secrecy laws." June 22, 2005 Conference; Tr: 32?

[2] Statement of Kevin Walsh: "There is a Lebanese account noted here at the very bottom of the list, your Honor. Again, we have not pursuant to the orderly process that this court has instituted, made any formal application to the Lebanese courts and in the case of Jordan and the Palestinian territories, we very much would like to be acting with the blessing of the local regulators rather than being put to the hard choice otherwise." October 11, 2005 Conference; Tr: 86-87.[page 78 in a prior version of the transcript]

2006 letter strongly suggests and without a waiver being sought from the appropriate Lebanese authorities.

To be clear, the account records are NOT subject to bank examination privilege. As Judge Pohorelsky expressly noted during the February 28, 2006 status conference:

I am not as concerned about that privilege anymore, I mean, at least as to transactional records. Tr. 42:11-13.

Likewise, the OCC itself has made clear that it will not and has not asserted bank examination privilege as to any transactional documents sought by the Plaintiffs. As noted in the OCC's letter to Mr. Elsner dated June 21, 2005: "[W]e can clarify that the OCC will not assert the bank examination privilege or the law enforcement privilege for documents prepared by Arab Bank in the ordinary course of business, even if OCC examiners reviewed or acquired copies of those documents."

For the reasons set forth above and because this issue is directly related to Plaintiffs' ability to fully and adequately brief the bank secrecy issue, unless we receive an unequivocal clarification and/or verification from you within the next five (5) business days, we intend to petition the court to immediately order a Rule 30(b) deposition on this matter. To be clear, we are seeking the following specific information:

1. Confirmation that the account referenced in your March 14, 2006, letter is in fact the same account that was the subject of the Court's November 8, 2005, Document Production Order;

2. If not, an explanation as to which account is in fact referenced in your March 14, 2006, letter;

3. If the account referenced in your March 14, 2006 letter is in fact the same account that was the subject of the Court's November 8, 2005, Document Production Order, the precise date upon which the Lebanese account was first produced to the OCC;[3]

4. Verification of whether Arab Bank Plc sought or received a waiver from the Special Investigation Commission in Beirut prior to producing the records of account # 3-810-622473-0330 to the OCC.

We look forward to your immediate response.

Sincerely,

Gary M Osen

---

[3] Please note that we are neither seeking the contents of the OCC's written request nor are we requesting that you produce any correspondence exchanged between the Defendant and the OCC pertaining to the account.

cc:    Ford Barrett, Senior Counsel: OCC
       All Counsel

**JA2788**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

COURTNEY LINDE, et al.                           :
                         Plaintiff,              :        Case No. CV 04 2799 (NG/VVP)
                                                 :
         -against-                               :
                                                 :
ARAB BANK, PLC,                                  :
                         Defendant.              :

PHILIP LITLE, et al.                             :
                         Plaintiff,              :        Case No. CV 04 5449 (NG/VVP)
                                                 :
         -against-                               :
                                                 :
ARAB BANK, PLC,                                  :
                         Defendant.              :

ORAN ALMOG, et al.                               :
                         Plaintiff,              :        Case No. CV 04 5564 (NG/VVP)
                                                 :
         -against-                               :
                                                 :
ARAB BANK, PLC,                                  :
                         Defendant.              :

ROBERT L. COULTER, SR.,                          :
FOR THE ESTATE OF JANIS                          :        Case No. CV 05 365 (NG/VVP)
RUTH COULTER, et al.                             :
                         Plaintiff,              :
                                                 :
         -against-                               :
                                                 :
ARAB BANK, PLC,                                  :
                         Defendant.              :

10325_1



GILA AFRIAT-KURTZER, et al.                :
                                           :       Case No. CV 05 388 (NG/VVP)
                        Plaintiff,         :
        -against-                          :
                                           :
ARAB BANK, PLC,                            :
                                           :
                        Defendant.         :
                                           :
MICHAEL BENNETT, et al.                    :
                                           :       Case No. CV 05 3183 (NG/VVP)
                        Plaintiff,         :
        -against-                          :
                                           :
ARAB BANK, PLC,                            :
                                           :
                        Defendant.         :
                                           :
ARNOLD ROTH, et al.                        :
                                           :       Case No. CV 05 3738 (NG/VVP)
                        Plaintiff,         :
                                           :
        -against-                          :
                                           :
ARAB BANK, PLC,                            :
                                           :
                        Defendant.         :
                                           :

## STIPULATED PRODUCTION ORDER

The above actions are currently pending in the United States District Court for the

Eastern District of New York and allege violations by defendant of, among other things, 18

U.S.C. §§ 2332, 2333, 2339A, 2339B and 2339C.  Prior to the entry of this Order:

    A.    Plaintiffs in the above actions, except Bennett v. Arab Bank, PLC and Roth v.

Arab Bank, PLC, served Plaintiffs' First Request for the Production of Documents to Defendant

Arab Bank PLC upon defendant which contained a request for bank account records maintained

in Lebanon.  Request 17 sought documents regarding account #3-810-622473-0330 maintained

in defendant's Al-Mazra'a branch in Beirut, Lebanon.  Such plaintiffs also served Plaintiffs'

2

10325_1

Joint Modified Phase I Request For The Production Of Documents To Defendant Arab Bank, PLC upon defendant.  Request 1 sought documents regarding account #3-810-622473-0330 maintained in defendant's Al-Mazra'a branch in Beirut, Lebanon;

      B.      At a conference held on October 11, 2005,  the Court concluded that plaintiffs' request for documents regarding this bank account was a proper request and defendant represented that it would present an Order directing the production of such documents to the regulatory authorities in Lebanon whose permission defendant asserts it will need before it can produce such records; and

      C.      The parties have agreed that this Order directing defendant to produce the specific documents called for in the First Request and Joint Modified Request should be presented by defendant to the regulatory authorities in Lebanon whose permission defendant asserts is required.

      THEREFORE, IT IS HEREBY ORDERED THAT:

      1.      Defendant shall produce for Account No. 3-810-622473-0330, maintained at Arab Bank's  Al-Mazra'a Branch in Beirut, Lebanon, the name on the account, documents containing any information concerning the identity of the account holder(s) including, without limitation, the account opening application, and any and all records relating to wire transfers or other deposits made into the account or disbursed from the account from January 1, 2000 to present and all correspondence between the Arab Bank and the account holder or any other third party concerning this account from January 1, 2000 to present, documents regarding the web site www.palestine-info.com which requested contributions to the account, any documents concerning the closing of the account, the freezing of its funds and the reporting of its activities to any government authorities and any documents which support or form the basis for the

3

10325_1

**JA2791**

statements regarding the account contained in paragraphs 41-43 of the Declaration of Shukry Bishara.

    2.    Defendant shall provide this Order to any appropriate judicial or regulatory authority.

STIPULATED AND AGREED TO:

By _____
MOTLEY RICE LLC
Michael E. Elsner (ME-8337)
Justin Kaplan
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000

Counsel for *Almog* and *Afriat- Kurtzer*
Plaintiffs

By _____
KOHN, SWIFT & GRAF, P.C.
Robert A. Swift
Steven M. Steingard
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

Counsel for *Linde* and *Coulter*
Plaintiffs

By _____
SAYLES WERBNER
Mark S. Werbner
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
(214) 939-8711

Counsel for *Litle/Bennett/Roth* Plaintiffs

By _____
LEBOEUF, LAMB, GREENE
& MACRAE LLP
Kevin Walsh
Randall Fox ( R F - 2 8 4 5 )
125 West 55th Street
New York, NY 10019-5389
(212) 424-8000

Counsel for *Arab Bank, plc*

SO ORDERED:

    s/VVP

_____
VIKTOR V. POHORELSKY
United States Magistrate Judge
Brooklyn, New York

Dated: *November 8, 2005*

4

10325_1

**JA2792**

# LeBoeuf, Lamb, Greene & MacRae LLP

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

GOODWIN SQUARE
225 ASYLUM STREET, 13TH FLOOR
HARTFORD, CT 06103
(860) 293-3500
FACSIMILE: (860) 293-3555

E-MAIL ADDRESS: RONALD.ZDROJESKI@LLGM.COM
WRITER'S DIRECT DIAL: (860) 293-3537
WRITER'S DIRECT FAX: (860) 241-1337

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
BISHKEK
ALMATY
BEIJING

May 17, 2006

**BY ELECTRONIC MAIL**

Gary M. Osen
Osen & Associates, LLC
700 Kinderkamack Road
Oradell, NJ 07649

> Re: *Linde, et al. v. Arab Bank, PLC*, 04-2799 (NG) (VVP)
> *Litle, et al. v. Arab Bank, PLC*, 04-5449 (NG)(VVP)
> *Almog, et al. v. Arab Bank, PLC*, 04-5564 (NG) (VVP)
> *Coulter, et al. v. Arab Bank, PLC*, 05-365 (NG) (VVP)
> *Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-388 (NG) (VVP)
> *Bennett, et al. v. Arab Bank, PLC*, 05-3183 (NG)(VVP)
> *Roth, et al. v. Arab Bank, PLC*, 05-3738 (NG)(VVP)
> **May 2, 2006 Correspondence**

Dear Gary:

We write on behalf of Arab Bank plc (the "Bank") in response to plaintiffs' letter dated May 2, 2006, Re: Bank Secrecy Briefing – Verifications Concerning Lebanese Account (the "Letter"). The Bank does not intend to thwart plaintiffs' legitimate requests for discovery materials. However, as the information sought by the Letter clearly implicates the bank examination privilege, the Bank is prohibited from providing such information.

As you may recall, during the February 29, 2006 Status Conference, the Court directed the Bank to verify the fact it is unable to catalog all of the potentially responsive documents reviewed by the Office of the Comptroller of the Currency ("OCC") and prepare a log of responsive documents withheld from production on the basis of the bank examination privilege. *See* Tr. 54:4-6, 66:24-67:3; 67:23-25. In response, in our March 14, 2006 letter, we provided the plaintiffs with the following statement:

> *In addition to making all of the records itemized above available to the OCC during the most recently concluded examination period, the Bank produced documents for a specific account in response to a specific letter request of the OCC. I can now verify that we have*

**JA2793**

> *produced these documents pursuant to a previous document request. Neither the*
> *notification of annual examination nor the written request were in the form of a formal*
> *subpoena. Other than that single request, the Bank would not be able to reconstruct all*
> *of the particular documents the OCC reviewed during its examination.*

Plaintiffs are now using this statement to surmise "facts" about the Bank's communications with the OCC, and want the Bank to confirm and/or verify these "facts." Specifically, the Letter requests confirmation as to what account was the subject of the OCC request mentioned in the statement, and verification as to the manner in which the Bank responded to the request. Under the circumstances, we can only believe that this is a thinly disguised attempt to circumvent the decision of the Court respecting the bank examination privilege.

Although plaintiffs are not seeking the actual correspondence between the Bank and the OCC, they are nevertheless seeking privileged information concerning the work product of the OCC and the Bank's responses to the OCC's supervisory requests. (*See* August 3, 2005 letter from OCC Senior Deputy Comptroller Timothy Long to Michael Elsner: "the work product of the OCC staff, the OCC's letters to the bank and the bank's responses are privileged supervisory communications protected by the bank examination privilege.").

Because it is the OCC, not the Bank, that holds and thus, has the ability to waive the bank examination privilege, the Bank is not in a position to provide plaintiffs with "an unequivocal clarification and/or verification" of such privileged information. Given the OCC's previous denial to plaintiffs' requests for such non-public information related to the Bank on the grounds of the bank examination privilege, law enforcement investigatory privilege and attorney-client privilege, the Bank has no reason to believe that the OCC has authorized the disclosure of this privileged information.

Additionally, the Letter's claim that this issue is directly related to plaintiff's ability to brief the bank secrecy issue is unsupportable. Bank secrecy laws at issue in this matter are not waivable. (*See* Memorandum of Law of Defendant Arab Bank plc in Opposition to the Plaintiffs Motion for an Order Overruling Objections Deeming Facts as Admitted and Compelling Further Responses to Plaintiffs' First Set of Requests for Admissions and Related Interrogatories, at 22-23). Moreover in this instance, the Bank could not have waived bank secrecy protection by providing documents pursuant to the request of the OCC, a regulatory agency of the Bank.

Given these facts, frankly, it appears that the Letter is nothing more than another attempt to gain access to information that was already denied to them by the OCC and on multiple occasions by the Court.

Very truly yours,

Ronald W. Zdrojeski

**JA2794**

Gary M. Osen, Esq.
May 17, 2006
Page 3

cc:     Attached Service List

NYC596740.3



**OSEN & ASSOCIATE, LLC**
ATTORNEYS AT LAW
700 KINDERKAMACK ROAD, ORADELL, NEW JERSEY 07649
TELEPHONE 201.265.6400  FACSIMILE 201.265.0303
WWW.OSEN.US

May 18, 2006

**VIA E-MAIL**

Ronald W. Zdrojeski, Esquire
LeBoeuf, Lamb, Greene & MacRae LLP
Goodwin Square
225 Asylum Street, 13th floor
Hartford, CT  06103

<div style="margin-left:2em">

RE:        **Account No. # 3-810-622473-0330 in Beirut**

**Linde v. Arab Bank, plc, No. 04 CV 2799 (NG)(VVP)**
**Litle v. Arab Bank, plc, No. 04 CV 5449 (NG)(VVP)**
**Almog v. Arab Bank, plc, No. 04 CV 5564 (NG)(VVP)**
**Coulter v. Arab Bank, plc, No. 05 CV 365 (NG)(VVP)**
**Afriat-Kurtzer v. Arab Bank, plc, No. 05 CV 388 (NG)(VVP)**
**Bennet v. Arab Bank, plc, No. CV 05 3183(NG)(VVP)**
**Roth v. Arab Bank, plc, No. CV 05 3738(NG)(VVP)**

</div>

Dear Ron,

In anticipation of our meet and confer telephone conference tomorrow, I write on behalf of all Plaintiffs' counsel in the above-captioned actions. To begin with, we appreciate the fact that your letter of March 14, 2006 corrected statements made by your colleague, Mr. Walsh, to the Court at the status conference on February 28th. At the same time, it should be noted that our concerns pertaining to documents marked ABPLC006883-ABPLC006902 ("the Beirut account") do not derive from the fact that the documents may have been produced by the Defendant to the OCC. It was *your* letter of March 14th that introduced the possible connection between the Beirut account documents and the documents produced "for a specific account in response to a specific letter request from the OCC."

Our concern regarding the Beirut account documents is directly related to the Defendant's assertions concerning Lebanese bank secrecy. Plaintiffs have the right to know whether the Beirut account documents were previously produced to *any* U.S. entity, including other courts, governmental agencies or private parties.

In order to properly evaluate the alleged "risks" faced by your client in producing Lebanese banking records and, more importantly, assessing whether your client's representations

**JA2796**

to the Court concerning Lebanese bank secrecy are accurate and made in good faith, the answer to the question of whether the Beirut account documents have ever been previously produced to *anyone* in the United States and whether the formal consent of the Special Investigation Commission in Beirut was obtained prior to that production (if any) is therefore essential.

It may very well be that the Beirut account documents have never been previously produced in the United States. If so, Plaintiffs' counsel are entitled to a clear and unambiguous statement to that effect.

If the documents have been previously produced with the prior consent of the Special Investigation Commission in Beirut, then Plaintiffs are entitled to concrete verification of that fact. It is our sincere hope that this issue can be resolved without the need to further involve the Court.

I look forward to speaking with you further about this tomorrow.

Sincerely,

Gary M. Osen

cc:     All counsel

JA2797

# Exhibit C

KOHN, SWIFT & GRAF, P. C.

ONE SOUTH BROAD STREET, SUITE 2100

JOSEPH C. KOHN
ROBERT A. SWIFT
GEORGE W. CRONER
ROBERT J. LAROCCA
MICHAEL J. BONI
DENIS F. SHEILS
DOUGLAS A. ABRAHAMS
WILLIAM E. HOESE
MARTIN J. D'URSO
STEVEN M. STEINGARD
ELKAN M. KATZ
CRAIG W. HILLWIG
HILARY E. COHEN
CHRISTINA D. SALER
KATE REZNICK
JOSHUA D. SNYDER

PHILADELPHIA, PENNSYLVANIA 19107-3304

(215) 238-1700
TELECOPIER (215) 238-1968
FIRM E-MAIL: info@kohnswift.com
WEB SITE: www.kohnswift.com

E-MAIL: SSTEINGARD@KOHNSWIFT.COM

HAROLD E. KOHN
1914-1999

SPECIAL COUNSEL
JOSEPH M. HOEFFEL

OF COUNSEL
MERLE A. WOLFSON
LISA PALFY KOHN

May 12, 2006

**Via Electronic Mail**

Ronald W. Zdrojeski, Esq.
Lebouef Lamb Greene & MacRae LLP
Goodwin Square
225 Asylum Street, 13th floor
Hartford, CT 06103

> **Re:** *Linde v. Arab Bank, plc, No. 04 Civ. 2799 (NG) (VVP) and all other pending cases against Arab Bank, plc*

Dear Ron:

On behalf of the Plaintiffs in the above-captioned actions, I write again about our repeated inquiries to you regarding your assurances to the Court on December 21, 2005, that the first two categories of documents contained in paragraph 3 of our Proposed Order submitted to the Court on December 12, 2005 [which referred to the Financial Crimes Enforcement Network Assessment of Civil Penalty Order of August 17, 2005] "are already being produced in response to Plaintiffs' First Request 33" [referring to Plaintiffs' First Request for the Production of Documents to Defendant Arab Bank plc, dated February 24, 2005]. The two categories were "orders issued between 2000 and 2004 by the Palestinian regulatory authorities 'that focused explicitly on funds transfers to a number of beneficiaries with accounts at members of the Arab Bank Group in the Palestinian Territories'" and "circulars issued by regulatory authorities in the Palestinian Territories 'containing the names of suspected criminals' and '[orders to] institutions holding accounts of the suspected criminals [to either freeze the accounts or place the accounts on a watch list].'"

I have raised this issue in letters to you dated April 26, 2006 and May 1, 2006 and we have repeatedly raised it at other times including at the status conference with the Magistrate in

**JA2799**

February and at our most recent meet and confer session in March. Based on our review of the documents Arab Bank has produced to date, we have yet to receive these documents and you have yet to respond to our repeated inquiries. Our sole interest is receiving this information as promised without further delay. We do not wish to commence another round of letter writing to the Magistrate, but we cannot allow this situation to continue without seeking appropriate relief. We request that you advise us upon receipt of this letter when these documents will be produced.

Very truly yours,

Steven M. Steingard

cc:    All Counsel

# LeBoeuf, Lamb, Greene & MacRae llp

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

GOODWIN SQUARE
225 ASYLUM STREET, 13TH FLOOR
HARTFORD, CT 06103
(860) 293-3500
FACSIMILE: (860) 293-3555
E-MAIL ADDRESS: RONALD.ZDROJESKI@LLGM.COM
WRITER'S DIRECT DIAL: (860) 293-3537
WRITER'S DIRECT FAX: (860) 241-1337

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
BISHKEK
ALMATY
BEIJING

May 18, 2006

**BY ELECTRONIC MAIL**

Gary M. Osen
Osen & Associates, LLC
700 Kinderkamack Road
Oradell, NJ  07649

Re:  *Linde, et al. v. Arab Bank, PLC*, 04-2799 (NG) (VVP)
*Litle, et al. v. Arab Bank, PLC*, 04-5449 (NG)(VVP)
*Almog, et al. v. Arab Bank, PLC*, 04-5564 (NG) (VVP)
*Coulter, et al. v. Arab Bank, PLC*, 05-365 (NG) (VVP)
*Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-388 (NG) (VVP)
*Bennett, et al. v. Arab Bank, PLC*, 05-3183 (NG)(VVP)
*Roth, et al. v. Arab Bank, PLC*, 05-3738 (NG)(VVP)
<u>**May 16, 2006 Correspondence**</u>

Dear Gary:

I write in response to your follow up letter of May 16, 2006 concerning ABPLC008392, ABPLC008393, ABPLC008892, ABPLC008897, ABPLC008942, ABPLC008948, ABPLC008969, ABPLC008973, ABPLC009467, and ABPLC009480.

We do not agree with your reading of Paragraph 5 of the Document Production Order as requiring the production of these documents.  However, given that you have now identified these specific transfers, to the extent that we are able to locate corresponding Arab Bank, New York transfer records, we will produce them accordingly.

Very truly yours,

Ronald W. Zdrojeski

JA2801

Gary M. Osen, Esq.
May 18, 2006
Page 2

cc:     Attached Service List

# LeBoeuf, Lamb, Greene & MacRae LLP

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

GOODWIN SQUARE
225 ASYLUM STREET, 13TH FLOOR
HARTFORD, CT 06103
(860) 293-3500
FACSIMILE: (860) 293-3555
E-MAIL ADDRESS: RONALD.ZDROJESKI@LLGM.COM
WRITER'S DIRECT DIAL: (860) 293-3537
WRITER'S DIRECT FAX: (860) 241-1337

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
BISHKEK
ALMATY
BEIJING

**CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY**

May 22, 2006

**BY ELECTRONIC MAIL**

Gary M. Osen, Esq.
Osen & Associates, LLC
700 Kinderkamack Road
Oradell, NJ 07649

Re:     *Linde, et al. v. Arab Bank, PLC*, 04-2799 (NG) (VVP)
        *Litle, et al. v. Arab Bank, PLC*, 04-5449 (NG)(VVP)
        *Almog, et al. v. Arab Bank, PLC*, 04-5564 (NG) (VVP)
        *Coulter, et al. v. Arab Bank, PLC*, 05-365 (NG) (VVP)
        *Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-388 (NG) (VVP)
        *Bennett, et al. v. Arab Bank, PLC*, 05-3183 (NG)(VVP)
        *Roth, et al. v. Arab Bank, PLC*, 05-3738 (NG)(VVP)
        *Weiss, et al. v. Arab Bank, PLC*, 06-1623 (NG)(VVP)
        **ABPLC 007144 - ABPLC009926**
        **Confidential Letter Pursuant to April 28, 2006 Order**

Dear Gary:

I write in response your May 18, 2006 letters to Magistrate Judge Pohorelsky and counsel for Arab Bank, plc (the "Bank"), concerning the verification letter the Bank provided on May 17, 2006.

Pursuant to Judge Pohorelsky's April 28, 2006 Order, the matters discussed in this letter have been designated as Confidential; accordingly these matters shall not be disclosed to anyone beyond the group of attorneys directly involved in above referenced cases. (Apr. 28, 2006 Tr. 27:18 - 28:3.)

As explained in the May 17, 2006 letter and discussed Friday during our Meet and Confer, pursuant to the March 24, 2006 Scheduling Order, the Bank produced ABPLC 007144 -

**LETTER CONTAINS CONFIDENTIAL INFORMATION**
**ATTORNEYS' EYES ONLY**

**JA2803**

Gary M. Osen, Esq.
May 22, 2006
Page 2

ABPLC009926 in response to the March 3, 2006 Production Order, and we confirm that the Bank will not object to the authenticity of ABPLC 007144 - ABPLC009926.

We have also considered your request to identify which documents were produced pursuant to the Sealed Order of the U.S. District Court, Northern District of Texas and which documents were produced pursuant to the Order of the Bow Street Magistrates' Court, London. In response to your request, we direct you to the documents themselves; plaintiffs may assume that the documents which specify the branch location as Arab Bank, London were produced pursuant to the Order of the Bow Street Magistrates' Court, London.

I believe this letter resolves your concerns about these issues. If I am incorrect, please contact me.

Very truly yours,

Ronald W. Zdrojeski

cc:     Attached Service List

JA2804

<div align="center">**SERVICE LIST**</div>

**BY ELECTRONIC DELIVERY:**

**IN *LITLE, ET AL. V. ARAB BANK, PLC,* CV 04-5449 & *BENNETT, ET AL. V. ARAB BANK, PLC,* CV 05-3183 & *ROTH, ET AL. V. ARAB BANK, PLC,* CV 05-3738 & *WEISS, ET. AL. V. ARAB BANK, PLC,* CV 06-1623**

**Liaison Counsel for *Litle, Bennett and Roth* Plaintiffs:**
James P. Bonner, Esq (jbonner@lawssb.com)
SHALOV, STONE & BONNER LLP
485 Seventh Avenue
Suite 1000
New York, N.Y. 10018
Telephone: (212) 239-4340
Facsimile: (212) 239-4310

**Co-Counsel for *Litle, Bennett and Roth* Plaintiffs:**
Mark S. Werbner, Esq. (mwerbner@swtriallaw.com)
SAYLES WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Telephone: (214) 939-8711
Facsimile: (214) 939-8787

Richard D. Heideman, Esq. (rdheideman@hnklaw.com)
HEIDEMAN LEZELL NUDELMAN & KALIK, P.C.
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
Telephone: (202) 462-8990
Facsimile: (202) 462-8995

Steven R. Perles, Esq. (sperles@perleslaw.com)
PERLES LAW FIRM, P.C.
1146 19th Street, NW
Washington DC 20036
Telephone: (202) 745-1300
Facsimile: (202) 745-1858

**IN *LINDE, ET AL. v. ARAB BANK, PLC,* CV 04-2799 & *COULTER, ET AL. v. ARAB BANK, PLC,* CV 05-365**

**Liaison Counsel for *Linde* Plaintiffs; Co-counsel for the *Coulter* Plaintiffs**:
Andrew D. Friedman, Esq. (afriedman@whesq.com)
Joshua D. Glatter, Esq. (jglatter@whesq.com)
WECHSLER HARWOOD LLP
488 Madison Avenue
8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

**Counsel for the *Coulter* Plaintiffs; Co-Counsel for *Linde* Plaintiffs:**
Gary M. Osen, Esq. (gmo@osen.us)

Peter Raven-Hansen (praven@law.gwu.edu)
OSEN & ASSOCIATES, LLC
700 Kinderkamack Road
Oradell, NJ 07649
Telephone: (201) 265-6400
Facsimile: (201) 265-0303

Robert A. Swift, Esq. (rswift@kohnswift.com)
Steven M. Steingard, Esq. (ssteingard@kohnswift.com)
KOHN SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

**IN *ALMOG, ET AL. v. ARAB BANK, PLC*, CV 04-5564 & *AFRIAT-KURTZER, ET AL. V. ARAB BANK, PLC*, CV 05-388**

**Counsel for *Almog & Afriat-Kurtzer* Plaintiffs**
Ronald L. Motley, Esq. (rmotley@motleyrice.com)
Jodi W. Flowers, Esq. (jflowers@motleyrice.com)
John M. Eubanks, Esq. (jeubanks@motleyrice.com)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

**Co-Counsel for *Almog* Plaintiffs**
Alan Gerson, Esq. (gerson@gilgintl.org)
ATTORNEY AT LAW
2131 S. Street
Washington, D.C. 20008
Telephone: (202) 966-8557

# LeBoeuf, Lamb, Greene & MacRae LLP

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

Goodwin Square
225 Asylum Street, 13th Floor
Hartford, CT 06103
(860) 293-3500
FACSIMILE: (860) 293-3555

E-MAIL ADDRESS: RONALD.ZDROJESKI@LLGM.COM
WRITER'S DIRECT DIAL: (860) 293-3537
WRITER'S DIRECT FAX: (860) 241-1337

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
BISHKEK
ALMATY
BEIJING

June 5, 2006

**VIA ELECTRONIC MAIL**

Mike Elsner
Motley & Rice, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464

Steven M. Steingard
Kohn, Swift & Graf, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107-3304

Re: *Linde, et al. v. Arab Bank, PLC*, 04-2799 (NG)(VVP)
*Litle, et al. v. Arab Bank, PLC*, 04-5449 (NG)(VVP)
*Almog, et al. v. Arab Bank, PLC*, 04-5564 (NG)(VVP)
*Coulter, et al. v. Arab Bank, PLC*, 05-365 (NG)(VVP)
*Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-388-(NG)(VVP)
*Bennett, et al. v. Arab Bank, PLC*, 05-3138(NG)(VVP)
*Roth, et al. v. Arab Bank, PLC*, 05-3738 (NG)(VVP)
**New York Depositions**

Dear Mike and Steve:

      This is in response to your e-mails of June 1, 2006, requesting the production of three Bank employees located in New York for depositions beginning on June 20, 2006. While I understand your desire to begin taking these depositions as soon as possible, the Bank will be unable to make the witnesses available that week. The Bank is prepared, however, to make at least one individual available in New York the week of June 26, 2006. We expect to be in a

**JA2807**

position to identify the individual(s) to you either later this week or early next week.  In addition, we make these and other witnesses available subject to the following understandings:

- the individuals are fact witnesses and, as such, the depositions cannot exceed the 7 hours allowed under FRCP 30(d);

- unless issues concerning bank secrecy have been resolved by the Court prior to the taking of the depositions, you appreciate that we will object to and instruct each witness not to answer any question that addresses bank secrecy issues; and

- any witness deposed now will not be made available in the future for further examination.

If this is agreeable to you, we propose that the depositions be taken at LLGM's offices in New York, and presume that they would begin at 10:00 a.m.

Sincerely yours,

Ronald W. Zdrojeski

RWZ:jzg


cc:   Attached Service List

JA2808

<u>**SERVICE LIST**</u>

**BY ELECTRONIC DELIVERY:**

<u>IN *LITLE, ET AL. V. ARAB BANK, PLC*, CV 04-5449 & *BENNETT, ET AL. V. ARAB BANK, PLC*, CV 05-3183 & *ROTH, ET AL. V. ARAB BANK, PLC, CV 05-3738 & WEISS, ET. AL. V. ARAB BANK, PLC, CV 06-1623*</u>

**Liaison Counsel for *Litle, Bennett and Roth* Plaintiffs:**
James P. Bonner, Esq (jbonner@lawssb.com)
SHALOV, STONE & BONNER LLP
485 Seventh Avenue
Suite 1000
New York, N.Y. 10018
Telephone: (212) 239-4340
Facsimile: (212) 239-4310

**Co-Counsel for *Litle, Bennett and Roth* Plaintiffs:**
Mark S. Werbner, Esq. (mwerbner@swtriallaw.com)
SAYLES WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Telephone: (214) 939-8711
Facsimile: (214) 939-8787

Richard D. Heideman, Esq. (rdheideman@HLNKlaw.com)
HEIDEMAN LEZELL NUDELMAN & KALIK, P.C.
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
Telephone: (202) 462-8990
Facsimile: (202) 462-8995

Steven R. Perles, Esq. (sperles@perleslaw.com)
PERLES LAW FIRM, P.C.
1146 19th Street, NW
Washington DC 20036
Telephone: (202) 745-1300
Facsimile: (202) 745-1858

<u>IN *LINDE, ET AL. v. ARAB BANK, PLC*, CV 04-2799 & *COULTER, ET AL. v. ARAB BANK, PLC,* CV 05-365</u>

**Liaison Counsel for *Linde* Plaintiffs; Co-counsel for the *Coulter* Plaintiffs**:
Andrew D. Friedman, Esq. (afriedman@whesq.com)
Joshua D. Glatter, Esq. (jglatter@whesq.com)
WECHSLER HARWOOD LLP
488 Madison Avenue
8th Floor
New York, NY 10022

Telephone: (212) 935-7400
Facsimile: (212) 753-3630

**Counsel for the *Coulter* Plaintiffs; Co-Counsel for *Linde* Plaintiffs:**
Gary M. Osen, Esq. (gmo@osen.us)
Peter Raven-Hansen (praven@law.gwu.edu)
OSEN & ASSOCIATES, LLC
700 Kinderkamack Road
Oradell, NJ 07649
Telephone: (201) 265-6400
Facsimile: (201) 265-0303

Robert A. Swift, Esq. (rswift@kohnswift.com)
Steven M. Steingard, Esq. (ssteingard@kohnswift.com)
KOHN SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

**IN *ALMOG, ET AL. v. ARAB BANK, PLC*, CV 04-5564 & *AFRIAT-KURTZER, ET AL. V. ARAB BANK, PLC*, CV 05-388**

**Counsel for *Almog & Afriat-Kurtzer* Plaintiffs**
Ronald L. Motley, Esq. (rmotley@motleyrice.com)
Jodi W. Flowers, Esq. (jflowers@motleyrice.com
John M. Eubanks, Esq. (jeubanks@motleyrice.com)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

**Co-Counsel for *Almog* Plaintiffs**
Alan Gerson, Esq. (gerson@gilgintl.org)
ATTORNEY AT LAW
2131 S. Street
Washington, D.C. 20008
Telephone: (202) 966-8557

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

COURTNEY LINDE, et al.                    :
                                          :
                    Plaintiffs,           :          Case No. CV 04 2799(NG)(VVP)
                                          :
        -against-                         :
                                          :
ARAB BANK, PLC,                           :
                                          :
                    Defendant.            :
                                          :
PHILIP LITLE, et al.                      :
                    Plaintiffs,           :
                                          :          Case No. CV 04 5449(NG)(VVP)
        -against-                         :
                                          :
ARAB BANK, PLC,                           :
                                          :
                    Defendant.            :
                                          :
ORAN ALMOG, et al.                        :
                                          :
                    Plaintiffs,           :          Case No. CV 04 5564(NG)(VVP)
                                          :
        -against-                         :
                                          :
ARAB BANK, PLC,                           :
                                          :
                    Defendant.            :
                                          :
ROBERT L. COULTER, SR.                    :
FOR THE ESTATE OF JANIS                   :
RUTH COULTER, et al.                      :          Case No. CV 05 365(NG)(VVP)
                                          :
                    Plaintiffs,           :
                                          :
        -against-                         :
                                          :
ARAB BANK, PLC,                           :
                                          :
                    Defendant.            :

19479_1

**JA2811**

| | | |
|---|---|---|
| GILA AFRIAT-KURTZER, et al. | : | |
| Plaintiffs, | : | Case No. CV 05 388(NG)(VVP) |
| -against- | : | |
| ARAB BANK, PLC, | : | |
| Defendant. | : | |
| MICHAEL BENNETT, et al. | : | |
| Plaintiffs, | : | |
| -against- | : | Case No. CV 05 3183(NG)(VVP) |
| ARAB BANK, PLC, | : | |
| Defendant. | : | |
| ARNOLD ROTH, et al. | : | |
| Plaintiffs, | : | Case No. CV 05 3738(NG)(VVP) |
| -against- | : | |
| ARAB BANK, PLC, | : | |
| Defendant. | : | |
| STEWART WEISS & SUSAN WEISS, et al. | : | |
| Plaintiffs, | : | Case No. CV 06 1623(NG)(VVP) |
| -against- | : | |
| ARAB BANK, PLC, | : | |
| Defendant. | : | |

## ORDER RE FOREIGN BANKING SECRECY

19479_1

**JA2812**

Pending before the Court is Plaintiffs' Joint Motion to Overrule Defendant's Objections to Plaintiffs' First Set of Requests For Admission and Related Interrogatories. Defendant Arab Bank plc has opposed this Motion on the basis that disclosure would violate the foreign banking secrecy laws of Jordan, Lebanon and/or the Palestinian Authority. A discovery dispute has arisen as to whether Defendant obtained consents or waivers re foreign banking secrecy from foreign authorities in these jurisdictions before producing documents from Defendant's offices or branches in those jurisdictions to the United States government in separate proceedings.

To bring this discovery dispute to a conclusion and permit final briefing of the pending Motion, the Court makes the presumptive factual finding, pursuant to Fed. R. Evid. 104, that Defendant has previously produced documents relevant to this case in the United States without obtaining the prior formal consent of the applicable governmental authorities in Jordan, Lebanon or the Palestinian Authority providing Defendant with immunity from criminal prosecution for violations of any applicable banking secrecy laws prior to Defendant's production of these documents in the United States.

Defendant may rebut this finding with competent evidence and may submit a further brief addressing this or any other related bank secrecy issues on or before June 9, 2006. Plaintiffs may submit their Reply Brief no later than June 23, 2006.

SO ORDERED:

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated:        Brooklyn, New York
              June 7, 2006

19479_1

TOTAL P.04

**JA2813**

# LeBoeuf, Lamb, Greene & MacRae llp

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

GOODWIN SQUARE
225 ASYLUM STREET, 13TH FLOOR
HARTFORD, CT 06103
(860) 293-3500
FACSIMILE: (860) 293-3555

E-MAIL ADDRESS: RONALD.ZDROJESKI@LLGM.COM
WRITER'S DIRECT DIAL: (860) 293-3537
WRITER'S DIRECT FAX: (860) 241-1337

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
ALMATY
BEIJING

June 21, 2006

**BY ELECTRONIC FILING**

The Honorable Victor V. Pohorelsky
United States Magistrate Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *Linde, et al v. Arab Bank plc*, No. 04 Civ. 2799 (NG)(VVP) and related cases
              Arab Bank Depositions

Dear Magistrate Judge Pohorelsky:

    This letter is submitted in response to the June 15, 2006 letter from plaintiffs' counsel regarding the proposed depositions of Arab Bank employees in New York beginning the week of June 26, 2006, and in Jordan beginning the week of July 13, 2006. Plaintiffs' counsel have asked to take depositions of Bank witnesses while their motion concerning foreign bank secrecy laws remains pending, *and* to reserve the right to re-call the witnesses once the Court has ruled on their motion. This request is unreasonable and should be denied.

    Background

    On or about May 30, 2006, plaintiffs' counsel contacted the undersigned and indicated that plaintiffs wished to begin taking the depositions of various bank employees. Over the next two days, several conversations among the parties produced a list of 14 individuals in four countries that plaintiffs sought to depose in accordance with an aggressive schedule throughout June and July.[1]

---

[1] Among the witnesses identified by plaintiffs were some of the most senior Bank officials in Jordan, Lebanon, and Palestine. Specifically, the list provided by plaintiffs' counsel included four individuals in Jordan, three in Palestine, three in the United States (New York), and four in Lebanon. We later determined and informed plaintiffs' counsel that one of the four individuals included on plaintiffs' list for Lebanon was, in fact, deceased.

**JA2814**

The Honorable Victor V. Pohorelsky
June 21, 2006
Page 2

Coincidentally, on June 1, 2006, the undersigned traveled to the Middle East for two weeks in order to meet with our client on these and other issues related to the pending actions. In light of plaintiffs' requests, we changed our plans, and interviewed and prepared the witnesses plaintiffs sought to depose in the coming weeks. Despite the difficulties of working in Palestine, including lost days due to the Israeli Defense Force's closure of Ramallah to visitors and civil unrest in Gaza and the West Bank, by June 8, 2006, we were able to respond to plaintiffs' requests.

Specifically, the Bank agreed to produce at least seven witnesses within the general timeframe sought by plaintiffs, including at least one witness in New York. The Bank also agreed to produce five witnesses from Palestine, Jordan, and Lebanon, including the senior banking officers for Arab Bank in Palestine and Lebanon. Given our understanding of plaintiffs' areas of interest, we also offered to produce an additional witness in Jordan not on plaintiffs' list, but with relevant information and seniority. This offer was declined.

Before turning to the specifics of the dispute now raised by plaintiffs' counsel, it is important to note that, from the outset of the negotiations on scheduling discovery, we made clear, on behalf of Arab Bank, that we could not, and would not permit the Bank's employees to disclose information that might constitute criminal violations of applicable bank secrecy laws. (*See* Mem. of Law of Def. Arab Bank, plc in Opp. to Pls.' Motion for an Order Overruling Objections, Deeming Facts as Admitted and Compelling Further Responses to Pls.' First Set of Requests for Admissions and Related Interrogatories, Apr. 3, 2006.)

Consistent with this position, the Bank was nonetheless willing to accommodate plaintiffs by producing witnesses according to plaintiffs' desired schedule, subject to certain understandings, namely that: (1) unless and until issues concerning bank secrecy have been resolved by the Court, we will object to, and instruct each witness not to answer, any questions at deposition that call for the disclosure of information covered by foreign bank secrecy laws; and (2) any witness that plaintiffs choose to depose now, notwithstanding that bank secrecy issues remain unresolved, would not be made available in the future for further examination. Thus, the Bank's position should be of no surprise to plaintiffs' counsel and, more importantly, is reasonable under the circumstances and entirely consistent with the rules and well-established principles governing depositions.

Discussion

As Your Honor is aware, foreign bank secrecy laws cover information and materials that are central to the pending actions, including information and materials likely to be raised by plaintiffs' counsel in depositions. Plaintiffs' motion to compel the Bank to provide information protected by foreign bank secrecy laws is still pending before the Court. To the extent that plaintiffs' counsel is a victim of timing in this regard, any resulting delay is due in large part to their own delays in pursuing the bank secrecy issues before the Court. In particular, the document underlying plaintiffs' motion to compel (*i.e.*, the Bank's Responses to Plaintiffs' First Requests for Admission and Related Interrogatories) had been in plaintiffs' counsel's possession since October 24, 2005, and a meet and confer on the Bank's bank secrecy objections was

**JA2815**

The Honorable Victor V. Pohorelsky
June 21, 2006
Page 3

conducted within a week thereafter.  Nevertheless, plaintiffs waited until February 20, 2006 --
nearly four months after they received the Bank's responses and objections -- to make their
motion to compel.  Moreover, despite being served with the Bank's opposition to that motion on
April 3, 2006, plaintiffs have dictated a schedule that will extend briefing on the motion well into
July.

        Rather than wait for these issues to be resolved by the Court, however, plaintiffs have
now chosen to move aggressively in seeking to depose senior bank personnel from their
respective jurisdictions in a compressed timeframe.  While we may question the wisdom of
plaintiffs' decision to move forward in the face of such significant uncertainty, as demonstrated
above, the Bank nonetheless has worked vigorously to respond to plaintiffs' requests and to
make several of the individuals sought by plaintiffs available in short order.  Should plaintiffs'
counsel choose to go forward with these depositions at this time, the Bank is obliged to prevent
violations of bank secrecy laws.  (Mem. of Law of Def. Arab Bank, plc in Opp. to Pls.' Motion
for an Order Overruling Objections, Deeming Facts as Admitted and Compelling Further
Responses to Pls.' First Set of Requests for Admissions and Related Interrogatories, Apr. 3,
2006.)

        Moreover, the Bank is under no obligation to make these witnesses available to plaintiffs
a second time should plaintiffs choose to go forward now.  It is well settled that, multiple
depositions of a witness are unduly disruptive, and, therefore, cannot be taken without leave of
court.  *See, e.g., Export-Import Bank v. Asia Pulp & Paper Co.*, 03 Civ. 8554, 2005 U.S. Dist.
LEXIS 28671, at *112 (S.D.N.Y. Nov. 8, 2005).  Multiple depositions of witnesses in this case --
most of whom reside halfway around the world -- is clearly overly burdensome and expensive,
and leave to take them is unwarranted under the circumstances.

        Plaintiffs' counsel at all times has the choice of moving forward with the depositions now
subject to the understandings put forth by the Bank, or, in the alternative, waiting to take the
depositions after bank secrecy issues have been resolved.  Alternatively, the Bank has no
objection to extending the discovery period so as to accommodate plaintiffs' choosing the latter
option.  But to compel that the depositions move forward in the manner sought by plaintiffs
counsel would risk violating foreign laws and seriously prejudice the Bank.  Accordingly,
plaintiffs' request should be denied.

                            Respectfully submitted,

                            Ronald W. Zdrojeski

cc:     All counsel on attached list

**JA2816**

## SERVICE LIST

**BY ELECTRONIC DELIVERY:**

**IN *LITLE, ET AL. V. ARAB BANK, PLC,* CV 04-5449 & *BENNETT, ET AL. V. ARAB BANK, PLC,* CV 05-3183 & *ROTH, ET AL. V. ARAB BANK, PLC, CV 05-3738 & WEISS, ET. AL. V. ARAB BANK, PLC, CV 06-1623***

**Liaison Counsel for *Litle, Bennett and Roth* Plaintiffs:**
James P. Bonner, Esq (jbonner@lawssb.com)
SHALOV, STONE & BONNER LLP
485 Seventh Avenue
Suite 1000
New York, N.Y. 10018
Telephone: (212) 239-4340
Facsimile: (212) 239-4310

**Co-Counsel for *Litle, Bennett and Roth* Plaintiffs:**
Mark S. Werbner, Esq. (mwerbner@swtriallaw.com)
SAYLES WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Telephone: (214) 939-8711
Facsimile: (214) 939-8787

Richard D. Heideman, Esq. (rdheideman@HLNKlaw.com)
HEIDEMAN LEZELL NUDELMAN & KALIK, P.C.
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
Telephone: (202) 462-8990
Facsimile: (202) 462-8995

Steven R. Perles, Esq. (sperles@perleslaw.com)
PERLES LAW FIRM, P.C.
1146 19th Street, NW
Washington DC 20036
Telephone: (202) 745-1300
Facsimile: (202) 745-1858

**IN *LINDE, ET AL. v. ARAB BANK, PLC,* CV 04-2799 & *COULTER, ET AL. v. ARAB BANK, PLC,* CV 05-365**

**Liaison Counsel for *Linde* Plaintiffs; Co-counsel for the *Coulter* Plaintiffs:**
Andrew D. Friedman, Esq. (afriedman@whesq.com)
Joshua D. Glatter, Esq. (jglatter@whesq.com)
WECHSLER HARWOOD LLP
488 Madison Avenue
8th Floor
New York, NY 10022

**JA2817**

Telephone: (212) 935-7400
Facsimile: (212) 753-3630

**Counsel for the *Coulter* Plaintiffs; Co-Counsel for *Linde* Plaintiffs:**
Gary M. Osen, Esq. (gmo@osen.us)
Peter Raven-Hansen (praven@law.gwu.edu)
OSEN & ASSOCIATES, LLC
700 Kinderkamack Road
Oradell, NJ 07649
Telephone: (201) 265-6400
Facsimile: (201) 265-0303

Robert A. Swift, Esq. (rswift@kohnswift.com)
Steven M. Steingard, Esq. (ssteingard@kohnswift.com)
KOHN SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

**IN *ALMOG, ET AL. v. ARAB BANK, PLC*, CV 04-5564 & *AFRIAT-KURTZER, ET AL. V. ARAB BANK, PLC*, CV 05-388**

**Counsel for *Almog & Afriat-Kurtzer* Plaintiffs**
Ronald L. Motley, Esq. (rmotley@motleyrice.com)
Jodi W. Flowers, Esq. (jflowers@motleyrice.com)
John M. Eubanks, Esq. (jeubanks@motleyrice.com)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

**Co-Counsel for *Almog* Plaintiffs**
Alan Gerson, Esq. (gerson@gilgintl.org)
ATTORNEY AT LAW
2131 S. Street
Washington, D.C. 20008
Telephone: (202) 966-8557

**JA2818**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

COURTNEY LINDE, et al.,

                              Plaintiffs,

                    - v -                                         CV-04-2799 (NG) (VVP)

ARAB BANK, PLC,
                              Defendant.
-------------------------------------------------------------x

PHILIP LITLE, et al.,

                              Plaintiffs,

                    - v -                                         CV-04-5449 (NG) (VVP)

ARAB BANK, PLC,
                              Defendant.
-------------------------------------------------------------x

ORAN ALMOG, et al.,

                              Plaintiffs,

                    - v -                                         CV-04-5564 (NG) (VVP)

ARAB BANK, PLC,
                              Defendant.
-------------------------------------------------------------x

ROBERT L. COULTER, SR., et al.,

                              Plaintiffs,

                    - v -                                         CV-05-365 (NG) (VVP)

ARAB BANK, PLC,
                              Defendant.
-------------------------------------------------------------x

GILA AFRIAT-KURTZER, et al.,

                              Plaintiffs,

                    - v -                                         CV-05-388 (NG) (VVP)

ARAB BANK, PLC,
                              Defendant.
-------------------------------------------------------------x

MICHAEL BENNETT et al.,

                              Plaintiffs,

**JA2819**

```
                    - v -                          CV-05-3183 (NG)(VVP)

ARAB BANK, PLC,
                        Defendant.
------------------------------------------------------------x
ARNOLD ROTH, et al.,

                        Plaintiffs,
                    - v -                          CV-05-3738 (NG)(VVP)

ARAB BANK, PLC,
                        Defendant.
------------------------------------------------------------x
```

## ORDER

The plaintiffs have asked the court to rule on a dispute concerning depositions of the defendant's employees.  The dispute arises from the anticipated assertion by the defendant of foreign bank secrecy laws as a bar to inquiry about some subjects that will be raised in the depositions.  The question whether those laws may be legitimately asserted to bar discovery here is an issue that has been recognized as a core issue from the outset of the litigation and is presently being briefed.  Nevertheless, the plaintiffs understandably wish to press forward with depositions as the earliest cases have now been pending for more than a two years.  The defendant does not object to proceeding with depositions.  The defendant takes the position, however, that any employees who are deposed now should not be required to appear again for deposition testimony if the bank secrecy issue is decided against them.

Ordinarily, if a party mistakenly directs a witness under its control not to answer a question because of a privilege, the witness is required to reappear for deposition testimony to answer the questions which were not answered.  The situation is somewhat different here, of course, because the privilege that will be asserted is one that has been long anticipated by the

-2-

**JA2820**

parties and it will be no surprise that the issue will arise.  There is therefore some merit to the

defendant's notion that the plaintiffs ought to wait for the bank secrecy issue to be decided

before  pressing forward with depositions, and if they do not, they should bear the consequence

of doing without the witness' testimony on the questions where bank secrecy is asserted.

Nevertheless, in light of the delays encountered thus far in discovery, depositions should

commence as soon as possible.  Thus, as to bank employees who reside in New York, because the

cost and inconvenience of reappearing is relatively minimal, if the bank secrecy issues are

decided against the defendant, those employees will be required to reappear to complete any

testimony that they were directed not to give because of the assertion of bank secrecy.  As to

employees elsewhere in the world, however, given the logistical difficulties presented if employees

are required to make multiple deposition appearances, depositions should not proceed until the

bank secrecy issue is decided.

SO ORDERED:

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated:       Brooklyn, New York
             June 22, 2006

-3-

**JA2821**

ב י ת ה מ ש פ ט ה צ ב א י י ה ו ד ה

בפני כב' האב"ד: רס"ן יאיר תירוש
השופטת: רס"ן דליה קאופמן
השופט: רס"ן מייקל בן-דוד

התביעה הצבאית
(באמצעות קמי"ש סלבה פסק)

נגד

הנאשם: יאסר חסן מוחמד חמאד, ת.ז. 901409995 / שב"ס
(באמצעות ב"כ עו"ד תאודורי)

---

## נימוקי גזר הדין

הנאשם, יליד 1977, תושב סלוואד שבתחבל יהודה, הורשע על ידינו ביום
29/05/06 בשורה ארוכה של עבירות כגון חברות בהתאחדות בלתי
מותרת, גרימת מוות בכוונה, ניסיון לגרימת מוות בכוונה, קשירת קשר
לביצוע עבירה, החזקת חומרי נפץ- ועבירות חמורות נוספות. במהלך
ביצוע הפעילות העוינת על ידי הנאשם וחבריו נרצחו שני אזרחים ושלושה
חיילי צה"ל- ואחרים נפצעו. פעילות הנאשם התבצעה במסגרת חוליה
צבאית של עזדין אלקאסם, שהוא הזרוע הצבאית של ארגון החמאס.
בנוסף, "לפעילותם השגרתית" של הנאשם במסגרת ארגון אסור, שמו
הנאשם וחבריו כמטרה לעצמם לפגוע ולהרוג אזרחים ישראלים וחיילי
צה"ל רבים ככל שיצליחו ופעלו לשם כך ללא לאות ע"י יזום ותכנון
פיגועים שונים ומשונים, אותם ניסו לבצע.

התביעה הצבאית ביקשה להחמיר בעונשו של הנאשם שהורשע ברצח של
מסי אזרחים וחיילי צה"ל ובפציעתם של אחרים- ולגזור עליו 8 מאסרי
עולם מצטברים בשל רצח 5 ישראלים ובגין יתר הפעילות של הנאשם
אשר כללה בין השאר, מסי ניסיונות לגרימת מוות בכוונה של אזרחים
ישראלים וחיילי צה"ל.

לדעת התביעה הצבאית, חייב ביהמ"ש להעביר מסר תקיף, ברור וחד, הן
לנאשם והן לאחרים האמורים לבצע מעשים נפשעים כדוגמת אלה שעשה
הנאשם, כי הם יורחקו לצמיתות מחברת בני-אנוש נורמטיביים
וחופשיים ; ויוותרו עד ליום מותם מאחורי סורג ובריח.

רס"ן אלינור ברזמי
קצינת העיר נתניה

L_C180804

JA2822

# APOSTILLE
## (CONVENTION DE LA HAYE 5 DU OCTOBER 1961)

| | | | |
|---|---|---|---|
| 1. | STATE OF ISRAEL | | מדינת ישראל .1 |
| 2. | THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY MR./MS | ברזני אלינור BARAZANI ELINOR | מסמך ציבורי זה נחתם בידי מר/גב' .2 |
| 3. | ACTING IN THE CAPACITY OF NATANIA CITY OFFICER FOR MILITARY MATTERS | | המכהן בתור קצינת העיר נתניה .3 |
| 4. | BEARS THE SEAL/STAMP OF THE MINISTRY OF | צבא הגנה לישראל ISRAELI DEFFENCE | נושא את החותם/חותמת של משרד .4 |
| 5. | CERTIFIED AT THE MINISTRY OF FOREIGN AFFAIRS | | אושר במשרד החוץ .5 |
| 6. | THE | 5/10/2011 | ביום .6 |
| 7. | BY | SHIR TZIKVASHVILY CONSULAR BUREAU | שיר ציקבאשוילי חתטיבת מקונסולרית על-ידי .7 |
| 8. | NO 528773. | | מס' 528773 .8 |
| 9. | SEAL/STAMP | | חותם/חותמת .9 |
| 10. | SIGNATURE, JERUSALEM | | חתימה, ירושלים .10 |

PX3742.pdf

L_C180805

JA2823

הסניגור המלומד היה מודע לכך שהנאשם הורשע במספר עבירות של 1
גרימת מוות בכוונה, והוא הותיר לביהמ"ש את ההכרעה בעניין מידת 2
העונש שיש להשית עליו. יחד עם זאת, ציין הסניגור הנכבד כי לדעתנו 3
הפריזה התובעה הצבאית בעניין בקשת מאסרי העולם, ולגרסתו יש 4
להחזיר את ההתארחשויות "לפרופורציות הנכונות" שלהם. 5
6

חיי האדם מהווים ערך בסיסי ומקודש של כל בן-אנוש בחברה מתוקנת. 7
הלאו של "לא תרצח" כלול בעשרת הדיברות, ומהווה את בסיס 8
העקרונות שלפיהם חייב בן-אנוש לנהוג. עקרון קדושת החיים מקובל 9
כמובן גם בדת האסלאם, שהנאשם נמנה על מאמיניה. 10
11

בנוסף הורשע הנאשם בעבר בעבירות שאף הן בעלות אופי לוחמני ואולם 12
לאחר שחרורו לא נרתע מלשוב ולהצטרף לפעילות חמורה יותר. 13
14

לענישה יש כידוע מטרות שונות של מניעה והרתעת אחרים מלנהוג בדרכו 15
של הנאשם- ומנגד הצורך להתחשב בנסיבותיו האישיות של הנאשם, 16
ובנחיצות לשקמו ולהחזירו למסגרת נורמטיבית ובונה. אולם כאשר 17
המדובר במעשים כה חמורים כפי שעשה הנאשם, נדחה כל שיקול אישי 18
הקשור בנאשם ובמשפחתו מול החובה להגן על הציבור מפני מעלליו של 19
הנאשם בעתיד ; והעונש היחיד ההולם את העניין הוא הרחקת הנאשם 20
לצמיתות מאחורי סורג ובריח. 21
22

מעשיו הנפשעים של הנאשם כבר תוארו בהכרעת הדין, ואין אנו רואים 23
צורך לחזור על הדברים במסגרת זו. הנאשם הורשע לא רק בחברות 24
ובארגון עוין ובהחזקת חומרי נפץ, אלא גם בביצוע פיגועים קשים נגד 25
כלי-רכב אזרחיים שנסעו לתומם בכבישי יהודה- וכנגד סיור רגלי של 26
צה"ל, שנקלע לציר הראשי של עין-יברוד. כתוצאה ממעשים נפשעים אלו, 27
נרצחו באכזריות שני אזרחים ישראלים ושלושה חיילי צה"ל, שלאחר 28
רציחתם בידי הנאשם וחבריו. 29
30

הנאשם לא הביע כל חרטה על מעשיו ועובדה זו מצביעה כאלף עדים על 31
מסוכנותו לביטחון האזור. האדישות של הנאשם לחיי האדם ניכרת 32
ממעשיו הנפשעים ואין לנו כל ספק שלולא היה נעצר על ידי כוחות 33
הביטחון היה מבצע פיגועים נוספים, יחד עם חברי חוליתו. 34
35

בהתאם להלכה שנקבעה ע"י ביהמ"ש הצבאי לערעורים זה מזמן, ראוי 36
להטיל מאסר עולם על נאשם בגין רציחתו של כל אדם וכן מאסר עולם 37
נוסף בגין ניסיונותיו המרובים של הנאשם לגרום מוות וזאת עפ"י הלכת 38
**נופל.** 39
40
41
42

נאמן למקור

רס"ן אלינור ברוני
קצינת העיר נתניה

-2-

תאריך: כ' תמוז, תשס"ך
16 יולי, 2006

תיק מס': 1324/04

1 אשר על כן, לאחר ששמענו את טיעוני הצדדים, החלטנו ביום 11/07/06
2 לגזור על הנאשם את העונשים הבאים :
3

4   א. מאסר עולם בגין רציחתו של דוד ציון ז"ל.
5   ב. מאסר עולם בגין רציחתו של צבי גולדסטיין ז"ל.
6   ג. מאסר עולם בגין רציחתו של סמל רועי יעקוב סולומון ז"ל.
7   ד. מאסר עולם בגין רציחתו של סמ"ר ארז עידן ז"ל.
8   ה. מאסר עולם בגין רציחתו של סמל אלעד פולק ז"ל.
9   ו. מאסר עולם נוסף בגין יתר העבירות בחן הורשע הנאשם.
10

11 כל העונשים ירוצו במצטבר, כך שסה"כ ירצה הנאשם 6 מאסרי עולם
12 מצטברים.
14 **זכות ערעור תוך 30 יום מהיום.**
15
16 **ניתן והודע היום, כ' תמוז תשס"ך, 16 ביולי 2006, בלשכה.**
17
18 **מזכירות ביהמ"ש תעביר עותק מנימוקי גזר הדין לצדדים.**
19
20
21
22        שופטת                    אב"ד                    שופט
23
24
25
26
27
28



רס"ן אלינור בבאי
קצינת העיר נתניה

נאמן למקור

-3-

PX3742.pdf

L_C180807

JA2825

# בית המשפט הצבאי יהודה

בפני כב׳ האב״ד: רס״ן יאיר תירוש
השופטת: רס״ן דליה קאופמן
השופט: רס״ן מייקל בן-דוד

התביעה הצבאית
(באמצעות קמ״ש סלבה פסק)

**נגד**

הנאשם: יאסר חסן מוחמד חמאד, ת.ז. 901409995 / שב״ס – נוכח
(באמצעות ב״כ עו״ד תאודורי – נוכח)

## ג ז ר - ד י ן

לאחר ששמענו את טיעוני הצדדים, החלטנו לגזור על הנאשם את העונשים הבאים:

א.  מאסר עולם בגין רציחתו של דוד ציון ז״ל.
ב.  מאסר עולם בגין רציחתו של צבי גולדסטיין ז״ל.
ג.  מאסר עולם בגין רציחתו של סמל רועי יעקוב סולומון ז״ל.
ד.  מאסר עולם בגין רציחתו של סמ״ר ארז עדין ז״ל.
ה.  מאסר עולם בגין רציחתו של סמל אלעד פולק ז״ל.
ו.  מאסר עולם נוסף בגין יתר העבירות בהן הורשע הנאשם.

כל העונשים ירוצו במצטבר, כך שסה״כ ירצה הנאשם 6 מאסרי עולם מצטברים.

נימוקי גזר הדין המלאים יפורסמו בהמשך.

**זכות ערעור תוך 30 יום מיום מתן הנימוקים.**

**ניתן והודע היום, 11/07/06, בפומבי ובמעמד הצדדים.**

שופטת                                    אב״ד                                    שופט

נאמן למקור

רס״ן אלינור ברוני
קצינת העיר נתניה

-3-



143 RODNEY STREET
BROOKLYN, N.Y. 11211
TEL. (718) 384-8040
FAX: (718) 388-3516

# Certificate of Accurate Translation

Translated document: **L_C180804-8**        Source Language: **Hebrew**

Translation date: **April, 28, 2014**        Target Language: **English**

Description of Document:  **Sentence and Verdict  of Yaser Hasan
Muhammad Hamad**

Targem Translations, a language services provider in the New York
metropolitan area with more than 50 years of professional experience,
hereby certifies and states that the above mentioned document has been
translated and edited by a team of highly skilled translators and editors
who have the background and experience needed to perform the
translation and editing. We further certify that, to the best of our
knowledge, the translated English document is an accurate translation of
the original Hebrew document and that reflects the content and meaning
of the original Hebrew document.

Yours Sincerely

Wolf Markowitz, Manager
Targem Translations



PROFESSIONAL
TRANSLATIONS
OF FOREIGN
LANGUAGES

PX3742.pdf

**JA2827**

תאריך: כ' תמוז, תשס"ו                  תיק מס': 1324/04
16 יולי, 2006

ב י ת   ה מ ש פ ט   ה צ ב א י   י ה ו ד ה

בפני כב' האב"ד: רס"ן יאיר תירוש
השופטת: רס"ן דליה קאופמן
השופט: רס"ן מייקל בן-דוד

התביעה הצבאית
(באמצעות קמ"ש סלבה פסק)

נגד

הנאשם: יאסר חסן מוחמד חמאד, ת.ז. 901409995 / שב"ס
(באמצעות ב"כ עו"ד תאודורי)

## נימוקי גזר הדין

הנאשם, יליד 1977, תושב סלוואד שבחבל יהודה, הורשע על ידינו ביום
29/05/06 בשורה ארוכה של עבירות כגון חברות בהתאחדות בלתי
מותרת, גרימת מוות בכוונה, ניסיון לגרימת מוות בכוונה, קשירת קשר
לביצוע עבירה, החזקת חומרי נפץ- ועבירות תחמורת נוספות. במהלך
ביצוע הפעילות העוינת על ידי הנאשם וחבריו נרצחו שני אזרחים ושלושה
חיילי צה"ל- ואחרים נפצעו. פעילות הנאשם התבצעה במסגרת חוליה
צבאית של עזדין אלקאסם, שהוא הזרוע הצבאית של ארגון החמאס.
בנוסף, "לפעילותם השיקרתית" של הנאשם במסגרת ארגון אסור, שמו
הנאשם וחבריו כמטרה לעצמם לפגוע ולהרוג אזרחים ישראלים וחיילי
צה"ל רבים ככל שיצליחו ועל לשם כך ללא לאות ע"י יזום ותכנון
פיגועים שונים ומשונים, אותם ניסו לבצע.

התביעה הצבאית ביקשה להחמיר בעונשו של הנאשם שהורשע ברצח של
מס' אזרחים וחיילי צה"ל וחיילי צה"ל ובפציעותם של אחרים- ולגזור עליו 8 מאסרי
עולם מצטברים  בשל רצח 5 ישראלים ובגין יתר הפעילות של הנאשם
אשר כללה בין השאר, מס' ניסיונות לגרימת מוות בכוונה של אזרחים
ישראלים וחיילי צה"ל.

לדעת התביעה הצבאית, חייב ביהמ"ש להעביר מסר תקיף, ברור וחד, הן
לנאשם והן לאחרים האמורים לבצע מעשים נפשעים כדוגמת אלה שעשה
הנאשם, כי הם יורחקו לצמיתות מחברת בני-אנוש נורמטיביים
וחופשיים ; ויוותרו עד ליום מותם מאחורי סורג ובריח.

רס"ן אליעזר בדמי
קצינת העיר נתניה

-1-



**APOSTILLE**
**(CONVENTION DE LA HAYE 5 DU OCTOBER 1961)**

| | | | |
|---|---|---|---|
| 1. | STATE OF ISRAEL | מדינת ישראל | .1 |
| 2. | THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY MR.MS | ברזני אלינור BARAZANI ELINOR | מסמך ציבורי זה נחתם בידי .2 גב/מר |
| 3. | ACTING IN THE CAPACITY OF NATANIA CITY OFFICER FOR MILITARY MATTERS | | המכהן בתואר קצינת העיר .3 נתניה |
| 4. | BEARS THE SEAL/STAMP OF THE MINISTRY OF | צבא התגנה לישראל ISRAELI DEFFENCE | נושא את החותם/חותמת של .4 משרד |
| 5. | CERTIFIED AT THE MINISTRY OF FOREIGN AFFAIRS | | אושר במשרד החוץ .5 |
| 6. | THE | 5/10/2011 | ביום .6 |
| 7. | BY | SHER TZIKVASHVILY שיר ציקבאשווילי CONSULAR BUREAU התשכבה הקונסולרית | על-ידי .7 |
| 8. | NO 528773. | | מס' 528773 .8 |
| 9. | SEAL/STAMP | | חותם/חותמת .9 |
| 10. | SIGNATURE, JERUSALEM | | חתימה, ירושלים .10 |

L_C180805

PX3742.pdf

**JA2829**

1. הסניגור המלומד היה מודע לכך שהנאשם הורשע במספר עבירות של
2. גרימת מוות בכוונה, והוא הותיר לביהמ״ש את ההכרעה בעניין מידת
3. העונש שיש להשית עליו. יחד עם זאת, ציין הסניגור הנכבד כי לדעתו
4. הפריזה התביעה הצבאית בעניין בקשת מאסרי העולם, ולגרסתו יש
5. להחזיר את ההתחרשטויות ״לפרופורצית הנכונות״ שלהם.
6.
7. חיי האדם מהווים ערך בסיסי ומקודש של כל בן-אנוש בחברה מתוקנת.
8. הלאו של ״לא תרצח״ כלול בעשרת הדיברות, ומהווה את בסיס
9. העקרונות שלפיהם חייב בן-אנוש לנהוג. עקרון קדושת החיים מקובל
10. כמובן גם בדת האסלאם, שהנאשם נמנה על מאמיניה.
11.
12. בנוסף הורשע הנאשם בעבירות בעבר בעבירות שאף הן בעלות אופי לוחמני ואולם
13. לאחר שחרורו לא נרתע מלשוב ולהצטרף לפעילות חמורה יותר.
14.
15. לענישה יש כידוע מטרות שונות של מניעה והרתעת אחרים מלנהוג בדרכו
16. של הנאשם- ומנגד הצורך להתחריד בנסיבותיו האישיות של הנאשם,
17. ובנסיונצות לשקמו ולהחזירו למסגרת נורמטיבית ובונה. אולם כאשר
18. המדובר במעשים כה חמורים כפי שעשה הנאשם, נדחה כל שיקול אישי
19. הקשור בנאשם ובמשפחתו מול החובה להגן על הציבור מפני מעלליו של
20. הנאשם בעתיד ; והעונש היחיד ההולם את העניין הוא הרחקת הנאשם
21. לצמיתות מאחורי סורג ובריח.
22.
23. מעשיו הנפשעים של הנאשם כבר תוארו בהכרעת הדין, ואין אנו רואים
24. צורך לחזור על הדברים במסגרת זו. הנאשם הורשע לא רק בחברותא
25. בארגון עיין ובהחזקת חומרי נפץ, אלא גם בביצוע פיגועים קשים נגד
26. כלי-רכב אזרחיים שנסעו לתומם בכבישי יהודה- וכנגד סיור רגלי של
27. צה״יל, שנקלע לצרו הראשי של עין-יברוד. כתוצאה ממעשיים נפשעים אלו,
28. נרצחו באכזריות שני אזרחים ישראלים ושלושה חיילי צה״יל, שלאחר
29. רציחתם בידי הנאשם וחבריו.
30.
31. הנאשם לא הביע כל חרטה על מעשיו ועובדה זו מצביעה כאלף עדים על
32. מסוכננותו לביטחון האזור. האדישות של הנאשם לחיי האדם ניכרת
33. ממעשיו הנפשעים ואין לנו כל ספק שלולא היה נעצר על ידי כוחות
34. הביטחון היה מבצע פיגועים נוספים, יחד עם חברי חולייתו.
35.
36. בהתאם להלכה שנקבעה ע״יי ביהמ״ש הצבאי לערעורים זה מזמן, ראוי
37. להטיל מאסר עולם על נאשם בגין רציחתו של כל אדם וכן מאסר עולם
38. נוסף בגין נסיונותיו המרובים של הנאשם לגרום מוות וזאת עפ״יי הלכת
39. נופל.
40.
41.
42.

נאמן למקור

-2-

רס״יין אליעזר ברזני
קצינת העיר נתניה

PX3742.pdf

1   אשר על כן, לאחר ששמענו את טיעוני הצדדים, החלטנו ביום 11/07/06
2   לגזור על הנאשם את העונשים הבאים :

4   א. מאסר עולם בגין רציחתו של דוד ציון ז״ל.
5   ב. מאסר עולם בגין רציחתו של צבי גולדשטיין ז״ל.
6   ג. מאסר עולם בגין רציחתו של סמ״ר רועי יעקוב סולומון ז״ל.
7   ד. מאסר עולם בגין רציחתו של סמ״ר ארז עידן ז״ל.
8   ה. מאסר עולם בגין רציחתו של סמל אלעד פולק ז״ל.
9   ו. מאסר עולם נוסף בגין יתר העבירות בהן הורשע הנאשם.

11   כל העונשים ירוצו במצטבר, כך שסה״כ ירצה הנאשם 6 מאסרי עולם
12   מצטברים.

14   **זכות ערעור תוך 30 יום מהיום.**

16   **ניתן והודע היום, כ׳ תמוז תשס״ו, 16 ביולי, 2006, בלשכה.**

18   **מזכירות ביהמ״ש תעביר עותק מנימוקי גזר הדין לצדדים.**

<br>

שופטת         אב״ד         שופט

נאמן למקור

רס״ן אלינור בבנס
קצינת העיר נתניה

-3-

L_C180807

**JA2831**

ב י ת ה מ ש פ ט ה צ ב א י י ה ו ד ה

בפ כב' האב"ד: רס"ן יאיר תירוש
השופטת: רס"ן דליה קאופמן
השופט: רס"ן מייקל בן-דוד

התביעה הצבאית
(באמצעות קמ"ש סלבה פסק)

גגד

הנאשם: יאסר חסן מוחמד חמאד, ת.ז. 901409995 / שב"ס - נוכח
(באמצעות ב"כ עו"ד תאודורי – נוכח)

─────────────────────────────────

ג ז ר - ד י ן

לאחר ששמענו את טיעוני הצדדים, החלטנו לגזור על הנאשם את העונשים הבאים:

א. מאסר עולם בגין רציחתו של דוד ציון ז"ל.
ב. מאסר עולם בגין רציחתו של צבי גולדסטיין ז"ל.
ג. מאסר עולם בגין רציחתו של סמל רועי יעקב סולומון ז"ל.
ד. מאסר עולם בגין רציחתו של סמ"ר ארז עידן ז"ל.
ה. מאסר עולם בגין רציחתו של סמל אלעד פולק ז"ל.
ו. מאסר עולם נוסף בגין יתר העבירות בכן הורשע הנאשם.

כל העונשים ירוצו במצטבר, כך שסה"כ ירצה הנאשם 6 מאסרי עולם מצטברים.

נימוקי גזר הדין המלאים יפורסמו בהמשך.

**זכות ערעור תוך 30 יום מיום מתן הנימוקים.**

**ניתן והודע היום, 11/07/06, בפומבי ובמעמד הצדדים.**

שופטת          אב"ד          שופט

נאמן למקור

רס"ן אליעזר ברזני
קצינת העיר נתניה

L_C180808

PX3742.pdf

JA2832

Date: 20 Tamuz, 5766
July 16, 2006

Case no. 1324/04

## Military Court – Judea

**Appearing before Presiding Judge: Major Yair Tirosh**
**Judge: Major Dahlia Kaufman**
**Judge: Major Michael Ben-David**

**The Military Prosecution**
(Represented by Law Officer Slava Pesak)

[stamp:] Correct copy
[signature]
[stamp:] Military Appeals
Court — Judea and
Samaria

**vs.**

**Defendant: Yaser Hasan Muhammad Hamad, I.D. 901409995/Prison Service**
(Represented by counsel, Attorney Theodori)

### Reasons in determining the verdict

The Defendant, born in 1977, a resident of Silwad in the Judea district, was convicted by this court on May 29, 2006 for a long list of offenses such as membership in an illegal organization, intentionally causing death, attempt to intentionally cause death, conspiracy to commit a crime, possession of explosive materials - and various other serious crimes. In the course of the Defendant carrying out hostile actions together with his accomplices, two citizens and three IDF soldiers were murdered and others were injured. The Defendant's activities were executed within the framework of a military cell of the Izz al-Din al-Qassam [Brigades], the military wing of the Hamas organization. Additionally as part of the Defendant's "routine activities" as a member of an illegal organization, the Defendant and his colleagues set the goal for themselves to injure and to kill as many Israeli civilians and IDF soldiers as they could, and to this end, they worked tirelessly initiating and planning various and diverse attacks which they tried to execute.

The Military Prosecution has requested a severe punishment for the Defendant, who was convicted of murdering a number of civilians and IDF soldiers, and maiming several others – and asked for 8 consecutive life sentences for the murder of 5 Israelis and for the Defendant's other actions which included, inter alia, a number of attempts to intentionally cause the death of Israeli citizens and IDF soldiers.

In the opinion of the Military Prosecution, the court must deliver a strong, clear and sharp message both to the Defendant and to others who intend to commit these abominable acts such as those committed by the Defendant, that they shall forever be removed from normative and free human society; and that until their deaths they shall remain under lock and key.

L_C180804

[stamp:] District Officer, Netanya.
9338
[signature] [stamp:] 4584482.
Major Elinor Barazani, District
Officer, Netanya

PX3742.pdf

**JA2833**

## APOSTILLE
## (CONVENTION DE LA HAYE 5 DU OCTOBER 1961)

| | | | |
|---|---|---|---|
| 1. | STATE OF ISRAEL | | מדינת ישראל .1 |
| 2. | THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY MR./MS | ברזני אלינור **BARAZANI ELINOR** | מסמך ציבורי זה נחתם בידי מר/גב׳ .2 |
| 3. | ACTING IN THE CAPACITY OF NATANIA CITY OFFICER FOR MILITARY MATTERS | | המכהן בתואר קצינת העיר נתניה .3 |
| 4. | BEARS THE SEAL/STAMP OF THE MINISTRY OF | צבא הגנה לישראל **ISRAELI DEFFENCE** | נושא את החותם/חותמת של משרד .4 |
| 5. | CERTIFIED AT THE MINISTRY OF FOREIGN AFFAIRS | | אושר במשרד החוץ .5 |
| 6. | THE | 5/10/2011 | ביום .6 |
| 7. | BY | **SHER TZIKVASHVILY** **CONSULAR BUREAU** שׁיׁר ציקבאשׁוׁיׁלׁי הׁתׁקׁיׁבׁוׁח הׁקׁוׁנׁסׁוׁלׁיׁת | על ידי .7 |
| 8. | NO 528773. | | מס׳ 528773 .8 |
| 9. | SEAL/STAMP | | חותם/חותמת .9 |
| 10. | SIGNATURE, JERUSALEM | | חתימה, ירושלים .10 |

L_C180805

PX3742.pdf

**JA2834**

Date: 20th Tamuz, 5766

July 16, 2006                                                    Case no. 1324/04

The learned defense attorney was aware of the fact that the Defendant was convicted of a number of counts of intentionally causing death and he left it to the court's discretion to decide the extent of the punishment which would be meted out. Nevertheless, the honorable defense attorney noted that, in his opinion, the Military Prosecution had gone too far in requesting life imprisonment, and according to his view the events should be restored to their "correct proportions."

Human life is a basic, sacred value to every human in civilized society. The commandment Thou Shalt Not Kill is one of the Ten Commandments and forms the basis of the value system according to which human beings are obligated to conduct themselves. The sanctity of human life is valued also in the faith of Islam, of which the Defendant is an adherent.

The Defendant was also convicted previously of crimes of a belligerent nature and even following his release was not deterred from returning and engaging in even worse activities.

It is well known that punishment serves many functions in preventing and deterring others from behaving as the Defendant did. On the other hand, there is the need to consider the personal circumstances of the Defendant, and the necessity to rehabilitate and restore him to a normative and constructive framework. However, in the case of the severe acts that the Defendant committed, any personal considerations related to the Defendant or his family must be waived against the obligation to protect the public from any such acts of the Defendant in the future. The only fitting punishment is to remove the Defendant and put him behind bars forever.

The atrocious actions of the Defendant have already been described in the verdict and we see no need to repeat them at this juncture. The Defendant was convicted not only of membership in a hostile organization and for the possession of explosive materials, but also in committing grave attacks against civilian vehicles which were innocently being driven on the Judean highways – and also against IDF foot patrols who were trapped on the main route of Ein Yabrud. As a result of these atrocious actions, two Israeli civilians were ruthlessly murdered, and after their murder by the Defendant and his accomplices, three IDF soldiers were murdered.

The Defendant has not expressed any remorse for his actions and this fact demonstrates like a thousand witnesses how dangerous he is to the region. The Defendant's sheer disregard for human life is abundantly evident from his despicable deeds and we have no doubt whatsoever that if he had not been apprehended by the security forces, he would have committed further attacks along with his accomplices in his cell.

In keeping with the long standing law determined by the Military Appeals Court, it would be fitting to sentence the Defendant to life imprisonment for each and every person he murdered and an additional term for all the Defendant's attempts to intentionally cause death, according to the Nofel ruling.

| | |
|---|---|
| [stamp:] Correct copy<br>[signature]<br>[stamp:] Military Appeals<br>Court — Judea and<br>Samaria | [stamp:] District Officer, Netanya.<br>9338<br>[signature] [stamp:] 4584482.<br>Major Elinor Barazani, District<br>Officer, Netanya |

L_C180806

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42

PX3742.pdf

JA2835

Date: 20 Tamuz, 5766
July 16, 2006                                          Case no. 1324/04

Therefore, after listening to the pleas of the parties, we decided on July 11, 2006 to sentence the   1
Defendant to the following:                                                                            2
                                                                                                       3
1.  One life sentence for the murder of David Zion.                                                    4
2.  One life sentence for the murder of Zvi Goldstein                                                  5
3.  One life sentence for the murder of Sgt. Ro'i Yaakov Solomon                                       6
4.  One life sentence for the murder of Staff Sergeant Erez Idan                                       7
5.  One life sentence for the murder of Sgt. Elad Pollack                                              8
6.  One life sentence for all the remaining offenses of which the Defendant has been convicted.        9
                                                                                                      10
All the sentences will be served consecutively, so that in total the Defendant shall serve 6         11
consecutive life sentences.                                                                           12
                                                                                                      13
**Right to appeal within 30 days from today.**                                                        14
                                                                                                      15
**Handed down and published today, 20 Tamuz, 5766, July 16, 2006, in chambers.**                      16
                                                                                                      17
**The Court clerk will provide each of the sides with the reasons for the verdict.**                  18
                                                                                                      19
[signature]                    [signature]                    [signature]                            20
**Judge**                      **Presiding Judge**            **Judge**                                21
                                                                                                      22
                                                                                                      23
                                                                                                      24
                                                                                                      25
                                                                                                      26
                                                                                                      27
[stamp:] District Officer, Netanya.        [stamp:]   Correct   copy                                  28
              9338                          [signature]                                               29
       [signature] [stamp:] 4584482.        [stamp:] Military Appeals                                 30
     Major Elinor Barazani, District        Court — Judea and                                         31
           Officer, Netanya                              Samaria                                      32
                                                                                                      33
                                                                                                      34
                                                                                                      35
**L_C180807**                                                                                         36
                                                                                                      37
                                                                                                      38
                                                                                                      39

PX3742.pdf

**JA2836**

Date: 20 Tamuz, 5766
July 16, 2006                                        Case no. 1324/04

<div align="right">1</div>

**Military Court - Judea**

1
2
**Presented before presiding judge: Major Yair Tirosh**                              3
**Judge: Major Dahlia Kaufman**                                                      4
**Judge: Major Michael Ben –David**                                                  5
                                                                                    6
**The Military Prosecution**                                                         7
(Represented by Law Officer Slava Pesak)                                             8
<div align="center">vs.</div>                                                        9
                                                                                    10
**Defendant: Yaser Hasan Muhammad Hamad, I.D. 901409995/Prison Service**             11
(Represented by counsel, Attorney Theodori)                                          12
                                                                                    13

                                                                                    14
<div align="center"><u>**Sentence**</u></div>                                        15
                                                                                    16
After listening to the pleas of the parties, we decided  to sentence the Defendant to the following:   17
                                                                                    18
1.  One life sentence for the murder of David Zion.                                  19
2.  One life sentence for the murder of Zvi Goldstein                                20
3.  One life sentence for the murder of Sgt. Ro'i Yaakov Solomon                     21
4.  One life sentence for the murder of Staff Sergeant Erez Idan                     22
5.  One life sentence for the murder of Sgt. Elad Pollack                            23
6.  One life sentence for all the remaining offenses of which the Defendant has been convicted.   24
                                                                                    25
All terms will be served consecutively so that in total the Defendant will serve 6 terms of life   26
imprisonment.                                                                        27
                                                                                    28
The full sentence reasoning will be publicized in due time.                          29
                                                                                    30
**Right to appeal within 30 days from the day the reasons were given.**              31
                                                                                    32
**Handed down and published today, July 11, 2006, in open court and in the presence of the**   33
**parties.**                                                                         34
                                                                                    35
[signature]                    [signature]                    [signature]           36
**Judge**                    **Presiding Judge**            **Judge**                37
                                                                                    38
                                                                                    39

|  |  |
|---|---|
| [stamp:] District Officer, Netanya. 9338<br>[signature] [stamp:] 4584482.<br>Major Elinor Barazani, District Officer, Netanya | [stamp:]  Correct  copy [signature]<br>[stamp:] Military Appeals Court  —  Judea  and Samaria |

**L_C180808**

PX3742.pdf

**JA2837**

ב י ת ה מ ש פ ט ה צ ב א י י ה ו ד ה

בפני כב' האב"ד: רס"ן יאיר תירוש
השופטת: רס"ן דליה קאופמן
השופט: רס"ן מייקל בן-דוד

נאמן למקור

התביעה הצבאית
(באמצעות קמ"יש סלבה פסק)

הנאשם: אחמד מוצטפא צאלח חאמד (נג'אר),ת.ז. 001113836 / שב"ס
(באמצעות ב"כ עו"ד תאודורי)

נ י מ ו ק י ג ז ר ה ד י ן

הנאשם שהוא כיום כבן 30 ותושב סלוואד שבחבל יהודה, הורשע על ידינו ביום 29/05/06 בשורה ארוכה של עבירות כמו חברות בהתאחדות בלתי מותרת, גרימת מוות בכוונה, ניסיון לגרימת מוות בכוונה, קשירת קשר לביצוע עבירה, החזקת חומרי נפץ- ועבירות חמורות נוספות. במהלך ביצוע הפעילות העוינת על ידי הנאשם וחבריו נרצחו 6 אזרחים וחיילים ישראלים- ואחרים נפצעו. פעילות הנאשם התבצעה במסגרת חוליה צבאית של עזדין אלקאסם, חפלג הצבאי של ארגון החמאס. בנוסף, "לפעילות השרתיתי" של הנאשם במסגרת ארגון אסור, שמו הנאשם וחבריו כמטרה לעצמם לפגוע ולהרוג אזרחים ישראלים וחיילי צה"ל רבים בכל שיצליחו, ופעלו לשם כך לא לאות ע"י יזום ותכנון פיגועים שונים ומשונים, אותם ניסו לבצע.

התביעה הצבאית ביקשה להחמיר בעונשו של הנאשם שהורשע ברצח של שלושה אזרחים ושלושה חיילי צה"ל ובפציעתם של אחרים- ולגזור עליו 9 מאסרי עולם מצטברים בשל רציחתם ששת הישראלים ובגין יתר הפעילות של הנאשם אשר כללה בין השאר, מס' ניסיונות לגרימת מוות בכוונה של אזרחים ישראלים וחיילי צה"ל.

לדעת התביעה הצבאית, חייב ביהמ"ש להעביר מסר תקיף, ברור וחד, הן לנאשם והן לאחרים האמורים לבצע מעשים נפשעים כדוגמת אלה שעשה הנאשם, כי הם יורחקו לצמיתות מחברת בני-אנוש נורמטיביים וחופשיים ; ויוותרו עד ליום מותם מאחורי סורג ובריח.

קצינת העיר תל-אביב
סא"ל מירב שטרן 3585229

-1-

# APOSTILLE
## (CONVENTION DE LA HAYE 5 DU OCTOBER 1961)

| | | | | |
|---|---|---|---|---|
| 1. | STATE OF ISRAEL | | מדינת ישראל | .1 |
| 2. | THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY MR./MS | שטרן מירב<br>STERN MERAV | מסמך ציבורי זה נחתם בידי מר/גב׳ | .2 |
| 3. | ACTING IN THE CAPACITY OF CITI OFFICER FOR MILITARY MATTERS | | המכהן בתור ק.העיר ת״א | .3 |
| 4. | BEARS THE SEAL/STAMP OF THE MINISTRY OF | צבא הגנה לישראל<br>ISRAELI DEFFENCE | נושא את החותם/חותמת של משרד | .4 |
| 5. | CERTIFIED AT THE MINISTRY OF FOREIGN AFFAIRS | | אושר במשרד החוץ | .5 |
| 6. | THE | 5/10/2011 | ביום | .6 |
| 7. | BY | SHIR TZIKVASHVILY<br>CONSULAR BUREAU | שיר ציקבאשווילי<br>הלשכה הקונסולרית | על-ידי | .7 |
| 8. | NO 528790. | | מס׳ 528790 | .8 |
| 9. | SEAL/STAMP | | חותם/חותמת | .9 |
| 10. | SIGNATURE, JERUSALEM | | חתימה, ירושלים | .10 |

L_C180857

JA2839

1 הסניגור המלומד היה מודע לכך שהנאשם הורשע בשש עבירות של גרימת
2 מוות בכוונה (רצח), והוא הותיר לביהמ"ש את ההכרעה בעניין מידת
3 העונש שיש להשית עליו. יחד עם זאת, ציין הסניגור הנכבד כי לדעתו
4 הפריזה התביעה הצבאית בעניין בקשת מאסרי העולם, ולגרסתו יש
5 להחזיר את ההתרחשויות "לפרופורציות הנכונות" שלהם.

6
7 בדברו האחרון בביהמ"ש סירב הנאשם לעמוד. אולם, לאחר שהובהר לו
8 שהוא חייב לעמוד, קם הנאשם על רגליו ואמר את הדברים הבאים: "זה
9 ביהמ"ש של טרור ואני לא מכיר את ביהמ"ש הזה. אני רוצה להגיד על
10 מה שהתובע אמר שאנחנו עשינו דברים קטלניים. מה שאתם עושים
11 עכשיו בעזה, זה יותר חמור ממה שאנחנו עשינו. אני רוצה להגיד שיש
12 חייל אסיר אצלנו ואנו נתייחס אליו כמו שאתם מתייחסים אלינו".
13 (פרוטוקול הדיון מיום 11/07/06 סוף עמ' 2)

14
15 הכפירה של הנאשם בסמכות העניינית של ביהמ"ש לדון אותו, היא
16 בעניינו משנית בלבד. אולם אין ספק בכך שהדברים שאמר הנאשם
17 מעידים כי גם עכשיו הוא סבור שיש הצדקה מלאה להתנהגותו הנפשעת
18 ולמעשי הרצח הנתעבים שביצע, והוא איננו מביע חרטה על הדברים גם
19 לאחר מעשה.

20
21 לא ניתן להתעלם מכך שהנאשם הורשע בעבר ובכל פעם שהשתחרר
22 ממאסר הגביר את פעילותו והעצים אותה. כך לדוגמא עסק הנאשם
23 "בתחילת דרכו" בזריקת אבנים ונשפט בגין כך בשנת 1994. לאחר
24 שחרורו "התקדם" הנאשם במדרג הלוחמני ובשנת 1999 הועמד לדין בגין
25 עבירות שעניינן זריקת בקבוקי תבערה. עם שחרורו ממאסר זה, לא
26 המתין הנאשם כלל ומיד הצטרף לפעילות הצבאית של חבריו, שאת
27 חלקם הכיר בין כותלי הכלא ואף תפס את הפיקוד על החוליה. הפעם עסק
28 הנאשם בצורה אינטנסיבית בזריעת הרג ואין מנוס מכך שיהיה נתון
29 מאחורי סורג ובריח לכל ימי חייו.

30
31 לעניישה יש כידוע מטרות שונות של מניעה והרתעת אחרים מלנהוג בדרכו
32 של הנאשם- וממנגד הצורך להתחשב בנסיבותיו האישיות של הנאשם,
33 ובנחיצות לשקמו ולהחזירו למסגרת נורמטיבית ובונה. אולם כאשר
34 המדובר במעשים כה חמורים כפי שעשה הנאשם, נדחה כל שיקול אישי
35 הקשור בנאשם ובמשפחתו מול החובה להגן על הציבור מפני מעלליו של
36 הנאשם בעתיד ; והעונש היחיד החולם את העניין הוא הרחקת הנאשם
37 לצמיתות מאחורי סורג ובריח.

38
39 מעשיו הנפשעים של הנאשם כבר תוארו בהכרעת הדין, ואין אנו רואים צורך... 3585
40 צורך לחזור על הדברים במסגרת זו. הנאשם הורשע לא רק בחבר... ה... עיר תל-אב...
41 ובארגון עוין ובהחזקת חומרי נפץ, אלא גם בביצוע פיגועים קשים נגד
42 כלי-רכב אזרחיים שנסעו לתומם בכביש יהודה- וכנגד סיור רגלי של
43 צה"ל, שנקלע לציר הראשי של עין-ירוד. כתוצאה ממעשים נפשעים אלו,

נאמן למקור

נרצחו באכזריות שלושה אזרחים ישראלים ושלושה חיילי צה"ל, שלאחר    1

רציחתם בידי הנאשם וחבריו, דאג הנאשם לוודא פעם נוספת את מותם.    2

רק אדם שאיבד צלם אנוש יכול לנהוג כך, וכל תוספת בסוגיה מיותרת.    3

   4

בהתאם להלכה שנקבעה ע"י ביהמ"ש הצבאי לערעורים זה מזמן, ראוי    5

להטיל מאסר עולם על נאשם בגין רציחתו של כל אדם וכן מאסר עולם    6

נוסף בגין נסיונותיו המרובים של הנאשם לגרום מוות וזאת עפ"י הלכת    7

**נופל.** לכן, לאחר ששמענו את טיעוני הצדדים, החלטנו ביום 11/07/06    8

לגזור על הנאשם את העונשים הבאים:    9

   10

א. מאסר עולם בגין רציחתו של דוד ציון ז"ל.    11

ב. מאסר עולם בגין רציחתו של צבי גולדסטיין ז"ל.    12

ג. מאסר עולם בגין רציחתו של שלום הר-מלך ז"ל.    13

ד. מאסר עולם בגין רציחתו של סמל רועי יעקב סולומון ז"ל.    14

ה. מאסר עולם בגין רציחתו של סמי"ר ארז עידן ז"ל.    15

ו. מאסר עולם בגין רציחתו של סמל אלעד פולק ז"ל.    16

ז. מאסר עולם נוסף בגין יתר העבירות בהן הורשע הנאשם.    17

   18

כל העונשים ירוצו במצטבר, כך שסה"כ ירצה הנאשם 7 מאסרי עולם    19

לריצוי במצטבר.    20

   21

**זכות ערעור תוך 30 יום מהיום.**    22

   23

**ניתן והודע היום, כ' תמוז תשס"ו, 16.7.06, בלשכה.**    24

   25

**מזכירות ביהמ"ש תעביר עותק מנימוקי גזר הדין לצדדים.**    26

   27

   28

   29

שופטת        אב"ד        שופט    30

   31

   32

   33

נאמן למקור

L_C180859

PX4009.pdf

JA2841

# ב י ת  ה מ ש פ ט  ה צ ב א י  י ה ו ד ה

**בפני כב׳ האב״ד :** רס״ן יאיר תירוש  
**השופטת :** רס״ן דליה קאופמן  
**השופט :** רס״ן מייקל בן-דוד

**התביעה הצבאית**  
(באמצעות קמ״ש סלבה פסק)

**נגד**

**הנאשם :** אחמד מוצטפא צאלח חאמד (נג׳אר), ת.ז. 1178199 / שב״ס - נוכח  
(באמצעות ב״כ עו״ד איליא תאודורי – נוכח)

---

## ג ז ר - ד י ן

לאחר ששמענו את טיעוני הצדדים, החלטנו לגזור על הנאשם את העונשים הבאים :

א.  מאסר עולם בגין רציחתו של דוד ציון ז״ל.  
ב.  מאסר עולם בגין רציחתו של צבי גולדסטיין ז״ל.  
ג.  מאסר עולם בגין רציחתו של שלום הרי-מלך ז״ל.  
ד.  מאסר עולם בגין רציחתו של סמל רועי יעקוב סולומון ז״ל.  
ה.  מאסר עולם בגין רציחתו של סמ״ר ארז עידן ז״ל.  
ו.  מאסר עולם בגין רציחתו של סמל אלעד פולק ז״ל.  
ז.  מאסר עולם נוסף בגין יתר העבירות בהן הורשע הנאשם.

כל העונשים ירוצו במצטבר, כך שסה״כ ירצה הנאשם 7 מאסרי עולם לריצוי במצטבר.

נימוקי גזר הדין המלאים יפורסמו בהמשך.

**זכות ערעור תוך 30 יום מיום מתן הנימוקים.**

**ניתן והודע היום, 11/07/06, בפומבי ובמעמד הצדדים.**

3585229 סא״ל מירב שטרן  
קצינת ק״ער תל-אביב

_____  _____  _____  
שופטת              אב״ד              שופט

נאמן למקור

-3-

בית המשפט הצבאי יהודה

בפני כב׳ האב״ד: רס״ן יאיר תירוש
השופטת: רס״ן דליה קאופמן
השופט: רס״ן מייקל בן-דוד

התביעה הצבאית
(באמצעות סרן סרגיי מורין)

נגד

הנאשם: אחמד מוצטפא צאלח חאמד (נאג׳ר), ת.ז.1178199/שב״ס
(באמצעות ב״כ עו״ד תאודורי)

רשמת: טור׳ נגה מימראן
מתורגמן: סמ״ר בדיע אסעד

**נאמן למקור**

---

## הכרעת דין

כנגד הנאשם הוגש כתב אישום המייחס לו שורה ארוכה של עבירות חמורות שעניינן
חברות בהתאחדות בלתי מותרת, גרימת מוות בכוונה, ניסיון לגרימת מוות בכוונה
ועבירות חמורות נוספות.

כל חומר הראיות בתיק הוגש בהסכמת הצדדים, והנאשם ויתר על פרשת ההגנה
בתנאי שהדבר לא יהווה חיזוק לראיות התביעה.

התביעה הצבאית הגישה סיכומים מפורטים בכתב במסגרתם ביקשה להרשיע את
הנאשם בכל העבירות המיוחסות לו בכתב האישום. הסנגור המלומד טען בעל פה
בפני ביהמ״ש וביקש לזכות את הנאשם בנוכח העובדה שאין בראיות התביעה כדי
להוכיח את האשמות כנגד הנאשם.

ביהמ״ש הצבאי לערעורים קבע בשורה ארוכה של החלטות כי מקום בו הוגש חומר
ראיות בהסכמה, חזקה שהההגנה אינו חולקת על אמיתות תוכנו של חומר הראיות
(עד״י אי״ש 114/01 **אבו הלאל נ׳ התוב״ץ** וע׳ אי״ש 75/02 **ברוגתי נ׳ התוב״ץ**).
בהתחשב בעובדה שכל חומר הראיות הוגש בתיק בהסכמה, הרי שעל ביהמ״ש לבחון
האם יש בחומר ראיות זה שהוגש לביהמ״ש , כדי להוכיח במידה הנדרשת על פי דין
את ההאשמות המיוחסות לנאשם בכתב האישום. נבחן אם כן אחת לאחת את
פרטי האישום המיוחסים לנאשם בכתב האישום ונבדוק האם הוצגו בפנינו ראיות
המוכיחות את אשמתו של הנאשם מעבר לכל ספק סביר.

### פרט אישום 1

פרט אישום זה מייחס לנאשם עבירה של ניסיון לגרימת מוות בכוונה, בכך שבשטחים
1997 ביחד עם אנשים נוספים הוא ביצע פיגוע ירי לעבר עמדת צה״ל הסמוכה
ליישוב עופרה. עיון בחומר הראיות בתיק ובעיקר בעדותו של חאלד עומר מיום
31.12.03 בעמ׳ 3 שורה 21 ואילך מגלה כי כל יסודותא העבירה מתקיימים. יודגש כי
תוספת ראייתית לאותה עדות ניתן למצוא בעדויות הרבות המצויות בתיק שיפורטו
בהמשך המתייחסים לפעילות המשותפת הרבה שביצע הנאשם עם אותו חאלד

-1-

1  עומר, לרבות עדותו של הנאשם עצמו המאשרת את הפעילות חברה שביצע יחד עם
2  חאלד עומר ועדויות השותפים הנוספים בהם יאסר חאמד ופרח חאמד.
3
4  בנסיבות האמורות מצאנו כי יש מקום להרשיע את הנאשם בביצועה של עבירה זו.
5

**פרט אישום 2**
6
7  פרט אישום זה מתבסס הן על עדותו של חאלד עומר והן על עדותו של הנאשם בפני
8  חוקר השב״כ ״מיכה״ שהונגשה בהסכמת הצדדים.  כמו כן מופלל הנאשם בביצוע
9  עבירה זו על ידי מספר עדים נוספים ובהם אחמד חאלד חאמד ופרח חאמד ויאסר
10 חאמד. עדויות אלו מבוססות במידה הנדרשת בדין את האשמה המיוחסת לנאשם
11 בפרט אישום זה חברות בהתאחדות בלתי מותרת.
12
13 בנסיבות המקרה הוכחו בפנינו כל יסודות העבירה, במידת ההוכחה הנדרשת כדין
14 ואנו קובעים כי יש להרשיע את הנאשם בעבירה של חברות ופעילות בהתאחדות
15 בלתי מותרת.
16

**פרט אישום 3**
17
18 פרט אישום זה מיוחס לנאשם בעבירה של ניסיון לגרימת מוות בכוונה, בכך שהשתתף
19 בפיגוע ירי בחודש אפריל 2003 במהלכו נפגע רכב שהסיע פועלים למקום עבודתם.
20 לאחר שבחנו את חומר הראיות בתיק הגענו למסקנות הבאות :
21
22 א.  הנאשם ביצע יחד עם חברו חאלד עומר פיגוע ירי באזור כביש 60 לעבר רכב
23     שהסיע פועלים . כמפורט בעדותו של בעדותו של חאלד עומר מיום 24.12.03
24     עמ׳ 7 שורה 16 ואילך.
25 ב.  קיימים הבדלים לא מבוטלים בין פיגוע הירי שאירע ביום 30.04.03 והתביעה
26     הצבאית טוענת כי הנאשם אחראי לו יחד עם חבריו, לבין עדותו של חאלד
27     עומר :
28
29 –   סוג הרכב הוא שונה.
30 –   צבע הרכב הוא שונה
31 –   קיים הבדל  משמעותי בתאריך ביצעו הפיגוע שכן חאלד עומר מדבר
32     על פיגוע שאירע בחודש יוני 2003 , כתודשיים לאחר האירוע שנגרם
33     לטענת התביעה על ידי הנאשם וחבריו.
34
35 בנסיבות האמורות, החלטנו לקבל את טענת הסנגור, ואנו קובעים כי קיים לשיטותנו
36 ספק סביר בשאלה האם הנאשם אכן גרם לפיגוע שאירע ביום 30.04.03 , ויש מקום
37 לזכותו מפרט האישום השלישי לכתב האישום.  עם זאת, נוכח העובדה שהוכח
38 בפנינו ביצועו של עבירה שעניינה ניסיון לגרימת מוות בכוונה על ידי הנאשם
39 וחבריו, אנו קובעים כי יש להרשיע את הנאשם בעבירה של ניסיון לגרימת מוות
40 בכוונה בגין מעשיו של מעשיו בגין מעשיו בפיגוע ירי זה.
41
42 כך למעשה אנו מרשיעים את הנאשם תחת העבירה המנויה בפרט האישום השלישי
43 בעבירה של ניסיון לגרימת מוות בכוונה, בכך שביצע פיגוע ירי בכביש 60 בחודש יוני
44 2003 במתכונת המתוארת בפרט האישום השלישי, כאשר לא הוכח בפנינו כי כתוצאה
45 ממעשיו של הנאשם נגרם כלשהו לרכוש, זאת בניגוד לפסקה 5 בפרט האישום
46 השלישי המקורי.
47

3585229 סא״ל מירב שטי
קצינת העיר תל-אביב

נאמן למקור

L_C180862

PX4009.pdf

JA2844

1
יודגש כי מאחר והנאשם וחברו פרח חאמד הם שירו את הירויות הקטלניות          2
וכתוצאה מהם נהרג צבי גולדסטיין ז"ל ונפצעו בני משפחתו שנסעו ברכב, הרי          3
שמתקיים היסוד העובדתי הנדרש להוכחת העבירות וקשר הסיבתי הנדרש על פי          4
דין להוכחת גרימת המוות בכוונה. 31 הכדורים שנורו על ידי הנאשם ושותפו הם          5
שגרמו למוות ולפציעה.          6
7
לאור האמור לעיל אנו קובעים כי יש להרשיע את הנאשם בביצוע שלושת העבירות          8
המפורטות בפרטי אישום 7 ו-8.          9
10
**פרטי אישום 9 ו-10**          11
פרטי האישום האמורים מייחסים לנאשם ולחבריו ביצוע פיגוע ירי, בו נרצח שלום          12
הר-מלך ז"ל ונפצעה אשתו לימור הר-מלך תבדל"א. בעקבות פציעתה של לימור הר-          13
מלך נדרשה לילדה בניתוח קיסרי.          14
15
התשתית הראייתית המתייחסת לפרט אישום זה אינה סבוכה, הנאשם מודה          16
בביצוע העבירות בחקירתו בשב"כ ומופל על ידי חבריו לחוליה. כך מציין הנאשם          17
בחקירתו מיום 21.12.03 בסעיף 24 כי ביצע ירי יחד עם חברו פרח חאמד לעבר רכב          18
בצבע אדום שנסע מכיוון דרום לצפון על ציר אלון. בעקבות הירי התהפך הרכב          19
ובמהלכו, לדבריו נהרג אחד הנוסעים. אף חבריו של הנאשם לרבות שותפו לביצוע          20
הירי פרח חאמד, בעדותו מיום 31.12.03 מאשרים את דבריו. הראיות הנוספות          21
בתיק משתלבות היטב בתיאור בתיאורו של הנאשם וחבריו את האירוע ואין ספק כי מדובר          22
באותו אירוע בו נרצח שלום הר-מלך ז"ל.          23
24
יודגש כי מאחר והנאשם הוא שירה יחד עם פרח חאמד 24 כדורים לעבר הרכב,          25
שבהם נפגע בראשו של שלום הר-מלך ז"ל, מתקיים הן היסוד העובדתי הנדרש וחן          26
הקשר הסיבתי בין מעשיו של הנאשם לבין מותו של הקורבן. אף היסוד הנפשי של          27
כוונה לגרום למוות מתקיים בנסיבות המקרה, כפי שעולה באופן ברור מהעדויות          28
בתיק שקושרות את הנאשם. לאור האמור הראיות בתיק שפורטו לעיל, ברור אף כי כל          29
יסודות העבירה של ניסיון לגרימת מוות בכוונה מתקיימים בנסיבות המקרה.          30
31
אשר על כן, אנו קובעים כי התביעה הצבאית הוכיחה מעבר לכל ספק סביר כי          32
הנאשם וחבריו ביצעו את העבירות המנויות בפרטי האישום התשיעי והעשירי לכתב          33
האישום.          34
35
**פרט אישום 11**          36
פרט אישום זה מייחס לנאשם החזקה של תומרי נפץ בכך שהחזיק ברשותו שקית          37
הכוללת בין היתר חצי קילוגרם של חומר נפץ, חוטים להפעלת מטען חבלה ושלושה          38
נפצים עם שני חוטי חשמל המחוברים לכל אחד מהם. הנאשם העביר את חומרי          39
התבלה האמורים לפרח חאמד כדי שיתביא אותם.          40
41
התביעה הצבאית מתבססת בטיעונינו על עדויותיהם של חאלד עומר, השאם פנאזי          42
ופרח חאמד. מעיון בעדויות האמורות עולה כי שותפו של הנאשם בביצוע העבירה          43
קושרים אותו באופן ברור לביצועם. כך באמרתו של חאלד עומר מיום 31.12.03          44
מעמ׳ 5 שורה 20 ואילך, עולה באופן ברור כי הנאשם ביצע את העבירה המיוחסת לו          45
בכתב האישום. הדברים אף מוצאים מקום בעדויות הנוספות בתיק לרבות עדותו          46
של פרח מיום 31.12.03 עמ׳ 1 המציין באופן מפורש כי הנאשם הביא לו את חומר          47
הנפץ האמור.          48
49

נאמן למקור

PX4009.pdf

לאור האמור לעיל אנו סבורים שהוכחה בפנינו כל יסודות העבירה ועל כן יש מקום
להרשיע את הנאשם בעבירה זו.

## פרט אישום 12

פרט אישום זה מייחס לנאשם עבירה של קשירת קשר לביצוע פשע בכך שתוחדש
ספטמבר 2003 תכנן עם חאלד עומר ומספר אנשים נוספים לבצע פיגוע ירי בסמוך
לעיר יברוד. הפיגוע לא יצא אל הפועל לאחר שהושגים החליטו לבטלו בעקבות הקמת
מגדלי שמירה של צה"ל באזור המתוכנן לביצוע הפיגוע.

התביעה הצבאית הסתמכה על עדותו של חאלד עומר באמרתו במשטרה מיום
31.12.03, שהוגשה בהסכמת הצדדים. בעמ' 2 משורה 26 ואילך מספר חאלד על
התכנון לבצע את הפיגוע. יצוין כי תוספבת ראייתית לעדות זו מצאנו בעדויות הרבות
המצויות בתיק שפורטו לעיל המתייחסות לפעילותה המשותפת של הנאשם וחאלד
עומר, לרבות עדויותיהם של פרח חאמד, יאסר חאמד, השאם חיגיאזי ואף את דבריו
של הנאשם המאשר את פעילותו עם העד, בשורה ארוכה של פיגועים אחרים.

מאחר שמדובר במסכת עובדתית אחת , הרי שעל פי הלכה הפסוקה די בראיות
אלה כדי לעמוד בתנאים הקבועים בחוק ולהוות תוספת ראייתית מספקת בנסיבות
העניין.

אשר על כן, משהוכחו בפנינו העובדות הרלוונטיות והתקיימותה של העבירה בפרט
האישום ה-12, אנו מרשיעים את הנאשם בעבירה זו.

## פרט אישום 13

פרט אישום זה מייחס לנאשם עבירה של ניסיון לגרימת מוות בכוונה. על פי כתב
האישום השתתף הנאשם יחד עם חבריו בפיגוע ביום 19.09.03. במהלך אותו
נסע הנאשם ברכב מסוג סובארו ותפקידו היה להתריע ולאבטח את ציר נסיעתם של
שלושה חבריו חוליה, אשר היו מיועדים לבצע את פיגוע הירי. סמוך לשעה 10:00
בעת שהגיע למקום רכב מסוג פולקסווגן, בו נהג יצחק פאראוי, ירו חבריו של
הנאשם לעבר הרכב.

הנאשם אשר איבטח את נסיעת שותפיו ונסע לפניהם ברכבו, נדרש בסיום הפיגוע
לחלץ את שלושת המפגעים לאחר שאירעה תקלה ברכבם. בעקבות בקשתם נסע
הנאשם לאחר שביצע את הפיגוע ומילט מהמקום את שלושת המפגעים.

יצוין כי עקב קב המידור, בין חברי החוליה לא הכירו שלושת המפגעים את הנאשם,
מאחר שהיו חברים בחוליה שנייה מקבילה של החמאס באזור בנימין.

התביעה הצבאית מתבססת בעיקר על עדותו של השאם חיגיאזי, אשר היה למעשה
אחראי על הנאשם  בתקופה בה נעברה הפיגוע האמור. באותה עדות מיום 20.12.03
שנכתבה בעת חקירתו בשב"כ, מפרט חיגיאזי בסעיפים 7.62-7.71, כיצד בוצע אותו
פיגוע ומרחיב בעניינו חלקו של הנאשם בביצוע הפיגוע לרבות תפקידו כמאבטח פותח
הציר והעובדה שהנאשם סייע לחלץ את חברי החוליה מהמקום לאחר שרכבם מסוג
סובארו התקלקל במהלך בריחתם. השאם מציין כי הוא בעצמו יצר קשר עם
הנאשם קודם לפגוע ובקש ממנו לאבטח את הציר. כמו כן, מתאר השאם חיגיאזי
את שיחת הטלפון שערך עם הנאשם ביום הפיגוע לאחר שרביע תמידה התקשר אליו
וציין כי הרכב שלהם התקלקל ובה שמע מהנאשם כי כבר יצר קשר עם חבריו
החוליה והוא בדרכו לחלצם.



נאמן למקור
סאייל מירב שטרן   3585229
קצינת העיר תל-אביב

L_C180865

JA2847

PX4009.pdf

אמרתו של השאם חיג׳אזי נתמכת בעדויותיהם של מגדי נעסאן וכן בעדותו של
מחמוד סעד :

מגדי נעסאן מעדותו ביום 17.12.03 בעמ׳ 5-4 מתייחס לפיגוע האמור ומתאר ירי
לעבר רכב ישראלי בצבע לבן שנסע מכיוון כוכב השחר לכיוון מעלה אפריים. באותה
עדות מציין נעסאן, כי לאחר שבוצע הפיגוע התקלקל הרכב.
במשטרה מיום 22.12.03 עמ׳ 3 שורה 24 ואיל״כ מתייחס העד לפיגוע ומציין כי
השלושה ביצעו ירי לעבר רכב לבן , כבל הנראה מסוג ״אופל״ שנסע בכביש ולאחר
הפיגוע הרכב התקלקל, מגדי החביא את כלי הנשק ורכב בו נהג אדם שהוא אינו
מכיר הסיע אותך לכפר מאלב.

כפי שנכתבה בהודעה על עובדות מוסכמות, אין חולק כי באותו אירוע נתפם רכב
מסוג סובארו (רכבם של שלושת המפגעים), אשר התקלקל בסמוך למקום בו בוצע
הירי.

בנסיבות האמורות ונוכח השתלבות הגרסאות, במיוחד ככל שהדבר נוגע למקום
ביצוע הפיגוע ולעובדה שרכבם של המפגעים נתפס באותו היום , בסמוך למקום
הפיגוע, אנו מגיעים למסקנה כי העדים מדברים על האירוע בו נורו יריות לעבר
מכוניתו של יצחק פאראוי.

### פרט אישום 14
פרט אישום זה מייחס לנאשם עבירה של ניסיון לגרימת מוות בכוונה בכך שהשתתף
עם אנשים אחרים בפיגוע ביום 06.10.03 , בו הופעל מטען חבלה לעבר ג׳יפ צבאי
וגרם לפציעה קלה של אחד החיילים. חלקו של הנאשם באירוע , כמפורט בכתב
האישום התמצא בתכנון לביצוע הפיגוע ובאמצעות מטען החבלה שקיבל לידו ,
כמפורט בפרט האישום ה-11. בסופו של דבר הפיגוע לא יצא אל הפועל מאחר
ובטרם הספיקו הנאשם וחבריו לבצע את הפיגוע, הותלה על ידי הנאשם והשאם
חיג׳אזי, כי מטען החבלה יועבר לחוליה הצבאית בראשות השאם חיג׳אזי על מנת
שהם יבצעו את הפיגוע האמור.

העובדות המפורטות בפרט האישום מגלות כי הנאשם שימש למעשה כמסייע
בהעברת חומר הנפץ להשאם חיג׳אזי לצורך ביצוע הפיגוע ולא השתתף בעצמו בפיגוע
האמור. חומר הראיות מתבסס למעשה על עדויותיהם של שורת של עדים אשר
השתתפו בהכנת המטען ביניהם, רבע חמידה, מגדי נעסאן ואנשים נוספים, אשר
למעשה לא היה כל קשר ישיר בינם לבין הנאשם , אך הם מתארים את ביצוע הפיגוע
האמור.

בעדותו של פרח חאמד מיום 31.12.03 בה הוא מתאר כיצד הכינו הנאשם וחבריו את
המטען, הוא מציין במפורש בעמ׳ 2 שורה 21, כי הנאשם סיפר לו שהוא לוקח את
המטען לחולייה נוספת שתבצע פיגוע באותו מטען וכעבור יומיים אף עדכן אותו כי
אותו פיגוע אכן בוצע. אף השאם חיג׳אזי בזכ״דים מחקירתו בשב״כ מאמת את
העובדה כי הנאשם הוא זה שמסר את המטען לצורך ביצוע הפיגוע.

העדויות האמורות מוכיחות מעבר לכל ספק סביר כי אכן הנאשם התכוון לסייע
לחברי החוליה השנייה לבצע את הפיגוע כך שמתקיים הן היסוד הנפשי והן היסוד
העובדתי הדרושים לצורך הוכחות ביצוע העבירה של סיוע לניסיון לגרימת מוות
בכוונה.



נאמן למקור

3585229 סא״ל מידב שטרן
קצינת העיר תל-אביב

PX4009.pdf

L_C180866

JA2848

עם זאת, אין מקום להרשיע את הנאשם בעבירה של ניסיון לגרימת מוות בכוונה
מאחר ונחלקו התמצאה בסיוע בלבד על ידי אספקת מטען התבלה והוא לא היה חלק
מהמעגל הפנימי של מבצעי הפיגוע ואין לראות בו כמבצע עיקרי של הפיגוע.

אשר על כן, אין מקום להרשיעו בעבירה של ניסיון לגרימת מוות בכוונה אלא
בעבירה של סיוע לניסיון לגרימת מוות בכוונה.

אשר לפציעת החייל אשר נגרמה לטענת התביעה הצבאית בפיגוע זה. מאחר ולא
הובאו בפנינו ראיות חד משמעיות המוכיחות כי אכן נפצע חייל ובהעדר תיק
פ.א המאמת את אותה פציעה, לא ניתן לקבוע מעבר. לכל ספק סביר כי אכן נפצע
באותו אירוע חייל ועל כן אנו מחליטים שלא להרשיע את הנאשם בסיפא של סעיף
11 לפרט האישום ה-14.

לסיכום, אנו מרשיעים את הנאשם בעבירה של סיוע לניסיון לגרימת מוות בכוונה,
בגין חלקו בהעברת המטען אשר גרם לפיצוץ ביום 06.10.03, לעבר ג'יפ צבאי באזור
מעייר ומזכים אותו מעבירה של ניסיון לגרימת מוות בכוונה.

### פרט אישום 15,16,17 ו-18

פרטי האישום האמורים מתייחסים לפיגוע שבוצע לטענת התביעה הצבאית על ידי
הנאשם ושותפיו בכפר עין יברוד בו נרצחו סמ"ר ארז עידן ז"ל, סמל אלעד פולק ז"ל
וסמל רועי יעקב סולמון ז"ל . באותו אירוע נפצע גם חברם של השלושה סמי"ר שחף
גלעד כתוצאה מהירי שביצעו הנאשם וחבריו.

הנאשם בעדותו בשב"כ מודה בפה מלא בביצוע העבירה. כך בסעיפים 25-27 לזכ"ד
מיום 21.12.03 מתאר הנאשם את ביצוע הפיגוע במילים הבאות:

‏"25. תכנון פיגוע נגד חיילים בעין יברוד.

25.1 לפני כחודשיים לערך, העלה חברי החוליה בסילואד רעיון לתקוף ולהרוג
את החיילים אשר ביצעו באופן סדיר סיורים בכפר עין יברוד.

25.2 החיילים ערכו סיורים באופן יום-יומי בכפר אולם לא בשעות קבועות
לעיתים בבוקר ולעיתים בערב ובחוליות של ארבעה כל פעם.

25.3 הנדון (הנאשם) העלה את הרעיון בפני השאם חיגאזי והלה הסכים
לביצוע הפיגוע וציין כי לצורך הפיגוע יצרף את אנשי חולייתו, אותם הנדון
אינו מכיר.

25.4 לצורך תכנון הפיגוע יצאו את הנדון, מואיד חמאד, פרח חאמד והשאם
חיגאזי , ברכבו של הנדון לסיור בכפר.

25.5 במהלך הסיור הבחינו בחומת בטון הנמצאת בסמוך לבית בכפר
שמאחוריה מספר עצים , על הציר הראשי של עין יברוד.

25.6 הנדון והשאם תכננו שהנדון יבוא עם שניים נוספים מחולייתו ואילו
מחולייתו של השאם יצטרפו שניים לביצוע הפיגוע.

נאמן למקור

PX4009.pdf

L_C180867

JA2849

25.7 הנדון תיאם עם השאם כי ביום שלאחר הסיור יתבצע הפיגוע ומבצעי הפיגוע יגיעו לאזור המערב ברכב, ולאחר שיתמקמו הרכבים, יעזבו את המקום.

25.8 לאחר ביצוע הפיגוע תכננו לברוח מהמקום בכלי הרכב שהביאו אותם למקום הפיגוע.

25.9 הרכבים היו צריכים להמתין במרחק של כ-300 מטר מממקום המארב בקשר עין עם מבצעי הפיגוע באופן שיאפשרו להם לדעת ברגע שהפיגוע יסתיים ואז להגיע כדי למלט את היורים מהמקום.

25.10 התכנון היה שלמחרת בסביבות השעה 18:00 בערב יתמקמו חברי שתי החוליות לביצוע הפיגוע.

25.11 יומיים או שלושה לפני היציאה לסיור העביר השאם לבית הנדון שני רובי קלצ'ניקוב נוספים , אותם היו אמורים לקחת עימם לביצוע הפיגוע.

25.12 הנדון לקח את הקלצ'ניקובים והחביא אותם בנקודת המסתור המוזכרת לעיל יחד עם יתר כלי הנשק של החוליה.

26. ביצוע פיגוע ירי נגד חיילים בעין יברוד.

26.1 למחרת בשעה 16:00 לערך לקח הנדון את רכבו מסוג דיהטסו ונסע לביתו של פרח חאמד שם אסף את חאלד, מואיד ופרח.

26.2 הארבעה הכניסו את ארבעת הקלצ'ניקובים וה M-16 של החוליה לתוך תיק יד שחור מבד, אותו הכניסו לתא המטען של רכב הנדון ונסעו לעין יברוד. ברכב נהג חאלד, אשר שימש כנהג.

26.3 בדרך לבשו כולם כיסויי פנים אותם קנה השאם חיגאזי ברמאללה עבור הפיגוע והעביר אותם לנדון יום לפני ביצוע הפיגוע.

26.4 כאשר הגיעו למקום המארב המתוכנן, ירדו הנדון , פרח ומואיד והתמקמו מאחורי חומת הבטון שאותה איתרו במקום המארב. הנדון לקח עימו את התיק עם חמשת כלי הנשק , אותו הביאו עימם.

26.5 במקום פגשו שני רעולי פנים להם העבירו שני כלי נשק מתוך החמישה עימם הגיעו.

26.6 הנדון איננו זוכר מי השתמש ב M-16 אולם זוכר כי היה חמוש בנשק מסוג קלצ'ניקוב.

26.7 לאחר שהתמקמו בנקודת המארב, המתינו החמישה כחצי שעה לערך תוך שהם שוכבים על העפר שמאחורי חומת הבטון, באופן שאפשר להם תצפית על הציר באופן שיכלו לראות את הסיור כאשר הוא מגיע מהאזור.

26.8 הנדון שכב במרכז, כאשר מכל צד שכבו שני חמושים אשר המתינו כמוהו להגעת החיילים.

נאמן למקור



3585229 סא"ל מירב שטרן
קצינת  העיר  תל-אביב

L_C180868
PX4009.pdf
JA2850

26.9 לאחר כחצי שעה ראה הנדון ארבעה חיילים מגיעים מצד שמאל, כאשר
הם הולכים בקבוצה שבה שניים הולכים מקדימה ושניים מאחורה.

26.10 כאשר הגיעו החיילים הראשונים למרחק של 5 מטרים לערך היו
החיילים בזוג האחורי במרחק של כ-10 מטרים מהנדון וחבריו.

26.11 ממרחק זה פתחו הנדון וחבריו באש בצרורות לעבר חיילי הסיור, עד
שכולם נפלו, ואזי הבחינו הנדון וחבריו בשלושה חיילים מוטלים על הארץ
וחייל נוסף נעלם מבלי שראו לאן.

26.12 הנדון וארבעה שהיו עימו קפצו מעל חומת הבטון אל הרחוב והתקרבו
אל שלושת החיילים וירו בהם פעם נוספת, כאשר הנדון יורה בשלושת
החיילים אשר שכבו על הרצפה על מנת לוודא את הריגתם...״

כפי שניתן לראות באופן ברור מעדותו של הנאשם עצמו בשב״כ, הוא מילא תפקיד
מרכזי בפיגוע בו נרצחו שלושה חיילי צה״ל ונפצע חייל נוסף. דבריו בשב״כ נתמכים
בעדויות נוספות בתיק לרבות עדויות שותפיו לביצוע העבירות, וכן העדויות
הטכניות שהוגשו לביהמ״ש המאמתות את דבריו בחקירתו בשב״כ לעניין האופן בה
בוצע הפיגוע הרצחני.

כפי שניתן לראות הנאשם עצמו הוא זה שתכנן את הפיגוע, יחד עם אנשים נוספים.
הוא זה שירה בעצמו בחיילי צה״ל ואף אכזרי רצח אותם מטווח קרוב כדי
לוודא את מותם.

בנסיבות העניין חוכח בפנינו מעבר לכל ספק סביר כי הנאשם ביצע את כל יסודות
העבירות המנויות בפרטי האישום ה-15 עד ה-18 לכתב האישום ואנו מרשיעים
אותו בביצוע העבירות האמורות.

**פרט אישום 19**
פרט אישום זה עניינו ניסיון לגרימת מוות בכוונה באמצעות משאית אשר תכננו
הנאשם וחבריו לבצע לאחר ביצוע הפיגוע בעין יברוד. כמפורט בכתב האישום ערכו
הנאשם וחבריו ניסוי כדי לבצע את הפיגוע האמור.

בזכד המתועד את חקירתו של הנאשם מיום 21.12.03, בסעיפים 28 ו-29, מתייחס
הנאשם בהרחבה לניסיון לגרימת מוות בכוונה ואף מפרט כיצד תכננו הנאשם
וחבריו לבצע את הפיגוע, את התכנונים שעשו על מנת לבצעו ואת הסיבה שבגללה
נכשל ביצוע הפיגוע. שותפיו של הנאשם לתכנון הפיגוע מפרטים אף הם בהרחבה
כיצד תכנן לבצע פיגוע ואת פעילותם לבצע את תוכניתם הזדונית.

אף שקיימות מספר גרסאות באשר למשתתפים בפיגוע, ואף סתירות קלות באשר
לפרטי התכנון המדויקים, אין מדובר בסתירות מהותיות.

על פי חומר הראיות הנאשם וחבריו תכננו לבצע את הפיגוע ומשורה של גורמים
שונים לא הצליחו לבצע אותו וזאת בשל נסיבות שאינן תלויות בהם, כגון נוכחות
ערה מן הרגיל של כוחות צה״ל וכן אי הגעה של כוחות צה״ל למקום במועד אחר.

-9-
סא״ל מירב שטרן 3585229
קצינת העיר תל-אביב
נאמן למקור
L_C180869
PX4009.pdf
JA2851

בנסיבות האמורות, לאור חומר הראיות האמור , אנו קובעים כי הוכח בפנינו ביצוע   1
העבירה המיוחסת לנאשם בפרט האישום 19 לכתב האישום על יסודותיה השונים   2
ומרשיעים את הנאשם בביצועה.   3
  4
**סוף דבר**   5
  6
אנו מרשיעים את הנאשם בעבירות המיוחסות לו בפרטי האישום   7
1,2,4,5,6,7,8,9,10,11,12,13,15,16,17,18,19 בכתב האישום.   8
  9
ביחס לפרט האישום ה-3, אנו מרשיעים את הנאשם בעבירה של ניסיון לגרימת   10
מוות בכוונה כמפורט בהכרעת הדין ומזכים אותו מגרימת הנזק לרכב המפורטת   11
בכתב האישום.   12
  13
ביחס לפרט האישום ה -14, אנו מרשיעים את הנאשם בעבירה של סיוע לניסיון   14
לגרימת מוות בכוונה בכוונה כמפורט בהכרעת הדין, ומזכים אותו מהעבירה של ניסיון   15
לגרימת מוות בכוונה בכוונה שיוחסה לו בכתב האישום.   16
  17
  18
ניתן והודע היום, 29.05.06, בפומבי ובמעמד הצדדים   19
  20
  21
  22

שופט               אב״ד             שופט



נאמן למקור

נחתם

L_C180870

PX4009.pdf

JA2852



143 RODNEY STREET
BROOKLYN, N.Y. 11211
TEL. (718) 384-8040
FAX: (718) 388-3516

# Certificate of Accurate Translation

Translated document: **L_C180856-70**  Source Language: **Hebrew**

Translation date: **August, 27, 2013**  Target Language: **English**

Description of Document: **Sentence and Verdict of Ahmed Mustafa Saleh Hamed (Najar)**

Targem Translations, a language services provider in the New York metropolitan area with more than 50 years of professional experience, hereby certifies and states that the above mentioned document has been translated and edited by a team of highly skilled translators and editors who have the background and experience needed to perform the translation and editing. We further certify that, to the best of our knowledge, the translated English document is an accurate translation of the original Hebrew document and that reflects the content and meaning of the original Hebrew document.

Yours Sincerely

Wolf Markowitz, Manager
**Targem Translations**

PROFESSIONAL
TRANSLATIONS
OF FOREIGN
LANGUAGES



**JA2853**

בית המשפט הצבאי יהודה

בפני כב' האב"ד : רס"ן יאיר תירוש
השופטת: רס"ן דליה קאופמן
השופט: רס"ן מייקל בן-דוד

התביעה הצבאית
(באמצעות קמ"ש סלבח פסק)

ה נ א ש ם : אחמד מוצטפא צאלח חאמד (נג'אר) ,ת.ז. 001113836 / שב"ס
(באמצעות ב"כ עו"ד תאודורי)

**נימוקי גזר הדין**

הנאשם שהוא כיום כבן 30 ותושב סלוואד שבתבל יהודה, הורשע על ידינו
ביום 29/05/06 בשורה ארוכה של עבירות כמו חברות בהתאחדות בלתי
מותרת, גרימת מוות בכוונה, ניסיון לגרימת מוות בכוונה, קשירת קשר
לביצוע עבירה, החזקת חומרי נפץ- ועבירות חמורות נוספות. במהלך
ביצוע הפעילות הענינית על ידי הנאשם וחבריו נרצחו 6 אזרחים וחיילים
ישראלים- ואחרים נפצעו. פעילות הנאשם התבצעה במסגרת חוליה
צבאית של עזדין אלקסאם, הפלג הצבאי של ארגון החמאס. בנוסף,
"לפעילות השגרתית" של הנאשם במסגרת ארגון אסור, שמו הנאשם
וחבריו כמטרה לעצמם לפגוע ולהרוג אזרחים ישראלים וחיילי צה"יל
רבים ככל שיצליחו, ופעלו לשם כך ללא לאות ע"י יזום ותכנון פיגועים
שונים ומשונים, אותם ניסו לבצע.

התביעה הצבאית ביקשה להחמיר בעונשו של הנאשם שחורשע ברצח של
שלושה אזרחים ושלושה חיילי צה"יל ובפציעתם של אחרים- ולגזור עליו
9 מאסרי עולם מצטברים בשל רציחתם ששת הישראלים ובגין יתר
הפעילות של הנאשם אשר כללה בין השאר, מסי ניסיונות לגרימת מוות
בכוונה של אזרחים ישראלים וחיילי צה"יל.

לדעת התביעה הצבאית, חייב ביהמ"ש לתעביר מסר תקיף, ברור וחד, הן
לנאשם והן לאחרים האמורים לבצע מעשים נפשעים כדוגמת אלה שעשה
הנאשם, כי הם יורחקו לצמיתות מחברת בני-אנשי נורמטביבים
וחופשיים ; ויוותרו עד ליום מותם מאחורי סורג ובריח.

קצינת הָעִיר תל-אביב
סאל"מ מירב שטרן 35585229

-1-

L_C180856

PX4009.pdf

**JA2854**

# APOSTILLE
## (CONVENTION DE LA HAYE 5 DU OCTOBER 1961)



| | | | |
|---|---|---|---|
| 1. | STATE OF ISRAEL | | מדינת ישראל .1 |
| 2. | THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY MR./MS | שטרן מירב STERN MERAV | מסמך ציבורי זה נחתם בידי מר/גב׳ .2 |
| 3. | ACTING IN THE CAPACITY OF CITI OFFICER FOR MILITARY MATTERS | | המכהן בתואר ק.העיר ת"א .3 |
| 4. | BEARS THE SEAL/STAMP OF THE MINISTRY OF | צבא ההגנה לישראל ISRAELI DEFFENCE | נושא את החותמ/ה/ות/מת של משרד .4 |
| 5. | CERTIFIED AT THE MINISTRY OF FOREIGN AFFAIRS | | אושר במשרד־ החוץ .5 |
| 6. | THE | 5/10/2011 | ביום .6 |
| 7. | BY | שיר צ׳קבאשווילי BHIR TZIKWASHVLY החטיבה הקונסולרית CONBULAR BUREAU | על־ידי .7 |
| 8. | NO 528790. | | מס׳ 528790 .8 |
| 9. | SEAL/STAMP | | חותמ/חותמת .9 |
| 10. | SIGNATURE, JERUSALEM | | חתימה, ירושלים .10 |

L_C180857

PX4009.pdf

JA2855

1  הסניגור המלומד היה מודע לכך שהנאשם הורשע בשש עבירות של גרימת
2  מוות בכוונה (רצח), והוא הותיר לביהמ״ש את ההכרעה בעניין מידת
3  העונש שיש להשית עליו. יחד עם זאת, ציין הסניגור הנכבד כי לדעתו
4  הפריחה התבצעית הצבאית בעניין בקשת מאסרי העולם, ולגרסתו יש
5  להחזיר את ההתרחשויות ״לפרופורציות הנכונות״ שלהם.
6
7  בדברו האחרון בביהמ״ש סירב הנאשם לעמוד. אולם, לאחר שהובחר לו
8  שהוא חייב לעמוד, קם הנאשם על רגליו ואמר את הדברים הבאים : ״זה
9  ביהמ״ש של טרור ואני לא מכיר את ביהמ״ש הזה. אני רוצה להגיד על
10 מה שהתובע אמר שאנחנו עשינו דברים קטלניים, מה שאתם עושים
11 עכשיו בעזה, זה יותר חמור ממה שאנחנו עשינו. אני רוצה להגיד שיש
12 חייל אסיר אצלנו ואנו נתייחס אליו כמו שאתם מתייחסים אלינו״.
13 (פרוטוקול הדיון מיום 11/07/06 סוף עמ׳ 2)
14
15 הכפירה של הנאשם בסמכות העניינית של ביהמ״ש לדון אותו, היא
16 בעניינו משנית בלבד. אולם אין ספק בכך שהדברים שאמר הנאשם
17 מעידים כי גם עכשיו הוא סבור שיש הצדקה מלאה להתנהגותו הנפשעת
18 ולמעשה חרצת הנתעבים שביצע, והוא איננו מביע חרטה על הדברים גם
19 לאחר מעשה.
20
21 לא ניתן להתעלם מכך שהנאשם הורשע בעבר ובכל פעם שהשתחרר
22 ממאסר הגביר את פעילותו והעצעים אותה. כך לדוגמא עסק הנאשם
23 ״בהתחלת דרכו״ בזריקת אבנים ונשפט בגין כך בשנת 1994. לאחר
24 שחרורו ״התקדם״ הנאשם במדרג הלוחמני ובשנת 1999 הועמד לדין בגין
25 עבירות שעניינן זריקת בקבוקי תבערה. עם שחרורו ממאסר זה, לא
26 המתין הנאשם כלל ומיד הצטרף לפעילות הצבאית של חבריו, שאת
27 חלקם הכיר בין כתלי הכלא ואף תפס את הפיקוד על החוליה. תפעח עסק
28 הנאשם בצורה אינטנסיבית בזריעת הרג ואין מנוס מכך שיהיה נתון
29 מאחורי סורג ובריח לכל ימי חייו.
30
31 לעונשים יש כידוע מטרות שונות של מניעה והרתעת אחרים מלנהוג בדרכו
32 של הנאשם- ומצד הצורך להתחשב בנסיבותיו האישיות של הנאשם,
33 ובנגזרויות לשיקומו ולהחזירו למסגרת נורמטיבית ובונה. אולם כאשר
34 בוחנים את מעשיו כה חמורים של הנאשם כפי שעשה הנאשם, נדחה כל שיקול אישי
35 הקשור בנאשם ובמשפחתו מול החובה להגן על הציבור מפני מעלליו של
36 הנאשם בעתיד ; והעונש היחיד ההולם את העניין הוא הרחקת הנאשם
37 לצמיתות מאחורי סורג ובריח.
38
39 מעשיו הנפשעים של הנאשם כבר תוארו בהכרעת הדין, ואין אנו רואים
40 צורך לחזור על הדברים במסגרת זו. הנאשם הורשע לא רק בחבלה
41 ובארגון עין ובהחזקת חומרי נפץ, אלא גם בביצוע פיגועים קשים נגד
42 כלי-רכב אזרחיים שנסעו לתומם בכבישי יהודה- וכנגד סיור רגלי של
43 צה״ל, שנקלע לציר הראשי של אעין-יברוד. כתוצאה ממעשים נפשעים אלו,

נאמן למקור

L_C180858

PX4009.pdf

תאריך: כ' תמוז, תשס"ו        תיק מס': 1172/04
16 יולי, 2006

נרצחו באכזריות שלושה אזרחים ישראלים ושלושה חיילי צה"ל, שלאחר
רציחתם בידי הנאשם וחבריו, דאג הנאשם לוודא פעם נוספת את מותם.
רק אדם שאיבד צלם אנוש יכול לנהוג כך, וכל תוספת בסוגיה מיותרת.

בהתאם להלכה שנקבעה ע"י ביהמ"ש הצבאי לערעורים זה מזמן, ראוי
להטיל מאסר עולם על נאשם בגין רציחתו של כל אדם וכן מאסר עולם
נוסף בגין נסיונותיו המרובים של הנאשם לגרום מוות וזאת עפ"י הלכת
נופל. לכן, לאחר ששמענו את טיעוני הצדדים, החלטנו ביום 11/07/06
לגזור על הנאשם את העונשים הבאים:

א. מאסר עולם בגין רציחתו של דוד ציון ז"ל.

ב. מאסר עולם בגין רציחתו של צבי גולדסטיין ז"ל.

ג. מאסר עולם בגין רציחתו של שלום הר-מלך ז"ל.

ד. מאסר עולם בגין רציחתו של סמל רועי יעקוב סולומון ז"ל.

ה. מאסר עולם בגין רציחתו של סמ"ר ארז עידן ז"ל.

ו. מאסר עולם בגין רציחתו של סמל אלעד פולק ז"ל.

ז. מאסר עולם נוסף בגין יתר העבירות בהן הורשע הנאשם.

כל העונשים ירוצו במצטבר, כך שסה"כ ירצה הנאשם 7 מאסרי עולם
לריצוי במצטבר.

**זכות ערעור תוך 30 יום מהיום.**

**ניתן והודע היום, כ' תמוז תשס"ו, 16.7.06, בלשכה.**

**מזכירות ביהמ"ש תעביר עותק מנימוקי גזר הדין לצדדים.**

שופט          אב"ד           שופט

נאמן למקור

-3-

ב י ת ה מ ש פ ט ה צ ב א י י ה ו ד ה

בפני כב׳ האב״ד: רס״ן יאיר תירוש
השופטת: רס״ן דליה קאופמן
השופט: רס״ן מייקל בן-דוד

התביעה הצבאית
(באמצעות קמ״ש סלבה פסק)

נגד

הנאשם: אחמד מוצטפא צאלח חאמד (נג׳אר), ת.ז. 1178199 / שב״ס - נוכח
(באמצעות ב״כ עו״ד איליא תאודורי – נוכח)

---

## ג ז ר - ד י ן

לאחר ששמענו את טיעוני הצדדים, החלטנו לגזור על הנאשם את העונשים הבאים:

א. מאסר עולם בגין רציחתו של דוד ציון ז״ל.
ב. מאסר עולם בגין רציחתו של צבי גולדסטיין ז״ל.
ג. מאסר עולם בגין רציחתו של שלום הר-מלך ז״ל.
ד. מאסר עולם בגין רציחתו של סמל רועי יעקב סולומון ז״ל.
ה. מאסר עולם בגין רציחתו של סמ״ר ארז עידן ז״ל.
ו. מאסר עולם בגין רציחתו של סמל אלעד פולק ז״ל.
ז. מאסר עולם נוסף בגין יתר העבירות בכן הורשע הנאשם.

כל העונשים ירוצו במצטבר, כך שסה״כ ירצה הנאשם 7 מאסרי עולם לריצוי
במצטבר.

נימוקי גזר הדין המלאים יפורסמו בהמשך.

**זכות ערעור תוך 30 יום מיום מתן הנימוקים.**

ניתן והודע היום, 11/07/06, בפומבי ובמעמד הצדדים.

_____     _____     _____
שופטת                    אב״ד                    שופט

סא״ל מירב שטרן 3585229
קצינת קעיר תל-אביב

נאמן למקור

-3-

L_C180860

PX4009.pdf

JA2858

בית המשפט הצבאי יהודה

בפני כב' האב"ד: רס"ן יאיר תירוש
השופטת: רס"ן דליה קאופמן
השופט: רס"ן מייקל בן-דוד

התביעה הצבאית
(באמצעות סרן סרגיי מורין)

נגד

הנאשם:אחמד מוצטפא צאלח חאמד (נאג'ר), ת.ז/11781991/שב"ס
(באמצעות ב"כ עו"ד האודורי)

רשמת: טור' נגה מימראן
מתורגמן: סמ"ר בדיע אסעד

נאמן למקור

הכרעת דין

כנגד הנאשם הוגש כתב אישום המייחס לו שורה ארוכה של עבירות חמורות שעניינן
חברות בהתאחדות:בלתי מותרת, גרימות מוות בכוונה, ניסיון לגרימת מוות בכוונה
ועבירות חמורות נוספות.

כל חומר הראיות בתיק הוגש בהסכמת הצדדים, והנאשם ויתר על פרשת החהגנה
בטענאי שדחבר לא יהווה חיזוק לראיות התביעה.

התביעה הצבאית הגישה סיכומים מפורטים בכתב במסגרתם ביקשה להרשיע את
הנאשם בכל העבירות המיוחסות לו בכתב האישום. הסנגור המלומד טען בעל פה
בפני ביהמ"ש וביקש לזכות את הנאשם בנוכח העובדה שאין בראיות התביעה כדי
להוכיח את האשמות כנגד הנאשם.

ביהמ"ש הצבאי לערעורים קבע בשורה ארוכה של החלטות כי מקום בו הוגש חומר
ראיות בהסכמה, חזקה שההגנה אינו חולקת על אמיתות תוכנו של חומר הראיות
(עד"אי אי/114/01 אבו הלאל נ' התוב"ץ ועי אישו 75/02 ברגותי נ' התוב"ץ).
בתחתשע בעובדה שכל חומר הראיות הוגש בתיק בהסכמה, הרי שעל ביהמ"ש לבחון
האם יש בחומר ראיות זה שהונגש לביהמשש , כדי להוכיח במידה הנדרשת על פי דין
את האשמות המיוחסות לנאשם בכתב האישום. נבחן אם כן אחת לאחת את
פרטי האישום המיוחסים לנאשם בכתב האישום ונבדיק האם הונגחו חומר ראיות
המוכיחות את אשמתו של הנאשם מעבר לכל ספק סביר.

פרט אישום 1

פרט אישום זה מייחס לנאשם עבירה של ניסיון לגרימת מוות בכוונה, בכך שבתאריך
1997 ביחד עם אנשים נוספים הוא ביצע פיגוע ירי לעבר עמדת צה"ל הסמוכה
ליישוב עופרה. עניין בחומר הראיות בתיק ובעיקר בעדותו של חאלד עומר מיום
31.12.03 בעמ' 3 שורה 21 ואילך מגלה כי כל יסודות העבירות מתקיימים. יודעת כי
תוספת ראייתנית לאותה עדות ניתן למצוא בעדויות הרבות המצוינות בתיק שיפורטו
בהמשך המתייחסים לפעילות המשותפת חרבה שביצע הנאשם עם אותו חאלד

L_C180861

PX4009.pdf

JA2859

עומר, לרבות עדותו של הנאשם עצמו המאשרת את הפעילות חברה שביצע יחד עם   1
חאלד עומר ועדויות השותפים הנוספים בהם יאסר חאמד ופרח חאמד.   2
   3
בנסיבות האמורות מצאנו כי יש מקום להרשיע את הנאשם בביצועה של עבירה זו.   4
   5

**פרט אישום 2**   6
פרט אישום זה מתבסס הן על עדותו של חאלד עומר והן על עדותו של הנאשם בפני   7
חוקר השב"כ "מוכחי" שהוגשה בהסכמת הצדדים. כמו כן מופלל הנאשם בביצוע   8
עבירה זו על ידי מספר עדים נוספים בהם אחמד חאלד חאמד ופרח חאמד ויאסר   9
חאמד. עדויות אלו מבוססות במידה הנדרשת בדין את האשמה המיוחסת לנאשם   10
בפרט אישום זה חברות בהתאחדות בלתי מותרה.   11
   12
בנסיבות המקרה הוכחה בפנינו כל יסודות העבירה, במידת התוכחה הנדרשת כדין   13
ואנו קובעים כי יש להרשיע את הנאשם בעבירה של חברות ופעילות בהתאחדות   14
בלתי מותרת.   15
   16

**פרט אישום 3**   17
פרט אישום זה מייחס לנאשם עבירה של ניסיון לגרימת מוות בכוונה, בכך שהשתתף   18
בפיגוע ירי בחודש אפריל 2003 במהלכו נפגע רכב שחסיע פועלים למקום עבודתם.   19
לאחר שבחנו את חומר הראיות בתיק הגענו למסקנות הבאות :   20
   21
א. הנאשם ביצע יחד עם חברו חאלד עומר פיגוע ירי באזור כביש 60 לעבר רכב   22
שחסיע פועלים . כמפורט בעדותו של חאלד עומר מיום 24.12.03   23
עמ' 7 שורה 16 ואילך.   24

ב. קיומים הבדלים לא מבוטלים בין פיגוע הירי שאירע ביום 30.04.03 והתביעה   25
הצבאית טוענת כי הנאשם אחראי לו יחד עם חבריו, לבין עדותו של חאלד   26
עומר:   27
   28

- סוג הרכב הוא שונה.   29
- צבע הרכב הוא שונה   30
- קיום הבדל משמעותי ממשמעותי ביצוע ביצוע הפיגוע שכן חאלד עומר מדבר   31
  על פיגוע שאירע בחודש יוני 2003 , כחודשיים לאחר האירוע שנגרם   32
  לטענת התביעה על ידי הנאשם וחבריו.   33
   34
בנסיבות האמורות, החלטנו לקבל את טענת הסנגור, ואנו קובעים כי קיים לשיחותנו   35
ספק סביר בשאלה האם הנאשם אכן גרם לפיגוע שאירע ביום 30.04.03, ויש מקום   36
לזכותו מפרט האישום השלישי לכתב האישום. עם זאת, נוכח העובדה שהוכח   37
בפנינו בצועה של עבירה של עבירה שנעשינה ניסיון לגרימת מוות בכוונה על ידי הנאשם   38
וחבריו, אנו קובעים כי יש להרשיע את הנאשם בעבירה של ניסיון לגרימת מוות   39
בכוונה בגין מעשיו בגין מעשיו בבנין במעשיו במעשיו ירי זה.   40
   41
כך למעשה אנו מרשיעים את הנאשם תחת העבירה בפרט האישום השלישי   42
בעבירה של ניסיון לגרימת מוות בכוונה , בכך שביצע פיגוע ירי בכביש 60 בחודש יוני   43
2003 במהותה המתוארת בפרט האישום השלישי, כאשר לא הוכח בפנינו כי כתוצאה   44
ממעשיו של הנאשם נגרם כלשהו לרכוש, זאת בניגוד לפסקה 5 בפרט האישום   45
השלישי המקורי.   46
   47

נאמן למקור

L_C180862

PX4009.pdf

JA2860

**פרט אישום 4 1-5**

פרטי אישום 4 1-5 מייחסים לנאשם השתתפות בפיגוע ירי במהלכו נרצח דוד ציון
ז"יל והתנאשים וחבריו ניסו לפגוע בנהגת הרכב ורד לורבר אשר נסעה ברכב שחלף
במקום זמן קצר לאחר שנרצת דוד ציון ז"יל באותו מקום.

התביעה הצבאית טוענת שהנאשם הודה בביצוע פרט האישום בחקירתו בשב"כ, כן
מתבססת התביעה הצבאית על הודעה על ידיעה בדבר עובדות מוסכמות שהוגשו על ידי
הצדדים ועדויות נוספות לרבות עדויות של פרח אמאד ועדויותיהם של פרח אמאד,
יאסר אמאד והשאמחגיאזי.

לאחר שבחנתי את הודאת התנאשים בעת חקירתו בשב"יכ, מצאתי כי בפסקאות 19-21
מודה התנאשם כי ביצע פיגוע ירי בו נהרג אדם במועד הרלונטי. העדויות הנוספות
בתיק, לרבות עדויות של חאלד עומר מיום 24.12.03 עמ' 8 שורה 15 ואילך תומכת
בדברוי ומכוחה מעבר לכל ספק סביר, כי הנאשם אכן ביצע את העבירות המיוחסות
לו בכתב האישום. דברוי של התנאשים וחבריו משתלבים היטב בראיות הנוספות
בתיק, ואין ספק כי הירי שביצע הנאשם בוצע באירוע בו נרצת דוד ציון ז"יל ביום
11.05.03.

יודגש כי מאחר שהתנאשים הוא זה שירה בעצמו כ-17 כדורים לעבר הרכב ולא נורו
לעבר הרכב יריות על ידי אנשים נוספים, מארח ונשקף של יאסר אמאד שהשתתף
אינו בפיגוע לא היה תקין עקב מעצור, הרי שאין ספק בשאלה של תפקידו של
הנאשם כמי שירה וורצח את דוד ציון ז"יל.

בנסיבות האמורות אנו קובעים כי התנאשם גרם בכוונה למותו של דוד ציון ז"יל וניסה
לגרום למותה בכוונה של הנוסעת שנסעה ברכב אחרי רכבו של נרצת דוד ציון ז"יל.

**פרט אישום 6**

פרט אישום זה מייחס לנאשם עבירה של נשיאת משרה בהתאחדות בלתי מותרת
בכך שעמד בראש וחוליית הצבאית של ארגון התחמאס וחהליף את חאלד עומר
בתפקיד זה החל מחודש מאי 2003.

התביעה הצבאית מתבססת בהקשר זה על אמרותיהם של השאם חיגיאזי, חאלד
עומר, פרח אמאד. עיון באמרותיו של חאלד עומר במשטרה לרבות עדותו מיום
24.12.03 עמ' 8 שורה 10 ואילך , מגלה כי אכן לדברוי התנאשם הפך לראשי החוליה.
הוא אף מציין בקשר לבקשר זה בעדותו מיום 31.12.03 שהוגשה בהסכמת הצדדים, כי
"אמאד מוצטפא נעשה אחראי על כולנו". אף עדותו של השאם חיגיאזי בחקירתו
בשב"יכ מגלה כי התנאשם ביצע את העבירה המיוחסת לו בכתב האישום.

**פרט אישום 7 8,**

פרטי האישום האמורים, מייחסים לנאשם ולחבריו ביצוע פיגוע ירי במהלכו נרצת
צבי גולדסטיין ז"יל ונפצעו בני משפתחו שנמצאו ברכב.

עיון בחומר הראיות בתיק לרבות הודאת הנאשם בשב"יכ המפורטת בזכ"ד מחקירתו
מיום 21.12.03. בפסקאות 22 ו-23 מגלה כי הנאשם הודה בביצוע הפיגוע הנדון.
יצויין כי חומר הראיות הנוסף בתיק לרבות הודעת הצדדים על עובדות מוסכמות
ועדויות שנדגבו של הנאשם מוכיחות מעבר לכל ספק סביר את יסודות העבירות
המפורטות בפרטי האישום ה7 ו-8 לכתב האישום. כמו כן, השתתנית העובדתית
הנוספת בתיק משתלבת היטב בדברוי הנאשם ושותפיו ואין ספק כי האירוע המנואר
על ידו הוא האירוע בו נרצת צבי גולדסטיין ז"יל ונפגעו בני משפתחו.

סא"ל מירב שטרן 3585229
קצינת העיר תל-אביב

נאמן למקור

-3-

L_C180863

יודגש כי מאחר והנאשם וחברו פרח ראמד חם שירו את היריות הקטלניות
וכתוצאה מהם נהרג צבי גולדשטיין ז"ל ונפצעו בני משפחתנו שנסעו ברכב, הרי
שמתקיים היסוד העובדתי הנדרש לחוכחת העבירות והקשר הסיבתי הנדרש על פי
דין לחוכחת גרימת חמות בכוונה. 31 הכדורים שנורו על ידי הנאשם ושותפו חם
שגרמו למוות ולפציעה.

לאור האמור לעיל אנו קובעים כי יש להרשיע את הנאשם בביצוע שלושת העבירות
המפורטות בפרטי אישום 7 ו-8.

## פרטי אישום 9 ו-10

פרטי האישום האמורים מייחסים לנאשם ולחבריו ביצוע פיגוע ירי, בו נרצה שלום
הר-מלך ז"ל ונפצעו אשתו לימור הר-מלך תבדל"א. בעקבות פציעתה של לימור הר-
מלך נדרש לילדה בניתוח קיסרי.

התשתית הראייתית המתייחסת לפרטי אישום זה אינה סבוכה, הנאשם מודה
בביצוע העבירה בחקירתו בשב"כ ומופלל על ידי חבריו לחוליה. כך מציין הנאשם
בחקירתו מיום 21.12.03 בסעיף 24 כי בוצע ירי יחד עם חברו פרח ראמד לעבר רכב
פרטי בצבע אדום שנסע מכיוון דרום לצפון על ציר אלון. בעקבות ירי חתנהגו הרכב
ובמהלכו, לדבריו נהרג אחד הנוסעים. אף חברו של הנאשם לרבות שותפו לביצוע
חירי פרח ראמד, בעדותו מיום 31.12.03 מאשרים את דבריו. הראיות חנוספות
בתיק משתלבות היטב בתיאור של הנאשם וחברו את האירוע ואין ספק כי מדובר
באותו אירוע בו נרצח שלום הר-מלך ז"ל.

יודגש כי מאחר והנאשם הוא שירה יחד עם פרח ראמד 24 כדורים לעבר הרכב,
אשר פגע בראשם של שלום הר-מלך ז"ל, מתקיים הן היסוד העובדתי הנדרש והן
הקשר הסיבתי בין מעשיו של הנאשם לבין מותו של הקורבן. אף היסוד הנפשי של
כוונה לגרום למוות מתקיים בנסיבות המקרה, כפי שעולה באופן ברור מתעדויות
בתיק לרבות דברי הנאשם. לאור חומר הראיות בתיק שפורט לעיל, ברור אף כי כל
יסודות העבירות של ניסיון לגרימת מוות בכוונה מתקיימות בנסיבות המקרה.

אשר על כן, אנו קובעים כי התביעה הצמיעה הוכחה מעבר לכל ספק סביר כי
הנאשם וחבריו ביצעו את העבירות המיוחסות בפרטי האישום התשיעי והעשירי לכתב
האישום.

## פרט אישום 11

פרט אישום זה מייחס לנאשם החזקת של חומרי נפץ בכך שהחזיק ברשותו שקית
הכוללת בין היתר חצי קילוגרם של חומר נפץ, חוטים להפעלת מטען חבלה ושלושה
נפצים עם שני חוטי חשמל המחוברים לכל אחד מהם. הנאשם העביר את חומרי
החבלה האמורים לפרח ראמד כדי שיחביא אותם.

התביעה הצמיעה מתבססת בטיעוניה על עדויותיהם של חאלד עמר, הנאשם פנדאש
פרח ראמד. מעיון בעדויות האמורות עולה כי שותפו של הנאשם לביצוע העבירה
קשרים בין היתר חצי קילוגרם של חומר נפץ, חוטים להפעלת מטען חבלה ושלושה
מנמ' 5 שורה 20 ואילך, עולה באופן ברור כי הנאשם ביצע את העבירה המיוחסת לו
בכתב האישום. הדברים אף מוצאים מקום בעדויות חנוספות בתיק לרבות עדותו
של פרח מיום 31.12.03 עמ' 1 המציינ באופן מפורש כי הנאשם הביא לו את חומר
הנפץ האמור.

נאמן למקור

L_C180864

PX4009.pdf

JA2862

1  לאור האמור לעיל אנו סבורים שהוכחה בפנינו כל יסודות העבירה ועל כן יש מקום
2  להרשיע את הנאשם בעבירה זו.
3
4  **פרט אישום 12**
5  פרט אישום זה מייחס לנאשם עבירה של קשירת קשר לביצוע פשע בכך שחודש
6  ספטמבר 2003 תכנן עם חאלד עומר ומספר אנשים נוספים לבצע פיגוע ירי בסמוך
7  לעין יברוד. הפיגוע לא יצא אל הפועל לאחר שהשניים החליטו לבטלו בעקבות הקמת
8  מגדלי שמירה של צה"ל באזור המתוכנן לביצוע הפיגוע.
9
10  התביעה הצבאית הסתמכה על עדותו של חאלד עומר באמרתו במשטרה מיום
11  31.12.03, שהוגשה בהסכמת הצדדים. בעמ׳ 2 משורה 26 ואילך מספר חאלד על
12  התכנון לבצע את הפיגוע. יצוין כי תוספת ראייתית לעדות זו מצאנו בעדויות הרבות
13  המצוינות בתיק שפורטו לעיל המתייחסות לפעילות המשותפת של הנאשם וחאלד
14  עומר, לרבות עדויותיהם של פרח אחמד, יאסר אחמד, השאם חיגאזי ואף את הדריו
15  של הנאשם המאשר את פעילותו עם ועד, בשורה ארוכה של פיגועים אחרים.
16
17  מאחר שמדובר במסכת עובדתית אחת , הרי שעל פי ההלכה הפסוקה די בראיות
18  אלה כדי לעמוד בתנאים הקבועים בחוק ולהוות תוספת ראייתית מספקת בנסיבות
19  הענין.
20
21  אשר על כן, משוכנעתו בפנינו העובדות חרלונטטיות והתקיימומתה של העבירה בפרט
22  האישום ה-12, אנו מרשיעים את הנאשם בעבירה זו.
23
24  **פרט אישום 13**
25  פרט אישום זה מייחס לנאשם עבירה של ניסיון לגרימת מוות בכוונה. על פי כתב
26  האישום השתתף הנאשם יחד עם חבריו בפיגוע ביום 19.09.03. במהלך אותו פיגוע
27  נסע הנאשם ברכב מסוג סובארו ותפקידו היה להתריע ולאבטח את ציר נסיעתם של
28  חבריו חברי חוליה, אשר היו מועדים לבצע את פיגוע הירי. סמוך לשעה 10:00
29  בעת שהגיע למקום רכב מסוג פולקסווגן, בו נהג יצחק פארארי, ירו חבריו של
30  הנאשם לעבר הרכב.
31
32  הנאשם אשר איבטח את נסיעת שותפו ונסע לפניהם ברכבו, נדרש בסיום הפיגוע
33  לחלץ את שלושת המפגעים לאחר שאירעה תקלה ברכבם. בעקבות בקשתם נסע
34  לאחר שבינתיים את הפיגוע ומילט מהמקום את שלושת המפגעים.
35
36  יצוין כי עקב המידור, בין חברי החוליה לא הכירו שלושת המפגעים את הנאשם,
37  מאחר שחיו חברים בחוליות שניית מקבילה של החמאס באזור בנימין.
38
39  התביעה הצבאית מתבססת בעיקר על עדותו של השאם חיגאזי, אשר היה למעשה
40  אחראי על הנאשם. בתקופה בה ביצע הפיגוע הנאמר. באותה עדות מיום 20.12.03
41  שנגבתה בעת חקירתו בשב"כ, מפרט חיגאזי בסעיפים 7.62-7.71 כיצד בוצע אותו
42  פיגוע ומתאר בעניני חלקו של הנאשם בביצוע הפיגוע לרבות תפקידו כמאבטח פתח
43  הציר והעובדה שהנאשם סייע לחלץ את חברי החוליה מהמקום לאחר שרכבם מסוג
44  סובארו התקלקל במהלך בריחתם. השאם מציין כי הוא בעצמו יצר קשר עם
45  הנאשם קודם לפיגוע ובקש ממנו לאבטח את הציר. כמו כן, מתאר השאם חיגאזי
46  את הפיגוע לאחר שרביע תמידה התאם שרביע תמידה התאם התקשר אליו
47  וציין כי הרכב שלהם התקלקל ובה שמע מהנאשם כי כבר יצר קשר עם חברי
48  החוליה והוא בדרכו לחלצם.
49

נאמן למקור
סא"ל מירב שטרן 3585229
קצינת העיר תל-אביב

L_C180865

PX4009.pdf

**JA2863**

תאריך : כ״ה באייר, תשס״ו
29 מאי, 2006

תיק מס׳ : 1172/04

1. אמרתו של הנאשם חיגיאזי נתמכת בעדויותיהם של מגדי נעסאן וכן בעדותו של
2. מחמוד סעד :
3.
4. מגדי נעסאן מעדותו ביום 17.12.03 בעמ׳ 4-5 מתייחס לפיגוע האמור ומתאר ירי
5. לעבר רכב ישראלי בצבע לבן שנסע מכוונו כוכב השחר לכיוון מעלה אפריים. באותה
6. עדות מציין נעסאן, כי לאחר שבוצע הפיגוע התקלקל הרכב.
7. במשטרה מיום 22.12.03 עמ׳ 3 שורה 24 ואילך מתייחס תעד לפיגוע ומציין כי
8. השלושה ביצעו ירי לעבר רכב לבן , כאל הנראה מסוג ״אופל״ שנסע בכביש ולאחר
9. הפיגוע הרכב התקלקל, מגדי חחביא את כלי הנשק ורכב בו נהג אדם שהוא אינו
10. מכיר הסיע אותך לכפר מאלק.
11.
12. כפי שנכתב בהודעה על עובדות מוסכמות, אין חולק כי באותו אירוע נתפס רכב
13. מסוג סובארו (רכבם של שלושת הנפגעים), אשר התקלקל בסמוך למקום בו בוצע
14. הירי.
15.
16. בנסיבות האמורות ונוכח השתלבות הגרסאות, במיוחד ככל שהדבר נוגע למקום
17. ביצוע הפיגוע ולעובדה שרכבם של הממפגעים נתפס באותו חיום , בסמוך למקום
18. הפיגוע, אנו מגיעים למסקנה כי העדים מדברים על האירוע בו גורו יריות לעבר
19. מכוניתו של יצחק פראונאי.
20.
21. **פרט אישום 14**
22. פרט אישום זה מיוחס לנאשם עבירה של ניסיון לגרימת מוות בכוונה בכך שהשתתף
23. עם אנשים אחרים בפיגוע ביום 06.10.03 , בו הופעל מטען חבלה לעבר ג׳יפ צבאי
24. וגרם לפציעות קלה של אחד החיילים. חלקו של הנאשם באירוע , כמפורט בכתב
25. האישום הומצאה בתכנון לביצוע הפיגוע באמצעות מטען חבלה שקיבל לידו
26. כמפורט בפרט האישום ה-11. בסופו של דבר הפיגוע לא יצא אל הפועל מאחר
27. ובטרם הספיקו הנאשם וחברו לבצע את הפיגוע, הוחלט על ידי הנאשם והשאם
28. חיגיאזי, כי מטען החבלה יעובר לחוליה הצבאית בראשות האשם חיגיאזי על מנת
29. שהם יבצעו את הפיגוע האמור.
30.
31. העובדות המפורטות בפרט האישום מגלות כי הנאשם שימש למעשה כמסייע
32. בהעברת חומר הנפץ לנאשם חיגיאזי לצורך ביצוע הפיגוע ולא השתתף בעצמו בפיגוע
33. האמור. חומר הראיות מתבסס למעשה של שורה של עדים אשר
34. חשתמנו בנתוות ונמצאו בנניים, רביע חמידה, מגדי נעסאן ואנשים נוספים, אשר
35. למעשה לא היה כל קשר ישיר בינם לבין הנאשם , אך הם מתארים את ביצוע הפיגוע
36. האמור.
37.
38. בעדותו של פרט חאמד מיום 31.12.03 בה תואר כיצד הכינו הנאשם וחבריו את
39. המטען, הוא מציין במפורט בעמ׳ 2 שורה 21, כי הנאשם סיפר לי שהוא לקח את
40. אותו פיגוע ולחוליה נוספת שתבצע פיגוע באותו מטען וכעבור יומיים כי עדכן אותו כי
41. אותו פיגוע אכן בוצע. אף הנאשם חיגיאזי בעדותו בזכ״דים מחקירתו בשביע מאמת את
42. העובדה כי הנאשם הוא זה שמסר את המטען לצורך ביצוע הפיגוע.
43.
44. העדויות האמורות מוכיחות מעבר לכל ספק סביר כי אכן הנאשם התכונן לסייע
45. לחברי החוליה השנייה לבצע את הפיגוע כך שמתקיים הן היסוד הנפשי ותן היסוד
46. העובדתי הדרושים לצורך הוכחות בייצוע העבירה של סיוע לניסיון לגרימת מוות
47. בכוונה.
48.

נאמן למקור

סא״ל מריב שמרון 3585229
קצינת העיר תל-אביב

L_C180866

PX4009.pdf

JA2864

תאריך : כ"ה באייר, תשס"ו      תיק מס' : 1172/04
29 מאי, 2006

1   עם זאת, אין מקום להרשיע את הנאשם בעבירה של ניסיון לגרימת מוות בכוונה
2   מאחר וחלקו התמצה בסיועו בלבד על ידי אספקת חבלה וחוא לא היה חלק
3   מהמעגל הפנימי של מבצעי הפיגוע ואין לראות בו כמבצע עיקרי של הפיגוע.

4   אשר על כן, אין מקום להרשיע בעבירה של ניסיון לגרימת מוות בכוונה אלא
5   בעבירה של סיוע לניסיון לגרימת מוות בכוונה.
6
7   אשר לפציעת החייל אשר נגרמה לטעונת התביעה הצבאית בפיגוע זה. מאחר ולא
8   הובאו בפנינו ראיות דיי משמעויות המוכיחות כי אכן נפצע חייל באירוע ובהעדר תיק
9   פ.א המאמת את אותה פציעה, לא ניתן לקבוע מעבר לכל ספק סביר כי אכן נפצע
10   באותו אירוע חייל ועל כן אנו מחליטים שלא להרשיע את הנאשם בסעיף של סעיף
11   11 לפרט האישום ה-14.
12
13   לסיכום, אנו מרשיעים את הנאשם בעבירה של ניסיון לגרימת מוות בכוונה,
14   בגין חלקו בהעברת הממוען אשר גרם לפיצוץ ביום 06.10.03, לעבר גיף צבאי באזור
15   מעיין ומזכים אותו מעבירה של ניסיון לגרימת מוות בכוונה.
16
17
18   __פרט אישום 15,16,17 ו-18__
19   פרטי האישום האמורים מתייחסים לפיגוע שבוצע לטענת התביעה הצבאית על ידי
20   הנאשם ושותפו בכפר יברוד בו נרצחו סמ"ר ארז עידן ז"ל, סמל אלעד פולק ז"ל
21   וסמל רועי יעקב סולמון ז"ל . באותו אירוע נפצע גם חברם של השלושה סמ"ר שנף
22   גלער כתוצאה מהירי שביצעו הנאשם וחבריו.
23
24   הנאשם בעדותו בשב"כ מודה בפה מלא בביצוע העבירה,כך בסעיפים 27-25 לזכ"ד
25   מיום 21.12.03 מתאר הנאשם את ביצוע הפיגוע במילים הבאות:
26
27   "25. תכנון פיגוע נגד חיילים בעין יברוד
28
29   25.1 לפני כחודשיים לערך, העלו חברי החוליה בסילואד רעיון לתקוף ולהרוג
30   את החיילים אשר ביצעו באופן סדיר סיורים בכפר עין יברוד.
31
32   25.2 החיילים ערכו סיורים באופן יום-יומי בכפר אולם לא בשעות קבועות
33   לעיתים בבוקר ולעיתים בערב ובחוליות ברב ארבעה כל פעם.
34
35   25.3 הנדון (הנאשם) העלה את הרעיון בפני הנאשם חגיאזי וחלה הסכם
36   לביצוע הפיגוע וציין כי לצורך הפיגוע יצרף גם אנשי חוליותו, אותם הנדון
37   אינו מכיר.
38
39   25.4 לצורך תכנון הפיגוע יצאו הנדון, מואדי חמאד, פרח חאמד והנאשם
40   חגיאזי , ברכבו של הנדון לסיור בכפר.
41
42   25.5 במהלך הסיור הבחינו בתוכנת בטון הנמצאת בסמוך לבית בכפר
43   שמאחוריה מספר עצים , על הציר הראשי של עין יברוד.
44
45   25.6 הנדון והנאשם תכננו שהנדון יבוא עם שניים נוספים מחוליותו ואלו
46   מחוליותו של הנאשם יצטרפו שניים לביצוע הפיגוע.
47

נאמן למקור

-7-

L_C180867

PX4009.pdf

JA2865

25.7 הנדון ותיאם עם השאם כי ביום שלאחר הסיור יתבצע הפיגוע ומבצעי הפיגוע יגיעו לאזור המערב ברכב, ולאחר שיתמקמו הרכבים, יעזבו את המקום.

25.8 לאחר ביצוע הפיגוע תכננו לברוח מהמקום בכלי הרכב שהביאו אותם למקום הפיגוע.

25.9 הרכבים היו צריכים להמתין במרחק של כ-300 מטר ממקום המארב בקשר עין עם מבצעי הפיגוע באופן שיאפשר להם לדעת ברגע שהפיגוע יסתיים ואז להגיע כדי למלט את היורים מהמקום.

25.10 התכנון היה שלמחרת בסביבות השעה 18:00 בערב יתמקמו חברי שתי החוליות לביצוע הפיגוע.

25.11 יומיים או שלושה לפני היציאה לסיור העביר השאם לבית הנדון שני רובי קלצ'ניקוב נוספים , אותם היו אמורים לקחת עימם לביצוע הפיגוע.

25.12 הנדון לקח את הקלצ'ניקובים והחביא אותם בנקודת המסתור המוכרת לעיל יחד עם יתר כלי הנשק של החוליה.

26. ביצוע פיגוע ירי נגד חיילים בעין יברוד.

26.1 למחרת בשעה 16:00 לערך לקח הנדון את רכבו מסוג דיהטסו ונסע לביתו של פרח תאמם שם אסף את תאלל, מואיד ופרח.

26.2 הארבעה הכניסו את ארבעת הקלצ'ניקובים וה M-16 של החוליה לתוך תיק של שחור מבד, אותו הכניסו לתא המטען של רכב הנדון ונסעו לעין יברוד. ברכב נהג תאלל, אשר שימש כנהג.

26.3 בדרך לבשו כולם כיסויי פנים אותם קנה השאם חינגאזי ברמאללה עבור הפיגוע והעבירו אותם לנדון יום לפני ביצוע הפיגוע.

26.4 כאשר הגיעו למקום המארב המתוכנן, ירדו הנדון , פרח ומואיד והתמקמו מאחורי חומת הבטון שאותה איתרו במקום המארב. הנדון לקח עימו את התיק עם חמשת כלי הנשק , אותו הביאו עימם.

26.5 במקום פגשו שני רעולי פנים להם העבירו שני כלי נשק מתוך החמישה עימם הגיעו.

26.6 הנדון איננו זוכר מי השתמש ב M-16 אולם זוכר כי היה חמוש בנשק מסוג קלצ'ניקוב.

26.7 לאחר שהתמקמו בנקודת המארב, המתינו החמישה כחצי שעה לערך תוך שהם שוכבים על העפר שמאחורי חומת הבטון, באופן שאפשר להם תצפית על הציר באופן שיכלו לראות את הסיור כאשר הוא מגיע מהאזור.

26.8 הנדון שכב במרכז, כאשר מכל צד שכבו שני חמושים אשר המתינו כמוהו להגעת החיילים.

נאמן למקור

סא"ל מירב שטרן 3585229
קצינת העיר תל-אביב

L_C180868

PX4009.pdf

JA2866

תאריך : כ"ה באייר, תשס"ו    תיק מס׳ : 1172/04
29 מאי, 2006

26.9 לאחר כחצי שעה ראה הנדון ארבעה חיילים מגיעים מצד שמאל, כאשר
הם הולכים בקבוצה שבה שניים הולכים מקדימה ושניים מאחררה.

26.10 כאשר הגיעו החיילים הראשונים למרחק של 5 מטרים לערך היו
החיילים בזוג האחורי במרחק של כ -10 מטרים מהנדון וחבריו.

26.11 ממרחק זה פתחו הנדון וחבריו באש בצרורות לעבר חיילי הסיור, עד
שכולם נפלו, ואז הבחינו הנדון וחבריו בשלושה חיילים מוטלים על הארץ
וחייל נוסף נעלם מבלי שראו לאן.

26.12 הנדון וארבעה שהיו עימו קפצו מעל חומת הבטון אל הרחוב והתקרבו
אל שלושת החיילים וירו בהם פעם נוספת, כאשר הנדון יורה בשלושת
החיילים אשר שכבו על הרצפה על מנת לוודא את הריגתם..."

כפי שניתן לראות באופן ברור מעדותו של הנאשם עצמו בשב"כ, הוא מילא תפקיד
מרכזי בפיגוע בו נרצחו שלושת חיילי צה"ל ונפצע חייל נוסף.דבריו בשב"כ נתמכים
בעדויות נוספות בתיק לרבות עדויות שותפיו לביצוע העבירות, וכן העדויות
הטכניות שהוגשו לביהמ"ש המאמתות את דבריו בחקירתו בשב"כ לעניין האופן בו
בוצע הפיגוע הרצחני.

כפי שניתן לראות הנאשם עצמו הוא זה שתכנן את הפיגוע, יחד עם אנשים נוספים.
הוא זה שירה בעצמו בחיילי צה"ל ואף באופן אכזרי רצח אותם מטווח קרוב כדי
לוודא את מותם.

בנסיבות העניין חוכח מעבר לכל ספק סביר כי הנאשם ביצע את כל יסודות
העבירות המנויות בפרטי האישום ה -15 עד ה -18 לכתב האישום ואנו מרשיעים
אותו בביצוע העבירות האמורות.

**פרט אישום 19**

פרט אישום זה עניינו ניסיון לגרימת מוות בכוונה באמצעותו משאית אשר תכנן
הנאשם וחבריו לבצע הפיגוע בעין יברוד. כמפורט בכתב האישום ערכו
הנאשם וחבריו ניסוי כדי לבצע את הפיגוע הנ"ל.

בזכד הממוצעד את חקירותו של הנאשם מיום 21.12.03, בסעיפים 28 ו-29, מתייחס
הנאשם בהרחבה לניסיון לגרימת מוות בכוונה ואף מפרט כיצד תכנן הנאשם
וחבריו לבצע את הפיגוע, את התכנונ שעשו על מנת לבצע ואת הסיבה שבגללה
נכשל ביצוע הפיגוע. שותפו של הנאשם לתכנון הפיגוע מפרטים אף הם בחרתבה
כיצד תוכנ לבצע פיגוע ואת פעילותם לבצע את תוכניתם הזדונית.

אף שקיימות מספר גרסאות אשר למשתתפים בפיגוע, ואף סתירות קלות באשר
לפרטי התכנון המדוייקים, אין מדובר בסתירות מהותיות.

על פי חומר הראיות הנאשם וחבריו תכננו לבצע את הפיגוע ומשורה של גורמים
שונים לא הצליחו לבצע אותו וזאת בשל נסיבות שאינן תלויות בהם, כגון נוכחות
ערה מן הרגיל של כוחות צה"ל וכן אי הגעה של כוחות צה"ל למקום במועד אחר.

נאמן למקור

סא"ל מיכרב שטון 3585229
קצינת. העיר תל-אביב

L_C180869

PX4009.pdf

JA2867



בנסיבות האמורות, לאור חומר הראיות האמור, אנו קובעים כי הוכח בפנינו כי ביצוע העבירה המיוחסת לנאשם בפרט האישום 19 לכתב האישום על יסודותיה השונים ומרשיעים את הנאשם בביצועה.

**סוף דבר**

אנו מרשיעים את הנאשם בעבירות המיוחסות לו בפרטי האישום 1,2,4,5,6,7,8,9,10,11,12,13,15,16,17,18,19 בכתב האישום.

ביחס לפרט האישום ה-3, אנו מרשיעים את הנאשם בעבירה של ניסיון לגרימת מוות בכוונה כמפורט בהכרעת הדין, ומזכים אותו מגרימת הנזק לרכב המפורטת בכתב האישום.

ביחס לפרט האישום ח -14, אנו מרשיעים את הנאשם בעבירה של סיוע לניסיון לגרימת מוות בכוונה כמפורט בהכרעת הדין, ומזכים אותו מהעבירה של ניסיון לגרימת מוות בכוונה שיוחסה לו בכתב האישום.

ניתן והודע היום, 29.05.06, בפומבי ובמעמד הצדדים

שופט   אב"ד   שופט

נאמן למקור

3585229 סא"ל מירב שטרן
קצינת העיר - תל-אביב

-10-

L_C180870

PX4009.pdf

JA2868

Date: 20 Tamuz, 5766                                               Case No.: 1172/04
July 16, 2006

<div style="text-align:center">

1                              **Military Court - Judea**
2
3    **Before the Hon. Presiding Judge:  Maj. Yair Tirosh**
4                       **Judge: Maj. Dalia Kaufman**
5                    **Judge: Maj. Michael Ben David**
6
</div>

7    **The Military Prosecution**
8    (Represented by Officer of Justice Selba Pesak)
9
10                                     Vs.
11
12   **Defendant: Ahmed Mustafa Saleh Hamed (Najar) ID No. 001113836/ Israeli Prison Service**
13   (Represented by counsel, Atty. Theodori)
14
15
16                          <u>**Grounds for the Sentence**</u>
17
18
19   The Defendant who today is about 30 years old and is a resident of Silwad in the Judea region, was convicted
20   by us on May 29, 2006 for a long list of offenses such as membership in an unlawful organization,
21   intentionally causing death, attempt to intentionally cause death, conspiracy to commit a crime, possessing
22   explosive materials – and other serious crimes. Over the course of committing these hostile acts by the
23   Defendant and his colleagues, 6 Israeli civilians and soldiers were murdered – and others were injured. The
24   Defendant's activities were executed within the framework of a military cell of Izz ad-Din al-Qassam, the
25   military wing of Hamas. In addition to the Defendant's "routine activities" as a member of a forbidden
26   organization, the Defendant and his colleagues set the goal for themselves to injure and to kill as many Israeli
27   civilians and IDF soldiers as they could, and for this purpose they worked tirelessly initiating and planning
28   various and diverse attacks which they tried to execute.
29
30
31   The Military Prosecution sought a severe punishment of the Defendant who was convicted of the murder of
32   three civilians and three IDF soldiers and the injury of others – and asked for a sentence of 9 consecutive life
33   sentences for the murder of the six Israelis and for the other activities of the Defendant which included, inter
34   alia, a number of attempts of intentionally causing the death of Israeli civilians and IDF soldiers.
35
36
37   In the considered opinion of the Military Prosecution the court must deliver a strong, clear and sharp message
38   both to the Defendant and to others who intend to commit these abominable acts such as those committed by
39   the Defendant, that they shall forever be removed from normative and free human society; and will remain
40   behind bars until their deaths.
41
42

[stamp:] Correct copy
[stamp:] Military Appeals Court — Judea and Samaria    [signature]
[illegible stamp] [signature]
[stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**

<div style="text-align:center">-1-</div>

**L_C180856**

<div style="text-align:center; color:red">PX4009.pdf</div>

<div style="text-align:right">**JA2869**</div>

## APOSTILLE
### (CONVENTION DE LA HAYE 5 DU OCTOBER 1961)

| | | | | |
|---|---|---|---|---|
| 1. | STATE OF ISRAEL | | מדינת ישראל | .1 |
| 2. | THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY MR./MS | שטרן מירב STERN MERAV | מסמך ציבורי זה נחתם בידי מר/גב' | .2 |
| 3. | ACTING IN THE CAPACITY OF CITI OFFICER FOR MILITARY MATTERS | | המכהן בתור ק.העיר תי"א | .3 |
| 4. | BEARS THE SEAL/STAMP OF THE MINISTRY OF | צבא ההגנה לישראל ISRAELI DEFFENCE | נשא את החותם/חותמת של משרד | .4 |
| 5. | CERTIFIED AT THE MINISTRY OF FOREIGN AFFAIRS | | אושר במשרד החוץ | .5 |
| 6. | THE | 5/10/2011 | ביום | .6 |
| 7. | BY | שירי ציקבאשוילי SHIR TZIKVASHVILY CONBULAR BUREAU התעיבכ הקונסולרית | על-ידי | .7 |
| 8. | NO 528790. | | מס' 528790 | .8 |
| 9. | SEAL/STAMP | | חותם/חותמת | .9 |
| 10. | SIGNATURE, JERUSALEM | | חתימה, ירושלים | .10 |

L_C180857

1  The learned defense attorney was aware of the fact that the Defendant was convicted of six counts of
2  intentionally causing death (murder), and he left it for the court to decide the extent of the punishment which
3  should be meted out. Nevertheless the honorable defense attorney noted that in his opinion the Military
4  Prosecution had gone too far in requesting life sentences, and according to his view the events should be
5  restored to their "correct proportions."
6
7  When the Defendant last addressed the court he refused to stand. However after it was made clear that he was
8  obliged to stand he got up on his two feet and said the following: "This is a court of terror and I do not
9  recognize this court. I wish to comment on what the prosecutor said that we were engaged in deadly activities,
10  what you are doing in Gaza is much more severe than what we are doing. I wish to add that we have a captive
11  soldier in our possession and we shall treat him as you are treating us (transcript of hearing dated July 7, 2006,
12  at the end of p. 2).
13
14
15  The Defendant's denial of the court's subject matter jurisdiction to try him is a trivial matter as far as we are
16  concerned. However there is no doubt that the things uttered by the Defendant show that even now he believes
17  that there is complete justification for his atrocious conduct and for the abominable acts of murder which were
18  carried out, and he does not express any regret for these things even post facto.
19
20
21  We cannot ignore the fact that the Defendant was convicted in the past and each time he was released from
22  imprisonment he increased his activity and intensified it. Thus, for example the Defendant at the "beginning of
23  his journey" was engaged in throwing stones and was tried for this in 1994. After his release the Defendant
24  was "promoted" in the combat hierarchy and in 1999 he was put on trial for offenses concerning the throwing
25  of Molotov cocktails. Upon his release from the latter imprisonment the Defendant did not waste any time and
26  immediately joined the military activities of his colleagues, some of whom he became acquainted with in jail
27  and he even took command of the cell. This time the Defendant was intensively engaged in sowing death and
28  there is no escaping the fact that he should be behind bars for the rest of his life.
29
30
31  It is well known that punishment serves various capacities as a deterrent and a warning to others from acting in
32  the manner of the Defendant – and on the other hand there is a need to consider the personal circumstances of
33  the Defendant and the necessity to rehabilitate him and to return him to a constructive and normative
34  framework. However when the actions involved are so grave as those committed by the Defendant any
35  personal consideration pertaining to the Defendant and his family must give way to the duty to protect the
36  public from the Defendant's future schemes; and the only suitable punishment in this case is removing the
37  Defendant and putting him  forever behind bars.
38
39  The atrocious actions of the Defendant have already been described in the verdict and we see no need to repeat
40  them at this juncture. The Defendant was convicted not only of membership in a hostile organization and for
41  the possession of explosive materials but also of committing grave attacks against civilian vehicles which were
42  innocently being driven on the Judean highways – and against IDF foot patrols who were trapped on the main
43  route of Ein Yabrud. As a result of these atrocious actions,

[stamp:] Correct copy [stamp:] Military Appeals Court — Judea and Samaria        [signature]
[illegible stamp] [signature]
[stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**

**L_C180858**                                    -2-

three Israeli civilians and three IDF soldiers were cruelly murdered, and after their murder by the Defendant and his accomplices, the Defendant ascertained one more time that they were indeed dead. Only a person who has lost his humanity can act in such a way, and any further comment on this matter is superfluous.

Pursuant to judicial precedent, which has been long established by this military court of appeals, it is appropriate to impose a life sentence on the Defendant for the murder of each person as well as an additional life sentence for the Defendant's many attempts to cause death, which is based on the **Nawfal** rule. Therefore, after hearing the parties' argument, we decided on July 11, 2006 to sentence the Defendant to the following:

A.      One life sentence for the murder of David Zion, of blessed memory.
B.      One life sentence for the murder of Zvi Goldstein, of blessed memory.
C.      One life sentence for the murder of Shalom Har-Melech, of blessed memory.
D.      One life sentence for the murder of Sgt. Ro'i Yaakov Salomon, of blessed memory.
E.      One life sentence for the murder of Staff Sergeant Erez Idan, of blessed memory.
F.      One life sentence for the murder of Sgt. Elad Polak, of blessed memory.
G.      One life sentence for all the remaining offense of which the Defendant has been convicted.

All the sentences shall be served consecutively, so that in total the Defendant shall serve seven life sentences consecutively.

**Right to appeal within 30 days from today.**

**Handed down and announced today, Tammuz 20, 5766, July 16, 2006, in chambers.**

**The court clerk shall deliver a copy of the grounds for sentencing to the parties.**

[signature]                       [signature]                    [signature]
**Judge**                         **Presiding Judge**          **Judge**

[stamp:] Correct copy
[stamp:] Military Appeals Court — Judea and Samaria    [signature]
[illegible stamp] [signature]
[stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**

-3-

L_C180859

PX4009.pdf

**JA2872**

1                                **Military Court - Judea**
2
3     **Before the Hon. Presiding Judge:  Maj. Yair Tirosh**
4                          **Judge: Maj. Dalia Kaufman**
5                   **Judge: Maj. Michael Ben David**
6
7     **The Military Prosecution**
8     (Represented by Officer of Justice Selba Pesak)
9
10                                   **Vs.**
11
12     **Defendant: Ahmed Mustafa Saleh Hamed (Najar) ID No. 1178199 / Israel Prison Service - Present**
13     (Represented by counsel, Atty. Theodori)
14
15
16                                 <u>**Sentence**</u>
17
18     After hearing the parties' arguments, we have decided to sentence the Defendant with the following
19     punishments:
20
21     A.        One life sentence for the murder of David Zion, of blessed memory.
22     B.        One life sentence for the murder of Zvi Goldstein, of blessed memory
23     C.        One life sentence for the murder of Shalom Har-Melech, of blessed memory.
24     D.        One life sentence for the murder of Sgt. Ro'i Yaakov Salomon, of blessed memory.
25     E.        One life sentence for the murder of Staff Sergeant Erez Idan, of blessed memory.
26     F.        One life sentence for the murder of Sgt. Elad Polak, of blessed memory.
27     G.        One life sentence for all the remaining offenses of which the Defendant has been convicted.
28
29     All the sentences shall be served consecutively, so that in total the Defendant shall serve seven life sentences
30     consecutively.
31
32     The grounds for sentencing shall be published later.
33
34     **Right to appeal within 30 days from today.**
35
36     **Handed down and announced today, July 11, 2006, publicly and in the presence of the parties.**
37
38     [signature]                   [signature]                  [signature]
39     **Judge**                        **Presiding Judge**              **Judge**
40
41
42

[stamp:] Correct copy
[stamp:] Military Appeals Court — Judea and Samaria     [signature]
[illegible stamp] [signature]
[stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**

L_C180860

PX4009.pdf

**JA2873**

Date: 25 Iyar, 5766                                     Case No.: 1172/04
May 29, 2006

1                            **Military Court - Judea**
2
3    **Before the Hon. Presiding Judge:  Maj. Yair Tirosh**
4                       **Judge: Maj. Dalia Kaufman**
5                      **Judge: Maj. Michael Ben David**
6
7    **The Military Prosecution**
8    (Represented by Capt. Sergey Morin)
9                                 Vs.
10
11    **Defendant: Ahmed Mustafa Saleh Hamed (Najar) ID No. 1178199/ Israel Prison Service**
12    (Represented by counsel, Atty. Theodori)
13
14    **Court Reporter: Private Nogah Mimran**
15    **Translator: Staff Sergeant Badi' Asad**
16
17
18                               **<u>Verdict</u>**
19
20
21 An indictment was filed against the Defendant charging him with a long list of serious offenses concerning his
22 membership in an unlawful association, intentionally causing death, attempt to intentionally cause death and
23 other serious offences.
24
25 All the material evidence in the case was filed by consent of the parties, and the Defendant waived making a
26 case for the defense provided that such waiver would not strengthen the prosecution's evidence.
27
28 The Military Prosecution filed detailed summaries in writing within the framework of which it requested the
29 court to convict the Defendant of all the offenses with which he has been charged in the indictment. The
30 learned defense attorney argued orally before [this] court that the Defendant should be acquitted in view of the
31 fact that none of the prosecution's evidence proves the charges against the Defendant.
32
33 The military court of appeals has held in a long list of decisions that where evidence has been filed by consent
34 there is a presumption that the defense does not dispute the veracity of the contents of the evidence (Appeal
35 against the verdict of the Judea and Samaria Military Court 114/01 **Abu Halal v. the Military Prosecutor** and
36 **Judea and Samaria** Appeal case 75/02 **Barghouti v. the Military Prosecutor).** Given the fact that all the
37 evidence was filed in this case by consent it is incumbent upon the court to examine whether anything in this
38 evidence which was filed with the court is sufficient under law to prove the allegations attributed to the
39 Defendant in the indictment. We shall thus examine, one by one, all the details of the counts attributed to the
40 Defendant in the indictment and we shall inspect whether evidence has been presented to us which prove the
41 guilt of the Defendant beyond any reasonable doubt.
42
43 <u>**Count 1**</u>
44 This count charges the Defendant with the offense of attempting to intentionally cause death, by the fact that in
45 1997, together with other persons he committed a shooting attack against an IDF post close to the settlement of
46 Ofra. A perusal of the evidence and especially the testimony of Khaled Omar dated December 31, 2003 on
47 page 3, line 21 onwards shows that all the elements of the crime exists. It should be emphasized that additional
48 evidence for that testimony may be found in the multiple testimonies found in the case which shall be detailed
49 later and which relate to the many joint activities which were executed by the Defendant along with

[stamp:] Correct copy [stamp:] Military Appeals Court — Judea and Samaria      [signature]
[illegible stamp] [signature] [stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**

-1-

L_C180861

1  Khaled Omar, including the testimony of the Defendant himself which confirms the many activities which
2  were executed together with Khaled Omar and the testimony of other collaborators including Yasser Hamed
3  and Farah Hamed.
4  In the aforesaid circumstances we have found that there is room to convict the Defendant of committing this
5  offense.
6  **Count 2**
7  This count is based both on the testimony of Khaled Omar and on the testimony of the Defendant given to the
8  ISS [Israel Security Services] Investigator "Micah" which was filed by consent of the parties. Likewise the
9  Defendant was incriminated in the commission of this offense by a number of other witnesses including
10 Ahmed Khaled Hamed and Farah Hamed and Yasser Hamed. These testimonies meet the legal requirements
11 for establishing the guilt attributed to the Defendant in this count of membership in an unlawful association.
12
13 In the circumstances of the case all the elements of the crime have been proven to us in accordance with the
14 amount of proof which is legally required and we maintain that the Defendant should be convicted of the
15 offense of membership and activity in an unlawful association.
16
17 **Count 3**
18 This count charges the Defendant with the offense of attempting to intentionally cause death by participating in
19 a shooting attack in April 2003 in the course of which a vehicle transporting workers to their place of work
20 was damaged. After we examined the evidence in the case we reached the following conclusions:
21
22 A.   The Defendant together with his colleague Khaled Omar carried out a shooting attack in the area of Road
23      60 against a vehicle which was transporting workers. As detailed in Khaled Omar's testimony dated
24      December 24, 2003, page 7, line 16 onwards.
25 B.   There are considerable differences between the shooting attack which took place on April 30, 2003 which
26      according to the Military Prosecution the Defendant together with his colleagues bears joint
27      responsibility, and the testimony of Khaled Omar:
28
29      - The type of vehicle is different.
30      - The color of the vehicle is different.
31      - there is a significant difference in the date of committing the attack since Khaled Omar speaks about an
32      attack which took place in June 2003, about two months after the incident which, according to the
33      prosecution, was caused by the Defendant and his colleagues.
34
35 In the aforesaid circumstances we decided to accept the claim of the defense attorney and we maintain that in
36 our view there is a reasonable doubt as to the question whether the Defendant indeed caused the attack which
37 occurred on April 30, 2003 and there is room to acquit him of **the third count in the indictment**. Nonetheless,
38 in view of the fact that the commission of an offense by the Defendant and his colleagues concerning the
39 attempt to intentionally cause death, was proven to us we maintain that the Defendant should be convicted of
40 the offense of attempting to intentionally cause death for his actions in this shooting attack.
41
42 Thus in practice we convict the Defendant under the offense listed in count three, the offense of attempting to
43 intentionally cause death, for committing a shooting attack on Road 60 in June, 2003 according to the outline
44 described in the third count, even if it was not proven to us that as a result of his actions any damage was
45 caused to property, in contrast to what was mentioned in paragraph 5 of the original third count.
46

[stamp:] Correct copy
[stamp:] Military Appeals Court — Judea and Samaria    [signature]
[illegible stamp] [signature]
[stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**
                                        -2-
**L_C180862**

1 **Count 4 and 5**
2 Counts 4 and 5 charge the Defendant with participating in a shooting attack in the course of which David Zion was
3 murdered and the Defendant and his colleagues attempted to harm the vehicle driver, Vered Lorber who drove a
4 vehicle which passed by shortly after David Zion was murdered at that place.
5
6 The Military Prosecution claims that the Defendant admitted committing this count of indictment in his interrogation
7 by the ISS. The Prosecution also bases its claim on the notice with respect to the agreed facts which was filed by the
8 parties, and on further testimony including the testimony of Farah Hamed and the testimonies of Farah Hamed,
9 Yasser Hamed and Hisham Hijazi.
10
11 After I have examined the Defendant's confession which was made during the ISS interrogation, I found that in
12 paragraphs 19 to 21 the Defendant admits that he committed a shooting attack in which a man was killed on the
13 relevant date. The additional testimonies in the case, including the testimony of Khaled Omar dated December 24,
14 2003 page 8, line 15 onwards supports his words and proves beyond any reasonable doubt that the Defendant indeed
15 committed the offense attributed to him in the indictment. The words of the Defendant and his colleagues are
16 corroborated by the additional evidence in the case, and there is no doubt that the shooting which was carried out by
17 the Defendant occurred at the same incident in which David Zion was murdered on May 11, 2003.
18
19 It should be emphasized that since the Defendant was the one who himself shot 17 rounds at the vehicle and no other
20 rounds were shot at the vehicle by other people, since the weapon of Yasser Hamad who participated in that attack
21 did not work due to a flaw, there is therefore no doubt as to the question of the Defendant's role as the shooter and
22 murderer of David Zion.
23
24 In the aforesaid circumstances we maintain that the Defendant intentionally caused the death of David Zion and
25 attempted to intentionally cause the death of a driver who drove in a vehicle behind the vehicle of David Zion.
26
27 **Count 6**
28 This count charges the Defendant with the offense of holding office in an unlawful association by assuming the
29 position of head of a Hamas military cell and by replacing Khaled Omar in this position as of May 2003.
30
31
32 The Military Prosecution bases itself in this context on the statements of Hisham Hijazi, Khaled Omar and Farah
33 Hamed. A perusal of Khaled Omar's statements to the police including his testimony dated December 24, 2003 page
34 8, line 10 onwards, shows that according to his own words the Defendant indeed became head of the cell. He even
35 noted in this context in his testimony dated December 31, 2003 which was filed by consent of the parties that
36 "Ahmed Mustafa became in charge of all of us." Also the testimony of Hisham Hijazi in his interrogation at the ISS
37 shows that the Defendant committed the offense attributed to him in the indictment.
38
39 **Count 7, 8**
40 The said counts charge the Defendant and his colleagues with executing the shooting attack in the course of which
41 Zvi Goldstein was murdered and his family members who were travelling in the vehicle were injured.
42
43 A perusal of the evidence in the case including the Defendant's confession to the ISS which is detailed in the
44 memorandum of his interrogation dated December 21, 2003 in paragraphs 22 and 23 show that the Defendant
45 admitted committing said attack. It should be noted that the additional evidence in the case including the admission
46 of the parties to the agreed facts and the testimonies of the Defendant's collaborators prove beyond any reasonable
47 doubt the elements of the crime, which are detailed in counts 7 and 8 of the indictment. Likewise the additional
48 factual basis in the case is corroborated by the words of the Defendant and his collaborators and there is no doubt
49 that the event described by him is the event in which Zvi Goldstein was murdered and his family members were
50 injured.

[stamp:] Correct copy
[stamp:] Military Appeals Court — Judea and Samaria    [signature]
[illegible stamp] [signature]
[stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**

PX4009.pdf

**JA2876**

It should be emphasized that since the Defendant and his colleague Farah Hamed were those who had fired the fatal shots and as a result thereof Zvi Goldstein was killed and his family members who drove with him in the vehicle were injured, we have the factual element required to prove the offense as well as causation required by law (i.e. legal causation) to prove the intentional cause of death. The 31 bullets which were fired by the Defendant and his collaborator caused the death and the injury.

In light of the aforesaid we maintain that the Defendant should be convicted of committing the three offenses detailed in counts 7 and 8.

### Counts 9 and 10

The said counts charge the Defendants and his colleagues with committing the shooting attack in which Shalom Har-Melech was murdered and his wife Limor Har-Melech was injured. In the wake of Limor Har-Melech's injury she was forced to give birth by Caesarian section.

The evidentiary basis relating to this count is uncomplicated; the Defendant admitted to committing the offense in his interrogation at the ISS and was incriminated by colleague in his cell. Thus the Defendant notes in his interrogation dated December 21, 2003 at paragraph 24 that he carried out the shooting together with his colleague Farah Hamed and it was aimed at a red civilian vehicle which was travelling from south to north on the Allon route. As a result of the shooting the vehicle turned over, over the course of which, according to him, one of the passengers was killed. Even the Defendant's colleagues including his collaborator in the shooting, Farah Hamed, in his testimony dated December 31, 2003 confirm his version. The additional evidence in the case is corroborated by the description of the Defendant and his colleagues and there is no doubt that it is the same incident in which Shalom Har-Melech was murdered.

It should be emphasized that since the Defendant together with his colleague Farah Hamed fired 24 bullets at the vehicle, which hit the head of Shalom Har-Melech, both factual elements and the legal causation between the Defendant's actions and the victim's death exist. The mental element of intention to cause death is also present in the circumstances of the case as has clearly transpired from the testimonies in the case including the Defendant's own words. In light of the evidence in the case which is detailed above, it is also clear that all the elements of the offense of attempting to intentionally cause death are present in the circumstances of the case.

Therefore we maintain that the Military Prosecution proved beyond any reasonable doubt that the Defendant and his colleagues committed the offenses listed in the ninth and tenth counts of the indictment.

### Count 11

This count charges the Defendant with possession of explosive materials in that he had kept in his possession a bag which, inter alia, included half a kilogram of explosive material, wires to operate a bomb and three explosive devices with two wires attached to each one of them. The Defendant delivered the aforementioned explosive materials to Farah Hamed so that he could hide them.

The Military Prosecution bases its arguments on the pleas in the testimonies of Khaled Omar, Hisham Hijazi and Farah Hamed. From a perusal of the said testimonies it transpires that the Defendant's collaborators in committing the offenses connect him clearly with the commission thereof. Thus in Khaled Omar's statements dated December 31, 2003 from page 5, line 20 and onwards it clearly transpires that the Defendant committed the offense with which he is charged in the indictment. These facts may also be seen in other testimony in the case including the testimony of Farah dated December 31, 2003 on page 1 where it explicitly mentions that the Defendant brought the said explosive material with him.

[stamp:] Correct copy [stamp:] Military Appeals Court — Judea and Samaria        [signature]
[illegible stamp] [signature]
[stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**

PX4009.pdf

**JA2877**

1   In light of the aforesaid we think that all the elements of the offense were proven to us and therefore there is room to
2   convict the Defendant of this offense.
3
4   **Count 12**
5   This count charges the Defendant with the offense of a conspiracy to commit a crime in that over the month of
6   September 2003 together with Khaled Omar and a number of other people he planned to commit a shooting attack
7   close to Ein Yabrud. The incident did not go ahead as planned after the two of them decided to cancel it owing to the
8   construction of an IDF watch out tower in the area in which the attack was planned to have taken place.
9
10  The Military Prosecution relied on the testimony of Khaled Omar in his statements to the police dated December 31,
11  2003 which was filed by consent of the parties. On page 2 from line 26 onwards Khaled talks about the plan to
12  commit the attack. It should be noted that we found further proof to this testimony in the many testimonies available
13  in the case which are detailed above and which relate to the joint activities of the Defendant and Khaled Omar,
14  including the testimonies of Farah Hamed, Yasser Hamed, Hisham Hijazi and also the words of the Defendant
15  himself which confirm his activities with the witness in a long list of other attacks.
16
17  Since this involves one factual incident, according to judicial precedent this evidence is sufficient in order to meet
18  the conditions established in the Law and to constitute a sufficient evidentiary basis in the circumstances of the case.
19
20
21  Therefore since the relevant facts and the existence of the offense mentioned in count 12 have been proven to us we
22  convict the Defendant of this offense.
23
24  **Count 13**
25  This count charges the Defendant with the offense of attempting to intentionally cause death. According to the
26  indictment the Defendant together with his colleagues participated in the incident of September 9, 2003. Over the
27  course of that attack the Defendant drove a Subaru vehicle and it was his duty to caution and secure the travel route
28  of three cell members who were supposed to carry out the shooting attack. At about 10 a.m. when a Volkswagen
29  vehicle driven by Yitzhak Farravi arrived at the place, the Defendant's colleagues fired at the vehicle.
30
31  The Defendant who had secured the ride of his collaborators and had driven in front of them in his own vehicle was
32  required at the end of the attack to rescue the three shooters after their vehicle became stuck. In the wake of their
33  request the Defendant drove to them after they had carried out the attack and he removed the three shooters from the
34  place.
35
36  It should be noted that as a result of the various divisions between the cell members, the three cell members did not
37  know the Defendant since they were in a corresponding second Hamas cell from the Binyamin region.
38
39  The Military Prosecution bases itself primarily on the testimony of Hisham Hijazi who in fact was in charge of the
40  Defendant during the period in which he executed the said attack. In the same testimony dated December 20, 2003
41  which was taken down during his interrogation by the ISS, Hijazi details in paragraphs 7.62-7.71 how that attack
42  was carried out and he elaborates on the role of the Defendant in committing the attack including his role as securing
43  the opening of the route and the fact that the Defendant assisted in the rescue of the cell members from the place
44  after their Subaru vehicle had broken down over the course of their escape. Hisham notes that he himself established
45  contact with the Defendant before the attack and he asked him to secure the route. Likewise Hisham Hijazi describes
46  the telephone conversation which he held with the Defendant on the day of the attack after Rabi' Hamida telephoned
47  him and noted that their vehicle broke down, and in which he heard from the Defendant that he had already
48  established contact with cell members and he was on his way to rescue them.
49

[stamp:] Correct copy [stamp:] Military Appeals Court — Judea and Samaria      [signature]
[illegible stamp] [signature] [stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**

-5-

L_C180865

PX4009.pdf

**JA2878**

1 Hisham Hijazi's statement is supported by the testimonies of Majdi Nassan and Mahmud Saad:
2

PX4009.pdf

JA2879

Majdi Nassan, in his testimony dated December 17, 2003, on pages 4-5, relates the said attack and describes shooting at a white Israeli vehicle which was driven from the direction of Kochav Hashachar towards Maaleh Ephraim. In that testimony Nassan notes that after carrying out the attack the vehicle broke down.
In the police file dated December 22, 2003, page 3 line 24 onwards the witness relates to the attack and notes that the three carried out the shooting at a white vehicle, which apparently was an Opel which was travelling on the road and after the attack the vehicle broke down and Majdi hid the weapons, and a vehicle driven by a person he did not know drove them to Kfar Malek.

As has been written in the statement of the agreed facts, no one disputes that a Subaru vehicle (the vehicle of the three shooters) was apprehended at that incident, and it had broken down close to the place in which the shooting took place.

In the said circumstances and in view of the corroboration of the versions, especially as it pertains to the place where the incident took place and the fact that the shooters' vehicle was apprehended that day, close to the place of the attack, we reach the conclusion that the witnesses are speaking about the incident in which shots were fired at the car of Yitzhak Farravi.

Count 14
This count charges the Defendant with the offense of attempting to intentionally cause death in that he participated together with others in the attack of October 6, 2003, in which a bomb was set off against a military jeep which caused light injury to one of the soldiers. The part played by the Defendant in this incident, as detailed in the indictment involved planning to execute the attack by means of the bomb which he received, as detailed in count 11. Eventually the attack did not take place since before the Defendant and his colleagues had managed to carry out the attack, it was decided by the Defendant and Hisham Hijazi that the bomb would be delivered to the military cell headed by Hasham Hijazi so that they would be the ones to carry out the said attack.

The facts detailed in the count of indictment show that the Defendant in fact served as an accomplice in transferring the explosive material to Hisham Hijazi for the purpose of carrying out the attack and did not himself participate in the said attack. The evidence is based in fact on the testimonies of a host of witnesses who participated in placing the bomb, among them Rabi' Hamida, Majdi Nassan and other people who in practice had no direct contact between themselves and the Defendant, but they describe the commission of the said attack.

In Farah Hamed's testimony dated December 31, 2003 in which he describes how the Defendant and his colleagues prepared the bomb, he notes explicitly on page 2, line 21, that the Defendant told him that he was taking the bomb to another cell which would carry out an attack with that bomb and two days later he even updated him that the attack had indeed been carried out. Also Hisham Hijazi in the memorandum of his interrogation by the ISS verifies the fact that the Defendant was the one who delivered the bomb for the purpose of carrying out the attack.

The said testimonies prove beyond any reasonable doubt that indeed the Defendant had intended to assist the members of the second cell to carry out the attack and thus there is both the mental element and the factual element necessary to prove the commission of the offense of assisting in an attempt to intentionally cause death.

[stamp:] Correct copy [stamp:] Military Appeals Court — Judea and Samaria     [signature]
[illegible stamp] [signature]
[stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**
L_C180866                                    -6-

1   Nonetheless there is no room to convict the Defendant with the offense of attempting to intentionally cause death
2   since the part played by him was limited exclusively to assistance in the form of supplying the bomb and he played
3   no part in the inner circle of those carrying out the attack and thus he may not be viewed as the main perpetrator of
4   the attack.
5   Therefore there is no room to convict the Defendant with the offense of attempting to intentionally cause death but
6   rather of the offense of assisting in the attempt to intentionally cause death.
7
8   As to the injuring of the soldier, which was caused in this attack according to the Military Prosecution, since no
9   unambiguous evidence has been presented to us which proves that indeed a soldier was injured in this incident and
10  in the absence of an incident file verifying such injury, we cannot maintain beyond a reasonable doubt that indeed a
11  soldier was injured in that incident and therefore we decide that the Defendant cannot be convicted of the last part
12  of paragraph 11 of count 14.
13
14  In conclusion we convict the Defendant of the offense of assisting in the attempt to intentionally cause death, for his
15  part in delivering the bomb which caused the explosion on October 6, 2003 toward a military jeep in the district of
16  Mughayer and we acquit him of the offense of attempting to intentionally cause death.
17
18  **Counts 15, 16, 17, and 18**
19  The said counts relate to the attack which according to the Military Prosecution was committed by the Defendant
20  and his collaborators in the village of Ein Yabrud in which Staff Sergeant Erez Idan, Sgt. Elad Polak and Sgt. Ro'i
21  Yaakov Salomon were murdered. In that incident a friend of these three, Staff Sergeant Shahaf Gilad was injured as
22  a result of the shooting which was carried out by the Defendant and his colleagues.
23
24  In his testimony at the ISS the Defendant fully confessed to having committed the offense. Thus in paragraphs 25-27
25  of the memorandum dated December 21, 2003, the Defendant describes committing the attack using the following
26  words:
27  "25. Planning an attack against soldiers in Ein Yabrud.
28
29  25.1 About two months ago, the idea was raised by members of the cell in Silwad to attack and kill the soldiers who
30  had regularly carried out patrols in the village of Ein Yabrud.
31
32  25.2 The soldiers carried out their patrols on a day-to-day basis in the village but not at the same time of day,
33  sometimes in the morning and sometimes in the evening and in groups of four each time.
34
35  25.3 The subject (Defendant) raised the idea to Hisham Hijazi and the latter agreed to carry out the attack and noted
36  that for the purpose of the attack he would add his cell members, who the subject doesn't know.
37
38
39  25.4 For the purpose of planning the attack, the subject, Mua'yed Hamad, Farah Hamed and Hisham Hijazi went out
40  together in the subject's vehicle to tour the village.
41
42  25.5 Over the course of the tour they noticed a concrete wall located near a home in the village and behind it a
43  number of trees on the main route of Ein Yabrud.
44
45  25.6 The subject and Hisham planned that the subject would arrive with two other members from his cell whereas
46  two would come from Hisham's cell and join [these two] in committing the attack.
47

[stamp:] Correct copy
[stamp:] Military Appeals Court — Judea and Samaria   [signature]
[illegible stamp] [signature]
[stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**

PX4009.pdf

JA2881

1   25.7 The subject arranged with Hisham that the day after the tour the attack would be carried out and the
2   perpetrators of the attack would reach the western area by car, and after parking the vehicles, they would leave
3   the area.
4
5   25.8 After committing the attack they planned to escape from the place with the vehicles which they had
6   brought to the place of the attack.
7
8   25.9 The vehicles needed to wait at a distance of approximately 300 meters from the place of the ambush and
9   in eye contact with the perpetrators of the attack in a way which would allow them to know the moment the
10  attack ends and then to arrive there in order to whisk away the shooters from the place.
11
12  25.10 It was planned that the next day at around 6 p.m. the members of the two cells would be stationed in
13  order to carry out the attack.
14
15  25.11. About two or three days before going on the tour, Hisham delivered two extra Kalashnikov rifles to the
16  house of the subject, which they were meant to take with them to carry out the attack.
17
18  25.12 The subject took the Kalashnikovs and hid them in the hiding places mentioned above with the rest of
19  the cell's weapons.
20
21  26. Carrying out the shooting attack against the soldiers in Ein Yabrud.
22
23  26.1 The next day at around 4 p.m. the subject took his Daihatsu vehicle and drove to the home of Farah
24  Hamed where he picked up Khaled, Mua'yed and Farah.
25
26  26.2 The four of them put the four Kalashnikovs and the cell's M-16 in a black cloth handbag, which they
27  placed in the trunk of the subject's vehicle and drove to Ein Yabrud. Khaled drove the vehicle and he served as
28  the driver.
29
30  26.3 On the way all of them wore face masks which Hisham Hijazi had bought in Ramallah for the attack and
31  he gave them to the subject the day before carrying out the attack.
32
33  26.4 When they arrived at the place of the planned ambush the subject, Farah and Mua'yed went out the
34  vehicle and positioned themselves behind the concrete wall which they had identified as the place of ambush.
35  The subject took with him the bag with the five weapons which they had brought with them.
36
37  26.5 Two masked men met them at the place, and they gave them two weapons from the five with which they
38  had come.
39
40  26.6 The subject does not remember who used the M-16 but does remember that he was armed with a
41  Kalashnikov gun.
42
43  26.7 After positioning  themselves in the place of the ambush the five waited for about half an hour while lying
44  on the dirt behind the concrete wall in a way which enabled them to observe the route and which enabled them
45  to see the patrol when it arrived in the area.
46
47  26.8 The subject lay in the center and on each side of him two armed men lay in wait for the soldiers to arrive.
48

[stamp:] Correct copy [stamp:] Military Appeals Court — Judea and Samaria      [signature]
[illegible stamp] [signature]
[stamp:] 3585229 Lt. Col. Merav Stern, District Officer, Tel Aviv

PX4009.pdf

JA2882

26.9 After around half an hour the subject saw the four soldiers arriving from the left side, while walking in formation with two in front and two behind.

26.10 When the soldiers in front came within approximately 5 meters, the pair of soldiers in the back was approximately 10 meters from the subject and his colleagues.

26.11 From that distance the Defendant and his colleagues opened fire in a hail of bullets at the patrolling soldiers until they all fell to the ground and then the subject and his colleagues noticed three soldiers lying on the ground and the other soldier had disappeared without them seeing where he went.

26.12 The subject and the four who were with him jumped from the concrete wall into the street and approached the three soldiers shooting them one more time, while the subject shot all three of the soldiers who were lying on the floor to make sure they had been killed."

As one can clearly see from the testimony of the Defendant himself to the ISS, he fulfilled a central role in the attack in which three IDF soldiers were murdered and another soldier was injured. His words to the ISS are supported in other testimonies in the case including the testimonies of his collaborators in carrying out the offenses, as well as the technical testimonies which were filed with the court which verify his words at the interrogation at the ISS concerning the manner in which the murderous attack was carried out.

As may be seen it was the Defendant himself who planned the attack, together with others. It was he himself who had fired at the IDF soldiers and in a cruel manner shot them at close range to ascertain that they were dead.

In the circumstances of the case it has been proven to us beyond any reasonable doubt that the Defendant committed all the elements of the offenses which are listed in counts 15 to 18 of the indictment and we convict him for committing the said offenses.

**Count 19**

This count concerns an attempt to intentionally cause death using a truck which the Defendant and his colleagues had planned to execute after carrying out the attack in Ein Yabrud. As detailed in the indictment the Defendant and his colleagues carried out an experiment in order to carry out said attack.

In the memorandum which records the investigation of the Defendant dated December 21, 2003, in paragraphs 28 and 29, the Defendant elaborates on the attempt to intentionally cause death and even details how the Defendant and his colleagues planned to carry out the attack, the preparations that they did in order to carry it out and the reason for its failure. The Defendant's collaborators in planning the attack also go into elaborate detail about how they planned to carry out the attack and their activities in carrying out their malicious plan.

Although there are a number of versions as to the participants in the attack, and slight contradictions as to the exact planning details, these are not significant contradictions.

According to the evidence the Defendant and his colleagues planned to carry out the attack, and because of a whole list of various factors they were unsuccessful in carrying it out owing to circumstances beyond their control, such as the exceptionally alert presence of IDF forces and the non-arrival of the IDF forces at the place at any other time.

-9-

[stamp:] Correct copy [stamp:] Military Appeals Court — Judea and Samaria     [signature]
[illegible stamp] [signature] [stamp:] 3585229 Lt. Col. Merav Stern, District Officer, Tel Aviv
L_C180869

PX4009.pdf

JA2883

Date: 25 Iyar, 5766                                        Case No.: 1172/04
May 29, 2006

1   In the aforesaid circumstances and in light of the said evidence we maintain that the commission of the offense
2   and the various elements thereof with which the Defendant is charged in count 19 has been proven to us and
3   we convict the Defendant of its commission.
4
5   <u>Conclusion</u>
6
7   We convict the Defendant of the offenses with which he has been charged in counts 1, 2, 4, 5, 6, 7, 8, 9, 10, 11,
8   12, 13, 15, 16, 17, 18, and 19.
9
10  With respect to charge no. 3 we convict the Defendant of the offense of attempting to intentionally cause death
11  as detailed in the judgment and we acquit him of causing damage to a vehicle as detailed in the indictment.
12
13
14  With respect to count no. 14 we convict the Defendant of the offense of assisting in the attempt to intentionally
15  cause death as detailed in the judgment and we acquit him of the offense of attempting to intentionally cause
16  death with which he has been charged in the indictment.
17
18
19  **Handed down and announced today, May 29, 2006 in public and in the presence of the parties**
20
21  [signature]                    [signature]                    [signature]
22  **Judge**                          **Presiding Judge**                 **Judge**

[stamp:] Correct copy
[stamp:] Military Appeals Court — Judea and Samaria    [signature]
[illegible stamp] [signature]
[stamp:] 3585229 Lt. Col. Merav Stern, **District Officer, Tel Aviv**


-10-

**L_C180870**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
LINDE, et al.,                 : 04-cv-5564(NG)(VVP)
                               : 04-cv-2799
                               : 04-cv-5449
                               : 05-cv-365
                  Plaintiff,   :
                               :
        - versus -             : U.S. Courthouse
                               : Brooklyn, New York
ARAB BANK, PLC.,               :
                  Defendant    : July 20, 2006
------------------------------X
                **S E A L E D   P O R T I O N S**

     TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
        BEFORE THE HONORABLE VIKTOR V. POHORELSKY
              UNITED STATES MAGISTRATE JUDGE

**A    P    P    E    A    R    A    N    C    E    S:**


**For Plaintiff Linde**
**and Coulter:**              **Gary Osen, Esq.**
                              **Bob Swift, Esq.**


**For Plaintiff Litle:**      **Mark Werbner, Esq.**




**For the Defendant:**        **Alan Howard, Esq.**
                              **Ron Strajezycki, Esq.**



**Official Transcriber:**     **Rosalie Lombardi**
                                **L.F.**



**Transcription Service:**    **Transcription Plus II**
                              823 Whittier Avenue
                              New Hyde Park, N.Y.  11040
                              (516) 358-7352




Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

**JA2885**

### Proceedings

1    THE CLERK:  Civil Cause for Status Conference

2    in 04-cv-2799: <u>Linde v. Arab Bank;</u>, 04-cv-5449; <u>Litle v.</u>

3    <u>Arab Bank,</u> 04-cv-5564; <u>Almog v. Arab Bank</u>,

4    05-cv-365; <u>Coulter v. Arab Bank</u>, 05-cv-388; <u>Afriat-</u>

5    <u>Kurtzer v. Arab Bank</u>, 05-cv-318; <u>Leifend (phonetic) v.</u>

6    <u>Arab Bank</u>, 05-cv-378; <u>Roth v. Arab Bank</u>, 05-cv-5518;

7    <u>Miller v. Arab Bank</u> and 06-cv-6163, <u>Weiss v. Arab Bank</u>.

8            Magistrate Judge Viktor Pohorelsky presiding.

9            THE COURT:  Please be seated.  Good morning.

10           COUNSEL:  Good morning.

11           THE COURT:  Well, there remain three motions

12   that are before me right now and I actually do want to

13   hear a little bit more about the motion to amend.  I

14   don't think I need to hear any more about the motion for

15   injunctive relief.  And I would like, of course, to hear

16   something about the bank secrecy issue.

17           But let me get a handle on what else is going

18   on.  So, let me ask first with respect to the plaintiffs

19   where things stand with respect to the discovery that

20   you're seeking apart from the things that you're waiting

21   on rulings on.  I mean, are there depositions being

22   scheduled, anything like that going on?

23           MR. WERBNER:  Your Honor, Mark Werbner.

24           I'm happy to give my quick summary of it, if

25   you would like.

1    MR. HOWARD:  No, we do not, your Honor.

2    THE COURT:  Okay.

3    MR. HOWARD:  And let me go on because there is

4  another category.

5    THE COURT:  Yes.

6    MR. HOWARD:  But just to finish, so that is

7  over 170,000 instructions.

8    THE COURT:  Okay.  Fine.

9    MR. HOWARD:  The third piece is a production of

10  account records, transaction records, relating to certain

11  entities that were Arab Bank customers that have been

12  produced under circumstances that you're aware of and we

13  discussed inside.

14    THE COURT:  But then isn't there -- there are

15  documents that were what we called the New York documents

16  aside from that --

17    MR. HOWARD:  Correct.  Aside from that, we have

18  also made production, I think there are almost 300

19  transactions.

20    THE COURT:  And what are those New York

21  documents, the so-called New York documents?

22    MR. HOWARD:  These are documents Swift 103,

23  MP-103 documents that actually went through the New York

24  branch involving some of the entities that were

25  identified in the document request and in the March 3

**Proceedings**

1  order.

2  THE COURT: I'm lost. Say that again? I'm

3  sorry. Transactions where the funds actually flowed

4  through the New York bank.

5  MR. HOWARD: Where you would have say an entity

6  who would instruct their bank who would instruct Arab

7  Bank, New York to send dollars to one of the entities

8  identified in the March 3 order in the territories and

9  that transaction record, those transaction records have

10  been produced.

11  THE COURT: Okay. I'm sorry, and who would be

12  the originator? Any one of the entities, the March 3

13  order said you had to provide information about to the

14  extent that they were in the New York office.

15  MR. HOWARD: Went through New York. If they

16  were -- correct me if I am wrong -- if they were the

17  originating party or if they were the receiving party or

18  both.

19  THE COURT: Okay. All right. And that's the

20  categories of documents. All right.

21  And what has not been produced are any

22  documents that are in Jordan, Palestine --

23  MR. HOWARD: What has not been produced is --

24  THE COURT: You know, the areas under the

25  Palestinian monetary authority, I guess and Lebanon?

JA2888

## Proceedings

1      MR. HOWARD: Other than --

2      THE COURT: The one --

3      MR. HOWARD: -- the ones that we talked about -

4   -

5      THE COURT: Yes.

6      MR. HOWARD: -- if it was a straight Middle

7   Eastern transaction or a transaction that did not go

8   through Arab Bank, New York and it was a -- it's covered

9   by these bank secrecy rules or account records over

10  there, accounts that are held in the Palestinian

11  territories, Lebanon, for which we don't have permission

12  of the government to release those records or in Jordan,

13  those records are covered by bank secrecy.

14      The other issue I would just say to supplement

15  what is at issue on this motion and the Court has dealt

16  with this is deposition testimony. We have deferred

17  depositions of Arab Bank employees in Jordan for

18  precisely the reason in anticipation that there will be

19  questions asked of these individuals -- .

20      THE COURT: Sure. Most of the questions would

21  relate to the --

22      MR. HOWARD: Specific accounts and --

23      THE COURT: -- transactions over there and --

24      MR. HOWARD: require these people to commit a

25  criminal act.

JA2889

**Proceedings**

1    THE COURT:  Yes.  All right.  Well, let me turn

2  to the plaintiffs.  First of all, it doesn't seem to me

3  to be substantially in dispute that the bank secrecy laws

4  of the area that we're talking about, the three, let's

5  call them.  It's the Palestinian Monetary Authority, is

6  that what it's called?  PMA?

7    MR. HOWARD:  PMA, Palestinian Monetary

8  Authority.  Yes, your Honor.

9    THE COURT:  The state of Jordan, the Country of

10  Jordan and then the Country of Lebanon, that the language

11  of their bank secrecy laws apply to the documents that

12  are at issue.  I mean, there's not a substantial dispute

13  about that.

14    MR. SWIFT:  No, it's not, your Honor.

15    THE COURT:  All right.

16    THE COURT:  And so the question is the how much

17  should this court recognize those laws?

18    MR. SWIFT:  Well, I --

19    THE COURT:  Go ahead.

20    MR. SWIFT:  I don't think I would quite

21  characterize it that way, your Honor.  First of all, we

22  have the issue of what is this?  Is it a privilege?  Is

23  it animal, vegetable or mineral?

24    THE COURT:  Well, I understand but I mean, I

25  think it's not a privilege.  It's not Arab Bank's -- the

JA2890

**Proceedings**

1  way the law is -- and I'm talking about just about the

2  law itself.  The way the law is framed it's a direction,

3  I think it's fair to say that there is a different

4  language but it's a direction that the bank or its

5  employees is not to disclose the information.

6          MR. SWIFT:  Your Honor, it's a typical blocking

7  statute that are enacted in countries around the world --

8

9          THE COURT:  Like the United States.

10          MR. SWIFT:  -- to protect the --

11          THE COURT:  It's not a blocking statute.  It's

12  a bank secrecy statute that is -- I mean, it does exactly

13  the same thing here; doesn't it?

14          MR. SWIFT:  Your Honor, there are many

15  exceptions to the statutes that are in effect in Lebanon

16  and Jordan.  And these are not absolute rights or

17  privileges.  It's analyzed in United States under a

18  comity analysis as to whether these can block discovery

19  of legitimate claims in the United States.

20          THE COURT:  No, I understand.  I understand.

21  But that's my point.  I mean, how much do we recognize

22  those -- how far do we recognize the authority of those

23  statutes to prevent that information from being provided?

24          MR. SWIFT:  Right.  And we ultimately get into

25  a comity analysis under the Aero Speciale (phonetic) case

JA2891

**Proceedings**

1  in the United States Supreme Court and Section 442 of the

2  restatement third of foreign relations.

3       THE COURT:  Right.

4       MR. SWIFT:  And I would like to address some of

5  these issues, if I may.

6       THE COURT:  Okay.  You can.

7       MR. SWIFT:  First of all, we --

8       THE COURT:  I may interrupt you with a question

9  or two.

10      MR. SWIFT:  That's fine.  The Court said a

11 number of months ago that I think I see where this is

12 going.  We are at an impasse right now in connection with

13 discovery because we have been told that the bank will

14 assert on a blanket basis banking secrecy during

15 depositions that will be taken and were, in fact,

16 originally scheduled to take place this month in Aman,

17 Jordan.

18      In addition to other types of discovery, while

19 some documents have been produced and some documents

20 indeed are parallel of other documents that have not been

21 produced, we're not being offered and given an

22 opportunity for fair discovery of the full picture

23 remembering that Arab Bank is the defendant in this case.

24 It is not a peripheral bank that is from whom we are

25 subpoenaing documents.

Transcription Plus II     Rosalie Lombardi

## Proceedings

1    So, the analysis is somewhat different because
2  of the importance of the fact that this is the defendant
3  and this is the defendant that is telling us two things;
4  one, they are saying we don't have to produce documents
5  to you bacchus of foreign banking secrecy and secondly --
6    THE COURT:  Well, no, we don't have to; we are
7  prevented from producing these by foreign bank secrecy.
8    MR. SWIFT:  Well, then that gets into the order
9  that your Honor issued with regard to the presumption
10 which you did not want to get into.
11   Because on the one hand, it's okay to produce
12 them and it doesn't matter about the statute and the
13 criminal sanctions and on the other hand --
14   THE COURT:  I understand.  Okay.  Okay.
15   MR. SWIFT:  Okay.
16   THE COURT:  Now I understand that argument.  I
17 understand that.  And I will give you a greater
18 opportunity to address that at some point today.
19   MR. SWIFT:  Let me point out that early on in
20 this litigation we expressed no reservation or objection
21 to the entry of a protective order which would protect
22 the legitimate privacy interest of the bank's customers.
23 And that -- because this isn't the bank's right or
24 privilege.
25   THE COURT:  Right.

JA2893

**Proceedings**

1      MR. SWIFT:  It is a customer right and
2  recognized in those countries to privacy.  And let's, you
3  know, be very clear.  With regard to documents in the
4  Palestine Authority, that is not a recognized state.  If
5  your Honor recognizes their set of law, then you have to
6  recognize whatever exists in the Southern Lebanon that's
7  controlled by Hezballoh or in Sicily controlled by la
8  cosa nostra.

9          THE COURT:  Except, you know, I mean isn't the
10  history of that authority -- in a sense it's a creature
11  of Israeli law; isn't it?

12          MR. SWIFT:  No, it's not, your Honor.

13          THE COURT:  No?  Well, then as a result of a
14  treaty, as I understand it, out of the Paris accords, is
15  that what it was?  Or the Oslo accords?  One of them.
16  But it was an authority that was sanctioned by Israel,
17  among others.

18          MR. SWIFT:  Well, I --

19          THE COURT:  So, I mean it is a creature and
20  there's no question it's not a state.  No question about
21  that.  And --

22          MR. SWIFT:  There's no question.  There's no
23  dejure recognition by the United States government, the
24  executive branch of this country that's empowered under
25  the Constitution to decide which countries are recognized

Transcription Plus II          Rosalie Lombardi

JA2894

1 and which are not. As you know, dejure recognition

2 involves many factors.

3         THE COURT: But let me jump. This effects the

4 analysis of the language of restatement 442 because then

5 you're talking about states and how much recognition is

6 to be given to states. And so, I'll tell you, take it

7 out of 442 and say it's not covered by that. But then

8 what it is covered by? It's got something. It's got

9 some -- it was set up to accomplish some purpose and some

10 purpose that was said to be -- thought to be legitimate

11 and hopefully still may be.

12         And so, it's not something that ought to be

13 just brushed aside, it seems to me. The level of comity

14 to be accorded to it may be different and not the same as

15 something --

16         MR. SWIFT: Your Honor?

17         THE COURT: -- same as something like Jordan's

18 or Lebanon's loss but it seems like I can't just ignore

19 it out of hand just because it doesn't rise to being a

20 mistake.

21         MR. SWIFT: Your Honor wouldn't permit la cosa

22 nostra to argue in this court that it can't produce --

23         THE COURT: La cosa nostra is not the right

24 analogy. La cosa nostra was not set up by any government

25 authority that I know of.

Transcription Plus II        Rosalie Lombardi

**JA2895**

**Proceedings**

1  for me that does -- has occurred to me is, you know, what

2  kind of a showing of -- further showing of need is there

3  that would be required to overcome the  bank secrecy

4  objections or bank secrecy laws?

5          But I don't want to carry further on that right

6  now.  Let me go to the other issue here and I'm going to

7  -- you know, the -- it really goes to -- you need to cut

8  off and go; okay.

9  **(Off the record)**

10  **(Sealed portion)**

11          THE CLERK:  Back on the record.

12          THE COURT:  We don't need to recall it or

13  anything.

14          THE CLERK:  No.

15          THE COURT:  All right.

16          The plaintiffs make the argument that these

17  bank secrecy laws are not -- there's really no teeth and

18  there really is no -- no concern of prosecution that's

19  faced and I'll point, among other things, the fact that

20  no effort was made -- there was no objection raised to

21  the production of the documents in response to subpoenas

22  here and in response to a -- to a subpoena here and in

23  response to the, I guess the process of the court in

24  London.

25          And I guess another aspect of it is there

Transcription Plus II          Rosalie Lombardi

**JA2896**

### Proceedings

1 haven't been any prosecutions of anybody for violating

2 these laws. So, what's the -- you know, if these laws

3 are really -- really are owed -- I guess what's the

4 response to the argument that these laws are not -- they

5 don't -- there's not such a big interest in these

6 countries in the enforcement of these laws?

7        MR. HOWARD: Well, there is a substantial

8 interest. The practical matter is, your Honor, quite

9 frankly, is those regulatory authorities don't know about

10 the disclosures to date in Texas.

11        THE COURT: Okay.

12        MR. HOWARD: So --

13        THE COURT: But you disclosed without concern

14 for that.

15        MR. HOWARD: Well, I wouldn't say it was

16 without concern. There was a decision made that in the

17 context of getting a grand jury subpoena and the context

18 of criminal proceedings or in the context of bank

19 regulators requests where the consequences for

20 non-disclosure where the circumstances concerning

21 confidentiality and the nature of the proceedings were

22 all very different than in this case.

23        A decision was made to go ahead and produce the

24 documents. That does not mean the same decision is

25 appropriate or would be made or is being made for

JA2897

**Proceedings**

1    purposes of this civil litigation.

2              Now, I agree, your Honor, that it's a factor

3    but it's a very different set of circumstances under

4    which that production occurred.  And now we have managed

5    to produce to these plaintiffs the very documents that

6    we've produced to the government that the government's

7    interested in.

8              THE COURT:  Well, what are these?  What are

9    they?

10             MR. HOWARD:  They are the records, including

11   account opening records, account statements, transaction

12   records for 11 Zacats.  And Mr. Werbner --

13             THE COURT:  Are they a --

14             MR. HOWARD:  -- I apologize, I meant to say it

15   was all the records of ceratin Zacats.  I did not say all

16   the Zacat records.

17             MR. WERBNER:  And you said all; okay.  I accept

18   your apology.

19             MR. HOWARD:  Okay.

20             THE COURT:  So, help me understand what it is

21   that there was confusion about.  You've produced all

22   records of certain Zacats.

23             MR. HOWARD:  Well, it was all of the records --

24             THE COURT:  Certain records of all Zacats or

25   certain records of certain Zacats?

### Proceedings

1    MR. HOWARD:  It was at least certain records of

2  certain Zacats.

3    THE COURT:  Okay.

4    MR. HOWARD:  Whether it was all, I can't sit

5  here and represent that every single piece of paper was

6  all that the government asked for --

7    THE COURT:  Okay.

8    MR. HOWARD:  -- in their subpoena relating to

9  11 out of the 70 Zacats.  And these are the 11 that the

10  plaintiffs focus on.  These are the ones the government

11  focuses on.

12    THE COURT:  Okay.

13    MR. HOWARD:  You're talking the Tocarum Zacat

14  (phonetic) Committee, the Janine Zacat Committee, you're

15  talking --

16    MR. WERBNER:  Hamas.

17    THE COURT:  And are these Zacats -- I mean, are

18  these records records of Arab Bank New York or records of

19  Arab Bank globally?

20    MR. HOWARD:  Globally.  They were produced by

21  Arab Bank New York and got the subpoena but these are the

22  very records we're talking about that are in the region.

23  These are -- they're account opening records.

24    THE COURT:  So, it's all records responsive to

25  the subpoena but you don't know whether it's all records

JA2899

**Proceedings**

1  that comply with the Court order --

2      MR. HOWARD:  I cannot make that --

3      THE COURT:  -- with the production order, I

4  should call it.

5      MR. HOWARD:  -- representation.  I can tell you

6  it's 2,700 pages of documents.  And for some of the

7  Zacats, it's redwells like this.  So, it's a substantial

8  amount of information that shows who the Zacat was, you

9  know, the KYC, know your customer information that was

10  taken from the Zacats.  It was, you know, the passport

11  photos.  All of the information -- and all of the

12  information that I respectfully submit, we have said from

13  the beginning is far from the suggestion that we're

14  trying to hide evidence.  We want to be able to produce

15  these documents.

16      These 11 Zacat records now show that there is

17  no information in there that shows that the bank had any

18  knowledge that they were funding terrorists.  And we

19  would like to be able to produce that for the other 60.

20  And we have asked those other 60 for their consent to do

21  so.

22      THE COURT:  There were 60 more that were

23  identified in my production.

24      MR. HOWARD:  Correct.

25      THE COURT:  You have --

## Proceedings

1   MR. HOWARD: I might be off by a couple but
2   it's --
3   MR. WERBNER: You did ask them for their
4   consent?
5   MR. HOWARD: Yes, we have asked them for their
6   consent because we're doing what we can do to make the
7   production because far from the statement that we're, you
8   know -- that we're trying to limit their discovery, I
9   think the record is pretty clear that we've been
10  forthcoming as much as we can. But these are real laws.
11  They apply. I'm telling you when I am going to sit there
12  and represent a bank person who has been working in a
13  bank in Lebanon under those bank secrecy laws for umpteen
14  years and they have it into their soul that they cannot
15  reveal any bank information, I'm going to have a hard
16  time getting them to say anything about any account.
17  These are real restrictions.
18          We're working within them and so they now have
19  based on our productions in a very different circumstance
20  to the Department of Justice, these 11 Zacat records --
21  the records of these 11 Zacats.
22          THE COURT: All right. Plaintiffs?
23          MR. SWIFT: Your Honor, a couple of comments.
24  One is, your Honor on June 7 entered an order that had
25  been stipulated by -- between plaintiffs and the

Transcription Plus II        Rosalie Lombardi

**JA2901**

# C  E  R  T  I  F  I  C  A  T  E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this __22nd__ day of __July__ , 2006.

_____
Rosalie Lombardi
Transcription Plus II

**JA2902**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
COURTNEY LINDE, et al.,

                          Plaintiffs,

            – v –                                    CV-04-2799 (NG) (VVP)

ARAB BANK, PLC,
                          Defendant.
------------------------------------------------------------x
PHILIP LITLE, et al.,

                          Plaintiffs,

            – v –                                    CV-04-5449 (NG) (VVP)

ARAB BANK, PLC,
                          Defendant.
------------------------------------------------------------x
ORAN ALMOG, et al.,

                          Plaintiffs,

            – v –                                    CV-04-5564 (NG) (VVP)

ARAB BANK, PLC,
                          Defendant.
------------------------------------------------------------x
ROBERT L. COULTER, SR., et al.,

                          Plaintiffs,

            – v –                                    CV-05-365 (NG) (VVP)

ARAB BANK, PLC,
                          Defendant.
------------------------------------------------------------x
GILA AFRIAT-KURTZER, et al.,

                          Plaintiffs,

            – v –                                    CV-05-388 (NG) (VVP)

ARAB BANK, PLC,
                          Defendant.
------------------------------------------------------------x
MICHAEL BENNETT et al.,

                          Plaintiffs,

**JA2903**

- v -                                          CV-05-3183 (NG)(VVP)

ARAB BANK, PLC,

                              Defendant.
-----------------------------------------------------------------x
ARNOLD ROTH, et al.,

                              Plaintiffs,

- v -                                          CV-05-3738 (NG)(VVP)

ARAB BANK, PLC,

                              Defendant.
-----------------------------------------------------------------x

## ORDER

By letter dated August 16, 2006, the defendant has submitted two issues for the court's review. Specifically, they seek an extension of discovery deadlines and "confirmation" of the court's March 24, 2006 Decision and Order. The plaintiff has submitted no response to me concerning either issue, but has addressed a letter to Judge Gershon concerning the latter issue.

As to the extension of discovery, all parties recognize that an extension is necessary in view of, among other things, a number of issues now being decided by the court which will affect the scope of discovery. Until those issues are decided, a determination of the length of time by which discovery should be extended is premature. Accordingly, the previously imposed deadlines are vacated, and new deadlines will be set once the scope of discovery to be completed becomes clearer.

As to the request for confirmation, it is not entirely clear what the court is being asked to do. To the extent that the defendant asks that I now "review the record as to certain documents that were not before the Court when it rendered its March 24, 2006 Decision and Order," Zdrojeski Letter, Aug. 16, 2006, I believe that it would be inappropriate to do so and in essence

-2-

**JA2904**

issue a new ruling while objections to the order are under review by Judge Gershon.  To the

extent that it may assist Judge Gershon in making her determination concerning those

objections, however, I can state that the extent of the involvement of the defendant's New York

branch in Saudi Committee transactions was not considered by the court and was irrelevant to

the decision.  The reasons for the decision, and the matters considered by the court, are set forth

in their entirety in the Order.

<div style="text-align: right;">

**SO ORDERED:**

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

</div>

Dated:        Brooklyn, New York
              August 31, 2006

<div style="text-align: center;">-3-</div>

<div style="text-align: right;">**JA2905**</div>

H
Linde v. Arab Bank, PLC
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Courtney **LINDE**, et al., Plaintiffs,
v.
**ARAB BANK**, PLC, Defendant.
Philip Litle, et al., Plaintiffs,
v.
**Arab Bank**, PLC, Defendant.
Oran Almog, et al., Plaintiffs,
v.
**Arab Bank**, PLC, Defendant.
Robert L. Coulter, Sr. et al., Plaintiffs,
v.
**Arab Bank**, PLC, Defendant.
Gila Afriat-Kurtzer, et al., Plaintiffs,
v.
**Arab Bank**, PLC, Defendant.
Michael Bennett, et al., Plaintiffs,
v.
**Arab Bank**, PLC, Defendant.
Arnold Roth, et al., Plaintiffs,
v.
**Arab Bank**, PLC, Defendant.
Netanel Miller, et al., Plaintiffs,
v.
**Arab Bank**, PLC, Defendant.
Stewart Weiss, et al., Plaintiffs,
v.
**Arab Bank**, PLC, Defendant.
**No. 04 CV 2799 NG VVP, 04 CV 5449 NG VVP,
04 CV 5564 NG VVP, 05 CV 365 NG VVP, 05
CV 388 NG VVP, 05 CV 3183 NG VVP, 05 CV
3738 NG VVP, 05 CV 5518 NG VVP, 06 CV 1623
NG VVP.**

Sept. 13, 2006.

Mark S. Werbner, Sayles Werbner, Dallas, TX,
Peter A. Binkow, Law Offices of Lionel Z. Glancy,
Neal Dublinsky, Glancy Binkow & Goldberg LLP,
Los Angeles, CA, Robert A. Swift, Steven M.
Steingard, Kohn, Swift & Graf, P.C., Philadelphia,

PA, Andrew David Friedman, Wechsler, Harwood,
Halebian & Feffer, L.L.P., Lee S. Shalov, James P.
Bonner, Shalov Stone & Bonner LLP, Douglas
James Pepe, Gregory P. Joseph, Peter Rolf Jerdee,
Gregory P. Joseph Law Offices, New York, NY,
Aaron Schlanger, Gary M. Osen, Osen & Associate,
Oradell, NJ, Richard D. Heidemann, Heidemann
Lezell Nudelman & Kalik PC, Allan Gerson, Attor-
ney at Law, Washington, DC, Donald Migliori,
Motley Rice, LLC, Providence, RI, Jodi Westbrook
Flowers, John M. Eubanks, Justin B. Kaplan, Mi-
chael E. Elsner, Ronald L. Motley, Robert T. Hae-
fele, Motley Rice, LLC, Mount Pleasant, SC, for
Plaintiffs.
Kevin Walsh, Leboeuf Lamb Greene & Macrae
LLP, New York, NY, Eric L. Lewis, Baach Robin-
son & Lewis, Washington, DC, for Defendant.

*ORDER*

GERSHON, United States District Judge:
***1** No objections have been filed to the July 24,
2006 Report and Recommendation of Magistrate
Judge Viktor V. Pohorelsky. The Court adopts the
Report and Recommendation in its entirety, and the
plaintiffs' motion for sanctions is denied.
SO ORDERED

*REPORT AND RECOMMENDATION*

VIKTOR V. POHORELSKY, Magistrate J.
The plaintiffs have moved for injunctive relief
and sanctions to redress conduct by the defendant's
counsel that they contend amounts to obstruction of
justice. The allegedly inappropriate conduct justify-
ing sanctions is the transmittal of a letter to an Is-
raeli organization whose website has published in-
formation and evidence concerning the claims made
by the plaintiffs here. Judge Gershon has referred
the motion to me for a report and recommendation.
*See* 28 U.S.C. § 636(b)(1)(B). For the reasons be-
low, I recommend that the motion be denied.

These related actions involve tort claims
arising from injuries and deaths caused by suicide

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bombings and other attacks in Israel, the West Bank, and Gaza since the onset of the second intifada in late 2000. The plaintiffs allege that the defendant knowingly encouraged and promoted these violent acts by providing a financial system for the collection and payment of funds in compensation and reward to the families of those who carried out the attacks.

The defendant's alleged involvement in these financial activities has been the subject of comment on a website in Israel operated by an organization known as the Center for Special Studies ("CSS"). The CSS, which dedicates itself "In memory to the fallen of the Israeli Intelligence Community," disseminates a wide variety of information about terrorism on its website. *See* Center for Special Studies Home Page, *http://www.intelligence.org.il/*. Information that has appeared there includes commentary about the defendant's involvement in the financial affairs alleged in this action, as well as copies of documents, supposedly seized by the Israeli army from Palestinians, which purport to reflect financial transactions of the type alleged here.

In response to the website's publications about it, the defendant's counsel here engaged an Israeli law firm to send a letter to CSS in May 2005. *See* Letter of Eytan Epstein, May 25, 2005, annexed as Ex. 1 to Plaintiffs' Memorandum of Law. The letter takes issue with assertions made on the website, and denies the defendant's participation in, or support of, terrorist activity. The letter notes that the website has published material of an apparently evidentiary nature that purports to have been obtained from official intelligence sources in Israel, material which the plaintiffs' counsel here have apparently used in prosecuting their claims here. The letter complains that the publication of such materials on the CSS website could have an impact on the proceedings in this action, and thus deny the defendant a fair opportunity to defend itself against the accusations. The letter asserts the belief that it is improper for the intelligence community of the State of Israel to publish material that could damage a party's position in ongoing litigation. Finally, the letter asks that CSS cease publishing material

accusing the defendant of illegal activity until the proceedings here are concluded and issue a written clarification that its publications were only opinions and assessments of CSS, and do not reflect the official position of the State of Israel.

**\*2** The plaintiffs argue that the letter constitutes an attempt to obstruct the plaintiffs' access to information by intimidating individuals from communicating about matters relating to the defendant. The court disagrees. The thrust of the letter is a defense of the defendant's reputation and a concern about how the information published on the website may affect public opinion and the proceedings in this action. Although the letter specifically mentions this action and highlights that some material published on the website would be used as evidence by the "prosecutors" (apparently a reference to the plaintiffs' counsel) here, it does not criticize CSS for providing that material to the "prosecutors." Rather, the criticism is directed at the publication of that material on the website. The court therefore finds nothing in the letter that constitutes an effort to obstruct the flow of information to the plaintiffs here, and the plaintiffs themselves acknowledge that the letter did not have that effect.

The principal case cited by the plaintiffs in support of their motion, *Ty, Inc. v. Softbelly's, Inc.,* is inapposite for several reasons. First, the effort to obstruct there involved a telephone call made for the specific purpose of dissuading an expert witness from offering testimony on behalf of the defendant at trial. In contrast, there has been no effort here to dissuade anyone from testifying anywhere, or to prevent anyone from providing information to the court. Second, the object of the supposed obstruction here, CSS, is not even a witness. At most CSS possesses documents that may have some evidentiary significance here, documents which it states are publicly available from the Israeli military. *See* Letter of Yehuda Tunik, July 26, 2005, annexed as Ex. 7 to Defendant's Memorandum of Law.

The court finds little to support the notion that the letter was an attempt to prevent CSS from passing on such information to the plaintiffs.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rather, the clear intent of the letter, on its face, is to attempt to convince CSS to cease publishing information on its website which the defendant asserts to be false and defamatory. That CSS understood the letter that way is clear from its written response to the letter, which contends that the commentary on its website constitutes merely the "research opinion of the author," and thus seeks to take advantage of an "expression of opinion" defense to defamation. Tunik Letter, *supra*. Equally telling is a disclaimer which now appears on the CSS website stating, in essence, that material appearing on the website constitutes the opinion of the author and does not reflect CSS's opinions. The defendant clearly has the right to take lawful steps to prevent the publication of statements it believes are defamatory. The Epstein letter constitutes such a step.

The court therefore concludes that the letter furnishes no basis for taking any action, and accordingly recommends that the plaintiffs' motion for sanctions be denied.

**\*3** Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *see, e.g., Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Serv.,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam).

E.D.N.Y.,2006.
Linde v. Arab Bank, PLC
Slip Copy, 2006 WL 2666309 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**JA2908**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X        **Docket#**
IN THE MATTER OF:                :      04-cv-2799(NG)(VVP)
                                 :      04-cv-5449(NG)(VVP)
                                 :      04-cv-5564(NG)(VVP)
                                 :      05-cv-365 (NG)(VVP)
ARAB BANK, PLC.,                 :
                                 :      U.S. Courthouse
                                 :      Brooklyn, New York
                                 :
                                 :      September 21, 2006
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**

**For Plaintiff Linde**
**and Coulter:**                        **Robert Swift, Esq.**
                                        **Gary Osen, Esq.**


**For Plaintiff Litle:**               **Mark Werbner, Esq.**
                                        **Richard Heidemann, Esq.**



**For the Defendant:**                  **Ronald Zdrojeski, Esq.**
                                        **Alan Howard, Esq.**



**Official Transcriber:**               **Rosalie Lombardi**
                                             **L.F.**


**Transcription Service:**              **Transcription Plus II**
                                        823 Whittier Avenue
                                        New Hyde Park, N.Y.  11040
                                        (516) 358-7352


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

**JA2909**

**Proceedings**

```
 1          THE CLERK:  Civil Cause for a Status Conference
 2   in 04-cv-2799, Linde v. Arab Bank, et al.
 3   Magistrate Judge Viktor Pohorelsky presiding.
 4          THE COURT:  Good morning, all.  Please be
 5   seated.  Did you guys sign in in some way so that we have
 6   names of the people, et cetera?  Okay.
 7          THE CLERK:  Yes, your Honor.
 8          THE COURT:  Okay.  Thank you, Jim.
 9          Right now, I gather that although you're
10   probably analyzing records and maybe gathering a few
11   additional records, really the things are sort of at a
12   half in discovery; am I correct, pending while you're
13   awaiting rulings really, not only from me but from Judge
14   Gershon, as well.  Is that accurate?  I mean, does
15   somebody want to bring me up to date on where you are
16   discovery wise?  Maybe that's a good way to open up
17   rather than me just presuming things.  Does the plaintiff
18   want to --
19          MR. OSEN:  Your Honor?
20          THE COURT:  You've got different people.  I
21   don't really care who talks but --
22          MR. WERBNER:  I'll defer to Mr. Osen.
23          MR. OSEN:  Gary Osen for the Linde plaintiffs,
24   your Honor.
25          Your summary is basically correct.  Obviously
```

1    MR. WERBNER:  Yes, sir.

2    THE COURT:  -- by which the Saudi Committee

3  production is finished.  If you said that off the bat, I

4  would have --

5    MR. WERBNER:  Well, I --

6    THE COURT:  Now I follow you.

7    MR. WERBNER:  That's where I am coming from.

8    THE COURT:  Okay.

9    MR. WERBNER:  Because otherwise, I have this

10  sense that -- and you've heard counsel say well, maybe if

11  I can now tell my client the way the winds are blowing,

12  it's going to effect things.  Well, I think it means --

13    THE COURT:  Of course it does.  Of course it

14  does.

15    MR. WERBNER:  So, given the --

16    THE COURT:  That's what happens.  You know,

17  that's the point of this; right?

18    MR. WERBNER:  We'll blow a big dust at them.

19    THE COURT:  That's the point of this; right?  I

20  mean, they have to know what I am thinking.

21    MR. WERBNER:  Blow a big dust at them.

22    THE COURT:  And what I am thinking -- just like

23  you do.  So, I mean, I wasn't prepared to give you a

24  ruling today because I frankly have not -- I can't put

25  pen to paper and if somebody wants to appeal this, that's

**Proceedings**

1    business interests throughout the Middle East.  You know,

2    this will -- the effort of preparing him and getting him

3    ready for his deposition is likely going to be laborious

4    and time consuming, just making -- getting him available

5    to do this.  And while I would certainly, you know, like

6    to heighten the plaintiff's hopes that this deposition

7    would be taken in New York, I don't have -- my

8    understanding is he doesn't regularly travel to New York.

9            THE COURT:  I mean, if he's a director and the

10   bank is here, you know, I could require him to appear

11   here.  You know --

12           MR. ZDROJESKI:  I would hope that the Court

13   would --

14           THE COURT:  We would like to help accommodate

15   everybody's interests but -- and we want to make this --

16   we don't want to make this unnecessarily inconvenient --

17           MR. ZDROJESKI:  Right.

18           THE COURT:  -- but, you know, I mean you've got

19   to understand, he's going to have to appear.

20           MR. ZDROJESKI:  No, I --

21           THE COURT:  He has to understand he's got to

22   appear.  I don't see -- they're willing to forgo a later

23   deposition of him which may be informed by more

24   production of records and more documents --

25           MR. ZDROJESKI:  Right.

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **26th** day of **September** , 2006.


-----------------------
Rosalie Lombardi
Transcription Plus II



OSEN & ASSOCIATE, LLC

ATTORNEYS AT LAW

700 KINDERKAMACK ROAD, ORADELL, NEW JERSEY 07649
TELEPHONE 201.265.6400  FACSIMILE 201.265.0303
WWW.OSEN.US

October 11, 2006

**BY ECF**

Honorable Viktor V. Pohorelsky
United States Magistrate Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

<u>Re:</u>    **Linde v. Arab Bank, plc, 04 CV 2799 (NG)(VVP), and related cases**

Dear Magistrate Judge Pohorelsky:

 We write on behalf of the Plaintiffs in the above-referenced cases to respond to the unfortunate misstatements contained in Defendant's letter dated October 6, 2006.

 Defendant incorrectly characterizes Plaintiffs' prior letter of October 4, 2006, as "procedurally improper." Defendant's counsel supports this contention by blatantly mischaracterizing Plaintiffs' letter as some form of Motion for Reconsideration and Your Honor's statements at the last conference as a "ruling." Apart from the undeniable fact that Your Honor did not issue any order in connection with this matter which would be subject to reconsideration, as we understand it, the sum total of Your Honor's so-called "ruling" was a request that Defense counsel "report back … within a week …" on the question of whether their client would have an interest in pursuing letters rogatory (Tr.: 55). Moreover, Your Honor characterized the entire exercise as providing Defendant "a little opportunity to do that, if, [Defendant] want[s] to do it." (Tr.: 33) Your Honor's invitation to Defendant's counsel to apprise the Court as to Defendant's willingness to pursue letters rogatory has now been mysteriously transformed into a Court Order.

 Moreover, Defendant's contention that Plaintiffs' concerns about the futility of letters rogatory in this context somehow contradicts their stated legal position on foreign bank secrecy is simply not plausible. Plaintiffs have never contested the *existence* of the foreign bank secrecy laws relied upon by the Defendant nor have the Plaintiffs denied that the governments in question have asserted their applicability. Plaintiffs *have* argued that those assertions are inconsistent with Jordan and Lebanon's stated obligations under binding international agreements. More importantly, Plaintiffs have demonstrated that U.S. law and *the clear U.S. interest in disclosure of the relevant records* are overwhelmingly more compelling than the privacy interests of Arab Bank's customers, which include Foreign Terrorist Organizations and

**JA2914**

Case 1:04-cv-02799-BMC-PK   Document 239   Filed 10/11/06   Page 2 of 3 PageID #: 5226
Letter to the Honorable Judge V. Pohorelsky
October 11, 2006
Page 2 of 3

their charitable fronts, Specially Designated Global Terrorists, and the families of suicide bombers and members of Foreign Terrorist Organizations incarcerated in Israeli prisons. The fact that the Jordanian Central Bank has made clear the position of the Jordanian government that, notwithstanding its treaty obligations, it insists upon the application of Jordanian bank secrecy laws, clearly indicates the further futility of any effort to proceed in the fashion which Defendant has so readily embraced.

At the most recent status conference, Your Honor specifically spoke about the possible effectiveness of government-to-government communications, and Plaintiffs' October 4, 2006, letter merely pointed out that letters rogatory are actually issued *by this Court*. Defendant, in its most recent letter, counters that the letters rogatory process seeks a court order from a foreign court rather then recognition of a U.S. court order (as previously sought by the Defendant). It is hard to imagine that this is a distinction that would make a meaningful difference, particularly in the case of the Palestinian Authority,[1] whose bank secrecy law (according to the Defendant) provides for *no* exceptions from the Palestinian 'judicial process' apart from customer waiver.

It is certainly understandable from the Defendant's standpoint that the prospect of pursuing letters rogatory for the next year or two is a welcome reprieve from what Plaintiffs believe should be the inevitable procedural outcome in this matter. In view of the fact that the process normally takes a minimum of 6 months to a year simply for the *issuance* of letters rogatory, and can take literally years for a definitive result (however futile), Defendant's enthusiasm for this approach is understandable. It is no wonder that Defendant's counsel now seeks to transform Your Honor's inquiry into a definitive "Order" issued by this Court.

However, as Your Honor made clear at the status conference, the Court does not intend this process to go on for a year or longer (Tr.: 41). The Defendant has met its obligation to the Court by readily embracing the possibility of proffering letters rogatory. Defendant has not, however, offered any excuse for its failure to commence those discovery efforts in the two years since these actions were commenced. Thus, particularly in light of the inevitable outcome of the letters rogatory process in these circumstances, that process should not be permitted to further delay this litigation. In short, Defendant's long belated pursuit of discovery by means of what will undoubtedly be fruitless letters rogatory, should not be permitted to interfere with what Plaintiffs respectfully submit is the most efficient and effective approach in this instance: the Court should issue an Opinion and Order regarding the pending Bank Secrecy Motion as expeditiously as the Court's schedule permits.

In so doing, the Court will set in motion the process by which one party or the other will undoubtedly file objections under Rule 72 and the matter will be taken up by the District Court. The process of resolving the issue of foreign bank secrecy will therefore take several months under the most expedited set of circumstances. If Defendant wishes to pursue means of

---

[1] In fact, the U.S. Consulate in Jerusalem advises that Letters Rogatory directed towards the Palestinian Authority should be sent directly by the party and not through diplomatic channels because the U.S. government has "very little dealings" with the PA.

**JA2915**

Letter to the Honorable Viktor V. Pohorelsky
October 11, 2006
Page 3 of 3

compliance with the Document Production Order by letters rogatory or by expediting its requests for consent from various bank customers, that is an effort which it can ultimately argue mitigates the sanctions (if any) ultimately levied by the Court.  Plaintiffs respectfully submit however, that those efforts should not be permitted to suspend the adjudication of the bank secrecy issue or delay discovery for months and, perhaps, years to come.

Respectfully submitted,

Gary M. Osen

GMO/eb

cc:    All Counsel

# UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK
## SUBPOENA IN A CIVIL CASE

COURTNEY LINDE, et al.

                Plaintiffs,

    -against-

ARAB BANK, PLC,

                Defendant.

Case No. CV 04 2799(NG)(VVP)

PHILIP LITLE, et al.

                Plaintiffs,

    -against-

ARAB BANK, PLC,

                Defendant.

Case No. CV 04 5449(NG)(VVP)

ORAN ALMOG, et al.

                Plaintiffs,

    -against-

ARAB BANK, PLC,

                Defendant.

Case No. CV 04 5564(NG)(VVP)

ROBERT L. COULTER, SR.,
FOR THE ESTATE OF JANIS RUTH
COULTER, et al.

                Plaintiffs,

    -against-

ARAB BANK, PLC,

                Defendant.

Case No. CV 04 5564(NG)(VVP)

JA2917

GILA AFRIAT-KURTZER, et al.

Plaintiffs,

-against-

ARAB BANK, PLC,

Defendant.

Case No. CV 05 388(NG)(VVP)

BENNETT, et al.

Plaintiffs,

-against-

ARAB BANK, PLC,

Defendant.

Case No. CV 05 3183(NG)(VVP)

ROTH, et al.

Plaintiffs,

-against-

ARAB BANK, PLC,

Defendant.

Case No. CV 05 3738(NG)(VVP)

STEWART WEISS AND SUSAN WEISS, et al.

Plaintiffs,

-against-

ARAB BANK, PLC,

Defendant.

Case No. CV 06 1623(NG)(VVP)

JOSEPH JESNER, et al.

Plaintiffs,

-against-

ARAB BANK, PLC,

Defendant.

Case No. CV 06 3869(NG)(VVP)

JA2918

TO:     Israel Discount Bank of New York
        511 Fifth Avenue
        New York, New York  10017

        Israel Discount Bank, Ltd.
        c/o Israel Discount Bank of New York
        511 Fifth Avenue
        New York, New York  10017

| ☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case. | |
| --- | --- |
| PLACE OF TESTIMONY | COURTROOM |
| | DATE AND TIME |

| ☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. | |
| --- | --- |
| PLACE OF DEPOSITION | DATE AND TIME |

| ☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): **See Schedule A annexed hereto.** | |
| --- | --- |
| PLACE<br>LeBoeuf, Lamb, Greene & MacRae LLP<br>125 West 55th Street, NY, NY 10025 | DATE AND TIME<br>November 30, 2006 |

| ☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below. | |
| --- | --- |
| PREMISES | DATE AND TIME |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| Steven J. Young, Esq.<br>LeBoeuf, Lamb, Greene & MacRae LLP<br>Attorneys for Defendant Arab Bank plc | October 31, 2006 |

| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER |
| --- |
| Steven J. Young, Esq.<br>LeBoeuf, Lamb, Greene & MacRae LLP<br>125 West 55th Street, NY, NY 10025<br>(212) 424-8000 |

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

**JA2919**

| PROOF OF SERVICE | | |
|---|---|---|
| **SERVED** | DATE | PLACE |
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                              DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**JA2920**

## SCHEDULE A

## INSTRUCTIONS

1.    As provided in Federal Rule of Civil Procedure 45(d), a person responding to a subpoena shall produce the documents and materials as they are kept or maintained in the ordinary course of business or shall organize and label them to correspond to the categories in the demand.

2.    Documents attached to each other should not be separated.

3.    In producing documents and other materials, You are to furnish all documents or things in Your possession, custody, or control, regardless of whether such documents or materials are possessed directly by You or by Your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, investigators, all attorneys, advisors, representatives, and other personnel, acting on Your behalf or under Your control.

4.    If any requested document or thing cannot be produced in full, You are to produce it to the extent possible, identifying which document or portion of a document is being withheld, and the reason that document is being withheld.

5.    When information subject to the subpoena is withheld on a claim that it is privileged or otherwise subject to protection from production, including, for example, documents withheld because they are subject to a bank examination privilege, such claim shall be made expressly and shall be supported by an identification of the nature of the documents, communications, or things not produced, sufficient to enable the demanding party, and the Court if necessary, to properly evaluate the claim.

6.    Unless a different time period is specified, the relevant time period with respect to each request herein is January 1, 1995 through the present (the "Relevant Time Period").

<u>**SCHEDULE A**</u>

<u>**DEFINITIONS**</u>

The Uniform Definitions in Discovery Requests set forth in Rule 26.3 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, and the rules of construction set forth therein and in the Federal Rules of Civil Procedure, are incorporated herein by reference as if separately set forth in each and every request herein.

Additionally, and to the extent not contradicted thereby, each the terms identified below, as used herein, shall have the following meaning:

1.  "Document" is defined to be synonymous in meaning and equal in scope to the usage of that term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations. A draft or non-identical copy is a separate document within the meaning of this term.

2.  When referring to documents, to "identify" means to provide, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

3.  "Israel Discount Bank," "Israel Discount Bank Facility," "You" and "Your" all refer, individually and collectively, to any of the following entities, and to any branches, subsidiaries, parents, successor entities or agents or representatives thereof, including, but not limited to, officers, directors, attorneys, employees, advisors and any other persons acting on their behalf or under their control:

    (a)  Israel Discount Bank of New York;

    (b)  Israel Discount Bank Ltd.;

    (c)  Discount Bancorp, Inc.;

2

**JA2922**

(d)     Israel Discount Bank, International Banking Facility; and

(e)     Israel Discount Bank, Broadway Branch.

4.     "Arab Bank" refers to Arab Bank plc, including all of its branches.

5.     "Transaction" includes, but is not limited to, a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument or investment security, payment or order for any monetary remittance or transfer, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected.

6.     "Transmittal" refers to the sending, receiving or movement of funds or securities, or of a right thereto, from one party to another party by any one or more of the following means:

(a)     any actual conveyance of money or of any financial security or instrument;

(b)     any accounting entry on the books of a financial institution evidencing a transfer of ownership in or rights to money or any financial security or instrument; and

(c)     any accounting entry or documentation otherwise reflecting the above, including the processing of funds or securities through any national or international funds or securities transfer system.

7.     "Palestinian Territories" refers to any portion, or all, of the regions generally known as the West Bank and the Gaza Strip, and also referred to as Judea, Samaria and Gaza, and including all such areas that were, at any time during the "Relevant Time Period,"

3

JA2923

under the direct or indirect control of the Palestinian National Authority or the State of Israel, or any Israeli military or other authority or any combination thereof.

8. "Palestinian Authorities" refers to any and all governmental entities and authorities within the Palestinian Territories vested with or exercising supervision and/or control over banks and other financial institutions operating within the Palestinian Territories, including but not limited to the Palestinian Monetary Authority.

9. "Israeli Authorities" refers to any and all Israeli governmental entities and authorities vested with or exercising supervision and/or control over banks and other financial institutions operating within the State of Israel and/or the Palestinian Territories, including but not limited to the State of Israel's governmental agencies, intelligence and security authorities, military authorities, and regulatory authorities including but not limited to the Bank of Israel.

10. "United States Authorities" refers to any and all governmental entities and authorities of the United States vested with or exercising supervision and/or control over banks and other financial institutions operating within, or doing business in or through, the United States, including but not limited to the United States Treasury Department and all of its branches, divisions and bureaus including the Office of the Comptroller of the Currency and the Financial Crimes Enforcement Network, and any other federal agencies, intelligence and security authorities and regulators providing advice to or exercising supervision or control over banking operations within or passing through the United States.

11. "New York Authorities" refers to any and all governmental entities and authorities of the State of New York vested with or exercising supervision and/or control over banks and other financial institutions operating within, or passing through, the State of New, including but not limited to the New York State Banking Department.

JA2924

12.     "Regulatory Authorities," as used herein, means, collectively, any or all of the above-defined Palestinian Authorities, Israeli Authorities, United States Authorities and New York Authorities.

13.     "Charitable Entity" means one or more of the following entities:

(a)     Al Aqsa Foundation a/k/a Al-Aqsa Charitable Foundation of Germany, Belgium, Denmark and the Netherlands a/k/a Al-Aqsa E.V.;

(b)     Al-Azariyah Zakat Committee a/k/a Lajnat Zakat we Sadaqat Al-Azarariyah a/k/a Bethany Zakat Committee;

(c)     Al Ihsan Charitable Society a/k/a Elehssan Society a/k/a Al-Ihsan Society a/k/a Ihsan Charity;

(d)     Al Islah Charitable Society a/k/a Al Islah Society a/k/a Al Aslah Charitable Committee a/k/a Islah (Reform) Society a/k/a Jamaiat Al Islah Al Islamia a/k/a Jamaiat Al-Islah Al-Khayriah;

(e)     Children's Mercy and Charitable Society - Gaza Strip a/k/a Society of Charity and Grace for Children a/k/a Jamiat Mubarat Al-Rahme Lil Atfal;

(f)     Comite de Bienfaisance et de Secours aux Palestiniens a/k/a Charitable Committee for Solidarity with Palestine a/k/a De Bienfaisance et de Comité le Solidarité avec la Palestine;

(g)     Dar El Salam Hospital a/k/a Dar Al-Salam Hospital;

(h)     El Wafa Charitable Society a/k/a Social Center, Rehabilitation Committee a/k/a Al-Wafaa' Building Charitable Society a/k/a Jamaiat al-Wafa' al-Khayriah;

(i)     Halhoul Zakat Committee a/k/a Lajnat Zakat Halhoul;

5

**JA2925**

(j)       Holy Land Foundation a/k/a Holy Land Foundation for Relief and Development;

(k)       House of the Qur'an and Sunnah Society a/k/a Jamaiat Dar Al-Quran wa Al-Sunnah;

(l)       Human Appeal International;

(m)       Human Relief International;

(n)       Human Relief Committee;

(o)       Interpal a/k/a Palestine Relief and Development Fund;

(p)       Islamic Association (Gaza) a/k/a Al Jamiyah Al-Islamiya a/k/a Al Gamiyah Al Islamiya;

(q)       Islamic Center Association a/k/a Islamic Center Society, Gaza Strip (Mujama) a/k/a Al Mujama Al-Islami;

(r)       Islamic Charitable Society Al Bireh a/k/a Al Jamiyah Al-Khairia Al-Islamiya Al Bireh a/k/a Islamic Charity Society of Al Bireh;

(s)       Islamic Charitable Society of Hebron a/k/a Al Jamiyah Al-Khiriah Al-Islamiya a/k/a/ Islamic Charity Society of Hebron a/k/a Islamic Charity Association;

(t)       Islamic Science and Cultural Society a/k/a Islamic Sciences and Culture Committee;

(u)       Islamic Society a/k/a Islamic Charity Society a/k/a Islamic Charitable Society a/k/a Al-Jamaia Al-Islamia Al-Khiria;

(v)       Islamic University Gaza a/k/a Al-Jamiyah Al-Islamiya Gaza;

(w)       Jamaiat Al-Salah Al-Islamiya, Gaza a/k/a Islamic Virtue Society – Gaza;

6

JA2926

(x)     Jenin Charitable Committee a/k/a Jenin Zakat Committee a/k/a Lajnat Amwal Al-Zakkah Jenin;

(y)     Orphan Care Society Bethlehem a/k/a Bethlehem Society for Orphans a/k/a Jami'yya Ri'aya al-Yatim Fi Bayt-Lehem;

(z)     Nablus Al-Tadamun Charitable Society a/k/a Solidarity for Islamic Charity Association a/k/a Al Tadamun Charitable Society a/k/a Gamaiyah Altadaman Al-Khiriya Al Aslamiya Nablus;

(aa)    Nablus Charitable Committee a/k/a Nablus Zakat Committee a/k/a Lajnat Zakat Nablus;

(bb)    Noon Institute for Quran Research;

(cc)    Nusseirat Islamic Society a/k/a Al-Jamaiah Al-Islamiah, Al-Nusseirat;

(dd)    Qalqilya Charitable Society a/k/a Qalqilyah Zakat Committee a/k/a Lajnat Zakkah Qalqilya;

(ee)    Qalqilya Society for Rehabilitation;

(ff)    Ramallah and Al-Bireh Charitable Committee a/k/a Ramallah Zakat Committee a/k/a Charity Committee in Ramallah and Al Bireh a/k/a Lajnat Zakat Ramallah we Al Bireh a/k/a Al Bireh Zakat Committee;

(gg)    Tulkarem Zakat Committee a/k/a Toklarem a/k/a Tulkarm Zakat Committee a/k/a Tulkarem Charitable Committee a/k/a/ Tolkarem Charitable Society a/k/a Lajnat Zakat Tul-Karem; and

(hh)    Welfare Society a/k/a Muassassat Al-Taawun.

7

**JA2927**

14.    "New York Charitable Entity Account" means any account that is or was maintained, during the Relevant Time Period, at an Israel Discount Bank Facility within the State of New York, in the name of, or for the benefit of, a Charitable Entity.

15.    "New York Charitable Entity Transaction or Transmittal" means any Transaction or Transmittal by, for or including as an intermediary any Charitable Entity, and that was initiated, facilitated or concluded by any Israel Discount Bank Facility located within the State of New York, during the Relevant Time Period.

16.    "State of Israel Charitable Entity Account" means any account that is or was maintained, during the Relevant Time Period, at an Israel Discount Bank Facility within the State of Israel, in the name of, or for the benefit of, a Charitable Entity.

17.    "State of Israel Charitable Entity Transaction or Transmittal" means any Transaction or Transmittal by, for or including as an intermediary any Charitable Entity, and that was initiated, facilitated or concluded by any Israel Discount Bank Facility located within the State of Israel, during the Relevant Time Period.

JA2928

<u>**SCHEDULE A**</u>

<u>**DOCUMENTS TO BE PRODUCED**</u>

1.      All documents that comprise or evidence any New York Charitable Entity Transaction or Transmittal, including as to each, but not limited to:

(a)      all documents that identify the originators, intermediaries and beneficiaries; and

(b)      all documents that comprise or reference the payment, receipt or transfer instructions provided by any person or entity.

2.      With respect to each New York Charitable Entity Account, all documents:

(a)      sufficient to identify the number of the account;

(b)      comprising account opening information (even if created prior to the Relevant Time Period), and including authorized signature records, documents evidencing account-holder identification and any and all other documents collected or created in compliance with any applicable account opening guidelines established by You or by any applicable banking or financial authority;

(c)      comprising periodic account statements issued by You with respect to the account throughout the Relevant Time Period; and

(d)      comprising account closing information, if the account was closed during the Relevant Time Period.

3.      All regulatory, judicial, quasi-judicial, investigatory and other documents that reference or concern one or more New York Charitable Entity Accounts, Transactions or Transmittals, whether created or collected by you, provided to you by anyone else, or provided by anyone else to you, and including but not limited to:

(a)      subpoenas;

**JA2929**

(b)  demands;

(c)  informational materials;

(d)  notices, warnings, restrictions, regulations or prohibitions;

(e)  findings, fines or other sanctions, orders, or stipulations; and

(f)  correspondence or other communications to, from or with any United States Authority, New York Authority, Israeli Authority or Palestinian Authority, and all references to or concerning any such communications.

4.  All documents that comprise or evidence any State of Israel Charitable Entity Transaction or Transmittal, including as to each, but not limited to:

(a)  all documents that identify the originators, intermediaries and beneficiaries; and

(b)  all documents that comprise or reference the payment, receipt or transfer instructions provided by any person or entity.

5.  With respect to each State of Israel Charitable Entity Account, all documents:

(a)  sufficient to identify the number of the account;

(b)  comprising account opening information (even if created prior to the Relevant Time Period), and including authorized signature records, documents evidencing account-holder identification and any and all other documents collected or created in compliance with any applicable account opening guidelines established by You or by any applicable banking or financial authority;

(c)  comprising periodic account statements issued by You with respect to the account throughout the Relevant Time Period; and

10

(d)     comprising account closing information, if the account was closed during the Relevant Time Period.

6.     All regulatory, judicial, quasi-judicial, investigatory and other such documents that reference or concern one or more State of Israel Charitable Entity Accounts, Transactions or Transmittals, whether created or collected by you, provided to you by anyone else, or provided by anyone else to you, and including but not limited to:

(a)     subpoenas;

(b)     demands;

(c)     informational materials;

(d)     notices, warnings, restrictions, regulations or prohibitions;

(e)     findings, fines or other sanctions, orders, or stipulations; and

(f)     correspondence or other communications to, from or with any United States Authority, New York Authority, Israeli Authority or Palestinian Authority, and all references to or concerning any such communications.

7.     To the extent not otherwise included within Your responses to these Requests, any and all documents comprising, evidencing or referencing any investigation of Your compliance practices or procedures, and any and all documents pertaining thereto, including but not limited to documents comprising and concerning the following:

(a)     the investigation of Israel Discount Bank, conducted by the New York State Banking Department, that led to the issuance of an Order to Cease and Desist, dated December 15, 2005 ("the Cease and Desist Order"), and in which it was concluded, among other things, that banking operations were being conducted "without effective management supervision and Board oversight to prevent unsafe or unsound practices and violations of the

11

JA2931

Bank Secrecy Act," that operations were being conducted "in violation of the USA PATRIOT Act . . . and Treasury Rules and Regulations . . . for failure to adopt appropriate policies and procedures for identifying and monitoring high-risk correspondent accounts," and mandating an independent review of all "compliance deficiencies, including criticism contained in examination reports issued since 2001," and all such related documents including but not limited to documents comprising and referencing:

(i)      the independent review mandated by the Cease and Desist Order (at ¶ 1(a) thereof);

(ii)     any further disciplinary action predicated on such independent review, as contemplated by the Cease and Desist Order (at ¶ 1(a) thereof);

(iii)    management's written report to the Federal Deposit Insurance Corporation ("FDIC") Regional Director and the Superintendent of the New York State Banking Department, addressing among other things the actions to be taken to correct Your compliance procedures, as mandated by the Cease and Desist Order (at ¶ 1(b) thereof);

(iv)    the written Bank Secrecy Act Plan, "to address the BSA program deficiencies contained in the New York State Banking Department's Report of Examination that commenced February 22, 2005," to be submitted to the FDIC Regional Director and the Superintendent of the New York State Banking Department, as mandated by the Cease and Desist Order (at ¶¶ 2-5 thereof);

(v)     the training program developed by You pursuant to the Cease and Desist Order (at ¶ 9 thereof);

(vi)    the amendment of Your audit policies, procedures and practices, and of the audit policies, procedures and practices of Your subsidiaries, and the

12

JA2932

reporting mandated in relation thereto, pursuant to the Cease and Desist Order (at ¶¶ 10-11 thereof);

(vii)     the enforcement plan formulated by KPMG at Your request and pursuant to the Cease and Desist Order;

(viii)    the recommendations formulated by the Promontory Financial Group as a result of their review of Your compliance procedures; and

(ix)     all communications by you to shareholders or to any other persons or entities, including affiliates, parents and subsidiaries, concerning the Cease and Desist Order or any investigation, fine, penalty , remediation or other related response or action.

(b)     the investigation of Your compliance practices undertaken by the New York State Attorney General's Office, as initially made public by You in or about December 2005; and

(c)     the settlement by You in 2006, with the New York State Banking Department and the United States Federal Reserve Board, of charges regarding improper compliance procedures, reportedly in the amount of or about $8.5 million in investigative costs and $16.5 million in additional fines.

8.     All manuals, circulars, policy documents, memoranda, lists, or instructions, comprising or referring to any rules, guidelines, or restrictions issued by any Regulatory Authority and also regulating or otherwise referencing:

(a)     Your conduct of business with, or for the benefit of, any person or entity located or doing business in the Palestinian Territories, including, without limitation, financial institutions and charitable organizations and including, without limitation, any lists or

13

JA2933

instructions setting forth such entities or persons as to whom transactions or the maintenance of accounts were or are prohibited;

(b)     Your conduct of any other business concerning the Palestinian Territories;

(c)     Your screening of Transfers conducted by wire;

(d)     Your compliance practices and procedures concerning the opening and maintenance of accounts; and

(e)     Your compliance practices and procedures regarding the verification of and familiarity with the bona fides of Your customers, also generally referred to as "Know Your Customer" practices and procedures.

9.     To the extent not produced in response to Request No. 8 hereinabove, any and all documents referring or relating to any request, requirement or suggestion of any Regulatory Authorities, or of Your own management, that Israeli banks, or You in particular, exercise heightened caution or restraint with regard to any Transfer, Transaction or account-holding by, to or for the benefit of any particular Palestinian or Arab business, person or organization, or any category thereof, located within the Palestinian Territories, and including, but not limited to, any consideration by You, any steps undertaken by You, or any complaints or caveats made by You with regard to the exercise of such heightened restraint or caution.

10.     All documents comprising, evidencing or relating to the publicly reported decision of Israeli Authorities, in or about October 2006, to rescind an injunction by the Bank of Israel and the Justice Ministry that required the reporting by all Israeli banks of all transactions with banks in the Palestinian Territories, and agreeing to grant to Israeli banks immunity from criminal prosecution for money transfers through banks in the Palestinian Territories, including

JA2934

but not limited to, all internal notes, memoranda and communications, and all related communications between or including You and:

        (a)    the Bank of Israel;

        (b)    the Justice Ministry;

        (c)    the Finance Ministry;

        (d)    the Association of Banks in Israel; or

        (e)    any other bank or financial institution.

11.    Any and all documents evidencing, comprising or referencing the initiation, maintenance or termination of any ongoing business relationship, at any time during the Relevant Time Period, between you and Arab Bank, including but not limited to:

        (a)    the entry into and maintenance of a financial services agreement between Israel Discount Bank and Arab Bank, dated September 21, 1994 and as thereafter amended, including but not limited to an amendment dated October 23, 2005 (collectively, as amended, the "Services Agreement"), and including any such documents that may exist in or about 1994, even if prior to the Relevant Time Period; and

        (b)    all documents, including notes, memoranda and any internal or external communications, concerning the Services Agreement or any provision or condition thereof or the performance of any obligation or responsibility thereunder, including but not limited to the exercise by You of the diligence and good faith required by Section 6 of the Services Agreement.

15

JA2935

# בית המשפט הצבאי יהודה

בפני כב׳ האב״ד: רס״ן יאיר תירוש
השופטת: רס״ן דליה קאופמן
השופט״ רס״ן זאב אפיק

נאמן למקור

התביעה הצבאית
(באמצעות סרן שגיב ליכטמן)

נגד

הנאשם: מוראד׳ וליד חאלד ברגותי ת.ז 945728608/ שב״ס
(באמצעות ב״כ עו״ד איליא תאודורי)

## נימוקי גזר הדין

הנאשם הורשע בסדרה ארוכה של עבירות חמורות ובהן חברות בפלג הצבאי של ארגון החמאס, עז אדין אל קסאם, נשיאת משרה בארגון זה, עבירות שעניינן נסיון גרימת מוות בכוונה וכן גרימת מוות בכוונה של חמישה חיילי צה״ל: **סמ״ר רז משה מינץ ז״ל, סמ״ר לי נעמן אקוניס ז״ל, סמ״ר ארז עידן ז״ל, סמל אלעד פולק ז״ל וסמל רועי יעקב סולומון ז״ל**, בגרימת מוות בכוונה של שלושה אזרחים ישראלים: **אסתר גאליה ז״ל, צבי גולדסטיין ז״ל ושלום הר-מלך ז״ל** ובהריגתו של תושב האיזור, **חכמת יאסין ז״ל**.

הנאשם אשר הצטרף לזרוע הצבאית של ארגון החמאס, גייס פעילים נוספים לארגון וקים חוליה חולייה צבאית שבראשה עמד יחד עם פעיל נוסף, גיאסר ברגותי. במסגרת חברותו בחוליה זו, הנאשם יזם, תכנן וביצע מספר פיגועים כדלקמן:

א. הנאשם הסכים יחד עם חבריו לחולייה, גיאסר ברגותי ויונס מסאעיד לבצע פיגוע לעבר חיילי צה״ל במחסום דורא אקרע במטרה לגרום למותם של החיילים. לאחר שחברי החולייה ערכו תצפיות והכנות לפיגוע יצאו הנאשם וחברי חולייתו לעבר המחסום כדי לבצע את הפיגוע הקטלני כאשר הם חמושים ברובים שונים ובאקדח. כאשר הגיעו הנאשם וחבריו למחסום, ביקש חייל צה״ל, **סמ״ר רז משה מינץ ז״ל** מהם הרבה להציג תעודה מזהה. בשלב זה פתח גיאסר ברגותי באש מהרובה שהחזיק כדי לגרום למותו של החייל ובעקבותיו פתח חבר חולייה נוסף באש לעבר החייל אשר נהרג כתוצאה מכך. הנאשם פתח באש וירה גם לעבר חייל נוסף וגרם לפציעתו. בגין מעשיו אלה הורשע הנאשם בגרימת מוות בכוונה של חייל צה״ל **סמ״ר רז משה מינץ ז״ל** וניסיון לגרימת מוות בכוונה של שאר חיילי צה״ל במחסום.

ב. הנאשם הציע לחבריו לחולייתו לבצע פיגוע נוסף במחסום סורדא בכוונה לגרום למותם של חיילי צה״ל באותו מחסום. הנאשם הציג בפני חבריו את תכניתו לביצוע הפיגוע ואלה הסכימו לאמצה ולהצטרף לנאשם לביצועה. מספר ימים קודם ליום שבו תכננו הנאשם וחבריו לבצע את הפיגוע נעצר הנאשם בחשד לאחזקת רכב גנוב. חבריו לחולייה החליטו לבצע את הפיגוע עפ״י

רס״ן אלינור ברזני
קצינת העיר נתניה

L_C180871

PX4010.pdf

JA2936



# APOSTILLE
## (CONVENTION DE LA HAYE 5 DU OCTOBER 1961)

| | | | |
|---|---|---|---|
| 1. | STATE OF ISRAEL | מדינת ישראל | .1 |
| 2. | THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY MR./MS | ברזני אלינור BARAZANI ELINOR | מסמך ציבורי זה נחתם בידי מר/גב׳ | .2 |
| 3. | ACTING IN THE CAPACITY OF NATANIA CITY OFFICER FOR MILITARY MATTERS | | המכהן בתור קצינת העיר נתנית | .3 |
| 4. | BEARS THE SEAL/STAMP OF THE MINISTRY OF | צבא ההגנה לישראל ISRAELI DEFFENCE | נושא את החותם/חותמת של משרד | .4 |
| 5. | CERTIFIED AT THE MINISTRY OF FOREIGN AFFAIRS | | אושר במשרד החוץ | .5 |
| 6. | THE | 5/10/2011 | ביום | .6 |
| 7. | BY | LIDAR RAHIMA CONSULAR BUREAU לידר רחימה החטיבה הקונסולרית | על-ידי | .7 |
| 8. | NO 528782. | | מס׳ 528782 | .8 |
| 9. | SEAL/STAMP | | חותם/חותמת | .9 |
| 10. | SIGNATURE, JERUSALEM | | חתימה, ירושלים | .10 |

PX4010.pdf

L_C180872

JA2937

נאמן למקור

1   תכניתו של הנאשם ואת תפקידו של הנאשם מילא פעיל אחר. בפיגוע זה
2   הגיעו חברי חולייתו של הנאשם למחסום סורדא ומשהתבחינו בשלושה חיילי
3   צה״ל, ירו לעברם באקדחים שהחזיקו. אחד מחברי החוליה ירה לעבר **סמ״ר**
4   **לי נחמן אקוניס ז״ל** וגרם למותו. גיאסר ברגותי ירה אף הוא כדור אחד
5   לעבר חייל אחר במחסום, אולם משגילה מעצור באקדחו, התנפל על החייל
6   וחטף את נשקו. אף שהנאשם לא נכח בפיגוע עצמו בשל מעצרו, הורשע
7   הנאשם בגרימת מותו בכוונה של חייל צה״ל **סמ״ר לי נחמן אקוניס ז״ל**
8   וניסיון לגרימת מותם בכוונה של שאר חיילי צה״ל במחסום והכל כמפורט
9   בהכרעת הדין.
10
11  ג.  בנוסף לפיגועים האמורים, הורשע הנאשם בעבירה נוספת שעניינה ניסיון
12  לגרימת מות בכוונה בכך שיחד עם חברי חולייתו הניחו מטען חבלה, אותו
13  הפעילו לעבר ג׳יפ של צה״ל על מנת לגרום למות החיילים בג׳יפ, אולם
14  למרבה המזל המטען לא התפוצץ. נסיונות נוספים של הנאשם וחברי חולייתו
15  להפעיל מטען זה לא צלחו אף הם.
16
17  בנוסף לפעילותו של הנאשם בחולייה הצבאית המוזכרת לעיל, הפעיל הנאשם יחד
18  עם גיאסר ברגותי, שתי חוליות חמאס צבאיות נוספות שבראשן עמד פעיל נוסף
19  אותו גייסו לעו אדין אל קסאם, השאם חג׳אז. כפי שקבענו בהכרעת הדין, הנאשם
20  וגיאסר היו אחראים להפעלתו של השאם חג׳אז, אספקת אמצעי לחימה, כספם
21  ואישור ביצוע הפיגועים המתוכננים, תוך שהנאשם וגיאסר נמצאים בקשר הדוק עם
22  אותו נאשם ונתאשם אף מונה ע״י גיאסר לעמוד בקשר ולהפעיל את השאם חג׳אז
23  וחולייתו. על כן מצאנו לנכון להרשיע את הנאשם כאחראי גם לפיגועים שבוצעו ע״י
24  החוליות שהופעלו ע״י השאם חג׳אז. כך מצאנו את הנאשם אחראי לסדרה ארוכה
25  של פיגועי ירי שביצעו החוליות בכבישי האזור, פיגועים אשר בחלקם לא היו נפגעים
26  למרבה המזל, פיגועים שבהם נפצעו נוסעי הרכבים שנרכו וכן מצאנו את הנאשם
27  אחראי לגרימת מותם של שלושה אזרחים ישראלים שנהרגו בפיגועים הללו: **אסתר**
28  **גאליה ז״ל, צבי גולדסטיין ז״ל ושלום הר-מלך ז״ל.**
29
30  עוד הורשע הנאשם בגרימת מותם של שלושה חיילי צה״ל **סמ״ר ארז עידן ז״ל, סמל**
31  **אלעד פולק ז״ל וסמל רועי יעקב סולומון ז״ל** בפיגוע בכפר עין יברוד ביום
32  19/10/03. בפיגוע זה, הנאשם וגיאסר ברגותי אישרו את תכנית הפיגוע כפי שהוצעה
33  השאם חג׳אזי וסיפקו לו 10,000 דולר לביצוע הפיגוע. הנאשם אשר היה שותף
34  לתכנית הפיגוע, נטל אף חלק בביצוע הן ע״י עריכת תצפיות לאחר הפיגוע והן ע״י
35  הברחת כלי הנשק שנלקחו מחיילי צה״ל, צילומם והעברת הצילומים לסוכנות
36  ידיעות לשם נטילת אחריות לפיגוע.
37
38  הנאשם השתתף בניסיון ביצוע פיגוע נוסף שמטרתו היתה התנגשות בג׳יפ חיילי
39  צה״ל באמצעות משאית, רצח החיילים, חטיפת גופותיהם לשם הבאה לשחרור
40  אסירים פלסטינים. הנאשם, אשר היה שותף לתכנית ואישר אותה, סיפק ביחד עם
41  גיאסר ברגותי להשאם חג׳אזי סכומי כסף גדולים לשם רכישת האמצעים לביצוע
42  הפיגוע. בנוסף, הנאשם וגיאסר ברגותי חפרו קברים לשם הסתרת גופות החיילים
43  והם היו אמורים לקבל את הגופות ולנהל את המשא ומתן לשחרור האסירים
44  הפלסטינים.
45
46  הנאשם וחברתן יצאו לביצוע הפיגוע כאשר הנאשם וגיאסר ברגותי הן אלה
47  שאמרים להודיע את הגעת כוחות צה״ל למקום וכן אמורים לקבל את גופות
48  החיילים ולהסתירן. תכניתם של הנאשם וחברי חולייתו לא יצאה אל הפועל בספ[...]

4584482
רס״ן אלונ... ברנ...
קצינת העיר נתניה

1 של דבר, על אף שהנאשם וחבריו חוליית נעשו מספר ניסיונות להוציאה אל הפועל
2 ואולם בסופו של דבר נעצרו.
3
4 כמו כן הורשע הנאשם בהריגתו של תושב האזור, חכמת יאסין זי"ל אשר נחשד
5 בעיניו כמשתף פעולה והוא חזרה חזרה לחשאם חגיאז לחטוף ולחקור באלימות בנוגע
6 לקשריו עם כוחות הביטחון הישראליים. חכמת יאסין נהרג תוך כדי חטיפתו על ידי
7 חברי החוליה כאשר התנגד לחטיפה.
8
9 הנאשם עמד ביחד עם גיאסר ברגותי בראשה של  תשתית חמאס צבאית שכללה
10 כמה מן החוליות הרצחניות ביותר שידע האזור. הנאשם לא נרתע ליטול חלק ישיר
11 בביצוע הפיגועים ואף שימש כממגן ומאשר פיגועים נוספים שבוצעו עי"י חוליות
12 אחרות שבאחריותו. הנאשם פעל יחד עם גיאסר ברגותי להשגת מימון לפעילויותיהן
13 הרצחניות של החוליות שהפעיל ואף נסע לשם כך מחוץ לאיזור, שם נפגש עם פעילי
14 חזבאללה וקיבל מהם סכומי כסף גדולים.  החוליות שבן הפעיל הנאשם היו חוליות
15 מאורגנות, מסודרות שפעלו כיחידות גרילה מימ... וכל מטרתן לזרוע הרס והרג
16 בקרב חיילי צה"ל ואזרחים ישראלים. כפי ששמענו גם בדברו האחרון של הנאשם
17 בבית המשפט, לנאשם משנה סדורה שמטרתה ברורה ורק הרחקתו מאחורי כתלי
18 הכלא עד סוף ימיו תמנע את המשך זריעת ההרג על ידו.
19
20 לפיכך, מצאנו כי אין הנאשם ראוי לעונש אחר, אלא לעונש החמור ביותר של מאסר
21 אשר ירחיק אותו לעולמים מהציבור. נאמנים לעיקרו קדושת החיים, מצאנו לגזור
22 על הנאשם עונש מאסר עולם נפרד בגין גרימת מותו של כל אחד מאלה שהנאשם
23 גרם למותם בכוונה וכן עונש מאסר עולם נוסף בגין יתר העבירות שביצע ואשר אין
24 צורך להכביר מילים באשר לחומרתם ומסוכנותם. בגין הריגתו של חכמת יאסין,
25 מצאנו לגזור על הנאשם עונש קצוב בשנים זאת למען התאמתה הקונסטפטואלית
26 שבין עבירת גרימת מוות בכוונה ובין עבירת ההריגה. אף שהתוצאה הקטלנית זהה
27 בשני המקרים, ישנו פער רב בין היסוד הנפשי הנדרש בין שתי העבירות. במקרה
28 שבפנינו הרשענו את הנאשם בעבירת ההריגה בהסתמך על צפייה של גרימת חבלה
29 ולאו דוקא צפיית התוצאה הקטלנית. אשר על כן לא מצאנו לגזור עליו מאסר עולם
30 בגין עבירה זו.
31
32 לאור האמור לעיל, החלטנו לגזור על הנאשם  את העונשים הבאים :
33
34 א. בגין גרימת מותו בכוונה של סמ"ר רז משה מינץ ז"ל – מאסר עולם.
35 ב. בגין גרימת מותו בכוונה של סמ"ר לי נחמן אקוניס ז"ל – מאסר עולם.
36 ג. בגין גרימת מותה בכוונה של אסתר גאלוה ז"ל – מאסר עולם.
37 ד. בגין גרימת מותו בכוונה של צבי גולדסטיין ז"ל – מאסר עולם.
38 ה. בגין גרימת מותו בכוונה של שלום הר-מלך ז"ל – מאסר עולם.
39 ו. בגין גרימת מותו בכוונה של סמ"ר ארז עידו ז"ל – מאסר עולם.
40 ז. בגין גרימת מותו בכוונה של סמל אלעד פולק ז"ל – מאסר עולם.
41 ח. בגין גרימת מותו בכוונה של סמל רועי יעקב סולומון ז"ל – מאסר עולם.
42 ט. בגין יתר העבירות בהן הורשע הנאשם אנו גוזרים עליו מאסר עולם נוסף.
43
44 בגין הריגתו של חכמת שוכרי חסן יאסין, אנו גוזרים על הנאשם 30 שנות מאסר
45 לריצוי בפועל.
46
47 **העונשים ירוצו במצטבר אחד לשני, כך שסה"כ ירצה הנאשם תשעה מאסרי עולם**
48 **ו- 30 שנות מאסר לריצוי במצטבר.**

-3-

נאמן למקור

L_C180874

PX4010.pdf

**JA2939**

המזכירות תעביר העתק נימוקי גזר הדין לצדדים.

זכות ערעור תוך 30 יום .
ניתן היום, 7/11/06, בלשכה.

‏_____       _____       _____
שופטת                      אב״ד                    שופט

נאמן למקור

4584482
רס״ן אלינור ברזני
קצינת העיר נתניה

-4-

PX4010.pdf

L_C180875

JA2940

**ב י ת   ה מ ש פ ט   ה צ ב א י   י ה ו ד ה**

בפני כב׳ האב״ד: רס״ן יאיר תירוש
השופטת: רס״ן דליה קאופמן
השופט: רס״ן זאב אפיק

התביעה הצבאית
(באמצעות סרן שגיב ליכטמן)

נגד

הנאשם: מוראד וליד חאלד ברגותי ת.ז 945728608/ שב״ס
(באמצעות ב״כ עו״ד איליא תאודורי)

---

אב״ד פותח את הישיבה ומזהה את הנאשם.

## גזר דין

לאחר ששקלנו את חומרת מעשיו של הנאשם ושמענו את טיעוני הצדדים, החלטנו
לגזור על הנאשם את העונשים הבאים :

א. בגין גרימת מותו בכוונה של סמ״ר רז משה מינץ ז״ל – מאסר עולם.
ב. בגין גרימת מותו בכוונה של סמ״ר לי נחמן אקוניס ז״ל – מאסר עולם.
ג. בגין גרימת מותו בכוונה של אסתר גאליה ז״ל – מאסר עולם.
ד. בגין גרימת מותו בכוונה של צבי גולדסטיין ז״ל – מאסר עולם.
ה. בגין גרימת מותו בכוונה של שלום הר-מלך ז״ל – מאסר עולם.
ו. בגין גרימת מותו בכוונה של סמ״ר ארז עידן ז״ל – מאסר עולם.
ז. בגין גרימת מותו בכוונה של סמל אלעד פולק ז״ל – מאסר עולם.
ח. בגין גרימת מותו בכוונה של סמל רועי יעקב סולומון ז״ל – מאסר עולם.
ט. בגין יתר העבירות בהן הורשע הנאשם אנו גוזרים עליו מאסר עולם נוסף.

בגין הריגתו של חכמת שוכרי חסן יאסין, אנו גוזרים על הנאשם 30 שנות מאסר
לריצוי בפועל.

העונשים ירוצו במצטבר אחד לשני, כך שסה״כ ירצה הנאשם תשעה מאסרי עולם
ו- 30 שנות מאסר לריצוי במצטבר.

נימוקי גזר הדין המלאים יפורסמו בהמשך.

זכות ערעור תוך 30 יום מיום מתן הנימוקים.
ניתן והודע היום, 05/10/06, בפומבי ובמעמד הצדדים.

שופטת                              אב״ד                              שופט

רס״ן אלינגר ברוך
קצינת העיר נתניה

נאמן למקור

PX4010.pdf

L_C180876

JA2941



143 RODNEY STREET
BROOKLYN, N.Y. 11211
TEL: (718) 384-8040
FAX: (718) 388-3516

**CERTIFIED TRANSLATION**

I, Miriam Braver, Project Manager at Targem Translations, Inc., located at 143 Rodney Street in Brooklyn, New York, a language services firm with a track record of providing expert language services to the legal community of more than 50 years, do hereby certify that our team of translators, editors and proofreaders, are professionally trained and vastly experienced in providing professional legal translations for submission in U.S. courts, from Hebrew into English and vice versa; and they have professionally translated document **"Sentence of Murad Walid Khaled Barghouti / L_C180871-76"** from Hebrew into English, faithfully, accurately and completely, to the best of their expertise and experience.

Date: May 6, 2014



Miriam Braver

ROCHAL WEISS
Notary Public, State of New York
Registration No.: 01WE6293785
Qualified in Kings County
My Commission Expires December 18, 2017

PROFESSIONAL
TRANSLATIONS
OF FOREIGN
LANGUAGES

PX4010.pdf

JA2942

Date: November 7, 2006                                                Case no.: 1445/04

1                              **Military Court - Judea**
2
3  **Appearing before the Honorable Presiding Judge: Major Yair Tirosh**
4                         **Judge: Major Dahlia Kaufman**
5                         **Judge: Major Zev Afik**
6
7  **The Military Prosecution**
8  (Represented by Captain Sagiv Lichtman)
9
10                                      **vs.**
11
12 **Defendant: Murad Walid Khaled Barghouti ID 945728608/Prison Service**
13 (Represented by counsel, Attorney Iliya Theodori)
14
15 _____
16
17
18                          **Reasons for sentencing**
19
20 The defendant was convicted for a long series of serious crimes which included membership in the military
21 wing of Hamas, the Izz al-Din al-Qassam [Brigades], holding a position in this organization, crimes which
22 involved attempt to intentionally cause death and intent to cause death of five IDF soldiers: **First Sergeant**
23 **Raz Moshe Mintz, First Sergeant Lee Nahman Akunis, First Sergeant Erez Idan, Sergeant Elad Pollack,**
24 **and Sergeant Ro'i Yaakov Solomon,** in intentionally causing death of three Israeli citizens: **Esther Galia,**
25 **Zvi Goldstein, and Shalom Harmelech,** and the killing of a resident of the area, **Hikmat Yassin.**
26
27 The defendant who joined the military wing of Hamas, recruited additional operatives to the organization and
28 established a military cell which he headed together with another activist, Jasser Barghouti.
29 In the scope of his membership in this cell, the defendant initiated, planned and executed several attacks, as
30 follows:
31
32     a.   The defendant agreed together with members of the cell, Jasser Barghouti and Yunis Masa'id to
33          execute an attack on IDF Soldiers at the Dura Akra checkpoint with intent to cause death to the
34          soldiers. After the members of the cell set up lookouts and preparations for the attack, the defendant
35          and members of his cell went out towards the checkpoint in order to execute the fatal attack while they
36          were armed with different rifles and a handgun. When the defendant and his accomplices reached the
37          checkpoint, the IDF soldier, **First Sergeant Raz Moshe Mintz** asked the vehicle's driver to show an
38          identifying document. At this point Jasser Barghouti opened fire from the rifle he held in order to cause
39          the death of the soldier and, following him, another member of the cell opened fire on the soldier who
40          was killed as a result. The defendant opened fire and also shot at another soldier and injured him.
41          Because of these acts, the defendant was convicted of intentionally causing the death of IDF soldier,
42          **First Sergeant Raz Moshe Mintz,** and attempt to intentionally cause the death of the remaining IDF
43          soldiers at the checkpoint.
44
45
46     b.   The defendant proposed to members of his cell to execute another attack at Surda checkpoint with
47          intent to cause death to IDF soldiers at that checkpoint. The defendant showed his accomplices his plan
48          to execute the attack and they agreed to adopt it and join the defendant in its execution. Several days
49          before the day the defendant and his accomplices planned to execute the attack, the defendant was
50          arrested for suspicion of possession of a stolen vehicle. His accomplices decided to execute the attack
51          according to the

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

PX4010.pdf

**JA2943**

**L_C180871**

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

PX4010.pdf

JA2944

## APOSTILLE
### (CONVENTION DE LA HAYE 5 DU OCTOBER 1961)

| | | | |
|---|---|---|---|
| 1. | STATE OF ISRAEL | | מדינת ישראל | .1 |
| 2. | THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY MR./MS | ברזני אלינור **BARAZANI ELINOR** | מסמך ציבורי זה נחתם בידי מר/גב' | .2 |
| 3. | ACTING IN THE CAPACITY OF NATANIA CITY OFFICER FOR MILITARY MATTERS | | המכהן בתור קצינת העיר נתניה | .3 |
| 4. | BEARS THE SEAL/STAMP OF THE MINISTRY OF | צבא החגנה לישראל **ISRAELI DEFFENCE** | נושא את חתומת/חותמת של משרד | .4 |
| 5. | CERTIFIED AT THE MINISTRY OF FOREIGN AFFAIRS | | אושר במשרד החוץ | .5 |
| 6. | THE | 5/10/2011 | ביום | .6 |
| 7. | BY | LIDAR RAHIMA CONSULAR BUREAU לידר רחימה חתיבת הקונסולריה | על-ידי | .7 |
| 8. | NO 528782. | | מס' 528782 | .8 |
| 9. | SEAL/STAMP | | חותם/חותמת | .9 |
| 10. | SIGNATURE, JERUSALEM | | חתימה, ירושלים | .10 |

L_C180872

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

PX4010.pdf

JA2945

1  defendant's plan and another operative took over the part of the defendant. In this attack the members of the
2  defendant's cell reached Surda checkpoint and when they noticed three IDF soldiers, shot at them with their
3  handguns. One of the members of the cell shot at **First Sergeant Lee Nahman Akunis,** and caused his death.
4  Jasser Barghouti also shot one bullet at another soldier at the checkpoint, but when he discovered his gun was
5  jammed, he attacked the soldier and took his weapon. Even though the defendant himself was not present at
6  the attack because of his arrest, the defendant was convicted of intentionally causing the death of an IDF
7  soldier, **First Sergeant Lee Nahman Akunis,** and attempt to intentionally cause death of the remaining IDF
8  soldiers at the checkpoint. It is all detailed in the sentence.
9
10
11  c.        In addition to the aforementioned attacks, the defendant was convicted of an additional crime which
12  concerned attempt to intentionally cause death. The members of his cell together with him placed an explosive
13  device, which they activated towards an IDF jeep in order to cause death to the soldiers in the jeep.
14  Fortunately, however, the device did not explode. Additional attempts by the defendant and the members of his
15  cell to activate this device were also not successful.
16
17  In addition to the defendant's activities in the military cell mentioned above, the defendant operated together
18  with Jasser Barghouti, two additional Hamas military cells led by another activist recruited into the Izz al-Din
19  al-Qassam [Brigades] by Hisham Hijaz. As we determined in the sentence, the defendant and Jasser were
20  responsible for activating Hisham Hijaz, supplying weapons and money, and confirming the execution of
21  planned attacks, while the defendant and Jasser were in close contact with Hisham and the defendant was even
22  appointed by Jasser to be in contact with and to activate Hisham Hijaz and his cells. That is why we found it
23  correct to convict the defendant as responsible also for the attacks that were executed by the cells that were
24  commanded by Hisham Hijaz. We found the defendant responsible for a long series of shooting attacks
25  executed by cells on the regional roads, some attacks in which there were fortunately no injured, attacks in
26  which passengers were injured in vehicles that were shot at, and we found the defendant responsible for
27  causing the death of three Israeli citizens who were killed in these attacks:  **Esther Galia, Zvi Goldstein and**
28  **Shalom Harmelech.**
29
30  The defendant was also convicted of causing the death of three IDF soldiers, **First sergeant Erez Idan,**
31  **Sergeant Elad Pollack and Sergeant Ro'i Yaakov Solomon** in an attack in Ein Yabrud village on October
32  19, 2003. In this attack the defendant and Jasser Barghouti approved of the attack plan as proposed by Hisham
33  Hijaz, and supplied him with ten thousand dollars to execute the attack. The defendant, who was a partner in
34  planning the attack, took part in its execution by setting up lookouts after the attack and smuggling weapons
35  that were taken from the IDF soldiers, and filming and transferring of cassettes to a news agency in order to
36  take responsibility for the attack.
37
38  The defendant participated in an attempt to execute an additional attack whose purpose was to crash into a jeep
39  of IDF soldiers with a truck, murdering soldiers and kidnapping the bodies in order to facilitate the release of
40  Palestinian prisoners. The defendant, who was a partner to the plan and approved it, together with Jasser
41  Barghouti supplied to Hisham Hijaz large sums of money for purchasing means to execute the attack. In
42  addition, the defendant and Jasser Barghouti dug graves to hide the soldiers' bodies and they were supposed to
43  receive the bodies and negotiate for the release of Palestinian prisoners.
44
45
46  The defendant and his accomplices went to execute the attack while the defendant and Jasser Barghouti were
47  to notify of the arrival of IDF forces to the area and were to receive the soldiers' bodies and hide them. The
48  plan of the defendant and the members of his cell was not carried out in ,

**L_C180873**

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

PX4010.pdf

JA2946

1    the end even though the defendant and members of his cell made several attempts to carry them out, because
2    they were arrested in the end.
3
4    Likewise, the defendant was convicted for the killing of a resident of the area, Hikmat Yassin whom he
5    suspected to be a collaborator. He instructed Hisham Hijaz to kidnap and violently interrogate him about his
6    contacts with Israeli security forces. Hikmat Yassin was killed during his kidnapping by the members of the
7    cell when he resisted the kidnapping.
8
9    The defendant stood together with Jasser Barghouti at the head of Hamas military infrastructure which
10   included some of the most murderous cells in the region. The defendant did not balk at taking a direct part in
11   executing the attacks and even financed and authorized additional attacks that were executed by other cells
12   under his responsibility. The defendant with Jasser Barghouti obtained money for the murderous activities of
13   the cell that he ran and even traveled for this purpose out of the region, where he met with Hezbollah activists
14   and received from them large sums of money. The cells which the defendant operated were orderly, organized
15   cells that acted as skilled guerilla units and their purpose was to wreak havoc and death among IDF soldiers
16   and Israeli citizens.  As we heard from the last words of the defendant in court, the defendant has a clear belief
17   system whose purpose is clear, and only his removal behind prison bars for the rest of his days will prevent his
18   continued killing.
19
20   We therefore found that the defendant deserves the severest punishment of imprisonment that will remove him
21   forever from the public. Faithful to the principle of sanctity of life, we decided to sentence the defendant to
22   separate life sentences for causing the deaths of all those who the defendant intentionally caused their deaths
23   and an additional punishment of life imprisonment because of the remaining offenses that he executed whose
24   severity and danger is unnecessary to elaborate upon. Because of killing Hikmat Yassin, we decided to
25   sentence the defendant with a punishment of limited years because of the conceptual distinction between
26   intentionally causing death and manslaughter. Even though the fatal results are identical in both incidents,
27   there is a wide gap between the mental state of mind necessary for both crimes. In the case before us, we
28   convicted the defendant for the crime of manslaughter based on the expectation to cause injury rather than the
29   expectation of the fatal result. Therefore, we did not decide to sentence him with life imprisonment for this
30   crime.
31
32   In light of the above, we decided to sentence the defendant to the following punishments:
33
34   a.      For intentionally causing the death of **First Sergeant Raz Moshe Mintz**-life sentence.
35   b.      For intentionally causing the death of **First Sergeant Nahman Lee Akunis**-life sentence.
36   c.      For intentionally causing the death of **Esther Galia**-life sentence.
37   d.      For intentionally causing the death of **Zvi Goldstein**-life sentence.
38   e.      For intentionally causing the death of **Shalom Harmelech**-life sentence.
39   f.      For intentionally causing the death of **First Sergeant Erez Idan**-life sentence.
40   g.      For intentionally causing the death of **Sergeant Elad Pollack**-life sentence.
41   h.      For intentionally causing the death of **Sergeant Ro'i Yaakov Solomon**-life sentence.
42   i.          For the remaining crimes of which the defendant was convicted, we sentence him to an additional life
43   sentence.
44   For the killing of Hikmat Shokri Hassan Yassin, we sentence the defendant to a 30-year sentence to be served
45   in prison.
46
47   **The punishments will be served consecutively one after the other, so that in total the defendant will serve**
48   **nine life sentences and a 30-year sentence to be served consecutively.**

L_C180874

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

PX4010.pdf

JA2947

Date: November 7, 2006                              Case no.: 1445/04

1
2   **The Court clerk will give copies of the reasons for sentencing to both parties.**
3
4   **Right to appeal within 30 days.**
5   **Handed down today, November 7, 2006, in chambers.**
6
7   [signature]                    [signature]                    [signature]
8   **Judge**                      **Presiding Judge**            **Judge**
9
10

**L_C180875**

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

PX4010.pdf

JA2948

Date: 13 Tishrei, 5767                                    Case no.:  1445/04
October 5, 2006

Military Court – Judea

**Appearing before the Honorable Presiding Judge:  Major Yair Tirosh**
                    **Judge:  Major Dahlia Kaufman**
                    **Judge:   Major Zev Afik**

**The Military Prosecution**
(Represented by Captain Sagiv Lichtman)

**vs.**

**Defendant:  Murad Walid Khaled Barghouti ID 945728608/Prison Service**
(Represented by counsel, Attorney Iliya Theodori)

---

**Presiding Judge opens the meeting and identifies the defendant.**

<u>**Sentence**</u>

After considering the severity of the acts of the defendant and hearing the arguments of both parties, we decided to sentence the defendant with the following punishments:

a.      For intentionally causing the death of **First Sergeant Raz Moshe Mintz**-life sentence.
b.      For intentionally causing the death of **First Sergeant Nahman Lee Akunis**-life sentence.
c.      For intentionally causing the death of **Esther Galia**-life sentence.
d.      For intentionally causing the death of **Zvi Goldstein**-life sentence.
e.      For intentionally causing the death of **Shalom Harmelech**-life sentence.
f.      For intentionally causing the death of **First Sergeant Erez Idan**-life sentence.
g.      For intentionally causing the death of **Sergeant Elad Pollack**-life sentence.
h.      For intentionally causing the death of **Sergeant Ro'i Yaakov Solomon**-life sentence.
i.      For the remaining crimes of which the defendant was convicted, we sentence him with an additional life sentence.
For the killing of Hikmat Shkori Hassan Yassin, we sentence the defendant to a 30-year sentence to be served in prison.

**The punishments will be served consecutively one after the other, so that in total the defendant will serve nine life sentences and a 30-year sentence to be served consecutively.**

**Full reasons for sentencing will be published in due course.**

**Right to appeal within thirty days from the day of giving reasons.**
**Handed down and published today, October 5, 2006, in open court and in the presence of both parties.**

[signature]                  [signature]                  [signature]
**Judge**                        **Presiding Judge**              **Judge**

**L_C180876**

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

PX4010.pdf

JA2949

Courtney LINDE, et al., Plaintiffs,

v.

ARAB BANK, PLC, Defendant.

Philip Litle, et al., Plaintiffs,

v.

Arab Bank, Plc, Defendant.

Oran Almog, et al., Plaintiffs,

v.

Arab Bank, Plc, Defendant.

Robert L. Coulter, Sr., et al., Plaintiffs,

v.

Arab Bank, Plc, Defendant.

Gila Afriat–Kurtzer, et al., Plaintiffs,

v.

Arab Bank, Plc, Defendant.

Michael Bennett et al., Plaintiffs,

v.

Arab Bank, Plc, Defendant.

Arnold Roth, et al., Plaintiffs,

v.

Arab Bank, Plc, Defendant.

Nos. CV04–2799(NG)(VVP),       CV05–365(NG)(VVP), CV05–3738(NG)(VVP), CV04–5449(NG)(VVP),       CV05–388(NG)(VVP), CV04–5564(NG)(VVP), CV05–3183(NG)(VVP).

United States District Court,
E.D. New York.

Nov. 25, 2006.

**Background:** In actions against Jordanian bank, alleging various torts arising out of bank's collection and payment of funds in compensation and reward to the families of those who carried out terrorist attacks in Israel, the West Bank, and Gaza, plain-tiffs, United States citizens and estates, survivors, and heirs of U.S. citizens who had been victims of such attacks, moved to overrule bank's objections to Plaintiffs' First Set of Requests for Admissions and Related Interrogatories and to impose sanctions for bank's refusal to comply with discovery obligations.

**Holding:** The District Court, Pohorelsky, United States Magistrate Judge, held that bank secrecy laws in Jordan, Lebanon, and the Palestinian territories did not excuse Jordanian bank from being ordered to produce appropriately limited categories of documents and information.

Ordered accordingly.

1. **Banks and Banking** ⟷151
   **Witnesses** ⟷196.3
   Bank secrecy laws in Jordan, Lebanon, and the Palestinian territories prohibited bank, which was alleged to have collected and paid funds in compensation and reward to the families of those who carried out terrorist attacks in Israel, the West Bank, and Gaza, from authenticating and otherwise providing information about documents that plaintiffs had obtained from various other sources.

2. **Banks and Banking** ⟷151
   **Witnesses** ⟷219(1)
   Jordanian bank, which was alleged to have collected and paid funds in compensation and reward to the families of those who carried out terrorist attacks in Israel, the West Bank, and Gaza, did not waive bank secrecy by its disclosure of some documents to regulatory and investigative authorities in the United States; bank secrecy laws in Jordan, Lebanon, and the Palestinian territories did not establish a waivable privilege held by the bank, but established confidentiality rights held by

bank's customers, which were waivable only by the customers.

**3. Witnesses** ⚖ **196.3**

The Federal Rules of Civil Procedure provide the court with authority to issue discovery orders requiring the disclosure of information protected by foreign bank secrecy laws, but exercising that authority is a matter of discretion.

**4. Banks and Banking** ⚖ **151**

    **Witnesses** ⚖ **196.3**

Bank secrecy laws in Jordan, Lebanon, and the Palestinian territories did not excuse Jordanian bank from being ordered, in action alleging that bank collected and paid out funds to reward the families of terrorists, to produce appropriately limited categories of documents and information, even though the vast majority of the discovery sought concerned information that originated outside the United States; information was essential to proof of plaintiffs' case, there were no reasonable alternative means for obtaining the information, and important interests of the U.S. would be undermined by noncompliance with the discovery orders.

———————

Mark S. Werbner, Sayles Werbner, Dallas, TX, Peter A. Binkow, Law Offices of Lionel Z. Glancy, Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA, Robert A. Swift, Steven M. Steingard, Kohn, Swift & Graf, P.C., Philadelphia, PA, Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY, Aaron Schlanger, Osen & Associate, Oradell, NJ, for Plaintiffs.

Kevin Walsh, Leboeuf Lamb Greene & Macrae LLP, New York, NY, Eric L. Lewis, Baach Robinson & Lewis, Washington, DC, for Defendant.

*DECISION AND ORDER*

POHORELSKY, Magistrate Judge.

The plaintiffs have moved for an order (1) overruling all objections made by the defendant Arab Bank, Plc to the Plaintiffs' First Set of Requests for Admissions and Related Interrogatories based on the application of the secrecy provisions of foreign banking laws and (2) imposing sanctions for the defendant's refusal to comply with discovery obligations. Although the motion attacks the defendant's responses to a limited number of discovery requests, its purpose is to remove the defendant's assertion of foreign bank secrecy laws as a bar to disclosure of numerous documents and other important information that has been requested by the plaintiffs and which the court has found relevant to the issues to be decided here. The court's decision on the bank secrecy matters presented is therefore crucial to the prosecution of the plaintiffs' claims.

**BACKGROUND**

These related actions involve tort claims arising from injuries and deaths caused by suicide bombings and other attacks in Israel, the West Bank, and Gaza since the onset of the second intifada in late 2000. The plaintiffs allege that the defendant knowingly encouraged and promoted these violent acts by providing a financial system for the collection and payment of funds in compensation and reward to the families of those who carried out the attacks. Proof concerning the flow of money, if any, from those allegedly funding the payments through the bank to the families of known participants in the attacks is essential to the plaintiffs' case. Furthermore, because the defendant denies knowing involvement in any such compensation scheme, proof concerning the arrangements for making

such payments and the breadth of the payment scheme is also crucial.

The plaintiffs' First Set of Requests for Admissions and Related Interrogatories ("Requests for Admissions"), served on September 16, 2005, sought information concerning a limited number of documents that were in the possession of the plaintiffs and which either appeared to be bank records of the defendant or contained information about accounts and customers of the bank. In the defendant's responses to the Requests for Admissions, the defendant declined to provide information on the grounds that doing so would violate the bank secrecy provisions of the Palestinian territories and perhaps other jurisdictions.

Although the defendant's responses to the Requests for Admissions are the nominal object of the plaintiffs' motion, the plaintiffs have made other discovery requests which have implicated foreign bank secrecy laws and the plaintiffs seek rulings here "to overrule all of the Defendant's objections to discovery based on foreign bank secrecy laws and to compel the discovery of all information that the Defendant has withheld on that basis." Plaintiffs' Memorandum of Law in Support of Their Motion for an Order Overruling Objections, Deeming Certain Facts as Admitted, and Compelling Further Responses to Plaintiffs' First Set of Requests for Admissions and Related Interrogatories ("Pl. Mem.") at 10. Thus, for example, in June 2005, for the purpose of raising bank secrecy issues and at the court's suggestion, the plaintiffs made a modified document request seeking information about specific bank accounts located in Jordan, Lebanon and the Palestinian territories. When the

defendant raised the bank secrecy laws of those jurisdictions as a bar to disclosure, the court entered an order on July 27, 2005 (the "First Production Order") directing the parties to seek to obtain permission to disclose the information from appropriate foreign regulatory authorities. The defendant successfully obtained such permission relating to a single account located in Lebanon, but was ultimately denied permission with respect to an account located in Jordan and accounts in the Palestinian territories.[1]

The plaintiffs have also served a First Request for the Production of Documents seeking a wide range of documents concerning accounts, account holders and transactions deemed likely to be involved in the scheme alleged. In an order dated March 3, 2006 (the "Second Production Order"), the court ruled on disputes concerning the scope of the document requests, and identified documents and other information the defendant was required to disclose. The Second Production Order also required the defendant to identify, by category, the documents covered by the Order whose disclosure would violate any foreign bank secrecy laws. The Order expressly reserved, however, any ruling concerning the issues now before the court.

The defendant complied with that portion of the Second Production Order concerning identification of documents prohibited from disclosure by foreign bank secrecy laws. In addition, the defendant obtained the permission of the Saudi Committee, the account holder alleged to be at the center of the compensation scheme at issue here, to disclose documents covered by the Order subject to the Saudi Com-

1. The defendant initially obtained a ruling from a court in Jordan that this court's order requiring production of the information sought fell within the exception in that nation's bank secrecy law which permits disclosure if ordered by a court. The ruling was overturned upon an appeal filed by the account holder.

mittee's prior review. As a result of the
Saudi Committee's waiver and its review,
which was continuing at the time of the
last conference in this matter in September, the defendant has now produced
some 170,000 transaction records relating
to that account holder. Other documents
covered by the Second Production Order,
however, continue to be withheld on the
basis of bank secrecy laws.

## DISCUSSION

The documents and other information
sought by the plaintiffs are primarily located in the bank's branches in Jordan, Lebanon, the West Bank and Gaza.[2] Jordan and
Lebanon, as well as the Palestinian Monetary Authority, an entity recognized by the
United States and other countries to have
jurisdiction over the financial system in
the West Bank and Gaza, have all promulgated bank secrecy laws which prevent the
disclosure of certain types of information
about business conducted by the bank, including the identities of accountholders
and the transactions occurring in their accounts, without the consent of the affected
customers.[3] Violations of the laws carry
criminal penalties, including fines and incarceration. Although the plaintiffs vigorously dispute that the defendant is entitled
to withhold any information on the basis of
those laws, they apparently do not dispute

that disclosure of at least some of the
information they seek would constitute a
violation of those laws.

**[1, 2]** The bank secrecy laws cited
above are broadly phrased and prohibit
not only the bank, but also bank employees, from disclosing information. The
court therefore rejects the plaintiffs' argument that the laws do not prohibit the
defendant from authenticating and otherwise providing information about documents that the plaintiffs have already obtained from various sources other than the
bank. The court also rejects the plaintiffs'
argument that the defendant's disclosure
of some documents to regulatory and investigative authorities in the United States
waives bank secrecy. The bank secrecy
laws do not establish a waivable privilege
held by the bank, they establish confidentiality rights held by the customers of the
bank, rights waivable only by the customers, not the bank.

**[3]** The court is thus left to determine
whether the existence of the bank secrecy
laws of the above foreign jurisdictions
should relieve the defendant from the discovery obligations already imposed on the
defendant by the court's prior orders finding discovery sought by the plaintiffs to be
appropriate. Fortunately, the Supreme
Court has provided substantial guidance

**2.** The bank has also apparently cited bank
secrecy laws of Morocco, Great Britain,
France, Austria and Switzerland as bars to
some of the discovery sought by the plaintiffs.

**3.** For example, Jordan's bank secrecy statute
provides that "A bank shall observe full confidentiality regarding all accounts, deposits. of
its customers" and that "All present and former administrators of the bank shall be prohibited from providing any information or
data on the clients or the accounts . . . or any
of their transactions, or disclosing or enabling
others to have access to such information and
data in situations other than those permitted
under this law." See Decl. of Aiman Odeh,

¶¶ 12–13. The law applicable in the Palestinian territories provides, "All present and former directors and employees of the banks
shall keep confidential all information and
documents regarding their customers." Decl.
of Maher Masri, ¶ 5. Lebanon's bank secrecy
law provides, "Managers and employees of
the banking establishments referred to in article 1 . . . are bound to absolute secrecy in
favor of the bank's clients and may not disclose to anyone whatsoever . . . the names of
clients, their assets and facts of which they
are aware . . ." Decl. of Chakib Cortbaoui,
¶ 4.

for resolving such issues. First, it is beyond dispute that the Federal Rules of Civil Procedure provide the court with authority to issue discovery orders requiring the disclosure of information protected by foreign bank secrecy laws. *See Société Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 204–06, 78 S.Ct. 1087,1091–92, 2 L.Ed.2d 1255 (1958); *Minpeco, S.A. v. Conticommodity Services, Inc.,* 116 F.R.D. 517, 520 (S.D.N.Y.1987). Exercising that authority is a matter of discretion, however, and in *Société Nationale Industrielle Aérospatiale v. U.S. District Court,* 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987), the Court reviewed at some length the difficulties encountered when discovery requests directed to foreign litigants seek documents and other information located in foreign jurisdictions whose laws prohibit their disclosure. The Court stressed the importance of comity in dealing with such situations, and cited with approval the *Restatement of Foreign Relations Law of the United States. See Aérospatiale,* 482 U.S. at 541–46 & n. 28, 107 S.Ct. 2542. In detailing the concerns that should inform comity analysis, the Court looked to a section of the tentative draft of that Restatement then under review, which has since become section 442 of the *Restatement (Third) of The Foreign Relations Law of the United States* (1987) (hereinafter "*Restatement*"). *Id.,* 482 U.S. at 546 n. 28; *British Intern. Ins. Co. Ltd. v. Seguros La Republica, S.A.,* No. 90 Civ. 2370(JFK)(FM), 2000 WL 713057, at *9 (S.D.N.Y. June 2, 2000). Numerous courts in this circuit have subsequently been guided by the principles set forth in that

section when deciding issues involving foreign discovery. *See, e.g., Reino De Espana v. American Bureau of Shipping,* No. 03 Civ. 3573, 2005 WL 1813017, at *3 (S.D.N.Y. Aug.1, 2005); *In re Auction Houses Antitrust Litigation,* 196 F.R.D. 444, 446 (S.D.N.Y.2000); *Madanes v. Madanes,* 186 F.R.D. 279, 285–86 (S.D.N.Y. 1999); *Hudson v. Hermann Pfauter GmbH & Co.,* 117 F.R.D. 33, 35–37 (N.D.N.Y.1987); *Minpeco, S.A. v. Conticommodity Services, Inc.,* 116 F.R.D. 517, 529–30 (S.D.N.Y.1987).

**[4]** Section 442 of the *Restatement* articulates a series of factors which courts have considered in deciding whether to exercise their power to compel production of protected documents and information:

> In deciding whether to issue an order directing production of information located abroad, and in framing such an order, a court or agency in the United States should take into account the importance of the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Restatement* § 442(1)(c); see, e.g., *British Intern. Ins. Co. Ltd.,* 2000 WL 713057, at *8–9; *Madanes v. Madanes,* 186 F.R.D. at 285–86.[4] Upon consideration of those fac-

---

4. Relying on a prior version of the *Restatement,* courts in the Circuit have also articulated and relied on the following formulation of factors, which overlap with those in the present *Restatement* in some respects but differ in others: (1) the competing interests of the na-

tions whose laws are in conflict, (2) the hardship of compliance on the party or witness from whom discovery is sought, (3) the importance to the litigation of the information and documents requested, and (4) the good faith of the party resisting discovery. *See,*

tors here, the court concludes that the bank secrecy laws cited by the defendant here should not excuse the defendant from being ordered to produce appropriately limited categories of documents and information.

The only one of the factors that arguably favors recognition of the bank secrecy laws as a bar to discovery is the fact that the vast majority of the discovery sought here concerns information that originated outside of the United States. The remaining factors, however, tilt in favor of discovery notwithstanding bank secrecy laws. As noted above, the discovery sought here is essential to the proof of the plaintiffs' case. Without it, the plaintiffs cannot prove the defendant's involvement in and knowledge of the financial transactions that are the basis of the plaintiffs' theory of liability. As to the specificity of the plaintiffs' requests, the plaintiffs' Requests for Admissions are highly specific. The requests that led to the Court's Second Production Order, on the other hand, were decidedly less specific. Nevertheless, the Second Production Order has narrowed the scope of the requests considerably, and with information that has been obtained thus far from the Saudi Committee production, the Order can be further narrowed to achieve greater specificity.

Reasonable alternative means for obtaining the discovery sought from the defendant is not available. The transactional and customer information simply cannot be obtained without disclosure of the defendant's records. The only other sources of most of that information would be customers and other participants in the transactions at issue, and their identities are largely unknown. Even if they were

known, it is unlikely that those persons would willingly disclose information to the plaintiffs for fear that any information verifying their connection to the perpetrators of violent acts would expose them to retaliation.

Finally, there is no question that important interests of the United States would be undermined by noncompliance with the discovery orders issued by the court. As the court has already recognized, those interests are articulated in statutes on which some of the claims in this litigation rest: "Congress has expressly made criminal the providing of financial and other services to terrorist organizations and expressly created a civil tort remedy for American victims of international terrorism." *Linde v. Arab Bank, PLC,* 384 F.Supp.2d 571, 584 (E.D.N.Y.2005). The discovery sought here is transactional and other evidence of precisely those financial and other services at which the statutes here are aimed. Without that discovery, the interests expressed in those statutes will be difficult if not impossible to vindicate in this action.

Although maintaining bank secrecy is an important interest of the foreign jurisdictions where the discovery sought here resides—indeed the United States has enacted similar bank secrecy protections—that interest must yield to the interests of combating terrorism and compensating its victims. Both Jordan and Lebanon, have recognized the supremacy of those interests over bank secrecy. As members of the Middle East and North Africa Financial Action Task Force, they have expressly adopted a policy not to rely on bank secrecy laws as a basis for protecting information relating to money laundering

*e.g., Reino De Espana,* 2005 WL 1813017, at *3 (citing *Minpeco, S.A. v. Conticommodity Services, Inc.,* 116 F.R.D. at 522). In the current *Restatement,* the question of good

faith may affect the remedy for non-compliance with a production order instead of the question whether a production order should be issued. *See Restatement* § 442(2).

and terrorist financing.[5] Although the Palestinian Monetary Authority has apparently not expressly adopted any policies recognizing the subordination of bank secrecy to the interest of fighting terrorism, it is not a state, *see Estates of Ungar v. Palestinian Authority* 315 F.Supp.2d 164, 177 (D.R.I.2004), and its interests therefore need not be accorded the same level of deference accorded to "states" in considering comity.[6] In any event, as the Palestinian Monetary Authority operates in an area governed at least in part by other authorities that have themselves engaged in terrorist activity, it would be absurd for this court to exalt the bank secrecy interests of those under the jurisdiction of the Palestinian Monetary Authority over the anti-terrorism interests of the United States and other recognized states in the region.

The court thus concludes that a discovery order overruling the defendant's objections to production on the basis of foreign bank secrecy laws is appropriate. Before granting the further relief sought by the plaintiffs on their motion, however, the court believes it is appropriate to follow the guidance of one further provision of the *Restatement.* Specifically, with respect to an order requiring the disclosure

of information located outside the United States which is prohibited by the law of a foreign state, "a court or agency in the United States may require the person to whom the order is directed to make a good faith effort to secure permission from the foreign authorities to make the information available." *Restatement* § 422(2)(a). It is appropriate to provide the defendant with that opportunity here. As noted above, the defendant previously unsuccessfully sought to obtain rulings from courts in Jordan and in the territories covered by Palestinian Monetary Authority that this court's orders fell within one of the exceptions to the operation of their bank secrecy laws, and successfully obtained permission from authorities in Lebanon to provide information protected by their bank secrecy laws to the plaintiffs here. Now that this court has ruled that the bank secrecy laws of those jurisdictions will not serve as a bar to discovery ordered here, the defendant may be in a position to pursue avenues for obtaining permission to disclose the information from pertinent governments and authorities through letters rogatory or other devices, and should be given a specified period of time to do so. The defendant has expressed its desire to

---

**5.** Both Jordan and Lebanon have signed a Memorandum of Understanding Between the Governments of the Member States of the Middle East and North Africa Financial Action Task Force Against Money Laundering and Terrorist Financing, November 30, 2004 (the "MOU"). The MOU adopts Forty Recommendations on Money Laundering and the Special Recommendations on Terrorist Financing which were created by the Financial Action Task Force, an intergovernmental body established at the G–7 Summit in 1989. MOU, available at *http://www.menafatf.org/images/uploadfiles/mou-eng.pdf,* Objective 1.1. Among the Forty Recommendations are provisions which specifically renounce bank secrecy as a basis for refusing requests for mutual legal assistance in money laundering and

terrorist financing investigations. *See* The Forty Recommendations, available at *http://www.fa tf-gafi.org/dataoecd/7/40/34849567.pdf,* Recommendations 36, 40.

**6.** The court does not mean to suggest that the enactments of the Palestinian Monetary Authority are entitled to no weight. Rather, since "[c]omity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of *other sovereign states,*" *Aerospatiale,* 482 U.S. at 543 n. 27, 107 S.Ct. 2542 (emphasis added), its lack of status as a "sovereign state" reduces the weight of its enactments as an expression of the interests of those within its limited jurisdiction.

engage in this effort.[7]

The documents and information for which the defendant is to seek permission for disclosure shall include (i) the documents that were the subject of the First Production Order and (ii) the information sought by the Requests to Admit. As to the documents and information that were the subject of the Second Production Order, in view of the documents that have been disclosed concerning the Saudi Committee, it appears that the order is broader than it needs to be to satisfy interests of comity. The parties shall be prepared to address appropriate limitations on the breadth of the order at the November 30, 2006 conference.

## CONCLUSION

For the foregoing reasons, the defendant's objections to providing discovery in this action based on foreign bank secrecy laws are overruled with respect to the documents and information that are the subjects of the First Production Order and the plaintiffs' Requests to Admit. The objections based on foreign bank secrecy laws are also overruled with respect to the Second Production Order, subject, however, to the court's further review and narrowing of that order following discussion at the next discovery conference. In all other respects, ruling on the plaintiffs' motion is deferred, pending the outcome of any attempts by the defendant to obtain approvals to disclose the above information notwithstanding applicable bank secrecy laws.

**Daniel J. O'KEEFE, Plaintiff,**

**v.**

**The UNITED STATES DEPARTMENT OF DEFENSE, Defendant.**

**Civil Action No. CV–05–2956 (DGT).**

United States District Court,
E.D. New York.

Nov. 30, 2006.

**Background:** Army employee brought action against Department of Defense (DOD), seeking release of disciplinary documents under Freedom of Information Act (FOIA). DOD moved for summary judgment.

**Holdings:** The District Court, Trager, J., held that:

(1) FOIA law enforcement exemption was applicable;

(2) exemption for documents exempted by other federal statute was inapplicable;

(3) exemption for personnel and medical files was applicable; and

(4) DOD failed to establish that it released all responsive non-exempt material.

Motion granted in part and denied in part.

**1. Records ⊶54**

Freedom of Information Act (FOIA) exemptions are construed narrowly, since disclosure, not secrecy, is dominant objective of FOIA. 5 U.S.C.A. § 552(b).

**2. Records ⊶65**

When agency's decision to withhold information is challenged under Freedom of Information Act (FOIA), burden of

7. The defendant has already submitted a motion for the issuance of letters rogatory to the governments of Lebanon and Jordan and to the Palestinian Monetary Authority concerning the Second Production Order.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
COURTNEY LINDE, et al.,

                  Plaintiffs,

  - against -

ARAB BANK, PLC,

            Defendant.
--------------------------------------------------------x
PHILIP LITLE, et al.,

                  Plaintiffs,

  - against -

ARAB BANK, PLC,

            Defendant.
--------------------------------------------------------x
ORAN ALMOG, et al.,

                  Plaintiffs,

  - against -

ARAB BANK, PLC,

            Defendant.
--------------------------------------------------------x
ROBERT L. COULTER, SR. et al.,

                  Plaintiffs,

  - against -

ARAB BANK, PLC,

            Defendant.
--------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ DEC 13 2006 ★

BROOKLYN OFFICE

**ORDER**
04 CV 2799 (NG)(VVP)

04 CV 5449 (NG)(VVP)

04 CV 5564 (NG)(VVP)

05 CV 365 (NG)(VVP)

**JA2958**

```
-------------------------------------------------------x
```
GILA AFRIAT-KURTZER, et al.,

                  **Plaintiffs,**

    - against -                               **05 CV 388 (NG)(VVP)**

ARAB BANK, PLC,

                  **Defendant.**
```
-------------------------------------------------------x
```
MICHAEL BENNETT, et al.,

                  **Plaintiffs,**

    - against -                               **05 CV 3183 (NG)(VVP)**

ARAB BANK, PLC,

                  **Defendant.**
```
-------------------------------------------------------x
```
ARNOLD ROTH, et al.,

                  **Plaintiffs,**

    - against -                               **05 CV 3738 (NG)(VVP)**

ARAB BANK, PLC,

                  **Defendant.**
```
-------------------------------------------------------x
```
**GERSHON, United States District Judge:**

       This is an appeal by plaintiffs from an order of the Honorable Viktor P. Pohorelsky, Magistrate Judge, dated March 26, 2006, which denied plaintiffs' request for discovery of transactional documents reviewed by the Office of the Comptroller of the Currency ("OCC") at the defendant's New York branch. The parties have submitted voluminous papers on the appeal, and oral argument was heard on November 14, 2006. Pursuant to Rule 72(a) of the Federal Rules of

JA2959

Civil Procedure, the non-dispositive rulings of a magistrate judge may be overturned only if found to be clearly erroneous or contrary to law. Judge Pohorelsky has ably supervised the discovery and other pretrial proceedings in these massive cases, and a mere disagreement with a discretionary ruling would not merit the granting of an appeal. However, upon review of the current state of the record in this case, as it emerged in the parties' papers on the appeal and on oral argument, I conclude that, in this instance, the appeal must be granted and the defendant ordered to produce the documents sought.

Judge Pohorelsky's order relied upon three rationales. The first was that the Bank would be unable to determine what documents the OCC had reviewed when it was on the site. As counsel for the Bank confirmed on oral argument of the appeal, this rationale was based solely on the representation of counsel and not on, for example, affidavits from Bank officials. Tr. at 6, Nov. 14, 2006. The Comptroller's Findings, contained in the OCC consent order, recite that "Arab Bank and Branch management cooperated and facilitated the Comptroller's review of transactions, accounts and existing Branch systems and controls . . . ." Pls.' Br., Ex. A.1 at 2. At oral argument, counsel for the Bank confirmed that "bank people" were present at the review and stated, "we never said that the Bank has no idea what the OCC reviewed." Tr. at 7, Nov. 14, 2006. In light of this, I conclude that the Bank *is* able to determine the documents which the OCC reviewed.

The second rationale was that the discovery requested was "not reasonably calculated to lead to admissible evidence" because it was broader than what is relevant to plaintiffs' case and because "[t]he focus of the OCC investigation was on the procedures implemented by the bank, not on terrorist activity." These conclusions do not give sufficient weight to the fact that the investigations by the OCC and the Department of the Treasury Financial Crimes Enforcement Network

3

**JA2960**

("FinCEN"), whose investigation relied in part on the OCC investigation, were not focused on minor, technical errors, but rather on the failure to implement procedures and comply with regulations that had, as a prime purpose, the prevention of the financing of terrorism, which is one of the bases of plaintiffs' claims. The Assessment of Civil Money Penalty, issued by FinCEN concurrently with the OCC's penalty of the same amount, in its Determinations Section, found expressly that Arab Bank's funds transfers "posed heightened risks of money laundering and terrorist financing," detailed the reasons for that finding, and concluded that the Bank had failed to comply with legal requirements for learning about the participants in its funds transfers, had failed to develop proper procedures for determining participants, and had failed to report suspicious activity. Pls.' Br., Ex. B at 2-7. That the OCC was not focused on the underlying terrorist activity, but rather on the Bank's failure to comply with all legal requirements despite the heightened risk involved in its transactions, does not make its investigation irrelevant to plaintiffs' case. On the contrary, plaintiffs' analysis of the material upon which the OCC based its conclusions could well be helpful to plaintiffs in their effort to show the Bank's knowing and intentional involvement with the terrorist organizations they claim are responsible for their injuries.

Finally, Judge Pohorelsky's third reason for denying the request was that any relevant documents would be covered by other requests made by plaintiffs. While this is correct, it is pertinent only insofar as the court can be confident that compliance with those other requests has been full, prompt and unequivocal. Here, based upon the record made before me on the appeal, the failure of the Bank to produce promptly the transactional documents at issue pursuant to other requests does not create confidence that reliance on other requests will be effective.

Discovery in the federal courts depends upon good faith compliance with demands, and a

4

party requesting documents should not be required to police its adversary's responses to its requests. To begin with, although counsel for the Bank avowed his recognition that the defendant in this case is Arab Bank, which is based in Jordan, and not Arab Bank's New York branch, the defendant's papers are replete with suggestions that, in fact, the Bank has not fully recognized its obligation to use all of its resources in responding to discovery requests. For example, the Bank stated that, "[i]n searching its New York records, the Bank had to rely exclusively on information available to it in the United States." Def.'s Sur. at 12. Thus, while the Bank has taken the position that transactions that went through New York are not covered by foreign bank secrecy laws, it has failed to produce New York documentation of what it calls "cover transactions," admittedly called for by plaintiffs' requests, solely on the ground that the documentation was not readily identifiable on the Bank's New York computers. This is so even though counsel did not dispute that records of millions of dollars of such transactions were in fact located in New York. If they are in fact not readily computer searchable by the means identified by counsel, then the Bank was obligated to use other means, including communications between Arab Bank officials in Jordan and New York, to determine how to locate and produce them. It is also noteworthy that counsel for the Bank has suggested a lack of connection to New York – saying, for example, that the documents "didn't touch New York" – even though the so-called "cover transactions" for which no documents were produced did in fact go through New York. Tr. at 58, Nov. 14, 2006. As the Bank acknowledges, foreign bank secrecy laws provided no arguable excuse for not disclosing responsive funds transfers, including "cover transactions," which went through New York.

In defending its failure to produce the documentation for these transactions, Arab Bank emphasizes that it produced "customer" transactions, namely, 73 documents describing transactions

5

**JA2962**

in New York involving the Saudi Committee. In so doing, the Bank obfuscates its obligation to produce evidence of funds transfers that went through New York involving the Saudi Committee even where the Saudi Committee was not the "customer" of Arab Bank. The suggestion that the Bank can fulfill its discovery obligations by producing customer transactions is belied by the findings of FinCEN as to the significance of funds transfers. The FinCEN Determinations Summary describes the New York branch of Arab Bank as "a clearing institution for funds transfers in United States dollars" and states that the New York branch cleared funds "as an intermediary institution." Pls.' Br., Ex. B at 2. ("Arab Bank - New York cleared funds transfers from originators with accounts at members of the Arab Bank Group in foreign jurisdictions, to beneficiaries with accounts at the same or other members of the Arab Bank Group in foreign jurisdictions.") *Id.* FinCEN found that "[t]he customer base and geographic locations of the Arab Bank Group and correspondent institutions, and the volume of funds transfers that Arab Bank-New York cleared, posed heightened risks of money laundering and terrorist financing." *Id.* at 3.

In sum, it is simply not acceptable at this late date for Arab Bank to withhold the documents showing the funds transfers through New York which plaintiffs seek to make their case.

<div align="center">CONCLUSION</div>

The defendant is directed to produce to plaintiffs within 30 days all transactional records produced to the OCC.

SO ORDERED.

_____
**NINA GERSHON**
**United States District Judge**

Dated: December 13, 2006
          Brooklyn, New York

<div align="center">6</div>

/S/

תאריך : כ״ז כסלו התשס״ז
18 בדצמבר 2006

תיק מס׳ : 1173/04

בית המשפט הצבאי יהודה

בפני כב׳ האב״ד : רס״ן יאיר תירוש
השופטת: רס״ן דליה קאופמן
השופט: רס״ן מייקל בן- דוד

התביעה הצבאית
(באמצעות סרן שגיב ליכטמן)

נגד

הנאשם: מואיד שוכרי עבד אלחמיד חמאד ת.ז. 901186403 / שב״ס
(באמצעות ב״כ עו״ד איליא תיאודורי )

<u>נימוקי גזר הדין</u>

הנאשם הורשע כמפורט בהכרעת הדין בסדרה ארוכה של עבירות אשר כוללות
חברות בחולייה צבאית של ארגון החמא״ס ותכנון וביצוע פיגועי ירי רבים. במסגרת
אותה חולייה ביצע הנאשם וחבריו מספר פיגועי ירי בהם נרצחו שלושה חיילי צה״ל
ושלושה אזרחים ישראלים.

כפי שעולה מהכרעת הדין הנאשם היה שותף מלא לאותם פיגועים, בחלק מהם הוא
היה היורה ובאחרים מילא תפקידים אחרים כגון תצפיתן או נהג הרכב הממלט.

בכל אחד מהפיגועים שבהם השתתף, היה הנאשם שותף לתכנית ונטל חלק מרכזי
בביצוע.

מעשיו של הנאשם נעשו בצורה אינטנסיבית וקדחתנית על מנת לזרוע הרג וזאת
מבלי להבחין בין חיילים, אזרחים, גברים, ילדים ונשים.

כמפורט בכתב האישום הנאשם השתתף בפיגוע שבוצע כנגד סיור חיילי צה״ל בעין
יברוד ובו נהרגו שלושה חיילים, **סמל רועי יעקב סולומון ז״ל, סמל אלעד פולק ז״ל
וסמ״ר ארז עידן ז״ל.**

הנאשם אשר היה שותף מלא לתכנית, להכנות ולביצוע הפיגוע ואף ירה, יחד עם
פעילים נוספים לעבר חיילי צה״ל בכדי לגרום למותם.

כמפורט בהכרעת הדין הנאשם וחבריו לא הסתפקו בכך, ולאחר שחיילי צה״ל נפלו
על הארץ, הם התקרבו אליהם וירו בהם גם מטווח קצר על מנת לוודא את הריגתם.

חייל צה״ל נוסף שהיה במקום נורה על ידי הנאשם וחבריו לאחר שנפצע והתמוטט
בצד הכביש בעקבות הירי.

בנוסף לכך, הנאשם וחבריו לחולייה בצעו שורה נוספת של פיגועי ירי קטלניים בהם
נרצחו **דוד ציון ז״ל, אסתר גאליה ז״ל ושלום הר- מלך ז״ל.** כמפורט בהרחבה
בהכרעת הדין באותם פיגועים נפצעו אזרחים נוספים.

רס״ן אלינור ברזני
קצינת העיר נתניה

-1-

PX3741.pdf

L_C180899

JA2964

# APOSTILLE
## (CONVENTION DE LA HAYE 5 DU OCTOBER 1961)

| | | | |
|---|---|---|---|
| 1. | STATE OF ISRAEL | | מדינת ישראל | .1 |
| 2. | THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY MR./MS | ברזני אלינור BARAZANI ELINOR | מסמך ציבורי זה נחתם בידי מר/גב' | .2 |
| 3. | ACTING IN THE CAPACITY OF NATANIA CITY OFFICER FOR MILITARY MATTERS | | המכהן בתור קצינת העיר נתניה | .3 |
| 4. | BEARS THE SEAL/STAMP OF THE MINISTRY OF | צבא הגנה לישראל ISRAELI DEFFENCE | נושא את החותם/חותמת של משרד | .4 |
| 5. | CERTIFIED AT THE MINISTRY OF FOREIGN AFFAIRS | | אושר במשרד החוץ | .5 |
| 6. | THE | 5/10/2011 | ביום | .6 |
| 7. | BY | LIDAR RAHIMA CONSULAR BUREAU | על-ידי | .7 |
| 8. | NO 528784. | | 528784 'מס | .8 |
| 9. | SEAL/STAMP | | חותם/חותמת | .9 |
| 10. | SIGNATURE, JERUSALEM | | חתימה, ירושלים | .10 |

L_C180900

JA2965

בנוסף לכך, בסמוך למעצרו, נטל הנאשם חלק בתכנית שהגו חברי התשתית הצבאית
אליה השתייך ואשר נועדה לגרום לרצח חיילי צה"ל, לאחר ביום התנגשות ברכבם,
חטיפת גופות החיילים על מנת לנהל מו"מ על שחרור אסירים פלסטיניים. אף
שהנאשם וחבריו ניסו לממש תכניתם זו מספר פעמים בסופו של דבר, נעצרו חברי
התשתית בטרם הספיקו לממשה.

התובע הצבאי בטיעוניו לעונש הדגיש את חומרת מעשיו של הנאשם את אבלן של
משפחות הנרצחים ואת כאבם של הפצועים.

אף דבריו של הנאשם בדברו האחרון בבית המשפט לפיו ברצונו לראות את
המשפחות של האנשים שנהרגו וברצונו לנסוך את הרווחה את חירי
מוכיחים כאלף עדים כי דרכו של הנאשם דרכי הרג הן, וכי אם ישוחרר לא יהסס
לשוב ולפגוע באחרים.

מעשיו של הנאשם אשר גרמו למותם של שישה אנשים חפים מפשע, אינם מותירים
ספק כי מקומו של הנאשם איננו בחברת בני האדם החופשיים.

דברי הנאשם בפנינו כמו גם מעשיו מעידים כי ראוי שיהיה מאחורי סורג ובריח עד
שיחזיר את נשמתו לבורא העולם.

לסיכום, לאחר ששמענו את טיעוני הצדדים ועל פי עיקרון קדמושת החיים החלטנו
לגזור על הנאשם מאסר עולם בגין כל אחת מהנפשות שנטל, כפי שנקבע לא אחת
בהלכה הפסוקה.

כן החלטנו לגזור על הנאשם מאסר עולם נוסף בגין העבירות הנוספות בהן הורשע,
לרבות, פציעתם של גברים, נשים וילדים חפים מכל פשע.

אשר על כן, ירצה הנאשם את העונשים הבאים :

א. בגין גרימת מותה בכוונה של **אסתר גאליה ז"ל**- מאסר עולם.
ב. בגין גרימת מותו בכוונה של **דוד ציון ז"ל**- מאסר עולם.
ג. בגין גרימת מותו בכוונה של **שלום חר- מלך ז"ל**- מאסר עולם.
ד. בגין גרימת מותו בכוונה של **סמל רועי יעקב סולומון ז"ל**- מאסר עולם.
ה. בגין גרימת מותו בכוונה של **סמל אלעד פולק ז"ל**- מאסר עולם.
ו. בגין גרימת מותו בכוונה של **סמ"ר ארז עידו ז"ל**- מאסר עולם.

בגין יתר העבירות בהן הורשע הנאשם - מאסר עולם נוסף.

כל העונשים ירוצו במצטבר כך שסה"כ ירצה הנאשם שבעה מאסר עולם מצטברים.

עותק מנימוקי גזר הדין יועברו ע"י מזכירות בית המשפט לצדדים.
זכות ערעור תוך 30 ימים.

ניתן והודע היום, 18/12/06, בפומבי ובמעמד הצדדים.

שופט                אב"ד                שופט

נאמן למקור

-2-

רס"ן אלינור ברוני
קצינת העיר נתניה
4584482

## בית המשפט הצבאי יהודה

בפני כב' האב"ד: רס"ן יאיר תירוש
השופט: רס"ן מייקל בן- דוד
השופטת: רס"ן דליה קאופמן

התביעה הצבאית
(באמצעות סרן שגיב ליכטמן)

נגד

הנאשם: מואיד שוכרי עבד אלחמיד חמאד ת.ז 901186403/ שב"ס - נוכח
(באמצעות ב"כ עו"ד איליא תאודורי- לא נוכח)

רמ"שית: רב"ט יפית קדישמן
מתורגמן: סמ"ר רמי עזי

אב"ד פותח את הישיבה ומזהה את הנאשם.

## גזר דין

לאחר ששקלנו את חומרת מעשיו של הנאשם, שמענו את טיעוני הצדדים לעונש ואת דברו האחרון של הנאשם החלטנו לגזור עליו את העונשים הבאים :

א.  בגין גרימת מותה בכוונה של **אסתר גאליה ז"ל** מאסר עולם.
ב.  בגין גרימת מותו בכוונה של **דוד ציון ז"ל** מאסר עולם.
ג.  בגין גרימת מותו בכוונה של **שלום הר- מלך ז"ל** מאסר עולם.
ד.  בגין גרימת מותו בכוונה של **סמל רועי יעקוב סולומון ז"ל** מאסר עולם.
ה.  בגין גרימת מותו בכוונה של **סמל אלעד פולק ז"ל** מאסר עולם.
ו.  בגין גרימת מותו בכוונה של **סמ"ר ארז עידו ז"ל** מאסר עולם.

בגין יתר העבירות בהן הורשע הנאשם אנו גוזרים עליו מאסר עולם נוסף.

כל העונשים ירוצו במצטבר כך שסה"כ ירצה הנאשם שבעה מאסר עולם מצטברים.

**נימוקי גזר הדין המלאים יפורסמו בהמשך.**

**זכות ערעור תוך 30 ימים מפרסום הנימוקים.**

**ניתן והודע היום, 9/10/06, בפומבי ובמעמד הצדדים.**

רס"ן אלימלך-ברזני
קצינת העיר נתניה

שופטת        אב"ד        שופט

נאמן למקור

# בית המשפט הצבאי יהודה

בפני כב׳ האב״ד: רס״ן יאיר תירוש
השופטת: רס״ן דליה קאופמן
השופט: רס״ן מייקל בן-דוד

התביעה הצבאית

נגד

הנאשם: מואיד שוכרי עבד אלחמיד חמאד ת.ז. 901186403 / שב״ס
(באמצעות ב״כ עו״ד איליא תיאודורי)

## הכרעת דין

השופטת רס״ן דליה קאופמן

### א. מבוא

כנגד הנאשם הוגש כתב אישום מתוקן הכולל שישה עשר פרטי אישום. לנאשם מיוחסות
עבירות שעניינן חברות בהתאחדות בלתי מותרת, פגיעה בביטחון האזור, קשירת קשר
להגרימת מוות בכוונה, ניסיון לגרימת מוות בכוונה וגרימת מוות בכוונה. לנאשם מיוחסת
השתתפות בפגיעועי ירי בהם נגרם מותם של 6 בני אדם ופציעתם של נוספים. בישיבה מיום
13/9/05 כפר הנאשם בכתב האישום.

### ב. חומר הראיות בתיק

הצדדים הגישו לבית המשפט ביום 16/05/05 הודעה משותפת על עובדות מוסכמות.
במסגרת זו, הודיעו הצדדים כי הפרטים הנוגעים לפיגועי הירי המוזכרים בפרטי האישום
השלישי, הרביעי, החמישי, השישי, השביעי והשמיני, התשיעי והעשירי וכן הפרטים
הנוגעים לפיגוע הירי המוזכר לפגיעועי נשוא פרטי האישום השנים עשר, שלושה עשר,
הארבעה עשר והחמישה עשר, אף הם מוסכמים. התביעה הצבאית הגישה בנוסף חוות
דעת מומחה בקשר לכל אחד מהפיגועים בגינם לקליעים שנאספו מזירות הפיגועים. חוות
דעת אלה אף שהתקבלו בתיק המשפט לא סומנו ועל כן מסומנות במסגרת זו ת/86
– ת/91 עפ״י סדרן.

בהמשך הישיבות בתיק הסכים ב״כ הנאשם להגשת חומר הראיות הנוגע לעדי התביעה 8
ו-9 וזאת בכפוף לצורך בתוספת ראייתית.
בישיבה מיום 24/11/05 הסכים ב״כ הנאשם להגשת חומר החקירה הנוגע ליתר העדים
בתיק והנאשם ויתר על ניהול פרשת הגנה בכפוף לכך שהדבר לא יהווה חיזוק לראיות
התביעה.

### ג. טיעוני הצדדים

התביעה הצבאית בסיכומיה ביקשה להרשיע את הנאשם בכל העבירות המיוחסות לו
בכתב האישום. התביעה הצבאית ביקשה ליתן אמון בהודעות העדים אשר הוגשו בהסכמה
לבית המשפט ומבלי שהעדים נחקרו נגדית.

התביעה הצבאית הפנתה בסיכומיה להודעות המפלילות את הנאשם בכל אחד מהפרטים
המיוחסים בכתב האישום וציינה כי גם לו נדרשה תוספת ראייתית הרי שהודעות העדים
השונים מחזקות האחת את השנייה.

רס״ן אלינור ברזני
קצינת העיר נתניה
4584482

נאמן למקור

PX3741.pdf

התביעה הצביעה התייחסה בסיכומיה להתאמות המפלילות בקשר לכל אחד מהפיגועים
והתהאמה בין דברי העדים ובין פרטי הפיגועים, אשר הינם בגדר עובדות מוסכמות בין
הצדדים.

הסניגור בסיכומיו התמצתיים העלה שתי טענות מרכזיות שיש בהן כדי להביא לזיכוי
הנאשם לשיטותו. ראשית טען הסניגור כי הנאשם הכחיש את כל העבירות המיוחסות לו
וכי לא קיימת תוספת ראייתית להודעות העדים. בנוסף טען הסניגור כי לא קיימת התאמה
בין הפיגועים שהתבצעו ובהם נגרם מותם של שלושה חיילי צה"ל ושלושה אזרחים ובין
ההודעות של העדים בתיק ומשכך אין מדובר באותם אירועים.

**ד. שאלות מהימנות ומשקל**

כאמור הוגש חומר הראיות במלואו בהסכמת הגנה ומבלי שעדי התביעה נחקרו. החומר
הנוגע לעדיי התביעה תביעה 1-9 הוגש בהסכמת ההגנה ובכפוף לכך שתידרש להודעותיהם
תוספת ראייתית.

עפ"י הלכת אבו הלאל ( עד"י איו"ש 114/01) משמעות ההסכמה להגשת חומר ראיות היא
כי ההגנה לא חולקת על תוכנו של חומר זה. בנוגע לחומר הראיות אשר לגביו צוינה
הסתייגות בנוגע לתוספת ראייתית, הרי שלא ניתן יהיה להרשיע את הנאשם על בסיס אותו
חומר מבלי שתמצא לו תוספת ראייתית בחומר הראיות.

קראתי בתשומת לב את חומר הראיות שהוגש לבית המשפט ולצורך קביעת מהימנותו של
החומר נתיתי דעתי גם למבחן הפנימי וגם למבחן החיצוני, כפי שנקבעו בפסיקה:

**הודעת הנאשם - ת/67 –** הנאשם בהודעתו הכחיש את העבירות המיוחסות לו וכאשר
חוקר המשטרה מעמת אותו עם הודעותיהם של עדים אחרים הנאשם משיב כי כל
האירועים כי הם שקר או שהעד שיקרן. הנאשם נשאל מדוע שכל האנשים הללו יגידו עליו
שקרים כאלה ומשיב שאינו יודע על כך דבר. כידוע כאשר נאשם מבקש לסמוך על הדברים
שהינם לטובתו בהודעתו המשטרתית עליו לחייד בבית המשפט והאנשים שבפנינו לא העיד.
העדים משקרים, לא מצאתי ליתן להכחשתו של הנאשם גורפת ללא מתן כל הסברים מלבד טענה כי שאר
העדים משקרים, לא מצאתי ליתן להכחשתו זו משקל.

מאידך בהודעת הנאשם בעמוד 5 שורות 17-11 נשאל הנאשם אודות האמור בהודעתו של
פרח האמד, בנוגע לתבונן הפיגוע נשוא פרט אישום 16 בכתב האישום והנאשם משיב:
" *תשובה - הפיגוע הזה לא הצליח אבל פיגועים אחרים כן יצליחו בעזרת ה"*

אמנם אין מדובר כאן בהודאה, אולם ניתן לראות בהתבטאות זו של הנאשם כמעין ראשית
הודיה. יודעת כי הודעת הנאשם הוגשה בהסכמת ההגנה ומבלי שהועלו טענות כלשהן
לגובה האמרה בנוגע לדיוק הרישום.

**הודעות עד תביעה מס' 2 פרח האמד – ת/68, ת/69, ת/70 ו – ת/71 –** הודעותיו של עד זה
הינן מפורטות, סדורות והגיוניות. כמו כן הודעות אלה משתלבות בהודעותיהם של העדים
האחרים. על כן מצאתי ליחס להודעות אלה משקל מלא.

**הודעות ע"ת מס' 3 ח'אלד עומר – ת/72, ת/73 ו– ת/74 –** אף הודעות אלה הינן מפורטות,
סדורות והגיוניות והעד מתאר את אותם האירועים אשר מתוארים גם על ידי העדים
האחרים. בנוסף העד כותב הודעותיו גם בכתב ידו ושרטטים את מקומתם ביצוע הפיגועים.
שרטוטים אלה מחזקים את מהימנות ומשקל הודעות. כמו כן כפי שעולה מזי"ח ההובלה
והצבעה ת/63 ומדזי"ח הפעולת ת/64 שהוגשו בהסכמה, העד הוביל את כוחות הביטחון
וחוקר משטרת ישראל, רס"ל אבי עקיבא למקום מסתתר כלי הנשק שבו נמצאו ארבעה
רובי קלצ'ניקוב, שני רובי 16M מקוצרים של חיילי צח"ל שנהרגו וכן רובה 16M ארוך,
תחמושת ואביזרים שונים. לאחר מכן הוביל העד את כוחות הביטחון למקום מסתור נוסף

רס"ן אלינור ברזני
4584482
קצינת העיר נתניה

נאמן למקור

שגם בו נמצאו כלי נשק של החוליה. זו של העד למקום מסתור הנשק מחזקת את                    2
מהימנות הודעותיו של העד. מצאתי ליחס להודעותיו של עד תביעה 3 משקל מלא.                    3

**הודעות עד תביעה מס' 4 אחמד חאלד חאמד – ת/77, ת/78, ת/79 ו- ת/80** – הודעותיו של              4
עד זה הינן סדורות הגיוניות ומפורטות. כמו כן הודעות אלה משתלבות במארג הכללי של            5
חומר הראיות ולפיכך מצאתי ליתן להן משקל מלא.                                            6

**הודעות עד תביעה מס' 5 יאסר חמאד – ת/81, ת/82 ו- ת/83** – עד זה מסר הודעות                  7
מפורטות מאד, סדורות והגיוניות, המשתלבות בפרטים שמסרו יתר העדים ועל כן מצאתי             8
ליחס להודעותיו משקל מלא.                                                              9

**הודעות עדי תביעה 6 – אחמד מצטפא חאמד ת/84 ו-ת/85** – בנוגע לעד זה הוגשו זכ"ד              12
אשר נרשם ע"י חוקר השב"כ מיכה וכן הודעה משטרתית בה הכחיש העד את כל המיוחס                 13
לו ומשתחפנה להודעות עדים אחרים הטיב כי דברים אלה אינם נכונים. יחד עם זאת לא היה          14
לעד כל הסבר בנוגע לדברים שעמם עומת ואף התכחש לשרטוטים שהוצגו לו ונשאו את                 15
שמו. בזכ"ד אשר מתעד חקירת העד מיום 21/12/03, נרשם כי העד טען תחילה שלא ביצע              16
דבר וראלום לאחר מכן מסר גרסה לפיה השתתף בפיגועים עם שניים נוספים. בהמשך              17
חקירתו של העד הופצע עם עם ח'אלד (המדובר בח'אלד עומר) ולאחר שזה אמר לעד כי                18
כלי הנשק נמצאים ברשותו של העד, לאחר שהשניים החליפו מספר דברים בניהם בנוגע              19
למקום מסתור הנשק, כפי שמצוין בזכ"ד שרטט העד את מקום מסתור הנשק ומסר              20
הודאה מפורטת ומסודרת מבחינה כרונולוגית בפני חוקר השב"כ. בחרתי להעדיף את              21
הזכ"ד האמור כי האמור בזכ"ד מסר ע"י העד לאחר מנומקת של העד בחקירתו המשטרתית.              22
שוכנעתי כי האמור בזכ"ד מסר ע"י העד לאחר מנומקת של העד בחקירתו המשטרתית.             23
שמעינה נחשפו ואין טעם להמשיך ולהסתיר. כתמיכה בהודאה זו, מצאתי את הביך                24
השרטוטים שצייר העד בעצמו. אכן מדובר בזכ"ד אשר העד לא הוזהר קודם למסירת                25
דבריו וכן אופי רשומו אינו מילה במילה. יחד עם זאת, היות שחחומר הוגש כולו              26
שהתייחסות אל הזכ"ד הינה כהודעה של עד ולא כהודעת נאשם ועל כן העדר אזהרה אין              27
בה כדי להשליך במקרה זה על משקל ההודעה. על כן מצאתי ליחס לזכ"ד ת/84 משקל              28
מלא.                                                                                  29

**הודעות עד תביעה מס' 7 השאם חג'אז – ת/23 עד ת/38** – ת/23 הינה הודעה משטרתית              32
של העד מיום 10/2/04 בה הכחיש את הכחשות המיוחסים לו ולגבי פרטים ספציפיים              33
מהודעות של אחרים הגיב כי הדברים אינם נכונים. לעומת זאת בזכ"ד חקירתו הראשונה              34
ת/24, ביום 20/12/03, חקירה שהיתה לעד לאחר מעצרו סירב העד תחילה להתודות על              35
פעילותיו ואף שיכנוי לו הוכחות. לאחר שלעד הוצגו ראיות שבהם פעילים אחרים הודו              36
בפעילותם המיוחסת, החל העד למסור הודאתו בצורה כרונולוגית מפורטת, סדורה ובהירה.              37
העד מוסר בזכ"ד פרטים מלאים, מוסר תיאור של מקומות שבהם ביצעו את הפיגועים, וכן              38
מספר בהרחבה על תהכונה שבעצעו לפיגועים. בחלק מהדברים מציין העד כי קיבל את              39
הזדורים מאחרים לדוגמה מח'אלד עומר. דברים אלה הינם כמובן בגדר עדות שמיעה והנשת              40
מידיעתו האישית ומצאתני להעדיף את הזכ"דים ומצאתני להעדיף את הזכ"דים על פני הכחשותו בחקירת המשטרה. יודגש              42
כי העד בהודעתו המשטרתית ת/23 עד עמ' 11 שורות 25- 26 ציין : *יאולי הודיעתי בפנוי*              43
(הכוונה לחוקר השב"כ ד.ק. ) *אבל לא עשיתי כלום*. נראה כי לאור הפירוט הרב שמסר              44
העד לחוקר השב"כ, הפרטים המלאים והמדויקים, גרסתו של העד באמרתו המשטרתית              45
אינה מהימנה ואין מנוס מלהעדיף את זכ"ד החקירה ת/24.                                        46

**הודעותיו של ע"ת 8, מוראד ברגותי** הוגשו בהסכמת ההגנה ובכפוף לצורך בתוספת              48
ראייתית. עד זה מוסיף פרטים בכל אחת מהודעותיו ומפרט את הדברים שמסר. לא רק זו,              49
אלא שבהודעות ת/42 שורות 25 – 27 מסביר העד מדוע הוא סרב למסור הודעה בנוקר              50
היום ולאחר שהופשע עם ג'אבר שאמר לו למסור את הדברים הוא הסכים למסור הודעה.              51
עד זה אינגו מזכיר בהודעותיו את הנאשם ועל כן הודעותיו אינן יכולות לשמש כבסיס              52

רס"ן אלינור בריני
קצינת העיר נתניה

נאמן למקור

L_C180905

**JA2970**

להרשעה אלא אף ורק כתוספת ראייתית. הודעות העד הינן הגיוניות, סדורות ומפורטות      2
ומצאתי ליתן להן משקל מלא.                                                          3

**הודעותיו של עד התביעה 9 ת/44 – ת/45** אשר הוגשו בהסכמת החגנה ובכפוף לצורך        4
בתוספת ראייתית, אינן מזכירות את שמו של הנאשם אם כן העד מתייחס בהם לאירועים          5
המיוחסים לנאשם בכתב האישום. מאחר שהעד השתייך לחוליייה אחרת שהיינתה ממודרת           6
מחוליייתו של הנאשם, אין בכך כדי לסתור את הראיות האחרות בתיק. כמו כן הודעותיו        7
של עד זה הינן סדורות והגיוניות ועל כן מצאתי ליתן להן משקל מלא.                      8
                                                                                  9

**הודעותיו של ע"ת 10 ת/46 – ת/56** – בנוגע לעד זה הוגשו בהסכמה בלתי מסוייגת הן    10
חקירותיו המשטרתיות והן זכ"ד החקירה. הן עפ"י הלכת **אבו הלאל** והן לאחר שקראתי       11
את  ההודעות והזכ"דים ומצאתי כי הינם מפורטים מאד סדורים והגיוניים, מצאתי ליתן        12
משקל מלא להודעות ע"ת 10.                                                           13
                                                                                  14

**הודעותיו של ע"ת 11 ת/57 – ת/59** – אף הודעות אלה הוגשו בהסכמה בלתי מסוייגת של   15
החגנה. על כן עפ"י הלכת **אבו הלאל** אין מחלוקת בין הצדדים באשר לתוכן ההודעות. כמו  16
כן, הודעות אלה הינן מפורטות, סדורות, הגיוניות ומשתלבות במארג של שאר העדויות         17
בתיק ועל כן מצאתי ליתן להן משקל מלא.                                               18
                                                                                  19

**הודעותיו של ע"ת 12 ת/60 – ת/62** – הודעותיו של עד זה הוגשו אף הן בהסכמה בלתי    20
מסוייגת של החגנה ועל כן אין מחלוקת בין הצדדים בנוגע לתבכן של ההודעות. מעבר לכך,    21
ההודעות עצמן מפורטות, הגיוניות וסדורות ומשתלבות במארג הכללי של חומר הראיות          22
בתיק והעד אף שרטט לבקשת חוקר המשטרה את מקומות ביצוע הפיגועים השונים, על כן          23
מצאתי ליתן להן משקל מלא.                                                           24
                                                                                  25

**פרט אישום ראשון**                                                               26
                                                                                  27
**היסוד העובדתי**                                                                 28
                                                                                  29
בפרט אישום זה מיוחסת לנאשם עבירה של חברות בחוליה צבאית של ארגון החמאס              30
המשתתיכת לגדודי עז אדין אל קסאם. לים מעצרו.                                        31
בפרטי העבירה כי במסגרת החברות התאמן הנאשם עם חברי חוליייתו בירי מרובי סער           32
ואקדח.                                                                            33
                                                                                  34

ע"ת 3, האלד עומר בהודעתו ת/72 עמי 2 שורות 4 – 10 מציין כדלקמן :                    35
                                                                                  36
*"יכן פגיתי אל יאסר חסן חמאד ... והוא הסכים לגיוס לחמאס הצבאי אמרתי לו שיש לי*      37
*נשק וכסף וכי יגייס עוד אחד לחוליה שלנו ואני רוצה להוסיף כי יאסר גייס את מואייד*    38
*שוקרי חמאד כבן 28 מסילוואד עובד טייח נשוי יש לו בן ובת וערכתי פגישה איתם בביתי*    39
*וגם יאסר אמר לי מוכן לפעול צבאית. גם להם מסרתי כי כאשר יגיע הנשק נפעל בחמאס*       40
*הצבאי ."*                                                                        41
                                                                                  42
בהמשך אותה הודעה, בשורות 18 – 27 מציין העד כדלקמן :                                43
                                                                                  44
*"כאשר קבעתי עם מואייד ויאסר שיבואו לביתי, שלחתי את אשתי לבית הוריה ולימדתי*        45
*אותם כשהגיעו לביתי על הנשקים 16M וקלצ׳ניקוב.*                                     46
*.....*                                                                           47
*לאחר שבוע אמרתי למואייד ויאסר שאנו הולכים להתאמן בירי וקבענו זמן לאחר יומיים*      48
*ואז הלכתי לבית פרח לקחתי 16M וקלצ׳ניקוב ונפגשתי ונפגשתי ובמפגשתי עם יאסר ומואייד ונסענו ברכבו*   49
*עד סוף רחוב זראעי ושם ירינו מכל חצי נשק מחתנית באופן מהיר ..."*                   50
                                                                                  51

**נאמן למקור**

תאריך: ט"ז תמוז, תשס"ן    תיק מס': 1173/04
11 יולי, 2006

ע"ת 3, ח'אלד עומר ממשיך לאורך כל הודעותיו לציין את הנאשם כחבר בחולייתו והוא אף    1
מספר על היוועצות שערך עם חברי חולייתו בנוגע להצטרפות אחמד מצטפא חאמד לחולייה    2
– ת/73 עמ' 2 שורות 5 ואילך:    3
4

"ובתשובה: אני סיפרתי בעדויות קודמות שגייסתי ארבעה אנשים לפעילות צבאית והם היו    5
כל 2 בחולייה. ואחרי כן אני התלהטתי שהם יהיו חולייה אחת שתעשה פעילות משותפת    6
בחולייה אחת היו יאסר ומוייד ובחולייה השנייה היו פרח אסמעיל נתור ואחמד חאלד    7
דהוד"    8
9

"לאחר שיצא מהכלא אחמד מוצטפא אז הוא אמר לי שרוצה לפעול איתו ועם אנשי    10
חולייתי ואני אמרתי לו שאני רוצה לדבר על כך עם אנשי החולייה שלי ואז הוא התרגז    11
ואמר לי שבגללו אני נכנסתי לפעילות צבאית ולמה זה שצריך כך לשאול את אנשי    12
החולייה. אבל אני שאלתי את אנשי החולייה וחלק מהם אמרו שאנחנו נהיה חולייה גדולה    13
זה לא טוב ורק מוייד אמר שזה טוב שאחמד מצטפא יצטרף אלינו ומה שהיה בסוף    14
שאחמד מצטפא נעשה אחראי על כולנו."    15
16

אף ע"ת 4 אחמד חאלד חאמד מציין את הנאשם כחבר בחולייה הצבאית ת/77 עמי 4    17
שורות 7 – 16 :    18

"כן בערך לפני כ- 9 חודשים השתחרר אחמד מצטפא חאמד מהכלא, כמה ימים אחרי זה    19
ביקש ממני חאלד לבוא לביתו כדי להכיר את החולייה השנייה, הסכמתי ובאתי, בבית של    20
חאלד היו 1.....3. מוייד שוקרי חמאד תושב סלוואד כבן 28, נשוי ויש לו בן ובת ואשתו    21
בהריון עובד בטיח...    22
23

עוד מציין העד בעמ' 5 שורות 24- 27    24
"בערך 3 שבועות לפני שנעצרתי ישבנו בבית אחמד מצטפא חאמד, אני אחמד מצטפא,    25
חאלד חאמד גנאאר, פרח נטור, יאסר חמאדומוייד שוקרי חמאד    26
ש"ת: סיפרתי לך עליהם כולנו חוליית חמאס צבאי."    27
28

ע"ת 5, יאסר חמאד מזכיר אף הוא את הנאשם כחבר חולייתו בהודעתו ת/81    עמי 1    29
שורות 27 -28:    30
"אני התכוננתי לומר שחאלד חאמד ומוייד שוקרי חמאד הם השבאב וביחד היינו חולייה    31
צבאית בהתחלה, שבוע אחרי זה הראה לי חאלד חאמד רובה קלצ'ניקוב ואני וחאלד    32
ומוייד עשינו אימון בירי. כל אחד למד על הנשק וירינו כל אחד כמה כדורים מהנשק    33
הזה."    34
35

דברים אלה של העד תואמים את דבריו של ע"ת 3, חאלד אשר סיפר על כך שבהתחלה הוא    36
התכונן להפעיל שתי חוליות הממודרדות זו מזו.    37
38

ע"ת 6 אחמד מצטפא חאמד מזכיר אף הוא את הנאשם כחבר בחולייה, ת/84 עמי 2    39
"חברי החולייה אותם גייס חאלד הם הר"מ:    40
פרח חאמד ...    41
מוייד שוקרי חמאד  סלוואד, כבן 27 מכונה אבו חמזה, נשוי ואב לילדים, עובד בטייח,  פ...    42
43

ע"ת 2 מזכיר אף הוא את הנאשם כמי שפעל עם עימו והשניים ביצעו יחד פיגועים והעד    44
מציין כי הנאשם הינו "פעיל צבאי בחמאס". (ת/68, עמי 2 שורה 4).    45
46

משכך ניתן לראות כי הוכחו העובדות המפורטות בפרט האישום הראשון.    47

**היסוד הנפשי**    49

בעבירה המיוחסת לנאשם בפרט האישום הראשון נדרש יסוד נפשי של מחשבה פלילית    51
רגילה הווה אומר מודעות להתנהגות ולנסיבות. חזקה היא שאדם מודע להתנהגותו    52
ולנסיבות העבירה. הנאשם, אשר נחקר בנוגע לעבירה זו טען כי העד שהפליל אותו שקרן,    53

-5-

נאמן למקור

אך לא העלה כל טענה העשויה לסתור את חזקת המודעות. לכן שוכנעתי כי מתקיים אף היסוד הנפשי הנדרש לשם הרשעה בעבירה זו.

**תוספת ראייתית**

העדים המוזכרים לעיל הינם שותפים של הנאשם לביצוע העבירות וכן מדובר בהודעות חוץ של העדים. על אף שהודעות הוגשו בהסכמה, ועל כן עפ"י הלכתה **אבו חלאל** לא נדרשת קיומה של תוספת ראייתית, מצאתי לציין כי הודעות אלה מחזקות אחת את השניה והינן אף בגדר חיזוק מובנר, כנדרש לגבי אמרות חוץ של שותפים. כמו כן מהווה חיזוק להודעות אלה 63/ות ו64/ת, בכך שהעובדה כי ע"ת 3 חאלד עומר הוביל את חוקרי למסתור הנשקים של החוליות, מאמתת את האמור באמרותיו.

לפיכך, מצאתי כי יש להרשיע את הנאשם בעבירה המיוחסת לו בפרט האישום הראשון.

**פרט אישום שני**

בפרט אישום זה מיוחסת לנאשם עבירה של פגיעה בביטחון האיזור בכך שהנאשם הציע לאחראיה החולייה שלו, חאלד עומר לבצע פיגוע התאבדות באמצעות ירי כדי לגרום למותם של אזרחים ישראלים רבים ככל האפשר. לאחר שחאלד עומר הביא את התוכנית בפני בבריכה אליה מגיעים מתיישבים ישראליים ולירות לעברם. הנאשם קיבל מחאלד כלי נשק ורימונים לביצוע הפיגוע ואסף מידע משך שבועיים על המקום אך נוכח כי המתיישבים הישראליים לא מגיעים יותר למקום.

**היסוד העובדתי**

ע"ת 3 חאלד עומר, בהודעתו ת/73 עמ' 4 שורה 27 ועד עמ' 5 שורה 19 מוסר על הצעתו של הנאשם לבצע פיגוע התאבדות ע"י ירי, האישור שקיבל חאלד מהשאם חיג'אזי, הצעת לנאשם לשם ביצוע הפיגוע התצפיות שערך הנאשם על מקום הפיגוע ואי ביצוע הפיגוע מכיוון שהנאשם גילה שהיהודים אינם מגיעים יותר לאותה בריכה ולכן הנאשם החזיר לחאלד את כלי הנשק.

הודעתו זו של ע"ת 3 מבססת את היסוד העובדתי המפורט בפרט האישום השני. כמו כן מצאתי קשירות הקשר, שכן הוא החל בהכנות לביצוע הפיגוע המתוכנן, הן ע"י קבלת הנשק לפגישת ורהן ע"י עריכת תצפיות על המקום. ואולם המעשים לא באו לגדר ניסיון גרימת מוות בכוונה. על כן , יש מקום להרשיע את הנאשם בעבירה של פגיעה בביטחון האיזור.

**היסוד הנפשי**

כפי שעולה מהודעת ע"ת 3 הנאשם היה מודע למעשיו ולסכנה לביטחון האיזור הטמונה בהם שכן כל מטרתו של הנאשם היתה לגרום מוות לתושבים ישראלים באמצעות ירי. על כן מצאתי כי מתקיים היסוד הנפשי הנדרש בעבירה המיוחסת לנאשם.

**תוספת ראייתית**

אף שכאמור, הודעותיו של ע"ת 3 הוגשו בהסכמה בלתי מסויגת, ועל כן עפ"י הלכת **אבו חלאל**, לא נדרשת להן תוספת ראייתית, מצאתי נוכח טענת ההגנה בנוגע להעדר תוספת ראיינית להתייחס לנקודה זו. לציין כי הודעות ע"ת 3 הינן הודעות חוץ של שותף על כן נדרש להן חיזוק מובנר ואולם חיזוק אין משמעותו ראיה מסבכת אלא ראיה מאמתת. על כן הודעות עדי תביעה 2,4,5,6,7 אשר מוסרים אותם פרטים אודות פעילות חולייתו של

4584482
רס"ן אלינור ברזני
קצינת העיר נתניה

PX3741.pdf

L_C180908

JA2973

נאמן למקור
חתימה
תיק מס': 1173/04

ע"ת 3 מהווה חיזוק מוגבר להודעות הנאשם. כמו כן מהווה חיזוק מוגבר ת/63 ו-ת/64,
כאמור דו"חות החובלה של העד אל מסתורי הנשק של החוליה.

על כן מצאתי כי יש להרשיע את הנאשם במיוחס לו בפרט האישום השני.

## פרט אישום שלישי

בפרט אישום זה מיוחסת לנאשם עבירה שעניינה ניסיון גרימת מוות בכך שביום חד' עם
יאסר חמאד ותאלד עומר ביצע פיגוע ירי לעבר רכב פרוד טרנזיט בכביש 60. עפ"י המפורט
בכתב האישום, הנאשם הציע לתאלד עומר לבצע את הפיגוע ותאלד פנה לממונה עליו,
אשם חניאזי של קבלת האישור לפיגוע וכן קבלת הנשק. תאלד עומר קיבל מהנאשם שני
רובי קלצ'ניקוב ושמונה מחסניות ומסר את הרובים לנאשם וליאסר. ביום הפיגוע הסיע
תאלד את הנאשם ואת יאסר למקום הפיגוע בכביש 60, שם פתח הנאשם באש מרובה
הקלצ'ניקוב שהחזיק ואילו יאסר לא ירה בשל מעצור בנשקו.

## היסוד העובדתי

ע"ת 3 תאלד עומר מציין בהודעתו ת/72 עמ' 3 שורות 10- 23 כדלקמן:

*"וכאשר הנשקים היו אצל השאם באו מואייד ויאסר והציעו כי נבצע פיגוע ירי בסוף רחוב*
*זראני וכי נחזור ברגל לכפר כדי שלא נחשף מקום הירי הוא מעל ציר 60 אנחנו קוראים לו*
*רחוב שכם כי הוא הדרך לשכם. זה לפני עיון חרמיה הסכמתי לתכנון זה בעבר זרקתי*
*מאותו מקום בקת"בים על כך נשפטתי ולכן הלכתי להשאם וביקשתי נשקים והוא נתן*
*לי 2 קלצ'ניקובים 8-1 מחסניות יום לפני הפיגוע התקשרתי להשאם ואמרתי לו שאני*
*הולכים לבצע פיגוע ירי יזה וזה באמצע רמדאן 2002 זה היה לפני תפילת הערב פניתי*
*אל מואייד ויאסר ואמרתי להם להגיע למקום הירי ואמרתי להם כי ירו 10 דקות לאחר*
*תפילת הערב מסרתי להם הנשקים והלכנו עד למקום הירי, אני חזרתי לכפר והקשבתי*
*לחדשות..."*

ע"ת 3, תאלד עומר מבסס את החלק הראשון של תכנון הפיגוע, ההכנות אליו והסעת
הנאשם ויאסר למקום הפיגוע. ואולם מאחר שהעד לא היה נוכח במקום הפיגוע, הרי
שאינו יכול לבסם את עצם הירי, שכן הדבר הינו בגדר עדות שמיעה. (העד מציין כי יאסר
דווח לו את הפרטים של הפיגוע, אך הדבר מהווה כמובן עדות שמיעה ממנה התעלמתי).

ע"ת 5 יאסר חמאד אשר עפ"י הודעת ע"ת 3 השתתף בעצמו בפיגוע, מוסר את הדברים
הבאים בהודעתו ת/81 עמ' 2 שורות 6 – 28:

*"ת: כן, בערב בחודש 11 2002 אני זוכר שזה היה במהלך הרמדאן יצאנו אני ומואייד*
*לבצע פיגוע ירי על הדרך העוקפת ליד אזור אל עקבה בסלווואד. תאלד חמאד נג'אר לקח*
*אותי ואת מואייד ברכבו שזה שחור לא יודע את הסוג שלו, הוריד אותנו באיזור אל*
*עקבה וחזר לבית. אני ומואייד היינו חמושים בקלצ'ניקוב כל אחד עמדנו במקום, השעה*
*היתה בערך 17:00 ואנחנו זיהינו רכב עם ספרים ישראלים שבא לכיוון שלנו וכשהוא*
*היה קרוב ירינו לכיוון שלו. לי היתה בעיה בנשק זה לא הוצא שום כדור ומואייד ירה*
*באוייר פתאום בגלל שאין לו טענון בנשק ולא נפגע ולא פגע במכונית שנסעה, אחרי זה הלכנו משם*
*וחזרנו לכפר. "*

העד מוסיף כי הם היו במרחק כ-10 מטרים מהרכב וכי הוא אינו זוכר את סוג הרכב לעברו
ירו.

עד כה מבסם את היסוד העובדתי של עבירת הניסיון גרימת מוות בכוונה. בנוגע לפיגוע
הספציפי, הוסכם בין הצדדים כי אין מחלוקת בנוגע לפרטי הפיגוע. הנה העד אינו זוכר
את סוג הרכב שלעברו ירה אך מצאתי כי קיימת התאמה בין חוות הדעת מומחה בתיק
פ"א 2863/02 לבין הפרטים שמסר העד. כך מחוות הדעת 71083/02-07 עולה כי לעבר
הרכב נורו כדורים מרובה קלצ'ניקוב או נשק באותו קוטר וכי כל התרמילים שנמצאו

4584482
רס"ן אלינור ברזי
קצינת העיר נתניה

מקורם בנשק אחד. הדבר תואם את האמור ע״י העד לפיו הנאשם היה היחיד שלכך, שכן   1
לעד היה מעצור בנשק.   2
  3

**היסוד הנפשי**   4
  5

היסוד הנפשי של הנאשם נלמד מהתנהגותו המתוארת ע״י שני העדים. כמובן שבעבירת   6
הניסיון לגרימת מוות בכוונה נדרשה נדרשת צפיית התוצאה הקטלנית וחפץ באותה תוצאה וכן   7
יחד עם זאת היו אלה שהציעו לחאלד לבצע פיגוע לעבר רכב, הם הצטיידו בכלי נשק   8
קטלניים וירו לעבר הרכב מטווח קצר. אמנם ע״ית 5 מציין שהנאשם ירה פתאום באוויר,   9
אך מציין כי זה היה בשל חוסר ניסיונו להשתמש בנשק ואין בכך כדי לשלול את כוונתו של   10
הנאשם לגרום מוות.   11
  12
  13

**תוספת ראייתית**   14
  15

למעלה מן הצורך אציין כי הודעותיהם של ע״ית 3 וע״ית 5 מחזקות זו את זו ועומדות   16
בדרישת הדין בנוגע לתוספת ראייתית הנדרשת לאמרת חוץ של שותף. בנוסף, קיימות   17
תוספות ראייתיות למכביר בדמות הודעות ע״ית 2,4,6,7, אשר מספרים אודות פעילות   18
החוליה וכן דו״חות החובלה והצבעה על הנשק של ע״ית 3 כמוזכר לעיל.   19
  20

על כן מצאתי כי יש להרשיע את הנאשם במיוחס לו בפרט האישום השלישי.   21
  22

**פרט אישום רביעי**   23
  24

בפרט אישום זה מיוחסת לנאשם גרימת מותה בכוונה של אסתר גאליה ז״ל ביום   25
18/11/02. עפ״י כתב האישום פרח חמאד וחאלד עומר תכננו לבצע פיגוע ירי לעבר רכב   26
ישראלי בקטע הכביש 458 (ציר אלון) בקטע שבין מחמאס ליישוב רימונים, כאשר פרח   27
יהיה היורה לעבר הרכב וחאלד יצטרף ויתריע על באו של כלי הרכב. חאלד הציע לנאשם   28
להצטרף לביצוע הפיגוע והנאשם הסכים לכך. ביום הפיגוע נסעו הנאשם ופרח לצומת   29
רימונים שם תצפת הנאשם כדי להודיע על התקרבותו רכב ישראלי ופרח התכונן לביצוע   30
הירי, לאחר שפרח ראה רכב מסוג הונדה שאטל בעל לוחיות זיהוי ישראליות ונהוג ע״י   31
נהגת יהודיה ירה פרח לעבר הרכב ומפגיעות הירי הנ״ל נהרגה הנהגת, אסתר גאליה ז״ל.   32
  33

**היסוד העובדתי**   34
  35

ע״ית 2 בהודעתו ת/68 בעמ׳ 1 שורה 27 ועד עמ׳ 2 שורה 26 מוסר אודות הפיגוע שתכנן יחד   36
עם חאלד עומר: *״לפנ*י *יותר משנה בחודש הרמדאן תכננתי פיגוע ירי בדרך בין מחמאס*   37
*לרימונים, דרך אלון... ואני חמוש בקלצ׳ין וחאלד חאמד תצפיתן על הדרך וחאלד הביא*   38
*איתו עוד אחד מואיד שוקרי חמאד,בבן 27 נשוי מסלמאר טייח חמוש בקלצ׳ין פעיל צבאי*   39
*בחמאס ......*   40

העד ממשיך ומוסר אודות כך שהמתין לרכב שהגיע ממחמאס ולאחר מספר דקות הגיע   41
רכב סטיישן שאת סוגו אינו זוכר עם לוחית זיהוי צהובה בו נהגת יהודיה והוא ירה לעבר   42
הרכב מטווח של כ- 5 מטר, 15 כדורים לערך. כן מציין העד כי הרכב נפגע ונעצר כ- 10   43
מטרים ממנו. העד מספר כי הנאשם ישב ברכב ותצפת על הדרך מהכיוון השני רואה האם   44
בא רכב.   45
  46

ע״ית 3 בהודעתו ת/72 עמ׳ 5 שורות 12 28- מוסר אודות פיגוע שתכננו יחד עם הנאשם ופרח   47
על כביש שמוביל לכפר טייבה ובו יש צומת שיש בו פניה לכביש השחר ולרימונים. העד   48
אמנם לא השתתף בפיגוע עצמו וכל כן אינו מוסר דברים אלה מידיעה אישית, אך הוא   49
מאמת פרטים בנוגע למסירת תחמושת ע ידו לשם ביצוע הפיגוע ושימוש ברכבו של ע״ית 3   50
לביצוע הפיגוע כפי שמוסר גם ע״ית 2.   51
  52

**הקשר הסיבתי בין הפיגוע המתואר ע״י ע״י 2 לבין גרימת מותה של אסתר גאליה ז״ל**   53

4584482
רס״ן אליענר ברזני
קצינת העיר נתניה

נאמן למקור

הפרטים שמוסר העד בנוגע למועד הפיגוע ומקומו, סוג הרכב והעובדה כי הרכב היה נהוג
ע״י נהגת וכי הרכב נפגע נענער מתאימים לעובדות המפורטות בכתב האישום, עובדות
אשר הסכמה ההגנה לגבי נכונותם. בנוסף מעיון בחוות הדעת מומחה שהוגשה בהסכמה
וב07/02/70591 עולה כי בזירה נמצאו 16 תרמילים שנורו מכלי נשק אחד מסוג
קלצ׳ניקוב או נשק בעל קוטר דומה, ואף ממצאים אלה מתאימים לפרטים שמסר ע״ת 2
בנוגע לירי.

משכך, לא נותר ספק בליבי כי הפיגוע שבוצע ע״י הנאשם וע״י פרח חמאד הינו הפיגוע בו
נגרם מותה של **אסתר גאליה ז״ל**.

**חלקו של הנאשם בביצוע העבירה**

מאחר שהנאשם לא היה זה שירה בעצמו לעבר רכבה של **אסתר גאליה ז״ל**, הרי שהוא
אינו מבצע עיקרי, יש לבחון האם הנאשם הינו שותף לעבירה עפ״י סעיף 14(א)(2) לצו או בדבר
כללי האחריות לעבירה או שמא הינו מסייע לפי סעיף 14(א)(3) לאותו צו. אמנם הנאשם לא
היה זה שירה ואולם הוא השתייך למעגל הפנימי של העבירה, הוא הגיע יחד עם המבצעים
העיקריי למקום הפיגוע הפנימי, כאשר הוא חמוש ברובה ותצפת על הכביש כדי להודיע על הגעת
רכב ישראלי למקום. משכך, שוכנעתי כי הנאשם הינו בגדר שותף ולא בגדר מסייע בלבד .

**היסוד הנפשי**

גם במקרה זה, מכיוון שהנאשם הכחיש את ההתחשדות נגדו מבלי לצרף כל הסבר, הרי
הנפשי שלו נלמד מנסיבות התנהגותו ומדברי העדים המפלילים. על כן מהתנהגות הנאשם
אשר הצטרף לפגוש ירי מטוהן קרוב לעבר נוסעי רכב ישראלי, הנני למדה על כך שצפה
שכתוצאה מהירי עשוי להיגרם מוות לנוסעים ואף חפץ בכך. הנאשם בהודעות המשטרתית
לא מסר כל גרסה העשויה לסתור את היסוד הנפשי הנלמד מהתנהגותו.

**תוספת ראייתית**

ההודעות של ע״ת 3 מאמתת את הפרטים שמסר ע״ת 2 בנוגע לאופן תכנון הפיגוע, מקום
ביצועו וההכנות אליו. משכך משמשת הודעה זו כחיזוק ואף כחיזוק מובהר להודעת ע״ת 2.
בנוסף משמשת חוות הדעת מומחה בנוגע לממצאים שנמצאו בזירת הפיגוע (מספר
התרמילים, סוג הנשק שממנו בוצע הירי והעובדה כי מדובר בנשק אחד) כחיזוק להודעת
ע״ת 2. דברים אלה נאמרו למעלה מהצורך, שכן הודעות ע״ת 2 הוגשו בהסכמה בלתי
מסוייגת ועל כן עפ״י הלכת **אבו הלאל** לא נדרשת להן תוספת ראייתית.

**פרט האישום החמישי**

בפרט אישום זה מיוחסת לנאשם עבירה שעניינה נסיון גרימת מוות בכוונה בכך שביום
27/12/02 ירה יחד עם יאסר חאמד לעבר אוטובוס אגד קו 177 שנסע מירושלים לבעל
חצור. פרח חאמד היה הצפתן והודיע ליאסר חאמד על הגעת האוטובוס וחאלד עומר היה
זה שהצ יע לחברי החתולים לבצע את הפיגוע והשיג את אישורו של השאם חיג׳אזי לביצוע
הפיגוע וכן תחמושת לשם ביצועו.

**היסוד העובדתי**

ע״ת 2 מציין בהודעתו ת/69 עמ׳ 2 החל משורה 22 ועד עמ׳ 3 שורה 10 כדלקמן :

*״מספר חודשים לאחר מכן שלח אותי חאלד ביחד עם יאסר חסן חמאד .... ומואייד*
*שוכרי חמאד כבן 27 נשוי עובד בטיח מהלואר לבצע פיגוע ירי לעבר מטרה ישראלית.*
*יצאנו שלושתינו ברכבו של מואייד מסוג סובארו בצבע אפור מודל 83 וזאת לאחר*
*שמואייד ויאסר ידעו באיזה שעות ואיזה מקום עובר באוטובוס ישראלי שנוסע מכיוון עופרה*
*לחזור בשעה 07:00 אני בתפקידי לשמש כתצפיתן שומר ומתריע והאוטובוס*
*למקום שהמתינו שאר חברי החתולים. קיבלתי מכשיר סלולארי והמתנתי להגעת*

רס״ן אליעזר ברזני
קצינת העיר נתניה

4589482

האוטובוס. תפקידי להודיע במכשיר הסלולארי שאיני זוכר את מספרו יאסר ומוּאיד
יבצעו את הירי לעברו. כל אחד מאיתנו תפס את מקומו וממקום התצפית שלי ראיתי את
האוטובוס והודעתי ליאסר ומוּאיד על כך שיהיו מוכנים, השניים כיסו את פניהם
ולדבריהם כשהאוטובוס התקרב לעבריהם הם ירו לעברו ברובי קלצ'ניקוב שכל אחד
החזיק ברשותו,"

ע"ת 3 מוסר אף הוא בהודעתו ת/72 עמ' 2 החל משורה 18 על תכנון לבצע פיגוע על
אוטובוס היוצא "מעוספרה כל יום לג/בל אל עצור שם יש מחנה צבאי והוא עובר דרך דיר
ג'ריר"ואח"כ בצומת כפר מאלכ..." עד זה מתאר את תכנון הפיגוע, חלוקת התפקידים בין
חברי החוליה כאשר פרח אמור לשמש כתצפיתן ואילו יאסר ומוּאיד יהיו בצומת כפר
מאלכ וירו על האוטובוס מרובי הקלצ'ניקוב כשהם רעולי פנים. העד אף מוסר כיצד השיג
תחמושת לפיגוע זה מהנישאם חיג'אזי. עד זה לא השתתף בפיגוע עצמו.

ע"ת 5 אשר השתתף בפיגוע עצמו מוסר בהודעתו ת/81 עמ' 3 שורה 22-2 כדלקמן:
"בחודש שני של שנת 2003 החלטנו אני ומוּאיד שוכרי שסיפרתי לך עליו והאלד חאמד
נג'אר לעשות עוד פיגוע ירי והפעם על אוטובוס ישראלי שיוצא מעוספרה לכיוון המחנה
הצבאי "עצורה" ואז ביום הפיגוע הלכנו אני ומוּאיד לבית של פרח נטור ולקחנו ממנו רובי
קלצ'ניקוב לכל אחד ונסענו במכונית של מוּאיד, רכב סובארו אפור לצומת כפר מאלכ
וחיכינו לאוטובוס שיבוא ....
חיכינו לכלפון מפרח נטור, פרח בא והיא תצפיתן והיה צריך להתקשר לפלאפון של
מוּאיד לומר לנו אם בא האוטובוס ואיפה הוא ובאמת פרח התקשר לפלאפון של מוּאיד
ואמר שהאוטובוס בדרך אלינו, אנחנו יצאנו מהרכב וחיכינו לאוטובוס בא אלינו ואז ירינו
עליו ביחד ,,"

העד מוסיף כי המדובר באוטובוס של אגד שנסע מכיוון עופרה למחנה הצבאי "עצורי" וכי
זה היה בשעות הבוקר 8:00 – 7:00 וחם היו רעולי פנים, הירי בוצע ממרחק 20-10 מטר
באופן אוטומט.

עפ"יי הודעותיהם של ע"ת 2,3, ו-5 מצאתי כי הוכח היסוד העובדתי של העבירה המיוחסת
לנאשם.

### האם הפיגוע שביצעו הנאשם וחברי חולייתו הינו הפיגוע המוזכר בפרט אישום חמישי?

עדותו של ע"ת 5 מתייחסת לפיגוע שבוצע בחודש פברואר 2003 בעוד הפיגוע בפרט אישום
חמישי בוצע ביום 27/12/02, הווה אומר יותר מחודש פער בזמנים. יחד עם זאת המדובר
באותה תקופה של השנה ואין כי ליחס משקל רב בנתון. העובדה שמוסר ע"ת 5 שכן עד זה השתתף
במספר רב של פיגועים שאת מועדם המדויק הוא זוכר ועל כן אין בפער זה כדי לשלול את
הזהות בין האירועים.
לעומת זאת פרטים מהותיים אחרים, כגון מקום הפיגוע, האוטובוס שלעברו הוא בוצע
שעת הפיגוע וכן העובדה כי מדובר עפ"י חוות הדעת מומחה זב 50684/02/03/07 בירי משולב
רובים שנמצא במוסג קלצ'ניקוב ומציאת מספר רב של תרמילים מתאימים לפרטים שמסר
ע"ת 5 בנוגע לביצוע הפיגוע.

על כן שוכנעתי מעבר לספק סביר כי הפיגוע שבוצע ע"יי הנאשם עפ"יי הודעות ע"ת 2,3, ו-5
הינו הפיגוע לעבר אוטובוס אגד 177 המתואר בפרט האישום החמישי.

אין צורך להכביר מילים באשר לחלקו של הנאשם כמבצע עיקרי בפיגוע זה, שכן הנאשם
היה זה שירה יחד עם ע"ת 5 לעבר האוטובוס.

### היסוד הנפשי

אף במקרה זה היסוד הנפשי נלמד מהתנהגות הנאשם וביצוע ירי מטווח קצר לעבר
אוטובוס נוסעים אינה מותירה ספק באשר לצפיית הנאשם את התוצאה הקטלנית, חפצו
בה וכוונתו להשלים את ביצוע העבירה.

רס"ו אליינר ברדון
קצינת העיר נתניה

L_C180912

PX3741.pdf

JA2977



**התוספת הראייתית**

הודעותיהם של ע״ת 2 ו- 3 מאמתות את הודעתו של ע״ת 5 ומחוות חיזוק מוגבר להודעה
זו, בה מפליל העד את הנאשם בביצוע הירי.

**פרט אישום שישי**

בפרט אישום זה מיוחסת לנאשם עבירה של נסיון גרימת מוות בכוונה בכך שביום 29/1/03
יחד עם חברי חולייתו, ביצע פיגוע ירי בנשר עין יברוד בכביש 60. תפקידו של הנאשם
בפיגוע זה עפ״י כתב האישום היה הסעת שני הירורים, פרח חאמד ויאסר חמאד למקום
הפיגוע ומילוטם מן המקום מאחר הירי. הנאשם הסיע את השניים למקום האירוע שם הם
ירו לעבר נוסעי רכב אופל אסטרה וגרמו לפציעתם של שניים מהנוסעים, דביר כנרתי
ויעקב שטיינמץ.

**היסוד העובדתי**

ע״ת 2 בהודעתו ת/69 עמ׳ 3 משורה 10 – מציין כי כחודשיים אחרי פיגוע האוטובוס יצא
יחד עם יאסר ומוחאייד לבצע פיגוע בכביש העוקף בעורפא. הם נסעו ברכב של מואייד
כשמואייד שימש כמסיע ואילו העד ויאסר חמאד ביצעו את הירי. הוא מציין כי הם עלו
מעל הגשר וירו על רכב בצבע כחול או שחור בעל לוחיות זיהוי ישראליות והרכב המשיך
בנסיעה מבלי לעצור.

ע״ת 3 מוסר בהודעתו ת/72 עמ׳ 6 שורה 6 עד עמ׳ 7 שורה 5 אודות תכנון הפיגוע ע״י חברי
החוליה, התפתהידים השנים שקיבלו חברי החוליה ובינתם תפקידו של הנאשם להסיע את
שני מבצעי הירי. עד זה לא היה נוכח בפיגוע עצמו.

ע״ת 5 שהיה ממבצעי הירי בפיגוע מוסר בהודעתו ת/81 עמ׳ 4 שורה 6 עד עמ׳ 5 שורה 7
מספר כי בסוף חודש פברואר 2003, יחד עם הנאשם ופרח חמאד נסע ברכבו של הנאשם
לגשר דיר דבואן כשהם מצויידים בשני רובי קלאצ׳ניקוב, הלכו לכביש העוקף לכיוון שכם
עמדו מאחורי סלע גדול והמתינו לרכב ואז כשהגיע רכב ירו לעברו. העד מוסר כי הפיגוע
בוצע סמוך לשעה 16:00.

בכך מצאתי כי הוכח היסוד העובדתי המיוחס לנאשם בפרט האישום השישי.

**האם הפיגוע בו השתתף הנאשם הינו הפיגוע בו נפצעו דביר כנרתי ויעקב שטיינמץ ?**

קיים פער של כחודש בין מועד הפיגוע המיוחס לנאשם ובין הפיגוע שניצעו חברי החוליה
עפ״י הודעותיהם, יחד עם זאת נוכח ריבוי הפיגועים שבהם השתתפו העדים אין כדי
להפריך את הקשר בין הודעותיהם לבין בפיגוע המונאר בכתב האישום. שעת הפיגוע
ומיקומו מתאימים לפרטים שמסרו העדים, אך העדים לא ידעו למסור את סוג הרכב
שלעברו ירו.

יחד עם זאת מעיון בחוות הדעת ממוחת מב״ז 53383/03/07 עולה כי בפיגוע נשוא פרט אישום
שישי נורו הקליעים משני רובים מסוג קלצ׳ניקוב וכי נמצאו קשרים חיוביים לנשקים
שבאמצעותם בוצעו הפיגועים נשוא פרטי האישום שלישי, רביעי, חמישי ושביעי, אשר
בוצעו אף הם ע״י חברי אותה חוליה. משכך שוכנעתי מעל לספק סביר כי הפיגוע המיוחס
לנאשם בפרט האישום השישי בוצע ע״י הנאשם וחברי חולייתו.

**האם הנאשם שותף או מסייע ?**

מאחר שהנאשם לא ירה בעצמו, ועל כן אינו המבצע העיקרי במקרה זה יש לתת את הדעת
האם הוא בגדר שותף או בגדר מסייע. נוכח היותו של הנאשם חבר החוליה, אשר היה

רס״ן אלינור ברזני
קצינת העיר נתניה
4584482

שותף לתכנון הפיגוע ולביצועו מצאתי כי הנאשם השתלב למעגל הפנימי של המבצעים
ולפיכך יש לראות בו שותף ולא מסייע.

### היסוד הנפשי

אף במקרה זה נלמד היסוד הנפשי מהתנהגותו של הנאשם ומשכך, לאור השתתפותו של
הנאשם בפיגוע שבו הוחלט לירות מטווח קרוב לעבר נוסעי רכב ישראלי מטווח קצר
מלמדת על כוונתו של הנאשם לגרום למותם של אותם נוסעים.

### התוספת הראייתית

למעלה מהצורך אציין כי הודעותיהם של ע"ת 2, 3 ו-5-1 מהוות חיזוק מוגבר לשניה
כנדרש לגבי הודעת חוץ של שותפים.

### פרטי אישום שביעי ושמיני

בפרטי אישום אלה מיוחסת לנאשם גרימת מותו בכוונה ביום 11/5/03 של דוד ציון ז"ל וכן
נסיון לגרום מות לנהיגת של רכב נוסף שעבר במקום. עפ"י כתב האישום הנאשם, אחמד
מצטפא חאמד ויאסר חאמד קשרו קשר לבצע פיגועי ירי לעבר נוסעי רכב ישראלי, תפקידו
של הנאשם בפיגוע זה עפ"י כתב האישום היה להתפתח מאיזור סלואד ולהתריע על הגעת
כוחות צה"ל. מבצעי הירי עצמו בפיגוע זה היו אחמד מצטפא חאמד ויאסר חאמד, אשר לא ירה
בסופו של דבר בשל מעצור בנשקו.

### היסוד העובדתי

ע"ת 5 מציין בהודעתו ת/81 בעמ׳ 5 החל משורה 11 כדלקמן :
*יב: כן, זה זה בחודש חמישי של שנת 2003 שבוע לפני שעשינו את הפיגוע החלטנו אני*
*ומואייד שוקרי ואחמד מצטפא חאמד לעשות פיגוע ירי על רכב ישראלי .... מואייד נשאר*
*הגענו לגשר יברוד, אני ואחמד מצטפא חאמד חאלד נסע לגיפנא וחיכה לנו שם וגו,*
*וחיכינו לרכב, ובא רכב וירינו עליו אני ואחמד מצטפא חאמד אבל לי היתה בעיה בנשק זה לא*
*ירה לי שום כדור ואחמד מצטפא ירה לכיוון הרכב ופגע ברכב...,"*
העד מוסיף כי הפיגוע בוצע בשעה 07:00 לערך וממרחק של כ- 20- 30 מטר מהרכב וכי
בחדשות נמסר שנהרג מתנחל מהפיגוע.

ע"ת 6 מוסר בזכ"ד ת/84 בסעיף 21 אודות פיגועי ירי שביצע באותו מקום
וכהוצאתו ממנו נהרג ישראלי. אך זה מסבר על כך שביצע את הפיגוע עם חאלד עומר
בלבד ולא עם שאר חברי החוליה. על כן הודעה זו אינה יכולה לבסס את המיוחס בפרטי
האישום שביעי ושמיני ועפ"י הפרטים נמסר מיידע עד מדובר בפיגוע אחר שביצע. בסעיף 23
מסבר על פיגוע נוסף שביצע באותו מקום, וכהוצאתה ממנו נהרג אדם, אך לדבריו שותפי
לפיגוע זה היו פרח חמאד כמבצע ירי וחאלד עומר כנהג מילוט. על כן אף פיגוע זה אינו
הפיגוע המוזכר בפרטי אישום 7 ו- 8.

הודעתו של ע"ת 5 עד מבססת את היסוד העובדתי שבפרט האישום השביעי.

### האם הפיגוע שביצע הנאשם הינו הפיגוע בו נהרג דוד ציון ז"ל?

פרטי הפיגוע שמוסר ע"ת 5 בנוגע למועד הפיגוע ושעתו, מקומו של הפיגוע והתוצאה
הקטלנית שנגרמה מתאימים לעובדות המוסכמות שבפרטי האישום השביעי. ואולם העד
אינו מוסר כל פרט בנוגע לסוג הרכב כיוון שלטענותינו אינו זוכר.

בחנתי בתשומת לב את חוות הדעת מומחה זב 62693/03/07 שהוגשה בהסכמה. עפ"י חוות
דעת זו כי בשטח נמצאו 17 תרמילים ופיסת מעטפת קליע. מבין 17 התרמילים שנמצאו 16

---

רס"ן אלינור ברוני
קצינת העיר נתניה

L_C180914

JA2979

PX3741.pdf

1    נורו ככל הנראה מרובה קלצ׳יקוב אחד ותרמיל אחד מקורו ברובה קלצ׳יניקוב אחר.
2    העובדה כי מאחד מרובי הקלצ׳יניקוב נמצא רק תרמיל אחד וכן העובדה שנמצאה פיסת
3    מעטפת קליע מתרוששת עם דברי ע״ת 5 לפיהם היה לו מעצור בנשק והנשק לא ירה והכדור
4    שפיסת מעטפתו שלו נמצאה בשטח הינו ככל  הנראה הכדור שגרם למעצור בנשקו של ע״ת
5    5.
6
7    כאשר לירי לעבר הרכב הנוסף שחלף במקום ונפגע מכדור אחד במיכל הדלק, כאמור
8    בעדותבו פרט האישום השמיני הרי שמדובר בירי שבוצע תוך כדי הירי לעבר רכבו של דוד
9    ציון ז״ל ומהווה חלק מאותו אירוע.
10
11    חיזוק נוסף לקשר בין פיגוע  הירי שביצעו הנאשם ובין האירוע שבו נהרג  דוד ציון ז״ל
12    מצאתי בעובדה כי לתרמילים שנמצאו בזירה נמצאו קשרים לאירועי ירי אחרים שבוצעו
13    ע״י הנאשם וחברי חולייתו, ובהם הפיגועים האמורים בפרטי אישום שלישי רביעי, חמישי
14    ושישי.
15
16    על כן מצאתי כי קיימת זהות בין פיגוע הירי המתואר ע״י ע״ת 5 כאמור לעיל ובין הפיגוע
17    בו נהרג דוד ציון ז״ל.
18
19    **חלקו של הנאשם בעבירה**
20
21    הנאשם, כך עפ״י הודעת ע״ת 5 היה שותף להחלטה לבצע את הפיגוע וקיבל תפקיד של
22    מתריע מפני כוחות צה״ל. אמנם הנאשם לא היה מבצע עיקרי ואולם נוכח היותו שותף
23    להחלטה ולקשירת הקשר לבצע את הפיגוע, על אף שחלקו קטן מזה של האחרים, עדיין
24    משתייך הנאשם למעגל הפנימי ויש לראותו כשותף לעבירה ולא כמסייע.
25
26
27
28    **היסוד הנפשי**
29
30    היסוד הנפשי במקרה זה נלמד ממעשיו של הנאשם. אנו למדים על כוונתו של הנאשם
31    לגרום מוות מקשירת הקשר לביצוע הפיגוע ומהשתתפותו בפיגוע הירי. הנאשם לא העלה
32    כל טענה העשויה לשלול את הנלמד מהתנהגותו.
33
34    **התוספת הראייתית**
35
36    ע״ת 4 בהודעתו ת/79 מספר על כך שנשלח ע״י אחמד מצטפא חאמד לבדוק האם הדרך
37    נקיה מצבא באיזור עין יברוד ולאחר מכן פגש את אחמד חאמד, יחד עם יאסר חמאד ע״ת
38    5 ודווח להם על ממצאיו. דבריו אלה של עד זה מחזקים את הודעתו של ע״ת 5 בנוגע
39    לפיגוע האמור ומאמתות פרטים שמסר ע״ת 5.
40
41    לפיכך מורשע הנאשם במיוחס לו בפרטי האישום השביעי והשמיני.
42
43    **פרטי אישום תשיעי ועשירי**
44
45    בפרטי אישום תשיעי ועשירי מיוחסת לנאשם גרימת מותו בכוונה של שלום הר מלך ז״ל
46    ופציעתו של לימור הר מלך  ביום 29/8/03. עפ״י כתב האישום הירי לעבר המנוח ואישתו
47    בוצע ע״י אחמד מצטפא חאמד ופרח חאמד והנאשם היה זה שהסיע את מבצעי הפיגוע
48    למקום הפיגוע המתוכנן ולאחר הפיגוע מילט אותם מן המקום.
49
50    **היסוד העובדתי**
51
52    ע״ת 2 בהודעתו ת/ 68 עמ׳ 4 שורות 5 -24 מתאר את הפיגוע שבוצע על ידו יחד עם אחמד
53    מצטפא חאמד בציר אלון כאשר הנאשם שימש כנהג :

נאמן למקור

4584482
רס״ן אלינור ברזני
קצינת העיר נתניה

-13-

נאמן למקור

תיק מס' : 1243x04

"ושלושה חדשים אחרי הפיגוע בגשר יבדוד שבו נפצעו 4 מתנחלים נפגשתי עם אחמד
מצטפא ומואייד שוקרי חמאד במקום ליד ביתי שם התחבאנו את הנשק ותכננו פיגוע לדי
ואחמד מצטפא הציע לבצע את הפיגוע ירי בדרך אלון ליד כביש עפר למעייר והסכמנו
להצעה זו...... ומואייד היה בשובארי נהג ואני ואחמד מצטפא ראינו רכב אדום ישראלי
בא מכיוון ההתנחלות רימונים ואני ואחמד מצטפא יצאנו מהרכב עם הקלאצים וירינו
אוטומטית על הרכב האדום כל אחד כ- 20 כדורים וראינו שהרכב האדום עצר בצד הדרך
כ- 70 מטר מאיתנו וברחנו.."

עפ"ת 6 מוסר בזכ"יד ת/84 סעיף 24 אודות ביצוע הפיגוע עם פרח חמאד והנאשם באיזור ציר
אלון, לעבר רכב פרייבט אדום. הפרטים שמוסר עד זה לגבי הפיגוע תואמים את הפרטים
שמסר עפ"ת 2 ומבססים את העובדות המפורטות בפרטי האישום התשיעי והעשירי.

**האם הפיגוע המוזכר עפ"י עפ"ת 2 ו- 6 הינו הפיגוע בו נרצח שלמה הר מלך ז"ל ונפצעה
ליאור הר מלך?**

הפרטים שמסרו שני העדים עפ"ת 2 ועפ"ת 6 לגבי מיקום הפיגוע, מועדו, צבע הרכב
והתוצאה הקטלנית, מתאימים לעובדות המוסכמות המצוינות בפרטי האישום התשיעי.
כמו כן מספר הכדורים שנורו עפ"י מבצעי הפיגוע וכן העובדה כי עפ"י חוות דעת מומחה זב
73623/03/07 הכדורים נורו משני רובי קלצ'ינקוב שונים מתאימים אף הם להודעות שני
העדים. כמו כן חשוב לציין כי לתמלילים ששימשו בראיות פיגוע זה, נמצאו עפ"י חוות
דעת קשורים לפיגועים אחרים שבוצעו עפ"י החולים. כוון הפיגועים נשוא פרט אישום
שישי, חמישי ושלישי. על כן לא נותר בליבי ספק כי הפיגוע שביצעו הנאשם וחברי חוליתו
הינו אותו פיגוע שבו נרצח שלמה הר- מלך ז"ל ונפצעה אישתו.

**חלקו של הנאשם בעבירה**

היותו של הנאשם ממתכנני הפיגוע כפי שעולה מהודעת עפ"ת 2 ועל אף שלא היה המבצע
העיקרי, לא מותירה ספק בנוגע להיותו חלק מהמעגל הפנימי של המבצעים ועל כן שותף
לביצוע העבירה.

**היסוד הנפשי**

כאמור בנוגע לפרטי אישום אחרים אף במקרה זה כוונתו של הנאשם לגרום מוות נלמדת
מקשירת הקשר לבצע את הפיגוע מטווח קצר לעבר נוסעי רכב ומהתנהגותו והצטרפותו
לביצוע הפיגוע.

**התוספת הראיתית**

כאמור הודעות עפ"ת 2 ו- 6 הוגשו בהסכמה בלתי מסויגת ועל כן עפ"י הלכת **אבו הלאל** לא
נדרשת להן תוספת ראייתית. יחד עם זאת הודעות אלה מהוות חיזוק מוגבר האחת של
השניה כנדרש לגבי אמרות חוץ של שותפים שלא הוגשו בהסכמה.

אשר על כן יש להרשיע את הנאשם בעבירות המיוחסות לו בפרטי האישום תשיעי ועשירי.

**פרט אישום אחד עשר**

בפרט אישום זה מיוחסת לנאשם עבירה שעניינה קשירת קשר לביצוע גרימת מוות בכוונה
באמצעות הנחת מטען חבלה שהנאשם וחבריו הדביקו עליו אומים כדי להגביר עצמתו.

פרט אישום זה מבוסס על הודעת עפ"ת 2 ת/71 בעמ' 2 וכן על הודעת עפ"ת 3 ת/73 בעמ' 6.

4584482
רס"ן אלינור בדינו
קצינת העיר נתניה

-14-

1   ע"ת 3   בהודעתו ת/73 בעמ' 6 שורה 26 מציין העד כי הצעתו של אחמד מצטפא חאמד
2   היתה להניח את מטען חבלה כנגד רכב שבו נוסעים קציני צה"ל ואולם חברי החוליה
3   סרבו לכך משום שחששו.
4
5   ע"ת 2 לעומתו מציין בהודעתו ת/71 : *יואחר כך תכננו לבצע פיגוע של הנחת מטען של*
6   *בלון גובכביש שבין הכביש של עופרה לבין הכביש שמגיע לעצור דרך דיר ג'ריר והתכנית*
7   *היתה להפעיל את המטען דרך חוטי טלפון לעבר רכב צבאי מסוג ניסאן בצבע חום*
8   *שנוסעים בו בכל יום קצינים"*
9
10   מאחר שע"ת 3 מספק הסבר הגיוני לכך שבסופו של דבר הפיגוע לא בוצע ע"י חוליית
11   הנאשם אלא ע"י חוליה אחרת, החלטתי להעדיף במקרה זה את הגרסה המקלה עם
12   הנאשם ומחמת הספק לזכותו מקשירת הקשר לבצע את הפיגוע של הנחת מטען. בנוגע
13   לשיפור המטען שני העדים מוסרים פרטים זהים ועל כן חלק זה מהאמור בכתב האישום
14   הוכח.
15
16   לפיכך יש לזכות את הנאשם מהעבירה המיוחסת לו בכתב האישום, קשירת קשר לגרימת
17   מוות בכוונה ולהרשיעו תחתה בעבירה של סחר באמל"ח לפי סעיף 2 לצו בדבר איסור סחר
18   בציוד מלחמתי.
19
20   **פרטי אישום שנים עשר, שלושה עשר, ארבעה עשר וחמישה עשר**
21
22   בפרטי אישום אלה מיוחסות לנאשם גרימת מוות בכוונה של שלושת חיילי צה"ל **סמ"ר**
23   **ארז עידן ז"ל, סמל אלעד פולק ז"ל, סמל רועי יעקב סולומון ז"ל** ופציעתו של חייל נוסף,
24   חברים לכוח של שלושת החיילים ההרוגים.
25
26   עפ"י כתב האישום חברי החוליה הצבאית השניה שהיתה תחת פיקודו של השאם חיג'אזי
27   הציעו לבצע פיגוע כנגד סיור חיילי צה"ל העובר מידי יום ביברוד. השאם חיג'אזי קיבל
28   את ההצעה הזו, השיג את האישורים הנדרשים ממפקדיו והחליט לצרף לתכנית הפיגוע
29   את כלל חברי החוליות הצבאיות של חממאס הקשורות אליו.
30   משהצטרפה אף חוליתו של הנאשם לתכנית, הסכימו הנאשם וחברי חוליותיו להצטרף
31   לביצוע הפיגוע ועל פי המוסכם בין חברי החוליה לנאשם, לפרח חממאד ולאחמד מצטפא
32   חממאד יועד תפקיד של מבצעי הירי. חברי החיילים ואילו חאלד עומר אמר היה לשמש
33   כנהג וכתפקידו ויאסר חממאד אמר היה להתריע מפני הגעת כוחות צה"ל מהיישוב עופרה.
34   הנאשם וחברי חוליותיו ערכו מעקבים אחר חיילי הסיור על מנת ללמוד את תנועותיהם ואף
35   מצאו נקודת מארב לביצוע הפיגוע.
36   ביום הפיגוע הצטיידו הנאשם וחברי חוליותיו בארבעה רובי קלצ'יניקוב ורובה 16M וחאלד
37   עומר הסיע אותם למקום המארב שנקבע. אחמד מצטפא שנסע ברכב אחר אסף אספ שניים
38   מחברי החוליה השניה והביאם למקום המארב. חאלד עומר שימש כנהג מילוט עפ"י
39   התכנית, המתין לחברי החוליה ליד המסעד בעין יברוד.
40   הנאשם וארבעת חבריו   (משני החוליות השונות) התמתנו בנקודת המארב כשהם מצוידים
41   בכלי הנשק שהביאו הנאשם וחבריו, ארבעה רובי קלצ'יניקוב ורובה 16M לסיוני של חיילי
42   צה"ל.
43   כאשר סיור של ארבעה חיילי חיילי צה"ל התקרב למקום המארב, ירו לעברם הנאשם וחבריו
44   בכוונה לגרום למותם. שלושת חיילי צה"ל **סמ"ר ארז עידן ז"ל, סמל אלעד פולק ז"ל,**
45   **סמל רועי יעקב סולומון ז"ל** נפלו על הכביש   מהירי של הנאשם וחבריו וחייל נוסף נפצע
46   ונעלם מאזור הראיה של היורים. הנאשם וחבריו התקרבו לחיילי צה"ל וירו בהם בעודם
47   המקוצרים מוטלים על הכביש כדי לוודא את הריגתם.   הנאשם וחבריו נטלו את רובי 16M
48   המקוצרים של חיילי צה"ל ונמלטו משם ברכבו של חאלד עומר שאסף את חברי החוליה
49   ברכבו.
50
51   **היסוד העובדתי**
52

נאמן למקור

4589481
רס"ן אלינור ברזני
קצינת העיר נתניה

הצבאי לערעורים
לחיילים

PX3741.pdf

L_C180917

JA2982

הפיגוע נשוא פרטי אישום 12 – 15 הינו פיגוע אשר השתתפו בו חברי שתי החוליות
הצבאיות ועל כן כל אחד מעיד מעייני התביעה ל-2 – 12 מספר אודות פיגוע זה, כל אחד מנקודת
מבטו עפ״י התפקיד שמילא במסגרת הפיגוע. יש לזכור כי חברי חוליתו של הנאשם חיג׳אזי
אשר השתתפו בפיגוע לא הכירו את הנאשם, (שתי החוליות היו ממדרות זו מזו) ועל כן
אינם מזכירים אותו בהודעותיהם, אך הם מציינים כי בפיגוע השתתפו פעילי חוליה נוספת
שהם לא הכירו.

עי״ת 2 פרט בהודעתו ת/68 עמ׳ 4 שורה 25 עד עמ׳ 6 שורה 20 את ביצוע הפיגוע במלואו
ואת חלקם של הנאשם בביצועו.

״הפיגוע הרביעי שעשינו בעין יברוד שלושה שבועות בערך לפני הרמדאן נפגשתי עם
חאלד ועם אחמד מוצטפא ומוחמד ותכננו ביצוע פיגוע ירי על סיור צה״ל שהלך
רגלית בכפר עין יברוד . כולם יודעים שחיילים הולכים רגלית  כל יום באותה שעה בדרך
הראשית בעין יברוד.

סיור שהולך רגלית בין השעות 16:00 ל-20:00 ובודק את התושבים בעין יברוד . ויומיים
לפני הפיגוע הזה אני ואחמד מוצטפא ומוחמד וחאלד יצאנו בערב בעין יברוד לראות היכן
נבצע את הפיגוע על הסיור של החיילים. יצאנו ברכב הסובארו האדום של מוחמד. לא
הרכב שהשתתף במיגונשום אלה רכב פרטי של מוחמד, רכב שני. יצאנו ברכב הזה
מסלולאט לעין יברוד וראינו בדרך הראשית שהלכו 4 חיילים והחיילים עצרו ברכב
לבדיקה שהיה לפנינו ושאלנו את התושבים של אותו היכן יברוד בדיוק הולכים החיילים
ואמרנו לנו ובחרנו מקום בדרך לבצע את הפיגוע. היה חומה של בית ליד הכביד הראשי.
ואחמד מוצטפא קנה רכב מיצובישי לבן לפגיעה ויום לפני הפיגוע אחמד הביא איתו 4
קלצ׳ניקוב ורובה ברטה ונפגשנו אני ומוחמד וחאלד ואחמד מוצטפא ליד ביתו במקום
במוחבא של הנשק שם היה ה16א. והאקדחים וניקינו את הנשק וקבענו לבצע את הפיגוע
למחרת בשעה 16:30. והתאמנו את הנשק מתחיל לעונבים ובאים הפיגוע בשעה 16:00
באתו לאחמד מוצטפא לביתו לקחת  את המיצובישי. ואחר כך באתו למקום שבו היה
מוחבא הנשק במיצובישי ואחר כך בא למקום הזה אחמד מוצטפא ברכב אופל אדום עם
מוחמד וחאלד. חאלד היה הנהג ברכב אופל אדום שייך לאחיו של אחמד מוצטפא, ששמו
אמג׳ד, שנמצא באמריקה. ושמנו את כל הנשק במיצובישי ואחמד מוצטפא נסע
במיצובישי הלבנה עם הנשק ואנחנו, אני ומוחמד וחאלד נסענו באופל לפנינו לפתוח
את הדרך למיצובישי שלא יבוא צבא.

ובשעה 17:30 בערך הגענו לכביש הראשי בעין יברוד כחצי שעה אחרי תפילת הערב
והיינו במיצובישי והאופל ונתנו לנו תיק עם 4 קלצ׳ניקוב ו-16א 1-3 מסכות  לפנים (אקני). אחמד נסע
במיצובישי על הכביש הראשי בעין יברוד ליד עד  החומה ועצר אחרי הבית עם החומה
ואנחנו הלכנו עם הנשק והסתכות לבית עם החומה.

ואחר כך בא אלינו אחמד מוצטפא ושמנו עלינו את המסכות והתחבאנו מאחורי הגדר אבן.
ולכל אחד היה נשק משלו איתו. לי היה ה16א ולמוצטפא היה קלצ׳ן ולאחמד מוצטפא קלצ׳ן
וחאלד היה התצובישי על פלאמזו ראה איפה החיילים הולכים ובאו עוד שנינים רעולי פנים
לא מכיר אותם ולקחת 2 קלצ׳ים וחיכינו לחיילים ואחר כחצי שעה שהכנו אחרי החומה
כ-70 מטר בערך מהצד של הבית וכ-270 ס״מ מהצד של הכביש כי יש עפר מהצד של
הבית. התחבאנו אני ומואייד ואחמד מוצטפא ושמו רעולים וגם אנחנו שמנו רעולים עלינו
אחרי החומה וחאלד התקשר לפלאמזו שלי ואמר לי שהחיילים באים אלינו ואמרתי
לכולם להתכונן לירי וגם ראיתי את החיילים שהלכנו שנינים מקירים שנינים מאחורה
ובכלנו זרינו עליהם אני ומואייד ואחמד מוצטפא ושני רעולי הפנים ולי היתה בעיה בנשק
ב16א וירינו רק 3 כדור על החיילים וראינו החיילים על הרצפה ובאנו אל החיילים
ומואייד ואחמד מוצטפא ושני רעולי הפנים הפנוסירו על החיילים שהיו על הרצפה על הכביש
שוכבים ולקחנו מהחיילים את הנשק שלהם ה16א קצר היה להם והכנסנו את הנשק
למיצובישי וחאלד בא ברכב אופל האדום ואני ומואייד ואחמד מוצטפא נסענו באופל
לסלומאד ושני רעולי הפנים בכסו במיצובישי ונסע לכיוון עופרים עם כל הנשק שהיה.
אני ראיתי רק 3 חיילים מצד של הרצפה בדרך הראשית וארבעי לחייל הרביעי
אולי לא ראיתי אותו.״

נאמן למקור

4584482
רס״ן אלינור ברזני
קצינת העיר נתניה

הודעה זו מבססת את העובדות המפורטות בכתב האישום בכל הנוגע לנאשם כמבצע עיקרי  1
של העבירה. עפ״י עדות זו הנאשם היה שותף מלא לתכנון הפיגוע והשתתף בו בביצוע ירי  2
לעבר החיילים ואח״כ וידאו הריגתם.  3
  4
אף עד״ת 3 בהודעתו ת/72 החל מעמ׳ 9 שורה 9 נותן תיאור מפורט של ביצוע הפיגוע בחודש  5
10/03 לעבר סיור של חיילי צה״ל. העד מציין כי הנאשם היה שותף לתכנון, למעקבים  6
לצורך ביצוע הפיגוע והן השתתף בפיגוע עצמו כשהיה חמוש ברובה קלצ׳ניקוב. אך עד זה לא  7
היה נוכח במקום הפיגוע עצמו, כיוון ששימש כנהג, אך הוא מוסר פרטים מדויקים לגבי  8
ההכנות לפיגוע והיעד, הווה אומר סיור חיילי צה״ל אותם ראה, סוגי הנשקים ומקום  9
הפיגוע.  10
  11
עד״ת 5 בהודעתו ת/81 עמ׳ 8 שורות 9- 26 מוסר אף הוא אודות אותו פיגוע. גם עד זה עפ״י  12
תפקידו לא היה בין היורים אלא מתריע מפני הגעת כוחות צה״ל והודעתו מאמתת פרטים  13
שמסרו העדים האחרים. עפ״י הודעתו עד זה הנאשם התקשר אליו והודיע לו שהם  14
ביצעו את הפיגוע, דבר המהווה הודאת חוץ של הנאשם בפני מי שאינו איש מרות ומחזקת  15
את ההפללה הישירית של העדים האחרים.  16
  17
עד״ת 6 בזכ״ד ת/84 מספר אף הוא בסעיף 25 על ת כנון הפיגוע וביצועו באופן מפורט  18
ומפליל את הנאשם בהשתתפות בפיגוע רצח שלושת חיילי צה״ל.  19
  20
בנוסף העדים שהשתתיכו לחוליה השניה מספרים בהודעותיחם על פיגוע זה מבלי להזכיר  21
את שמו של הנאשם שכן הם לא הכירו אותו.  22
  23
עד״ת 7 השאם חג׳אזי מספר על הפיגוע בזכ״ד ת/24 החל מסעיף 7.76 , גם עד זה לא היה  24
בין היורים עצמם אך הוא היה אחד ממתכנני הפיגוע.  25
  26
עד״ת 8 בת/39 עמ׳ 7 שורות 4 – 23, מספר על הפיגוע מתוך דברים שנמסרו לו ע״י השאם  27
חג׳אזי, ואלוא הוא מספר כי בהיותו אחראי של האישם, הוא נתן לו את האישור לביצוע  28
הפיגוע. כן היה לעד חלק בקבלת כלי הנשק של מבצעי הפיגוע ושל חיילי צה״ל ובצילומם  29
לשם נטילת אחריות. אף שאין מדובר כאן בעדות ישירה, הרי שהיא מחזקת את ההודעות  30
האחרות שבתאור הראיות.  31
  32
עד״ת 9 בהודעתו ת/44 עמ׳ 5 משורה 5 מספר אודות הפיגוע ואודות חלקו בפיגוע זה.  33
  34
עד״ת 10 בהודעתו ת/ 46 עמ׳ 5 שורות 2 ואילך מספר אודות השתתפותו בפיגוע לעבר סיור  35
של ארבעה חיילי צה״ל ועל כך שהוא אסף מידע אודות החיילים ובפיגוע עצמו שימש  36
כתצפיתן.  37
  38
עד״ת 11 שהיה ממבצעי הירי לעבר חיילי צה״ל מוסר אודות הפיגוע בהודעתו ת/57 עמ׳ 5  39
שורה 21 ואילך. עד זה מציין בהודעתו שיחד עמו ועם חברו לחוליה שניים או  40
שלושה רעולי פנים וכן מוסר את סוגי כלי הנשק ששימשו אותם בביצוע הפיגוע. עד זה לא  41
הכיר אמנם את הנאשם ולכן אינו מזכירו בשמו, אך מוסר פרטים זהים לע״ת 2 ו- 6 בנוגע  42
לאופן ביצוע הפיגוע.  43
  44
עד״ת 12 שאף הוא היה היה בין מבצעי הירי בפיגוע מוסר אודותיו בהודעתו ת/60 עמ׳ 11 שורה  45
17 ואילך. עד זה מוסר אף הוא אותם פרטים לגבי ביצוע הפיגוע ואף מוסר כי מחוליית  46
סלואד זיהה את אחמד אותו הכיר מישיבתם המשותפת בכלא.  47
  48
לאור כל האמור מצאתי כי הוכח היסוד העובדתי שבפרטי אישום 12,13, 14 ו- 15 מעבר  49
לספק סביר.  50
  51

נאמן למקור

4584482
רס״ן אלינור ברזני
קצינת העיר נתניה

L_C180919

JA2984

**האם הפיגוע עליו מספרים העדים בהודעותיהם הינו הפיגוע בו נרצחו שלושת חיילי  2**
**צה"ל סמ"ר ארז עידן ז"ל, סמל אלעד פולק ז"ל, סמל רועי יעקב סולומון ז"ל ונפצע חייל  3**
**נוסף?  4**

הפרטים שמסרו העדים בהודעותיהם כאמור לעיל תואמים את מבחינת כל הפרמטרים לפיגוע  5
המוזכר בפרט אישום 12 ואשר עובדותיו מוסכמות. ישנה התאמה הן מבחינת המועד של  6
הפיגוע, מקומו, מספר חיילי הסיור, אופן ביצוע הפיגוע ונטילת הנשקים. כמו כן  7
הודעותיהם של עדי התביעה תואמים את ממצאי חוות דעת המומחה שהוגשה במסגרת  8
העובדות המוסכמות ב 78614/03/07 הן בנוגע לריבוי הכדורים שנורו והן בנוגע לסוגי כלי  9
הנשק (ארבעה רובי קלצ'ניקוב שונים ורובה м16 אחד) והזהות שבין כלי הנשק שהשתתפו  10
בפיגוע זה לכלי נשק שבאמצעותם בוצעו פיגועים אחרים ע"י חברי החוליה כגון הפיגועים  11
נשוא פרטי האישום שישי, חמישי ורביעי.  12

לפיכך שוכנעתי מעבר לספק סביר כי הנאשם וחברי חולייתו הינם אלה שביצעו את הפיגוע  14
בו נהרגו שלושת חיילי צה"ל ונפצע חייל נוסף.  15

**היסוד הנפשי  17**

במקרה זה התנהגותו של הנאשם הווה ירי ישיר מטווח קצר לעבר חיילי צה"ל וכן  19
ירי נוסף לאחר שהחיילים נפלו על הכביש כדי לוודא הריגתם, אינה מותירה ספק באשר  20
לכוונתו של הנאשם לגרום מוות לחיילים.  21

**התוספת הראייתית  23**

שלל ההודעות בנוגע לפיגוע נשוא פרטי אישום 12 , 13, 14 ו- 15 כמפורט לעיל מאמתות  25
ומחזקות זו את זו ומהוות תוספת ראייתית לשניה האחת כנדרש בדין.  26

**פרט אישום שישה עשר  29**

בפרט אישום זה מיוחסת לנאשם עבירה שמהותה נסיון גרימת מוות . עפ"יי התכנית שהגה  31
הנאשם חניגאז חברי החוליות יעשו שימוש במשאית שתתנגש ברכב של חיילי צה"ל ולאחר  32
שחברי החולית ירו לעבר החיילים ויהרגום, הם יחטפו את גופות החיילים ויסתירם לצורך  33
שחרורם של אסירים פלסטינים ובינהם אח של הנאשם.  34

פיגוע זה תוכנן שיתבצע ע"י חברי שתי החוליות והנאשם עם חברי חולייתו הסכימו  36
להצטרף לתכנית. הנאשם וחברי שתי החוליות יצאו לבצע את הפיגוע המתוכנן  37
בשתי הזדמנויות כשהם מצוידים ברובי קלצ'ניקוב לא צלח מאחר שגיף צבאי לא עבר  38
במקום. ניסיון נוסף לצאת לפיגוע המתוכנן לא צלח מאחר שחברי החוליות הבחינו  39
בתנועה ערה של כוחות צה"ל.  40

**היסוד העובדתי  42**

כאמור, מאחר שגם בפיגוע זה אמורים היו להשתתף חברי שתי החוליות, הרי שכל העדים  44
2 – 12 מתייחסים בהודעותיהם לאירוע זה. יחד עם זאת ע"ית 7 – 12 אשר השתייכו  45
לחוליה השנייה ולא לחוליתו של הנאשם וכן הכי את חוליית הנאשם, אינם מזכירים בהודעותיהם  46
את שמו, אם כי הם מתייחסים לכך שבניסיון הפיגוע השתתפו חברי חוליית סלוואד (חוליית  47
הנאשם). להלן חומר הראיות המבסס פרט אישום זה ובו מופלל הנאשם בשמו ע"יי חברי  48
חולייתו :  49

א.  הודעת ע"ית 2 ת/68 עמ' 6 שורה 27 ואילך.  51
ב.  הודעת ע"ית 3 ת/72 עמי 10 שורה 14 ואילך.  52
ג.  הודעת ע"ית 4 ת/77 עמ' 6 שורה 12 ואילך.  53

PX3741.pdf

L_C180920

JA2985

ד. הודעת ע"ת 5 ת/81 עמ׳ 9 החל משורה 1 ואילך.
ה. זכ"ד חקירת ע"ת 6 ת/84 סעיפים 28 — 29

להלן חומר הראיות המבסס את ביצוע הפיגוע מבלי להזכיר את הנאשם בשמו,
הודעותיהם של חברי החוליה השנייה שלא הכירו את הנאשם :

א. זכ"ד ע"ת 7 ת/24 החל מסעיף 7.89 וכן זכ"ד ת/36 החל מסעיף 4.1
ב. הודעת ע"ת 8 ת/39 עמ׳ 7 שורה 27 ואילך.
ג. הודעת ע"ת 9 ת/44 עמ׳ 6 שורה 8 ואילך.
ד. הודעת ע"ת 10 ת/48 עמ׳ 2 שורה 10 ואילך וכן זכ"ד של עד זה ת/55 בסעיף 5.2
ה. הודעת ע"ת 11 ת/57 עמ׳ 7 החל משורה 10 ואילך.

מצאתי כי הוכח היסוד העובדתי שבפרט האישום השישה עשר. כמו כן מעשיהם של
הנאשם וחבריו יצאו מגדרהתכנה והגיעו לכלל נסיון כיוון שהם יצאו כשהם מצוידים בכלי
הנשק המתאימים ובהתאם לתכנית שתכננו כדי לבצע את הפיגוע. אי ביצועו נבע מכך
שלמקום לא הגיע ג'יפ צבאי, אך הנאשם וחבריו עשו מבחינתם את כל שנדרש מהם כדי
לבצע את הפיגוע ועל כן מעשיהם הינם בגדר נסיון כפי שנקבע גם בפסיקה.

**היסוד הנפשי**

אודות היסוד הנפשי אנו למדים מתכניתם של הנאשם וחבריו עצמם. המטרה עליה
הסכימו הנאשם וחבריו היתה גרימת מותם של החיילים וגטילת הגופות לשם משא ומתן
לשחרור אסירים. מכאן נלמדת הכוונה לגרום מוות. כמו כן מיצאתהם של הנאשם וחבריו
בשתי הזדמנויות כדי לממש את התכנית נלמדת כוונתו להשלים את העבירה, כנדרש לגבי
עבירת הנסיון.

**התוספת הראייתית**

כאמור חומר הראיות הוגש בהסכמת ההגנה בצורה בלתי מסויגת (למעט ע"ת 8 ו-9) ועל כן
עפ"י ההלכה הפסוקה לא נדרשת תוספת ראייתית. יחד עם זאת במקרה זה ההודעות
השונות כאמור לעיל מאמתות ומחזקות האחת את השניה ומהוות תוספת ראייתית כנדרש
עפ"י דיני הראיות במקרים שהחומר אינו מוגש בהסכמה.

בנוסף, חיזוק להודעות עדי התביעה 2 -12   בנוגע לפרט אישום זה מצאתי גם בהודעת
הנאשם ת/67 בעמ׳  5 שורות 11 — 17. הנאשם נשאל במקרה זה לתגובתו בנוגע לאמור
בהודעת ע"ת 2 באשר לפיגוע המתוכנן נשוא פרט אישום 16. ותגובת הנאשם *"הפיגוע הזה*
*לא הצליח אבל פיגועים אחרים כן יצליחו בעזרת ה'"* (כך במקור), מהווה מעין ראשית
הודיה המצביעה על כך שהנאשם ידע במה מדובר וקשור לענין.

לפיכך, יש להרשיע את הנאשם בעבירה המיוחסת לו בפרט האישום השישה עשר.

כבוד האב"ד רס"ן יאיר תירוש

אני מסכים.

כבוד השופט רס"ן מייקל בן דוד

אני מסכים.

רס"ן אלינור ברזני
קצינת העיר נתניה

L_C180921

PX3741.pdf

JA2986

<u>סוף דבר</u>

1
2
לסיכום, מצאנו לזכות את הנאשם העבירה המיוחסת לו בפרט האישום האחד עשר
3
ולהרשיעו תחתה בעבירה שעניינה סחר בציוד מלחמתי לפי סעיף 2 לצו בדבר איסור סחר
4
בציוד מלחמתי. כמו כן החלטנו להרשיע את הנאשם בעבירות המיוחסות לו בפרטי
5
האישום 2,1, 3, 4, 5,6, 6, 7, 8, 9, 10, 12, 13, 14, 15 ו- 16 עפ"י האמור בכתב האישום.
6
7
ניתן והודע היום, 11/07/06, בפומבי ובמעמד הצדדים.
8
9
10
שופטת                         אב"ד                      שופט
11
12
13
14
15
16
17

4584482
רס"ן אלונד ברזני
קצינת העיר נתניה

-20-



**143 RODNEY STREET**

**BROOKLYN, N.Y. 11211**

**TEL. (718) 384-8040**

**FAX: (718) 388-3516**

## CERTIFIED TRANSLATION

I, Miriam Braver, Project Manager at Targem Translations, Inc., located at 143 Rodney Street in Brooklyn, New York, a language services firm with a track record of providing expert language services to the legal community of more than 50 years, do hereby certify that our team of translators, editors and proofreaders, are professionally trained and vastly experienced in providing professional legal translations for submission in U.S. courts, from Hebrew into English and vice versa; and they have professionally translated document **"Sentence and Verdict of Mua'yed Shukri Abd al-Hamid Hamad / L_C180899"** from Hebrew into English, faithfully, accurately and completely, to the best of their expertise and experience.

Date: May 6, 2014

Miriam Braver

PROFESSIONAL

TRANSLATIONS

OF FOREIGN

LANGUAGES

ROCHAL WEISS
Notary Public, State of New York
Registration No.: 01WE6293785
Qualified in Kings County
Commission Expires December 16, 2017

JA2988

Date: 27 Kislev, 5766                                    Case Number: 1173/04
December 18, 2006

<div align="center">

**Military Court - Judea**

</div>

**Appearing before the Honorable Presiding Judge: Major Yair Tirosh**
<div align="center">

Judge: Major Dahlia Kaufman
Judge: Major Michael Ben-David

</div>

**The Military Prosecution**
(Represented by Captain Sagiv Lichtman)

<div align="center">

**vs.**

</div>

**Defendant: Mua'yed Shukri Abd al-Hamid Hamad   ID: 901186403/ Prison Service**
(Represented by counsel, Attorney Iliya Theodori)

<div align="center">

**Reasons for Sentencing**

</div>

The Defendant was convicted, as described in the verdict, of a long series of crimes which include membership in a military cell of the Hamas organization and the planning and execution of many shooting attacks. In the framework of this cell, the Defendant and his accomplices carried out a number of shooting attacks in which three IDF soldiers and three Israeli citizens were killed.

As the verdict indicates, the Defendant was a full participant in these attacks; in some of them he was the shooter and in others he played other roles such as the lookout or the driver of the getaway car.

In each of the attacks in which he took part, the Defendant took part in the planning and played a central role in its execution.

The Defendant's actions were carried out intensively and feverishly in order to sow death, without distinguishing between soldiers, citizens, men, women and children.

As described in the indictment, the Defendant took part in the attack carried out against a patrol of IDF soldiers in Ein Yabrud, in which three soldiers - **Sergeant Ro'i Yaakov Solomon of Blessed Memory, Sergeant Elad Pollack of Blessed Memory and First Sergeant Erez Idan** of Blessed Memory were killed.

The Defendant - who was a full partner in the planning and preparations for the execution of the attack - together with other activists, shot at IDF soldiers in order to cause their deaths.

As set out in the verdict, the Defendant and his accomplices were not satisfied with such, and after the IDF soldiers fell on the ground, they approached them and shot them at close range as well, in order to make certain of their deaths.

An additional IDF soldier who was there was shot by the Defendant and his accomplices after he was wounded and collapsed on the side of the road following the shooting.

Additionally, the Defendant and his fellow members of the cell carried out an additional series of fatal shooting attacks in which **David Zion of Blessed Memory**, **Esther Galia of Blessed Memory and Shalom Har-Melech of Blessed Memory** were killed – as described at length in the verdict. Additional citizens were injured in those attacks.

**L_C180899**

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

**JA2989**

PX3741.pdf

# APOSTILLE
## (CONVENTION DE LA HAYE 5 DU OCTOBER 1961)

| | | | |
|---|---|---|---|
| 1. | STATE OF ISRAEL | | מדינת ישראל .1 |
| 2. | THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY MR./MS | ברזני אלינור **BARAZANI ELINOR** | מסמך ציבורי זה נחתם בידי מר/גב׳ .2 |
| 3. | ACTING IN THE CAPACITY OF NATANIA CITY OFFICER FOR MILITARY MATTERS | | המכהן בתור קצינת העיר נתניה .3 |
| 4. | BEARS THE SEAL/STAMP OF THE MINISTRY OF | צבא התגנה לישראל **ISRAELI DEFFENCE** | נושא את החותם/חותמת של משרד .4 |
| 5. | CERTIFIED AT THE MINISTRY OF FOREIGN AFFAIRS | | אושר במשרד החוץ .5 |
| 6. | THE | 5/10/2011 | ביום .6 |
| 7. | BY | לידר רחימה LIDAR RAHIMA CONSULAR BUREAU תחטיבת הקונסולרית | על-ידי .7 |
| 8. | NO 528784. | | מס׳ 528784 .8 |
| 9. | SEAL/STAMP | | חותם/חותמת .9 |
| 10. | SIGNATURE, JERUSALEM | | חתימה, ירושלים .10 |

L_C180900

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

JA2990

Additionally, close to his arrest, the Defendant took part in a plan that was made by the members of the military infrastructure to which he belonged, and which was intended to lead to the murder of IDF soldiers, [and] after the date on which their vehicle was attacked – the capture of the soldiers' bodies in order to negotiate with them about the release of Palestinian prisoners. Although the Defendant and his accomplices tried several times to carry out this plan of theirs, the members of the infrastructure were, in the end, stopped before they were able to carry it out.

The Military Prosecution, in presenting its arguments supporting the sentencing, emphasized the severity of the Defendant's acts, the mourning of the families of those who had been killed and the pain of those who had been injured.

The Defendant's comments while making his last remarks in court, according to which he wanted to see the families of the people who had been killed and that he wished to kiss the gun with which he did the shooting, also prove, as if they were the testimony of a thousand witnesses, that the ways of the Defendant are ways of killing, and that if he is released, he will not hesitate to again attack others.

The Defendant's actions, which caused the deaths of six innocent people, do not leave any doubt that the Defendant's place is not among the society of free men.

The Defendant's remarks to us, as well as his actions, indicate that he should be behind lock and key until he gives up his soul to the Creator. To sum up, after hearing the parties' arguments and in accordance with the principle of the sanctity of life, we have decided to impose on the Defendant a life sentence for each of the souls that he took; as has been established often in the case law.

We have also decided to sentence the Defendant to serve an additional life sentence for the additional crimes of which he was convicted, including the wounding of innocent men, women and children.

The Defendant will therefore serve the following sentences:

1. A life sentence for causing the death of **Esther Galia of Blessed Memory**.
2. A life sentence for causing the death of **David Zion of Blessed Memory**.
3. A life sentence for causing the death of **Shalom Har-Melech of Blessed Memory**.
4. A life sentence for causing the death of **Sergeant Ro'i Yaakov Solomon of Blessed Memory.**
5. A life sentence for causing the death of **Sergeant Elad Pollack of Blessed Memory**.
6. A life sentence for causing the death of **First Sergeant Erez Idan of Blessed Memory**.

An additional life sentence for the other crimes for which the Defendant was convicted.

All sentences will be served consecutively such that in total the Defendant will serve seven consecutive life sentences.

**The Court clerk will transmit a copy of the reasons for the sentencing to the parties.**

**Right to an appeal within 30 days.**

**Handed down and published today, December 18, 2006, in open court and in the presence of the parties.**

[signature]                              [signature]                              [signature]
**Judge**                                **Presiding Judge**                      **Judge**

**L_C180901**

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

JA2991

PX3741.pdf

Date: 17 Tishrei, 5767 October 9, 2006          Case Number: 1173/04

<div align="center">

**Military Court - Judea**

</div>

**Appearing before the Honorable Presiding Judge: Major Yair Tirosh Judge: Major Michael Ben-David Judge: Major Dahlia Kaufman**

**The Military Prosecution**
(Represented by Captain Sagiv Lichtman)

<div align="center">

**vs.**

</div>

**Defendant: Mua'yed Shukri Abd al-Hamid Hamad ID: 901186403/ Prison Service - present**
(Represented by counsel, Attorney Iliya Theodori, not present)

**Court Reporter: Corporal Yafit Kadishman Interpreter: First Sergeant Rami Azi**

**The Presiding Judge opens the session and identifies the Defendant.**

<div align="center">

**Sentence**

</div>

Having considered the severity of the Defendant's actions, heard the parties' arguments and the last words of the Defendant, we have decided on the following sentences for the Defendant:

1. A life sentence for causing the death of **Esther Galia of Blessed Memory**.
2. A life sentence for causing the death of **David Zion of Blessed Memory**.
3. A life sentence for causing the death of **Shalom Harmelech of Blessed Memory**.
4. A life sentence for causing the death of **Sergeant Ro'i Yaakov Solomon of Blessed Memory**.
5. A life sentence for causing the death of **Sergeant Elad Pollack of Blessed Memory**.
6. A life sentence for causing the death of **First Sergeant Erez Idan of Blessed Memory**.

We sentence him to an additional life sentence for the other crimes of which the Defendant has been convicted.

The sentences will all be served consecutively such that in total the Defendant will serve seven consecutive life sentences.

**The full reasons for the sentence will be published later.**

**Right to an appeal within 30 days from the publication of the reasons.**

**Handed down and published today, October 9, 2006, in open court and in the presence of the parties.**

| [signature] | [signature] | [signature] |
|---|---|---|
| **Judge** | **Presiding Judge** | **Judge** |

**L C180902** [stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria [stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

<div align="right">

**JA2992**

</div>

<div align="center">

PX3741.pdf

</div>

3                          **Military Court - Judea**
4  **Appearing before the Honorable Presiding Judge: Major Yair Tirosh**
5  
6  **Judge: Major Michael Ben-David**
7  **Judge: Major Dahlia Kaufman**
8
9  **The Military Prosecution**
10                                        **vs.**
11
12 **Defendant: Mua'yed Shukri Abd al-Hamid Hamad ID: 901186403/ Prison Service**
13 (Represented by counsel, Attorney Iliya Theodori)
14

---

15                              **Verdict**
16
17 **Judge Major Dahlia Kaufman**
18
19     **A.  Introduction**
20 A revised indictment containing sixteen counts has been filed against the Defendant. The crimes of membership in an illegal
21 organization, harming regional security, conspiracy to intentionally cause death, attempt to intentionally cause death and intentional
22 causation of death have been attributed to the Defendant. The Defendant is accused of participating in shooting attacks that caused the
23 deaths of 6 persons and the injury of others. At our session on September 13, 2005, the Defendant pleaded not guilty to everything set
24 out in the indictment.
25
26     **B.  Evidentiary material in the case**
27 On May 16, 2005, the parties submitted a joint statement to the Court regarding the agreed upon facts. In this context, the parties
28 announced that the details relating to the shooting attacks mentioned in the third, fourth, fifth, sixth, seventh, eighth, ninth and tenth
29 counts are admitted, as are the details relating to the shooting attack mentioned in the twelve, thirteenth, fourteenth and fifteenth
30 counts. The Military Prosecution also submitted an expert opinion regarding each of the attacks, with regard to the bullets collected at
31 the sites of the attacks. These opinions, although received in the court file, were not marked and they are therefore marked in this
32 framework as P/86 through P/91, in order.
33
34 Later on, during the sessions relating to the case, the Defendant's counsel agreed to the submission of evidentiary material relating to
35 prosecution witnesses 8 and 9, subject to the need for evidentiary supplementation.
36 At the session on November 24, 2005, the Defendant's counsel agreed to the submission of material from the investigation relating to
37 the other witnesses in the case, and the Defendant waived the right to conduct a defense, subject to such waiver not constituting
38 support for the prosecution's evidence.
39
40     **C.  The parties' arguments**
41 The Military Prosecution, in its summation, asked for the Defendant's conviction of all the crimes attributed to him in the indictment.
42 The Military Prosecution asked that credence be given to the witnesses' statements - the submission of which to the Court had been
43 mutually agreed upon, without the witnesses having undergone a cross-examination.
44
45 The Military Prosecution referred in its summation to the Defendant's incriminating statements regarding each of the details attributed
46 in the indictment and noted that even if evidentiary supplementation was required, the various witnesses' statements reinforced each
47 other.
48
49
50 **L_ C180903**
51
52

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

JA2993

PX3741.pdf

In its summation, the Military Prosecution discusses the incriminating statements in connection with each of the attacks and the conformity between the witnesses' remarks and the details of the attacks, which fall within the definition of facts to which the parties have agreed.

In his summation, the defense attorney raised two key arguments which in his view can lead to the Defendant's acquittal. The defense attorney first argued that the Defendant denied all the crimes attributed to him and that there is no evidentiary support for the witnesses' statements. The defense attorney also argued that there is no conformity between the attacks carried out and in which the deaths of the three IDF soldiers and of the three citizens were caused, and the statements of the witnesses in the case, and that these are therefore not the same events.

### D. Issues of credibility and weight

As stated, all the evidentiary material was submitted with the agreement of the defense and without the prosecution's witnesses having been questioned. The material relating to prosecution witnesses 8 and 9 was submitted with the agreement of the defense and subject to the fact that evidentiary supplementation would be required for their statements.

According to the **Abu Hilal** case, (Military Court Appeal, Judea and Samaria Region 114/01), an agreement to the submission of evidentiary material signifies that the defense does not dispute the content of such material. With respect to evidentiary material regarding which a reservation has been stated concerning the need for evidentiary supplementation, the Defendant may not be convicted on such material unless evidentiary supplementation can be found within the evidentiary material.

I read with care the evidentiary material that has been submitted to the court and for the purpose of determining the reliability of the material, I took note of both the internal and external tests, as set out in our case law:

**Defendant's statement – P/67** - In his statement, the Defendant denied the crimes attributed to him and when the police investigator confronted him with the statements of the other witnesses, the Defendant responded, with respect to all the incidents, that they were lies or that the witness was a liar. The Defendant was asked why all these people would tell such lies about him and he answered that he did not know anything about it. As is known, when a defendant seeks to rely on matters in his statement to the police that are in his favor, he must testify in court, and the Defendant who is before us did not testify. Additionally, since the Defendant's denial was sweeping, and provided no explanations other than a claim that the other witnesses were lying, I do not see a need to give weight to his denial.

On the other hand, at lines 11-17 of page 5 of his statement, the Defendant was asked regarding that which was stated in Farah Hamed's statement, regarding the planning of the attack that is the subject of the sixteenth count in the indictment, and the Defendant responded:
"*Answer: this attack did not succeed but with God's help other attacks will be successful*"

Although this is not an admission, this remark by the Defendant can be seen as the beginning of one. It should be noted that the Defendant's statement was submitted with the agreement of the defense and without any arguments whatsoever being raised regarding the accuracy of the transcript.

**The statements of prosecution witness No. 2 – Farah Hamed – P/68, P/69, P/70 and P/71.** This witness' statements were detailed, orderly and logical. These statements fit in with the statements of the other witnesses. I therefore chose to attribute full weight to these statements.

**The statements of prosecution witness No. 3 – Khaled Omar – P/72, P/73, and P/74.** These statements were also detailed, orderly and logical, and the witness describe the same incidents that were also described by the other witnesses. In addition, the witness wrote his statement in his own handwriting and sketched the locations in which the attacks were carried out. These sketches strengthen the credibility and weight of the statements. Additionally, as indicated in the re-enactment at scene report, P/63 and the activity report, P/64 that were submitted with mutual consent, the witness led the security forces and an Israeli Police investigator, Sergeant Major Avi Akiva, to the weapons hiding place in which were found four Kalashnikov rifles, two short M-16 rifles of the IDF soldiers who were killed and a long M-16 rifle, ammunition and other items. Afterward, the witness brought the security forces to an additional hiding place,

**L_C180904**

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

PX3741.pdf

4   in which the cell's weapons were also found. This [pinpointing] by the witness of the weapons hiding place strengthens the credibility
5   of his statements. I decided to attribute full weight to the statements of Prosecution Witness 3.

7   **The statements of prosecution witness No. 4 – Ahmad Khaled Hamed – P/77, VP/78, VP/79 and P/80 –** this witness' statements
8   are orderly, logical and detailed. They also fit in with the overall layout of the evidentiary material and I therefore decided to attribute
9   full weight to them.

11   **The statements of prosecution witness No. 5 – Yaser Hamad – P/81, P/82, and VP/83 –** this witness gave very detailed, orderly
12   and logical statements, which fit in with the details provided by the other witnesses, and I therefore decided to attribute full weight to
13   his statements.

15   **The statements of prosecution witness No. 6 – Ahmad Mustafa Hamed – P/84 and P/85 –** A memorandum – written by the Israel
16   Security Agency investigator Micha – was submitted regarding this witness, as was a police statement in which the witness denied
17   everything attributed to him, and when he was referred to the statements of other witnesses, he responded that these were incorrect. At
18   the same time, the witness had no explanation regarding the matters with which he had been confronted, and he even rejected the
19   sketches that were presented to him and which bore his name. The memorandum, which documented the witness' questioning on
20   December 21, 2003, noted that the witness first claimed that he did not do anything, but that later he told a story that he had taken part
21   in attacks, together with two others. During the witness' questioning, he was introduced to Khaled (i.e., Khaled Omar) and after the
22   latter told the witness that the weapons were held by the witness, after they spoke briefly regarding the hiding place for the weapons,
23   as indicated in the memorandum, the witness sketched the hiding place for the weapons and made a detailed admission, which was
24   chronologically in order, to the Israel Security Agency investigator. I chose to prefer the memorandum over the witness' sweeping and
25   unreasoned denial given by the witness during his questioning by the police. I believe that what is written in the memorandum was
26   stated by the witness after he met another member of the cell and understood that his acts had been disclosed and that there was no
27   reason to continue to hide them. I find that the sketches made by the witness himself provide support for this admission. These are
28   indeed comments included in a memorandum that did not include a word-for word transcription, and regarding which the witness was
29   not cautioned prior to his making them. At the same time, since consent was given regarding the submission of the material, and
30   because no claims were made that the witness' remarks were misrepresented by the Israel Security Agency investigator and since a
31   reference to the memorandum is [equivalent to a reference] to a witness statement and not to a defendant's admission, the lack of a
32   warning therefore does not have any impact on the weight to be attributed to the statement. I have therefore decided to accord full
33   weight to the memorandum, P/84.

35   **The statements of prosecution witness No. 7 – Hisham Hijaz P/23 through VP/38**. P/23 is the witness' police statement given on
36   February 10, 2004, in which he denied all the suspicions attributed to him and in which, regarding specific details from statements
37   given by others, he responded that these matters were incorrect. In contrast, in the memorandum of his first questioning, P/24, dated
38   December 20, 2003, when he was questioned after his arrest, he at first refused to admit to having done the acts. After proof was
39   presented to him, in which other operatives acknowledged the attributed acts, the witness began to make his admission in a detailed,
40   orderly and clear chronological fashion. In the memorandum, the witness provided full details and gave a full description of the places
41   in which the attacks were carried out, and spoke at length of the preparations made for the attacks. In some of his remarks, the witness
42   indicated that he received reports from others, such as from Khaled Omar. These remarks are of course hearsay evidence and the
43   submission of the memoranda with consent does not change this fact. I was impressed by the credibility of the information provided
44   by the witness that was of his personal knowledge and I decided to prefer the memoranda over his denial made during the police
45   questioning. It is emphasized that the witness indicated, in his police statement – P/23, page 11, lines 25-26: "*I may have admitted it
46   to him* (referring to the Israel Security Agency investigator – D.K.) *but I did not do anything.*" It appears that in light of the
47   considerable detail that the witness provided to the Israel Security Agency investigator, and the full and accurate details, the witness'
48   story, as provided in his police statement is not reliable and I cannot avoid preferring the memorandum of his questioning – VP/24.

50   **The statements of prosecution witness No. 8, Murad Barghouti**, were submitted with the agreement of the defense and subject to a
51   need for evidentiary supplementation. This witness adds details in each of his statements and details the remarks that he made.
52   Moreover, in his statement, P/42, lines 25-27, he explains why he refused to give a statement in the morning, but after he was
53   introduced to Jaser, who told him to provide the details, he agreed to give a statement. This witness does not mention the Defendant in
54   his statements and his statements therefore cannot be used as a basis

56   **L_C180905**

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

**JA2995**

PX3741.pdf

for a conviction but only as evidentiary supplementation. The witness' statements are logical, orderly and detailed, and I decided to give them full weight.

**The statements of prosecution witness No. 9 – – P/44 - P/45**, which were submitted with the agreement of the defense and subject to the need for evidentiary supplementation, do not mention the Defendant's name although the witness refers in the statements to incidents that are attributed to the Defendant in the indictment. Since the witness belonged to a different cell, from whom information regarding the Defendant's cell was excluded, this does not contradict the other evidence in the case. Additionally, this witness' statements are orderly and logical and I therefore decided to give them full weight.

**The statements of prosecution witness No. 10, P/46 - VP/56.** Regarding this witness, both his police questioning and the memorandum of his questioning were submitted with unqualified consent. Both according to the **Abu Hilal** case and after reading the statements and memoranda, I decided that they are very detailed, orderly and logical, and I have decided to give full weight to the statements of prosecution witness 10.

**The statements of prosecution witness No. 11, P/57 - P/59.** These statements were also submitted with the defense's unqualified consent, and there is therefore, according to the **Abu Hilal** case, no disagreement between the parties regarding the content of the statements. Additionally, these statements are also detailed, orderly and logical, and fit in with the overall layout of the other testimony in the case and I have therefore decided to give them full weight.

**The statements of prosecution witness No. 12, VP/60 - P/62** – The statements by these witnesses were submitted with the defense's unqualified consent, and there is therefore no disagreement between the parties regarding the content of the statements. Furthermore, the statements themselves are detailed, logical and orderly and fit in with the general layout of the evidentiary material in the case, and the witness, at the request of the police investigator, even sketched the places at which the various attacks were carried out, and I have therefore decided to give them full weight.

**Count 1**

**The factual basis**

In this count, the Defendant is accused of the crime of membership in a military cell of the Hamas organization, which belongs to the Izz al-Din al-Qassam Brigades, beginning in August 2002, and continuing until the date of his arrest. The details of the crime also indicate that in the framework of this membership, the Defendant trained, together with members of his cell, in shooting a pistol and assault rifles.

Prosecution witness 3, Khaled Omar, states as follows in his statement, P/72 at p. 2, lines 4-10:

*I also asked Yaser Hasan Hamad... and he agreed to [my] recruitment to the military Hamas, I told him that I have weapons and money and that he is to recruit someone else into our cell and I want to add that Yaser recruited Mua'yed Shukri Hamad, aged approximately 28, from Silwad, works in plastering, married – he has a son and daughter, and I arranged a meeting with them in my house and Yaser also said that he was prepared to act militarily. I also told them that when the weapons arrived we would operate within the military [wing of] Hamas."*

Later on in the same statement, at lines 18-27, the witness states as follows:

*When I had set up with Mua'yed and with Yaser that they would come to my house, I sent my wife to her parents' house and taught them, when they came to my house, about the M-16 and Kalashnikov weapons....*

*A week later I told Mua'yed and Yaser that we were going to practice shooting and we set a time, for two days later, and then I went to Farah's house and took an M-16 and a Kalashnikov and I met with Yaser and Mua'yed and we went in my car to the end of Zira'i Street, and there we fired, rapidly, half a magazine from each weapon...*

L_C180906

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

**JA2996**

PX3741.pdf

Date: 15 Tamuz, 5766                                   Case Number: 1173/04
July 11, 2006

Witness 3, Khaled Omar, continues, throughout all his statements, to point to the Defendant as a member of his cell and he also tells of consultations that he held with members of his cell regarding the matter of Ahmad Mustafa Hamed joining the cell – T/73, page 2, lines 5 et seq.:

*"Answer: I said, in my previous testimony, that I recruited four people to military activity, and they were 2 each in a cell. And afterwards, I decided that they would be one cell that would carry out joint actions. Yaser and Mua'yed were in one cell and Farah Ism'ail Natur and Ahmad Khaled Dahud were in the second cell.*

*After Ahmad Mustafa left prison, he told me that he wanted to work with me and with the people in my cell, and I told him that I wanted to talk about this with the members in my cell, and then he got angry and told me that I got into military operations because of him and why is it necessary to ask the members in the cell. But I asked the members in the cell and some of them said that we would be a large cell and that is not good, and only Mua'yed said that it would be good for Ahmad Mustafa to join us and in the end what happened was that Ahmad Mustafa became responsible for all of us."*

Prosecution witness 4, Ahmad Khaled Hamad, also indicated the Defendant as a member of the military cell – P/77, page 4, lines 7-16:
*"Yes, approximately 9 months ago, Ahmad Mustafa Hamed was released from jail, and a few days after this, Khaled asked me to come to his house to meet the second cell. I agreed and came. There were 1...3 in Khaled's house. Mua'yed Shukri Hamad, a resident of Silwad, approximately 28 years old, married, and he has a son and daughter and his wife is pregnant, he works in plastering..."*

The witness also noted, on page 5, lines 24-27:
*"Approximately 3 weeks before I was arrested, we sat at the home of Ahmad Mustafa Hamed, me, Ahmad Mustafa, Khaled Hamed Najar, Farah Natur, Yaser Hamad and Mua'yed Shukri Hamad*
*Answer: I told you about them, we are all a Hamas military cell."*

Prosecution witness 5, Yaser Hamad, also mentioned the Defendant as a member of his cell, in his statement P/81, on page 1, lines 27-28:
*"I meant to say that Khaled Hamed and Mua'yed Shukri Hamad were the shabab* [the gang]*, and together we were a military cell, at the beginning; a week later, Khaled Hamed showed me a Kalashnikov rifle and I and Khaled and Mua'yed practiced shooting. Each of us learned about the weapon and each of us fired a number of bullets from this weapon."*

These comments from the witness conform to the remarks of prosecution witness 3, Khaled, who related that at the beginning he planned to use two cells that would be exclusive of each other.

Prosecution witness 6 Ahmad Mustafa Hamed also mentions the Defendant as a member of the cell – P/84, page 2:
*"The members of the cell that Khaled recruited were the following:*
*Farah Hamed...*
*Mua'yed Shukri Hamad Silwad, approximately 27 years old, known as Abu Hamza, married with children, works as a plasterer."*

Prosecution witness 2 also mentions the Defendant as one who worked together with him, and the two carried out attacks together, and the witness notes that the Defendant was a *"Hamas **military operative.**"* (VP/68, page 2, line 4).

It can thus be seen that the facts described in the first count have been proven.

**The mental element**

The mental element required for the crime attributed to the Defendant in the first count is one of regular criminal intent – meaning awareness of the behavior and of the circumstances. There is an assumption that a person is aware of his behavior and of the circumstances of the crime. The Defendant, who was questioned regarding this crime, claimed that the witness who incriminated him was a liar,

**L_C180907**


[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

JA2997

PX3741.pdf

but made no claim that could refute the presumption of awareness. I am therefore persuaded that the mental element required for a conviction of this crime is also present here.

**Evidentiary supplementation**

The witnesses mentioned above were the Defendant's accomplices in the execution of the crimes and these are external statements of the witnesses. Notwithstanding the statements were submitted with consent, and that according to the rule in **Abu Hilal**, no evidentiary supplementation is required, I have seen fit to note that these statements reinforce each other and even fall within the definition of increased reinforcement, as required for external remarks of accomplices. P/63 and P/64 also serve as reinforcement for these statements, in that the fact that prosecution witness 3 Khaled Omar led his investigators to the hiding place for the cells' weapons serves to corroborate what he said in his remarks.

I have therefore decided that the Defendant should be convicted of the crime attributed to him in the first count.

**Second count**

In this count, the Defendant is accused of the crime of harming regional security in that the Defendant proposed to the person responsible for his cell, Khaled Omar, to carry out a suicide attack, by way of shooting, in order to cause the death of as many Israeli citizens as possible. After Khaled Omar brought the plan to the person above him in the organization, Hisham Hijazi, who approved it, the Defendant offered to carry out an attack at a pool attended by many Israeli settlers and to shoot at them. The Defendant received from Khaled weapons and grenades to carry out the attack, and collected information over the course of two weeks regarding the location, but discovered that Israeli settlers no longer came to the place.

**The factual basis**

Prosecution witness 3, Khaled Omar, in his statement P/73, page 4, line 27 through page 5, line 19, tells of the Defendant's proposal to carry out a suicide attack by way of shooting, of the approval that Khaled obtained from Hisham Hijazi, of the Defendant's proposal to carry out the attack against Jews at the pool, of the delivery of the weapons to the Defendant by the witness in order to carry out the attack, of the scouting out activity the Defendant carried out regarding the location for the attack and of the failure to carry out the attack because the Defendant discovered that Jews no longer came to the pool, and that the Defendant therefore returned the weapons to Khaled.

This statement from witness 3 provides support for the detailed factual basis in the second count. I also found that the Defendant's actions were harming regional security. I note that the Defendant's actions go beyond the definition of a conspiracy, since he began the preparations for the commission of the planned attack, both by receiving weapons for the attack and by scouting out the location. Although the actions do not reach the level of attempt to intentionally cause death, the Defendant can be convicted of the crime of harming regional security.

**The mental element**

As is indicated in the statement of prosecution witness 3, the Defendant was aware of his actions and of the danger to regional security that they involved, since the Defendant's entire objective was to cause the death of Israeli residents by shooting. I therefore find that the mental element required for the crime attributed to the Defendant is present here.

**Evidentiary supplementation**

Even though as stated, prosecution witness 3's statements were submitted with unqualified consent, and even though according to the **Abu Hilal** rule, they do not require evidentiary supplementation, I have decided to discuss this point, in light of the defense argument regarding the lack of evidentiary supplementation – and to note that the statements of prosecution witness 3 are external statements of an accomplice, and they therefore require increased reinforcement, and that reinforcement does not mean supporting evidence but rather verifying evidence. The statements of prosecution witnesses 2, 4, 5, 6 and 7 – which provide details regarding the same actions of the cell

**L_C180908**

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

JA2998

3

4    to which prosecution witness 3 belonged – therefore constitute increased reinforcement of the Defendant's statements. Additionally,
5    P/63 and P/64, which are, as stated, the witness' scene reenactment reports concerning the cell's weapons hideouts, also constitute
6    increased reinforcement.

7

8    I therefore find that the Defendant should be convicted of what is attributed to him in the second count.

9

10    **Third count**

11

12    In this count, the Defendant is accused of a crime consisting of attempt to cause death, in that on [date missing], together with Yaser
13    Hamad and Khaled Omar, he carried out a shooting attack against a Ford Transit vehicle on Route 60. According to the details in the
14    indictment, the Defendant proposed the commission of the attack to Khaled Omar and Khaled appealed to his superior, Hisham Hijazi
15    for approval of the attack, and to obtain weapons. Khaled Omar received two Kalashnikov rifles and eight magazines and gave the
16    rifles to the Defendant and to Yaser. On the date of the attack, Khaled transported the Defendant and Yaser to the site of the attack on
17    Route 60, where the Defendant opened fire from the Kalashnikov rifle that he held, and Yaser did not fire because his weapon
18    jammed.

19

20    **The factual basis**

21

22    Prosecution witness 3, Khaled Omar notes the following in his statement, P/2, page 3, lines 10-23:

23

24    *"And while Hisham had these weapons, Mua'yed and Yaser came and proposed that we carry out a shooting attack at the end of*
25    *Zira'i Road, and that we return by foot to the village, so that we don't disclose the site of the shooting, which is above Route 60, we*
26    *call it Nablus Road because it is the road to Nablus. And this is before a review of the deception, I agreed to the plan because in the*
27    *past I threw Molotov cocktails from that place and I was tried for that, and I therefore went to Hisham and asked for weapons and*
28    *he gave me two Kalashnikovs and eight magazines. One day before the attack I called Hisham and told him that we are going to*
29    *carry out a shooting attack, and this was in the middle of Ramadan 2002 and this was before the evening prayer, I went to*
30    *Mua'yed and Yaser and told them to get to the shooting site and I told them that they should fire ten minutes after the evening*
31    *prayer. I gave the weapons to them and we went to the shooting site, I returned to the village and listened for news ..."*

32

33    Prosecution witness 3, Khaled Omar, supports the first part of the planning of the attack, the preparations for it and the transportation
34    of the Defendant and Yaser to the site of the attack. However, because the witness was not present at the site of the attack, he cannot
35    provide support for the facts surrounding the shooting, and the matter falls within the definition of hearsay evidence . (The witness
36    notes that Yaser reported the details of the attack to him, but this, of course, constitutes hearsay evidence that I have ignored.)

37

38    Prosecution witness 5, Yaser Hamad, who, according to the statement of prosecution witness 3, participated himself in the attack,
39    states the following in his admission, P/81, page 2, lines 6-28:
40    *"Answer: Yes, approximately in November of 2002, I remember it was during Ramadan, I and Mua'yed set out to carry out the*
41    *shooting attack on the bypass road, near the Al Aqaba region in Silwad. Khaled Hamed Najar took me and Mua'yed in his vehicle*
42    *which is a black vehicle, I don't know the make, and let us off in the Al Aqaba region and went home. Mua'yed and I were each*
43    *armed with a Kalashnikov and we stood there, the time was approximately 5:00 p.m., and we saw a vehicle with Israeli [license*
44    *plate] numbers which was coming in our direction, and when it was close, we fired towards it. I had a problem with my weapon*
45    *and it wouldn't fire any bullets, and Mua'yed shot in the air suddenly because he did not have experience with the weapon, and he*
46    *did not hit the car that was going by, [and] afterwards we left the place and returned to the village."*

47

48    The witness added that they were at a distance of approximately 10 meters from the vehicle and that he does not recall the type of
49    vehicle at which they fired.
50    This witness provides support for the factual basis for the crime of attempt to intentionally cause death. Regarding the specific attack,
51    the parties have agreed that there is no disagreement concerning the details of the attack. Although the witness does not recall the type
52    of vehicle at which they shot, I have found that the expert opinion in Police Incident 2863/02 and the details provided by the witness
53    are in conformity with each other. Thus, expert opinion 71083/02-07 indicates that bullets from a Kalashnikov rifle or from a weapon
54    with the same caliber were fired at the vehicle and that all the cartridge casings that were found

55

56    **L_C180909**

57

[stamp:] Correct copy [signature]
[stamp:] Military Appeals Court — Judea and Samaria
[stamp:] District Officer, Netanya. 9338
[signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

JA2999

4   came from a single weapon. This conforms to what was said by the witness – that the Defendant was the only one who fired, as the
5   witness's weapon was jammed.

**The mental element**

9   The Defendant's mental element is indicated by his behavior, which is described by the two witnesses. Of course, with regard to the
10  crime of attempt to intentionally cause death, what is required is an expectation of a fatal result and a desire for such result, and an
11  intention to complete the crime. The Defendant's intention to cause death is indicated by the fact that the Defendant, together with
12  Yaser, were among those who suggested to Khaled the commission of an attack against a vehicle, and that they equipped themselves
13  with lethal weapons and shot at a vehicle from close range. Although prosecution witness 5 indicates that the Defendant suddenly
14  started shooting in the air, but notes that this was because of his lack of experience in using the weapon and this does not negate the
15  Defendant's intention to cause death.

**Evidentiary supplementation**

18  Going beyond what is needed, I note that the statements given by prosecution witness 3 and prosecution witness 5 reinforce each other
19  and satisfy the legal requirements regarding the required evidentiary supplementation for an external statement by an accomplice.
20  Additionally, there is more than enough evidentiary supplementation in the statements of prosecution witnesses 2, 4, 6 and 7, which
21  tell of the cell's activity and in the scene reenactment reports concerning regarding witness 3's weapons, as noted above.

23  I therefore find that the Defendant should be convicted of what is attributed to him in the third count.

**Fourth count**

27  In this count, the Defendant is accused of the intentionally causing the death of Esther Galia of Blessed Memory, on November 18,
28  2002. According to the indictment, Farah Hamad and Khaled Omar planned to carry out a shooting attack on an Israeli vehicle in the
29  part of Route 458 (the Allon Road) in the section between Michmas and the Rimonim settlement, and Farah would be the one
30  shooting at the vehicle and Khaled would serve as a lookout and warn of the arrival of a vehicle. Khaled proposed to the Defendant
31  that he join in carrying out the attack and the Defendant agreed to this. On the date of the attack, the Defendant and Farah travelled to
32  the Rimonim junction where the Defendant served as a lookout in order to announce the approach of an Israeli vehicle, and Farah
33  prepared to carry out the shooting; after Farah saw a Honda Shuttle vehicle with Israeli license plates, driven by a Jewish woman, he
34  fired toward the vehicle and the driver, Esther Galia of Blessed Memory, was killed from hits from the above-mentioned shooting.

**The factual basis**

38  Prosecution witness 2, in his statement P/68, on page 1, line 27, through page 2, line 26, tells of the attack that he planned together
39  with Khaled Omar: *More than a year ago, during the month of Ramadan, I planned a shooting attack on the road between*
40  *Michmas and Rimonim, the Allon Road . ..  and I was armed with a Kalashnikov and Khaled Hamad was the lookout on the road*
41  *and Khaled brought another one with him, Mua'yed Shukri Hamad, approximately 27, married, from Silwad, a plasterer, armed*
42  *with a Kalashnikov, a Hamas military operative...*

44  The witness continues to describe the fact that he waited for a vehicle which arrived, from Michmas, and after a few minutes, a station
45  wagon came, the model of which he does not remember, with yellow [i.e., Israeli] license plates, and a Jewish woman was driving it,
46  and he fired approximately 15 bullets at the vehicle, from a range of approximately 5 meters. The witness also notes that the vehicle
47  was hit and stopped approximately 10 meters from him. The witness states that the Defendant sat in a vehicle and looked out at the
48  road from the other direction, to see if a vehicle was approaching.

50  Prosecution witness 3, in his statement P/72, page 5, lines 12-28, tells of the attack that they planned together with the Defendant and
51  Farah, on the road leading to Kfar Taibeh, in which there is a junction with a turn-off to Kochav HaShachar and Rimonim. The
52  witness did not participate in the attack himself, and he therefore does not tell these things from his personal knowledge, but he
53  verifies details regarding his delivery of the ammunition for the purpose of carrying out the attack and the use of prosecution witness
54  3's vehicle to carry out the attack, as prosecution witness 2 also describes.

**The causal connection between the attack described by prosecution witness 2 and causing the death of Esther Galia of Blessed**
**Memory**
L_C180910

59  [stamp:] Correct copy [signature]
    [stamp:] Military Appeals Court — Judea and Samaria
    [stamp:] District Officer, Netanya. 9338
    [signature] [stamp:] 4584482. Major Elinor Barazani, District Officer, Netanya

**JA3000**